**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.13-cv-03206-WJM-KMT

**CREW TILE DISTRIBUTION, INC.**, a Colorado corporation;

      Plaintiff and Counterclaim Defendant,

v.

**PORCELANOSA LOS ANGELES, INC**., a California corporation;
**PORCELANOSA NEW YORK, INC**., a New Jersey corporation;
**PORCELANOSA TEXAS, CORP**., a Texas corporation; and
**PORVEN, LTD.**, a Delaware corporation,

      Defendants, Counterclaimants and Third-Party Plaintiffs,

v.

**RYAN A. DAVIS**, an individual;
**DARLYNE A. DAVIS**, an individual;
**GLENN L. DAVIS**, an individual;
**SHANA L. BASTEMEYER**, an individual;
**PARADIGM TILE & STONE DISTRIBUTORS, LLC**, a Colorado limited liability company;
and **G&D DAVIS HOLDINGS, LLC**, a Nevada limited liability company.

      Third-Party Defendants.

---

**PLAINTIFF'S FED. R. EVID. 702 MOTION TO EXCLUDE THE EXPERT
TESTIMONY OF WENDY CARLSON**

---

Plaintiff Crew Tile Distribution, Inc., through its counsel, Burg Simpson Eldredge Hersh

& Jardine, P.C., submits the following Motion to Exclude the Expert Testimony of Wendy

Carlson, pursuant to Fed. R. Evid. 702.

## I.     INTRODUCTION

Defendants' intend to offer expert testimony at trial from Wendy Carlson that a signature on the contract at the center of this dispute is a forgery. This Court should not allow Ms. Carlson to testify to her opinions as they do not meet even the loosest interpretation of Fed. R. Evid. 702. Specifically, Ms. Carlson's testimony is based upon flawed methodology and admittedly flawed application of her chosen methodology in violation of Fed. R. Evid. 702 (c) and (d).  First, the process Ms. Carlson followed in analyzing the signature admittedly did not follow the ASTM standard accepted in the industry as the standard for such a review.  Second, as to the alternate process Ms. Carlson did follow, the so-called ACE-V method, where the letter "V" stands for a required independent "verification" of the opinion, she admits under oath that she chose not to verify as required by the method because she was too busy with other work. In short, Ms. Carlson admits that her opinions at best were "subjective" and not performed consistent with any scientifically accepted methodology or practice.  Expert testimony that does not follow peer-reviewed scientific standards, and which are derived from flawed application of the proper methodology required by such standards, are not permissible under Fed. R. Evid. 702. When such deficient opinions are offered, the Court must exercise its gate-keeper function to exclude such opinions from being presented to, and poisoning, the jury.

## II.    BACKGROUND FACTS

Plaintiff's claims arise from Defendants' alleged breach of a written contract (hereinafter "Contract") governing the purported exclusive distributor relationship between the parties. Plaintiff alleges that, under the Contract, it was entitled to exclusive distribution of Defendants'

products in Colorado for a period of five years.  At the end of the Contract term, Plaintiff alleges

that Defendants were required to either renew the exclusive distributorship contract or make a

termination payment to Plaintiff.  The termination payment in the Contract was defined as equal

to the greater of the value of Crew Tile's business or $2,500,000, whichever is greater.

Plaintiff's claims arise from Defendants' refusal to acknowledge the existence and validity of the

Contract, and alleged wrongful distribution of Defendants' products in Colorado through entities

other than Crew Tile.

Defendants have pled and maintain that the alleged exclusive distributorship Contract is a

forgery.  The disputed Contract was signed on December 14, 2009, by Ryan Davis and Darlyne

Davis (on behalf of Plaintiff), and Jack Handley (on behalf of Defendants).  Defendants assert

that Jack Handley's signature was forged.  In support of this argument, Defendants have retained

Wendy Carlson to provide an expert opinion in the field of forensic handwriting analysis.  Ms.

Carlson opines that not only was Jack Handley's signature forged, but it is highly probable that

Ryan Davis was the forger.  Ms. Carlson reaches these opinions despite her failure to follow

established standards for questioned document review, failure to follow even her own typical

procedures, a lack of sufficient facts, and highly questionable qualifications.

III.   **ARGUMENT**

Federal Rule of Evidence 702 governs the admissibility of expert testimony. Rule 702

provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training,
> or education may testify in the form of an opinion or otherwise if:
>     (a)  the expert's scientific, technical, or other specialized knowledge will help
>     the trier of fact to understand the evidence or to determine a fact in issue;
>     (b)  the testimony is based on sufficient facts or data;
>     (c)  the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed R. Evid. 702. In applying Rule 702, the court is required to perform a "gate-keeping" function to determine whether the opinion rendered is "reliable." *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589-90 (1993). Since the court's "gate-keeping" function applies to all expert matters that fall under Rule 702, courts should use a "flexible" approach to assess reliability. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141-42 (1999). The proponent of the expert testimony bears the burden of proving the foundational requirements of Rule 702 by a preponderance of the evidence. *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009).

### A.   Ms. Carlson's training and experience is inadequate, rendering her unqualified

To qualify as an expert, the witness must possess such knowledge, skill, experience, training, or education in the particular field as to make it appear that his or her opinion would rest on a substantial foundation and would tend to aid the trier of fact in its search for the truth. *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 928 (10th Cir. 2004).   Ms. Carlson's credentials are deeply troubling, given her dual role of providing both forensic document analysis and personality analysis from handwriting.  Ms. Carlson's training and experience are woefully inadequate for her to render expert opinions in this case, and she should be disqualified.

Ms. Carlson lacks an educational background in forensics, or any field related to scientific inquiry. *See* Exhibit 1, Carlson Dep., 6:11 − 7:8, 8:15 − 14:23.  Ms. Carlson's only education in the field of handwriting analysis was accomplished through two years of weekly telephone calls to a non-accredited school in California, known as "Handwriting University

International" and "International School of Forensic Document Examination," both operating out of the same office space. *Id*. 25:18 – 26:7; *See* Exhibits 2 and 3.  She did not attend any classes in-person. *See* Exhibit 1, 26:5 – 7, 44:14 – 17.

The schools in question are run by Bart Baggett, who was trained by his father Curtis Leo Baggett, both of whom have questionable credentials, and both of whom trained Ms. Carlson. *See* Exhibit 4, Section 1, pp. 2 - 3.  Bart Baggett is a media-figure, offering self-help books and speeches, as well as running the training programs for handwriting personality analysis and forensic document analysis.   *See* Exhibit 5.   Mr. Baggett purports to train "court qualified forgery experts," in addition to "scientific handwriting analysis" providing the ability to "look at anyone's handwriting and spot their deep dark secrets, fears, esteem, honesty, fetishes, sex drives, and dozens of other hidden personality traits." *See* Exhibits 2 and 3.  In her two years of tele-conference classes with Mr. Baggett, Ms. Carlson learned both disciplines. *See* Exhibit 1, 25:18 – 25, 79:6 – 11.

Curtis Leo Baggett holds himself out as a handwriting expert, despite being disqualified based on his credentials. *See* Exhibit 6; *United States v. Revels*, 2012 U.S. Dist. LEXIS 65069, *22 (E.D. Tenn. May 9, 2012); *Dracz v. Am. Gen. Life Ins. Co.*, 426 F. Supp. 2d 1373, 1379 (M.D. Ga. 2006).  In *Revels*, the court bolstered its decision to disqualify Mr. Baggett based on his credibility, given his numerous criminal convictions, including two felonies and one misdemeanor involving truthfulness, as well as his status as a "charlatan." *See* Exhibit 7, pp. 12 – 15.   Ms. Carlson's CV touts her practical courtroom training with C. L. Baggett. *See* Exhibit 4, Section 1, pp. 2 - 3.

Ms. Carlson's claimed expertise in the area of handwriting personality analysis casts a long shadow over her overall qualifications. Carlson purports to be able to accurately determine an individual's personality through her analysis of their handwriting. *See* Exhibit 1, 35:16 – 21, 39:20 – 40:1. She makes outlandish, unsubstantiated claims about her ability to outperform a psychiatrist, or even that person's own family members, when it comes to personality traits. *Id*. at 80:20 – 81:1. She acknowledges that an individual's signature or handwriting may change over time, and believes that it may be a reflection of how their personality is changing. *Id*. at 81:2 – 12. Ms. Carlson can offer no basis in fact or science to support her claimed expertise in handwriting analysis.

It is this sort of claimed expertise that tarnishes the reputations of other handwriting experts who are properly trained and qualified to testify in court of law. *See United States v. Jolivet*, 224 F.3d 902, 906 (8th Cir. Mo. 2000) (handwriting expert qualified based on having studied and taught internationally, written manuals, and practiced in the field for over two decades); *United States v. Paul*, 175 F.3d 906, 911 (11th Cir. Ga. 1999) (handwriting expert qualified based on 30 years of full-time experience, having established both the Secret Service's and the Naval Investigative Service's "questioned document" laboratories, having lectured and taught extensively in the field of handwriting analysis, and trained new "questioned document" examiners for several law enforcement organizations). Using these experts in comparison, Ms. Carlson's credentials are inadequate, and she is not qualified to testify as a forensic handwriting expert.

B.      **Ms. Carlson did not complete the final step of her ACE-V methodology for handwriting analysis, so her testimony should be excluded.**

An expert witness must reliably apply their chosen methodology in order to render admissible expert opinions. *See Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 595 (U.S. 1993); *see also Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003); *Mitchell v. Gencorp Inc.*, 165 F.3d 778, 781 (10th Cir. 1999); *United States v. Crabbe*, 556 F. Supp. 2d 1217, 1221 (D. Colo. 2008). "Under *Daubert*, any step that renders the analysis unreliable renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology." *Mitchell*, 165 F.3d at 782.

Ms. Carlson's failure to complete all four steps of her methodology makes her opinion unreliable and inadmissible. Ms. Carlson claims to have used an "ACE-V" methodology, an acronym for a four-step procedure: Analyze, Compare, Evaluate, and Verify. *See* Exhibit 4, Section 3, p. 6. However, **Ms. Carlson admits that she did not follow these four steps because she did not "verify**." *See* Exhibit 1, 73:7 – 11. Despite the four-step methodology, Ms. Carlson believes that "V – verification" step is not a requirement. *Id.* at 65:18 – 66:8. This is directly contrary to the core principles of scientific forensic analysis:

> "**Proper Use of ACE-V**… The final step needed to conform to an appropriate scientific method is to leave all information data, processes, and conclusions open for peer review. … Proper peer review has a very important place in science. … In order to examine whether scientific principles were used, the peer review phase requires that the peer reviewer see all the information and documentation that the initial practitioner used to arrive at his or her conclusion, even if the reviewer would not have arrived at the conclusion in this same way."

*See* Exhibit 8, Journal of Forensic Identification, 56 (3) 345, 347-48 (2006). Ms. Carlson readily admits that she does not consistently complete the verification step, does not consider it a matter of importance, and in this case, she "just wanted to do an examination and get it back to Mr.

Thomaidis rather than attempting to pass it on and wait on another examiner's conclusion." *See* Exhibit 1, 66:9 – 17.  It was only because of Ms. Carlson's schedule that she failed to complete the fourth step of the four-step ACE-V methodology. *Id.* 68:18 – 23.

The failure to follow the steps of the ACE-V methodology is fatal to the admissibility of Ms. Carlson's opinions. *See United States v. McDaniels*, 2014 WL 2609693, 13-15 (E.D. Pa. June 11, 2014) (Court excluding the testimony of a handwriting expert, who did not follow all 4 steps in the ACE-V methodology, including verification).   Because Ms. Carlson elected to not complete the fourth step of her chosen four-step ACE-V methodology, she did not reliably apply her methodology, thus rendering her testimony inadmissible.

**C.**      **Carlson also did not sufficiently complete steps two and three of her four-step ACE-V methodology**

In addition to Ms. Carlson's utter failure to complete step four, she also failed to appropriately "compare" (step two) and "evaluate" (step three).  As noted above, in *McDaniels*, the court excluded a handwriting expert that failed to follow the necessary four-step process of ACE-V.  *McDaniels*, 2014 WL 2609693, at 13-15.  The court explained that the expert did not appropriately "compare" by failing to note both similarities and differences, nor did she "evaluate" by balancing the similarities and differences between questioned writing and known writing.  *Id.* at 13-14.  While the court found that the ACE-V methodology may be sound, it requires proper application in order to render admissible opinions.  *Id.* at 14-15.  Ms. Carlson's failure to complete all four steps of her methodology makes her opinion unreliable and inadmissible.

In order to complete step two "compare," Ms. Carlson would have had to compare both similarities and differences in the questioned signatures she examined.  Her report offers only

differences. *See* Exhibit 4, Section 3, pp. 6 – 8. In analyzing the questioned signature of Jack Handley, Ms. Carlson lists fourteen differences, but not a single similarity. *Id*. at 6-7. In analyzing the questioned signature of Josep Domingot, Ms. Carlson again lists fourteen differences, but not a single similarity. *Id*. at 7-8. While an examination that looks only for differences between a questioned signature and known signatures may be convenient for Defendants' allegations of fraud, such an examination is not a reliable application of step two of the ACE-V methodology.

Further, in order to complete step three "evaluation," Ms. Carlson would have needed to demonstrate how she conducted the balancing of identifiable characteristics shared and not shared between the questioned signatures and the known signatures. Ms. Carlson did not do that. Not only is Ms. Carlson's opinion is utterly silent in this regard, given her failure to identify both similarities and differences, she could not have objectively balanced any of the characteristics had she even tried.

Without full adherence to the all of four steps involved in ACE-V, Defendants cannot show how Ms. Carlson's testimony meets the reliability requirements of the Fed. R. Evid. 702.

**D.** **While claiming to follow the ACE-V methodology, Ms. Carlson ignores the embedded ASTM Standards to ensure reliability.**

A proponent of challenged testimony must prove that "the witness has sufficient expertise to choose and apply a methodology, that the methodology applied was reliable, that sufficient facts and data as required by the methodology were used and that the methodology was otherwise reliably applied." *See United States v. Crabbe*, 556 F. Supp. 2d 1217, 1221 (D. Colo. 2008). Ms. Carlson's failure to use the ASTM Standards at all four steps of her ACE-V methodology makes her opinion unreliable and inadmissible.

9

In Ms. Carlson's report, under the heading "METHODOLOGY," she cites *Pettus v. United States* as authority for the general acceptance of her ACE-V methodology. *See* Exhibit 4, Section 3, p. 6; *Pettus v. United States*, 37 A.3d 213 (D.C. 2012). In *Pettus*, the court recognizes that ACE-V is four-step procedure where document examiners "at each step look for multiple handwriting characteristics that conform to standards recognized by ASTM International." *See* Exhibit 9, *Pettus*, 37 A.3d at 224-25. In upholding the ACE-V methodology, the court relied on the fact that "at each of the four ACE-V steps document examiners descend to the specific by using multiple standard (and published) handwriting characteristics to reach conclusions of or against identification." *Id*. at 228. In reaching this conclusion, the court recognized that published standards must be used to avoid a "skeletal ACE-V set of steps." *Id*.

ASTM publishes a comprehensive protocol with "procedures that should be used by forensic document examiners for examinations and comparisons involving handwritten items and related procedures." *See* Exhibit 10. ASTM is widely recognized as the leader in providing standardization of industry procedures, whose standards are rigorously peer-reviewed. *See* Exhibit 11.

Despite this, Ms. Carlson readily admits that she does not follow the ASTM Standards "hard and fast" when conducting a document review, and asserts that the ASTM Standards are "not accurate." *See* Exhibit 1, 38:6 – 10. Inexplicably, she claims to follow the ACE-V method, and not ASTM Standards because of the errors, yet somehow the ACE-V methodology follows the ASTM. *Id*. at 78:13 – 79:5. This circular reasoning makes no sense, and is contrary to rationale of *Pettus*. In order to conduct a scientific analysis within the ACE-V methodology, a document reviewer necessarily should follow the ASTM Standards, and Ms. Carlson did not.

While Ms. Carlson is free to choose her own methodology, the court must still determine that the "methodology applied was reliable." *Crabbe*, 556 F. Supp. 2d at 1221.   Here, Ms. Carlson may claim to have used the ACE-V methodology, but without application of the embedded ASTM standards at each step, her testimony cannot be reliable.

### E.        Carlson's opinion is not based on sufficient facts

In determining whether the proffered testimony is reliable, the Court assesses whether the reasoning or methodology underlying the testimony is valid and whether that reasoning or methodology can be properly applied to the facts in issue. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592-93 (1993).   Defendants must show that Ms. Carlson's opinion is based on facts which satisfy Rule 702's reliability requirements.   *See Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003).   Ms. Carlson's failure to consider adequate facts renders her opinions unreliable and inadmissible.

From the outset, Ms. Carlson did not have sufficient facts to reach a reliable conclusion about the validity of the Contract signatures.   Ms. Carlson did not review Jack Handley's own testimony where he is unsure if he signed the Contract, and testified: "that may be my signature." *See* Exhibit 1, 17:3 – 14; *see* Exhibit 12, Handley Dep. 45:4 – 24, 179:15 – 17.   In fact, Ms. Carlson does not believe that such information has any relevance to her opinion.  *See* Exhibit 1, 18:13 – 19.   Ms. Carlson did not know, or even inquire, if there were eye witnesses to Mr. Handley's signature, and agreed that such information could have been useful in her analysis. *Id*. at 20:1 – 21:14.   Ms. Carlson did not talk to Jack Handley to inquire about the facts and circumstances surrounding the signing of the contract.  *Id*. at 24:4 – 24.   Ms. Carlson did not review the original signed Contract, rather only a photograph taken with a cell phone.  *Id*. at 55:8

– 25. Ms. Carlson agrees that that analysis of the original document "would be preferable," but she did not do so. *Id*. at 56:1 – 9. It is undisputed that an original version of the Contract exists, as it was Defendants' counsel who inspected it, photographed it with his cell phone, and provided the photograph to Ms. Carlson.

Even assuming, *arguendo*, that Ms. Carlson could form a reliable opinion without any context or review of the original document in question, Ms. Carlson does not base her conclusions on objective facts, but rather her subjective opinions. The basis for Ms. Carlson's conclusions are the purported dissimilarities she saw between the questioned signatures and known signatures, however she readily agrees that her opinions about the shape and size of letters are subjective. *See* Exhibit 1, 83:8 – 14.

In her report, Ms. Carlson describes how she looks at various signatures, under magnification, in a side-by-side comparison. *See* Exhibit 4, Section 3, p. 6. She purports to look at "[l]etter height, letter formation, beginning, connecting and ending strokes, angles, slant and line quality." *Id*. Then, without any further explanation of what specific facts she is relying on, she concludes that the questioned signatures are dissimilar from known signatures, "indicating forgery." *Id*. at 6-7. She then proceeds to list out various differences she believes exist. *Id*. at 6-8. Even to the untrained eye, the differences noted by Ms. Carlson are contradictory within the set of **known signatures**.

For example, from her analysis of Jack Handley's signature, Ms. Carlson notes that "the stroke at the right of the 'a' ends in a downward stroke, rather than upward stroke toward the 'k', as seen in the known signatures." *Id*. at 6. This is inconsistent with known signature JHK8, where the stroke at the end of the "a" is flat. *Id.* at Section 2, QDE Ex. JHK8. Ms. Carlson

notes that "the tops of the loops of 'd' and 'l' are too even compared to known signatures." *Id.* at Section 3, p. 7. This is inconsistent with known signatures JHK1 and JHK6, where both have nearly even tops of loops of the "d" and "l." *Id.* at Section 2, QDE Ex. JHK1, JKH6. Ms. Carlson notes a "missing large ink glob on return stroke of loop that is supposed to be the 'y'." *Id.* at Section 3, p. 7. This is inconsistent with known signatures JHK1 and JHK8, where the ink glob is also missing. *Id.* at Section 2, QDE Ex. JHK1, JKH8. These are but three examples of the subjective nature of Ms. Carlson's analysis, where she ignores facts that are contrary to Defendants' forgery allegation.

Based on Ms. Carlson's failure to obtain sufficient contextual facts that surround the signatures, as well as deliberately ignoring contradictory facts within the signatures themselves, her opinions are not based on facts which satisfy Rule 702's reliability requirements.

   **F.      Carlson cannot determine that dates were *in fact* authored by Ryan Davis.**

As the final conclusion in her report, Ms. Carlson writes:  "the dates on the questioned document Q2 were authored by Ryan Davis." *See* Exhibit 4, Section 3, p. 10.  While handwriting experts have been qualified in the Federal Courts to assist the jury in comparing different examples of handwriting, a conclusion about the specific identity of the author simply goes too far.  "The handwriting analysis field does not pass *Daubert/Kumho* muster sufficiently to permit such an authoritative and potentially prejudicial statement." *United States v. Oskowitz*, 294 F. Supp. 2d 379, 384 (E.D.N.Y. 2003).  Ms. Carlson's effort to definitively opine on the identity of an author makes her opinions unreliable and inadmissible.

Ms. Carlson's efforts here are identical to the issue before the court in *Legacy Vision v. Yeamans*, where a handwriting expert attempted to opine on authorship in fact.  *See Legacy*

*Vision, LLC v. Yeamans*, 2005 U.S. Dist. LEXIS 46890, *18-22 (W.D. Okla. June 6, 2005).  In deciding to exclude that opinion, the court reasoned that there is no data to suggest handwriting analysis can say that a person is "the" author of a document, and such a factual decision is the province of the jury.  *Id*.  The *Legacy Vision* court relied heavily on similar decisions around the country. *See Id*.; *United States v. Hines*, 55 F. Supp. 2d 62, 70-71 (D. Mass. 1999); *United States v. Santillan*, 1999 U.S. Dist. LEXIS 21611, *15 (N.D. Cal. Dec. 3, 1999); *United States v. Rutherford*, 104 F. Supp. 2d 1190, 1194 (D. Neb. 2000); *United States v. Oskowitz*, 294 F. Supp. 2d 379, 384 (E.D.N.Y. 2003); *United States v. Hidalgo*, 229 F. Supp. 2d 961, 967 (D. Ariz. 2002).

Accordingly, this court should accept the great weight of authority cited above and exclude any testimony from Ms. Carlson that Ryan Davis *in fact* was the author of the dates on questioned document Q2.

WHEREFORE, Plaintiff respectfully requests that the Court enter an order excluding Ms. Carlson's opinions and testimony in their entirety.  Pursuant to WJM Revised Practice Standard III.F.4, Plaintiff is not requesting an evidentiary hearing.

**DATED** this the 30th day of December, 2015.

/s/ David J. Crough_____
Michael S. Burg
David K. TeSelle
David J. Crough
**BURG SIMPSON ELDREDGE HERSH & JARDINE, P.C.**
40 Inverness Drive East
Englewood, CO 80112
Telephone (303) 792-5595
Facsimile (303) 708-0527

14

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 30th day of December 2015, a true copy of the foregoing **PLAINTIFF'S FED. R. EVID. 702 MOTION TO EXCLUDE THE EXPERT TESTIMONY OF WENDY CARLSON** has been served on the following by electronic mail:

James N. Thomaidis, Esq.
Gersh & Thomaidis, LLC
1860 Blake Street, Suite 400
Denver CO 80202
Email:  jt@gtattorneys.com,

Service made pursuant to D.C.ColoLCiv.R. 6.1(c) upon:

Plaintiff, Crew Tile Distribution, Inc.
Email:  rycrew22@gmail.com, crewtiledistribution@yahoo.com

> */s/  Hannah Austin*
> Hannah Austin, Legal Assistant

15