**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.13-cv-03206-WJM-KMT

CREW TILE DISTRIBUTION, INC.;

      Plaintiff and Counterclaim Defendant;

v.

PORCELANOSA LOS ANGELES, INC., a California corporation;
PORCELANOSA NEW YORK, INC., a New Jersey corporation;
PORCELANOSA TEXAS, CORP., a Texas corporation;
and PORVEN, LTD; a Delaware corporation

      Defendants, Counterclaimants and Third-Party Plaintiffs;

v.

RYAN A. DAVIS, an individual;
DARLYNE A. DAVIS, an individual;
GLENN L. DAVIS, an individual;
SHANA L. BASTEMEYER, an individual;
PARADIGM TILE & STONE DISTRIBUTORS, LLC, a Colorado limited liability company;
and G&D Davis Holdings, LLC, a Nevada limited liability company

      Third-Party Defendants.

---

# DEFENDANTS' COMBINED RESPONSE AND BRIEF IN OPPOSITION TO PLAINTIFF'S MOTIONS TO EXCLUDE EXPERT WITNESS REPORTS AND TO STRIKE REBUTTAL OPINIONS OF DEFENDANTS' EXPERT WITNESSES

---

Defendants, Porcelanosa Los Angeles, Inc., Porcelanosa New York, Inc., Porcelanosa

Texas Corp. and Proven, Ltd., by and through undersigned counsel, hereby submit this Combined

Response and Brief in Opposition to Plaintiff's: (1) Fed. R. Evid. 702 Motion to Exclude the Expert

Testimony of Wendy Carlson; (2) Fed. R. Evid. 702 Motion to Exclude the Expert Testimony of

Kent McSparran; and (3) Motion to Strike the Rebuttal Opinions of Expert Patrick McFarlen.[1]  As grounds for this Combined Response and Brief in Opposition to Plaintiff's (hereinafter "Plaintiff" or "Crew Tile") foregoing motions, Porcelanosa Los Angeles, Inc., Porcelanosa New York, Inc., Porcelanosa Texas Corp. and Proven, Ltd. (hereinafter collectively "Defendants") state as follows:

## I.   NOTE ON CONFERRAL

Each party has a duty to confer prior to filing motions with the Court.  D.C.COLO.LCivR 7.1A states that the "court will not consider any motion…unless counsel for the moving party…before filing the motion, has conferred or made reasonable, good-faith efforts to confer with opposing counsel…to resolve the disputed matter."  Plaintiffs' counsel did not state in any one of Motion 1, Motion 2 or Motion 3 that conferral occurred (*see* Doc. 167, Doc. 168, Doc. 169, respectively), nor did they file a certificate attached to any one of the same, relating to any "specific efforts to comply with this rule."  In fact, Plaintiff made no effort whatsoever to confer with Defendants related to the content of these motions.  As Plaintiffs failed to confer on Motion 1, Motion 2 or Motion 3, prior to filing them with the Court, they are properly stricken.

## II.   INTRODUCTION

Relying on inapplicable cases, conjecture and misapplication of *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) and its progeny, Plaintiff moves to exclude the testimony of Defendants' Expert Witnesses, Wendy Carlson (hereinafter "Carlson") and Kent McSparran (hereinafter "McSparran").  However, the gravamen of Plaintiff's arguments for exclusion of Carlson's testimony in Motion 1 are: (a) the alleged absence of a voluntary independent

---

[1] In citing Plaintiff's three motions, for which Defendants sought and received leave of the Court to file this combined response, Defendants cite to Plaintiff's Fed. R. Evid. 702 Motion to Exclude the Expert Testimony of Wendy Carlson, as "**Motion 1**"; Plaintiff's Fed. R. Evid. 702 Motion to Exclude the Expert Testimony of Kent McSparran, as "**Motion 2**"; and Plaintiff's Motion to Strike the Rebuttal Opinions of Expert Patrick McFarlen, as "**Motion 3**."

verification of Carlson's forensic document analysis report; and (b) Plaintiff's attorneys' disparagement of the proprietor of one institution Carlson attended.  The law is clear that independent verification is not crucial to the admissibility of Carlson's expert opinion, as she applied a well-known methodology in articulating her opinion.  As well, Plaintiff's *ad-hominem* attacks on one of Carlson's former instructors is insufficient to preclude Carlson's testimony, particularly when considered in relation to her *curriculum vitae* and knowledge and training in forensic document examination.  Likewise, Plaintiff's arguments for the exclusion of McSparran's testimony in Motion 2 rest not on McSparran's methodology, but rather on Plaintiff's displeasure with his conclusion.  Courts agree that a litigant's discontentment with an expert opinion is *not* the proper focus of a *Daubert* inquiry.  McSparran properly relied on his knowledge, skill and training in framing his opinion.  Plaintiff's grievances in Motion 2 are applicable to the opinion's weight, not its admissibility.  In fact, after scheduling a deposition of McSparran for December 17, 2015, and causing him to prepare for the same, Plaintiff's counsel inexplicably cancelled the deposition and, in doing so, declined to conduct further inquiry into his knowledge and opinion.  Plaintiff's Motion 1 and Motion 2 constitute an attempt to sidestep the stringent factors a litigant must demonstrate in seeking to exclude reliable expert testimony and the Court should deny both.

Plaintiff's Motion 3, seeking to strike Patrick McFarlen's (hereinafter "McFarlen") October 12, 2015 Rebuttal Report also fails because the purportedly "late disclosure" Plaintiff relies upon is attributable solely to Plaintiff's and Third-Party Defendants' actions.  Notwithstanding that McFarlen's Rebuttal Report is as much supplemental as rebuttal in nature, for at least fourteen months, Plaintiff and Third-Party Defendants stonewalled Defendants' access to information critical for McFarlen's evaluation, including producing a wholly uninformed and unprepared Third Party Defendant as Plaintiff's 30(b)(6) designee in July, necessitating an in-

person discovery conference with the Court, and resulting in Defendants only being able to take the proper 30(b)(6) designee's deposition in mid-October. Nevertheless, McFarlen's evaluation demonstrates that Crew Tile was a worthless entity for the entire period it now claims the exclusive Distributor Agreement was in effect, even when accounting for the third party, Paradigm Tile & Stone Distributors, LLC (hereinafter "Paradigm Tile"), which Third-Party Defendants formed contrary to the very terms of the contract they claim existed and have the audacity to argue accrued damages as a "successor" or "affiliate" of Crew Tile. The timing of Defendants' disclosure of McFarlen's Rebuttal Report was also borne out of Plaintiff's and Third-Party Defendants' refusal to respond to Defendants' document requests, which is the subject of a pending motion to compel by Defendants (Doc No. 161) and Plaintiff's and Third-Party Defendants' bad faith retention of information plainly in their possession and critical to claims, defenses and damages in this case. *Five days before the close of discovery in this case* (on November 25, 2015), Plaintiff's and Third-Party Defendants' orchestrated a 800 page "document dump" of financial and banking records of Crew Tile, Paradigm Tile and a third predecessor entity, Infinite Flooring and Design, Inc. (hereinafter "Infinite Flooring"). While still grossly deficient in relation to what was requested by Defendants, this information is critical to this case and many pages bear reconciliation notes of Third Party Defendant and Crew Tile owner, Darlyne Davis, suggesting that they were in Plaintiff's possession prior to this case. The law is clear that a litigant may not purposely frustrate its opponent's efforts at discovery to gain or retain an unfair advantage related to information relevant to claims and defenses. As such, the Court should deny Plaintiff's Motion 3.

### III.   STATEMENT OF MATERIAL FACTS

Plaintiff commenced this lawsuit on November 22, 2013 alleging, among other things, claims related to the purported breach of an exclusive Distributor Agreement. (*See*, Plaintiff's

Second Amd. Compl., at ¶ 51, and attached Exhibit A- Distributor Agreement, dated Dec. 8. 2009.) Despite the production of over 100,000 documents, the evidentiary record has failed to yield *a single page of documentation* that demonstrates *any* communications, negotiations or discussions of *any kind* between Crew Tile and *anyone* at any of the Defendants, regarding contemplation or execution of the purported agreement.  In fact, the first time a version of the exclusive Distributor Agreement appears in evidence, is after Defendants informed Crew Tile they intended to open a showroom in Denver, when a version was sent in Word format, on Sunday, April 14, 2013, by Third Party Defendant Darlene Davis, to Third Party Defendant Shana Bastemeyer, stating: "Good morning – here is what I found for a distributor agreement – it's exclusives but we can fix that. Love M."  Five days later, on Friday, April 19, 2013, Third Party Defendant, Shana Bastemeyer then e-mailed Third Party Defendants, Ryan Davis, Darlyne Davis and Glenn Davis, another copy of the subject agreement, only now in PDF format and bearing Jack Handley's signature, with the subject "Crew Porcelanosa Distribution Agreement," stating: "attached :)S."  Despite the foregoing, Crew Tile alleges that Mr. Handley, a former Porcelanosa Los Angeles, Inc. outside sales representative, signed the alleged agreement in the presence of Crew Tile's principals and Porcelanosa Los Angeles, Inc.'s former general manager, Francisco Montilla.  Mr. Handley and Mr. Montilla have disavowed ever negotiating, consenting to or signing the purported agreement.

A.    **Facts Relevant to Carlson.**

AS Defendants' expert witness in the field of forensic document examination, Carlson has five years' of experience in forensic document examination and has been qualified as an expert by state and federal courts in thirteen states.  (*See*, Carlson Expert Report and *Curriculum Vitae*, attached hereto as **Exhibit A**; Carlson Supplemental Report, **Exhibit B**; Dec. 14, 2015 Dep. Tr. of W. Carlson, attached hereto as **Exhibit C**, at 89:6-91:22.)  In the past five years, Carlson has

examined over 10,000 documents and has rendered her opinion on, among others, altered documents and handwriting analyses, both domestically and abroad. (**Ex. A,** at p.1.)  In training to be an expert in forensic document examination, Carlson received training in multiple areas of handwriting analysis including, but not limited to, signature comparison, techniques for deciphering forged signatures, altered documents, handwriting characteristics and ethics requirements in engaging in document examination. (*Id.* at p.2.)  Given the sheer number of disputed signatures and conflicting documents in this case, Carlson was retained to provide forensic document examination.

From the outset of this case, Mr. Handley and Mr. Montilla testified they never saw, discussed, negotiated, ratified or consented to the subject agreement. (*See*, Aff. of Jack Handley, **Exhibit D**, at ¶¶ 24-30; *see also* Aff. of Francisco Montilla, **Exhibit E**, at ¶¶ 23-25.)  The alleged signor of yet another purportedly original exclusive agreement produced by Plaintiff in this case, Joseph Domingot, testified in his deposition on March 25, 2015 that he did not and would not have signed that agreement, despite it possessing a forged signature resembling his.  (*See*, Mar. 25, 2015 Dep. Tr. of Joseph Domingot, **Exhibit F**, at 34:4-36:16; and 109:12-112:12.)

Further, over the course of several depositions, Plaintiff and Third Party Defendants gave conflicting reports regarding the existence and number of originals of the agreement they claimed to have in their possession. (*See, e.g.* Nov. 25, 2014 Dep. Tr. of D. Davis, attached hereto as **Exhibit G**, at 98:18-100:3; Nov. 26, 2014 Dep. Tr. of Shana Bastemeyer, attached hereto as **Exhibit H**, at 116:5-119:23; and May 27, 2015 Dep. Tr. of Ryan Davis, attached hereto as **Exhibit I**, at 41:8-44:17.)  However, Plaintiff and Third Party Defendants could not produce an original of the claimed agreement on multiple occasions for inspection.   Ultimately, due to ostensible concerns about the security of the document, Plaintiff's counsel insisted that Defendants' counsel

inspect the relevant documents at Plaintiff's attorneys' offices, necessitating the use of photographs. (*See*, Photographs of Plaintiff's Exclusive Agreements, attached hereto as **Exhibit J.**) Defendants' counsel ultimately took photographs of the purported originals and furnished them to Carlson. Along with the photographs in **Exhibit J**, Defendants' counsel also gave Carlson other originals and copies of documents to assist her in the analysis of the signatures. In examining the signatures on the ostensible agreement, and in her supplemental report opining on the existence of copies in the evidentiary record of two originals of the claimed agreement, as testified by Ryan Davis in the second effort at a 30(b)(6) deposition of a Paradigm Tile designee, among others (*see*, Oct. 21, 2015 Dep. Tr. of Paradigm Tile 30(b)(6) Designee, Ryan Davis, **Exhibit K**, at 388:14-393:10), Carlson relied on her knowledge, skill, experience and training, in using ACE-V method applied by document examiners. (*See*, **Ex. A**, at pp. 49-77; and **Ex. C**, at 92:2-96:8).

## B.    <u>Facts Relevant to McSparran.</u>

As Defendants' expert witness in business practices of manufacturers, distributors and dealers, McSparran has more than 30 years' experience in consulting with and accounting for businesses manufacturing, distributing and selling consumer packaged goods, building materials and other retail products in the United States and abroad. (*See*, K. McSparran Expert Report and *Curriculum Vitae*, attached hereto as **Exhibit L**, at p. 27.) As a former management consultant and now partner in one of the largest accounting and consulting firms in the State of Colorado, McSparran has extensive experience advising companies in sales, supply-chain, manufacturing, and distribution of products and brands. (*Id.* at 27.) McSparran's depth of knowledge on business practices and agreements, and more than 30 years of experience with companies like Plaintiff and Defendants, demonstrates his ability to formulate expert opinions regarding the characteristics of a typical distribution agreement. Using his extensive knowledge, McSparran conducted a detailed

analysis of the purported agreement in the case at bar, in relation to other documentation, external research and typical and accepted practices and relationships.  (*Id.*)

C.    **Facts Relevant to McFarlen.**

As Defendants' business and valuation expert, McFarlen, is a Certified Public Accountant and a member of the American Institute of Certified Public Accountants, American Society of Appraisers, Colorado Society of Certified Public Accountants, and is a CFA Charter holder.  (*See*, McFarlen Expert Report and *Curriculum Vitae*, attached hereto as **Exhibit M**, at p. 38.)  Defendants retained McFarlen for his experience in analyzing and understanding, among other things, Crew Tile's present claims of millions of dollars in damages.  From the outset, Crew Tile's alleged damage calculations are dubious.  Plaintiff's expert, Steve Hazel, admits that Crew Tile was not doing any business in 2013 and 2014, yet during the term of the claimed exclusive Distributor Agreement "for Five (5) years from the date hereof" the "Agreement may be terminated only…(b)y the Company ("Porcelanosa USA") if…Distributor (Crew Tile) files bankruptcy or is no longer promoting products by the company."  (*See*, Exhibit A to Plaintiff's Second Amd. Compl., at Article VI, ¶¶ 1-2.)  Further, according to Mr. Hazel, the damage calculations: (a) rest entirely on the existence of the purported Distributor Agreement; (b) are calculated to assume *all* of Defendants' sales in Colorado from 2009 through 2014; and (c) inexplicably include damages from Paradigm Tile, a company that is *not* Crew Tile but rather a separate legal entity, not party to the claimed agreement and that did not even exist until September 2012. (*See, e.g.* Dec. 8, 2015 Dep. Tr. of Steve Hazel, attached hereto as **Exhibit N**, at 48:5-50:21; 74:1-82:2; and Paradigm Tile Colo. Sec. of State Registration, attached hereto as **Exhibit O.**)

In fact, Crew Tile: (a) operated at a loss of $45,000.00 in 2009 (*see*, Crew Tile 30(b)(6) Dep. Tr., attached hereto as **Exhibit P**, at 147:20-148:1); (b) only had a net profit of $12,000.00

in 2010 (*Id.*; *see also id.*, at 363:13-17); (c) lost $31,000.00 in 2011 (**Ex. N**, at 147:18-148:3); and

(d) operated at a loss of over $71,000.00 in 2012 (*Id.*), despite its assertion that Porcelanosa Los

Angeles, Inc., acting in concert with the other Defendants, breached the exclusive Distributor

Agreement beginning in 2013.  (*See*, Pls. Amd. Compl., at ¶¶ 17, 58, 63, and 69.)   In an effort to

glean additional information on Plaintiff's and Third Party Defendants' finances, on April 22,

2015, Defendants served Plaintiff with a Request for Production (hereinafter "RFP No. 22").   In

their response, however, Plaintiff and Third-Party Defendants asserted groundless objections and

refused to provide Defendants with the requested information.  (*See,* **Exhibit Q**, at pp. 2-3.)

Beginning in May 2015, Defendants sought 30(b)(6) depositions of Crew Tile and

Paradigm Tile designees, complete with enumerated topics.  (*See e.g*, Notice of Crew Tile 30(b)(6)

Depo., attached as **Exhibit R.**)  But rather than provide a competent witness, Crew Tile produced

Ryan Davis's girlfriend, Third Party Defendant, Shana Bastemeyer, as its 30(b)(6) designee.  Ms.

Bastemeyer was an abysmally deficient witness whose testimony was not only non-responsive,

but tailored to obstruct Defendants' discovery efforts.  (*See*, July 29, 2015 S. Bastemeyer Crew

Tile 30(b)(6) Dep. Tr., attached hereto as **Exhibit S**, at 38:2-46:22 and 56:17-62:16.)

Given Plaintiff's and Third Party Defendants' dilatory deposition tactics, Defendants'

counsel informed Plaintiff's counsel that Crew Tile's 30(b)(6) designee was grossly unprepared

and lacked the requisite knowledge for a 30(b)(6) designee.  (*See*, July 31, 2015 correspondence,

attached hereto as **Exhibit T.**)  Notwithstanding, Plaintiff and Third Party Defendants refused to

produce competent 30(b)(6) designees until Magistrate Judge Tafoya intervened on the issue.  As

part of the Court's intervention, the Magistrate Judge reviewed the transcript of the botched

30(b)(6) deposition and concluded that the testimony given by Ms. Bastemeyer was "ludicrous"

and "the worst example" she had ever seen of a 30(b)(6) witness.  (*See*, Aug. 13, 2015 Ct. Tr.

attached hereto as **Exhibit U**, at 3:22-6:7.)  In the same proceeding, Plaintiff's counsel argued, and Defendants agreed with the Court's consent, on a "blanket extension" of the parties' disclosure deadlines to accommodate: (a) Plaintiff's counsels' litigation schedule in an unrelated case in Connecticut, creating a six week conflict; (b) Plaintiff's obligation to produce competent Crew Tile and Paradigm Tile 30(b)(6) deponents; and (c) for the Court to allow the parties "all of October and all of November to get it all done." (*Id.*, at 25:11-26:17; 44:10-45:7; and 39:14-19.)

Defendants eventually were able to depose Ryan Davis, as the Crew Tile's and Paradigm Tile's 30(b)(6) designee, but not before October 19, 2015 and October 21, 2015 respectively. These depositions revealed previously undisclosed information critical to Defendants' experts' analyses, including related to the allegations by Plaintiff and Third-Party Defendants that Paradigm Tile is Crew Tile's successor and regarding the alleged existence of three signed originals of the claimed exclusive Distributor Agreement.  Before those depositions, however, Defendants demanded that Plaintiff and Third-Party Defendants comply with their discovery obligations and provide the proper response to Defendants' RFP No. 22.  (*See*, **Ex. P**; and August 12, 2015 correspondence, attached hereto as **Exhibit V.**)  Even so, Plaintiff and Third-Party Defendants refused to produce the requested and directly relevant information.  Despite Defendants' continued insistence that Plaintiff comply with its discovery obligations with regard to the April 22, 2015, RFP No. 22, in part to provide materials for Defendants' experts' analysis (*see e.g.*, Nov. 18, 2015 letter from counsel, attached hereto as **Exhibit W**), Plaintiff and Third-Party Defendants waited until five days before the discovery cut-off date before disclosing 794 pages of still deficient financial information.  (*See*, *Plaintiff's Tenth Supp. Discl.* and Excerpts from the same, attached hereto as **Exhibit X.**)  Still, the information Plaintiff and Third-Party Defendants produced, consisting of some bank records for Crew Tile, Paradigm Tile and Infinite Flooring, but omitting

twenty months' worth of directly relevant financial information for those entities, is only partially responsive to RFP No. 22. Even more, the so-called Tenth Supplemental Disclosure did not include any information evincing Plaintiff's and Third-Party Defendants' claimed damages relating to their "showroom," necessary for Defendants' experts' analysis.

Because of Plaintiff's and Third-Party Defendants' evasive tactics of: (1) deliberately withholding competent 30(b)(6) designees, absent judicial intervention; (2) necessitating a two and a half month delay in conformity with their previous deposition abuses and subsequent trial schedule (which Defendants acquiesced to without protest); and (3) ongoing refusal to comply with Defendants' RFP No. 22 (even as of the date of this filing), Defendants had insufficient information to request Carlson offer a supplemental opinion on purported different originals of the claimed the exclusive Distributor Agreement or for McFarlen to submit a meaningful rebuttal related to Plaintiff's experts' claimed damages. (*See*, **Ex. B**; *see also* P. McFarlen Expert Rebuttal Report, attached hereto as **Exhibit Y.**) Nevertheless, and notwithstanding the limited information available to Defendants, both Carlson's supplemental opinion and McFarlen's rebuttal opinion were disclosed to Plaintiff and Third Party Defendants on November 30, 2015, two full weeks before Carlson's deposition, on December 14, 2015, and three full weeks before McFarlen's deposition, on December 21, 2015. Consequently, Plaintiff and Third Party Defendants can demonstrate no prejudice stemming from the timing of Defendants' experts' reporting.

## IV.   ARGUMENT

### A.   Carlson's Expert Report and Testimony.

When reviewing a challenge to the admissibility of expert testimony under Federal Rule of Evidence 702, the Courts must confirm "that the testimony of an expert be both reliable, in that the witness is qualified to testify regarding the subject, and relevant, in that it will assist the trier

of fact in determining a fact in issue." *Vaughn v. Safeway*, No. 14-cv-01066-REB-NYW, 2015 U.S. Dist. LEXIS 157175, at *1, 2 (D. Colo. Nov. 20, 2015) (citations omitted).  Plaintiff's summary of the requirements of *Daubert* in Motion 1 is only correct insofar as the verbatim recitals of Fed. R. Evid. 702. (*See*, Motion 1, at p.4.)  Indeed, "in *Daubert* parlance, the trial court must act as a 'gatekeeper' by reviewing a proffered expert opinion for relevance (Rule 401) and reliability as determined by compliance with the elements of Rule 702." *James River Ins. Co. v. Rapid Funding, LLC*, No. 07-cv-01146-CMA-BNB, 2009 U.S. Dist. LEXIS 14199, at *1, 11 (D. Colo. Feb. 24, 1999).  But *Daubert* "makes clear that the factors it mentions do not constitute a definitive checklist or test." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999).  Rather, the *Daubert* factors are "meant to be helpful, not definitive." *Id.* at 151.

The Supreme Court has specified several factors relevant to a Court's analysis of expert testimony.  However, in using the *Daubert/Kumho* analysis, judges must be mindful that "the inquiry should not be aimed at the exhaustive search for cosmic understanding, but for the particularized resolution of legal disputes." *Bitler v. A.O. Smith Corp.*, 391 F.3d 1114, 1121 (10th Cir. 2004). Meaning, "it is the specific relation between an expert's method, the proffered conclusions, and the particular factual circumstances of the dispute, and not asymptotic perfection that renders testimony both reliable and relevant." *Id.*  Therefore, the court should "admit testimony that is "[so] sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Netwig v. Georgia-Pacific Corp.*, No. 02-2143-CM, 2005 U.S. Dist. LEXIS 18968, at *1, 4 (D. Kan. July 26, 2005).  What is more, the "rejection of expert testimony is the *exception* rather than the rule." *Id.*  (citation omitted) (emphasis added).

By the same token, Federal Courts have long considered and regarded expert forensic document examination and analysis as sufficiently technical in nature to constitute a proper subject

of expert testimony under Rule 702.  *See, e.g. Wood v. United States*, 357 F.2d 425, 428 (10th Cir. 1966); *United States v. Hernandez*, 42 Fed. Appx. 173, 176 (10th Cir. 2002); *United States v. Crisp*, 324 F.3d 261, 271 (4th Cir. 2002) (handwriting analysis "has a long history of admissibility in the courts of this country"); *United States v. Yass*, No. 08-40008-JAR, 2008 U.S. Dist. LEXIS 102963, at *1, 6 (D. Kan. Dec. 19, 2008) (handwriting analysis is certainly not "junk science").

**1.     *Plaintiff Improperly Invokes the Court's "Gatekeeping Role."***

Plaintiff's Motion makes several inferential leaps and attempts to mislead by making unsubstantiated factual assertions.[2]  Further, Plaintiff urges a judicial analysis that *Daubert* specifically forbids.  (*See*, Motion 1, at p. 11-12.)  One of Plaintiff's objections to Carlson's expert report is that the opinion lacks sufficient facts and data, ostensibly because Carlson: (a) did not review Mr. Handley's testimony regarding the signatures on the contract; (b) did not inquire whether there were any eye witnesses to the alleged signing of the contract; (c) did not engage in discussions with Mr. Handley; and (d) did not review the original signed contract. (*Id.*)

Notwithstanding that: (a) Mr. Handley has denied ever seeing, much less signing, the alleged contract (*see*, **Ex. D**, at ¶¶ 24-30); (b) no third parties witnessed the ostensible signing except, as individual Third Party Defendants claim, Mr. Montilla, who has also denied such a meeting occurred and ever seeing the alleged contract (*see* **Ex. E**, at ¶¶ 23-25); and (c) the individual Third Party Defendants are lying about the contract signing in mid-December 2009 (*see e.g.*, Dec. 4, 2009 e-mail from Mr. Montilla, attached hereto as **Exhibit Z**, in which Mr. Montilla directs that, since Infinite Flooring's prior invoices are unpaid, Porcelanosa Los Angeles, Inc. will

---

[2] For example, Plaintiff disingenuously and without presenting *any* evidence, baldly proclaims in Motion 1 that "it is undisputed that an original version of the Contract exists." (Motion 1, p.12).  Not only has Plaintiff never produced an ostensibly "original" of the contract for first hand expert evaluation, the entire thrust of Defendants' expert witness' reports are that the purported Distributor Agreement: (1) never was a contract; and (2) is a hopeless forgery.

not move ahead with even the first Crew Tile order, and *ergo* certainly no exclusive Distributor Agreement with a $2,500,000.00 penalty provision), Plaintiff's objections are based on the *factual foundations* of Carlson's opinion and thus are inaccurately offered for preclusion of her testimony under the applicable rules.  Nothing in *Daubert* or *Kumho* change the fundamental rule that "the factual basis of an expert's opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Wilson v. City of Lafayette*, No. 07-cv-01844-PAB-KLM, 2010 U.S. Dist. LEXIS 24539, at *1, 19 (D. Colo. Feb. 25, 2010) (citation omitted); *see also Duke Energy Field Servs., L.P. v. Gandy Corp.*, CV 05-1342 WPL/RP, 2006 U.S. Dist. LEXIS 97308, at *1, 9 (D. N.M. Dec. 27, 2006) (denying *Daubert* motion because defendant is free to inquire into expert's factual basis at trial).

Moreover, *Daubert* is clear that, contrary to lay witnesses, "an expert is permitted *wide latitude* to offer opinions, including those that are not based on firsthand knowledge." *Daubert*, 509 U.S. at 592 (emphasis added).  The rule "is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline." *Id.* So, "the requirement in Rule 702(1) that expert testimony be based on "sufficient facts or data" calls for a quantitative rather than a qualitative analysis." *Duke Energy,* 2006 U.S. Dist. LEXIS 97308, at * 9.  When factual disputes are involved, Rule 702 "is not intended to…exclude an expert's testimony on the ground that the court believes one version of the facts and not the other." *Id.*

Carlson's opinion of the forged signature on the exclusive Distributor Agreement is based on satisfactory factual foundation.  In her report, she describes the factual bases for her opinions, including the array of documents she reviewed in examining the signatures before formulating her opinion.  (*See*, **Ex. A**, at pp. 8-48.)  Even more, Plaintiff's argument for exclusion on the basis of the information Ms. Carlson *could have* reviewed, rest primarily on allegations Plaintiff considers

central to its claims.  Those very facts are contradicted by the evidentiary record, which supports Defendants assertion that the alleged Distributor Agreement is a fraud.  Regardless of whether analysis of a forged signature should occur with precision or upon broad evidentiary review, these are the precise factual disputes that are inappropriate for a *Daubert* motion because an ostensible "failure to review additional relevant facts goes to the weight to be accorded her opinions and not their admissibility."  *Vaughn*, 2015 U.S. Dist. LEXIS 157175, at * 8-9.  In light of the precedent concerning *Daubert* and Carlson's testimony, Plaintiff's argument for exclusion based on "insufficient data" is fatally flawed.  Any problem with the information Carlson reviewed or applied in conducting her analysis is a proper subject for cross-examination, not a *Daubert* motion.

**2.      Carlson is Competent to Provide Expert Testimony on Handwriting.**

Plaintiff argues that the Court must exclude Carlson's testimony on the basis that her experience is "inadequate" and thus that she is not qualified to render an expert opinion.  (Motion 1, at p.4.)  In an attempt to buttress this claim, Plaintiff spends a significant amount of time levering *ad hominem* attacks on Curt Baggett, the proprietor of one of the institutions where Carlson received training on handwriting analysis.  (*Id.* at 4-6.)  This argument is flawed for three reasons.  *First*, Plaintiff's assertion that Carlson is inexperienced rests on a self-serving disregard for the extensive and indisputable knowledge she acquired subsequent to finishing her training.  *Second*, Plaintiff attempts to mischaracterize Carlson's report by attacking one of her instructors, even though Carlson: (a) is *not* Mr. Baggett; (b) did not formulate her opinion after any consultation with Mr. Baggett; (c) has been qualified as an expert in a variety of venues, upon her own merits; and (d) applied an accepted methodology, along with her experience, skill, and knowledge, that render her opinion reliable.  *Third*, under Rule 702, it is clear that an expert can qualify through either knowledge, skill, experience, training, or education.  *See, United States v. Garza*, 566 F.3d

1194, 1199 (10th Cir. 2009).  If a forensic document examiner can demonstrate proper training and experience, courts regularly admit such experts' testimony.

In *Pavatt v. Trammell*, No. CIV-08-470-R, 2014 U.S. Dist. LEXIS 60527, at *1, 88 (W.D. Okla. May 1, 2014), the court upheld the admission of a handwriting expert's opinion where the expert demonstrated training and experience on the principles of handwriting identification.  So too in *United States v. Yass*, No. 08-40008-JAR, 2008 U.S. Dist. LEXIS 102963, at *1, 4-7 (D. Kan. Dec. 19, 2008), the court there allowed an expert's handwriting analysis because of the expert's apparent basis of his knowledge and experience.  And in *United States v. Zajac*, 748 F. Supp. 2d 1340, 1348 (D. Utah. 2010), the court permitted a handwriting expert's testimony primarily because "in certain fields, experience is the predominant, *if not sole*, basis for a great deal of reliable expert testimony." (emphasis added).  Finally, in *E3 Biofuels-Mead, LLC v. Zurich Am. Ins. Co.*, No. 08-CV-2674-CM, 2013 U.S. Dist. LEXIS 45272, at *1, 8 (D. Kan. Mar. 29, 2013), the court denied the plaintiff's *Daubert* motion based on the plaintiff's threadbare argument that the expert was unqualified because he "lacks a college degree."

The entire premise of *Daubert* and Rule 702 is that the proffered expert testimony "assist the trier of fact to understand the evidence or determine a fact in issue."  *Cook v. Rockwell Int'l Corp.*, 580 F. Supp. 2d 1071, (D. Colo. 2006).  Accordingly, "the Tenth Circuit takes a liberal approach to the question of whether proffered testimony will assist the jury." *Id.*  Therefore, any "doubts about whether an expert's testimony will be useful should generally be resolved in favor of admissibility." *Id.*  This is all the more because "*the jury is intelligent enough to ignore what is unhelpful in deliberations*." *Id.*  (citation omitted) (emphasis added).

Much like the aforementioned authorities, Carlson's credentials demonstrate that she has examined more than 10,000 documents and rendered opinions in approximately 850 cases

involving signatures and altered documents. (*See*, **Ex. A.**) Further, Carlson long ago completed her course and apprenticeship in forensic document examination and handwriting identification. *Id.* Yet, Plaintiff argues that Carlson's *mere attendance* at the International School of Forensic Document Examination ("ISFDE") makes her qualifications questionable. (Motion 1, at 5.) As Plaintiff itself must admit, this is akin to the "lacks a college degree" argument in *E3 Biofuels* and it is inappropriate on that basis to mandate who can and cannot be an expert in federal court. Rather, the admissibility of an expert's testimony must rest on either of the expert's "knowledge, skill, experience, training, or education." *Vaughn*, 2015 U.S. Dist. LEXIS 157175, at *4.

Even assuming, for the sake of argument, that Carlson's certification from the ISFDE is insufficient, she is still qualified to testify as an expert based on the breadth of her knowledge and experience. *Id.* What is more, Carlson's *curriculum vitae* reflects a myriad cases where she has qualified as an expert, along with lectures she's given on document examination and other qualifications. Also apparent is the amount of work she has performed for the State of Colorado in handwriting analysis. (**Ex. A**, at pp. 1-5.) Carlson's opinion here is clearly competent. *Id.*

### 3.     *Carlson's Expert Opinion Testimony is Reliable.*

As the Tenth Circuit has cautioned, "the reliability criteria enunciated in *Daubert* are not to be applied woodenly in all circumstances." *United States v. Garza*, 566 F.3d 1194, (10th Cir. 2009). To that end, the Court may evaluate reliability based on Carlson's knowledge and experience in her discipline. *See*, *Netwig v. Georgia-Pacific Corp.*, No. 02-2143-CM, 2005 U.S. Dist. LEXIS 18968, at *1, 4 (D. Kan. July 26, 2005). Nevertheless, Plaintiff argues that Carlson's testimony is unreliable because Carlson: (a) did not perform the "V" portion of the ACE-V method; (b) did not reach the conclusion Plaintiff desired in finding authenticity in the subject signatures; and (c) did not follow the ASTM methodology. (Motion 1, at 4-10.) Defendants will address

Plaintiff's spurious and groundless allegations *seriatim*.

Regarding the "V" portion of the ACE-V method, Plaintiff cannot deny that "handwriting analysis is performed by comparing a known sample of handwriting to the document in question to determine if they were written by the same person." *United States v. Prime*, 431 F.3d 1147, 1153 (9th Cir. 2005). And although ACE-V methodology is widely known and accepted, the V merely constitutes a component of independent verification. But it is not necessary in conforming to reliability under *Daubert*. *See, United States v. Crisp*, 324 F.3d 261, 276 (4th Cir. 2002) (admitting testimony despite absence of independent verification); *United States v. Baines,* 573 F.3d 979, 987 (10th Cir. 2009) (allowing expert testimony because independent verification under ACE-V is not truly independent); *United States v. Allen*, 208 F. Supp. 2d 984, (N.D. Ind. 2002) (expert's experience was sufficient for reliability even in absence of independent verification under ACE-V); *Lucas v. Shively*, 31 F. Supp. 3d 800, 818 (W.D. Va. 2014) (unverified analysis meets basic threshold for reliability under *Daubert*). As enunciated by these authorities, and as explained by Carlson, independent verification review is not required under ACE-V, only suggested. (*See*, **Ex. C**, at 75:8-16; and 78:7-12.)

Further, Plaintiff pontificates on the differences between the ACE-V and ASTM methods and attempts, though unpersuasively, to cloak the dissimilarities between them as somehow an error attributable to Carlson. However, Carlson clearly explained the differences between the two methods, the basis for her preferred reliance on the ACE method, and the capability of either method to withstand reliability tests. (*Id*. at 65:11-65:23; 77:12-79:5.) In its attempts to sully the method used by Carlson, Plaintiff fails to cite to a *single* case in support of its inferential leap that one method is superior to the other. Moreover, Plaintiff's insistence on the peer review component of the ACE-V method falls squarely in line with similar arguments that courts have regularly

rejected. *See e.g.*, *McCoy v. Whirlpool Corp.*, No. 02-2064-KHV, 20036 U.S. Dist. LEXIS 6909, at *1, 12 (D. Kan. Apr. 21, 2003) (holding that independent testing is not *sine qua non* of admissibility because *Daubert* "does not require an expert to back his or her opinion with independent tests that unequivocally support his or her conclusions").

Much like *McCoy*, Crew Tile has cited no evidence that Carlson's methodology is incapable of testing, or that testing her conclusions is a necessary and indispensable measure of reliability. Even more, Plaintiff does not– and cannot– counteract Carlson's testimony with any evidence, as Plaintiff made the decision not to retain its own handwriting expert, despite the ongoing allegations of fraud and forgery in this case. Rather than provide the Court with cogent analysis from a comparable expert, Plaintiff now relies on barebones attacks on methodology and hyperbole directed to Mr. Baggett. While Plaintiff is free to opine on things like Mr. Baggett's qualifications, a *Daubert* analysis to preclude Carlson's testimony requires much more than that.

Lastly, in conformity with *Crisp* and its progeny, Carlson has properly compared a variety of known samples of Jack Handley's and Ryan Davis's handwriting and signatures and her report details the reasoning for her conclusion that the exclusive Distributor Agreement is a forgery. (*See*, **Ex. A**; **Ex. B**; and **Ex. C**, at 100:6-103:18.) In addition, Carlson specifically points out the conflicts in the formation of her opinion and the processes used in her comparison, as detailed in her report. (**Ex. A.**) Plaintiff nevertheless criticizes Carlson's report for not reporting any "similarities" between the forged signatures and the ones Plaintiff argues are valid on the alleged Distributor Agreement. Plaintiff's argument in this regard is merely dissatisfaction with the factual conclusions of Carlson's report, coupled with Plaintiff's lack of rebuttal expert testimony on the same. At the very least, Plaintiff's argument reinforces Defendants' position that Ms. Carlson's expert reporting demonstrates genuine issues of a material fact. On that basis alone, the testimony

more than meets the *Daubert* threshold and will most assuredly assist the trier of fact in this case.

**4.  Carlson May Properly Opine on the Authorship of the Forged Documents.**

Finally, Plaintiff argues that Carlson may not opine on the issue that "the dates on the questioned document Q2 were authored by Ryan Davis." (Motion 1, at 13.) This argument is misplaced, especially in light of the substantial authority ruling expressly against Plaintiff's assertion. Strictly speaking, an expert "may offer an opinion even if it embraces an ultimate issue to be determined by the trier of fact." Fed. R. Evid. 704. *Accord, Yass,* 2008 U.S. Dist. LEXIS 102963, at *6 (holding that handwriting expert may opine on ultimate issue of fact regarding authorship of handwriting); *Prime*, 431 F.3d at 1154 (allowing expert's ultimate opinion that defendant wrote disputed note); *United States v. Jolivet*, 224 F.3d 902, 906 (8th Cir. 2000) (affirming district court's admission of handwriting expert's testimony on ultimate issue of authorship); *United States v. Paul*, 175 F.3d 906, 911 (11th Cir. 1999) (allowing expert testimony that identified defendant as writer of extortion note).

Despite Plaintiff's argument and citation to *a single case* finding the contrary in Motion 1, the prevailing rule is that a handwriting expert may properly provide admissible testimony on the authorship in fact of a document.

**B.  <u>McSparran's Expert Report and Testimony.</u>**

In his expert report, McSparran presents a summary of his opinion as follows:

It is my opinion that this disputed Distributor Agreement, dated December 8, 2009, which Crew Tile claims represents an agreement between Crew Tile and Porcelanosa USA, giving Crew Tile exclusive distribution rights to distribute all of Porcelanosa's products within the State of Colorado, excluding the City of Aspen and Pitkin County, produced by Crew Tile in this case, is not a contract that would be negotiated, drawn up or signed by an officer or a designated representative of a company such as Porcelanosa Los Angeles, Inc., or any of its affiliated companies. It is my opinion that a specific distributor agreement template was taken from the internet and very crudely amended to create the purported Agreement between

Crew Tile Distribution, Inc. and Porcelanosa USA.

(*See*, **Ex. G**, at 6.)

*1.*    ***McSparran's Opinion is Reliable and Based on Sufficient Knowledge & Experience.***

In Motion 2, Plaintiff next takes issue with McSparran's expert report because, according to Plaintiff, McSparran offers no data in support of his opinions and therefore the opinion is merely one of *ipsie dixit*. (Motion 2, at 7-9.)  This position is misguided, and Plaintiff does not – and cannot – substantiate any attack on McSparran's qualifications, which forms the essence of *Daubert* and *Kumho* analysis.  Furthermore, such and analysis actually demonstrates the admissibility McSparran's opinions.

McSparran's expert conclusion is based on his years of experience in consulting with and advising companies like Defendants (and for that matter Plaintiffs). (*See*, **Ex. G**, at p.2.)  In articulating his opinion, McSparran engages in a lengthy description of the characteristics of distribution agreements generally, the levels of reviews for such agreements, and the overarching business reasons companies would engage in agreements of that kind. (*Id.*).  As well, McSparran's experience includes over thirty years of working directly with companies like Defendants, who regularly engage third parties, and reviewing agreements associated with the same. (*Id.* at p.3).

For instance, McSparran's report demonstrates an in-depth understanding of the consummation of a distribution agreement (or lack thereof) including, but not limited to: (a) a summary of McSparran's independent research and analysis that identified a nearly identical template to the ostensible exclusive Distributor Agreement in this case, readily available to anyone on the internet; (b) the heightened level of preliminary review such agreements are subject to within a company like Porcelanosa Los Angeles, Inc.; (c) the critical nature of some type of cure provision in any such agreement; (d) the practical need for an agreement to be free from

typographical errors in terms, product names and entities; (e) the considerations of gross margin and revenue in formulating a fair cancellation clause; (f) the heightened level of scrutiny that agreements giving exclusive rights require; (g) the specifications of a forum selection clause, normally drafted to reflect the manufacturer's home state; (h) the delineation of choice of law provisions that typically favor the manufacturer; (i) the highly unusual situation by which any such agreement would have been signed without the name of the actual party in the body of the agreement; (j) the irreconcilable language in the subject agreement-- i.e. that all warranty "repair/replacement" of tiles must "be done at Company's factory, or other warranty repair facilities of Company…" (*see*, Ex. A to Plaintiff's Second Amd. Compl., at Article V, ¶ 1) and "if any time the serial number plate is removed or defaced" it will void the warranty on tiles (*see*, Ex. A to Plaintiff's Second Amd. Compl., at Article V. ¶ 2)-- that is unusual for sophisticated business entities like Porcelanosa Los Angeles, Inc.  There is no question that McSparran is an expert in his field, with an incontrovertible understanding of companies engaged in supply chain sales activity.

Plaintiff's objection that McSparran's opinion is not supported by any testable premises or data ignores the Supreme Court's opinion and acknowledgement in *Kumho* that "there are many different kinds of experts, and many different kinds of expertise." *Kumho Tire Co.*, 526 U.S. at 150.  Further, it is well accepted that "experience alone – or experience combined with other knowledge, skill, training or education" may provide the foundation for expert testimony.  *In re: Motor Fuel Temperature Sales Practices Litig.*, No. 07-1840-KHV, 2012 U.S. Dist. LEXIS 25242, at *1, 51 (D. Kan. Feb. 28, 2012).

Moreover, since McSparran's opinion is based on applicable principles in his field, "the relevant reliability concerns will necessarily "focus upon personal knowledge or experience." *Id.* at 151; *see also Compton v. Subaru of Am., Inc.,* 82 F.3d 1513, (10th Cir. 1996) (*Daubert* factors

did not apply to preclude testimony since "testimony was not based on any particular methodology or technique"); *In re Consumer Fin. Servs.*, 350 B.R. 520, 528 (N.D. Okla. 2005) ("experts in disciplines that require the use of professional judgment are less likely candidates for exclusion").

Plaintiff's attacks on McSparran's report in Motion 2 are similar to that of the aggrieved party in *Netwig v. Georgia-Pacific Corp.*, No. 02-2143-CM, 2005 U.S. Dist. LEXIS 18968, at *1, 5 (D. Kan. July 26, 2005).   There, at issue was whether the absence of a particular scientific methodology rendered a plumbing expert's opinion unreliable and inadmissible.   The court held that irrespective of the absence of a scientific method, the opinion was admissible because the testimony "would be useful to the trier of fact in understanding the evidence…" *Id.* at 7; *see also United States v. Markum*, 4 F.3d 891, 897 (10th Cir. 1993) (allowing firefighter to testify as expert even though testimony was not scientific in nature).

McSparran's academic and professional background, coupled with decades of practical experience, more than adequately demonstrate his qualifications.   Moreover, they evince the reliability of his opinions about the general business practices of manufacturers, distributors and dealers, along with principles of distribution agreements.   These opinions will unquestionably assist the jury in understanding the convoluted facts and allegations in this case and in assessing the validity of the purported Distributor Agreement.   While Plaintiff may disagree with McSparran's opinions, the proper means to have challenged his findings would have been by way of a rebuttal expert opinion, or at minimum with questioning in a deposition.   Yet, despite initially scheduling McSparran's deposition, Plaintiff's counsel inexplicably cancelled it days before it was to occur.   (*See*, Dec. 15, 2015 correspondence from Plaintiff's counsel, attached hereto as **Exhibit A-1.**)   By passing on the opportunity to examine McSparran on his skill and knowledge in a deposition, Plaintiff must wait for the opportunity to do so at trial.

**2.      *Plaintiff and Its Co-Conspirators Deeply Desire to Sidestep McSparran's Opinion.***

In fact, as has been demonstrated since the outset of this case, Plaintiff and Third Party Defendants want nothing more than to minimize or eliminate McSparran's and Carlson's opinions regarding the subject agreement.   Plaintiff's entire case rests on the shaky foundation of the fraudulent exclusive Distributor Agreement, and all fact finding efforts in this case have demonstrated additional facets of the contract's non-existence and the misuse of the judicial process by Plaintiff and Third Party Defendants in seeking an inequitable outcome upon the opposite conclusion.   In fact, Plaintiff's sole expert, Steve Hazel, a forensic accountant, has stated in his deposition that:

> Q.      By Mr. Thomaidis: Uh-huh. But wouldn't the existence of the
> exclusivity component be a necessary prerequisite to
> any of the damage calculations that you produced in any
> of your three expert reports?
> A.      By Mr. Hazel:  Well, if there is not an exclusive agreement,
> which we've been asked to assume, that's how we did our
> calculation. But if there's not an exclusive
> agreement, would there be a potentially different
> damage set? Possibly. But we don't know of any claims
> under those particular areas that might be in place.
> Again, we've been asked to assume that there's an
> exclusive distributor agreement.
> Q.      By Mr. Thomaidis:  In the event that there wasn't an exclusive
> distribution agreement, there wouldn't be any damages
> in this case; isn't that true?
> Mr. Crough: Object to form.
> A.      By Mr. Hazel:  Again, I don't know what other potential
> claims there might be. We haven't calculated damages
> under any other scenario.

(*See,* **Ex. N**, at 75:19-76:12.)   Mr. Hazel was asked to *assume* that the exclusive Distributor Agreement existed and Plaintiffs have neither bolstered their argument that the contract is valid, nor addressed any scenario aside from exclusivity under the same.   In fact, Plaintiff, Third Party Defendants and their attorneys have actively sought to obstruct fact-finding in this respect.

Perhaps nowhere is this more obvious than in the deposition of the first 30(b)(6) designee of Crew Tile.  Rather than provide a competent and prepared designee, Plaintiff produced Ryan Davis's girlfriend, Third Party Defendant, Shana Bastemeyer.  Not only was Ms. Bastemeyer's testimony grossly deficient and objectively non-responsive, but its entire goal was to obstruct Defendants' discovery efforts. (*See*, **Ex. S**, at 38:2-46:22 and 56:17-62:16.)

Magistrate Judge Tafoya, in remedying the discovery dispute over Plaintiff and Paradigm Tile's designee, summed up the situation aptly, indicating:

> I think I understand, frankly, why you're putting up someone who has no real knowledge about anything, but the thing is you really can't put up someone who can't even answer how things were spelled.  I mean, this is -- this is probably the worst example I've ever seen of a witness who I wonder why -- where you found her.  I mean, she's one of the owner's girlfriends.  She's not even an employee of the company.  Stretching pretty far…

(*See,* **Ex. U**, at 4:4-11.)  Plaintiff and Third Party Defendants actually seek to obstruct discovery and analysis in this case, because discovery and interpretation of the evidence will further demonstrate their fraud.  This is a *modus operandi* that the Magistrate Judge seemed to clearly recognize on August 13, 2015.

The Court should deny Plaintiff's Motion 2 to strike McSparran's testimony and allow his valid, reliable and supported opinion to go before the jury.  At its core, the ultimate touchstone of a *Daubert* inquiry is to aid the trier of fact.  Even if the Court harbors its own doubts about a particular methodology, it still should find an expert's methodology helpful if it assists the trier of fact.  *Law v. NCAA*, No. 94-2053-KHV, 1998 U.S. Dist. LEXIS 6640, at *1, 25 (D. Kan. Apr. 23, 1998) (quotation omitted).

**C.**     **McFarlen's Supplemental Expert Report and Testimony.**

Plaintiff's Motion 3 to strike McFarlen's supplemental report shares similar characteristics

to what are now dozens of motions Plaintiff has filed in this case-- it is without merit and the primary effect is to impose unnecessary burden and costs on Defendants and the Court.  This is particularly notable given that Plaintiff's attorneys filed four motions, all on the same day as the deadline for dispositive motions.  Motion 3 seeks to strike McFarlen's Rebuttal Report, but is without merit, particularly when prejudice and Plaintiff's obstructionist behavior are considered.

*1.*     ***Standard of Review***

Federal Rule of Civil Procedure 26 expresses the view that expert reports must contain "a complete statement of all opinions the witness will express the basis and reasons for them; [and] the facts or data considered by the witness in forming them…" Fed. R. Civ. P. 26 (a)(2)(B).  To be sure, the overarching purpose of an expert report "is to set forth the substance of direct examination" and allow the adversary to "perhaps arrange for expert testimony from other witnesses." Fed. R. Civ. P. 26(a)(2)(b) Advisory Committee Notes, 1993 Ams., at ¶ 2. Correspondingly, an expert report need not contain "sufficient information and detail for an opposing expert to replicate and verify in all respects both the method and results described in the report." *Cook v. Rockwell Int'l Corp.*, 580 F. Supp. 2d 1071, 1122 (D. Colo. Dec. 7, 2006).  Not to mention that "an expert's initial Rule 26 report cannot always anticipate every possible challenge to the report." *Miller v. Pfizer*, 356 F.3d 1326, 1332(10th Cir. 2004).  For these reasons, "it may be appropriate to permit the party using an expert to submit supplements to the report in response to assertions by opposing experts that there are gaps in the expert's chain of reasoning." *Id.*  In fact, a court's failure to permit supplementation of an expert report "could even constitute an abuse of discretion in some circumstances."  *Id.* (*quoting Dodge v. Cotter Corp.*, 328 F.3d 1212, 1228 (10th Cir. 2003)).

A party is under a duty to supplement a Rule 26(a)(2)(B) expert report if a "party learns

that in some material respect the information disclosed is incomplete and if the additional or corrective information has not otherwise been made known to the other parties…" Fed. R. Civ. P. 26(e); *see also Jacobsen v. Deseret Book Co.,* 287 F.3d 936, (10th Cir. 2002) ("a party is under a continuing duty to supplement the expert report if there are additions or changes to what has been previously disclosed.") Even more, recalculations of data an expert previously provided constitute proper supplementation that the trial court should accept. *See e.g.*, *SEC v. Maxxon*, 465 F.3d 1174, 1182 (10th Cir. 2006) (finding no error in admitting supplemental expert report and chastising movant for not taking advantage of inquiring during cross-examination). That is why it is commonplace for courts to allow changes and revisions to an expert report in preparation for trial. *See*, *Ast. v. BNSF Ry. Co.*, No. 09-2519-EFM, 2011 U.S. Dist. LEXIS 53597, at *1, 17 (D. Kan. May 19, 2011) (allowing revised report even though it may further extend trial date).

As far as the timing of a supplemental report, such report "must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due." Fed. R. Civ. P. 26(e)(2). Indeed, Rule 26 "explicitly provide for supplementation of an expert witness' report up until the deadline for pretrial disclosures." *Jaramillo v. Bustamante*, No. 09-634 JCH/WDS, 2011 U.S. Dist. LEXIS 143747, at *1, 5-6 (D. N.M. July 25, 2011) (allowing supplemental report and permitting defendants opportunity to re-depose expert within 30 days); *see also Musket Corp. v. Star Fuel of Okla., LLC*, No. CIV-11-444-M, 2012 U.S. Dist. LEXIS 144317, at *1, 2-4 (W.D. Okla. Oct. 5, 2012) (denying motion to exclude supplemental report filed less than three weeks before trial); *Lobo Well Serv., LLC v. Marion Energy, Inc*., No. 2:07-CV-273-TS, 2011 U.S. Dist. LEXIS 38767, at *1, 25 (D. Utah, Apr. 18, 2011) (expert may supplement report until pretrial disclosures).

Lastly, even if a supplemental report is untimely, Rule 37(c) allows a district court to deny a motion to strike that report if the alleged violation is justified or harmless. Fed. R. Civ. P. 37(c);

*see also Jacobsen v. Desert Book Co.*, 287 F.3d 936, 953 (10th Cir. 2002). And "the determination of whether a Rule 26(a) violation is justified or harmless is entrusted to the broad discretion of the district court." *Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.*, 170 F.3d 985, 993 (10th Cir. 1999) (holding that damage theory purportedly not disclosed until trial did not warrant exclusion). By and large, the Court is not required to "make explicit findings concerning the existence of a substantial justification or the harmlessness of a failure to disclose." *Id.*

In determining the extent of any alleged violations of Rule 26(a), the Tenth Circuit has set forth the following factors as guidance for Courts:

> (1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness.

*Id.*

## 2.    *The Rebuttal Report Addresses Information Purposely Withheld by Plaintiff.*

Inexplicably, Plaintiff seeks to exclude McFarlen's report, while at the same time openly ignoring its own obligations to have provided Defendants with the requisite information that must underlie that report. Not only is McFarlen's Rebuttal Report consistent with his previously disclosed and undisputed initial report (*see*, **Ex. H** and **Ex. U**), but the "Monte Carlo" simulation included in the Rebuttal Report is based largely on the previous data and aimed directly at addressing Plaintiff's expert's hazy opinion as to the existence of the Distributor Agreement, rather than only evaluation of a balance sheet. (*See*, **Ex. I**, at 75:8-76:12; and **Ex. U**, at pp. 3-6.)

Indeed, Tenth Circuit courts understand that "in most cases, the defendant gets the expert reports of the plaintiff's experts and deposes the plaintiff's experts *before* the defendant has to produce the reports of the defendant's experts." *Coffey v. United States*, No. CIV 08-0588 JB/LFG,

2012 U.S. Dist. LEXIS 83154, at *1, 32 (D. N.M. May 26, 2012) (emphasis added).  Not only did this standard not apply in the case at bar, through no fault of Defendants, the law is unabashedly clear that "an expert's initial Rule 26 report cannot always anticipate every possible challenge to the report." *Miller*, 356 F.3d at 1332.

From the outset, Defendants propounded on Plaintiff and Third-Party Defendants, a critical document request that was central to a calculation of Plaintiff's and Paradigm Tile's damages and in addressing the baseless allegation that certain Third Party Defendants were "pumping money into building a showroom in expectation" of the alleged Distributor Agreement.  (*See*, Pls. Second Amd. Compl., at ¶¶ 29, 32, and 56; **Ex. L**, **Ex. O**, **Ex. Q**, and **Ex. S.**)   For example, Crew Tile's and Paradigm Tile's owner, Third Party Defendant, Darlyne Davis, testified in her deposition that:

> Q.    By Mr. Thomaidis: How much money did you and your husband Glenn Davis contribute to Infinite Flooring & Design, Inc.; Crew Tile Distribution, Inc.; and Paradigm Stone & Tile Distributors, LLC together?
> A.    By Darlyne Davis:  Approximately anywhere from 6 to 700,000.
> Q.    By Mr. Thomaidis:  Okay.  And part two of the question is:  How much did you contribute to Crew Tile Distribution, Inc. standing alone?
> A.    By Darlyne Davis:  Four to five (hundred thousand dollars)

(*See* Nov. 25, 2014 Dep. Tr. of Darlyne Davis, at 120:23-121:8, attached hereto as **Ex. G.**)  Despite these topic's significance and the claimed damages validated by the same, Plaintiff and Third Party Defendants never produced the requested information.   Moreover, because of Plaintiff's malfeasance in producing defective 30(b)(6) designees and requesting to postpone discovery (*see*, **Ex. O** and **Ex. P**), Defendants were further delayed from inquiry into Plaintiff's and Third-Party Defendants' finances or operations, factors indisputably critical to all of McFarlen's opinions and reporting.   As such, the supplemental report should not be stricken under the Court's rules

especially where the reasons for the disclosure were predicated on information that Defendants were not even privy to until the unreasonably delayed 30(b)(6) depositions."

In some ways, the case at bar is similar to *Coffey*, 2012 U.S. Dist. LEXIS 83154, at *15. There, the plaintiff provided the United States with a supplemental report four months after the discovery deadline.  The United States moved to exclude the supplemental report and in applying the factors in *Woodworker's Supply*, the court held that "while there may have been some delay in providing materials to [the expert] and some delay in his formulating these additional opinions, the Court does not believe any of these delays were intentional such that Coffey was attempting to engage in gamesmanship with the supplementation." *Id.* at *31; *see also E3 Biofuels-Mead, LLC v. Zurich Am. Ins. Co.*, No. 08-CV-2674-CM, 2013 U.S. Dist. LEXIS 45272, at *1, 8 (D. Kan. Mar. 29, 2013) (finding no prejudice where party was given opportunity to explore bases for opinions during expert's deposition).

### 3.       *Any Delay in Providing the Rebuttal Report is Justified and also Harmless.*

As noted above, Rule 37(c) allows a district court to deny a motion to strike an expert report and allow the testimony when the alleged violation is justified or harmless. Fed. R. Civ. P. 37(c); *see also Woodworker's Supply*, 170 F.3d at 993 (itemizing factors courts apply).

Here, the four factors in *Woodworker's Supply* weigh in favor of denying Plaintiff's Motion 3. *First*, Plaintiff cannot demonstrate any prejudice from the Rebuttal Report's timing.  Plaintiff identifies two issues of prejudice in Motion 3: (1) that all experts have been deposed; and (2) discovery is closed. (Motion 3, at p.11).

Regarding the first ostensible issue, back on August 13, 2015, following the failed attempt at the first 30(b)(6) deposition of Plaintiff in July, its counsel argued, and Defendants and the Court consented to a "blanket extension" of the parties' deadlines to accommodate Plaintiff's counsels'

litigation schedule in an unrelated case, thereby creating an additional six week delay on Plaintiff's and Paradigm Tile's obligations to produce competent 30(b)(6) designees. (*See* **Ex. U**, at 25:11-26:17; 44:10-45:7.)   At that time, the Court made clear the time would allow the parties "all of October and all of November to get it all done." (*Id.*, at 39:14-19.)   Notwithstanding Defendants' counsels' retrospective regret for agreeing to Plaintiff's counsel's request, Plaintiff did not even file a *Daubert* motion regarding the opinions found in the Rebuttal Report.   Moreover, Courts routinely allow supplementation, even after discovery has closed.  *See, Benham v. Ozark Materials River Rock, LLC,* 2013 U.S. Dist. LEXIS 146616, at *1, (N. D. Okla. Oct. 10, 2013) (permitting filing of amendment to expert report after close of *Daubert* and dispositive motions); *Musket Corp. v. Star Fuel of Okla., LLC*, No. CIV-11-444-M, 2012 U.S. Dist. LEXIS 144317, at *1, 2-4 (W.D. Okla. Oct. 5, 2012) (denying motion to exclude supplemental report filed less than three weeks before trial); *Lobo Well Serv., LLC v. Marion Energy, Inc*., No. 2:07-CV-273-TS, 2011 U.S. Dist. LEXIS 38767, at *1, 25 (D. Utah, Apr. 18, 2011)(expert may supplement until pretrial disclosures).

Regarding the second issue, as Plaintiff counsel is well aware, there is no trial date set in the case at bar and Plaintiff and Third-Party Defendants' refusal to divulge critical information is the underlying factor for any delay in the Rebuttal Report disclosure.   It is, therefore, difficult to understand how Plaintiff will not have adequate time to review and address the Rebuttal Report.   Further, notwithstanding the fragmented information available to Defendants, McFarlen's rebuttal opinion were disclosed to Plaintiff and Third Party Defendants on November 30, 2015, three full weeks before McFarlen's deposition, on December 21, 2015.   Notwithstanding that Plaintiff has already had the opportunity to depose McFarlen, after three weeks to review his second report, any purported prejudice could be cured in a variety of ways, given that the parties still do not have a trial date.   For example, should Plaintiff seek to re-depose McFarlen, there is no reason such a

request could not be accommodated before the now unascertained trial date. This accommodation also would further allay what is little, if any, prejudice to Plaintiff.

It is clear that Defendants did not willfully wait to disclose the Rebuttal Report, but rather disclosed it at the earliest feasible time, based on the facts being investigated. In the same vein, Plaintiff's motion makes no mention, nor can Plaintiff lay claim to any bad-faith or willfulness on Defendants' part. Plaintiff and Third Party Defendants can demonstrate no prejudice stemming from the timing of Defendants' experts' reporting.

**4.      *McFarlen's Opinion is Not Inadmissible Per Se.***

Finally, Plaintiff's argument that McFarlen's rebuttal testimony is inadmissible *per se* may be dispensed with quickly. In reality, Plaintiff overlooks the overarching principle that "expert testimony explaining general principles is admissible, without application of these principles to the facts of the case, if the explanation would assist the trier of fact and is found to be reliable." *Cook,* 580 F. Supp. 2d at 1083. And expert testimony is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Id.*

McFarlen's opinion that Plaintiff's expert's calculations are erroneous, improperly reflecting all sales of all Porcelanosa Los Angeles, Inc.'s products in Colorado for the five years of the ostensible exclusive Distributor Agreement, based on a contractual clause that Plaintiff's expert *assumed* existed, is merely relevant opinion testimony to which Plaintiff is free to cross-examine McFarlen on. (*See,* **Ex. N**, at 75:19-76:12.) After all, since "the jury is intelligent enough to ignore what is unhelpful in deliberations,' it is simply up to the trier of fact-- not Plaintiff via a motion– to determine what constitutes a conclusory opinion." *See, United States v. Concepcion Sablan*, 555 F. Supp. 2d 1177, 1181 (D. Colo. 2006) (denying motion to exclude expert opinion to

extent movant seeks *per se* rule that testimony is inadmissible); *Amorgianos v. Amtrak*, 303 F.3d 256, 267 (2nd Cir. 2002) (flaw in an expert's reasoning will not render an expert's opinion *per se* inadmissible); *United States v. Smithers*, 212 F.3d 306, 316-18 (6th Cir. 2000) (reversing trial court for applying *per se* rule of inadmissibility instead of applying *Daubert* to determine admissibility); *Yass,* 2008 U.S. Dist. LEXIS 102963, at *6 (rejecting motion for exclusion *per se* because movant "is asking the Court to do what no federal appellate court to address the issue has [ever] done").

## V.    CONCLUSION

Motion 1 and Motion 2 attempt to sidestep the factors a litigant must demonstrate in seeking to exclude reliable expert testimony.  Therefore, both should be denied.  Regarding Motion 3, the law is clear that a litigant may not intentionally frustrate its opponent's efforts at discovery, seeking an unfair advantage in litigation.  Consequently, it too should be denied.

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiff's: (1) Fed. R. Evid. 702 Motion to Exclude the Expert Testimony of Wendy Carlson; (2) Fed. R. Evid. 702 Motion to Exclude the Expert Testimony of Kent McSparran; and (3) Motion to Strike the Rebuttal Opinions of Expert Patrick McFarlen.

DATED this 20th day of January, 2016.

Respectfully submitted,

**GERSH & THOMAIDIS, LLC**

By: */s/ James N. Thomaidis*                 .
     James N. Thomaidis
     Olayinka L. Hamza
     1860 Blake Street, Suite 400
     Denver, CO  80202
     303.293.2333
     jt@gtattorneys.com
     oh@gtattorneys.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 20th day of January 2016, a true and correct copy of the foregoing **DEFENDANTS' COMBINED RESPONSE AND BRIEF IN OPPOSITION TO PLAINTIFF'S MOTIONS TO EXCLUDE EXPERT WITNESS REPORTS AND TO STRIKE REBUTTAL OPINIONS OF DEFENDANTS' EXPERT WITNESSES** was sent electronically to the following:

> David Crough
> Michael Burg
> David K. TeSelle
> Burg, Simpson, Eldredge, Hersh & Jardine, PC-Englewood
> 40 Inverness Drive East
> Englewood CO 80112
> (303) 792-5595
> (303) 708-0527 – Fax
> dcrough@burgsimpson.com
> mburg@burgsimpson.com
> dteselle@burgsimpson.com

By:     */s/ James N. Thomaidis*               .