Texas:
3021 Ridge Road, Suite A-130
Rockwall, Texas 75032
Phone: (214) 458-6009
Fax: (303) 265-9087

Colorado:
1550 Larimer Street, Suite 251
Denver, Colorado 80202
Phone: (303) 330-8636
Fax: (303) 265-9087

## Wendy Carlson
### Expert Document Examiner
www.AmericasHandwritingExpert.com
ws.carlson@yahoo.com

FORENSIC HANDWRITING AND DOCUMENT EXAMINER
EXPERT REPORT SUPPLEMENT

November 13, 2015

I have examined three (3) documents purported to be copies of the same document, executed on or about the same time. For the purpose of this examination I have labeled these exhibits 'Q100' through 'Q300'.

Today I have compared the documents and signatures one to the respective others to determine if the documents are indeed different from one another or if the documents and signatures are duplicates of one another. The documents in question are copies of a Distributor Agreement, dated December 8, 2009, bearing signatures of Jack Handley, Ryan Davis and Darlyne Davis.

A meticulous examination and side-by-side comparison of the questioned documents and signatures one to the others was conducted using the unaided eye, handheld magnifying loupes, photocopy enlargements and metric measuring devices. The scientific methodology used in this examination consists of the "ACE-V" method, which stands for "Analyze, Compare, Evaluate and Verify," the same method reportedly used by the FBI, the U.S. Treasury Department and U.S. Postal Service in their questioned document laboratories. This method was also accepted and affirmed by the District of Columbia Court of Appeals in Case No. 08-CF-1361, *Pettus v. United States*.

My hypothesis was formed without bias as to authorship of the questioned documents and signatures. My examination revealed remarkable similarities present in the questioned documents and signatures when compared one to the others known. All tests were done with accepted scientific methodology, techniques, and scientific instruments, which helped to confirm authorship of the questioned signature and initials.

Based on my scientific examination and agreement of the unique, identifiable handwriting characteristics and the measurable distinctions in the questioned documents and signatures, it is my professional expert opinion that the documents are duplicates of one another with exception to the copy size, labels, coversheets and filing header. The documents are indeed duplicates in respect to the body of the document and each signature is identical to the respective others.

**EXHIBIT B**

Forensic Handwriting and Document Examiner
Expert Report Supplement
November 13, 2015
Page 2 of 2

I am willing to testify to this fact in a court of law and I will provide exhibits to the Court to show that my opinion is correct. My Curriculum Vitae is attached and incorporated herein by reference.

Respectfully submitted,

_____
Wendy Carlson


State of Texas          )
                        )
County of Rockwall  )

The above Letter of Opinion regarding was subscribed before me this *17TH* day of November, 2015.

_____
Notary Public – State of Texas

RONNIE W LAWRENCE
My Commission Expires
December 20, 2015

**EXHIBIT B**

**From:**          Shana Bastemeyer [shanabcrew@yahoo.com]
**Sent:**          Friday, April 19, 2013 4:26 PM
**To:**          Ryan Davis; paradigmtiledistributor@gmail.com; gldadavis@aol.com
**Subject:**      Crew Porcelanosa Distribution Agreement
**Attachments:**  Crew Porcelanosa Dist Agreement.pdf

attached :)S

Thank you,

**Shana Bastemeyer**
*Vice President of Sales*
**Paradigm Tile & Stone Distributors**
12445 E. 39th Ave. Ste. 503
Denver, CO 80239
office   303.288.9240
fax      303.452.5147
mobile 303.885.9383
www.crewtile.com

*Your Exclusive Colorado Porcelanosa Distributor!*



DEPOSITION
EXHIBIT
20
ANSEN & COMPANY

10/21/15

1

QDE EXHIBIT
Q100
**EXHIBIT B**

CREW171

## DISTRIBUTOR AGREEMENT

THIS AGREEMENT is made this 8th day of December, 2009, by and between Porcelanosa USA , with its principal place of business located at 1301 S. State College Blvd., Anaheim, CA 92806 ("Company") and Crew Tile Distribution, Inc., 601 S. Broadway, Suite C, Denver, CO 80209 (the "Distributor").

NOW, THEREFORE, in consideration of the promises hereinafter made by the parties hereto, it is agreed as follows:

### ARTICLE 1
### APPOINTMENT OF DISTRIBUTORSHIP

1. <u>Distribution Right</u>. The Company hereby appoints and grants Distributor the exclusive and non-assignable right to sell the products of the Company ("Products") listed in the then current "Product Line". The distribution right shall be limited to customers who have places of business and will initially use the Company's products in the geographic area set forth in attached hereto.

    A.  State of Colorado (except for the city limits of Aspen and Pitkin County)
    B.  All specifications generated in the Colorado territory regardless of job location
    C.  All Dealers/Specifies/Architects/Designers in stated territory
    D.  Distributor also reserves the right to sell retail out of its own showrooms

Distributor also agrees to not have an online point of purchase, (ie: Web site sales outside of agreed territory)

2. <u>Prices</u>. All prices stated are FOB the Company's offices in 1301 S. State College Blvd., Anaheim, CA 92806. Prices do not include transportation costs which shall be borne by Distributor. Prices do not include federal, state or local taxes applicable to the products sold under this Agreement. An amount equal to the appropriate taxes will be added to the invoice by the Company where the Company has the legal obligation to collect such taxes. Distributor shall pay such amount to the Company unless Distributor provides Company with a valid tax exemption certificate authorized by the appropriate taxing authority.

3. <u>Terms</u>. Terms are net cash upon delivery, except where satisfactory credit is established in which case terms are net thirty (30) days from date of delivery. The Company reserves the right to revoke any credit extended at the Company's sole discretion. Distributor agrees to pay such invoices when due regardless of other scheduled deliveries. Invoices not paid within thirty (30) days of the invoice date will have one and one half percent (1-1/2%) per month finance charge assessed against the unpaid balance from the date of invoice until the date of payment.

4. <u>Title to Products</u>. The Company hereby reserves a purchase money security interest in each unit of Product sold or to be sold under this Agreement and in the proceeds thereof, if Distributor shall have sold or leased a unit(s) to another party prior to Distributor paying Company the purchase price for such Unit as set forth herein, in the amount of such unit's purchase price. These interests will be satisfied by payment in full. A copy of this Agreement may be filed with the appropriate authorities at any time after the signature by the Company as a financing statement in order to perfect the Company's security interest. On the request of the Company, Distributor shall execute financing statement(s) and other instruments the Company shall desire to perfect a security interest in the Product for its purchase price. Title to the Product shall pass to Distributor upon receipt by the Company of payment in full for all amounts due for such units of Product.

5. <u>Competitive Products</u>. Distributor agrees not to represent or sell other products which are deemed to be competitive with the Company's Product unless agreed to by the Company by written notice.

**EXHIBIT B**

CREW171

## ARTICLE II
### MARKETING AND SUPPORT

1. <u>Sales</u>. Distributor shall use its best efforts to promote the sale and distribution of the Products and to provide adequate support, which efforts shall include the following:

<u>Distributor:</u>

A: Establishing and maintaining appropriate, attractive and accessible premises and facilities for the display and demonstration of Products;

B: Provide an adequate, trained sales and technical staff to promote the sale and support of the Product;

C: Undertake promotional campaigns and canvas prospective users to stimulate the sales of Products;

D: Provide Company with forecasts with and updated Job Registrations and current project progressions

<u>Company:</u>

A: To Job Register and price protect each project specified by Distributor

B: Not to use any information provided by the Distributor (ie, leads/contacts/pricing etc.) for any type of direct sale

C: Timely notification (minimum 60 days) of any price changes, transportation costs, or product line changes (ie: New product lines/Discontinued products)

D: Any COF/Spec or warranty documents needed by Distributor or its customers

E: To disclose origin of all manufactured products to distributor to avoid any governing acts for product placement

2. <u>Advertising</u>. Company shall, upon request, assist the Distributor on all advertising, sales promotion, and public relations campaigns to be conducted, including providing Distributor with documentation of previous promotional campaigns conducted in connection with the Products, and shall provide necessary technical information and assistance.

3. <u>Training</u>. Company shall furnish training of Distributor's sales and technical representatives at various times and locations as shall be designated for this purpose by Company. Enrollment in training courses shall be limited to a reasonable number of persons who shall be sufficiently qualified to take the courses. Distributor shall pay the salaries and all travel and lodging expenses and subsistence of its representatives.

## ARTICLE III
### DELIVERY

1. <u>Purchase Orders</u>. Distributor shall order Products by written notice to Company. Each order shall specify the number of units to be shipped, the type of units to be shipped (as identified by Company model number designations indicated in the Price List) including all optional features, the desired method of shipment to distributor. Company shall indicate its acceptance of such release by returning a signed copy

**EXHIBIT B**

to Distributor or email authorization. Company agrees to ship units to Distributor as close as possible to the delivery schedule set forth in each order as accepted by Company, unless Company otherwise indicates in writing. Company shall not be required to honor any release which: (a) specifies a shipping date earlier than Company's then current delivery schedule for the date such release is received by Company and/or (b) specifies a quantity to be delivered in any one month within the current delivery schedule which is greater than one hundred percent (100%) of the total quantity shipped in the preceding sixty (60) day period.

    2. Product Acceptance. Company shall be responsible for any manufacturing defects or any product not acceptable by industry standards

    3. Shipment. All shipments of Product shall be made FOB Company's location and liability for loss or damage in transit shall be borne by the Company, thereafter any additional shipping after proper receipt by Distributor will be distributor responsibility. Shipping dates are approximate and are based, to a great extent, on prompt receipt by Company of all necessary ordering information from Distributor. Distributor shall bear all costs of transportation and insurance and will promptly reimburse Company if Company prepays or otherwise pays for such expenses. Company shall not be in default by reason of any failure in its performance under this Agreement if such failure results from, whether directly or indirectly, fire, explosion, strike, freight embargo, Act of God or of the public enemy, war, civil disturbance, act of any government, de jure or de facto, or agency or official thereof, material or labor shortage, transportation contingencies, unusually severe weather, default of any other manufacturer or a supplier or subcontractor, quarantine, restriction, epidemic, or catastrophe, lack of timely instructions or essential information from Distributor, or otherwise arisen out of causes beyond the control of the Company. Nor shall the Company at any time be liable for any incidental, special or consequential damages.

    4. Delay. Distributor may delay for a period of thirty (30) days upon giving the Company written notice at least fifteen (15) days prior to the scheduled delivery date. In the event distributor delays delivery for more than thirty (30) days with notification as set forth above, or for a period of more than five (5) days written notice.

    5. Cancellation. Distributor may, at any time prior to the scheduled date of shipment, cancel any or all Products on order upon giving timely written notice and upon payment of the following cancellation charges for each unit cancelled. The cancellation charges, intended as liquidated damages and not penalties, are as follows:

| Number of Days Prior to Scheduled Date of Shipment that Notice of Cancellation is Received by Company: | Cancellation Charges Expressed as a Percentage of Purchase Price: |
|---|---|
| 0-5 days | 0% |
| 5-15 days | 0% |
| 16-30 days | 0% |
| 31 days or more | 0% |

ARTICLE IV
PROPRIETARY RIGHTS

    1. Use of Company Name. Company expressly prohibits any direct or indirect use, reference to, or other employment of its name, trademarks, or trade name exclusively licensed to Company, except as specified in this Agreement or as expressly authorized by Company in writing. All advertising and other promotional material will be submitted to Company at least two weeks in advance and will only be used if Company consents thereto, which consent shall not be unreasonably withheld. Company hereby authorizes and requires Distributor's use of the Company's insignia or lettering which will be on the products at the time of the delivery. Company hereby authorizes the Distributor's use of the legend set forth below. The Company shall submit to the Distributor in writing full particulars prior to any use of the authorized legends, on stationery, invoices, promotion material or otherwise, and shall not proceed with such use unless and until the Company's written approval shall have been received.

**EXHIBIT B**

CREW17109

Authorized legend shall be the following:

Porcelanosa USA
GAMA DÉCOR
Venis
System Pool
L´Antic Colonel
Urba-Tek
Buetek
*Anything under the Porcelanosa Groupo Umbrella

If the authorized legend is used on any stationery, invoices, promotion material or otherwise by Distributor, Distributor will, on termination of this Agreement, or upon request of Company, discontinue the use of such legend on any stationery, invoices, promotion material or otherwise and thereafter will not use, either directly or indirectly in connection with its business, such legend or any other names, titles of expressions so nearly resembling the same as would likely lead to confusion or uncertainty, or to deceive the public.

2. Patent Indemnity. Company agrees, at its own expense, to indemnify, defend and hold harmless each Distributor and its customers from and against every expense, damage, cost and loss (including attorneys' fees incurred) and to satisfy all judgments and decrees resulting from a claim, suit or proceeding insofar as it is based upon an allegation that the Products or any part thereof furnished by Company or any process which is practiced in the customary use of the Products is or has been infringing upon any patent, copyright or proprietary right, if Company is notified promptly of such claim in writing and given authority, and full and proper information and assistance (at Company's expense) for the defense of same. In case the Products, or any part thereof, in such suit is held to constitute an infringement and the use of said Products or part is enjoined, Company shall, in its sole discretion and at its own expense, either procure for the indemnities the right to continue using said Products or part or replace or modify the same with nonperformance or capacity or affect its compatibility with the hardware or firmware comprising the Product or the software utilized thereon.

3. Drawings and Data. The Company normally supplies all necessary data for the proper installation, test, operation and maintenance of its Products. Portions of this data are proprietary in nature and will be so marked. The Distributor agrees to abide by the terms of such markings and to be liable for all loss or damage incurred by the Company as a result of the improper or unauthorized use of such data. The Company retains for itself all proprietary rights in and to all designs, engineering details, and other data pertaining to any Product specified in the contract and to all discoveries inventions, patent rights, etc., arising out of work done in connection with the contract and to any and all Product developed as a result thereof, including the sole right to manufacture any and all such products. The Distributor shall not contact the Company's suppliers, or any other person, for the purpose of manufacture.

4. Title to Products and Documentation Package. Distributor acknowledges that the Products and documentation listed in Schedule 1 are the property of Company, and that the products are being made available to Distributor in confidence and solely on the basis of its confidential relationship to Company, Distributor agrees not to print, copy, provide or otherwise make available, in whole or in part, any portion of an original or modified Product Documentation Package or related materials.

## ARTICLE V
## WARRANTY

1. Product Warranty. Company warrants that Distributor shall acquire Products purchased hereunder free and clear of all liens and encumbrances except for Company's purchase money security interest defined in Articles I, 4, above. Company further warrants all Products to be free from defects in material or workmanship under normal use and service for a period of [e.g., Lifetime] from the date of delivery. All repair/replacement covered by this warranty must be done at Company's factory, or other such warranty repair facilities of Company as designated by Company unless Company specifically directs that this service be performed at another location. Any defect corrected within ninety (90) days and found to be

**EXHIBIT B**

CREW171