**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge William J. Martínez**

Civil Action No.13-cv-3206-WJM-KMT

CREW TILE DISTRIBUTION, INC.,

      Plaintiff and CounterDefendant,

and

RYAN A. DAVIS,
DARLYNE A. DAVIS,
GLENN L. DAVIS,
SHANA L. BASTEMEYER,
PARADIGM TILE & STONE DISTRIBUTORS, LLC, and
G&D DAVIS HOLDINGS, LLC,

      CounterDefendants,

v.

PORCELANOSA LOS ANGELES, INC.,
PORCELANOSA NEW YORK, INC.,
PORCELANOSA TEXAS, CORP., and
PORVEN, LTD.,

      Defendants and CounterClaimants.

---

## ORDER REGARDING PRETRIAL EVIDENTIARY MOTIONS

---

In this business dispute pending under 28 U.S.C. § 1332, Plaintiff Crew Tile

Distribution, Inc. ("Crew Tile") alleges that it is owed damages arising from the breach of

a 2009 exclusive distribution agreement (the "2009 Distribution Agreement") by

Defendants / CounterClaimaints (Porcelanosa Los Angeles, Inc., *et al.*, collectively,

"Porcelanosa").  Porcelanosa alleges that the alleged 2009 Agreement is a forgery

created by Crew Tile and the CounterDefendants (collectively the "Crew Tile Parties"),

and counterclaims for abuse of process and related claims.  The Court has previously entered detailed orders setting out the factual background of this case (see ECF Nos. 236, 237), and familiarity with that background is presumed.

Now before the Court are the following motions related to pre-trial evidentiary matters:

1.   Porcelanosa's Motion Raising Objections to the Sur-Rebuttal Report of Plaintiff's Expert, Steve[n] Hazel (ECF No. 242);

2.   Crew Tile's Motion to Strike the Reports of Defendants' Undisclosed Experts (ECF No. 252);

3.   The Crew Tile Parties' Joint Motion *In Limine* to Exclude Certain Evidence, Testimony and Argument (ECF No. 251); and

4.   Porcelanosa's Combined Motion *In Limine* (ECF No. 253).

These motions are resolved as set out below.

## I.  PORCELANOSA'S MOTION RAISING OBJECTIONS TO THE SUR-REBUTTAL REPORT OF PLAINTIFF'S EXPERT, STEVE[N] HAZEL (ECF No. 242)

### A.   Background

The parties have disclosed opposing experts as to the amount of Crew Tile's claimed damages, including the experts' calculations of the business valuation of Crew Tile at the time of Porcelanosa's alleged breach or termination of the 2009 Distribution Agreement.  Crew Tile's expert is Mr. Steven Hazel, and Porcelanosa's expert is Mr. Patrick McFarlen.  Further background regarding these experts is set out in the Court's previous Order Regarding Expert Witnesses.  (ECF No. 237 at 26–29.)

The Court's prior orders concluded that Mr. McFarlen's rebuttal report dated

2

November 11, 2015 (the "McFarlen Rebuttal Report") was untimely disclosed, but that the untimely disclosure was harmless.  (*Id.* at 27–28.)  As a sanction in lieu of exclusion, the Court ordered that "Plaintiff may have its expert, Mr. Steven Hazel, prepare and serve a sur-rebuttal report in response to the November 11, 2015 report of Defendants' expert," Mr. McFarlen.  (ECF No. 239.)

Mr. Hazel had previously prepared two affirmative reports, dated February 2, 2015 and April 3, 2015, and a rebuttal report dated July 30, 2015 (the "Hazel Rebuttal Report").  (*See id.* at 2.)  Following the Court's prior order, he prepared an additional report, dated October 31, 2016 (the "2016 Hazel Report," or the "New Report"), which describes itself as the "second revised damages and valuation report."  (ECF No. 245-2 at 2.)[1]  After receiving this report, Porcelanosa took an additional deposition of Mr. Hazel, as permitted by the Court's order.  (*See* ECF Nos. 239, 245-3.)

Porcelanosa objects that the 2016 Hazel Report is not a proper sur-rebuttal to the McFarlen Rebuttal Report, arguing the new Report instead engaged in "Analysis *Carte Blanche,*" revising Mr. Hazel's underlying opinions as a whole, instead of rebutting Mr. McFarlen's criticisms.  (*See generally* ECF No. 242 at 3–8.)  Crew Tile responds, *first*, that the 2016 Hazel Report was an overall fair rebuttal to Mr. McFarlen (ECF No. 245 at 3–5), *second*, that "[w]hile the opinions may go beyond specific sur-rebuttal," they were proper supplementation under Rule 26(e) b)(2)(E) & 26(e) (*id.* at 5–6), and *third,* that Porcelanosa has suffered no prejudice warranting exclusion of Mr.

---

[1] All citations to docketed materials found in this order reference the page number found in the ECF header, which sometimes differs from the documents' internal pagination, as where the parties have attached cover sheets or docketed only excerpts of longer materials.

Hazel's opinions.

**B.     Legal Standards**

Porcelanosa's motion fails to cite a single rule, statute, court decision, or any other legal authority in support of its request for relief.  (*See* ECF No. 242 at 1–8; *contra* D.C.COLO.LCivR 7.1(d) (a contested motion is to "state under which rule or statute it is filed and be supported by a recitation of legal authority").)  Nevertheless, it is clear that the Court's resolution of this dispute must apply Rules 26(a)(2), 26(e), and 37(c), governing expert disclosures, supplementation, and the appropriate sanctions for improper disclosures, respectively.

Rule 26(a)(2)(D)(ii) defines an expert's rebuttal disclosures as those "intended solely to contradict or rebut evidence on the same subject matter identified by another party."   Separately, Rule 26(e) requires supplementation "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties."  For expert witnesses, supplementation "must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due."  Fed. R. Civ. P. 26(e)(2).  In this Court, the pretrial disclosures required by Rule 26(a)(3) "shall be made in the proposed final pretrial order."  D.C.COLO.LCivR 26.1(b).

Regarding the relationship between experts' rebuttal and supplementation, the Court agrees with the following analysis:

> Supplementation under the Federal Rules of Civil Procedure means correcting inaccuracies, or filling the interstices of an incomplete report based on information that was not available at the time of the disclosure. Rebuttal evidence is evidence intended solely to contradict or rebut evidence on

4

> the same subject matter identified by another party in its
> expert disclosures.

*Aid for Women v. Foulston*, 2005 WL 6964192, *3 (D. Kan. July 14, 2005) (internal

quotation marks and citations omitted).  As relevant here, a party "may not offer

testimony under the guise of 'rebuttal' only to provide additional support for his case in

chief."  *Anderson v. Seven Falls Co.*, 2013 WL 3771300, at *9 (D. Colo. July 18, 2013)

(quoting *Stanfield v. Dart*, 2013 WL 589222, at *3 (N.D.Ill. Feb. 14, 2013)).  Expert

opinions are not fairly offered as rebuttal "if the testimony proffered does not address or

rebut previously disclosed expert testimony."  *Smith v. Wal-Mart Stores, Inc.*, 2012 WL

4051925, at *1 (D. Nev. Sept. 13, 2012).  Thus, the deadline for rebuttal disclosure—or,

here, for sur-rebuttal—"is not intended to provide an extension of the deadline by which

a party may deliver the lion's share of its expert information."  *Id.*

**C.    Contents of 2016 Hazel Report**

After carefully examining the relevant record, it is obvious that the 2016 Hazel

Report was not prepared or offered strictly as a sur-rebuttal to the McFarlen Rebuttal

Report.  Initially, the 2016 Hazel Report does not describe itself as a rebuttal report.  It

barely mentions the McFarlen Rebuttal Report, and it does not respond to almost any of

Mr. McFarlen's criticisms.  This is in stark contrast to the previous rebuttal report

prepared by Mr. Hazel in this case.  (ECF No. 169-3.)  The prior rebuttal report leaves

no ambiguity that it is a rebuttal.  It explicitly stated that its purpose was to "review and

rebut the McFarlen . . . Reports," (*id.* at 1), followed by a lengthy section titled "Rebuttal

of McFarlen Report," which states specific criticisms of Mr. McFarlen's analysis.  (*See*

*id.* at 10–12.)[2]

By contrast, the 2016 Hazel Report does not address itself to the November 2015 McFarlen Report, which it barely mentions.  The New Report instead states that its purpose is to provide opinions "with respect to information produced . . . subsequent to" the three previous Hazel Reports.  (ECF No. 245-2 at 2.)  The content of the 2016 Hazel Report confirms this purpose, as the new report sets out a wholesale recalculation of Mr. Hazel's damages and valuation analysis, based upon new data and information.  Without attempting to detail all of the changes from Mr. Hazel's prior reports, the Court notes that, first and foremost, his new calculations rest upon a new data set, "the 2008–14 Sales Data production," which Mr. Hazel "received on or around November 24, 2015," well after writing his prior reports.  (*See id.* at 4.)  The New Report also relies on other materials received after Mr. Hazel's prior reports.  (*See id.* at 3.)  None of this material was addressed by the McFarlen Rebuttal Report.

Relying on these new sources, the 2016 Hazel Report adds several elements to Mr. Hazel's damages analysis.  Among other things, the 2016 Hazel Report adds a category of damages for Crew Tile's "shut down costs," which were not calculated in his prior analyses.  (*Compare* ECF No. 245-2 at 9 *with* ECF No. 242-10 at 5.)[3]  Mr. Hazel

_____

[2] For example, Mr. Hazel's prior rebuttal report argued directly that Mr. McFarlen did not calculate a lost profits measure, "does not calculate damages," "fail[ed] to consider relevant information," made certain assumptions "blindly, without correlation to the specific facts," and that Mr. McFarlen's report "fails to consider intangible assets" in business valuation, and generally reflected that McFarlen "does not know the facts and is assuming information that is incorrect."  (ECF No. 169-3 at 10–12.)

[3] Mr. Hazel explained in deposition testimony that he had "been asking for the shutdown costs since day one" in this litigation (ECF No. 245-3 at 24), but that his previous reports could not calculate a figure because he had not received the necessary information (*id.* at 23–24). He testified that the information he needed would come from the Crew Tile Parties (*id.* at 24),

has also dramatically increased his calculation of Crew Tile's alleged damages. First, he re-calculated Crew Tile's "historical lost profits" upwards by nearly 50%, from $421,144 to $629,000. (*Compare* ECF No. 245-2 at 9 *with* ECF No. 242-10 at 5.) Second, he increased his "fair value of company" estimate, from $156,000 to $1,128,000. (*Id.*) Crew Tile argues that Mr. Hazel's prior analysis estimated a range of possible damages and the New Report specifies a number still falling within that range (ECF No. 245 at 6), but the April 2015 Hazel Report plainly stated a single figure for "Total Calculated Damages" (ECF No. 242-10 at 5), and the New Report materially changes that figure (ECF No. 245-2 at 9). These dramatic increases flow principally from Mr. Hazel's new reliance on the "2008–2014 Sales Data production." (*See* ECF No. 245-2 at 7.) In addition, the increased "lost profits" and "fair value" figures both rest on "[i]nformation related to Plaintiff's retail and distributor revenues and customer base," which Mr. Hazel had not previously reviewed, but which he now uses to allocate costs differently as between distinct "retail" and "distributor" sales categories. (*See id.* at 7.)[4] With only one exception, none of Mr. Hazel's re-calculations purport to be offered in response to any particular criticisms raised by the McFarlen Rebuttal Report.

---

and his current calculation is based on "discussions with Client," rather than specific data or records produced in discovery. (ECF No. 242-1 at 21; *see also* ECF No. 245-3 at 24–25.)

[4] The distinction between "retail" and "distributor" sales categories is referenced on the face of the 2016 Hazel Report, along with Mr. Hazel's explanation that the "additional documents and testimony" reviewed subsequent to his prior reports included "Information related to Plaintiff's retail and distributor revenues and customer base." (ECF No. 245-2 at 3, 7.) Review of the prior Hazel reports does not reveal a similar distinction. (*See generally* ECF Nos. 242-10, 169-3.)

**D.      Rebuttal Analysis**

The Court concludes that the New Report is exactly what it says it is:  a supplementation and re-calculation of Mr. Hazel's opinions, based on materials he had not previously reviewed.  Crew Tile effectively concedes that it is not solely a sur-rebuttal, admitting "the report may go beyond specific sur-rebuttal," and sets out "*all* of [Mr. Hazel's] opinions," not only those responsive to the November 11, 2015 McFarlen Rebuttal Report.  (ECF No. 245 at 2 (emphasis added); *see also* ECF No. 242-13 (Crew Tile's disclosure of the 2016 Hazel Report, describing it as "the third supplemental report").)

Crew Tile argues, however, that because Mr. McFarlen "draws into question nearly every . . . aspect of Mr. Hazel's valuation methodology,"  "Mr. Hazel was required to provide complete justification for his opinions in sur-rebuttal."  (ECF No. 245 at 4.)  The Court finds this portion of Crew Tile's argument disingenuous.  As summarized above, the stated and obvious purpose of the 2016 Hazel Report was to overhaul Mr. Hazel's opinions in reliance upon new information, not to respond to Mr. McFarlen. This goes far beyond both the language and intent of the Court's prior order, which granted leave—only as a limited form of sanction—for Crew Tile to prepare "a sur-rebuttal report *in response to the November 11, 2015 report*" from Mr. McFarlen. (ECF No. 239 (emphasis added).)  The Court did not grant leave for Mr. Hazel to revise "all of" his opinions, but that is evidently what Crew Tile asked him to prepare.[5]

---

[5] *See* ECF No. 245-2 at 2 (2016 Hazel Report states it was prepared in response to the "request of counsel to provide . . . opinions with respect to information produced . . . subsequent to [prior Hazel reports]"); ECF No. 245-3 at 11 (Mr. Hazel testifying that "a surrebuttal report in response to the November 11th, 2015 report of . . . McFarlen" was "not

The Court also rejects Crew Tile's suggestion that the McFarlen Rebuttal Report was so sweeping that the only possible form of sur-rebuttal was for Mr. Hazel to re-vamp all of his analysis.  The McFarlen Rebuttal Report raised specific criticisms, to which Mr. Hazel could have specifically responded, in much the same fashion as his previous rebuttal report.  Instead, the New Report obviously and unnecessarily went beyond the scope of the McFarlen Rebuttal Report.  For example, the McFarlen Rebuttal Report explicitly did not address Mr. Hazel's lost profits analysis.  But Mr. Hazel has nevertheless re-calculated that measure.  The McFarlen Rebuttal Report articulated approximately six discrete criticisms of Mr. Hazel's report (*see* ECF No. 245-1 at 5–6),[6] which Mr. Hazel might have directly addressed, but did not.  The McFarlen Rebuttal Report also used a "Monte Carlo Simulation," as a probabilistic model of how the range of different inputs or assumptions in the two experts' work affect the possible valuations of Crew Tile.  As was clear at his deposition, Mr. Hazel might have offered specific criticisms in response to this "Monte Carlo simulation" but those were nowhere included in his New Report.  (*See* ECF No. 245-3 at 31.)

Typically, the Court is not inclined to "place an overly restrictive interpretation on the operative phrase," of the "*same subject matter*" which sets the boundaries for acceptable rebuttal disclosure by experts in the ordinary exchange of experts' reports

---

quite what [Mr. Hazel] understood" his new report should address, explaining "we weren't trying to limit [the new report] to that particular [McFarlen Rebuttal Report ] . . . we're doing it in response to all reports and all information").)

[6] For example, Mr. McFarlen criticized that "Mr. Hazel's Income Approach does not take into account the current negative amounts . . . in working capital," and that "Mr. Hazel utilize[d] a 185% and a 92% revenue growth" but "does not provide support for these growth percentages." (ECF No. 245-1 at 5.)

under Rule 26(a)(2)(D)(ii).  *See Armstrong v. I-Behavior Inc.*, 2013 WL 2419794, at *3

(D. Colo. June 3, 2013).  Here, however, the Court can only conclude that the 2016

Hazel Report goes far beyond the "same subject matter" of the McFarlen Rebuttal

Report.  The subject matter open to sur-rebuttal was clearly defined in the

circumstances of this case.  Ordinarily, Rule 26 "does not permit parties to further rebut

rebuttal expert disclosures."  *Rothenberg v. Standard Ins. Co.*, 2012 WL 2126846, at *2

(D. Colo. June 12, 2012).  Here, the Court affirmatively *allowed* a sur-rebuttal, as a form

of sanction.  (ECF No. 237 at 28–29.)  Therefore, the scope of the "subject matter" to

which Mr. Hazel was responding was defined by the four corners of the McFarlen

Rebuttal Report.  Furthermore, there is no credible argument that the 2016 Hazel

Report was offered "*solely* to contradict or rebut" the evidence offered in the McFarlen

Rebuttal Report, *see* Fed. R. Civ. P. 26(a)(2)(D)(ii) (emphasis added), since Crew Tile

freely admits that the purpose of the new Report was largely to *supplement* Mr. Hazel's

work.  In sum, the Court concludes that the 2016 Hazel Report plainly exceeded the

scope of permissible sur-rebuttal to the McFarlen Rebuttal Report.

## E.    Supplementation

The question therefore becomes whether the 2016 Hazel Report was

permissible as a supplement under Rule 26(e).  Crew Tile argues, correctly, that

supplementation of Mr. Hazel's prior report based on his incorporation of the later

information into his opinions as "entirely appropriate, and required under the Rules,"

acknowledging the duty to supplement expert reports based on new information is a

"requirement" under Rule 26(e).  (ECF No. 245 at 6.)  The language of Rule 26(e) is

mandatory, and the duty to supplement arises whenever a party "learns that in some material respect the disclosure . . . is incomplete or incorrect." Fed. R. Civ. P. 26(e)(1)(A); *see also Sender v. Mann*, 225 F.R.D. 645, 653 (D. Colo. 2004) ("Rule 26 *requires* a party to supplement . . . if that party 'learns that in some material respect the information disclosed is incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties.'" (emphasis added) (quoting Fed. R. Civ. P. 26(e)(1)(A)).

Here, Crew Tile readily acknowledges that the information underlying the 2016 Hazel Report "differed significantly from the information [Mr. Hazel] had when his first reports were issued," and required Mr. Hazel to "correct and narrow his opinions." (ECF No. 254 at 6.) Crew Tile argues there was no way Mr. Hazel could issue a new report *without* relying on this new information. (*Id.*) All of this confirms that Crew Tile was obligated to supplement Mr. Hazel's prior reports and disclosures given the material changes to his opinions arising from reliance on the new information.

What Crew Tile fails to acknowledge is that the mandatory supplementation requirement under Rule 26(e) also has time limits. Supplementation must be completed "in a timely manner," Fed. R. Civ. P. 26(e)(1)(a), and for experts, this means no later than "by the time the party's pretrial disclosures under Rule 26(a)(3) are due," Fed. R. Civ. P. 26(e)(2). Here, by Local Rule and Court Order, Crew Tile's Rule 26(a)(3) pretrial disclosures were due no later than when the parties submitted their proposed Final Pretrial Order, on March 31, 2016. (*See* ECF Nos. 202, 208; D.C.COLO.LCivR 26.1(b); Fed. R. Civ. P. 26(e)(2).) Thus any supplementation of Mr. Hazel's opinions was also required to be completed by that time. Fed. R. Civ. P.

11

26(e)(2).

Mr. Hazel's prior reports and disclosures were completed by April 2015. Thereafter, he received additional information in discovery, most significantly the "updated sales information ('2008–2014 Sales Data') received on or around November 24, 2015." (ECF No. 245-2.)   Crew Tile therefore had approximately four months after receiving this information to timely supplement Mr. Hazel's report(s) before the March 2016 Rule 26(a)(3) pretrial disclosures/Proposed Pretrial Order.   But Crew Tile did not complete or serve this supplementation until October 2016, and then only *after* the Court granted leave for a sur-rebuttal.   Crew Tile at no time requested leave to supplement Mr. Hazel's opinions after the Rule 26(a)(3) disclosure deadline, and never alerted the Court of its intent to have Mr. Hazel prepare a new report exceeding the scope of a sur-rebuttal to the  McFarlen Rebuttal Report.  (*See* ECF No. 238.)  Thus, to the extent the 2016 Hazel Report is in fact a supplementation, not a sur-rebuttal, the Court can only describe it in the same way it previously described the McFarlen Rebuttal Report: "plainly and egregiously late."  (ECF No. 237 at 27.)

## F.    Sanctions

The final issue is what sanction to apply.  The Court has considerable discretion in this determination, but is guided by the factors articulated in *Woodworker's Supply Inc. v. Principal Mut. Life Ins. Co.*, 160 F.3d 985, 993 (10th Cir. 1999):  (1) the prejudice or surprise to the impacted party; (2) the ability to cure the prejudice; (3) the potential for trial disruption; and (4) the erring party's bad faith or willfulness.  Here, the Court concludes that these factors weigh against allowing Mr. Hazel to testify on the basis of

his late supplementation/improper sur-rebuttal.

As to surprise, Crew Tile never sought leave for this untimely supplementation, and all prior filings contemplated that the New Report would be prepared as a sur-rebuttal to the McFarlen Rebuttal Report, and nothing more.  Since the revised sales data has been available to Mr. Hazel since November 2015, it was reasonable for Porcelanosa to rely on the expectation that it had not materially altered Mr. Hazel's opinions, since the deadline to disclose any supplementation required by this data passed long ago.  In addition, and as further described below, part of Mr. Hazel's supplementation is on the basis of information provided by the Crew Tile Parties, which Porcelanosa has never before seen.  These circumstances make the contents of Mr. Hazel's New Report a "surprise" to Porcelanosa within the meaning of Rule 37(c) and *Woodworker's Supply*.

As to prejudice and Porcelanosa's ability to cure it, although Porcelanosa has taken an additional deposition of Mr. Hazel, it has not had—and will not have—opportunity for its own expert to prepare an analysis addressing the new information and analysis from Mr. Hazel.  This includes Mr. Hazel's new retail/distributor distinction, and his new calculation of "shut down costs."  Allowing late disclosure of these new expert opinions would be prejudicial at this late stage of litigation.  *See Beller ex rel. Beller v. United States*, 221 F.R.D. 689, 695 (D.N.M. 2003) (allowing improper supplementation "would interfere with the Court's ability to set case management deadlines, because new reports and opinions would warrant further consultation with one's own expert and virtually require new rounds of depositions").

In addition, at least some of the new information relied upon by Mr. Hazel has

evidently not been subject to prior disclosure or discovery.  This includes any informal communications between Mr. Hazel and the Crew Tile principals (the Davises) supporting Mr. Hazel's calculation of "shut down costs," as well as the "Information related to Plaintiff's retail and distributor revenues and customer base," which appears to underlie Mr. Hazel's new retailer/distributor distinction.  (ECF No. 245-2 at 3.) Porcelanosa argues that it has never seen this information.  (*See* ECF No. 242 at 7.) Crew Tile does not point to anywhere that it has produced this information during litigation, instead responding that Porcelanosa might have inquired into these areas during depositions.  (ECF No. 245 at 7–8.)  This argument does not explain Crew Tile's failure to produce the relevant information in its possession, which now underlies its expert's opinions, while discovery was still open.

Regarding the potential for trial disruption, the Court similarly concludes that opening the door to new areas of expert testimony at this stage would, no doubt, lead the parties to delve into areas at trial that have not been fairly subject to disclosure and discovery.  This would almost certainly lead to the additional need for objections, argument, side-bars and complicated rulings at trial, all as to matters that should have been vetted months ago.  Allowing Mr. Hazel to testify based on his New Report would also, no doubt, lead Porcelanosa and Mr. McFarlen, not unreasonably, to attempt to rebut these new opinions.  For all these reasons, the Court finds that allowing the last-minute alteration of Mr. Hazel's opinions would invite disruption of an orderly trial process.

As to willfulness or bad faith, it appears from the record that Crew Tile acted deliberately in soliciting a new supplemental report from Mr. Hazel based on information

14

it has had for many months, rather than asking him to complete only the sur-rebuttal to the McFarlen Rebuttal Report which the Court authorized.  The Court finds this conduct to be willful.

Finally, the Court notes that when the shoe was on the other foot, Crew Tile sought to strike all of Mr. McFarlen's rebuttal testimony, arguing as follows:

> A supplemental expert report that states additional opinions or rationales or seeks to 'strengthen' or 'deepen' opinions expressed in the original expert report exceeds the bounds permissible supplementation and is subject to exclusion under Rule 37(c).  *Beller*, 221 F.R.D. at 695; *see [also] Keener* [*v. United States*, 181 F.R.D. 639, 641–42 (D. Mont. 1998)]; *Minebea Co., Ltd. v. Papst*, 231 F.R.D. 3, 6 (D.D.C. 2005). "To rule otherwise would create a system where preliminary [expert] reports could be followed by supplementary reports and there would be no finality to expert reports, as each side, in order to buttress its case or position, could 'supplement' existing reports and modify opinions previously given."  *Beller*, 221 F.R.D. at 695. "This result would be the antithesis of the full expert disclosure requirements stated in Rule 26(a)."  *Cook v. Rockwell Int'l Corp.*, 580 F. Supp. 2d 1071, 1169 (D. Colo. 2006).

(ECF No. 169 at 5–6).  The Court finds analogous reasoning applies here.  Allowing wholesale re-calculation and supplementation at this stage would invite, if not require, additional reports and disclosures from Porcelanosa's experts, and quite possibly additional discovery into the information the Davises communicated to Mr. Hazel.

For all these reasons, although exclusion is "a drastic sanction," *Summers v. Missouri Pac. R.R. Sys.*, 132 F.3d 599, 604 (10th Cir. 1997), the Court concludes it is appropriate here, in light of the scope and willfulness of Crew Tile's improper

disclosure.[7]  Moreover, the Court sees no practical alternative.  While one or two elements of the new Hazel report arguably respond to the McFarlen Rebuttal Report, there is no way to subdivide Mr. Hazel's new analysis.  His calculation of fair value rests on his calculation of lost profits.  Both rest on new information never addressed by Mr. McFarlen.  And, on the one discrete topic on which Mr. Hazel actually responded to a criticism from Mr. McFarlen, adjusting his analysis to account for typical or "industry average" figures for owners' compensation (as published by Risk Management Association ("RMA")) (ECF No. 245-2 at 7), Mr. Hazel's accounting for this criticism depends almost entirely on his new retail/distributor distinction.  (*Id.*)  Given that the overall purpose of the 2016 Hazel Report is to re-calculate damages based on new data, there is no way to extricate any discrete points of opinion from that overall re-calculation as fair rebuttal points to the McFarlen Rebuttal Report.

The Court concludes that Mr. Hazel's 2016 Report must be stricken as a whole.  His trial testimony will be limited only to those topics fairly contained in his previous disclosures and reports.  This includes exclusion of any opinions or testimony disclosed only in Mr. Hazel's December 2016 deposition, since the permissible scope of that deposition was intended and limited to addressing the contents of a report that was, in

---

[7] The Court also observes that despite the dramatic changes in the bases for Mr. Hazel's opinions and in his "top line" valuation of lost profits and the "fair value" of Crew Tile, these changes have a much smaller impact on his "bottom line" estimate of Crew Tile's damages.  The alleged 2009 Distribution Agreement contains a provision setting a minimum termination fee of the *greater* of the company's fair value or $2.5 million.  No version of Mr. Hazel's analysis (or Mr. McFarlen's) values the company at greater than $2.5 million. Therefore, if the jury concludes the Agreement is legitimate and binding, it will most likely not matter whether the jury concludes the company was worth $0, or $2.49 million, or any amount in between. In these circumstances, excluding Mr. Hazel's 2016 Report is less of a drastic sanction than it otherwise might be.

turn, improperly prepared and disclosed, and has now been excluded.

Finally, Porcelanosa's request for unspecified alternate relief, or for a hearing, is denied.  Porcelanosa argues that "merely striking the [2016 Hazel Report] will not clarify or resolve questions of fact related to what was only recently set forth within"  (ECF No. 242 at 3), but this statement is unexplained.  It is unclear what "questions of fact" Porcelanosa sees as problematic, and Porcelanosa has not formulated any specific request for relief other than exclusion, asking only for a hearing of unspecified parameters to "discuss" the New Report and "remedial measures related to the same." (ECF No. 242 at 2.)  The Court sees no likelihood that such an unstructured hearing would aid its resolution of this matter, given the lack of specific proposals from Porcelanosa and particularly in light of the overall, and sustained, contentiousness of the parties' and their counsel's conduct in this litigation.  Under Rule 37(c)(1), the default form of relief is exclusion, and Porcelanosa offers no persuasive reason to proceed otherwise.

## II. CREW TILE'S MOTION TO STRIKE THE REPORTS OF DEFENDANTS' UNDISCLOSED EXPERTS (ECF NO. 252)

As detailed in the Court's prior Order, one of Porcelanosa's retained experts is Ms. Wendy Carlson, a handwriting examiner.  Ms. Carlson is expected to testify that she examined the purported signature of Porcelanosa's representative on the 2009 Distribution Agreement and concluded that the signature is a forgery.  (*See generally* ECF No. 237 at 4–23.)

By prior Order, the Court denied Crew Tile's motion to exclude Ms. Carlson's testimony under Federal Rule of Evidence 702.  (*Id.*)  As relevant here, one of the

contested issues was that while Ms. Carlson purports to follow a four-step "ACE-V" method ("Analyze"; "Compare"; "Evaluate"; and "Verify"), she had not completed the fourth step of "Verification," by having another examiner either review her work or complete an independent analysis to see if he or she agreed with Ms. Carlson. (*See id.* at 7–12.)  The Court found the lack of verification under the ACE-V method was "concerning," but concluded it did not render Ms. Carlson's testimony inadmissible in this case, instead bearing on the weight or credibility of her opinions. (*Id.* at 11.)  The Court reasoned, in part, that "as a practical matter, making the verification step of ACE-V a prerequisite in every case would essentially require parties to obtain two experts' opinions before the first became admissible." (*Id.*)

After disclosing Ms. Carlson's reports and opinions, and long after the expert disclosure deadlines, Porcelanosa produced additional documents which summarize additional review of the 2009 Distribution Agreement by two additional handwriting examiners, Messrs. Baggett and Lehew. (*See* ECF Nos. 252-4 at 2, 252-5 at 2.)  The letters summarizing these reviews, dated December 18, 2015 and January 3, 2016, were prepared well after Ms. Carlson's report, but only shortly after her deposition, when counsel criticized her failure to "Verify" her opinions. (*See* ECF Nos. 252-3, 208.)

Porcelanosa has now listed these documents on its exhibit list(s) for trial, describing them as "Expert Document Examiner Second opinion Report[s]." (*See* ECF No. 208-2 at 24.)  Crew Tile moves to exclude these documents on grounds that they are untimely and improperly disclosed expert reports, and beyond that, are inadmissible hearsay.  The Court agrees.  The additional handwriting examiners were never

18

disclosed as expert witnesses, have never been included on any witness list, and will not testify or be cross-examined at trial.  Their letter-reports are plainly out of court statements that can only conceivably be offered for the truth of the matter(s) asserted (*i.e.*, to support the proposition that the 2009 Distribution Agreement is a forgery created by the Crew Tile Parties).  As such, these documents are inadmissible as hearsay under Federal Rules of Evidence 801 & 802, and are also excluded based on untimely and improper disclosure, pursuant to Rule 37(c)(1).

Porcelanosa's defense of these proposed trial exhibits is unpersuasive. Porcelanosa explains that, despite all appearances, these letters are not meant as new experts' reports, but "represent only Wendy Carlson's completion of the 'V' component ["verification"] of the ACE-V method," and that Porcelanosa and Ms. Carlson "sought and received peer verifications . . . to supplement the credibility of her testimony."  (ECF No. 268 at 2, 4–5.)  This may explain why these documents exist, but does now show why they are admissible.  Porcelanosa nowhere explains how these proposed exhibits are not hearsay, nor how they would be offered for any purpose other than to prove the truth of the matter(s) asserted.  Finally, to the extent the letter-reports are intended to show "verification" of Ms. Carlson's work, they do not, on face, mention Ms. Carlson or her prior review.  Thus, the documents themselves do not establish that their authors were performing their review as a form of "Verification" for Ms. Carlson or that she is aware of their contents.  They simply set out the authors' own review and opinions.

In sum, since Porcelanosa presents no viable basis for admitting these

documents into evidence, the Court will exclude them.[8]

### III.  PORCELANOSA'S MOTION *IN LIMINE* (ECF No. 251)

**A.    "Foreign" Companies and Witnesses**

Porcelanosa moves for a pretrial order to exclude "inflammatory and incorrect

assertions that Defendants are 'Spanish' companies and that their representatives 'from

Spain' don't obey the law . . . because of that multinational origin."  (ECF No. 253 at 6.)

In support they cite examples of Crew Tile's counsel asking Porcelanosa

representatives in depositions about their immigration status (*e.g.*, "Do you have a

Green Card?") (*id.* at 7), and one troubling example in which Crew Tile's counsel

confronted a Spanish witness with questions such as "Do you understand even though

you are not a citizen, you still have to comply with the U.S. law?", and "You just think

you can do anything you want.  You are from Spain.  You don't have to follow the rules;

do you?"  (*id.* at 6; ECF No. 253-1 at 4–6) .

In response, Crew Tile points out that Porcelanosa has put the international

organization of the Porcelanosa entities at issue.  Specifically, Porcelanosa has argued

the 2009 Distributor Agreement is not genuine because it would have required

---

[8] Crew Tile's motion requests that the Court issue an order striking the letter-reports from Porcelanosa's exhibit list, and that relief is granted.  No specific relief is either requested or granted regarding Ms. Carlson's testimony.  The Court notes only that, in general, her testimony may not become an improper "conduit for hearsay."  *See Williams v. Illinois*, 567 U.S. 50, ___, 132 S. Ct. 2221, 2225 (2012); *Marsee v. U.S. Tobacco Co.*, 866 F.2d 319, 323 (10th Cir. 1989) (collecting cases that "have admitted expert opinion testimony but have excluded hearsay evidence offered in support of that testimony, both on direct and cross-examination"); *see generally* 3 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence*, § 7:16 (4th ed., May 2016 update) ("While an expert may consider remote statements that are not admitted and may be inadmissible, he cannot properly act as a conduit by presenting an opinion that is not his own opinion but that of someone else, and should not testify that others agree with him as a means of vouching for or reinforcing any opinion of his own that he presents, at least in relation to central or contested matters.").

authorization from the board of directors of Porcelanosa's parent entity in Spain, but it bears the signature of only a regional employee based in California.  (*See* ECF No. 266 at 3; ECF No. 266-1 at 7.)  Porcelanosa has also argued that Porcelanosa does not enter into exclusive distribution agreements, while Crew Tile seeks to introduce evidence tending to show that Porcelanosa has entered into such agreements, at least outside the United States.  (*See* ECF No. 266 at 3–4; ECF No. 266-1 at 5; ECF No. 266-4.)

The Court concludes that the fact that the Porcelanosa Entities comprise an international group of parent and subsidiary companies is relevant and not unduly prejudicial.  The undisputed facts related to the organization, ownership, and chain of authority of the Porcelanosa companies is admissible as it may have a tendency to make a disputed and consequential fact more or less likely, namely, whether the disputed 2009 Distributor Agreement was signed or authorized by Porcelanosa.  *See* Fed. R. Evid. 401–02.  These facts by themselves are not unduly prejudicial.

However, any questioning or commentary regarding the nationality, citizenship, or country of origin of any witness will be excluded as irrelevant and prejudicial under Rules 401 & 403.  Likewise, prejudicial or inflammatory phrasing of questions that implicates any witness's nationality or country of origin, as exemplified by counsel's deposition questioning of Mr. Diago (*see* ECF No. 266-1), will not be tolerated.  Fed. R. Evid. 403; Fed. R. Evid. 611(a).

## B.      Discharge of Mr. Montilla

Porcelanosa seeks to exclude any evidence related to the departure of its former

executive, Francisco Montilla, some years after the relevant facts in this case, when Mr. Montilla evidently tested positive for cocaine use.  (ECF No. 253 at 10–12.)  Crew Tile argues these facts are relevant because it reflects a prior instance in which "Mr. Montilla was dishonest about his cocaine use, initially denying use, and then only admitting use after being forced to take a drug test."  (ECF No. 266 at 4–5.)

The Court will exclude this evidence under Rule 403.  Any marginal relevance of these acts and allegations, including any evidence of Mr. Montilla's short-lived denial of drug use to his employer, is greatly outweighed by the prejudicial impact such testimony would have, given the negative connotations surrounding drug use.  Crew Tile has not shown that these facts have any bearing on Mr. Montilla's conduct during the period relevant to issues in dispute in this case.  Moreover, the potential for the prejudicial impact of such evidence is amply illustrated by the manner in which Crew Tile's counsel questioned Mr. Montilla during his deposition, accusing him of "cocaine addiction" and seeking to elicit testimony that he had used cocaine at a party with actor George Clooney.  (ECF No. 253-2 at 13–14.)

At trial Crew Tile may not ask any questions related to Mr. Montilla's alleged drug use, or regarding the circumstances of his departure from Porcelanosa.[9]

## C.     Discharge of Mr. Handley

Porcelanosa also seeks to exclude evidence related to the discharge of Porcelanosa's former employee, Mr. Jack Handley, in 2012.  (*See* ECF No. 253 at

---

[9] Crew Tile makes the unrelated argument that "Mr. Montilla was also dishonest with Plaintiff about its inclusion on Porcelanosa's website."  (ECF No. 266 at 5.)  The Court enters no pretrial ruling regarding this claim or evidence, since no party has requested one.

9–10.)  As phrased by Porcelanosa, Mr. Handley "was terminated . . . in late-2012, after the company received reports that he contacted certain customers of the company and offered to sell them tile manufactured by a competitor, which is against Porcelanosa['s] policy."  (*Id.* at 9.)  For his own part, Mr. Handley denies that he was engaged in selling competitors' products.  (ECF No. 253-4 at 3–4.)

Porcelanosa argues that testimony or evidence regarding Mr. Handley's discharge should be excluded as unduly prejudicial under Rule 403 and as improper "bad acts" evidence under Rule 404(b).  (*See* ECF No. 253 at 12.)  Crew Tile argues that evidence related to Mr. Handley's discharge shows he "was dishonest about selling competitive products, having denied doing so despite proof to the contrary" (ECF No. 266 at 5), citing testimony from Porcelanosa witnesses stating they learned he was, in fact, "offering competitor products" (ECF No. 266-1 at 6), or "[m]aybe he never got to sell any, but he was trying to" (ECF No. 266-3 at 2).

Crew Tile argues that the evidence related to the circumstances of Mr. Handley's discharge is admissible under Rule 608(b), as a specific instance of conduct probative of his character for truthfulness or untruthfulness, and may be admissible as impeachment evidence under Rule 404(b).  (*See* ECF No. 266 at 5–6 (citing *United States v. Morris*, 41 Fed. App'x 160, 165 (10th Cir. 2002) and *United States v. Gay*, 967 F.2d 322, 328 (10th Cir. 1992)).

Under Rule 608(b), the Court "may, on cross-examination" allow inquiry into specific instances of past conduct "if they are probative of the character for truthfulness or untruthfulness of . . . the witness."  The application of this rule is within the trial court's discretion.  *United States v. Atwell*, 766 F.2d 416, 420 (10th Cir. 1985) ("The trial

court in its discretion may allow inquiry into the prior conduct of a witness concerning his character for truthfulness. The rule does not *require* inquiry." (emphasis added)). However, "extrinsic evidence" is not admissible for this purpose. *See* Fed. R. Evid. 608(b); *United States v. Martínez*, 76 F.3d 1145, 1150 (10th Cir. 1996) ("the rule allows cross-examination of witnesses about specific conduct if those incidents reflect on the witness' character for truthfulness. However, if the witness denies making a statement on a matter classified as collateral, his examiner must take his answer—that is, he may not prove the making of the statement by extrinsic evidence" (internal quotation marks omitted)). In addition, admission of evidence under Rule 608(b) remains subject to the balancing test of Rule 403. *See Atwell*, 766 F.2d at 420. The Court also retains the power to limit or exclude questioning to prevent harassment or undue embarrassment of a witness. Fed. R. Evid. 611(a)(3).

Applying those rules here, the Court will exercise its discretion to allow cross-examination of Mr. Handley regarding his discharge from Porcelanosa. Mr. Handley is the individual whose (alleged) signature appears on the face of the disputed 2009 Distribution Agreement. Whether or not he signed the Agreement on behalf of Porcelanosa is *the* central disputed factual issue in this case. Thus, his credibility (*i.e.*, his "character for truthfulness") is a critical determination for the jury in this case. Given that context, and the factual and temporal connection between the disputed issues in this case and the alleged basis for Mr. Handley's discharge, the Court will allow Crew Tile to cross-examine Mr. Handley on this issue pursuant to Rule 608(b), while limiting the scope and nature of that cross-examination pursuant to Rules 403 and 611(a)(3).

### IV.  CREW TILE PARTIES' MOTION *IN LIMINE* (ECF No. 251)

**A.**    **Alleged 2004 Distribution Agreement**

In addition to the disputed 2009 Distribution Agreement, discovery in this case also revealed the existence of a separate, alleged, 2004 contract between a previous business owned by the Davises (non-party, Infinite Flooring & Design, or "IFD") and Porcelanosa.  (*See generally* ECF No. 251.)

On face, this alleged 2004 contract is titled "Exclusivity Agreement," and would have given IFD exclusive rights to sell certain ventilated building facade products manufactured by Porcelanosa (or an affiliate).  (ECF No. 251-1.)  The Porcelanosa executive whose signature appears on the face of this 2004 agreement, Mr. Josep Domingot, denies having signed it, and Porcelanosa denies giving IFD or the Davises any exclusive sales rights.  (*See* ECF No. 267-13 at 4–7.)  Crew Tile contends that the 2004 agreement is genuine, but was "never implemented."  (ECF No. 251 at 5.)  In other words, much like the 2009 Distribution Agreement, the parties dispute whether the 2004 document was a valid contract granting exclusive distribution rights or is a fabrication.

Crew Tile moves to exclude evidence related to the 2004 contract on the basis that it is irrelevant, Fed. R. Evid. 401, prejudicial or distracting, Fed. R. Evid. 403, and as improper character evidence, Fed. R. Evid. 404 & 608(b).  (ECF No. 251 at 4–8.)  Crew Tile's motion on this point is denied, and the Court will allow evidence regarding the parties' interactions in 2004, including each side's evidence related to the alleged 2004 contract.

Initially, the Court finds this evidence is relevant.  Fed. R. Evid. 401–02.  To the extent the 2004 agreement is genuine, the jury may conclude that it makes it more or less likely that Crew Tile and Porcelanosa later entered into the 2009 Distribution Agreement.  If genuine, the 2004 contract could tend to disprove Porcelanosa's claim that it does not enter into exclusive distribution contracts.  And, to the extent the 2004 contract already granted an exclusive distribution right to IFD for some of the same products, during the same timeframe, the jury may infer *either* that the 2009 Distribution Agreement is not genuine, because its terms contradict or overlap with the pre-existing contract, *or* that the 2009 Distribution Agreement is more likely to be genuine, because Porcelanosa and the Davises had an existing record of entering into exclusive distribution agreements.[10]  Conversely, if the 2004 contract was contemplated or proposed by the Davises but not agreed to by Porcelanosa, that fact would tend to prove Porcelanosa's business practices did not include exclusivity agreements, and that the Davises were aware of that practice.  Therefore, regardless of which side's evidence the jury ultimately credits, the Court concludes that the evidence related to the disputed 2004 contract is relevant to the disputed issues.  The Court also concludes that the probative value of this evidence outweighs the danger that it will be prejudicial or confusing to the jury.  Fed. R. Evid. 403.

More broadly, the Court finds that evidence showing the history of the business relationship(s) between the Davis family and Porcelanosa is relevant.  It is undisputed

---

[10] Porcelanosa's evidence can be viewed as showing the ventilated facade products that were covered by the 2004 contract, and manufactured by "Butech" or "Butek," are also covered by the 2009 Distribution Agreement, since its terms address products manufactured by the same entity.  (*See* ECF No. 85-1 at 4; ECF No. 267-9 at 4.)

that Ryan Davis was at one time employed by Porcelanosa, but that his employment there was eventually terminated (although the parties also dispute the nature of this termination).  It is undisputed that, through IFD, the Davises previously entered into dealer or distribution agreements with Porcelanosa.  Neither party moves to exclude any of this evidence, and the Court concludes that this evidence of the history of the parties' business relationships will assist the jury in deciding whether it is either more or less likely that they signed the 2009 Distribution Agreement.  The Court finds the evidence related to the alleged 2004 contract is a material part of this overall history of the parties' business relationships, and this remains true, regardless of which side's evidence the jury ultimately believes.

To the extent Porcelanosa's evidence tends to show the 2004 agreement was *not* genuine, the Court will not exclude this evidence as an improper character attack against Ryan Davis under Rule 404(a).  Under Rule 404(b), "other acts" evidence may be admissible for purposes other than to show a person's character or conduct in accordance with a character trait.  For example, such evidence may be admitted to prove motive, opportunity, intent, preparation, plan, or knowledge.  Fed. R. Evid. 404(b)(2).  Related to the discussion above, the Court concludes that to the extent evidence related to the 2004 contract could be viewed as a character attack, it is nevertheless admissible under Rule 404(b) to prove, among other things, the parties' knowledge of one another's business goals or practices, the existing relationship between the parties, and the parties' opportunity to modify or expand an (allegedly) pre-existing distribution agreement to encompass different or additional products.

The Court also concludes it can effectively prevent an undue "mini-trial" or "trial-

27

within-a-trial" regarding the validity of the 2004 agreement through the regular application of Rule 403 to limit cumulative, confusing, or prejudicial evidence or a waste of time. *See also* Fed. R. Evid. 611 (Court may reasonably control mode and presentation of evidence). Finally, the Court rejects Crew Tile's suggestion that the Court must make a threshold determination of whether the 2004 contract was, in fact, forged (*see* ECF No. 251 at 7), before admitting either cross-examination, Fed. R. Evid. 608(b), or extrinsic evidence, Fed. R. Evid. 404(b) related to the 2004 contract, since the Court does not view the primary relevance or basis for admitting this evidence as character evidence or an attack on the truthfulness of either Ryan Davis or Josep Domingot. *See* Fed. R. Evid. 404(b), 608(b).[11]

## B.   Personal Relationship Between Mr. Davis and Ms. Sudovich

Crew Tile moves to exclude any evidence regarding the personal relationship between Ryan Davis and Michelle Sudovich, who was also an employee of Crew Tile and may be a witness at trial (*see* ECF No. 278), arguing this evidence is irrelevant, prejudicial, and an improper character attack. (ECF No. 251 at 8–11 (citing Fed. R. Evid. 401, 402, 403, 404(b), & 608(b).) Porcelanosa concedes, correctly, that evidence of the relationship between Mr. Davis and Ms. Sudovich is not relevant. However, Porcelanosa argues that the fact Mr. Davis has retained an attorney in his child custody dispute *is* relevant, because this tends to show (along with other examples) that the Davises "used attorneys for everything," although they did not have an attorney review

---

[11]   At trial the Court will entertain a request from any party or parties seeking a limiting instruction to direct the jury that it should not weigh evidence related to the 2004 agreement as character evidence, or as evidence tending to show that the conduct of any party in 2009 was in keeping with prior conduct or character.

the disputed 2009 Distribution Agreement.  (*See* ECF No. 267 at 5.)

The Court will exclude, under Rules 401–03 and 404, all evidence related to the personal relationship between Mr. Davis and Ms. Sudovich, including any facts related to their child custody dispute(s), or any allegations relating to Mr. Davis's conduct as a parent.  Such evidence is irrelevant to the issues in dispute and would be highly prejudicial and confusing.  Fed. R. Evid. 403.  The Court will allow Porcelanosa to briefly introduce evidence establishing that Mr. Davis has hired attorneys on other occasions.  However, the testimony and questioning on this topic must be limited to the eliciting fact that he has retained an attorney(s), and the reasons must be phrased in neutral terms such as referencing hiring an attorney for "personal matters" or "family matters," without eliciting or presenting any facts regarding the nature of the attorney representation or the underlying dispute.

## V.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.  Porcelanosa's Motion Raising Objections to the Sur-Rebuttal Report of Plaintiff's Expert, Steve[n] Hazel (ECF No. 242) is GRANTED IN PART, as set forth above.  Mr. Hazel's 2016 Report is STRICKEN and his testimony will be limited to topics addressed in his previous disclosures and reports; Porcelanosa's request for a hearing or for other "remedial measures" is DENIED.

2.  Crew Tile's Motion to Strike the Reports of Defendants' Undisclosed Experts (ECF No. 252) is GRANTED.  The "second opinion" letter-reports prepared by Messrs. Baggett and Lehew and currently included on Defendant's Final Exhibit List (ECF No. 278) as Exhibit C25 are STRICKEN.

3.      Porcelanosa's Combined Motion *In Limine* (ECF No. 253) is GRANTED IN PART

and DENIED IN PART, as set forth above.

4.      The Crew Tile Parties' Joint Motion *In Limine* to Exclude Certain Evidence,

Testimony, and Argument (ECF No. 251) is GRANTED IN PART and DENIED IN

PART, as set forth above.


Dated this 16th day of February, 2017.

BY THE COURT:

_____
William J. Martinez
United States District Judge