1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLORADO
2

   Civil Action No. 13-cv-3206-WJM-KMT
3

   CREW TILE DISTRIBUTION, INC.,
4

   Plaintiff and Counterclaim Defendant,
5

   and
6

   RYAN A. DAVIS,
7  DARLYNE A. DAVIS,
   GLENN L. DAVIS,
8  SHANA L. BASTEMEYER,
   PARADIGM TILE & STONE DISTRIBUTORS, LLC, and
9  G&D DAVIS HOLDINGS, LLC,

10  Counterclaim Defendants,

11  vs.

12  PORCELANOSA LOS ANGELES, INC.,
    PORCELANOSA NEW YORK, INC.,
13  PORCELANOSA TEXAS, CORP., and
    PORVEN, LTD.,
14
    Defendants.
15
    -------------------------------------------------------------
16
                    REPORTER'S TRANSCRIPT
17                   (JURY TRIAL, DAY 2)
                       VOLUME II
18  -------------------------------------------------------------

19       Proceedings before the HONORABLE WILLIAM J. MARTINEZ,

20  Judge, United States District Court for the District of

21  Colorado, commencing at 8:44 a.m., on the 14th day of

22  March, 2017, in Courtroom A801, United States Courthouse,

23  Denver, Colorado.

24

25

APPEARANCES

     MICHAEL S. BURG, DAVID K. TeSELLE, and DAVID J.
CROUGH, Burg, Simpson, Eldredge, Hersh & Hardine,
PC-Englewood, 40 Inverness Drive East, Englewood, Colorado
80112, appearing for the plaintiffs.

     JAMES N. THOMAIDIS, JARED A. BARNARD and JONATHAN T.
LIEBER, Gersh & Thomaidis, LLC, 1860 Blake Street, Suite
400, Denver, Colorado 80202, and
D. ELIZABETH WILLS, Wills Law Firm, LLC, 20 South Cherry
Street, Denver, Colorado 80246, appearing for the
defendants.


             MARY J. GEORGE, FCRR, CRR, RMR
          901 19th Street, Denver, Colorado 80294
          Proceedings Reported by Mechanical Stenography
             Transcription Produced via Computer

                    P R O C E E D I N G S

     (Proceedings in open court outside the presence of the

jury at 8:44 a.m.)

          THE COURT:  Mr. Thomaidis, I understand you have a

matter to raise with me.

          MR. THOMAIDIS:  I do, Your Honor.  Thank you.

          So yesterday during the course of direct slash

cross-examination, of Ms. Bastemeyer, there was a chorus of

multiple attorneys that were objecting.  And given their

proximity to the jury, I'd like to request that the Court

instruct them to just have one attorney object, and

anything else either be written or be quiet enough so the

jury can't hear it.

          THE COURT:  Okay.  I did notice that.  And I think

1     we shouldn't have three attorneys contemplating objections

2     at the same time.  You can pass notes, you can very -- one

3     person can very quietly make a recommendation to object,

4     but it really should just be one attorney primarily

5     responsible for making an objection, otherwise pass notes.

6     I agree with Mr. Thomaidis on that.

7          Mr. Thomaidis, how much longer do you have on your

8     examination?

9          MR. THOMAIDIS:  And, Your Honor, I have retooled

10     the questioning to try to get to the crux of what we need

11     for Ms. Bastemeyer.  I would anticipate that an hour, maybe

12     an hour and a half.

13          THE COURT:  All right.  Well, I need to mention,

14     to you, primarily, but to all counsel, that we need to pick

15     up the pace if we -- we want to have a prayer of finishing

16     by Wednesday.  We're just on our first witness and at least

17     appears to me that we're not progressing very well.  So

18     let's try to pick up the pace.

19          MR. THOMAIDIS:  I understand, Your Honor.  Thank

20     you.

21          MR. BURG:  Your Honor, we have another matter that

22     we'd like to have -- bring to the Court's attention.

23          THE COURT:  All right.

24          MR. BURG:  We have moved our schedule around to

25     accommodate Mr. Montilla and Mr. Handley, who are on our

1    list.

2         THE COURT:  Okay.

3         MR. BURG:  Mr. Handley is going to testify -- is

4    going to be here on Wednesday and Mr. Montilla's going to

5    be here on Friday.  Now, we already did that.  The problem

6    we have is with Mr. Domingot.  They've indicated that he

7    can't be here any time but Thursday in the middle of our

8    case, which we think is improper.  And obviously to have

9    him testify -- he's not on our list, he is their witness,

10   and it would be certainly, I think, prejudicial to have him

11   testify in the middle of our case.

12        And we told Mr. Thomaidis that we believe it's

13   unacceptable to have him come in on Thursday, that they

14   ought to have him come in during the presentation of their

15   case.  He's not an expert, he's a lay witness.  And that's

16   an issue I think Your Honor is going to have to rule on.

17        THE COURT:  Well, let me hear from Mr. Thomaidis

18   first.

19        MR. THOMAIDIS:  Your Honor, defendants'

20   perspective is we would have done everything we could to

21   get him here the following week, but, unfortunately, he's a

22   senior executive in a company.  He has some very serious

23   obligations the following week.  We intended to clear it

24   with plaintiffs' counsel fairly early on and it just wasn't

25   doable.  So --

1          THE COURT:  Well, this is -- this is how I do it

2     in my trials.  If counsel can agree and stipulate to take

3     witnesses out of order and have a witness that should be

4     called by one party in another party's case, if counsel

5     agree and stipulate, I'm fine with it, but if there's not a

6     stipulation or agreement, then that won't happen.  So you

7     need to have him come here during your case or he doesn't

8     testify.

9          All right.  Let's bring in the jury.

10          Let me just add, subject, of course, you can make

11     an agreement at any time, this afternoon or whenever.  If

12     things change and you -- and both sides will stipulate and

13     agree to take Mr. Domingot out of order, that's fine, but

14     unless and until there's such an agreement, then that order

15     stands.

16          (In the presence of the jury at 8:49 a.m.)

17          THE COURT:  Welcome back, ladies and gentlemen of

18     the jury, to day two of our trial.

19          Ms. Bastemeyer, you may resume the witness stand.

20          THE WITNESS:  Thank you, Your Honor.

21          THE COURT:  And, ma'am, I remind you that you

22     remain under oath.

23          THE WITNESS:  Yes.  Thank you, Your Honor.

24          THE COURT:  Okay.  Mr. Thomaidis, you may resume

25     your examination.

Cross - Bastemeyer

1        MR. THOMAIDIS:  Thank you, Your Honor.

2                CROSS-EXAMINATION (Continued)

3    BY MR. THOMAIDIS:

4    Q.   Would you please turn to deposition -- or, excuse me,

5    Defendants' Exhibit B-26.  Do you recall seeing this

6    e-mail, correct?

7    A.   Yes.

8    Q.   And did you read the attachment to this e-mail?

9    A.   Did I read -- yes, I'm -- yes.

10   Q.   Were you familiar with the attachment to this

11   e-mail?

12   A.   I scanned it, yes.

13   Q.   Okay.  Would you please turn to A-16, which is a

14   stipulated exhibit.  Do you recognize this document?

15   A.   I do.

16   Q.   And is this the document that was filed in this case

17   in November of 2013?

18   A.   I'm only looking at page 1 of 7, but I believe so.

19   Q.   And could you please turn to the remaining seven

20   pages.

21        COURTROOM DEPUTY:  I don't show A-16, Your Honor,

22   as having been admitted into evidence yet.

23        THE COURT:  I think that's correct.  Let me

24   just -- I show there being a stipulation.  Do you want to

25   move for its admission?

Cross - Bastemeyer

1    MR. THOMAIDIS:  Certainly, Your Honor.  Does -- do

2    defendants have it on -- as a stipulated exhibit?

3    THE COURT:  A-16, A one six?

4    MR. THOMAIDIS:  A one six, Your Honor.

5    THE COURT:  Shows on my exhibit list as a

6    stipulated exhibit.

7    MR. THOMAIDIS:  Okay.

8    THE COURT:  Are you -- are you saying that there's

9    not a stipulation?

10   MR. THOMAIDIS:  No, my understanding it is also a

11   stipulated exhibit.

12   THE COURT:  Okay.  So why are we questioning it?

13   Okay.  Given the stipulation -- I'm -- folks, I'm taking

14   the representations that are in my exhibit list and I show

15   that there is a stipulation, so there's a request to move

16   A-16 into evidence.  Given the stipulation, A-16 is

17   admitted into evidence and may be published to the jury.

18   MR. THOMAIDIS:  Thank you, Your Honor.

19   (Defendants' Exhibit A-16 received)

20   BY MR. THOMAIDIS:

21   Q.   Would you please turn to the first page -- or would

22   you please go to the first page of A-16.  And did you read,

23   Ms. Bastemeyer, the language in the first paragraph of

24   Article 1:  The company hereby appoints and grants

25   distributor the exclusive and non-assignable right to sell

Cross - Bastemeyer

1    the products of the company?

2    A.   I'm reading it now.  Like I said, I've never really

3    read verbatim, line for line, this agreement.  I know the

4    content of it, but I reviewed it, but I haven't -- so I can

5    read it.  Yes, I'm reading it.

6    Q.   Okay.  As the vice president of sales for Crew Tile at

7    this time, what did the provision "exclusive and

8    non-assignable," mean to you when you read this document?

9         MR. CROUGH:  Objection, Your Honor, she said she

10   didn't read it word-for-word.

11        THE COURT:  Well, he's asking her in her capacity

12   as an officer of the corporation.  You may answer.

13   Overruled.

14        THE WITNESS:  Well, it says the company hereby

15   appoints and grants distributor the exclusive and

16   nonassignable right to sell the products of the company,

17   products listed in the then current product line.

18   BY MR. THOMAIDIS:

19   Q.   And, Ms. Bastemeyer, what I'm asking:  As the vice

20   president of the company, what did that mean to you?

21   A.   That we are selling Porcelanosa products, the full

22   product line and portfolio.

23   Q.   Okay.  Was it your understanding that this document

24   could be assigned to another company?

25   A.   It doesn't really -- it doesn't mean one way or the

Cross - Bastemeyer

1   other to me in that.  But I'm not a lawyer, so . . .

2   Q.   Okay.  To your knowledge, did Crew Tile Distribution

3   ever seek the assistance of counsel with respect to this

4   document?

5   A.   I wasn't there when it was created; I wasn't there

6   when it was executed, so . . .

7   Q.   So if you'd please move to the bottom of the first

8   page.  And this is Article 1, paragraph 5.  Did you read

9   the language:  The distributor agrees not to represent or

10  sell other products which are deemed to be competitive with

11  the company -- or with the company's product unless agreed

12  to by the company by written notice?

13  A.   I see that.

14  Q.   Did you read this?

15  A.   Again, I did not read the contract verbatim

16  word-for-word, but I see it now.  I mean, I understand what

17  that says.  And --

18  Q.   Ms. Bastemeyer, as the vice president of sales for

19  Crew Tile Distribution, what did the provision "deemed to

20  be competitive with the company's product" mean to you when

21  you read this document?

22  A.   That you can't sell competitive products.

23  Q.   And so in your time working with Crew Tile

24  Distribution, were products by the manufacturer Sark Tile

25  and Spec Ceramics competitive with the products being sold

Cross - Bastemeyer

1   to you by Porcelanosa Los Angeles?

2   A.   No.

3   Q.   And why is that?

4   A.   Because they're cheap tile.   It's -- it's -- it's not

5   even in the same line.   Porcelanosa has the luxury tile up

6   here, and then there's the cheap tile.

7   Q.   And so in that same provision of the contract, it

8   says, unless agreed to by the company by written notice.

9   Do you see that?

10  A.   I do see that.

11  Q.   Did you ever seek -- to your knowledge, Crew Tile, did

12  you ever seek written consent from the company?   The

13  company being Porcelanosa Los Angeles.

14  A.   I'm not aware of the -- what Jack Handley or Ryan

15  talked about.   What I am aware of is that Jack Handley and

16  I had discussions about Sark Tile and Spec Tile, and it was

17  approved to be able to bring into a job to specify.

18  Q.   And --

19  A.   So --

20  Q.   And, Ms. Bastemeyer, that's not my question.

21  A.   Oh.

22  Q.   My question was:   Did Crew Tile, to your knowledge as

23  the vice president of the company, did they ever seek

24  written authorization from Porcelanosa Los Angeles to sell

25  these other competing products?

Cross - Bastemeyer

1    A.    I'm only -- I only know what Jack and I talked about.

2    I don't know what he and Ryan talked about.

3    Q.    Okay.  And, again, I'll ask the question one more

4    time.  To your knowledge, did Crew Tile Distribution ever

5    seek written consent from Porcelanosa Los Angeles to sell

6    these products?

7    A.    There may be something in writing.  I'm not aware of

8    it.

9    Q.    And if you please go to the fifth page of this

10   document, which is page 6 of 8 in the exhibit.  And there

11   under Article 6, paragraph 2, under Termination, did you

12   read the language:  This agreement may be terminated only

13   by the company if distributor files bankruptcy or is no

14   longer promoting products by the company?

15   A.    I didn't personally read that line, but I can see it

16   right here.

17   Q.    Did you read this document?

18   A.    No, I reviewed it.

19   Q.    And what is the difference between read and review?

20   A.    I looked at highlights.  I skimmed it.

21   Q.    So in this case, did you read the language:  This

22   agreement may be terminated only by the company at the end

23   of the fifth year of this agreement, upon the company

24   paying to distributor the sum of $2.5 million or present

25   company value, whichever is greater, and having given to

Cross - Bastemeyer

1    distributor 120 days note -- advance written notice of the

2    intention to so terminate?

3    A.   I was going to say -- yeah, it didn't have that part

4    on there.  Thank you for expanding that.

5    Q.   Oh, I'm sorry.

6    A.   I was aware there was a $2.5 million buyout, yes.

7    Q.   Did you consider that to be fair for both parties?

8         MR. CROUGH:  Objection, Your Honor.  Foundation.

9         THE COURT:  Overruled.

10        THE WITNESS:  Are you asking my opinion if I think

11   it's fair?

12   BY MR. THOMAIDIS:

13   Q.   As the vice president of Crew Tile Distribution, did

14   you consider that provision to be fair?

15        MR. CROUGH:  I'm sorry to keep on objecting, Your

16   Honor.  Form.  She's not the vice president of Crew Tile;

17   she's vice president of sales.  It's mischaracterizing her

18   role.

19        THE COURT:  She is a vice president, so overruled.

20        THE WITNESS:  I believe it's fair, yes.

21   BY MR. THOMAIDIS:

22   Q.   And so when you reviewed this document, did you read

23   the provision that said that this contract could be

24   canceled if Crew Tile Distribution was no longer promoting

25   the products of Porcelanosa Los Angeles?

Cross - Bastemeyer

1    A.    I see that it says that.

2    Q.    And so as the vice president of sales for Crew Tile

3    Distribution, what did that provision mean to you?

4    A.    We also had to be representing Porcelanosa, which we

5    did.

6    Q.    Were you always in a showroom and representing

7    Porcelanosa?

8    A.    We were always representing Porcelanosa, yes, whether

9    we were in the warehouse, whether we were in our showrooms.

10   The warehouse did have an area for receiving customers, so

11   a hundred percent we were always representing Porcelanosa.

12   That was what I did every day.  That's what I got up and

13   did every day.

14   Q.    I see.  Did you have any sales objectives when you

15   were the vice president of sales at Crew Tile

16   Distribution?

17   A.    What do you mean -- sure, I mean, I wanted to make

18   sure we were always performing and getting the Porcelanosa

19   product out, but did I have personal goals?  No, it was

20   myself and Ryan and Darlyne.  I did not make goals.  I just

21   worked every day to do the best I could to get the product

22   out there and worked on specific jobs.

23   Q.    So as the vice president of sales for Crew Tile

24   Distribution, did you have any minimum sales dollar that

25   you had to achieve to keep your job?

163

Cross - Bastemeyer

1    A.    No.

2    Q.    Okay.  And to your knowledge, did Crew Tile

3    Distribution have any minimum sales in dollars that they

4    had to maintain to keep this contract?

5    A.    Not that I'm aware of.

6    Q.    Did you see any when you were reviewing this

7    contract -- this exclusive distributor agreement in 2009?

8    A.    No.  I didn't see sales objectives.

9    Q.    Were they included in the document?

10   A.    Not that I've seen.

11   Q.    I'd like to please now go to Exhibit A-84.  And this

12   is also, as far as my list goes, a stipulated -- a

13   stipulated exhibit.

14            THE COURT:  Are you moving for its admission?

15            MR. THOMAIDIS:  I would like to move for its

16   admission, Your Honor.

17            THE COURT:  Given the stipulation, A-84 is

18   received into evidence and may be published to the jury.

19        (Defendants' Exhibit A-84 received)

20   BY MR. THOMAIDIS:

21   Q.    Now, Ms. Bastemeyer, are you familiar with this

22   document?

23   A.    Yes.

24   Q.    And this appears to be a draft e-mail sent from you to

25   Ryan Davis on April 2d, 2012; would you agree?

Cross - Bastemeyer

1    A.    Yes.

2    Q.    Was this draft e-mail ever finalized and sent to Crew

3    Tile Distribution's customers?

4    A.    I believe it was.  I did not send it, but I believe it

5    was sent.

6    Q.    Why do you believe it was sent?

7    A.    Because I have seen it.  I didn't send it, but I've

8    seen it.

9    Q.    Who would have sent this document?

10   A.    I believe Darlyne did.

11   Q.    And so at the top of the page here, it says, Crew Tile

12   Distribution is excited to announce we will be moving to a

13   new showroom location.  And then you go on to say, more

14   details to come.

15         What were those details that were to come?

16   A.    The showroom location.

17   Q.    And so at this time, did you not have a showroom

18   location?

19   A.    Well, no, we were moving to the warehouse in the

20   interim while we looked for another showroom, but we did

21   have showroom space within the warehouse.  There was a

22   customer receiving area and there were some racks and we

23   had all of the samples there.

24   Q.    Why were you looking for another showroom?

25   A.    Because we left the Denver Design Center.  We were

Cross - Bastemeyer

1    closing that showroom.  We were leaving.

2    Q.   Did you leave that showroom or were you evicted from

3    that showroom?

4    A.   Evicted, I suppose.

5    Q.   And so when Crew Tile Distribution moved back to its

6    warehouse, did it stop promoting the products it was buying

7    from Porcelanosa Los Angeles?

8    A.   Say that again.

9    Q.   When Crew Tile Distribution moved back to the

10   warehouse -- moved back to its warehouse facility, did it

11   stop promoting the products it was buying from Porcelanosa

12   Los Angeles?

13   A.   Absolutely not.

14   Q.   How so?

15   A.   We continued to sell Porcelanosa, we continued to be

16   in the dealers and -- I don't understand -- we were still

17   the exclusive distributor for Porcelanosa, we were still

18   promoting the product and working with dealers, doing Lunch

19   and Learns, product knowledge, all for Porcelanosa.

20   Q.   And you mentioned those things multiple times

21   yesterday, but were you actively promoting the products of

22   Porcelanosa Los Angeles?

23   A.   Yes.

24   Q.   So would Crew Tile have been in violation of the

25   exclusive distributor agreement of December 8th, 2009, if

Cross - Bastemeyer

1    it had been in place, by being evicted by its show -- from

2    its showroom?

3    A.    Say -- say that again.

4    Q.    Would Crew Tile Distribution have been in violation of

5    the exclusive distributor agreement of December 8th, 2009,

6    if it had been in place, by being evicted from the Denver

7    Design Center showroom?

8    A.    No.

9    Q.    To your knowledge --

10        MR. CROUGH:  Your Honor, may we approach?

11        THE COURT:  All right.

12    (Side bar proceedings held)

13        MR. CROUGH:  Your Honor, there is no defense in

14    this case --

15        THE COURT:  Lower your voice.

16        MR. CROUGH:  There is no defense in this case of

17    breach of contract.  The line of questioning that he's

18    getting into on whether such an action would be a breach of

19    a contract is irrelevant.  There is no defense of breach.

20    The only defense is whether or not the contract exists.

21        MR. THOMAIDIS:  And I certainly agree, Your Honor,

22    but necessary to prove a contract doesn't exist is the fact

23    that all these things were being breached, literally

24    everything.  So I don't know --

25        THE COURT:  Wait, how -- wait.  To -- to establish

Cross - Bastemeyer

1      that a contract doesn't -- does or does not exist, you have

2      to establish that it's been violated.

3             MR. THOMAIDIS:  Well, given the pattern and

4      practice of the parties, I think it is one of the

5      considerations.

6             THE COURT:  But -- okay.  If there's -- you don't

7      have a breach of contract counterclaim.

8             MR. THOMAIDIS:  Correct.

9             THE COURT:  All right.  Now, if you had a breach

10     of contract counterclaim, then all these questions would

11     have been appropriate, but I think Mr. Crough has a point,

12     there's no breach of contract.  The issue is whether the

13     contract exists, not whether it's been breached.

14            MR. THOMAIDIS:  And I understand, Your Honor, but

15     given the practice of the parties, for instance, if it --

16     if the contract existed -- and Porcelanosa's maintaining

17     that it does not -- or it had not -- and it never had a

18     copy -- if the contract was going under -- in the course of

19     performance, the vacation of the showroom would have, for

20     instance, been a breach, and Porcelanosa most certainly

21     would have put them on notice of it.  They didn't have it.

22            THE COURT:  So let's follow this through.  If --

23     if -- you're trying to establish that the contract does not

24     exist --

25            MR. THOMAIDIS:  I guess the dilemma that we

Cross - Bastemeyer

1    have -- the dilemma that we have is there can be no breach

2    of contract if the contract never existed.

3            THE COURT:  Right.

4            MR. THOMAIDIS:  And the only way we can get to

5    that is showing the precursor leading up to the contract,

6    which would be whether Porcelanosa would reasonably have

7    entered into this contract.  And then the other is the

8    course of practice of the parties while the contract was

9    ostensibly in effect.  And one of the things we've said is

10   that this contract didn't exist at all until mid-April of

11   2013, and in the course of -- Crew Tile frankly was

12   inconsistent with the contract existing in December of

13   2009.

14           THE COURT:  I see what you're saying.  You're

15   saying that if there had, in fact, been a contract, then

16   the plaintiff would have comported itself in certain

17   respects --

18           MR. THOMAIDIS:  Yes.

19           THE COURT:  -- in compliance with the contract and

20   that its failure to do so, you believe, is a -- is one

21   indicia of showing that there wasn't a contract.

22           MR. THOMAIDIS:  That's correct, Your Honor.

23           THE COURT:  I understand that.

24           MR. CROUGH:  But the way we see it, if he wants to

25   ask questions about what the parties did and then argue

Cross - Bastemeyer

1      later on whether that's consistent with the contract,

2      that's fair play.  But to stand here and ask Crew Tile

3      witnesses whether or not their actions would be forgery,

4      then make a determination for themselves whether that would

5      be a breach of the contract, goes too far.  If he's looking

6      to prove it based on the actions of the parties, we can get

7      into evidence of what the parties were doing, but asking

8      the parties whether or not this was a breach or that was a

9      breach or this was a breach, I think it is inappropriate.

10              THE COURT:  Yeah, I agree with Mr. Crough.  I

11     think that you're both right, but on this particular point,

12     he has the better of the argument, and that is what you're

13     asking these witnesses -- and I think it's one question too

14     far -- I agree, you're asking them, in effect, had it been

15     in place, assuming that there's a contract in place, would

16     there have been a breach?  And I think that's -- that's one

17     question too far.

18              I think you can establish, for example, that Crew

19     Tile was evicted from the design center and then in closing

20     argument, that's one of your contentions that you can argue

21     from that fact that you've established through these

22     witnesses that they were evicted, whatever other provisions

23     you believe was violated.  You can establish all of that

24     and argue that, their failure to meet those requisites of

25     the supposed contract is evidence that -- from which the

Cross - Bastemeyer

1    jury should infer that no such contract existed that the

2    plaintiff did comport itself to any such provisions.

3            MR. THOMAIDIS:  I understand.

4            THE COURT:  Okay.  So I'll allow you to continue

5    to ask all of those questions about what the plaintiff did

6    or didn't do, but I don't want you to ask questions of so

7    had it been in place, do you believe this would have been

8    in violation of the contract?

9            MR. THOMAIDIS:  Understood.

10           THE COURT:  All right.

11       (Side bar concluded)

12           THE COURT:  Okay.  Next question.

13   BY MR. THOMAIDIS:

14   Q.   Ms. Bastemeyer, as the vice president of sales for

15   Crew Tile Distribution, did anyone from Crew Tile

16   Distribution ever inform anyone at Porcelanosa Los Angeles

17   that Crew Tile had left its showroom in Denver Design

18   District?

19   A.   I did not, so I'm -- I would assume that somebody did,

20   but I don't have the details of that.

21   Q.   And so do you have any personal awareness, given that

22   it was you and Ryan Davis and Darlyne Davis, do you have

23   any personal either recollection, firsthand, or did you

24   hear from someone that someone had contacted Porcelanosa

25   Los Angeles?

Cross - Bastemeyer

1        MR. CROUGH:  Objection, Your Honor.  Foundation.

2   Calls for hearsay.

3        THE COURT:  Overruled.

4        THE WITNESS:  In the course of doing business,

5   obviously we had to inform them of, you know, what we -- I

6   would assume somebody did, I didn't personally, but I

7   believe somebody, they were informed.

8   BY MR. THOMAIDIS:

9   Q.   And why do you believe someone informed them?

10  A.   Well, because that's where we send our products, it

11  was our warehouse.  I don't -- I didn't inform them.  I'm

12  not sure if they were told or not, but I would assume so.

13  Q.   And wouldn't it have been important for a business

14  partner to inform another business partner of a decision

15  like that, or of an occurrence like that?

16  A.   I suppose so.

17  Q.   But you don't have any firsthand knowledge that that

18  happened?

19  A.   I don't personally know.  I did not reach out to them

20  and say -- that wasn't my place.

21  Q.   Okay.  I would like to move on to Defendants' Exhibit

22  A-85.  Now this is not a stipulated exhibit.

23       THE COURT:  Your next question, counsel.

24  BY MR. THOMAIDIS:

25  Q.   Ms. Bastemeyer, do you recognize this document?

172

Cross - Bastemeyer

1   A.   I think I've seen it in these proceedings, but I

2   didn't necessarily see this myself, like before this

3   litigation.

4   Q.   And this document was -- this court document was

5   produced two days before the e-mail that you drafted that

6   was in the previous exhibit.

7   A.   Okay.  I don't have that other exhibit up, so I can't

8   corroborate your two days.  But I'll assume you're correct.

9   Q.   Well, the previous exhibit was dated April 2d,

10  2012 --

11  A.   Okay.  You didn't have it up there, so I wanted to

12  make sure.

13  Q.   And this document is dated April 4th, 2012, would you

14  agree?

15  A.   Yes.

16  Q.   Okay.  So have you seen this document before?

17          MR. CROUGH:  Objection, Your Honor.  Asked and

18  answered.

19          THE COURT:  Sustained.

20  BY MR. THOMAIDIS:

21  Q.   What is this document, Ms. Bastemeyer?

22          MR. CROUGH:  Objection, Your Honor.  Foundation.

23  It's not in evidence.

24          THE COURT:  Yeah, you can't -- well, you know what

25  to do.  Go ahead.

Cross - Bastemeyer

1   BY MR. THOMAIDIS:

2   Q.   How do you recognize this document?

3   A.   How do I recognize it?

4   Q.   Yes, ma'am.

5   A.   I've seen it in the course of documents being produced

6   for -- for the -- these proceedings.

7   Q.   Do you recognize it as a court document?

8   A.   I do.

9   Q.   Do you recognize your former attorney, Mr. Stephen

10  Berken's name on the first and second pages of this

11  document?

12  A.   I do.

13  Q.   Then do you recognize this document?

14          MR. THOMAIDIS:   Your Honor, as the vice

15  president --

16          MR. CROUGH:   Objection --

17  BY MR. THOMAIDIS:

18  Q.   -- as the vice president of Crew Tile Distribution,

19  the vice president of sales of Crew Tile Distribution, do

20  you recognize this document?

21  A.   I did not see this document prior to this, so --

22  Q.   Okay.   Then we'll withdraw it until later.

23          Would you please turn to Exhibit A-95.

24  A.   Oh, you said to turn, I'm sorry.

25          MR. THOMAIDIS:   This is also a stipulated exhibit.

174

Cross - Bastemeyer

1    BY MR. THOMAIDIS:

2    Q.   And, Ms. Bastemeyer, do you recognize this e-mail?

3              THE COURT:  Is this already in, Deb?

4              COURTROOM DEPUTY:  Yes, Your Honor.

5              THE COURT:  Okay.

6              THE WITNESS:  Yup.  Yes, I do.

7    BY MR. THOMAIDIS:

8    Q.   Okay.  This appears to have been sent on July 27,

9    2012, would you agree?

10   A.   Yes.

11   Q.   And who is the e-mail order desk?

12   A.   That's Darlyne and Ryan.

13   Q.   Is it Darlyne or Ryan or both?

14   A.   They both have access to it, but it was primarily

15   Darlyne's e-mail.

16   Q.   I see.  And so who is rycrew22@gmail.com?

17   A.   That's Ryan's e-mail address.

18   Q.   And in this e-mail, you appear to be responding to an

19   e-mail from Darlyne Davis regarding a discontinued tile

20   called Ruggine; is that accurate?

21   A.   Yes.

22   Q.   And you then said you are going to discuss with Ryan

23   Davis to see what else we may have that is similar in

24   Porcelanosa's Sark and Spec.  Would you agree?

25   A.   Thank you.  Sure.

Cross - Bastemeyer

1    Q.   So why would you be asking -- why were you inquiring

2    about these similar products to Porcelanosa in Sark Tile

3    and in Spec Ceramics Tile?

4    A.   Similar in color, because sometimes, as I discussed

5    yesterday, with budgeting, you have to have an inexpensive

6    or a cheaper tile to be able to round out the entire

7    project.

8         And as you can see, this is for the Grand Junction

9    Medical Center -- GJMC is Grand Junction Medical Center.

10   And, of course, when you're doing a project like that,

11   budgeting -- not everything is going to have the luxury

12   tile, so you need a lower-end or a cheaper tile to be able

13   to make sure that you can get the entire job.

14   Q.   I see.  And so here you say, I'll discuss with Ryan to

15   see what else we may have that is similar in Porcelanosa,

16   Sark and Spec, and then we will provide the whole picture

17   and options.

18   A.   Uhm-hum.

19   Q.   Were you talking about a different -- a similar color

20   or were you talking about similar tile?

21   A.   Similar colors.  "Ruggine (all colors are discontinued

22   per Jack)" so we needed to find some additional colors.

23   Q.   Was Crew Tile promoting and selling not only

24   Porcelanosa tile, here but also tile of Sark and Spec

25   Ceramics, at least as of July 27, 2012?

Cross - Bastemeyer

1    A.    Promoting and selling, no.

2    Q.    And why not?

3    A.    Because we were promoting Porcelanosa.  And in order

4    to move the sale along for Porcelanosa with the budgetary

5    constraints that some people have -- again, you can't

6    always use the luxurious tile in an employee bathroom, a

7    janitor's closet, a back hallway, and so you needed to find

8    similar things that had the same color but definitely not

9    luxurious.

10   Q.    I see.  Would this have been a violation of the terms

11   of the exclusive distributor agreement of December 2009 --

12   I'm sorry, I'll withdraw the question.

13          It also seems that you were evaluating products

14   that were similar in Porcelanosa's, Sark and Spec Ceramics;

15   would you agree?

16   A.    No.

17   Q.    If these products were similar to one another, would

18   that not mean that they were competitors of one another?

19   A.    Similar in color.  If you read down the e-mail, all

20   colors are discontinued per Jack.  We were looking for

21   additional color options.

22   Q.    But you were looking for an additional color option in

23   a piece of tile; is that right?

24   A.    Yes.  Sark and Spec have tile.

25   Q.    And so you were looking for a different color from a

Cross - Bastemeyer

1   different manufacturer; is that accurate?

2   A.   That could be -- different color, yes.

3   Q.   So what color were you looking for?  What color is

4   Ruggine?

5   A.   Ruggine had earth-tone colors.

6   Q.   I see.  So you were looking for another earth-tone

7   colored tile --

8   A.   Uhm-hum.

9   Q.   -- from Sark or Spec Ceramics?

10   A.   Similar.  Yeah.

11   Q.   Okay.  Please turn to another stipulated exhibit.

12   This is trial Exhibit B-7.

13   A.   Do I need to turn to it?  I'm sorry.

14   Q.   No, it should come up on your screen.  And I believe

15   this is in evidence, but perhaps it isn't.  If not, I would

16   move to admit it.

17           THE COURT:  I see that it's up there, and --

18           MR. THOMAIDIS:  Oh, sorry.  Thank you, Your Honor.

19           THE COURT:  I'm trusting Ms. Hansen to put up

20   there what's in evidence, so . . .

21   BY MR. THOMAIDIS:

22   Q.   So this appears to be an e-mail dated October 19,

23   2012; would you agree?

24   A.   October 19, 2012, yes.

25   Q.   And so at this point in time, were you and the Davises

Cross - Bastemeyer

1  doing business as Crew Tile Distribution or as Paradigm

2  Tile & Stone Distributors?

3  A.   We were doing business as both.

4  Q.   How so?

5  A.   Paradigm was an affiliate entity created as a

6  complement to Crew to help expand the marketplace to sell

7  Porcelanosa products.  That's all Paradigm did was

8  Porcelanosa products through Crew.

9  Q.   And so you say here, Ryan would like to take a look at

10  this letter with you one more time this morning before it

11  gets e-mailed out.

12       Did this get sent out to Crew Tile Distribution,

13  Incorporated -- or Incorporated's customers?

14  A.   I believe so.  I believe -- but I didn't send it

15  myself.

16  Q.   And who would have sent this document?

17  A.   Darlyne would have sent it.

18  Q.   And so in the first paragraph under Dear Valued

19  Customer, it says here, Exciting changes and a diversified

20  product mix.  What does that include?

21  A.   No, I see it.  We were just moving into our new

22  showroom and we were going to have more Porcelanosa

23  products show cases.  We didn't have any other product

24  showcased.

25  Q.   Did you ever inform Porcelanosa Los Angeles that you

Cross - Bastemeyer

1    were moving into a new showroom?

2    A.    I did not personally, no.

3    Q.    Are you aware of anyone at Crew Tile Distribution

4    providing that information to Porcelanosa Los Angeles?

5    A.    I would have to go on the assumption, since we moved

6    out of our warehouse and had a new address to ship product

7    to, that they were informed, but I did not inform them.

8    Q.    So your assumption is that because you had a different

9    address, they would know that you switched showrooms?

10   A.    I would assume they would understand we had a new

11   location.

12   Q.    I see.  So if you look at the next paragraph down, it

13   says, Moving forward all communications will come through

14   Paradigm Tile & Stone Distributors, including all invoices.

15   Effective immediately, please remit all payments and make

16   checks payable to Paradigm Tile & Stone Distributors.

17           Do you see that?

18   A.    I do.

19   Q.    What were you trying to communicate when you said

20   that?

21   A.    I believe at the time we were trying to smooth out

22   operations and kind of just put things together and make it

23   easy for our customers.

24   Q.    And so why would you smooth out operations by having

25   your customers pay Paradigm Tile & Stone Distributors

Cross - Bastemeyer

1   versus simply having your customers pay Crew Tile

2   Distribution?

3   A.   That was a decision between Darlyne and Ryan.   I

4   wasn't -- I didn't deal with -- I wrote the letter, but I

5   didn't deal with financial stuff.

6   Q.   I see.   So you weren't privy to why they were

7   switching from Crew Tile Distribution's bank accounts to

8   Paradigm Tile & Stone Distributors' bank accounts?

9   A.   No, I did not deal with bank accounts.

10  Q.   And so you don't know why you're now saying in this

11  draft e-mail that all payments and checks payable must come

12  through Paradigm Tile & Stone Distributors?

13  A.   That was how it was explained to me and that's what I

14  put in the letter, yes.

15  Q.   And so Crew Tile Distribution was operational at this

16  time in October of 2012.   Why were payments not coming

17  through that company and, instead, going through Paradigm

18  Tile & Stone Distributors, LLC?

19          MR. CROUGH:   Object to foundation.

20          THE COURT:   Yeah, let's get more foundation in

21  there.

22  BY MR. THOMAIDIS:

23  Q.   Now, you were previously working for Crew Tile

24  Distribution, correct?

25  A.   Yes.

181

Cross - Bastemeyer

1    Q.    And you subsequently were working for Paradigm Tile &

2    Stone Distributors, correct?

3    A.    Yes.

4    Q.    And at the time, you were one of three employees of

5    the company, if I understand your testimony correctly.

6    Right?

7    A.    Yes.

8    Q.    And so, to your knowledge, was Crew Tile Distribution

9    operational at this time?

10   A.    Crew?  Absolutely.

11   Q.    How so?

12   A.    I -- I called on our customers, I -- I don't know the

13   details, but I -- I represented Crew and Paradigm.  I was

14   always out representing both.  I didn't make a distinction

15   between the two, but I was representing both.

16   Q.    And so if both were in existence, is there a reason

17   why all the payments are now required to go through

18   Paradigm Tile & Stone Distributors?

19   A.    I don't know that reason.

20   Q.    Did you ever -- ever have any communication with

21   anyone in Crew Tile Distribution or Paradigm Tile & Stone

22   Distributors about why that was occurring?

23   A.    I didn't ask, no.

24   Q.    Was this because you and the Davises didn't want money

25   in Crew Tile Distribution's accounts?

Cross - Bastemeyer

1          MR. CROUGH:  Object to foundation.

2          THE COURT:  Sustained.

3          MR. THOMAIDIS:  I'll withdraw the question.

4    BY MR. THOMAIDIS:

5    Q.   Ms. Bastemeyer, if you'd go down a little further in

6    this document, you'll see that there's a section there that

7    talks about the location.  Do you see that?

8    A.   I -- yeah.

9    Q.   And --

10   A.   Down here?

11   Q.   I'm sorry?

12   A.   All the other stuff is highlighted, so which part

13   would you like me to look at specifically?

14   Q.   I'm referring to this bottom section beginning

15   right -- oops -- beginning right here to here.

16   A.   Okay.

17   Q.   Now, was Crew Tile Distribution doing business at that

18   same location?

19   A.   Yes.

20   Q.   And so is there a reason why you're not including Crew

21   Tile Distribution on this e-mail?

22          MR. CROUGH:  Objection, Your Honor.

23   Mischaracterizes the evidence.

24          THE COURT:  How so?

25          MR. CROUGH:  Crew Tile Distribution mentioned in

Cross - Bastemeyer

1   the first part, Your dear valued customer, Crew --

2        MR. THOMAIDIS:  I can refine the question.

3        THE COURT:  All right, go ahead.

4   BY MR. THOMAIDIS:

5   Q.   So the question about the location being effective

6   immediately, it says Paradigm Tile & Stone Distributors,

7   and there's no mention of Crew Tile in that first section.

8   Is there a reason for that?

9   A.   No, I -- I mean, Crew's mentioned up there.  I -- I

10  was just giving an address.

11  Q.   And so then as we move down the page, just slightly,

12  but the 12445 East 39th Avenue, Unit 502, is that the same

13  location that Crew Tile Distribution was doing business out

14  of?

15  A.   Yes.

16  Q.   And then if you go down a little bit further, it says

17  material pickup, Unit 518; do you see that?

18  A.   Yes.

19  Q.   Was that material pickup for the business clients you

20  were working with or the retail clients you were working

21  with?

22  A.   We didn't work with retail clients.  We only worked

23  with dealers.

24  Q.   I'm sorry.  So you had testified previously that

25  Paradigm Tile & Stone Distributors was designed to handle

184

Cross - Bastemeyer

1    retail customers and smaller businesses; is that right?

2    A.    That is incorrect.

3    Q.    I'm sorry.  Then would you please explain.

4    A.    Paradigm had a different customer segmentation.  It

5    went after the designers who were working on large specs

6    but may have had home-based businesses, not out of an

7    interior designer showroom.

8    Q.    I see.

9    A.    It's not retail.

10   Q.    And so those smaller companies, were they doing

11   pickups at Unit 518?

12   A.    I would assume so.  I mean, the designer, if they were

13   going to pick up their material that they ordered for a job

14   that they had specified and they were using Porcelanosa,

15   yeah, they would come pick it up from us.

16   Q.    And so with the larger companies, the dealers and the

17   other retailers, would they have come to the same location,

18   Unit 518, to pick up material?

19   A.    Yes.

20   Q.    And so is there a reason why Crew Tile Distribution

21   isn't included here?  Wouldn't those customers have needed

22   to know?

23   A.    It is included.  It says it at the top.

24   Q.    I see.  So let's move down a little bit further.  It

25   says all phone numbers and e-mail addresses will remain the

Cross - Bastemeyer

1    same.  Do you see that?

2    A.    I do.

3    Q.    Is that the same telephone number as Crew Tile

4    Distribution had had previously?

5    A.    I -- I believe so.

6    Q.    Are you sure?

7    A.    Yes.

8    Q.    Okay.  Is that the same fax number that Crew Tile

9    Distribution had previously?

10   A.    Yes.

11   Q.    And is that the same web address that Crew Tile had

12   previously?

13   A.    Web address.  I'm not seeing a web address on what

14   you're showing me here.

15   Q.    It says underneath fax number, it says

16   Crewtiledistribution@yahoo.com?

17   A.    That's an e-mail address, not a web address.

18   Q.    Oh, I'm sorry.  So did it still have the same e-mail

19   address at that time?

20   A.    Yes.

21   Q.    So why did none of these things change?

22   A.    Why would they need to?

23   Q.    Were you aware that Paradigm Tile & Stone

24   Distributors, LLC, was a different legal entity than Crew

25   Tile Distribution, Incorporated?

Cross - Bastemeyer

1    A.    I am aware of that, yes.

2    Q.    And so why would these not have needed to be changed

3    to account for this new company?

4    A.    Well -- well, it doesn't make sense.  I mean, why

5    would you do that?  They're calling -- they know we're the

6    exclusive Porcelanosa dealer, so they're calling for

7    Porcelanosa product.  So I don't see what changing the

8    phone number would have anything to do -- it's probably a

9    convenience for our customers.

10   Q.    I see.  And then if you move a little bit further down

11   the page, to the, Thank you, Ryan Davis, general manager,

12   Paradigm Tile & Stone Distributors, do you see that?

13   A.    I do.

14   Q.    And then underneath all of that -- and it appears to

15   be his same e-mail address as previously, correct?

16   A.    That is correct.

17   Q.    And underneath that it says, Your Colorado Porcelanosa

18   Distributor.

19   A.    Correct.

20   Q.    Was Paradigm Tile & Stone Distributors, LLC, your

21   Colorado Porcelanosa distributor at this time?

22   A.    Through Crew.

23   Q.    And if there was a contract, hypothetically, that

24   included only Crew Tile Distribution, would Paradigm Tile &

25   Stone Distributors have been party to that contract?

Cross - Bastemeyer

1    A.    Working through Crew, I looked at Paradigm as like a

2    dealer, I suppose, that was only all about Porcelanosa, and

3    then the account ran through Crew.

4    Q.    So was Crew Tile Distribution purchasing Porcelanosa

5    products at this time?

6    A.    Yes.

7    Q.    Was Paradigm Tile & Stone Distributors purchasing

8    Porcelanosa products at this time?

9    A.    I don't know how that account -- but if there was an

10   account set up, I'm not aware of that financial -- I know

11   Crew was buying, but I don't know about how Paradigm, how

12   that worked.  I believe it went through the Crew account.

13   That's my opinion, though.  I didn't deal with the

14   financials.

15   Q.    So aside from yourself and Ryan Davis and Darlyne

16   Davis, was there anyone else working at Crew Tile

17   Distribution at this time?

18   A.    You know, maybe a warehouse guy, but no, nope, just

19   the three of us pounding the pavement.

20   Q.    And so at the time that this e-mail was written, aside

21   from you and Darlyne Davis and Ryan Davis, was there anyone

22   else working at Paradigm Tile & Stone Distributors at this

23   time?

24   A.    No, outside of a warehouse guy that would have been in

25   the warehouse, I don't believe so.

188

Cross - Bastemeyer

1    Q.    But did you think it was appropriate to -- while

2    sending this out as Paradigm and Stone Distributors, did

3    you think it was appropriate to refer to that company as

4    Your Colorado Porcelanosa Distributor?

5    A.    Well, because it's titled to Dear Valued Customer,

6    Crew Tile Distribution is proud to announce we are

7    expanding.  So we're expanding with Paradigm and we're

8    still the Colorado Porcelanosa distributor.

9    Q.    Ms. Bastemeyer, as the -- in your position with

10   Paradigm Tile & Stone Distributors, LLC, and also with Crew

11   Tile Distribution, was it expanding at this time?

12   A.    Sure.  We were going after new customer markets and

13   segments.  We were looking for ways to increase

14   Porcelanosa's exposure in the market.  And that was always

15   the goal, always the goal.

16   Q.    And is there any reason why Crew Tile Distribution

17   couldn't have expanded to capture this market segment that

18   you've described without creating a new legal entity like

19   Paradigm Tile & Stone Distributors, LLC?

20   A.    Like I say, Crew's focus was on large flooring dealers

21   and the large architects with large jobs out there.  This

22   was a different entity created to promote and support that

23   effort and the agreement Crew had with Porcelanosa.

24   Q.    And so I'm not certain that you answered my question.

25   A.    I'm sorry.

Cross - Bastemeyer

1    Q.   My question was:  Is there any reason why Crew Trial

2    Distribution, Incorporated, couldn't have done what

3    Paradigm Tile & Stone Distributors, LLC, professes to be

4    doing?

5    A.   I think we wanted to expand the market and come up

6    with a different brand for us to be able to do that.

7    Q.   And, again, I don't think you're answering my

8    question.  My question is:  Is there any reason why Crew

9    Tile Distribution, Incorporated, couldn't have done what

10   Paradigm Tile & Stone Distributors professes to be now?

11   A.   I -- I don't know.  I -- I don't -- I mean, I don't

12   understand -- I assume they could, but that wasn't the

13   decision that was made.  It wasn't my decision, so . . .

14   Q.   So as the vice president of sales now for Paradigm

15   Tile & Stone Distributors, LLC, was there any reason that

16   Crew Tile Distribution couldn't do these exact same things?

17        MR. CROUGH:  Objection, Your Honor.  Asked and

18   answered.

19        THE COURT:  Sustained.

20        MR. THOMAIDIS:  I'll withdraw the question.

21        THE COURT:  Let's move on.

22   BY MR. THOMAIDIS:

23   Q.   Would -- can we please go to trial Exhibit B-21.

24        This is a stipulated exhibit that has not been

25   entered as an exhibit yet.

Cross - Bastemeyer

1    COURTROOM DEPUTY:  B-21 has been admitted.

2    MR. THOMAIDIS:  Oh, it has?

3    COURTROOM DEPUTY:  And it's on your screen.

4    MR. THOMAIDIS:  Ah, thank you.

5  BY MR. THOMAIDIS:

6  Q.   So I -- you testified about this document previously,

7  correct?

8  A.   I'm not sure.  I haven't in the last couple of days.

9  Yesterday or today.  I -- we haven't gone over this, no.

10  Q.   Do you recognize this document?

11  A.   I do.

12  Q.   Okay.  And at the bottom of the page there, it appears

13  that there is an e-mail from

14  paradigmtiledistributor@gmail.com.  Do you see that?

15  A.   I do.

16  Q.   And whose e-mail address is that?

17  A.   It's Darlyne's.

18  Q.   And you described it previously with what you

19  described as Love, M; is that right?

20  A.   I don't have that part on my screen, sir.

21  Q.   I'm sorry.  Can you please expand it?

22  A.   Yes, she did sign it Love, M.

23  Q.   So at this time, are you and the Davises doing

24  business as Crew Tile Distribution or Paradigm Tile & Stone

25  Distributors, LLC?

Cross - Bastemeyer

1   A.    Both.

2   Q.    Now, in this e-mail, it appears that Paradigm Tile &

3   Stone Distributors, Darlyne Davis, is sending this to

4   shanabcrew@yahoo.com; do you see that?

5   A.    I do.

6   Q.    Did you ever change your professional e-mail address

7   from shanabcrew@yahoo.com to a different e-mail address?

8   A.    No.

9   Q.    And is there a reason why not?

10  A.    Ease.

11  Q.    And so in this e-mail, Darlyne Davis is saying -- why

12  is Darlyne -- excuse me, she's saying, Ry agreed you should

13  call, and then in parentheses, business as usual.  Do you

14  see that?

15  A.    Yes.

16  Q.    So what was Ms. Davis -- or Mrs. Davis communicating

17  to you at this time with respect to "business as usual"?

18  A.    That even though Porcelanosa had told us on the 10th

19  that we are no longer going to -- they are no longer going

20  to be working with us, we still had customers to take care

21  of, jobs to fill, and we were still moving forward with

22  business as usual because we were hoping that, you know,

23  they would change their mind.

24  Q.    And so describe for me what happened on April 10th,

25  2012, if you would.

Cross - Bastemeyer

1    A.    We were supposed to have a sales and marketing call,

2    product knowledge.  That was supposed to be a Skype call.

3    Skype didn't work, so they changed it to a conference call.

4    It was Jeff and Paco, myself and Ryan.  It was a very short

5    call.

6         Paco got on the call and said -- or on the phone

7    and said to us that they were coming in and opening a

8    Denver showroom, taking over the Colorado market, and that

9    they weren't going to be working with us anymore, and Ryan

10   said, You can't do that.  We have a contract.  And we said

11   all this before.

12   Q.    I'm sorry.  I don't want to belabor it.  Were you in

13   attendance on that telephone call?

14   A.    I was.

15   Q.    Did you announce yourself on that telephone call?

16   A.    Yes.

17   Q.    Okay.  And so after this Skype call occurred --

18   A.    It wasn't a Skype call.

19   Q.    I'm sorry, this Skype conference call -- Skype

20   telephone calls --

21   A.    It wasn't Skype.  Skype didn't work.  It turned to a

22   phone call, speaker.

23   Q.    So once this conference call occurred, did you and

24   Ryan Davis have any discussions about what was going to

25   happen next?

Case 1:13-cv-03206-WJM-KMT   Document 360   Filed 05/05/17   USDC Colorado   Page 44 of 313

Cross - Bastemeyer

1    A.    Sure.  I mean, we were, like I said, shocked, anger.

2    Went through a process of what are we going to do now?

3    Q.    I see.  And so if we go back to Exhibit B-21, at the

4    top of the page there, you're again including Paradigm Tile

5    & Stone Distributors, Colorado Porcelanosa Distributor.  Do

6    you see that?

7    A.    Uhm-hum.

8    Q.    And that is different from the previous exhibit that

9    we looked at, which said, just simply, your Colorado

10   Porcelanosa distributor.

11   A.    Sure.

12   Q.    Is there a reason why that changed?

13   A.    Not necessarily.  I put it in there.

14   Q.    And so was there any reason why you wouldn't have put

15   that in every e-mail that you would have sent?

16   A.    I think there was at a time we didn't have "exclusive"

17   in there because of Pitkin County, out of respect for

18   them.

19   Q.    Out of respect for whom?

20   A.    The territory -- the person who had the territory in

21   Aspen, because we weren't all of Colorado, so we didn't

22   have Pitkin County or Aspen.

23   Q.    And so why did you not have Pitkin County or Aspen, to

24   the extent that you know?

25   A.    They already had an exclusive agreement with

Cross - Bastemeyer

1    Porcelanosa for that area, so that was prior.

2    Q.   And so in conducting business as usual, did you do

3    anything in particular to perform business as usual with

4    Crew Tile Distribution and Paradigm Tile & Stone

5    Distributors?

6    A.   Sure, we kept continuing to get product, samples, and

7    keep working toward filling the Porcelanosa -- our jobs and

8    our customers and making sure they were taken care of and

9    we were working still with Porcelanosa.

10   Q.   Okay.  And then if you would now please turn with me

11   to trial Exhibit B-20.  I think this is stipulated to, but

12   I don't believe it's been entered as an exhibit.

13          COURTROOM DEPUTY:  B-20 has been admitted.

14          MR. THOMAIDIS:  Oh, it has?  Okay.

15   BY MR. THOMAIDIS:

16   Q.   So please look at B-20.  Now here is an e-mail which

17   is also on April 12th, 2013, you responding to

18   paradigmdistributor@gmail.com and also to Ryan Davis, would

19   you agree?

20   A.   Yes.

21   Q.   And so is this you conducting business as usual?

22   A.   Sure.  We were opening up a new customer.

23   Q.   Okay.  And so given that you had these other tile

24   manufacturers previously, is there any reason why you

25   weren't considering business as usual at this time?

195

Cross - Bastemeyer

1    A.    I -- I'm sorry, I don't understand your question.

2    Q.    If Crew Tile Distribution was open and successful and

3    if Paradigm Tile & Stone distributors was newly opened and

4    also successful, is there a reason why you would have been

5    considering anything other than business as usual?

6    A.    Is there a reason why we wouldn't -- well, they had

7    just told us two days before that they weren't going to

8    work with us anymore.  I mean, that would -- that would --

9    so yeah, but --

10   Q.    Did they tell you -- did Porcelanosa Los Angeles tell

11   you that they weren't going to work with you anymore or did

12   they say they simply intended to open a showroom in

13   Denver?

14   A.    They were coming in and taking the Colorado

15   territory.

16   Q.    And is that what Paco Montilla said to you on that

17   telephone call?

18   A.    That is what he said.

19   Q.    And you're certain?

20   A.    Yes.

21   Q.    And so please go to B-22.

22         Has this been entered as an exhibit?

23         MR. CROUGH:  They were stipulated and not used.

24         MR. THOMAIDIS:  So I may move the entry of --

25         THE COURT:  Is it in, Deb?

196

Cross - Bastemeyer

1    COURTROOM DEPUTY:  Yes, it is, Your Honor.

2    THE COURT:  It is.  B-22.

3  BY MR. THOMAIDIS:

4  Q.   So you had given some testimony about this document

5  previously, correct?

6  A.   Correct.

7  Q.   And so this is an e-mail from

8  paradigmtiledistributor@gmail.com, correct?

9  A.   Correct.

10  Q.   And this is sent on Sunday, April 14, 2013, so

11  approximately two days after the previous e-mail; is that

12  right?

13  A.   Yes.

14  Q.   And so why is Darlyne Davis sending you a Word

15  document titled distributoragreement.doc?

16  A.   Because in that time period, we were exploring all

17  options.  Ryan was looking at -- we needed to make sure if

18  Porcelanosa wasn't going to fill our orders as they had

19  indicated, then we needed to figure out what we needed to

20  do to keep our customers happy and fill the jobs, and so we

21  did in this time frame kind of explore options of other

22  manufacturers that would be nonexclusive so that we could

23  make sure we kept our customers happy and our jobs filled

24  if that's where it -- what it came to.

25  Q.   And so would you agree that this is a template of an

Cross - Bastemeyer

1   exclusive distributor agreement that Darlyne Davis sent you

2   on April 14th, 2013?

3   A.   Well, this isn't a template, this is just the

4   e-mail.

5   Q.   And we'll -- but the attachment?

6   A.   Okay.  Well, yeah, if I could see the attachment, but

7   yeah, I believe so.  If that's what you're -- I mean, I

8   want you to show it to me first before I answer it under

9   oath.

10  Q.   You provided testimony on this exhibit yesterday,

11  correct?

12  A.   Right.

13  Q.   And you looked at the attachment at that time,

14  correct?

15  A.   So it's -- you would show me the same attachment then?

16  Because you talked about it as being a Word doc and all of

17  this, so I wasn't sure if you were . . .

18  Q.   Let's go to the first page of the attachment.

19          COURTROOM DEPUTY:  What exhibit number are we?

20          MR. THOMAIDIS:  This is trial Exhibit B-22, page 2

21  of 5.

22          COURTROOM DEPUTY:  Thank you.

23  BY MR. THOMAIDIS:

24  Q.   Do you recognize this document?

25  A.   I do, yes.

198

Cross - Bastemeyer

1   Q.   What is it?

2   A.   It is the template of the Sark agreement, a blank

3   template, that Darlyne sent me to -- that we could use if

4   we needed to.

5   Q.   Okay.  And at the top there, it says, by and between

6   Sark Tile, Incorporated, located in Lincoln, Nebraska, and

7   Crew Tile Distribution, Incorporated.  Would you agree?

8   A.   Yes.

9   Q.   And so did you ever enter into -- at least as to your

10   knowledge, did you ever enter into an exclusive distributor

11   agreement with Sark Tile Distribution?

12   A.   That was before I was officially with Crew, but yes,

13   they did.

14   Q.   Okay.

15   A.   February of 2012.

16   Q.   And Sark Tile is a manufacturer of tile, correct?

17   A.   Yes.

18   Q.   I misspoke.  To my knowledge, did you ever enter into

19   an exclusive distributor agreement with Sark Tile out of

20   Lincoln, Nebraska?

21   A.   Yes, there was an agreement that was signed.  It

22   wasn't executed, but it was signed.

23   Q.   What's the difference between being signed and being

24   executed?

25   A.   We never went forward with it.

199

Cross - Bastemeyer

1   Q.   I see.  Was it an exclusive agreement?

2   A.   I -- I didn't read it then so I don't -- I don't

3   honestly know --

4   Q.   Okay.

5   A.   -- truthfully, I don't know.

6   Q.   Would you please turn to same trial exhibit, B-22,

7   page 4 of 5.  Have you seen this page -- this attachment

8   before?

9   A.   I've seen it.  I've never really ever read it.

10  Q.   So is there a reason why Article 6, paragraph 1 there,

11  Notice or Communication, it says Sark Tile, 901 West

12  O Street, Lincoln, Nebraska?

13  A.   I haven't --

14  Q.   It's right here.

15  A.   I mean, I see that address, I don't understand your --

16  what is the question?

17  Q.   Is there a reason, to your knowledge as a -- as an

18  employee of these companies, is there a reason why that

19  says Sark Tile, Incorporated?

20  A.   I don't -- I guess I -- I apologize, I don't quite

21  understand your question.  I don't -- I mean, I see it

22  there.  I don't . . .

23  Q.   Maybe we should take another shot at this.  Are you

24  familiar with the document that's an attachment to this

25  e-mail?

Cross - Bastemeyer

1    A.    Yes.   I'm familiar with it.   I've --

2    Q.    And so why are you familiar with the attachment?

3    A.    Because Darlyne sent it over to me.

4    Q.    And so why did Darlyne send it over to you?

5    A.    We were exploring options, if we weren't going to be

6    able to get Porcelanosa product, how we would take care of

7    our customers and fill the jobs that we had.   So it was

8    an -- exploring an option.

9    Q.    I see.   And so what did Darlyne Davis mean when she

10   says, Here's what I found for a distributor agreement.

11   It's exclusives, but we can fix that?

12   A.    It means that we weren't looking for an -- we wanted a

13   nonexclusive agreement, if we were going to go and try to

14   fill those jobs.   But we ended up never doing that.

15   Q.    And so what does Darlyne Davis say when -- or what

16   does Darlyne Davis mean when she says, We can fix that?

17   A.    It's -- so we were looking for a template with a -- to

18   go to another manufacturer that Ryan might have been

19   familiar with.   Not Sark.   But using this -- and being able

20   to -- we weren't looking for an exclusive.   We needed --

21   we -- if we were going to explore another manufacturer to

22   help keep our lights on and do the -- fill the jobs that we

23   had, if Porcelanosa truly was not going to ship to us

24   anymore and fill our -- give us product, then we needed to

25   make sure our customers were taken care of.

Cross - Bastemeyer

1     Q.   And so who was Darlyne Davis referring to when she

2     says, We can fix that?

3                MR. CROUGH:  Objection, Your Honor.  Form.

4                THE COURT:  Yeah, sustained.  Why don't you ask

5     Ms. Davis, when she's on the witness stand, what she meant.

6                MR. THOMAIDIS:  Understood, Your Honor.

7     BY MR. THOMAIDIS:

8     Q.   Ms. Bastemeyer, did you have anyone specifically that

9     you and Ryan Davis and Darlyne Davis had contemplated

10    entering into another agreement with at this time in April

11    2013?

12    A.   No, not to my -- there was nobody specific.  It was

13    Ryan knew some different people out there and there were

14    options and we needed to figure out what we could do, but

15    there wasn't anybody specific.  We were just kind of like,

16    let's put all of this out on the table and see what we can

17    do to make sure we make -- kept our customers happy.

18    Q.   So was Darlyne Davis sending you this Word document so

19    you and Ryan Davis could create the contracts that's now

20    the center of this case?

21    A.   Absolutely not.

22    Q.   Would you agree that the purported distributor

23    agreement that is attached to this e-mail looks nearly

24    identical to the document that was later sent to -- sent to

25    Darlyne Davis by you?

Cross - Bastemeyer

1   A.   Without comparing -- I mean, I -- I don't know what

2   you -- they're different.  No, one was Crew Tile and

3   Porcelanosa, and this is a Sark template.

4   Q.   Did you ever review these documents side-by-side?

5   A.   Did I?  No.

6   Q.   So, Ms. Bastemeyer, what did you do with this Word

7   template of an exclusive distributor agreement that Ms. --

8   that Darlyne Davis sent you?

9   A.   Nothing.

10  Q.   You did nothing with it?

11  A.   It -- nothing ever happened with it.  No.

12  Q.   Did you or Ryan Davis ever take this document -- this

13  Word document that Darlyne Davis sent you on Sunday, April

14  14th, 2013, and modify it?

15  A.   No.  We weren't going to move forward with the

16  decision -- no, we didn't move forward with anything like

17  this.  We were operating as business as usual.  We needed

18  to find some solutions, possibly explore solutions, if

19  Porcelanosa wasn't going to bring product, what we could do

20  to make sure our customers were happy and we can fill our

21  jobs, and then there was a conversation and none of this

22  was -- we dropped all of this.

23        We decided that we had -- Ryan had a conversation

24  with Ray and everything was put on hold because we had an

25  agreement and we needed to make sure that we understood

203
Cross - Bastemeyer

1   what that agreement meant and that we didn't do anything to

2   hurt our agreement.  We did everything to protect it and

3   this never went anywhere.

4          THE COURT:  Mr. Thomaidis, how much longer do you

5   have?

6          MR. THOMAIDIS:  I've got, I think, four exhibits

7   and maybe 20 minutes.

8          THE COURT:  Oh, you -- it's not quite what you

9   told me before the jury came out.  Let's move it along,

10  please.

11         MR. THOMAIDIS:  Sorry, Your Honor.

12  BY MR. THOMAIDIS:

13  Q.   Did you and Ryan Davis take that modified Word

14  document and put Mr. Jack Handley's signature on it?

15  A.   No.

16  Q.   And later on April 19, 2013, did you circulate to Ryan

17  Davis, Darlyne Davis, Glenn Davis, this newly created

18  agreement and send it for their review?

19  A.   No.

20  Q.   So let's go ahead and move on to Trial Exhibit B-23,

21  please.

22         MR. THOMAIDIS:  Your Honor, I don't believe this

23  has been entered as an exhibit at this time.  It has been

24  stipulated to.

25         COURTROOM DEPUTY:  It's been admitted.

204

Cross - Bastemeyer

1          MR. THOMAIDIS:  Sorry.

2          THE COURT:  Let me tell you again, Mr. Thomaidis,

3    when you see an exhibit come up on the back screen, that

4    means it's -- the jury is seeing it in their monitors, that

5    means it's been admitted, because Ms. Hansen doesn't put it

6    up there unless it's admitted.

7          MR. THOMAIDIS:  I understand.  If it --

8          THE COURT:  All you need to do is glance over

9    there if you have a question as to whether something's in

10   evidence.

11         MR. THOMAIDIS:  Done.  Thank you.

12   BY MR. THOMAIDIS:

13   Q.   So, Ms. Bastemeyer, are you familiar with this

14   exhibit?

15   A.   Yes.

16   Q.   And what is it?

17   A.   It's a past due payment notice for -- yeah, it's for

18   our website.  I just wanted to make sure it was -- yeah,

19   it's -- it was for Crew Tile website.

20   Q.   Okay.  And so why was Crew Tile past due in paying for

21   its web address?

22   A.   It wasn't my area.

23         MR. CROUGH:  Object to form, "past due."

24         THE COURT:  Sustained.

25         MR. THOMAIDIS:  May I get you to please expand the

Cross - Bastemeyer

1    bottom portion of this e-mail.  Now there in the subject

2    line, it says, Past-due payment notice.  Do you see that,

3    Ms. Bastemeyer.

4    A.    In the subject?  Yes, I see that.

5    Q.    So is there a reason why Crew Tile Distribution was

6    past due with respect to its payment for its website, to

7    the extent you know?

8    A.    Well, to me, this says service period, April 14th,

9    2013, through April 13th, 2014.  This is April 15th.  So

10   it's one day, if I'm reading this correctly.

11   Q.    Okay.

12   A.    So -- and the service period would have been -- that

13   14th -- if the 15th was a Monday, that would have been on a

14   Sunday, so that could maybe account for the day.

15   Q.    But this e-mail indicates that credit card that was on

16   file didn't go through.

17   A.    Okay.

18   Q.    Would you agree?

19   A.    It says -- yes, it says there is a -- yup, it says

20   that.

21   Q.    Okay.  Let's please move up to the next section of

22   this exhibit.  All right.  Right here.  The next section

23   down -- perfect -- no, a little bit further.  That's great,

24   thank you.

25        And so you see this section -- second e-mail in

Cross - Bastemeyer

1   the string, correct?

2   A.    From order desk to Ryan?

3   Q.    Correct.

4   A.    Is that the one?  Yes, I see that.

5   Q.    Do you see that's copying you as well?

6   A.    Yes.

7   Q.    And this is dated Monday, April 15, 2013; would you

8   agree?

9   A.    Yes.

10  Q.    And so this is Darlyne Davis corresponding with you,

11  right?

12  A.    Myself and Ryan, yes.

13  Q.    Okay.  She says, See below, should I pay for this?  Is

14  there a reason why Darlyne Davis wouldn't have paid for

15  Crew Tile Distribution's website in this time frame?

16          MR. CROUGH:  Object to foundation.

17          THE COURT:  Sustained.  I think she's testified

18  she wasn't involved in the financial matters of the

19  company.

20          MR. THOMAIDIS:  Okay.

21  BY MR. THOMAIDIS:

22  Q.    Is there a reason why you and Ryan Davis and Darlyne

23  Davis would not have wanted to keep the Crew Tile website

24  running if it was an operational and successful business?

25  A.    No, we always wanted to keep the -- the website up and

Cross - Bastemeyer

1    running.  This just shows that the credit card was -- could

2    have had a bad expiration date, and if there was a credit

3    card on file, wouldn't you just assume it would

4    automatically renew?  And so now since they tried and

5    something was bad with that card or there was an issue with

6    that card, they're sending notice that, hey, we have an

7    issue, send us some different card.

8            I mean, I have that happen -- I have that happen

9    to me all the time.  I don't understand --

10   Q.   Is there a reason why --

11   A.   I don't -- I don't -- my opinion, reading this, it

12   isn't as though she's not -- it -- we weren't not paying

13   it, it was a credit card that was on file that probably had

14   a bad expiration date or something, and so when it came

15   time to renew, they're letting us know.

16           And she's saying, Should I pay for this, because

17   this is five days after we were just told by Porcelanosa

18   that they're coming into the market.  So she's just

19   questioning -- everything was a question.

20   Q.   Was this part of you and Ryan Davis and Glenn Davis

21   and Darlyne Davis' plan to maintain the appearance that

22   Crew Tile Distribution was business as usual while you

23   created the contract that's at the center of this case?

24   A.   Absolutely not.

25   Q.   So please move to the top, this top section of this

Cross - Bastemeyer

1    e-mail.

2          And here you say -- or here you're saying, Per

3    Ryan - we need to show stability and good faith that we are

4    operating and have a working website.  Do you see that?

5    A.   Uhm-hum.

6    Q.   If Crew Tile Distribution was operating and successful

7    at this time, why would you and Ryan Davis and Glenn Davis

8    and Darlyne Davis need to show stability?

9    A.   We wanted to show good faith to our customers and --

10    and filling our jobs.  We knew what Porcelanosa was going

11    to say or do if they're coming into the Colorado

12    marketplace.  We were protecting our customers.  We were

13    showing stability and having our website staying up,

14    absolutely.

15    Q.   And so if you're working to show stability, why was

16    Crew Tile Distribution not stable?

17    A.   They had just kind of rocked our foundation five days

18    ago.

19    Q.   Was the reason this e-mail was sent because Crew Tile

20    Distribution was actually not functioning at this time?

21    A.   That is incorrect.

22    Q.   And was it because you and the Davises were actually

23    operating a new business called Paradigm Tile & Stone

24    Distributors, LLC?

25    A.   We were operating both.

Cross - Bastemeyer

1    Q.    If we could please now go to trial Exhibit B-26.   You

2    testified about this document yesterday, correct?

3    A.    I -- yes.

4    Q.    And so why were you sending an e-mail with what's now

5    titled crewporcelanosadistagreement.pdf to Ryan Davis,

6    Glenn Davis, Darlyne Davis, on Friday, April 19, 2013?

7    A.    Because at some point there we all wanted to take a

8    look at the agreement, and so I scanned it and I sent it to

9    everyone that was -- we wanted to make sure we understood

10   what we had and we wanted to get it into that -- into our

11   hands and make sure we knew how best to move forward.

12   Q.    How did you get this document?

13   A.    Ry brought it to me.

14   Q.    And so didn't Ryan Davis and Darlyne Davis and Glenn

15   Davis already have this document?

16   A.    Not in an electronic format.   I scanned it.   Yeah, we

17   had a -- we had a paper copy, but I want -- we put this and

18   we scanned -- I scanned it so we could send it and

19   eventually it got sent to Ray.

20          THE COURT:   Let's keep going.

21   BY MR. THOMAIDIS:

22   Q.    So why does this document look so much like the Word

23   document titled Distributor Agreement.doc that was sent to

24   you five days previously?

25   A.    Because that was the template of the blank Sark

Cross - Bastemeyer

1    agreement that Jack Handley provided, and so it would make

2    sense, I suppose, that it looks like the other one.   I

3    mean, it was a document that was provided by Jack Handley,

4    I assume that they used that as a template.

5    Q.   So you're certain that Jack Handley sent this document

6    to you and Ryan Davis and the rest of the people at Crew

7    Tile Distribution?

8         MR. CROUGH:   Object to form.   Which document are

9    we talking about now?

10        MR. THOMAIDIS:   I'm referring to the attachment in

11   trial Exhibit B-26, Your Honor.

12        THE COURT:   All right.   With that clarification,

13   you can answer the question.

14        THE WITNESS:   So are you -- you're asking me if

15   I'm certain that Jack Handley brought the agreement that

16   was signed by Crew on December 14th, 2009?   I wasn't there,

17   but to the best of my knowledge, yes.

18   BY MR. THOMAIDIS:

19   Q.   And so let's talk about the document that was attached

20   as trial Exhibit B-22.   Would you mind blowing it up.

21   Please go to the first page of this document.

22        What about this document?   Who gave you this

23   document?

24   A.   Jack Handley.

25   Q.   And you're certain?

Cross - Bastemeyer

1    A.   Yes.

2    Q.   So now if we could please go back to Exhibit 26.   And

3    so when you sent this e-mail on April 19th, 2013, by this

4    time had you and Ryan Davis fixed all you needed to fix

5    with the Word document Darlyne Davis sent five days

6    previously?

7    A.   I don't even know how to answer that.

8    Q.   I'd like you to answer, Ms. Bastemeyer.

9    A.   Please say the question again.

10   Q.   By this time, had you and Ryan Davis fixed all that

11   you needed to fix with respect to the Word document Darlyne

12   Davis sent on April 14th, 2013?

13   A.   We didn't fix anything with it.   We didn't -- it

14   didn't go anywhere.   We didn't -- we thought about

15   exploring options with other manufacturers, but at the end

16   of the day, we didn't.   There was a conversation with Ray

17   and he said, You guys have a contract, don't do anything to

18   jeopardize that.   So nothing was fixed.

19   Q.   So why were you sending this e-mail with the document

20   titled crewporcelanosadistagreement.pdf to Ryan Davis and

21   Glenn Davis and Darlyne Davis on April 19th, 2013?

22          MR. CROUGH:   Your Honor, I'm not trying to be

23   disruptive.   Asked and answered.   He's going over old

24   ground.

25          THE COURT:   Sustained.   And we went through this

Cross - Bastemeyer

1    yesterday as well.  Let's move on to something else.

2         MR. THOMAIDIS:  I'll move on.

3    BY MR. THOMAIDIS:

4    Q.   Ms. Bastemeyer, were you sending this e-mail to

5    Darlyne Davis, Glenn Davis, Ryan Davis, to make sure that

6    the attached document had their approval?

7    A.   No.

8    Q.   What did you and Ryan Davis and Glenn Davis and

9    Darlyne Davis intend to do with the document that was

10   attached to this e-mail?

11   A.   Review it as a group.  Make sure Ray saw it, that we

12   all understood, and we were going to go see a lawyer.

13   Q.   Ms. Bastemeyer, in the context of this case, isn't it

14   true that this is the first time this document appears in

15   any of the documents that have been produced in this case?

16        MR. CROUGH:  Object to form.

17        THE COURT:  I didn't understand that question.

18        MR. THOMAIDIS:  Sorry, Your Honor.

19   BY MR. THOMAIDIS:

20   Q.   In the course of the discovery of this case, there

21   have been many documents produced, correct, Ms.

22   Bastemeyer?

23   A.   Many documents produced in the course of this case,

24   yes, I would -- yes.

25   Q.   Would you characterize it as hundreds of thousands of

Cross - Bastemeyer

1    pages?

2    A.    Well, yesterday in your opening you said a quarter of

3    a million, so I'll -- you have seen more than probably I

4    have, so . . .

5    Q.    So to the extent you reviewed documents in this case,

6    is this the first time chronologically that this document

7    appears in the documents in the case?

8    A.    It's the first time it was -- that I scanned -- that I

9    personally scanned it, so I don't really know where -- what

10   you mean, but it's the first time I scanned it and that I

11   sent it and I circulated it.

12   Q.    How many copies of this document were executed,

13   according to plaintiff and counter defendants in this case?

14   How many originals were executed?

15            MR. CROUGH:   Object to foundation, Your Honor.

16   We've already been there on the execution date, she wasn't

17   there.

18            THE COURT:   Sustained.

19   BY MR. THOMAIDIS:

20   Q.    To your knowledge, did any Porcelanosa Los Angeles

21   representative or any other defendant ever possess a copy

22   of this document?

23   A.    To -- say that again.

24   Q.    To your knowledge, did any Porcelanosa Los Angeles

25   representative, or any defendant, ever possess a copy of

214

Cross - Bastemeyer

1   this document?

2   A.   I assume Jack and Paco took a copy with them after

3   they signed it.  I wasn't there, though.

4   Q.   Do you have any firsthand knowledge, Ms. Bastemeyer,

5   of either Jack Handley or Paco Montilla having this

6   document in their possession?

7   A.   I wasn't there when they signed it and when they left,

8   but I'm -- naturally I would assume that they took a copy

9   for themselves.

10  Q.   You interfaced with Jack Handley, correct?

11  A.   Yes.

12  Q.   And you interfaced with Paco Montilla, correct?

13  A.   Yes.

14  Q.   Did they ever mention to you that they had a copy of

15  this contract?

16  A.   They talked to me in terms of working within the

17  agreement.  They never sat me down and said, You know what,

18  Shana, I got a copy right -- no, I mean, that's not how

19  conversations go.  We -- we operated within -- they always

20  acknowledged that we had an agreement, we talked about

21  working toward the agreement.  I . . .

22  Q.   So when you scanned this document in, was it your

23  intention to send a copy of it to Crew Tile Distribution's

24  investor, Ray Perry?

25  A.   Yeah, I didn't send it to him, but . . .

215

Cross - Bastemeyer

1    Q.    What was your intention for scanning the document in?

2    A.    For all of us to -- I wanted to circulate it between

3    all of us so we could review it and make sure that we

4    understood that -- what we had and that we could go to a

5    lawyer.

6    Q.    Were there any other reasons?

7    A.    I don't believe so.

8    Q.    Let's go ahead and move on to trial Exhibit B-29,

9    please.   This is another stipulated document.

10            Do you recognize this e-mail?

11   A.    Yes.

12   Q.    So why were you writing this e-mail?

13   A.    To let our customers know that there's going to be a

14   price increase and that there were some changes by

15   Porcelanosa to us that would affect our customers as far as

16   special orders and discontinued items.

17   Q.    And if there was a price increase, you would still be

18   selling Porcelanosa Los Angeles products, wouldn't you?

19   A.    Yeah, we will send out new price lists.

20   Q.    And this is dated July 29th, 2013, correct?

21   A.    Correct.

22   Q.    So Porcelanosa Los Angeles didn't really cut you off

23   and discontinue products on April 10th, did they?

24   A.    No, but that's when they started -- as I've testified,

25   samples would be 12 weeks out, they wouldn't ship product,

216

Cross - Bastemeyer

1    it all had to come from Spain, or -- I mean, it just took

2    forever to get anything from them.

3    Q.   Are you --

4    A.   They slow-played it, trying to just, I don't know,

5    starve us out, probably.

6    Q.   Are you familiar with the logistics of shipping

7    tile?

8    A.   I don't know exactly what you mean by -- would you

9    explain "logistics," what you mean by that?

10   Q.   One of the pieces of testimony that we saw from your

11   deposition yesterday was that each individual job was, as

12   you said, job-packed from Porcelanosa.

13   A.   No, not from Porcelanosa, we job-packed.  Crew Tile

14   job-packed.

15   Q.   So were you familiar with transporting fragile tile

16   from point A to point B?

17   A.   Sure.

18   Q.   Okay.  It's heavy, it's complicated to move,

19   correct?

20   A.   Yup.

21   Q.   And it takes time, correct?

22   A.   Sure.

23   Q.   Okay.

24        THE COURT:  Mr. Thomaidis, we're going to take our

25   morning break at 10:30, and you will conclude your

217

Cross - Bastemeyer

1    examination at that time.

2         MR. THOMAIDIS:  I will, Your Honor.  Thank you.

3         THE COURT:  You --

4         MR. THOMAIDIS:  Oh, I'm sorry, I thought we were

5    taking our break.

6         THE COURT:  No, let me repeat what I said.  We'll

7    take our morning break at 10:30.  It's 10:15.  You will

8    conclude your examination of this witness at 10:30.

9         MR. THOMAIDIS:  Understood.  Thank you, Your

10   Honor.

11   BY MR. THOMAIDIS:

12   Q.   To your knowledge, Ms. Bastemeyer, on July 29th, 2013,

13   did Porcelanosa have any price increases that they passed

14   on to Crew Tile Distribution or Paradigm Tile & Stone

15   Distributors?

16   A.   Yes, we were informed --

17   Q.   So --

18   A.   No, we were informed of a price increase by

19   Porcelanosa.

20   Q.   And so who informed you at Porcelanosa that there had

21   been a price increase?

22   A.   I -- I don't know where the information -- where the

23   letter or how the call came, but I do know there was a

24   price -- a new price list that was sent and Darlyne put

25   together -- implemented it for us.

Cross - Bastemeyer

Q.   Who received that telephone call?

A.   Again, I don't know if it was a telephone call or an e-mail.  I didn't receive -- I wasn't personally notified, but I believe it went to Darlyne and to Ryan.

Q.   And so why are you asking for thoughts from Darlyne Davis and Ryan Davis in this e-mail about its contents if the Porcelanosa prices had simply increased?

A.   Because they are the ones that had the conversations with them and I wanted to make sure I had the document written correctly.

Q.   And so, Ms. Bastemeyer, at this time, were you aware that Porcelanosa was selling its products through companies like Home Depot?

A.   Oh, I've -- that's a national account.

Q.   And what about the Great Indoors at the time?

A.   Well, the Great Indoors had closed in Colorado but, yeah, I was aware it was a national account.  We -- Ryan -- when they closed in Colorado up in Denver -- up south, he went, I think, and even picked up their racks.

Q.   What about a company called Prosource?  Were you familiar that they were selling Porcelanosa products?

A.   I believe that Prosource Denver was a national account.  I think they were a franchise or something.  But Prosource Denver was a national account for Porcelanosa.

Q.   And to your knowledge as the vice president of sales

Cross - Bastemeyer

1    for either Crew Tile Distribution or Paradigm Tile & Stone

2    Distributors, any provision in the contract that would

3    account for things like national accounts?

4    A.    I -- I don't remember seeing anything -- any language

5    written like that, but I believe it was national accounts

6    are national accounts that go -- they're not in -- within

7    the Colorado territory, you're always going to have some

8    sort of national deal.

9            MR. THOMAIDIS:  I see.  I have no further

10   questions, Your Honor.

11           THE COURT:  All right.  We'll take our morning

12   break.  We will be in recess for 15 minutes.

13       (Recess at 10:18 a.m. to 10:38 a.m.)

14           THE COURT:  Ms. Bastemeyer, I remind you you

15   remain under oath.

16           THE WITNESS:  Yes, sir.  Thank you.

17           THE COURT:  All right.  Redirect.

18           MR. CROUGH:  No redirect, Your Honor.

19           THE COURT:  All right.  Ma'am, you may step

20   down.

21           THE WITNESS:  Thank you, Your Honor.

22           THE COURT:  Plaintiff/counter defendants may call

23   their next witness.

24           MR. BURG:  Thank you, Your Honor.  We would call

25   Ray Perry.

220

Direct - Perry

```
 1        COURTROOM DEPUTY:  Right here, sir.  If you'll

 2   just stand right there and raise your right hand.

 3        RAYMOND PERRY, PLAINTIFFS' WITNESS, SWORN

 4        COURTROOM DEPUTY:  Please be seated.  Please state

 5   your full name for the record and spell your first and last

 6   name.

 7        THE WITNESS:  My name is Raymond Perry.

 8   R-a-y-m-o-n-d, P-e-r-r-y.

 9                    DIRECT EXAMINATION

10   BY MR. BURG:

11   Q.   Good morning, Your Honor.  Ladies and gentlemen of the

12   jury.  Counsel.

13        Good morning, Mr. Perry.

14   A.   Good morning.

15   Q.   Would you please tell the jury a little bit about your

16   education, where you went to school and the year you

17   graduated.

18   A.   I grew up in Pueblo.  After graduating from high

19   school, I went to the University of Northern Colorado in

20   Greeley.  I graduated in 1989.

21   Q.   And what was the degree in?

22   A.   I got a bachelor of science in business administration

23   with an emphasis in accounting.

24   Q.   Mr. Perry, where are you employed?

25   A.   I work for a company called Spectrum Retirement
```

Direct - Perry

1    Communities.

2    Q.   What does Spectrum Retirement Communities do?

3    A.   We build senior living facilities around the

4    country.

5    Q.   How long have you worked for Spectrum?

6    A.   I've worked for the principal of Spectrum for 28

7    years.

8    Q.   Can you tell the jury -- first of all, what is your

9    job description at Spectrum?

10   A.   I'm senior vice president of acquisitions and

11   dispositions.  I handle the acquisition and disposition of

12   raw land that we build senior living communities on.

13   Sometimes when we build, we sell some of them, we sell very

14   little.  When it's time to sell them, I sell them to

15   investors.

16   Q.   Can you tell the jury what that entails in terms of

17   what you need to do specifically at your job with regard to

18   your position with Spectrum.

19   A.   We find areas around the country that we feel there's

20   a need with seniors for communities for them to live in.

21   We do independent living, assisted living, and memory care

22   facilities.  We'll find an area and I'll go out and find 10

23   locations in an area roughly, narrow that down to two

24   locations, and start negotiating on those and pick one.

25            Negotiate a contract, a price, the contract, and

222

1    see through the entitlement process and the closing of the

2    purchasing of the land.

3    Q.   What do you do to determine whether or not the raw

4    land that you're looking at is actually going to be a

5    good -- a good place to put a senior living housing place

6    in?

7    A.   We do demographic studies.  We have a demographic

8    company that we engage to tell us how many seniors are in

9    the area that are qualified, both age- and income-wise, for

10   the type of facility that we're looking to build.

11   Q.   And what else do you do?  Do you look at demographics,

12   do you look at need, competition?

13   A.   We look at demographics, once again, to find out how

14   many seniors are there, how many qualify.  Then we look at,

15   for that number of seniors that are there, that -- you

16   know, that's what the demand is.  We figure out what the

17   supply is, so we figure out who our competitors are in the

18   region that we're looking to, to enter into, and then we

19   figure out if there's -- you know, if there's a need based

20   upon the supply and demand that are in place.

21   Q.   And would you describe that as your due diligence?

22   A.   Yes.

23   Q.   Okay.  And before you would invest in a company, do

24   you do due diligence, Mr. Perry?

25   A.   I do.

223

Direct - Perry

1   Q.   Telling -- tell the jury a little bit generally what

2   you do in terms of your due diligence before you invest in

3   a company.

4   A.   I've invested in a number of companies and I would try

5   to find out kind of what the prospect was, what the growth

6   of the company.  You know, starting out a new business, a

7   lot of times it's -- what I'm investing in, it's -- you're

8   trying not to necessarily look at what today -- today's

9   value or promise is, but, you know, what it is three, four,

10  five years down the road, and how you feel like you can

11  potentially help the growth of that business and what the

12  potential is.

13  Q.   And can you tell the jury when you first met anyone

14  associated with Crew Tile.

15  A.   I met Ryan Davis on -- on Halloween of 2009, so

16  October 31st, 2009.

17  Q.   Okay.  Where -- how did you meet him?

18  A.   I was out in Las Vegas for a fight.  I had a friend

19  who was a professional fighter at a fight in Las Vegas.

20  Ryan Davis was out there for the same fight.  A mutual

21  friend introduced us.

22  Q.   At the time you met in Las Vegas, did you have any

23  discussions with him in Las Vegas about Crew Tile?

24  A.   I did not.

25  Q.   Okay.  Subsequent to coming back to Denver after the

Direct - Perry

1    fight in Las Vegas, did you have discussions with Mr. Davis

2    about Crew Tile?

3    A.    I did.

4    Q.    Can you tell the jury generally what those discussions

5    entailed.

6    A.    Mr. Davis told me that he was working with a company

7    called Porcelanosa, that he was working on getting an

8    exclusive distribution agreement put together, so they'd

9    be -- he'd be the exclusive distributor of Porcelanosa Tile

10   in the state of Colorado, outside of Pitkin County.  And

11   that he was looking for me to potentially be an investor in

12   the company.

13   Q.    Can you tell the jury the time frame in which those

14   discussions occurred after your coming back from Las Vegas

15   on Halloween?

16   A.    I would say probably two or three weeks after we got

17   back from Las Vegas is when Ryan contacted me.

18   Q.    And after he began to discuss with you the potential

19   of being an investor in Crew Tile, did you do your due

20   diligence or some due diligence at that time?

21   A.    I did do some due diligence.  I kind of wanted to

22   continue to learn more about the company, so I continued to

23   have conversations with Ryan over the following months

24   about that.

25   Q.    Did you do any due diligence with regard to the

225

Direct - Perry

1    Spanish company, Porcelanosa?

2    A.    I did.  I work with a Spanish architect, an architect

3    from Spain, the entire family is from Spain, and I asked

4    him about Porcelanosa, if he was familiar with them, their

5    product, things of that nature.  And he said he definitely

6    was and had a very glowing endorsement of their product.

7    Q.    When you indicate you worked with that architect,

8    that's in your position at Spectrum?

9    A.    It is not.  Outside of my position at Spectrum, I do

10   other deals.  I had built some homes on my own or with

11   investors and this gentleman, Carlos Alvarez from Spain,

12   had been the architect on those for those homes that I

13   built.  I also built a home for myself.  He was the

14   architect for the home I built for myself.

15   Q.    After you discussed that with him, can you tell us,

16   did you have follow-up conversations with Mr. Ryan Davis

17   about the potential opportunity to invest with Crew Tile?

18   A.    I did.

19   Q.    And can you tell the jury generally what those

20   discussions entailed.

21   A.    I talked to Ryan about just what the possibility was,

22   after talking to Carlos Alvarez, the architect.  You know,

23   he described Porcelanosa as the GE of Spain, that they were

24   a very large company.  And so I kind of, you know,

25   mentioned that to Ryan and talked to him about the

Direct - Perry

1    possibility in how big Porcelanosa was and, you know, kind

2    of what the potential was.

3         Ryan said he was very familiar with their product,

4    that he worked with it in the past, and that he thought it

5    was a great opportunity.

6    Q.   And during these discussions, did Mr. Davis talk to

7    you about his plan to have an exclusive distributor

8    agreement with Porcelanosa to be their exclusive in

9    Colorado, with the exception of Pitkin County and Aspen?

10   A.   He did.

11   Q.   And can you tell me when those discussions occurred.

12   A.   I -- they occurred throughout a number of

13   conversations that I had with Ryan, but one of the early

14   conversations, maybe not the first, he said that

15   representatives of Porcelanosa were flying out to see the

16   showroom and to execute a exclusive distributor agreement

17   with -- with Crew Tile.

18   Q.   And when Mr. Davis told you that, did he talk about

19   the potential of you meeting with Mr. Montilla and Mr.

20   Handley who were the representatives and managers and sales

21   managers for Porcelanosa California?

22   A.   He did.  He didn't mention them by name, he said two

23   representatives.  But he said, you know, I want you to hear

24   from them, I want you to ask them questions, you know,

25   about their company, you know, about what the growth

Direct - Perry

1   potential is.  I'd like them to just speak with you and get

2   familiar with you and vice versa.

3   Q.   Did Mr. Davis eventually give you a firm date in which

4   those individuals were going to be flying out to execute

5   the contract and then meet with you?

6   A.   He did.

7   Q.   And do you recall what the date was?

8   A.   I think through depositions and things of that nature,

9   I believe it was December 14th of 2009.

10  Q.   Okay.  And let me ask you, did you attend the meeting

11  at the -- at the showroom where Mr. Montilla was, Mr.

12  Handley, Darlyne Davis, and Ryan Davis?

13  A.   I did not.

14  Q.   Okay.  How was it set up where you were going to meet

15  with Mr. Montilla and Mr. Handley on their visit to Denver

16  on December 14th, '09?

17  A.   Ryan had set up a lunch meeting at Elway's in

18  Cherry Creek and they were -- Mr. Montilla, Mr. Handley,

19  were meeting Ryan at the showroom, they were going to walk

20  the showroom, take a look at it.  You know, it was my

21  understanding sign this agreement, and then they were going

22  to meet me for lunch at Elway's in Cherry Creek.

23  Q.   All right.  And did they meet you at Elway's in

24  Cherry Creek on December 9th, '09?

25  A.   I believe it's December 14th --

228

Direct - Perry

1   Q.   December 14, I'm sorry.

2   A.   Yes, they did.

3   Q.   Okay.  Who was at the lunch meeting?

4   A.   It was myself, Ryan, Paco Montilla, and Jack

5   Handley.

6   Q.   And what was the mood of the meeting?

7   A.   It was very excited.  Everyone was very happy and

8   laughing and joking, and just seemed to be a lot of energy,

9   you know, at the lunch, and everyone seemed to be very

10  happy with -- with each other and the situation.

11  Q.   And can you tell the jury what Mr. Montilla said about

12  Ryan and about the opportunity to you as the potential

13  investor?

14  A.   Ryan introduced me as a potential investor, and Paco

15  said, I think this is a great opportunity for you.  I think

16  there's huge potential for growth.  This is a great

17  company.  We'd love to have you come in and be an investor

18  with Ryan.  He's our guy.

19       You know, he must have said -- he must have called

20  Ryan -- he said eight or nine times, he's our guy.  Ryan's

21  our guy.  And just was very complimentary of Ryan and of

22  the opportunity and of what he said was a great opportunity

23  to build the Porcelanosa business here in Colorado.

24  Q.   Did you ask any questions of Mr. Montilla or Mr.

25  Handley about this opportunity -- potential opportunity for

Direct - Perry

1    you?

2    A.   I did.  I asked him kind of how they saw the growth

3    happening in Colorado.  Mr. Montilla was almost bragging

4    about how they built the business up in the United States.

5    He talked about the showroom they have in LA, as well as

6    the showroom they have in Miami.  He talked about how it

7    was like a $5 million showroom, one of them was like an

8    $8 million showroom, and how much business they were doing.

9    I don't remember exactly what the volume was at the time.

10   But he said if you started out and you grow it correctly,

11   it could be huge.

12   Q.   Did anyone at that meeting tell you specifically, We

13   signed a contract this morning?

14   A.   They did not say that specifically at the meeting,

15   no.

16   Q.   Was there anything that was said that gave you the

17   impression that they had not signed a contract that

18   morning?

19   A.   No, at the contrary, I was under the impression that

20   they had.

21   Q.   Did you confirm with Mr. Davis some time after that

22   meeting as to whether or not either Mr. Handley or Mr.

23   Montilla had signed the contract?

24   A.   I did.  I spoke with Ryan probably a couple of days

25   after, maybe the next day, and he said that they had signed

230

Direct - Perry

1   the agreement and that they had been granted the exclusive

2   distributorship for Colorado for Porcelanosa Tile.

3   Q.    Was he -- was he -- was it your understanding that Mr.

4   Montilla -- what was your understanding about from Mr.

5   Montilla and Mr. Handley as to whether this was a vacation

6   to Denver and this was a side trip or whether they were

7   going in and out the same day?

8   A.    It was my understanding they were -- Paco and Jack

9   were flying in that morning just to meet with Ryan and to

10  meet with me and then flying back to California.

11  Q.    Okay.  So they were in and out the same day.

12  A.    Yes.  I think the only thing they did was meet with

13  Ryan and I.

14  Q.    Okay.  And how long did the lunch last?

15  A.    Oh, it was probably an hour and a half, two hours, I

16  would imagine.

17  Q.    And after the meeting, did you immediately invest in

18  the company?

19  A.    I didn't.  It was a tough time in our economy; we were

20  going through the great recession.  And being in the real

21  estate business, you know, you have to put tile into new

22  buildings, I knew things were slow, so, you know, I told

23  Ryan I was interested, but that I kind of wanted to

24  continue to investigate it, see how the economy was turning

25  around.

231

Direct - Perry

1       I believed that it was going to, but I didn't know

2   how long it was going to take and, you know, kind of what

3   the progression would be.

4   Q.   In your own business in Spectrum, were you -- was

5   people at Spectrum, including yourself, concerned about the

6   economy at that point in time?

7   A.   Absolutely.

8   Q.   And with regard to your hesitancy, what more due

9   diligence did you want to do before you would decide

10  whether or not you would invest?

11  A.   I wanted to talk to some home builders that I knew

12  that I have good relationships, one of my best friends is a

13  homebuilder.  I wanted to ask him what his thoughts were

14  about, you know, home building starting to increase in

15  Colorado.

16       I wanted to talk to -- more to my architect about

17  what his thoughts were, as well as talk to him about using

18  Porcelanosa tile in the jobs that he spec'd.  And just

19  watching the economy in general, as much as anything.

20  Q.   And did you ultimately decide to become an investor in

21  Crew Tile?

22  A.   I did.

23  Q.   And can you tell the jury when you decided to become

24  an investor?

25  A.   I think I made the decision to do it in roughly May or

232

Direct - Perry

1   June of 2010.  And I gave checks, you know, to Crew Tile as

2   my investment in June or July.

3   Q.   And how much did you invest?

4   A.   $50,000.

5   Q.   And did you do that in one check or multiple checks?

6   A.   I believe I did it in three.

7   Q.   Three checks?

8   A.   Yes.

9   Q.   Oh, in the May, June, timetable?

10  A.   Correct.  May, June, July timetable, yes.

11  Q.   And what was -- what were the factors that entered

12  into it for you to decide to invest in Crew Tile in May and

13  June?

14  A.   I think the biggest factor was there was an expansion

15  of DIA, of the airport, and they had granted -- awarded the

16  right to design it to Spanish architect, a gentleman named

17  Santiago Calatrava.  And in talking to Ryan and talking to

18  my architect, they said this guy was world known, and I

19  also had heard that he used Porcelanosa tile to spec that

20  in a lot of projects that he had done.  I thought it was a

21  huge opportunity, and that really is kind of what pushed me

22  to I better get into this -- this deal.

23  Q.   Did you -- did you want to have an opportunity to even

24  invest more money if the opportunity occurred?

25  A.   I did.  When Ryan and I were first talking, we were

Direct - Perry

1    talking about investing 15 percent investment money to

2    obtain 15 percent.  After I found out about Santagio

3    Calatrava, I asked for the option to acquire up to another

4    15 percent of the company, so I could potentially own 30

5    percent.

6    Q.    And did that ever come to fruition?

7    A.    It did not.

8    Q.    After that initial meeting with Mr. Montilla and Mr.

9    Handley, did you have subsequent meetings with them?

10   A.    I did.  I probably met with Jack, oh, probably four or

11   five times.  I met with Paco twice; you know, once at the

12   first meeting and then he came out about a year later.

13   Q.    Can you tell -- tell the jury what that second meeting

14   with Mr. Montilla was about.  And by the way, did Mr.

15   Handley come with him that second meeting?

16   A.    He did.

17   Q.    All right.  Can you tell the jury what was discussed

18   at that second meeting that you had with him about a year

19   later.

20   A.    It had come to Ryan's attention, or Ryan had informed

21   me that it had come to his attention that Jack Handley had

22   been selling Porcelanosa tile directly to dealers and to

23   customers --

24   Q.    Would that have been -- based on your understanding of

25   the agreement, would that have been in violation of the

234

Direct - Perry

1    agreement?

2    A.    Yes.

3    Q.    Okay.  Can you tell the jury what was discussed at

4    that second meeting.

5    A.    The second meeting Paco came out -- the first meeting,

6    you know, Paco was bragging about Porcelanosa and could

7    not -- he could not have been more full of himself and

8    confident.  The second meeting he came in, you know, very

9    reserved and, you know, just came in, you could tell he

10   felt bad about what had happened, and felt like, you know,

11   kind of he or Jack had gotten caught.  He apologized a

12   number of times that Jack had done this, said that he was

13   sorry and said that it would discontinue.

14   Q.    When you say he was sorry, what was he sorry about --

15   first of all, who else was at that meeting beside you, Mr.

16   Montilla, Mr. Handley?

17   A.    So it was Paco Montilla, Jack Handley, myself, Ryan,

18   and Michelle Sudovich.

19   Q.    Okay.  Can you -- can you be more specific:  What was

20   Mr. Montilla apologizing about?

21   A.    Mr. Montilla was apologizing that Jack had sold

22   product and had been in contact with dealers that we sold

23   to, as well as clients that we were speccing deals for.

24   Q.    And did he indicate to you as to whether or not the --

25   what was going to happen in the future?

235

Direct - Perry

1  A.    He said he was going to stop it.  He said he was sorry

2  that it continued to happen of -- or that it had happened,

3  it was continuing to happen, but he was going to put an

4  immediate stop to it.

5  Q.    And did you believe him?

6  A.    I did.

7  Q.    At that time you were an investor?

8  A.    At that time I was an investor, yes.

9  Q.    Was there any discussion at the meeting about

10  potentially expanding the territory for Crew Tile?

11  A.    There was.  At the meeting, you know, one of the

12  things that I wanted to accomplish at the meeting was I

13  wanted to hear him say he was sorry, that it was going to

14  stop, but I also wanted to make sure we were doing what we

15  were supposed to be doing as Crew Tile, what Paco's

16  expectations were.

17       So I specifically asked him, I said, Are we doing

18  what you expect of us?  Are we meeting your expectations?

19  And he said yes, and he said, So much so I want to talk to

20  you about another territory.

21       And I don't remember if he said Utah or

22  New Mexico, he might have even said both, but he talked to

23  us -- talked to me at the time about making an additional

24  investment and giving us another territory to grow

25  Porcelanosa Tile.

Direct - Perry

1   Q.   And how did that make you feel, having had that second

2   meeting with Mr. Montilla with regard to his saying that

3   they were going to stop selling direct in violation of the

4   agreement, as well as maybe expanding the territory?

5   A.   Well, it made me feel good that, you know, he was

6   happy with what we were doing and that he wanted us to grow

7   the business and into potential other markets, but I felt

8   like he should have been there telling us he was sorry that

9   that was happening.

10  Q.   Okay.  Now, do you recall a discussion with either Mr.

11  Handley or Mr. Montilla about Crew Tile going on the

12  Porcelanosa website as a -- as their Colorado exclusive

13  distributor?

14  A.   I did.  Ryan -- Ryan, before the meeting, said,

15  There's two things I want to accomplish here.  I want these

16  guys to look at you and tell you, one, that they're going

17  to stop contacting any of our dealers or our clients; and,

18  two, that they're going to put us up on the website.

19       So that conversation came up, I don't remember

20  exactly who brought it up, but Paco said at the time that

21  they were going to add Crew Tile onto their website, so

22  anyone from Colorado that was inquiring about Porcelanosa

23  tile would be directed to Crew Tile.

24       MR. BURG:  May I have a moment, Your Honor?

25       THE COURT:  You may.

Direct - Perry

1    BY MR. BURG:

2    Q.   Are you aware that after your meeting, there was an

3    exchange between Mr. Davis and Mr. Montilla about putting

4    Crew Tile on the -- on the website?

5              MR. THOMAIDIS:  Your Honor, I'm going to object on

6    lack of personal knowledge and also hearsay.

7              THE COURT:  Let me read this question.

8              MR. BURG:  I'll withdraw it, Your Honor, and try

9    again.

10             THE COURT:  Sustained.

11             MR. BURG:  At this time, I'd like to have Exhibit

12   102, which is stipulated, put up.  Yeah, move for

13   admission.

14             THE COURT:  One second.  All right.  I see it as

15   being stipulated.  Given the stipulation, Exhibit 102 is

16   admitted into evidence and may be published to the jury.

17        (Plaintiffs' Exhibit 102 received)

18   BY MR. BURG:

19   Q.   If you look at the -- start on the page 2.  This is an

20   e-mail from Ryan Davis to Paco Montilla, says, Web Site,

21   and it says, Just curious when we will be added to the

22   Porcelanosa website.  As of today, we're still not -- we're

23   not listed.

24             Would this be consistent with the conversation you

25   had with Mr. Montilla that Crew Tile was to be added to the

238

Direct - Perry

1    website?

2    A.   It would be.

3            MR. THOMAIDIS:  Your Honor, same objection.

4            THE COURT:  Overruled.

5    BY MR. BURG:

6    Q.   And if you can see the response from Mr. Montilla to

7    Mr. Davis on February 9th, 2012, can you see what it

8    says?

9    A.   I do.  It says, Please send me the following

10   information and we will post it as soon as possible:

11   Showroom hours, showroom address, phone, fax.

12   Q.   Are you aware whether or not Mr. Montilla was not

13   truthful in that -- are you aware that -- let me ask it

14   this way -- I withdraw that.

15           Are you aware that Mr. Montilla never put

16   Porcelanosa on their website -- never put Crew Tile on the

17   Porcelanosa website?

18   A.   It's my understanding --

19           MR. THOMAIDIS:  Objection.  Lack of personal

20   knowledge.

21           THE COURT:  He's asking him if he knows.  Do you

22   know?

23           THE WITNESS:  I was told that it was never put up

24   there.  I did not go to the website to specifically look

25   for it.

239

Direct - Perry

1           THE COURT:  All right.

2    BY MR. BURG:

3    Q.   Are you aware of whether or not when Mr. Montilla said

4    that they would not sell direct in violation of the

5    agreement, do you know if they lived up to that agreement,

6    based on your knowledge?

7    A.   It was my understanding from Ryan that after our

8    meeting that they had put some measures in place and had

9    made Jack very aware that he was not allowed to contact any

10   of our clients or the dealers.  That it was my

11   understanding that they had stopped that for a certain

12   amount of time.

13          And then I don't know how long, but after that it

14   is my understanding that they had started it up again.

15   Q.   Okay.  So that just so I'm clear, so for a period of

16   time after Mr. Montilla told you that it would stop, they

17   stopped; but sometime after that, they did not.

18   A.   Correct.

19   Q.   Okay.  Let me put on a -- on an admitted exhibit, No.

20   46.  This is the distributor agreement.  Have you seen this

21   agreement, sir?

22   A.   Yes, I have.

23   Q.   Okay.  Can you -- can you tell me when the first time

24   you saw it.

25   A.   I'm not exactly sure when the first time I saw the

240

Direct - Perry

1    agreement was.

2    Q.    Would it have been sometime before 2013?

3    A.    Yes, I believe that it was.

4    Q.    Okay.  So you invested in 2010; is that correct?

5    A.    Correct.

6    Q.    And it's sometime prior to 2013 you would have seen

7    this agreement?

8    A.    Yes, I believe so.  I don't remember the exact date,

9    but yes.

10   Q.    Did -- at some point in time, did you ever look and

11   become familiar with the terms of the agreement?

12   A.    Yes.

13   Q.    And were you getting financials from the company as to

14   how they were doing?

15   A.    I was.

16   Q.    Okay.  How was the company doing?

17   A.    It was struggling the first couple of years.

18   Q.    Did that surprise you for a new startup business?

19   A.    No.  Especially given the time when -- we were in the

20   midst of the great recession.  Things were starting to get

21   better, but it was slowly getting better.  I mean, it's not

22   at the fever pitch it's at today, for sure.

23   Q.    And did the fact that this was a five-year contract,

24   did that give you some comfort?

25   A.    It did.

Direct - Perry

1   Q.   Tell the jury why.

2   A.   Well, I felt in five years that that would give Crew

3   Tile enough time to build a business, build a Porcelanosa

4   brand, people would start developing again, and that we

5   would be able to put our product into the developments that

6   were going up.

7   Q.   Were you aware that no one was taking salaries out of

8   Crew Tile?

9   A.   I had been told that.  Ryan told me that no one was

10  taking salaries.

11  Q.   How did that make you feel?

12  A.   It made me feel bad, but I think that's sometimes what

13  you have to do in the beginning of a company is you do what

14  you have to to get by to get the company up and running and

15  successful.

16  Q.   That shows a commitment of the people who were

17  involved?

18  A.   100 percent.

19  Q.   Did you -- did you come to learn how much money

20  Darlyne Davis and Glenn Davis put in the company from their

21  retirement account?

22  A.   I think through the depositions and different things

23  I've come to -- it's my understanding they put in about

24  $400,000.  I think at the time I originally thought they

25  put in 600,000, but I think they put in 400-, $500,000,

Direct - Perry

1  somewhere in that range.

2  Q.   Okay.  And the fact that they're willing to put up

3  their retirement account, did that give you some comfort?

4  A.   Absolutely.

5  Q.   And you never met them prior to meeting Mr. Ryan

6  Davis, correct?

7  A.   I had not.

8  Q.   During the period of time when you were an investor in

9  Crew Tile, did you have an opportunity to meet with them?

10  A.   I did.

11  Q.   And did you have an impression about both Darlyne

12  Davis and Glenn Davis as to their ethics and character?

13  A.   I did.

14  Q.   And what was that?

15  A.   I felt that they were both hardworking, you know,

16  family-oriented people.

17  Q.   Were you aware that Mr. -- Mr. Davis had worked over

18  34 years at -- at the AT&T?

19  A.   I had a conversation with Mr. Davis -- with Glenn

20  Davis at the grand opening of Crew Tile and I believe he

21  mentioned something about that.  I knew he had the same

22  position for a long time.  I don't know that I knew exactly

23  where it was.

24  Q.   And were you aware that Darlyne Davis had been

25  involved in accounts payable, worked for Geneva

Direct - Perry

1    Pharmaceuticals, and had been acquired by -- that giant

2    pharmaceutical company had been acquired by Navaris, a

3    giant pharmaceutical company, and she had been both the

4    bookkeeper payable and then also became the person who

5    actually wrote the paychecks and handled millions of

6    dollars of money in the account?

7    A.    I knew she had an accounting background and accounting

8    job.   I don't know that I knew the companies exactly that

9    she worked for.

10   Q.    And after being an investor in the company, did you

11   have any doubts about the character and ethics of Mr. Ryan

12   Davis, Darlyne Davis, and Glenn Davis?

13   A.    I did not have any question about that.

14   Q.    As you sit here today, with the accusations that have

15   been made by this company against them of being forgerers,

16   frauds, perjurers, has any of that changed your opinion of

17   them?

18   A.    It has not.

19   Q.    Now, were you satisfied with the company's growth

20   between 2010 and 2011?

21   A.    I was satisfied with the growth because we were

22   growing.   Once again, the economy started to pick up so the

23   economy -- I was happy it was picking up, I felt we were in

24   the right -- Crew Tile was going to the right direction, so

25   I was relatively happy.   I had been hoping that we would

Direct - Perry

1    get some distributions of some nature, but we hadn't, and I

2    was okay with that, you know, after speaking with Ryan and

3    with Darlyne, that, you know, we would continue to grow;

4    when it was appropriate, then distributions would be

5    made.

6    Q.   Did you -- so, in effect, they weren't taking

7    salaries, but there were no distributions to you in terms

8    of cash, that was acceptable with the startup company?

9    A.   It was.

10   Q.   Now, you said you had other -- other meetings with

11   Jack Handley.  How many meetings did you have with them?

12   A.   I probably had a total four, maybe five.

13   Q.   What was the substance of those meetings?

14   A.   One of the other meetings think -- some gentleman flew

15   in to talk to us about some facades -- some building

16   facades.  They had some connection to Porcelanosa.  They

17   came with books that had, you know, Porcelanosa Tile on the

18   front of them.  And they were trying to get us to invest in

19   trying to sell facades for buildings, keep moisture off of

20   them, keep them more energy efficient.

21   Q.   Did that ever happen?

22   A.   It did not.  But Jack Handley was there that night,

23   and I was having a hard time because Jack, knowing I was in

24   the senior housing business, kept trying to pitch me this

25   deal that his dad was in Florida in the senior housing

Direct - Perry

1    opportunity and he kept talking to me while I was trying to

2    listen to the presentation that was being made, so I was

3    kind of annoyed with Jack, to be honest with you, at that

4    meeting.

5    Q.   Did you find out some time later on that Mr. Handley

6    was fired?

7    A.   I did.

8    Q.   And did you ever know why he was fired?

9    A.   It was my understanding he was selling somebody else's

10   tile to other companies besides Porcelanosa.  He was

11   selling somebody else's tile to other people.

12   Q.   When did you become aware that there were issues with

13   the Exhibit No. 46, the exclusive distributor agreement?

14   A.   I started to feel that there may be an issue -- Ryan

15   told me that it was getting harder and was taking longer to

16   get tile delivered from Porcelanosa, that he was speccing

17   jobs, selling the tile to people to be installed, but that

18   Porcelanosa would give them a date that the tile was going

19   to be delivered, and those dates started getting further

20   and further behind.  And so I started to grow concerned at

21   that time.

22   Q.   What were you concerned about, at that point in time,

23   based on your experience in business of 28 years, dealing

24   with all kinds of different issues including buying land

25   from people, developing senior housing?

Direct - Perry

1    A.    Well, I started -- when I talked to Ryan about it, I

2    started to worry a little bit they were trying to suffocate

3    us, trying to make it difficult for us to conduct business,

4    to try to put an unnecessary strain on us.

5    Q.    Did you become informed as to when Porcelanosa was

6    going to set up their own showroom?

7    A.    I was informed of that, yes.

8    Q.    And how did that make you feel?

9    A.    Angry.

10   Q.    Why?

11   A.    Because we had an agreement with them that they could

12   not do that.

13   Q.    Did you become aware that Crew Tile was behind on

14   their rent at the Denver Design Center?

15   A.    I became aware of that at the deposition from Mr.

16   Thomaidis.  He showed me some documents prior to that, I

17   didn't know that they had -- that they were in arrears.  I

18   knew that they had moved, but I didn't know, you know,

19   that -- what the reason for that was, necessarily.

20   Q.    What is one of the reasons -- were you told one of the

21   reasons why they were moving?

22   A.    I did.  Ryan talked to me about the fact they were

23   going to move from the design district.  He said the design

24   district had changed their model and the way they conducted

25   business, that they were going to almost a retail outlet,

Direct - Perry

1    and that we really were trying to go after bigger deals and

2    sell to dealers, and that he didn't feel we needed to pay

3    the rent associated with the Denver Design District, so he

4    said he was going to start looking for another space, which

5    he eventually found.

6    Q.   Were you upset that Mr. Davis had not been completely

7    honest with you about the fact that they were so behind in

8    their rent and had became evicted, and is that something

9    that bothered you?

10   A.   I think when, you know, we went through the deposition

11   and I found out that, I was a little bit, but not

12   necessarily.  Once again, it was a struggling company to

13   begin with and, I mean, I'm in the real estate --

14   commercial real estate, we have people that get behind on

15   rent in almost every property we have at certain points in

16   time.

17   Q.   Did you also find out through the deposition about a

18   company called Infinite Flooring?

19   A.   I did.

20   Q.   And what did you find out?  Was that a company that

21   Mr. Davis had previously?

22   A.   It is.  Ryan told me he had a company previous, I

23   didn't know what the name of that company was.  Through the

24   deposition, Mr. Thomaidis told me it was called Infinite

25   Flooring.

Direct - Perry

```
 1    Q.   Were you informed that Infinite Flooring basically

 2    went out of business and Mr. Ryan Davis had to take

 3    bankruptcy?

 4    A.   That's what Mr. Thomaidis told me in the deposition,

 5    yes.

 6    Q.   And, again, was this a surprise to you or upsetting to

 7    you in 2008 that a retail flooring company would lose money

 8    and go out of business and to take bankruptcy?

 9    A.   No, I think at that time a lot of businesses were

10    going out of business.  It wouldn't have surprised me and I

11    don't think it would have impacted my investment in Crew

12    Tile.  I was investing in this deal, not that deal.

13    Q.   So these -- this was a new deal?

14    A.   This was a brand-new deal, brand-new times, you

15    know --

16    Q.   Okay.

17    A.   -- new product.

18    Q.   When the Davises determined that Porcelanosa was

19    setting up their own deal, do you recall discussing with

20    them what options they had to keep the company alive?

21    A.   I did.  We -- I spoke with Ryan and he said, What do

22    we do?  We have -- we have these clients that are built

23    up -- I built these relationships up, you know.  Do we go

24    out there and find another tile to sell to these people and

25    continue to be able to keep our doors open?
```

Direct - Perry

1    And I said, Absolutely not.  Don't do anything --

2    don't do one thing to breach the agreement that we have

3    with Porcelanosa.

4    Q.   Why did you tell him that, even though -- let me ask

5    you this:  Did you understand that, based on Porcelanosa's

6    action, that Crew Tile was going to be put out of business

7    if Porcelanosa was going to be selling direct and basically

8    cutting them out of their percentage?  Why did you -- as an

9    investor in the company, why would you tell them not to

10   explore other options?

11   A.   Because we had an agreement and I didn't want to be in

12   breach of the agreement that we had with Porcelanosa.

13   Q.   And why not?

14   A.   Because we had an agreement with them.  And I wanted

15   to live up to what we were supposed to do as our part of

16   the agreement.

17   Q.   Have you been paid any -- any -- have you been paid

18   back any part of your investment?

19   A.   I have not.

20   Q.   Have you made any demand on the Davises for the

21   money?

22   A.   I have not.

23   Q.   Why not?

24   A.   Well, because I think they were doing the best they

25   could to make this company go.  I feel not getting tile

Direct - Perry

1   from Porcelanosa and Porcelanosa opening a showroom up in

2   the Denver Design Center is the reason that we had -- that

3   Crew Tile's no longer around.  I don't think it's because

4   of Ryan or Darlyne or Glenn.

5   Q.   Did you -- did you -- did you have -- at some point in

6   time, did you have an understanding that Porcelanosa

7   actually sent a letter to all of their customers and

8   dealers telling them not to deal with Crew Tile --

9   A.   I did.

10  Q.   -- and to only deal with Porcelanosa Dallas?

11        MR. THOMAIDIS:  Object, Your Honor.  That

12  misstates the evidence.

13        THE COURT:  We don't have any evidence of that so

14  far.  Why don't you lay a little bit more foundation as to

15  why he would know.

16        MR. BURG:  Can you put up Exhibit 159.  I ask it

17  be admitted.  It's a stipulated exhibit.

18        THE COURT:  What exhibit is it?

19        MR. BURG:  159.

20        THE COURT:  159.  One second.

21        MR. BURG:  Your Honor, is it admitted?

22        THE COURT:  I don't -- is it, Deb?

23        COURTROOM DEPUTY:  No.

24        THE COURT:  Okay.  Given the stipulation, Exhibit

25  159 is admitted into evidence and may be published to the

251

Direct - Perry

1    jury.

2              MR. BURG:   Thank you.

3         (Plaintiffs' Exhibit 159 received)

4    BY MR. BURG:

5    Q.   Sir, are you aware of the existence of this letter in

6    which Porcelanosa-USA is proud to announce that the

7    Colorado market will now be serviced by Porcelanosa Texas

8    as of November 1, 2013?   I'm not asking if you saw the

9    letter, but are you aware that this letter had been sent?

10   A.   Yes.

11   Q.   Okay.   And the date of the letter was Halloween,

12   October 31, 2013?

13   A.   Yes, that's what it says -- states at the top.

14   Q.   That's referred to as the trick letter, or the

15   trick-or-treat letter, as far as you know?

16   A.   I'm not sure what it's --

17   Q.   When Mr. Davis informed you -- the Davises informed

18   you that they had sent this letter to all of their

19   customers without even talking to anyone at Crew Tile, what

20   was your reaction to it?

21   A.   I still told them they had to go talk to an

22   attorney.

23   Q.   And is that what you advised the Davises to do in this

24   particular case?

25   A.   It is.

Direct - Perry

1          MR. BURG:  Okay.  May I have a second, Your Honor?

2          THE COURT:  You may.

3    BY MR. BURG:

4    Q.   Was this the icing on the cake in terms of the actions

5    of Porcelanosa?

6          MR. THOMAIDIS:  Objection, Your Honor.  Leading.

7          THE COURT:  Overruled.

8          THE WITNESS:  I believe it -- this and their

9    opening of a showroom in the Denver Design Center, yes.

10   BY MR. BURG:

11   Q.   Did you -- and that was in April of 2013, correct?

12   A.   I'm not sure what the time exactly was.

13   Q.   At that time when you discussed with the Davises the

14   opening of the Porcelanosa -- of the Porcelanosa showroom,

15   did you at that time say you might have to talk to a

16   lawyer?

17   A.   Yes.

18   Q.   And when you found out about this, was that when you

19   really said, You really need to talk to a lawyer?

20   A.   I think it was even before this letter, but definitely

21   after this letter came out.

22         MR. BURG:  Thank you.  I appreciate it, Mr. Perry.

23   I have no more questions.

24         THE COURT:  Cross-examination.

25         MR. THOMAIDIS:  Thank you, Your Honor.

Cross - Perry

1    CROSS-EXAMINATION

2    BY MR. THOMAIDIS:

3    Q.    Thank you for being here today, Mr. Perry.

4          You had indicated that you're involved in

5    commercial real estate, correct?

6    A.    That is correct.

7    Q.    And would you say that you work with complex

8    commercial contracts often?

9    A.    I do.

10   Q.    And do you seek the attorney -- or do you seek the

11   assistance of attorneys when you're reviewing -- involved

12   with these complex contracts?

13   A.    Sometimes.  Most of the time, probably, yes.

14   Q.    And so in your position with Spectrum retirement

15   communities, how many attorneys would you say are -- or how

16   many law firms do you have on retainer to review

17   contracts?

18   A.    I don't know about retainer.  We have an in-house

19   legal department and we -- as well, we also have outside

20   attorneys, probably deal with -- I mean, we're in different

21   states.  Every state we go to we have a local counsel, as

22   well as having three or four here in Denver.

23   Q.    Okay.  And so in the context of your professional

24   life, you interact with attorneys frequently, correct?

25   A.    I do.

Cross - Perry

1   Q.   Okay.  And so would you enter into a contract without

2   seeking assistance of counsel?

3   A.   I would not.

4   Q.   Would you personally enter a contract without

5   assisting -- without seeking the assistance of counsel?

6   A.   It depends on the contract.

7   Q.   Okay.  What type of contract would you -- is there a

8   threshold where you would seek the assistance of an

9   attorney before entering a contract?

10   A.   I would say it would depend on the complexity of

11   the -- of the agreement.

12   Q.   And so as it relates to the document that Mr. Burg was

13   questioning you about, would that be something that you

14   would have sought the assistance of an attorney on?

15   A.   I didn't see that agreement until after I entered into

16   an agreement with the Davises for my ownership, so I didn't

17   have anyone look at that document.

18   Q.   I understand.

19   A.   No reason to.

20   Q.   Did Ryan Davis or Glenn Davis or Darlyne Davis ever

21   indicate to you how many copies or how many originals of

22   that contract were signed?

23   A.   They did not.

24   Q.   Okay.  Did Ryan Davis or Glenn Davis or Darlyne Davis

25   ever indicate to you that an original copy was signed for

Cross - Perry

 1    you as it relates to that agreement?

 2    A.    I don't believe I had those conversations with them.

 3    I wasn't an investor at the time so I don't know why I

 4    would have gotten the original at the time that they signed

 5    it.

 6    Q.    And you mentioned previously that you engaged in due

 7    diligence as it relates to, I guess, the evaluation of Crew

 8    Tile for a potential investment?

 9    A.    I did.

10    Q.    So what did you do exactly?

11    A.    As I stated before, I checked out Porcelanosa and --

12    the company, you know, went to a website, saw the products

13    they had.  Ryan was building out the showroom here in

14    Denver Design Center.  I went down to the showroom, you

15    know, probably four or five times to see what the showroom

16    was going to look like.  You know, put my hands on the

17    tile, touch it, feel it, see it.  You know, see if they had

18    walls, the tiles.  See what it looked like, things of that

19    nature.

20            As I previously mentioned, I started talking to my

21    architect about potentially speccing Porcelanosa in jobs

22    that he was doing, spoke to some friends that were doing

23    construction, you know, building their own buildings or

24    rehabbing buildings that they owned and asked them about

25    the potential of putting Porcelanosa tile in their

Cross - Perry

1      properties.

2      Q.    And the architect that you're referring to is Santiago

3      Calatrava; is that right?

4      A.    Santagio Calatrava was awarded the right to do the

5      design of the expansion of DIA.  That's one Spanish

6      architect.  The architect I'm speaking about now is a man

7      named Carlos Alvarez who is a local architect here that

8      I've done a lot of business with.  Most of the building he

9      does is Spanish based, it has definitely Spanish influence,

10     the exterior definitely does.  A lot of the interior is

11     Spanish based as well.

12           I was going to ask him if he was familiar with

13     Porcelanosa.  And he said yes, it was a huge company, a

14     very good company, and he liked their product.

15     Q.    And so did Mr. Alvarez ever purchase any products from

16     Crew Tile Distribution?

17     A.    I believe he did.  I did set up a meeting -- after I

18     invested in the company, I set up a meeting with one of the

19     representatives from Crew, the salespeople, to go to the

20     office of Carlos Alvarez.  I believe he bought tile.  I

21     know that they actually had two or three meetings.  Whether

22     he actually spec'd and bought stuff from them, I'm not

23     sure.

24     Q.    Do you remember what brand of tile he purchased or

25     what brand of tile he was speccing?

Cross - Perry

1   A.   Having to go in there for Porcelanosa, I don't

2   understand your question.

3   Q.   Were you familiar with Mr. Alvarez purchasing Denver

4   Tile & Stone Tile from Crew Tile Distribution?

5   A.   No.

6   Q.   Do you have any firsthand knowledge of what Mr.

7   Alvarez would have purchased in terms of this project that

8   he was speccing?

9   A.   He was speccing a lot of projects.  I'm not sure if he

10   ever did, in fact, buy, but I know that there was a number

11   of -- at least two or three meetings --

12   Q.   I'm sorry, please continue.

13   A.   -- with his designers and the salesperson from Crew

14   Tile.

15   Q.   Are you familiar with another architect by the name of

16   Morris?

17   A.   I am.  So the company's called Alvarez Morris.  Carlos

18   Alvarez is the architect, his wife is Carolyn Morris.

19   She's a designer.

20   Q.   And so between Mr. Alvarez and Ms. Morris, are you

21   aware that they purchased Denver Tile & Stone Tile from

22   Crew Tile Distribution?

23   A.   I'm not aware of that.

24   Q.   You testified previously that you met Ryan in Las

25   Vegas, correct?

Cross - Perry

1    A.    Correct.

2    Q.    And that was at a professional fight -- fight of some

3    kind?

4    A.    Yes, professional boxing match.

5    Q.    Okay.  Do you remember approximately when that was?

6    A.    It was October 31st of 2009.

7    Q.    And so subsequent to October 31st, 2009, did you meet

8    Darlyne Davis?

9    A.    I did.

10   Q.    And so approximately when did you meet Darlyne

11   Davis?

12   A.    I met her the first time I went to the showroom, which

13   was probably in February of 2010.

14   Q.    Okay.  And so did Darlyne Davis, after February of

15   2010, ever indicate to you that she was the owner of Crew

16   Tile Distribution?

17   A.    I don't know that I had specific conversations with

18   her about that.  It's my understanding it was a family

19   business.

20   Q.    Did Ryan Davis ever indicate to you that he was the

21   owner of Crew Tile Distribution?

22   A.    From the beginning, he said that his parents put up

23   the majority, if not all, of the money.

24   Q.    Do you recall signing any documents as it relates to

25   Crew Tile Distribution that relate to the ownership of the

Cross - Perry

1    company?

2    A.    I do.

3    Q.    Do you remember when that was?

4    A.    It was approximately June of 2010.

5    Q.    Okay.  And in June of 2010, do you remember who were

6    the signatories to those documents?

7    A.    I believe that Ryan and myself were the people on --

8    that were listed on there.

9    Q.    And do you know what you were representing yourselves

10   as on those documents?

11   A.    Shareholders.

12   Q.    Okay.  Were there any other shareholders mentioned on

13   those contracts?

14   A.    I know that Darlyne's name was in the agreement in one

15   or two places.  I don't remember what it related to, but

16   her name was in the agreements.

17   Q.    Was she a signatory as a secretary and a witness or

18   was she a signatory as a stockholder?

19   A.    I don't remember, to be honest with you.

20   Q.    Okay.  Do you remember any of those documents being

21   produced in this case?

22   A.    I do.  In the deposition some of those documents were

23   shown to me again.

24   Q.    Okay.  So within those documents, it's your

25   recollection that the only shareholder, aside from

1    yourself, was Ryan Davis; is that right?

2    A.    I don't remember --

3    Q.    Okay.

4    A.    -- the breakdown.

5    Q.    So do you remember the circumstances under which you

6    met Darlyne Davis?

7    A.    I do.  I went to the showroom to see how the showroom

8    was coming along and Darlyne was there doing some paperwork

9    in the back.

10   Q.    And so what was communicated to you in that meeting?

11   A.    I think everyone was just excited about getting the

12   showroom up and running.  And my first meeting Darlyne was,

13   you know, very sweet, nice to me, said, you know, it's nice

14   to meet you, and you know, vice versa.  It was a very

15   pleasant meeting.

16   Q.    And you indicated that meeting occurred, I believe you

17   said, March in 2010?

18   A.    I believe it was February.  I would say January,

19   February.

20   Q.    So January, February of 2010.

21   A.    Correct.

22   Q.    Was there ever a contract given to you at that time?

23   A.    I don't believe it was given to me at that time, no.

24   I was not an investor yet.

25   Q.    Okay.  So how much money did Ryan Davis ask you to

Cross - Perry

1    invest in Crew Tile Distribution?

2    A.    $50,000.

3    Q.    And do you remember when he asked you to make that

4    investment?

5    A.    Oh, I think he asked me to make the investment when I

6    first met with him in November of 2009.  We continued to

7    have meetings, discussing it.  I continued to tell him I

8    was wanting to get more comfortable with the company and

9    the showroom and getting the showroom further along and

10   open.  And then I finally made a decision, once again, once

11   I found out about the architect Calatrava, I thought that

12   was a huge opportunity to get Porcelanosa tile into DIA and

13   I thought, you know, it was my understanding that it had to

14   come through Crew Tile to be installed there, since it was

15   in Colorado.

16        So that was the time I pulled the trigger and told

17   Ryan that I was ready to do the deal.

18   Q.    So did Ryan Davis indicate to you that they were

19   speccing Porcelanosa products into the Denver International

20   Airport?

21   A.    He said -- he didn't say that they were, he said there

22   was a very good chance that they would; that Mr. Calatrava

23   spec'd in Porcelanosa tile in a lot of deals that he had

24   done previously and he thought being from Spain and his

25   previous history with Porcelanosa tile, that there was a

Cross - Perry

1    great chance that he -- a very good chance that he would

2    spec that into the DIA development.

3    Q.    And to your knowledge, did Crew Tile Distribution ever

4    spec Porcelanosa product -- Porcelanosa products into the

5    Denver International Airport project?

6    A.    We continued to talk about the DIA project.   I

7    continued to talk about it with Ryan.   I also talked about

8    it with Paco and Jack Handley at the second meeting I had

9    with Paco, and everyone seemed to be very positive that

10   they thought that there was a good chance or that it was

11   going to be spec'd in there.   I don't know if it ever was.

12   It's my understanding through the trial prep over the last

13   couple of weeks that it was, in fact, put in there, but it

14   did not go through Crew Tile.

15   Q.    And to your knowledge, did anything ever come of the

16   Crew Tile distribution spec relationship that would have

17   ultimately had this tile going into Denver International

18   Airport?

19   A.    No.   Crew Tile never got any benefit of it, even

20   though Porcelanosa tile was put in there.

21   Q.    And so who told you that Porcelanosa tile was put into

22   the Denver International Airport?

23   A.    I believe the Crew Tile attorneys did, told me that.

24   Q.    And did you review any documents that would indicate

25   that that actually occurred?

Cross - Perry

1    A.    I did not.

2    Q.    But ultimately you did invest $50,000 in Crew Tile,

3    correct?

4    A.    I did.

5    Q.    Do you know what became of that money?

6    A.    I don't.

7    Q.    Do you know, was it used to buy inventory, was it used

8    to stock product, was it used to --

9    A.    That I don't know.

10   Q.    Did you ever ask?

11   A.    I did not.

12   Q.    And in conducting your due diligence as it relates to

13   Crew Tile Distribution, did you ever evaluate any of the

14   Davis' former companies or whether Ryan Davis had been an

15   employee of Porcelanosa Los Angeles?

16   A.    I did not research into that.  I really wasn't worried

17   about what has happening previously.  I was worried about

18   what happened now.

19   Q.    Did Ryan Davis indicate to you that he ever worked for

20   Porcelanosa Los Angeles?

21   A.    He said that he had done some work with Porcelanosa.

22   It wasn't my understanding he was a direct employee of

23   theirs but, I don't know, but he said he's very familiar

24   with their product, he had worked with them in the past,

25   and, you know, thought it was a great company, which I

Cross - Perry

1  believe it is.  Great product.

2  Q.   But he didn't indicate to you that he was employed by

3  Porcelanosa Los Angeles?

4  A.   Not that I remember.

5  Q.   Did you ever conduct any inquiry into Infinite

6  Flooring & Design?

7  A.   I did not.

8  Q.   Is there any reason why you didn't?

9  A.   Once again, I wasn't worried about what had happened

10  previously.

11  Q.   Did anyone at Infinite Flooring & Design, any of the

12  owners, any of the Davises tell you why it was closed?

13  A.   Ryan first told me that when I first met with him that

14  he had been involved in a floor tile company that had shut

15  down.

16  Q.   Did he say it was shut down or did he say it was

17  purchased?

18  A.   I don't remember what the exact wording was about how

19  it came to an end or to a conclusion.

20  Q.   Just so I understand, you did -- you were informed by

21  Mr. Davis that Infinite Flooring & Design had shut down?

22  A.   I was aware by Mr. Davis that it was no longer around.

23  I don't remember exactly what the terminology or what was

24  said further than that.  I wasn't too interested in that,

25  to be honest.

Cross - Perry

1  Q.   Would that not have concerned you as relates to the

2  $50,000 investment?

3  A.   No.   Once again, it was a hard time in Colorado and in

4  our nation.   I -- there were businesses closing left and

5  right.   Not at all.

6  Q.   So when, approximately, did you invest this money?

7  A.   Somewhere in the May to July time frame of 2010.

8  Q.   Okay.   And did you invest it in one tranche or

9  multiple checks?

10  A.   I believe I gave them three checks.

11  Q.   Do you remember what the amounts of those checks

12  were?

13  A.   I believe one of them was $7500, I think one was

14  5,000, and the third one I believe would be for the

15  remainder of, you know, for 37 five.

16  Q.   And was there any reason you broke it up into three

17  discrete checks?

18  A.   The first check I gave to Ryan, they had some fee that

19  was coming up, I think it was a legal fee of some nature.

20  For some reason he said, you know, I -- I think he was

21  trying to get me just to take a small bite out of what my

22  investment was going to be.   But he asked me for whatever

23  the dollar amount was and then I wrote him a check.

24       At that time I said I was committed at that point,

25  so . . .

Cross - Perry

1    Q.    Did he ever indicate to you what that legal fee was?

2    A.    He -- I'm not sure that's exactly -- I don't remember

3    exactly what it was for.

4    Q.    Okay.  What about the second check?

5    A.    The second check I gave him to show that I was serious

6    about the deal.  At the time, we were drafting agreements

7    between, you know, the Davis family and myself for my

8    ownership interest.  So until those agreements were fully

9    agreed to and signed, I didn't want to give them all of the

10   money.

11   Q.    I see.  What agreements did you sign?

12   A.    I signed corporation agreements.  I think there was

13   three or four different agreements.  You know, basically a

14   partnership agreement.  I don't remember what the exact

15   titles of those agreements were.  Articles of organization.

16   They were documents that I had my attorney draft for the

17   partnership.

18   Q.    And to your knowledge, in preparing for this trial and

19   preparing for being here today, did you ever review those

20   documents?

21   A.    I looked at them briefly.

22   Q.    Okay.  Do you remember who the shareholders were?

23   A.    Once again, I --

24        MR. BURG:  I'm going to object.  Asked and

25   answered.

Cross - Perry

1          MR. THOMAIDIS:  I'll withdraw the question.

2     BY MR. THOMAIDIS:

3     Q.   And so what exactly did Mr. Davis indicate to you that

4     Crew Tile would be doing when he asked for the investment

5     of money initially?

6     A.   He said they were going to go out and meet with

7     architects and dealers and start getting the spec

8     Porcelanosa tiles in the jobs that they were doing.  That

9     he would have -- he would go out himself and he would have

10    a salesperson or two go out and start contacting these

11    people, getting it in front of them, making them familiar

12    with Porcelanosa tile and trying to get them to spec that

13    into developing deals or rehab deals that they were

14    doing.

15    Q.   And so at any point did he indicate to you that he was

16    going to be the exclusive distributor in the state of

17    Colorado for Porcelanosa products?

18    A.   Yes, from the beginning.

19    Q.   And so from January and February of 2010, or from the

20    time that you met at the fight in Las Vegas, which is the

21    first time?

22          MR. BURG:  Objection to form.

23          MR. THOMAIDIS:  That was not a very good question.

24          THE WITNESS:  Yeah, I'm sorry, I didn't understand

25    the question.

Cross - Perry

1      THE COURT:  Please rephrase.

2   BY MR. THOMAIDIS:

3   Q.   Did Mr. Davis mention to you that he was going to be

4   the exclusive distributor of Porcelanosa's products in

5   Colorado when you met in October -- on October 31st of

6   2009?

7   A.   He did not.  He did not mention the tile company.

8   That was not part of the conversation at all.

9   Q.   So when was the first time that he indicated to you

10  that he was going to be the exclusive distributor of

11  Porcelanosa's products in Colorado?

12  A.   I would say probably two weeks later after we got back

13  from the fights, he said, you know, let's go have lunch, I

14  want to talk about an opportunity with you.  And at that

15  time he said he was working on that, getting that

16  relationship.  He felt that it was going to happen, but

17  that it had not been signed yet.

18      And he was working towards that and thought that

19  it would be a great opportunity and wanted me to invest.

20  Q.   So you indicated that you had then later met with

21  Darlyne Davis in, I believe you said, January of 2010,

22  right?

23  A.   January, February.

24  Q.   And at that time, did they give you a copy of an

25  exclusive distributor agreement?

Cross - Perry

1    A.   No.   It -- I wasn't an investor at that time.

2    Q.   Did they indicate to you that an exclusive distributor

3    agreement had been signed in that meeting?

4    A.   I spoke with Ryan a couple of days after the lunch

5    meeting I had with him and he indicated that an agreement

6    had been signed.

7    Q.   And so did Mr. Davis ever indicate to you that he had

8    prior exclusive agreements with Porcelanosa Los Angeles,

9    Incorporated?

10   A.   Not that I remember.

11   Q.   So in your exchange for your $50,000 investment, what

12   did you get in return?

13   A.   I got 15 percent ownership in Crew Tile.

14   Q.   And that was memorialized by these documents that you

15   indicated that you had signed?

16   A.   That's correct.

17   Q.   And you indicated previously that you had asked your

18   attorney to draft some documents, I believe.   Who is that

19   attorney?

20   A.   His name is Anthony Mallgren.

21   Q.   So did Ryan Davis ever offer to draft your 15 percent

22   ownership documents in Crew Tile Distribution?

23   A.   Oh, I believe he gave me some agreements to begin with

24   that I went through and didn't feel that they were

25   encompassing enough, and so I told him that I wanted to

Cross - Perry

1    have my attorney draft documents for the agreement, you

2    know, for our partnership agreement.

3        I introduced -- over the phone, I introduced Ryan

4    to Mr. Mallgren.  The three of us had a conversation.  I

5    actually had a couple of conversations but an introduction

6    conversation, and then Mr. Mallgren drafted documents for

7    the partnership.

8    Q.   And so why did you feel the documents that Ryan Davis

9    gave you with respect to your ownership interests were

10   deficient?

11   A.   I don't remember exactly why I felt that at the time.

12   I just felt that they were not encompassing enough for --

13   you know, for what I wanted for the partnership agreements

14   to --

15   Q.   Do you remember any of the specifics of why you didn't

16   feel protected?

17   A.   I don't.

18   Q.   Did Mr. Ryan Davis ever indicate to you that he had

19   put money up for the operation of Crew Tile Distribution?

20   A.   I don't know that he ever said.  I got the impression

21   that he probably -- that he did -- I got the impression

22   that he did, but that the majority of the money came from

23   his mother and father.

24   Q.   And why did you --

25   A.   Not all.

Cross - Perry

1    Q.   I'm sorry.  Why did you get the impression that he had

2    invested?

3    A.   Ryan told me that they had taken all of their savings

4    to invest it in this company.

5    Q.   And you testified previously that you estimated that

6    Darlyne Davis and Glenn Davis had put in approximately

7    $400,000 based on the depositions in this case; is that

8    right?

9    A.   Correct.  Depositions or separate conversations with

10   the Crew Tile attorneys.  I originally thought it was

11   600,000 for some reason, but I think it's closer to

12   400,000, somewhere in that range.

13   Q.   Okay.  Did you ever do any firsthand investigation

14   prior to the initiation of this lawsuit about how much they

15   had actually invested in Crew Tile Distribution?

16   A.   I did not.

17   Q.   Is there a reason why you didn't verify those things

18   before you made your investment?

19   A.   No.  I don't -- to me, once again, it was a family

20   business.  Where exactly it came from and how much exactly

21   it was was not the relevant part of my investment.

22   Q.   And so to your knowledge, did your attorney Mr.

23   Mallgren submit any documents in your possession in

24   response to a subpoena in this case?

25   A.   I do not know if he did or not.  I had some -- I had

Cross - Perry

1    my agreements that I got from Mr. Mallgren that I gave to

2    our attorneys.

3    Q.    So do you remember attending a lunch meeting related

4    to Crew Tile Distribution in December of 2009?

5    A.    Yes.

6    Q.    And you were -- you remember specifically the date

7    that that meeting occurred?

8    A.    I don't remember the exact date.  Once again, the date

9    was -- I have come to the conclusion from other people that

10   it was December 14th.  I don't remember the exact date.

11   Q.    So who were the other people that you came to the

12   conclusion on that date about?

13   A.    I spoke with Ryan about what the date of the -- of the

14   lunch was.  And I know, you know, it was roughly in that

15   time frame, but I don't --

16   Q.    So when did you speak with Ryan about the time frame

17   that that meeting occurred?

18   A.    After we had started the lawsuit, I believe.

19   Q.    And so prior to communicating with Ryan Davis after

20   this lawsuit had started, did you have any firsthand

21   recollection when that meeting occurred?

22   A.    I know it was roughly in that -- end of December --

23   end of 2009.

24   Q.    And you testified previously that you were there,

25   correct?

Cross - Perry

1    A.    Correct.

2    Q.    Now, what part of that meeting did you attend?

3    A.    I believe I was there before they were, even got

4    there, they -- I was there before they got there.  So we

5    met, sat down, you know, discussed Porcelanosa, discussed

6    Ryan, discussed the opportunity.  We finished lunch.  They

7    went back -- my understanding is they went back to the

8    showroom and I went back to my own office.

9    Q.    When you say "there," it doesn't sound as if you are

10   referring to their showroom, correct?

11   A.    No, I believe they went back to the showroom.

12   Q.    I see.  So -- but the meeting that you said occurred,

13   did that occur at a restaurant or did that --

14         MR. BURG:  I'm going to object, it's cumulative.

15   We already know it was at Elway's, it's -- I'm sorry, but

16   we're going over the same thing.  We have already had

17   testimony --

18         MR. THOMAIDIS:  I'll withdraw the question, Your

19   Honor.

20         THE COURT:  Yeah, I think we've established those

21   things.  Let's move on to new matters.

22   BY MR. THOMAIDIS:

23   Q.    Did you ever attend a portion of this meeting at the

24   Crew Tile Distribution showroom?

25   A.    I did not.

Cross - Perry

1    Q.   And so you didn't ever witness a signature on an

2    exclusive distributor agreement or on any contract that day

3    on December 14th --

4    A.   Did I -- I'm sorry, I don't understand your

5    question.

6    Q.   Did you ever witness a signature --

7    A.   I didn't see him sign it --

8    Q.   I'm sorry.  I'll let you answer it.

9    A.   I want to make sure I understand your question.  Did

10   you ask did I see them sign it?

11   Q.   Correct.

12   A.   I did not.

13   Q.   And so at this lunch meeting, was there any discussion

14   of signing an exclusive agreement by Jack Handley, Paco

15   Montilla, Ryan Davis?

16   A.   The agreement wasn't discussed.  Once again, Paco just

17   kept saying, Ryan's our guy, Ryan's our guy.  We're

18   excited.  Ryan's our guy.  This is a huge opportunity.

19   Ryan's our guy.

20   Q.   And based on your recollection, was there any

21   discussion of a contract?

22   A.   There was not at that lunch meeting, no.

23   Q.   And was there any discussion of being a distributor at

24   that meeting?

25   A.   Yeah, I believe that there were discussions about

Cross - Perry

1    the -- that Crew Tile was going to be a distributor for

2    Porcelanosa.

3    Q.   Okay.  And who were having those discussions?

4    A.   Paco, Jack, Ryan.  There was conversation around the

5    table.

6    Q.   And in that lunch meeting, was there any discussion

7    whatsoever at any time about the term "exclusive" or

8    "exclusivity"?

9    A.   That word was never used at that lunch meeting, but

10   it's definitely the impression that I got.  I mean, Paco --

11   Q.   How did you get that impression?

12   A.   Paco was kind of almost selling me on investing in

13   this company.  I think he, you know, had been told by Ryan

14   that I had a lot of experience from a business standpoint.

15   I think he wanted to have me involved with it.  And so it

16   was almost a sales job by Paco on me as much as anything

17   to, you know, join forces with Ryan, invest in the company,

18   and do what I could to grow the business with Ryan.

19   Q.   Did you get the impression that Mr. Montilla was

20   enthusiastic about his job?

21   A.   Very.

22   Q.   Did you get the impression that Mr. Montilla was proud

23   of his company?

24   A.   Very.

25   Q.   Did you get the impression that Paco Montilla was

Cross - Perry

1    committed to Crew Tile's success?

2    A.    Yes.

3    Q.    Did he ever give you any reason to doubt that in that

4    meeting?

5    A.    No.

6    Q.    Okay.  But there was no discussion about exclusivity,

7    correct?

8    A.    There was not.

9             MR. THOMAIDIS:  So, Your Honor, at this time I

10   would like to reference Exhibit A-37, which I believe was

11   stipulated to.  So, Your Honor, at this time we would move

12   for admission of Exhibit 37.

13            MR. BURG:  It's stipulated.

14            THE COURT:  It's not in, Deb?

15            COURTROOM DEPUTY:  No.  No, Your Honor.

16            THE COURT:  Given the stipulation, Exhibit A-37 is

17   admitted into evidence and may be published to the jury.

18        (Defendants' Exhibit A-37 received)

19   BY MR. THOMAIDIS:

20   Q.    Mr. Perry, would you just take a moment to take a look

21   at this e-mail.

22   A.    Okay.

23   Q.    Do you remember seeing this e-mail on August 25th,

24   2010?

25   A.    I don't remember seeing it, no.

Cross - Perry

1    Q.   Okay.  So you had no recollection of any of the

2    details of this e-mail?

3    A.   I -- I don't recall it off the top of my head.  You --

4    Q.   Did Ryan Davis ever indicate to you that he was

5    attempting to sell Alcalagres product tile?

6    A.   Did Glenn Davis or did Ryan Davis?

7    Q.   I'm sorry, did Ryan Davis ever indicate to you that he

8    was trying to sell Alcalagres tile?

9    A.   I don't remember that exact conversation.  You had

10   brought up Alcares- -- Alca-  -- however you say that.  You

11   had mentioned that in the deposition that we did.

12   Q.   So prior to the deposition that you attended in this

13   case, had you ever heard about Alcalagres tile in the

14   context of Crew Tile Distribution?

15   A.   It appears this is an e-mail to me about it.  I

16   don't -- it wasn't something that stuck in my head or

17   something that was important to me, I guess.

18   Q.   And so, Mr. Perry, would this have indicated that Crew

19   Tile Distribution was exclusive with Porcelanosa?

20   A.   Yes, we had an exclusive agreement with Porcelanosa,

21   and that at a price point, you know, I -- from what this

22   looks like, this is not a competitor to Porcelanosa from a

23   price standpoint and product standpoint.

24   Q.   And so who indicated that to you?

25   A.   It says that in this e-mail.

Cross - Perry

1    Q.   I see.  But you haven't seen this e-mail before --

2    A.   I may -- once again, I'm assuming that I have because

3    it looks like it's to me.  I'm assuming that I have seen

4    this.

5    Q.   Okay.  So I want you to recollect very carefully for

6    me, this e-mail is dated August 25th, 2010.  By this time,

7    had you seen a copy of this exclusive distributor

8    agreement?

9    A.   I don't remember exactly when I -- when I saw a copy

10   of the exclusive distributor agreement.

11   Q.   Okay.  Do you recall Ryan Davis informing you at any

12   point prior -- actually, I'll withdraw the question.

13        What other types of tile products do you recall

14   Crew Distribution -- Crew Tile Distribution selling?

15   A.   The only thing I remember them selling was the

16   Porcelanosa tile.  I'd seen some samples of it in the

17   showroom and, you know, had seen some product displays as

18   the one behind you that had samples of the product.

19   Q.   And had you seen any other manufacturers' products in

20   the Crew Tile Distribution showroom?

21   A.   I had not.  Not that I was looking at, but I did

22   not.

23   Q.   And so did you see Alcalagres tile products in Crew

24   Tile's showroom?

25   A.   I did not know that.  I didn't see it.  Not to my

Cross - Perry

1    knowledge, no.

2    Q.   Did you see any Denver Tile & Stone products in the

3    Crew Tile Distribution showroom?

4    A.   Not to my knowledge, no.

5    Q.   Did you see any Spec Ceramic tile products in Crew

6    Tile's showroom?

7    A.   Porcelanosa.

8    Q.   That was the only one?

9    A.   That's the only one I was aware of, yes.

10   Q.   And here Ryan Davis says, Crew Tile is not quite

11   exclusive with Alcalagres yet.

12        To your knowledge, was Crew Tile Distribution

13   working to obtain an exclusivity with Alcalagres as well?

14   A.   Not that I'm aware of.  Once again, that's what it

15   looks like through this e-mail, but I didn't have extensive

16   conversation with Ryan about Alcalagres.

17   Q.   Did Mr. Davis ever indicate to you -- Mr. Ryan Davis,

18   did he ever indicate to you that he was seeking to sell a

19   product called ventilated facade?

20   A.   It was a facade system, and I think ventilated is a

21   type of -- I think that's the type of facade, rather than

22   the name of the facade, yes.

23   Q.   So what was Crew Tile Distribution trying to do with

24   respect to facades?

25   A.   Ryan was talking about trying to spec these ventilated

Cross - Perry

1   facades for buildings that were going up.  He asked me to

2   attend a meeting with two gentlemen that flew to town.

3   They represented themselves as working with Porcelanosa.

4   Once again, gave me a packet that said "Porcelanosa" along

5   the front of it.  And they were talking to Ryan about the

6   potential of trying to sell ventilated facades.

7   Q.   And did Ryan Davis ever indicate to you at that time

8   that he had an exclusivity agreement to sell ventilated

9   facades -- the Porcelanosa ventilated facades in a

10  four-state region that he had signed several years earlier?

11  A.   He did not indicate that to me, no.

12  Q.   Did he ever indicate to you that he had exclusivity in

13  any way as it relates to this product, ventilated

14  facades?

15  A.   Not that I remember.

16          MR. THOMAIDIS:  Okay.  And so, Your Honor, at this

17  time, I'd like to mark trial Exhibit A-69, which I believe

18  is --

19          MR. BURG:  I'm sorry, 59?

20          MR. THOMAIDIS:  69.  I believe this is also

21  stipulated to.

22          THE COURT:  Are you moving for its admission?

23          MR. THOMAIDIS:  I would like to move for its

24  admission, assuming that we're all on the same page.

25          THE COURT:  All right.  Given the stipulation,

Cross - Perry

1    Exhibit A-69 is admitted into evidence and may be published

2    to the jury.

3        (Defendants' Exhibit No. A-69 received)

4    BY MR. THOMAIDIS:

5    Q.   So, Mr. Perry, I'd like to ask you to just take a few

6    minutes to take a look at this document.

7    A.   Yes.

8    Q.   Are you familiar with this document?

9    A.   Not specifically.

10   Q.   Do you recall ever receiving this document?

11   A.   I don't remember receiving this document exactly, but

12   I remember the content of it.  I do.

13   Q.   And what was the content?  What do you recollect of

14   the content?

15   A.   The content was the $300,000 sale number, which is

16   what we had set up as a goal.

17   Q.   And so did you ever do anything to verify these sales

18   numbers that Mr. Davis was including on January 4th,

19   2012?

20   A.   I did not do anything to confirm those.  The only

21   confirmation I'd ever done or tried doing was asking Paco

22   if we were living up to the expectations that he had for

23   what we were doing and the sales numbers we were doing.

24   Q.   So at this time, did Ryan Davis indicate to you that

25   Crew Tile Distribution was $38,253.69 behind in their rent

Cross - Perry

1   payments at the Denver Design District?

2   A.   He did not.

3   Q.   Would that have been something that would have

4   concerned you?

5   A.   Yes.  I would say that it would be something that

6   would cause me some concern.

7   Q.   So, Mr. Perry, did you ever review any tax returns as

8   it relates to Crew Tile Distribution?

9   A.   I did not.

10  Q.   Did you ever review any financial statements as it

11  relates to Crew Tile Distribution?

12  A.   I did.  I got sales figures at the end of each year.

13  Q.   And so those sales figures, in what form did you

14  receive them?

15  A.   I received a profit and loss and a balance sheet.  I

16  don't know, specifically.  I'm not sure I understand the

17  question beyond that.

18  Q.   Were they received in a QuickBooks format, were they a

19  spreadsheet?  Do you recall how you received them?

20  A.   I think most of the time Ryan and I would go to lunch

21  and I think he would hand me copies of them.  I don't know

22  what the format was, how they were compiled.

23  Q.   I see.  Do you know who compiled them?

24  A.   I believe Darlyne did.

25  Q.   Do you have any reason to believe that a third party,

283

Cross - Perry

1   not Darlyne Davis, would have compiled those?

2   A.   No.

3        MR. THOMAIDIS:  Your Honor, may I have just a

4   couple of seconds, please?

5        THE COURT:  You may.

6   BY MR. THOMAIDIS:

7   Q.   Mr. Perry, at the time that you made your investment,

8   which sounds like it would have been mid-2010, how many

9   employees did Crew Tile Distribution have?

10  A.   I would say when the showroom got up and running, I

11  was under the impression, although I did -- had not met all

12  of them, I was under the impression they had roughly six.

13  Q.   And do you know who those employees are, to the extent

14  you can remember?

15  A.   Ryan Davis was one, they had two or three salespeople,

16  Darlyne, and I think there was another woman who did some

17  of the accounting and scheduling.

18  Q.   And so who were the salespeople, to the extent you

19  recollect?

20  A.   I don't think I knew the salespeople at the time I

21  made my investment.  I didn't know them.

22  Q.   Did you know Michelle Sudovich?

23  A.   I did not know her, no.

24  Q.   Did you attend a meeting in which Michelle Sudovich

25  hired another employee for Porcelanosa?

Cross - Perry

1    A.   I did not.

2    Q.   Excuse me, for Crew Tile Distribution?

3    A.   No.

4    Q.   Okay.  Did you attend the meeting where Ryan Davis was

5    considering employing Michelle Sudovich as a salesperson

6    for Crew Tile Distribution?

7    A.   I did.  Ryan asked me to attend a lunch with he and

8    Michelle, we went to PF Chang's down by Park Meadows.

9    That's when he introduced me to Michelle and said that he

10   had done some work with her previously and asked, you know,

11   my impression.  She talked about being excited to join the

12   company.  And so I met her at that time.

13   Q.   And so was she ultimately hired with the company, to

14   your knowledge?

15   A.   She was.

16   Q.   And what about a woman by the name of Adela Stransky,

17   are you familiar with her?

18   A.   I'm not -- you asked me that in the deposition.  I --

19   that may have been the woman that was working with Darlyne

20   in the office.  I don't -- I'm not sure.

21   Q.   Okay.  To your knowledge, aside from Michelle Sudovich

22   and Adela Stransky, the person you recollect working in the

23   office, were there other salespeople?

24   A.   There were.  Through time, there was a gentleman named

25   Johnny Damico that I had known from my commercial real

Cross - Perry

1   estate background.  I did leasing and management of the

2   shopping center that he owned a business in, and he came to

3   work for Crew Tile.

4   Q.   And so do you recollect how long Johnny Damico worked

5   for Crew Tile?

6   A.   I do not.

7   Q.   Do you remember how he came to leave Crew Tile?

8   A.   I do not.

9   Q.   Was he terminated?

10  A.   I have no idea.  I didn't get involved with the

11  day-to-day.

12        MR. THOMAIDIS:  So, Your Honor, at this time, I'd

13  like to move on to trial Exhibit B-27, which is also

14  stipulated to between the parties.  And I would move for

15  its admission.

16        THE COURT:  I think it's already in evidence.

17        COURTROOM DEPUTY:  It's not been admitted yet.

18  B-27?

19        THE COURT:  Oh, I thought it was, because I

20  thought you put it up there.  All right.  Given the

21  stipulation, Exhibit B-27 is admitted into evidence and may

22  be published to the jury.

23     (Defendants' Exhibit B-27 received)

24  BY MR. THOMAIDIS:

25  Q.   And so, Mr. Perry, I'd like to ask you first about the

Cross - Perry

1   cover page of this exhibit, B-27.  This is an e-mail that's

2   from paradigmtiledistributor@gmail.com dated April 22d,

3   2013, at 4:31 p.m.  Do you see that?

4   A.   I do.

5   Q.   Do you recall ever seeing this e-mail?

6   A.   I do.

7   Q.   Okay.  Then in the "To" line it says

8   rperry@sregrp.com.  Do you see that?

9   A.   I do.

10  Q.   Is that your e-mail address?

11  A.   It is.

12  Q.   Okay.  And so you recall receiving this e-mail,

13  correct?

14  A.   I don't recall it.  I've seen it since then.  I don't

15  recall it at the time, getting it, but I've seen it.

16  Q.   So when did you first see this document?

17  A.   Oh, it appears --

18       MR. BURG:  Objection.  Your Honor --

19  A.   -- got this e-mail.

20       MR. BURG:  -- this document or a form of this

21  document?  I think it's --

22       THE COURT:  I think he asked when he first saw

23  this document.

24  BY MR. THOMAIDIS:

25  Q.   And I'll clarify the question.  When did you first see

Cross - Perry

1   this e-mail and we'll go to the document in just a minute.

2   A.   Well, it looks likes I got this e-mail on April 22d,

3   2013.

4   Q.   But do you have a firsthand recollection of receiving

5   it on April 22d, 2013?

6   A.   I don't.

7   Q.   Okay.  Do you have a firsthand recollection of opening

8   it on April 22d, 2013?

9   A.   I don't.

10  Q.   Okay.  Mr. Perry, let's go ahead and move on to the

11  first page -- or the second page of the exhibit, which is 2

12  of 8.  Do you recognize this document?

13  A.   I do.

14  Q.   What is it?

15  A.   It's the distributor agreement for Crew Tile and

16  Porcelanosa.

17  Q.   Okay.  And then if I can ask you just to please scroll

18  through the attachment, relatively briefly, so Mr. Perry

19  can review it.

20       So you recognize the seven pages of that document?

21  A.   I do.

22  Q.   And so is that the exclusive distributor agreement

23  that plaintiff and counter defendants have alleged exist in

24  this case?

25  A.   It is.

288

Cross - Perry

1    Q.   And so would you please scroll back to the first page

2    of the e-mail.   And, Mr. Perry, you testified previously

3    that you had thought that you received this document prior

4    to 2013; is that correct?

5    A.   Correct.

6    Q.   And this e-mail is dated April 22d, 2013, would you

7    agree?

8    A.   It is.

9    Q.   Is this the first time that you saw this exclusive

10   distributor agreement that Crew Tile alleges it had?

11   A.   I don't remember exactly the first time I saw it.   I

12   got this agreement on this date, but that -- I could have

13   been traveling and asked Ryan to send me a copy of it for

14   discussion purposes.   I got this that day, it doesn't mean

15   that's the first day that I saw it, if that's your

16   question.

17   Q.   Yeah.   And I just would like you to recollect for me

18   very carefully, to the extent you can.   Do you remember

19   receiving this document on April 22d, 2013?

20   A.   I don't.

21   Q.   And do you recollect receiving this document at any

22   point prior to April 22d, 2013?

23   A.   I -- I testified a number of times I don't remember

24   exactly the first time when I saw this agreement was.

25          MR. THOMAIDIS:   At this time, defendants have no

Redirect - Perry

1   further questions.

2            THE COURT:  All right.  Redirect.

3                    REDIRECT EXAMINATION

4   BY MR. BURG:

5   Q.   Mr. Perry, when you had these meetings with Mr.

6   Montilla, did you rely on what he told you as the head of

7   the California division of Porcelanosa?

8   A.   I did.

9   Q.   When you had the lunch meeting and he was talking

10  about Ryan being his guy and how they were going to build

11  the market, did you rely on that in terms of your

12  investment?

13  A.   I did.

14  Q.   And when he came out about a year later and told you

15  that they had been selling direct in violation of the

16  agreement, he was going to stop that, did you rely on

17  that?

18  A.   I did.

19           MR. BURG:  Thank you.  No more questions.

20           THE COURT:  All right.  May this witness be

21  excused for the plaintiff?

22           MR. BURG:  Yes.

23           THE COURT:  For the defendant?

24           MR. THOMAIDIS:  Your Honor, may I have a brief

25  re-redirect, please?

1          THE COURT:  No.  Is -- may this witness be

2    excused?

3          MR. THOMAIDIS:  I would ask for leave to ask two

4    questions --

5          THE COURT:  No.  No recross.

6          MR. THOMAIDIS:  Then, yes, he may be --

7          THE COURT:  All right.  All right.  Mr. Perry,

8    thank you for joining us.  You may step down.

9          THE WITNESS:  Thank you.

10          THE COURT:  You're excused.  All right, let's take

11    our lunch break at this time.  Ladies and gentlemen of the

12    jury, we will be in recess until 1:15.  Again, please do

13    not discuss the facts or the law with anyone.  And do not

14    do any independent research on the facts, the law or the

15    parties.

16      (Recess at 12:06 p.m.)

17                    AFTERNOON SESSION

18      (Proceedings outside the presence of the jury at 1:16

19    p.m.)

20          THE COURT:  I'm going to ask a point of

21    information.  Is Mr. Perry cross-endorsed by both sides?

22          MR. BURG:  I don't believe so.

23          MR. THOMAIDIS:  Actually, he was, Your Honor.

24          MR. BURG:  He was?

25          THE COURT:  He was?  Okay.  Well, you will recall

1    at the final trial preparation conference I advised counsel

2    to let me know when a witness is cross-endorsed, either by

3    indicating it on the witness list or by telling me orally.

4    Had you told me that he was cross-endorsed, I would have

5    allowed the recross that you requested.  I had no idea that

6    he was cross-endorsed because no one had told me he was.

7         So going forward, advise me when a witness is

8    cross-endorsed and that way I will allow cross-examination

9    beyond the scope of direct, which is something I

10   specifically recall covering at the final trial preparation

11   conference.

12        This point about recrossing we did not cover at

13   the TPC, but it's my practice to do so when a witness is

14   cross-endorsed.

15             MR. THOMAIDIS:  Thank you, Your Honor.

16             THE COURT:  All right.  Okay.  Let's bring in the

17   jury.

18        (Proceedings were held in the presence of the jury at

19   1:18 p.m.)

20             THE COURT:  The plaintiff/counter defendants may

21   call their next witness.

22             MR. CROUGH:  Thank you, Your Honor.  Plaintiffs

23   call Ryan Davis.

24             THE COURT:  All right.

25              RYAN DAVIS, PLAINTIFFS' WITNESS, SWORN

Direct - Ryan Davis

1        COURTROOM DEPUTY:  Please be seated.  State your

2    full name for the record and spell your first and last

3    name.

4        THE WITNESS:  My name is Ryan Davis.  R-y-a-n,

5    D-a-v-i-s.

6                    DIRECT EXAMINATION

7    BY MR. CROUGH:

8    Q.   Good afternoon, Mr. Davis.

9    A.   Good afternoon, Mr. Crough.

10   Q.   Before we get started in our background, I need to ask

11   you this:  Your name's come up a lot in the trial so far.

12   A.   It has.

13   Q.   Are you a forger?

14   A.   There's no part of me that's a forger.  In any

15   accusation or claim, that is absolutely false.

16   Q.   Did you forge the distribution agreement that's at the

17   center of this case?

18   A.   No.

19   Q.   Did your parents and your fiance take part in any

20   conspiracy to create a forgery to bring this case?

21   A.   Absolutely not.

22   Q.   Are you sitting here as a witness in this case, sworn

23   to tell the truth, willing to perjure yourself to this

24   jury?

25   A.   I'm sitting here under God and telling everybody

Direct - Ryan Davis

1    inside this courtroom, I did not forge a contract nor did

2    my family, and any claim stating that is absolutely

3    false.

4    Q.   Mr. Davis, let's talk about who you are.  First off,

5    where were you raised?

6    A.   I was born and raised here in Denver, and raised in

7    Broomfield, Colorado.

8    Q.   Where did you go to high school?

9    A.   I was at Horizon High School.

10   Q.   After high school, what did you do?

11   A.   Ah, again like you stated in the opening, my

12   grandfather wanted to see one of his grandsons serve and my

13   cousin was a -- he built satellites for the Government, so

14   he wasn't really a viable option so it was me.  I decided

15   after coming out of high school, I didn't have a plan, I

16   guess, so I joined the Army.

17   Q.   What year was that?

18   A.   It was 1994 when I joined.

19   Q.   And was -- what was the Army up to at that time?

20   A.   Well, it was just at the end of the Desert Storm

21   campaign and we were getting ready to go into the Desert

22   Thunder campaign.

23   Q.   Did you voluntarily enlist?

24   A.   Absolutely.

25   Q.   How long did you enlist for?

Direct - Ryan Davis

1   A.   I enlisted for four years.  It was my first

2   enlistment.

3   Q.   And you mentioned the army, was there a specific

4   division or branch that you enlisted in?

5   A.   I was combat arms, so I went 19 Delta, which was an

6   advanced calvary so we were kind of the first guys in if

7   something happened.

8   Q.   Help the jury understand, what is it that you're doing

9   for the Army?  Is that fueling up trucks?

10  A.   No, advanced cavalry is -- again we're the first guys

11  in.  We basically go in first and we give sit reps, which

12  is a situation report, to the rest of our units to tell

13  them what's going on behind enemy lines, basically.

14  Q.   So if I understand you, you're preparing for combat?

15  A.   Absolutely.  This is kind of forefront of armed

16  combat, yes.

17  Q.   Now did you plan to make military a career for you?

18  A.   At the time, it was an option.  I was going for

19  Special Forces.  I wanted to obviously continue that

20  career, yes.

21  Q.   When you say going for Special Forces, what does that

22  mean?

23  A.   My plan was to eventually become involved with Special

24  Forces, or I guess in a sense like a SEAL, but on the Army

25  side, which was called Special Forces.

Direct - Ryan Davis

1   Q.   Did you ultimately make a career out of the

2   military?

3   A.   I didn't.

4   Q.   And why not?

5   A.   On a routine mission down in Pinon Canyon, we were on

6   a jump -- a parachute jump and my parachute deployed late,

7   and I wound up shattering my foot and ankle, so . . .

8   Q.   So you're at Pinon Canyon, that's here south in

9   Colorado right?

10  A.   Just a little bit north of the New Mexico border, yes.

11  It's a training site for the Army here.

12  Q.   How did you get out of the canyon?

13  A.   I was air-lifted.

14  Q.   Did you quit right there, if you broke your foot?

15  A.   No.  What happened, again, this was forced selection

16  for Special Forces.  It was a training course and a 15-day

17  course, which was very hectic.  It made boot camp look like

18  school, I guess.  And I was on my 14th day and I broke my

19  foot on the last mission.  It was a 50-mile course that we

20  had to complete in 24 hours, hitting check points.

21       So when I broke my foot, I still finished the

22  course.  I finished on a broken foot.  I did about 40 miles

23  on a broken foot.

24  Q.   So, yeah, how far in were you on the jump left to

25  finish when you broke your foot?

Direct - Ryan Davis

1  A.   It was right at the beginning, so technically I did

2  the entire course with a broken foot, so . . .

3  Q.   How did you treat the foot?

4  A.   Well, I got to the first medical station -- or the

5  first check point and the medics checked it out, and they

6  told me that there wasn't much more damage that I could do

7  and it was my choice.  And I didn't want to be dropped

8  basic -- on a medical for everything that I had been

9  through, so they duct-taped it and I finished the course,

10  so . . .

11  Q.   Did you finish the course on a duct-taped foot?

12  A.   Yeah.

13  Q.   Now, tell me what -- so were you able to qualify for

14  Special Forces after the injury you had?

15  A.   I did.  I -- I qualified and I was actually picked up

16  by a unit.  The problem was by the time my injury was

17  healed, I didn't have enough retainability left in the

18  military to be able to get picked up by a unit, so . . .

19  Q.   Did you re-up at that time?

20  A.   I didn't, no.  I had some other opportunities that

21  came up at that time.

22  Q.   What was your next step after the military?

23  A.   Hastings College, a small college out of Nebraska, was

24  looking for me to come up there to play football and

25  basketball for them.

Direct - Ryan Davis

1   Q.   And I forgot to ask you one thing.  When you left the

2   military, what was your discharge status?

3   A.   I was -- I was a disabled veteran.

4   Q.   Were you honorably discharged?

5   A.   Yes.

6   Q.   And are you still categorized as a disabled veteran?

7   A.   Yes.  I'm -- technically I'm still under the VA's

8   watch term of 30 percent disabled veteran, so I still

9   receive services from the VA from time to time.

10  Q.   All right.  Let's talk about the -- you said Hastings

11  College in Nebraska; is that right?

12  A.   That's correct.

13  Q.   And were you able to participate in sports yet?

14  A.   I did.  I went up there, you know, first year, I was

15  playing basketball and football and I kept having a

16  reoccurring injury, the foot was a problem.  I mean, you

17  can't go and play football and basketball after the damage

18  I did to it without reoccurring injuries, so it was a

19  common theme.

20  Q.   Did that -- did the injury ultimately prevent you from

21  continuing on with the sports?

22  A.   It -- based on the scholarship, yeah, I couldn't play

23  under scholarship anymore, no, up at that school after the

24  first year because of so many injuries to my foot.

25  Q.   Had you gotten any treatment for that foot, beyond the

Direct - Ryan Davis

1   duct tape, of course?

2   A.   Yeah, I've -- I've had eight surgeries, six of them

3   through the VA, so . . .

4   Q.   How is it holding up now?

5   A.   It is, I guess.  It works.

6   Q.   Let's talk about your work history.  So did you

7   graduate from Hastings?

8   A.   No.  I went there for a year.  Played sports and then

9   I came back and graduated from Regis University.

10  Q.   What year was that?

11  A.   Oh, gosh, I did the -- it's an adult program, so I --

12  I think I finally completed my program in 2012, so . . .

13  Q.   When did you start Regis?

14  A.   It was when I came home, I just started taking classes

15  at night.  I wasn't going full semester because I was

16  working full-time, too, so I was only making two classes a

17  semester.  It took a while to get done, so . . .

18  Q.   So you're going to classes at night or weekends and

19  working during the day?

20  A.   That's correct.

21  Q.   Let's talk about the working.  What -- what kind of

22  jobs did you have when you came back to Colorado?

23  A.   Well, I mean, throughout the time when I was in

24  college and high school, I installed tile, so I knew about

25  it.  That's what I did to make money.  So when I came --

Direct - Ryan Davis

1    decided to enter the work force, I guess after college --

2    or after the Hastings, I went to work for a company called

3    Coastal Flooring & Design.

4    Q.   What kind of business was Coastal Flooring?

5    A.   They were, in a sense, like we were talking, they were

6    a dealer.  They did homes, DR Horton homes, things of that

7    nature.

8         They were really -- we were really big down in the

9    Meadows -- down by Park Meadows down there when that first

10   took off several years ago.  Obviously that was -- 2001

11   when I was working for them.

12   Q.   There's already been some discussion in the courtroom

13   here that you at some point were an employee of Porcelanosa

14   directly; is that right?

15   A.   That's correct.  When I --

16   Q.   When did that happen?

17   A.   Well, after I left Coastal, I had an opportunity with

18   Porcelanosa and it was -- it was something that I felt was

19   good for me.

20   Q.   And why was it good for you?

21   A.   Oh, I mean, I looked at the product, the background of

22   the company, so -- it was just a company that I would want

23   to work with.  I mean, it was a lot better than -- when I

24   was with Coastal, I was a warranty manager, so I was trying

25   to go in and fix all homeowners' complaints and mistakes,

Direct - Ryan Davis

1    and after a long period of time, that kind of gets

2    daunting, so I wanted some kind of going fresh.

3    Q.   Did you see Porcelanosa as a bigger opportunity for

4    you?

5    A.   Yeah, I did.

6    Q.   When you started working with Porcelanosa, what was

7    your job?

8    A.   I was a sales rep.  Originally when I was first hired

9    I flew down to California to interview, down in Porcelanosa

10   Los Angeles.  I was hired.  And the original steps was I

11   was going to come out here and start calling on customers,

12   but I was going to work out of my home.

13          And then later I was responsible for developing

14   and building their showroom and hiring some people out here

15   before I left.

16   Q.   Was -- what was the Porcelanosa's footprint in the

17   Colorado market at that point?

18   A.   There was none.  I was basically hired to start the

19   footprint out -- out here in '03.

20   Q.   And it's a Spanish company.  Did you -- were you --

21   how were you taught about the Spanish product that you were

22   using?

23   A.   I went back to Spain several times.  I traveled back

24   there with Josep Domingot.  I learned -- I saw the factory,

25   learned how the tiles were made all the way from raw

Direct - Ryan Davis

1   product all the way to packaging.  Obviously so many

2   product lines between system pool, which is, you know,

3   shower columns, and Porcelanosa's a large company, so I

4   spent a lot of time back there not only learning the

5   product, but getting myself identified and familiar with

6   the company.

7   Q.   Now, you mentioned the name Josep Domingot.  Who was

8   he?

9   A.   At the time, he was the general manager out there in

10  California.

11  Q.   So the boss of the California operation?

12  A.   Yeah.  Kind of the boss of the boss, yes.

13  Q.   Now, when did you leave Porcelanosa as a direct

14  employee?

15  A.   It was spring, early summer of '04.

16  Q.   Let's talk about what happened around that time.  What

17  was your family situation?

18  A.   Well, I had a son on the way, so my fiance at the time

19  was pregnant with my son, so . . .

20  Q.   Did -- how much were you making as a sales rep at

21  Porcelanosa?

22  A.   $22,000 a year with point zero zero zero zero 3

23  percent commission.

24  Q.   How did point 000 --

25  A.   003, I --

302

Direct - Ryan Davis

1    Q.    -- percent translate into money for you?

2    A.    Never did.

3    Q.    Was that enough money to support your new coming

4    family?

5    A.    Me, by myself, it was, but with a son on the way,

6    there was no way I could support him with what I was

7    making.

8    Q.    So what did you do next?  What was the plan after

9    Porcelanosa?

10   A.    You know, I learned a lot when I was working with

11   Porcelanosa.  I -- I built and opened up their showroom and

12   I, you know, was running around and calling on people.  In

13   a sense, it gave me kind of a template to be able to start

14   my own company.  I understood what it took to get going.

15   So being that I installed and I had good relationships

16   throughout, I decided I wanted to start my own flooring

17   company.

18   Q.    Was there an overlap between starting your new

19   flooring company and when you were -- when you left

20   Porcelanosa?

21   A.    Well, yeah, there was an overlap.  I wanted to leave a

22   little bit earlier, and I let Josep know what my plan was.

23   And Josep asked if I could maybe hang out for a little,

24   couple of weeks longer, until they could find a replacement

25   and I could help train them up a little bit with the

Direct - Ryan Davis

1   experience that I had.

2   Q.   What was the new business that you got started?

3   A.   It was called Infinite Flooring & Design.

4   Q.   So when you -- when you left Porcelanosa, were you

5   fired?

6   A.   I know the paperwork says that, but I -- yes, I guess

7   I was, because it was a conflict of interest that I was

8   starting my own flooring company.

9   Q.   And what would be the conflict of interest there?

10  A.   Well, I mean, owning a flooring company and also

11  acting as the distributor manufacturer, there could be

12  definitely several points of conflict there, so I just felt

13  that it was a clean break was better.

14  Q.   Did you talk to Josep Domingot about that?

15  A.   Yeah, I did, absolutely.

16  Q.   And regardless of what the paperwork says, what was

17  your understanding of how you ended that relationship?

18  A.   Josep and I were great.  I mean, we had several

19  conversations even after I left the company.  I mean, as

20  far as I knew, we were -- I guess associates.  I wouldn't

21  say friends, but we were still good associates.

22  Q.   And you've seen the paperwork in this case after --

23  when you left Porcelanosa in 2004, right?

24  A.   I did, yeah.

25  Q.   And you've seen that it says it's a voluntary

Direct - Ryan Davis

1   termination is how you left, right?

2   A.   I seen that, yeah.

3   Q.   Right.  And did you agree that there was a potential

4   conflict going on there in doing both jobs?

5   A.   I mean, agree or not agree, I guess really it was past

6   the point of me -- I made my decision to move on, so

7   whatever was in the paperwork or however they wanted to put

8   it really didn't concern me at that point, I guess.  I was

9   moving on with my life.

10   Q.   Would you say that you left on good terms?

11   A.   Yeah.  I felt like they -- I left on great terms.  I

12   mean, obviously I had several discussions and did business

13   with them afterwards, so I felt for me, personally, there

14   was no hostilities or no issue when I left.

15   Q.   There's been some discussion about another contract,

16   the facade agreement that I think it's been referred to.

17   Do you recall that?

18   A.   Yeah.  I do.

19   Q.   Okay.  Let's -- I want to get some context for that.

20   So tell me how -- how did this agreement come about?

21   A.   Well, in the trips that I was back with Spain, two of

22   my trips that I took back, the first trip was personally

23   for me to learn the product, the company, the line and

24   everything, how it's made, that was more product knowledge

25   for me.  The second two trips that I went back, the first

Direct - Ryan Davis

1    trip I took 12 architects back with me strictly for the

2    ventilated facades.  We spent 10 days back there and I was

3    able to spend 10 days with architects and engineers on a

4    rain-screen system for buildings and so I learned a lot.

5         And we came back to Denver.  And it was about six

6    months later that I did another trip back out there with

7    some more architects and engineers from Denver and spent

8    another 10 days out there learning about this entire

9    system.

10        So I can't say that I'm a full-blown professional

11   on it, but I can tell you I know quite a bit about

12   ventilated facades, so . . .

13   Q.   And just for the room's edification, can you help us

14   understand, what is a ventilated facade, just briefly?

15   A.   If you were to take a building -- I guess in a sense,

16   I was looking at this -- this might be a good example:  If

17   you have a normal wall and you wanted to either reface it

18   or put tile on it, there -- this is what they call facade.

19        Now a ventilated facade, there's a gap between the

20   wall and tile and that allows for air movement, which is

21   great for R value, and it helps out with, you know, how the

22   building is sustainable.  It also helps out because if you

23   have porcelain -- through-body porcelain tiles on the

24   outside of the building, you don't need to paint, you don't

25   need to worry about wear and tear.  If one breaks, you pop

Direct - Ryan Davis

1    it off, you pop in a new one, you can change the design.

2            I mean, there's -- it's a phenomenal system and

3    that's truly why I got so interested in it.  I was really

4    interested in ventilated facades.  It was new, it just --

5    it was taking off over in Europe.  I got to go to Valencia

6    and see some serious projects being done at the time.  I

7    got to work with engineers -- so I learned the product very

8    well, I felt.

9    Q.    When you went back to Spain, was that on your own

10   dime?

11   A.    No, no, it was all with Porcelanosa, including with

12   the 12 architects and the eight architects, they set up

13   everything for everybody.

14   Q.    By "set up," did they pay for it?

15   A.    Yeah.  Airfare, hotel, food, even entertainment at

16   nights.  So they were great trips.  They were awesome.

17   Q.    And let's get back to this.  So when you left

18   Porcelanosa in 2004, did you come to an agreement with Mr.

19   Domingot about that ventilated facade system?

20   A.    So the idea was this:  When I got back to the states,

21   Josep and I believed, and probably more than I because when

22   I was back in Spain going through their training, Josep

23   would go to other meetings, so we kind of felt like that,

24   truly, I probably had a -- the most knowledge in the United

25   States at the time about the ventilated facades just based

Direct - Ryan Davis

1    on my experience.

2              So with me leaving, Josep felt like that might be

3    an opportunity missed, so we were just waiting on approval

4    for this in the United States.  So Josep and I came to a

5    rough agreement, I would say, that if this thing does come

6    to fruition, let's get back together, let's get it ironed

7    out, and let's go out and start speccing this stuff since

8    you know it and I don't.

9    Q.    Did you enter into a written agreement?

10   A.    I did, yeah.

11   Q.    Okay.  And do you remember who the parties were to

12   that agreement?

13   A.    It was just Josep and I, actually at the Porcelanosa

14   office before I left.

15   Q.    And it was -- did the two of you sign it?

16   A.    We did, yeah.

17   Q.    You signed it and you watched Josep sign it?

18   A.    Yeah.

19   Q.    Do you remember, was it you, personally, Ryan Davis,

20   that was party to the contract or was it your business?

21   A.    It was Infinite Flooring & Design because that's what

22   I was starting, so . . .

23   Q.    Let's fast-forward to beginning to work with Mr.

24   Handley.  First off, was Mr. Handley around with

25   Porcelanosa back in 2004, that time frame?

Direct - Ryan Davis

1    A.   Honestly I couldn't tell you that, but I didn't know

2    of him, no.

3    Q.   Do you recall when you started doing business with Mr.

4    Jack Handley as a Porcelanosa -- when he was a Porcelanosa

5    employee?

6    A.   First time I ever met Jack Handley, he walked into my

7    showroom, I want to say it was late summer, fall, of

8    2008.

9              MR. CROUGH:  Your Honor, before we move on, I've

10   got a number of stipulated exhibits, if I could offer those

11   into evidence --

12             THE COURT:  All right.

13             MR. CROUGH:  -- so I don't have to do it as I go

14   through them.  I have Plaintiffs' Exhibit 18, 23, 24, 28,

15   31, 37, 38, 39, 42, 44, 55, 57, 63, 77, 82 --

16             THE COURT:  Hold on.  44.

17             MR. CROUGH:  Back up --

18             THE COURT:  44, 55?

19             MR. CROUGH:  55, 57, 63, 77, 82, 88, 98, 110, 118,

20   150, 170 and defendants' stipulated Exhibit A-78.

21             THE COURT:  All right.  And you're representing

22   these are all stipulated to?

23             MR. CROUGH:  All stipulated.

24             THE COURT:  All right.  Given the stipulations,

25   exhibits 18, 23, 24, 28, 31, 37, 38, 39, 42, 44, 55, 57,

Direct - Ryan Davis

1    63, 77, 82, 88, 98, 110, 118, 150, 170, and A-78 are

2    admitted into evidence and may be published to the jury.

3         (Plaintiffs' Exhibit Nos. 18, 23, 24, 28, 31, 37, 38,

4    39, 42, 44, 55, 57, 63, 77, 82, 88, 98, 110, 118, 150, and

5    170 and Defendants' Exhibit A-78 received)

6              MR. CROUGH:   Thank you.

7              Please publish Plaintiffs' 18.

8    BY MR. CROUGH:

9    Q.    I'd like to take -- excuse me.  Mr. Davis, I would

10   like to take a look at this e-mail.  It's titled below,

11   date of August 2008.  Do you see that?

12   A.    I do.

13   Q.    And it's -- an attachment here is a ventilated facade

14   catalog?

15   A.    Correct.

16   Q.    And it's an e-mail from Jack Handley; do you see

17   that?

18   A.    I do.  I see that.

19   Q.    What's he communicating to you here?

20   A.    Right here was the first time I met him.  He was going

21   to send out some more information for us.  And I told him

22   that I was still interested being that I have some interest

23   with the company, so . . .

24   Q.    What's the signature that Jack Handley's got there?

25   What was his title?

Direct - Ryan Davis

1   A.   He was the architectural and design commercial sales

2   manager.

3   Q.   And when you worked with him, you understood he was a

4   manager?

5   A.   Yeah.

6   Q.   And did Infinite Flooring ever sell these ventilated

7   facades?

8   A.   No, we didn't.  As far as I know -- like I said, it

9   was -- after we signed that agreement with Josep, it was a

10  year or two, I check up on it here and there and it never

11  got approved, and so I forgot about it until Jack walked

12  into my showroom that day.

13  Q.   When you say it never got approved, was it the product

14  was not approved in the United States?

15  A.   It's got to go through code approval in the United

16  States government, to make sure it doesn't fall over on

17  people, it's building approval.  So this stuff can go

18  several stories up in the air, if not, you know, a hundred

19  stories in the air, so there's a lot to it, so you need to

20  make sure you have appropriate approvals from the

21  Government, yeah.

22  Q.   So the contract in 2004 between Infinite Flooring and

23  Porcelanosa for ventilated facades, was that ever put into

24  motion --

25  A.   No, we never acted under it, no, no.  There was

311

Direct - Ryan Davis

1   nothing to put in motion.  It wasn't approved.

2   Q.   Let's talk about when you're meeting Handley -- Mr.

3   Handley in person.  What is it you understood he wanted

4   from you?

5   A.   Well, originally when he walked into my showroom, I

6   think it was like any other sales call.  I was the dealer

7   at the time, so he was coming in just to kind of meet us,

8   network a little bit, and try to get our sales, I think.

9   Q.   Was it your understanding that he was in charge of the

10  Colorado market?

11  A.   Yeah, that's what he told me.

12  Q.   What was he trying to get from you?

13  A.   He wanted some showroom space inside my showroom and

14  wanted me to start doing business with Porcelanosa again.

15  Q.   You say showroom space, like put in a display, that

16  kind of thing?

17  A.   That's correct.

18  Q.   And Infinite Flooring had its own showroom?

19  A.   We were -- we were a dealer.  We had several different

20  manufacturers, carpet, tile, things of that nature.

21  Q.   There's been some discussion of Infinite Flooring &

22  Design and the demise.  Do you recall that testimony?

23  A.   I do.

24  Q.   So let's talk about the end of Infinite Flooring.

25  Approximately when did that happen?

Direct - Ryan Davis

1   A.   It was '08, '09.   We were -- it was -- it was that

2   time with the economy.

3   Q.   And explain, what was going on with the economy in

4   '08, '09 and the housing supplies, business --

5   A.   Like Shana stated earlier, it was good until it

6   wasn't.   I mean, we did mostly all residential -- high-end

7   residential, custom homes, things of that nature.   About

8   '07, late '07, that started to dry up.   So we started

9   chasing the commercial stuff and that was a whole different

10  animal.   So '08, '09, I had a few general contractors that

11  went belly up that owed me a lot of money.   And they wound

12  up not paying me.   And I couldn't pay my vendors.

13        The economy was bad so I couldn't go out and find

14  more work to recover from it.   So I was kind of in a bad

15  spot.   We installed everybody's tile and we did all of our

16  work, but I kind of was left holding the bag a little bit.

17  Q.   And when you say the -- so what had happened -- had

18  you already done the work and just hadn't gotten paid for

19  it?

20  A.   Yeah.   We did several -- several projects with one

21  company where when it came time to get paid, they didn't

22  pay it, so the work was all completed.

23  Q.   Were there home foreclosures going on at that time?

24  A.   It was crazy.   In fact, yeah, I -- yeah, everybody was

25  dropping, you know, in '08 and '09.   And we were a dealer,

Direct - Ryan Davis

1   I mean, we were healthy enough for a while but there was no

2   way that we could survive that long under those

3   conditions.

4   Q.   How did the pipeline of new work look to you?

5   A.   Like I said a little bit ago, we could have recovered

6   it if the work was out there, but there was simply no work

7   out there after '09.  I mean . . .

8   Q.   Did -- as working with Infinite Flooring Design, did

9   you sign personal guarantees for any of the work that you

10  were doing?

11  A.   I had to.  I was the owner of the company.  So when we

12  went out -- and even us as a distributor, we have people

13  sign personal guarantees with us, so yeah, I had to sign

14  personal guarantees.

15  Q.   So in those personal guarantees, was -- so Infinite

16  Flooring's debt became your debt; is that right?

17  A.   In a sense, yes.

18  Q.   And so with the customers unable to pay you, how much

19  debt were you shouldering?

20  A.   Originally it was a lot more than what I filed

21  bankruptcy for, but we ran down some of the debt, but I

22  just kind of ran out of options.  I think personally it was

23  only about $4,000 of personal debt, the rest was because I

24  was a personal guarantor.

25  Q.   Do you recall how much debt you discharged in that

Direct - Ryan Davis

1   bankruptcy?

2   A.   I don't.  Again, I handed it over to my attorney.  I

3   think it was right around 200,000 when it was all said and

4   done.

5   Q.   Let's go back to working with Jack Handley.  When did

6   you start talking with Mr. Handley about becoming a

7   distributor for Porcelanosa?

8   A.   The -- I mean, small discussions started, the idea

9   maybe started, I would say, March of '09.

10  Q.   If we could publish 23, please.

11       Actually -- so this is an e-mail, August 2009,

12  Jack Handley is writing to you, What do you think?

13       And if we could flip to the next page of it,

14  please.

15       What is this?

16  A.   Well, we had been talking about going out and actually

17  starting to rep a little bit for Porcelanosa.  So before we

18  did that, we wanted to make sure we had Porcelanosa's

19  consent so we could go out there and use their name.

20  Q.   Why are you asking to use their name?  What was

21  your -- what were you planning on doing with it?

22  A.   Well, I kind of think before you use somebody's name,

23  you better ask to use it.  So, again, we were talking about

24  distribution and Jack said it was good, and we could move

25  forward.

Direct - Ryan Davis

1  So I reached out to him and I asked him, Well, if

2  we're going to go out and start pounding the pavement, I

3  want to make sure I have your guys' blessing to use your

4  name.

5  Q.  So as I understand it, this is Crew Tile asking

6  Porcelanosa for use of intellectual property, trade names,

7  that type of thing, to use in Crew's advertising materials;

8  is that right?

9  A.  That's exactly right.

10  Q.  Now, the business that was formed, there's been the

11  words -- RG Crew have been put out there.

12  A.  That's correct.

13  Q.  What did RG Crew stand for?

14  A.  It was for Ryan and Glenn.  It was my father and I and

15  the Crew guys that we had.  And it's kind of where the

16  concept of the name came.  When I was done with Infinite

17  Flooring & Design, I was looking at trying to start

18  something different but staying inside the industry but

19  allowing myself to do other work, I guess.  So it was more

20  of starting a company to keep moving and staying in the

21  same industry, but not be so exclusive just to the flooring

22  part of things.

23  Q.  So was RG Crew a landscaping company?

24  A.  We did one landscaping job.  I had a friend of a

25  friend that wanted a volleyball court, so we went over and

Direct - Ryan Davis

1    we put in a volleyball court.

2    Q.   When did the name change from RG Crew to Crew Tile

3    Distribution?

4    A.   Well, during the discussions with Jack, they told us

5    if we wanted to become a full-fledged distributor, RG Crew

6    Construction Services didn't sound like a distribution

7    name, so they asked us later if we were to do this, we

8    needed to come up with a name change.  And eventually

9    that's why we dropped RG and went to Crew Tile

10   Distribution.

11   Q.   So in discussions with Jack Handley, who's working for

12   Porcelanosa at the time, you changed the name to Crew Tile

13   Distribution?

14   A.   That's correct.  That was one of the things they said,

15   If we go into an exclusive agreement with you, we can't

16   have RG Construction Services.  So it was one of the topics

17   that we talked about, yes.

18   Q.   Now, did you ever ask Mr. Handley expressly for all of

19   Colorado to be Crew Tile's business?

20   A.   I told him if we were going to become a distributor in

21   Colorado, yeah, I want all of Colorado.  Yeah, I did ask

22   him.

23   Q.   Publish Exhibit 24, please.

24        Now, the date on this is August 26th, 2009.  Do

25   you see that?

317

Direct - Ryan Davis

1   A.    Uhm-hum.

2   Q.    Okay.  And I'll -- it's -- just a moment -- you to

3   Jack Handley.  And the way I read this says you found out

4   you were undercut from Porcelanosa on the Jeff Jensen

5   order.  What do you mean "undercut"?

6   A.    It's -- they had reached out for pricing with

7   Porcelanosa directly and they had given them a price.

8   Q.    Okay.  And then the sentence beyond that, Is there any

9   way that anything from Colorado can be transferred to us?

10        What are you -- what are you asking?

11  A.    Well, I mean, we had been talking about distribution

12  and this is the first time that, just in talking that they,

13  kind of undercut their word.  I didn't have anything in

14  writing at the time, so, I mean, my next -- my next

15  question to them is, to avoid all of this, can I have all

16  of Colorado?

17  Q.    The next sentence down below it, you talk about

18  meeting with a designer in Evergreen, and she's saying she

19  could buy cheaper direct and would not consider you.  So

20  what's happening here?

21  A.    Again, the same thing where she would -- she would

22  call direct and get pricing, so . . .

23  Q.    And is it my -- so if you call Porcelanosa directly,

24  can you buy it cheaper than if you buy it through a

25  distributor?

318

Direct - Ryan Davis

1    A.    Not a distributor, no, but a dealer sometimes, yes.

2    Q.    So is -- is what you're discussing here, is this kind

3    of the framework of the business model for a distributor?

4    A.    Well, this is the first time where we've started

5    putting some serious framework around it, yes.

6    Q.    Did you keep Mr. Handley updated on the progress that

7    Crew was making in that fall 2009 period?

8    A.    I was very transparent with Jack Handley.

9    Q.    Exhibit 28, please.  This e-mail is September 11th,

10   2009, titled Status Update from you to Jack Handley.  And

11   you're saying, Jack, we touched base with you to let you

12   know how things are coming.  The feedback and response that

13   we're getting on the line is awesome.

14         What are you talking about?  Who's the feedback

15   from and what is the line?

16   A.    Well, at this point, I mean, it was September 11th of

17   2009, so I mean, we were -- we were already taking the

18   distribution thing pretty serious, so my -- my team and I

19   were out -- we were out getting market feedback on the

20   product to find out if this thing would work for us.  And

21   in the feedback we were getting from architects and

22   designers and things of that nature, after seeing some of

23   this product, was the feedback was awesome, people wanted

24   to work with it.

25   Q.    What do you -- how was your optimism feeling at this

Direct - Ryan Davis

1   point?

2   A.   Well, I mean, for me, I -- it was -- it sounded like I

3   was going to become a distributor, that's where my head was

4   at, I was excited about it, it was a great product, and --

5   and, like I said, I had the commitment from the company, we

6   were in talks, so everything -- it was, I guess in a sense,

7   exciting for me.

8   Q.   Who was your team at this point?

9   A.   I had Joey Griebel at the time and Bob Domingot worked

10  for me.

11  Q.   What were those two guys doing?

12  A.   They were sales reps.

13  Q.   They were out doing the same thing you are?

14  A.   They came over from Infinite Flooring & Design with

15  me.

16  Q.   Now further down in this e-mail you mentioned the --

17  you say, I placed all the Texas step racks, I've purchased

18  500 handle boards with displays and have a majority of

19  these spoken for.

20        Now, so which of -- are either of these two a step

21  rack over here?

22  A.   The one with the loose tiles on it are -- with the

23  larger tiles, that's what we call a step rack.

24  Q.   So this is what we refer to as the Texas step rack,

25  this rack with the tiles displayed this way?

320

Direct - Ryan Davis

1   A.   That's correct.

2   Q.   Okay.  What's a handle board?

3   A.   Handle board actually, I can't see it from here, but

4   it's a bigger version of what's on the spinning display

5   right there.  This shows some of our smaller format tile

6   but not super large, and it allows us to put that in that

7   step rack --

8   Q.   Something like this?

9   A.   Yeah, so we could actually slide that board into a

10   step rack, so we could use it a couple of different ways.

11   Q.   So it puts, if I understand it, your smaller tile in a

12   larger format and make it more attractive for display; is

13   that correct?

14   A.   Yeah, we take the smaller tiles and put them on boards

15   so they could fit inside the rack.

16   Q.   You say you're purchasing them?

17   A.   When we did the handle boards.  The Texas step racks,

18   when we were talking about Porcelanosa, they started

19   sending those out for us so that we could start placing

20   them in dealers.  Porcelanosa didn't have the larger handle

21   boards at the time and I felt like that was a good way for

22   us to get product out right away so I purchased 500 handle

23   boards.

24   Q.   Did you use Crew Tile to purchase those?

25   A.   Yes.

Direct - Ryan Davis

1  Q.   Why were you purchasing them without having a contract

2  in place?

3  A.   Well, I guess the initial decision was we wanted to

4  move forward with it.  I mean, the Porcelanosa was showing

5  good faith, we were showing good faith, there was no reason

6  not to move forward.

7  Q.   One more thing in this e-mail before we move on.  Down

8  below, this sentence says, 32 accounts are set up and

9  sampled out.  Who are you referring to?  Not specifically,

10  but what is an account when you say that?

11  A.   Well, I can't specifically say all of those were

12  dealers, but between architects and dealers, that's what we

13  called accounts, so we were already out setting up accounts

14  and telling them what we were going to do.

15  Q.   When you say set up and sampled out, what does that

16  mean?

17  A.   Typically we would walk into a showroom, I would

18  either meet with the general manager or the owner, we would

19  talk about floor space, we would talk about how much we

20  could have.  I would show them what type of displays that

21  we had, and we would negotiate floor space so I could move

22  those displays into their showrooms.

23  Q.   And these accounts, did you consider these to be

24  Crew's customers?

25  A.   Yeah, definitely Crew's customers.  I vetted them and

Direct - Ryan Davis

1   I brought them up, yeah.

2   Q.    Publish 31.

3         This is another e-mail date on this October 9th,

4   2009 --

5         THE COURT:  What exhibit is this, counsel?

6         MR. CROUGH:  Sorry.  Plaintiffs' 31.

7         THE COURT:  All right.

8   BY MR. CROUGH:

9   Q.   Again, October 9th, 2009, e-mail, with an attachment,

10  customer contact for Jack, and it's an Excel spreadsheet.

11  You're writing to Jack, Attached is our list of customer

12  contacts.  These are our customers.

13        Before we explain, I think we need to show page 2.

14  Three, four, five.  I think that's it.  So this list, this

15  list of five pages of customers, who are those?

16  A.   Well, those are customers that we made contact with

17  already and either gave them catalogs or some type of

18  merchandising products for Porcelanosa.

19  Q.   Why were you sending this list to Porcelanosa?

20  A.    Well, knowing what I know now, I wouldn't have, but I

21  was doing it because, again, I was being fully transparent.

22  I mean, it was a good faith.  Jack asked -- you know, I

23  wanted to show him that my guys are out talking to people

24  and we wanted to show the type of -- of movement that we

25  had in Denver with this, so I sent them over who we had for

Direct - Ryan Davis

1    customers at the time or who we were talking about.

2    Q.    Now, at the time, now in October of 2009, were you

3    concerned that without -- you don't have a written

4    agreement in place and Crew Tile is now giving up its

5    customer list to Porcelanosa who could still sell direct?

6    Why are you doing that?

7    A.    Trust.   I mean, honestly if I had Paco, the main guy

8    out there, and I have his right-hand man Jack out here

9    telling me one thing, I believe it.   I mean, I didn't have

10   any reason not to believe it.   So, yeah, I turned over --

11   like I said, I wanted to be transparent.   This was a

12   partnership, this was going to be a long-lasting

13   relationship.

14        I wanted to -- if they wanted to see our progress

15   out here, I was going to turn over what we were doing.

16   Q.    Were you showing Paco here how hard you were

17   working?

18   A.    Yeah.   I mean, absolutely.   Showing him that within

19   the last -- I mean from the last conversation since we

20   started to do this, we were out spending our time and our

21   hours trying to vet and develop this -- this territory for

22   Porcelanosa and ourselves.

23   Q.    Were you -- were you telling Porcelanosa how hard you

24   would work as a distributor?

25   A.    Yeah.   I mean, I think that's pretty evident to be

Direct - Ryan Davis

1    able to do that much work when you're not under contract.

2    Q.   Now, before you actually enter under contract in

3    December of 2009, were you acting as a distributor?

4    A.   Yeah, they were even calling us a distributor.   Part

5    of the deal was is when I started turning this over, they

6    said, in return, until we could get a contract done, we'll

7    refer to you as our distributor in Denver.

8    Q.   Can we publish Plaintiffs' 37 and 38, please.

9         We have a couple -- so, first off, this is the one

10   on top, October 29th, 2009, this is you're cc'd on this

11   e-mail, right?

12   A.   Yup.

13   Q.   I'm sorry?

14   A.   Yes, I am, sorry.

15   Q.   And it's from Jack Handley to an Olga@dencat.

16   A.   Den Cat was an architectural -- small architectural

17   firm.

18   Q.   And what is Jack Handley writing to Olga at the

19   architectural firm?

20   A.   It looks like it was an Internet inquiry that came

21   directly to Porcelanosa and he was referring Olga over to

22   us, saying that we have a local distributor in the Denver

23   market.

24   Q.   And she writes, Ryan with Crew Tile is a local

25   distributor in Denver market, asking you to reach out to

Direct - Ryan Davis

1    Olga to see if she's interested in Silk Blanco.  Was that a

2    Porcelanosa product?

3    A.   It is, yes.

4    Q.   During this time frame, were you asking Mr. Handley

5    and Mr. Montilla for a written distributor contract?

6    A.   No, not at this time, no.  This was just part of

7    the -- what we had talked about.  Again, he said that he

8    would call us or -- that we were going to start referring

9    us to their distributor, and any work that came into the

10   Colorado territory, they would refer to us.

11   Q.   Let's move down to the next e-mail below it.  And not

12   to be redundant here, but same time, 10-29-09, Eric from

13   Eric Fisher.  Who is this Timberline Enterprises?

14   A.   Timberline, I believe, was a -- was a small dealer,

15   too.

16   Q.   So is this, again, Jack Handley referring a dealer to

17   Crew Tile, referring to Crew Tile's our local distributor

18   covering the Denver market?

19   A.   Yeah, another one of that, yeah.  There are several of

20   these.

21   Q.   Was it surprising to you to be receiving these e-mails

22   and customer referrals over from Jack?

23   A.   No, he said -- that's exactly what he said he was

24   going to do.

25   Q.   When did you start asking Jack Handley for an

Direct - Ryan Davis

1    exclusive written distributor agreement?

2    A.   Well, part of the discussion was, one, a name change

3    and, two, we had to have a nice showroom, so looking for a

4    nice showroom, we finally picked the Denver Design

5    District.  So once we decided that that's where we wanted

6    to move, we started having the discussions of putting the

7    actual exclusive distribution agreement together.

8    Q.   That was -- was part of your discussion that Aspen to

9    be off limits?

10   A.   They told me that up-front.  They said that they had

11   had a relationship up there for quite a few years prior to

12   getting with me and that they were going to respect that

13   relationship and that relationship was exclusive up in

14   Aspen and Pitkin County.  I knew that up-front.

15   Q.   Okay.  So in negotiations for your exclusive contract,

16   part of the deal was that you knew Aspen, Pitkin County,

17   would be off limits?

18   A.   Yeah, they made it clear up there that they already

19   had a player up there, they had an agreement with a guy up

20   there and they made that very clear that they were going to

21   continue to honor that agreement since they had it.

22   Q.   Please publish 39.

23        Now, this is an e-mail from you, Ryan Davis,

24   directly to Paco Porcelanosa.  Is that Paco Montilla?

25   A.   Yes, that's right.

Direct - Ryan Davis

1    Q.    And he -- again, he's the boss of Porcelanosa in Los

2    Angeles, right?

3    A.    Correct.

4    Q.    Okay.  And this is November 3d, 2009; is that right?

5    A.    That is right.

6    Q.    So about a month and a week or so before the contract

7    was ultimately signed?

8    A.    That's correct.

9    Q.    Now moving into the e-mail itself, a couple of things

10   I wanted to point out to you and ask you to clarify for us.

11   So down at the bottom here, you're talking about how you're

12   pushing Porcelanosa in the Denver marketplace with five

13   outside reps, three support staff, you're making great

14   success so far.  But you mentioned here a condo project in

15   Aspen that you had already spec'd.  Do you see that?

16   A.    I do.

17   Q.    And below it you talk about how you're withdrawing

18   your samples and you're telling the client to reselect all

19   the materials?

20   A.    Yup.

21   Q.    Why are you doing that?

22   A.    Jack and I and Paco had an agreement and part of that

23   agreement was is I wasn't going to sell in Aspen or Pitkin

24   County, so I -- based on my word, I had to withdraw from

25   the project.

Direct - Ryan Davis

1    Q.    Would you have made money on this project?

2    A.    Yeah, it was 13 condos.  I would have made decent

3    money on that project, absolutely.

4    Q.    You're voluntarily giving up a project?

5    A.    We had a verbal agreement.  I was going to honor my

6    word.  Yeah, I told them that I wouldn't do business in

7    Pitkin County or Aspen.

8    Q.    Just below the last sentence I highlighted, I want to

9    honor our relationship and build it on trust.  What are you

10   referring to there?

11   A.    Again, exactly what I just said.  We were going into a

12   long-lasting relationship.  I knew one project -- this was

13   going to be one of a lot that were going to come down the

14   road, so I wanted to let them know that in honoring our

15   relationship and being transparent and knowing that they

16   can trust my word, I pulled our -- our -- our, I guess our

17   card off the table.  We weren't going to -- we weren't

18   going to do that project anymore.

19   Q.    Last question on this e-mail before I move on.  Down

20   at the bottom you write, I want to make sure that our

21   agreement his understood.  Does that mean is understood?

22   A.    Yes.  Is understood.

23   Q.    What agreement are you talking about?

24   A.    The exclusivity contract.

25   Q.    Now, part of the agreement you had with Porcelanosa is

Direct - Ryan Davis

1    that you would make a showroom, right, create one?

2    A.   That's correct.

3    Q.   If we could publish 42, please.

4         And this is November 23d, 2009, from you to Jack

5    Handley of Porcelanosa.  And what are you writing to him

6    here?

7    A.   We had made the decision and we found a spot in Denver

8    Design District and we were going to move forward with it,

9    so I was trying to get with Jack so that we could have all

10   the material and the displays here so that once we started

11   in the showroom, we would have everything here so we could

12   get going.

13   Q.   Are you confirming Porcelanosa right now that you've

14   got a showroom lined up?

15   A.   That's correct.  They knew it.  They knew I had the

16   showroom lined up, yes.

17   Q.   And you talk about displays for the showroom.  Are you

18   talking about things like this?

19   A.   There was some of those and then there was much larger

20   displays, we had large room racks, things of that nature.

21   A lot bigger than those.

22   Q.   Now, let's talk about the Denver Design Center.  Why

23   did Crew Tile pick the Denver Design Center for the

24   showroom?

25   A.   Well, in the industry, the Denver Design Districts at

330

1    the time was kind of the higher echelon for designers, and

2    that's where you would want to put the luxury tile is in an

3    area like Denver Design District, so we felt like that was

4    a great opportunity for us.

5           It was -- it was the best opportunity to market

6    this material and also market it to the people that were

7    going to buy it.  We felt that was our best option at the

8    Denver Design District.

9    Q.   Now, at that time, this is now late 2009, could

10   anybody walk into the Denver Design Center and buy the

11   product displayed there?

12   A.   No, at the time what we were told by the Denver Design

13   District is there was roughly about 496 designers on staff,

14   they were required to do $1,000 a year with each one of the

15   showrooms, and that they had to have a pass.  You had to --

16   I guess, in a sense, kind of go through a background check

17   as a designer to make sure you qualify you could bring

18   clients into the design district.

19   Q.   So you had special permission to come in?

20   A.   Well the designers did, yes.

21   Q.   The designer did?

22   A.   Yeah.

23   Q.   So me off the street, I couldn't walk in off the

24   street and buy anything there in 2009?

25   A.   You had to have a designer with you if you were to

Direct - Ryan Davis

1    walk in there.

2    Q.   Was it a concern for Crew Tile in setting up a

3    showroom that you wouldn't be able to sell to retail

4    clients off the street?

5    A.   No, that was -- actually, it was right in line with

6    our motto.  What we wanted to do is get in the Denver

7    Design District where we could show this.  And if we did

8    have any type of retail or customer that we couldn't sell

9    to, we could turn around and automatically refer them to

10   one of our dealers right away and still make the sale.

11   Q.   When did you start construction on the showroom,

12   itself?

13   A.   Denver Design District let us in a month before we

14   actually signed our lease so we could start construction.

15   Q.   So I understand that the lease was in early December;

16   is that right?

17   A.   The lease was signed on December 8th of 2014.

18   Q.   So you're in early November?

19   A.   We were right before Thanksgiving, we worked over

20   Thanksgiving to try to get the showroom up and running.

21   Q.   And is this the same time that you were working to get

22   Mr. Handley out to Colorado so you could get that agreement

23   in place?

24   A.   Yeah.  Jack and I were working on a date that we could

25   get all three of us out there so we could get some

Direct - Ryan Davis

1   paperwork signed and move forward.

2   Q.   You say "all three of us," who are you talking

3   about?

4   A.   Jack, Paco and myself.

5   Q.   Now, there was a time when you ultimately met with Mr.

6   Montilla, and Mr. Handley in person in Colorado; is that

7   right, all together?

8   A.   Yeah.

9   Q.   If we could publish Plaintiffs' Exhibit 44, please.

10          At the top of this e-mail is Jack writing to you,

11   December 3d, 2009.  And he's saying, Ryan, as you can see

12   Paco has agreed to visit now and we need to make the most

13   of it.

14          What is he talking about?

15   A.   Well, there was a couple of dates that were bounced

16   around before this.  This was finally decided on, and this

17   is just an e-mail saying that Paco finally confirmed a

18   date, this is when we're coming out.  Make sure that your

19   showroom is ready, your staff is ready, and let's get this

20   deal closed up.

21   Q.   And the next part of this e-mail is, plan it, prepare

22   for it, nail it.

23   A.   Uhm-hum.

24   Q.   What was your understanding of what Jack is

25   communicating to you on December 3d, 2009?

333

Direct - Ryan Davis

1    A.    Truthfully, it was everything that we were working on

2    and discussed all the way up until that point.  I mean, it

3    was the distribution, it was the client, it's the project,

4    it's the product.  I mean, everything that we worked on, he

5    said, we got to plan it, prepare for it, and nail it.  This

6    was the time to get the deal done, and Jack wanted to make

7    sure that there wasn't a hiccup on my end or anything like

8    that, so when Paco comes out here, we can finally get this

9    thing done and we can start moving down the road.

10   Q.    Was it your understanding that they were going to come

11   to Colorado and plan for it, prepare for it and nail it is

12   actually signing the exclusive distributor contract?

13   A.    Yeah, that's when they told me, we're coming out to

14   get this done.

15   Q.    I want to talk about December 14th, 2009.

16   A.    Sure.

17   Q.    The date that's come up a lot so far in this case.

18   And I want to walk the jury through the events of the day.

19   All right?

20         First off, when did you first see Mr. Handley and

21   Mr. Montilla on that day?

22   A.    I picked them up from the airport.

23   Q.    About what time?

24   A.    Oh, between 8:30 and 9:00, I would say.

25   Q.    Where did you go?

334

Direct - Ryan Davis

1    A.    Directly to the airport, we went straight over to the

2    Denver Design District.

3    Q.    What happened when you got there?

4    A.    We walked around my showroom.  We discussed how we

5    were going to do some designs, some vignettes, what type of

6    floor tiles to put down, some of the best sellers, and then

7    we did a tour of the actual design center and met with some

8    of their staff there, too.  And the idea of that was just

9    to kind of show Paco and Jack not only do we have our

10   showroom, but we also have the support of other showrooms

11   around us and a lobby area where we can put up displays,

12   things of that nature, so . . .

13   Q.    What happened after the tour?

14   A.    Right after the tour, we came back to our -- my

15   showroom, and we signed the contract.

16   Q.    Let's get down to the granular level here.  So when

17   you say "sign the contract," where was it done, who was

18   there?

19   A.    It was in the front of my showroom.  We -- I remember

20   it.  We put up a makeshift table because we were still in

21   the middle of construction, so it was two saw horses and a

22   piece of plywood.  A little embarrassed about that in front

23   of Paco, but it was part of the process.

24          But yeah, we sat down at our little makeshift

25   table with some folding chairs and we signed the contract.

Direct - Ryan Davis

1    Q.   Who all signed the contract that day?

2    A.   It was myself, my mom, and Jack Handley.

3    Q.   Was Paco there?

4    A.   He was.

5    Q.   Where was he?

6    A.   He was standing right behind Jack Handley.

7    Q.   Was he aware that the contract was being signed?

8    A.   He was the one that went ahead and motioned to Jack to

9    go ahead and sign the contract, that he was good with

10   everything, and then he jumped on the phone right away and

11   started talking in Spanish, so I don't know what he was

12   saying, so . . .

13   Q.   How many copies of the contract were signed?

14   A.   There was three total.

15   Q.   Why three?

16   A.   There was one for us, there was one for them, and I

17   had another third one because I was looking for potential

18   investors and I wanted to have one of those contracts for

19   potential investors.

20   Q.   At that point in time, did you have a specific

21   investor in mind?

22   A.   I had a few people.  Obviously I was talking to Ray

23   Perry and I had a few other people that I had been talking

24   to about the same thing.

25   Q.   And did you witness Jack Handley sign that piece of

Direct - Ryan Davis

1    paper?

2    A.    Yeah.   He did it right in front of me.

3    Q.    Any doubt in your mind that happened?

4    A.    It was 12 inches in front of me.   I watched him do it.

5    I watched my mom do it and I know I did it, so . . .

6    Q.    Did you have any concern that he was signing it

7    instead of Mr. Montilla?

8    A.    No.   I mean, like I said, everything, as you can see

9    from the e-mails, I mean, everything was in good faith.   I

10   don't -- I don't remember questioning much at that time as

11   far as my trust factor with them.

12   Q.    Did you have any reason to believe that Mr. Handley

13   didn't have the authority to sign a contract like that?

14   A.    No.   I mean, he was shipping me racks and he was

15   already calling me a distributor in the e-mails, he was

16   sent -- I had no -- I had absolutely no question to -- I

17   had no question of his authority.

18   Q.    What happened after the contract was signed?

19   A.    After the contract was signed -- we finally signed the

20   contract and we went over and we met Ray Perry at lunch at

21   Elway's.

22   Q.    When did you start talking to Mr. Perry about that

23   lunch?   Was that arranged that day?

24   A.    No, no, the lunch was arranged -- after I had found

25   out when they were going to come to Denver, based on their

Direct - Ryan Davis

1    e-mail, I reached out to Ray and coordinated with him, too.

2    I said, I would like to set up a lunch after they come out

3    and visit so you can visit with them.

4    Q.    Let's talk about the contract just a little bit more.

5            Pull up 46, please.

6            Now, you -- you've seen this contract, correct?

7    A.    I have, yes.

8    Q.    Is this the contract that you signed on December 4th,

9    2009 -- excuse me, December 14th, 2009?

10   A.    That's correct.

11   Q.    Do you know why it's dated the 8th day of December,

12   2009?

13   A.    I have a speculation, but I don't know exactly,

14   because, again, I didn't write the contract.  But I wanted

15   to try to at least get my lease with the Denver Design

16   District and this contract within the same day, so I signed

17   my lease with the Denver Design District on December 8th

18   and technically I wanted my distribution contract within

19   that date, too.  And that was the original discussion is

20   originally Jack and Paco were going to be out there on the

21   8th, so . . .

22   Q.    Did you type out this contract?

23   A.    No.

24   Q.    Was it brought in electronic form?

25   A.    No.  He brought it out in a folder.

Direct - Ryan Davis

1   Q.   Did you ever see the contract in this form and edit,

2   line item, that type of thing?

3   A.   No, I had never seen a full draft.  We had some notes

4   and stuff.  And, again, we had dozens and dozens and dozens

5   of phone conversations.

6   Q.   Okay.  Did you have any input on content of the

7   contract?

8   A.   Yeah, of course.  I had -- I definitely had some input

9   on the contract.

10  Q.   And what -- what parts of the contract were important

11  to you?

12  A.   Well, we wanted a time frame, obviously.  We wanted

13  some type of provision where if they did what they did,

14  that I would have some type of protection.  I -- yeah, I

15  guess between length, protection, things of that nature,

16  yeah, I -- I had some input.

17  Q.   When you say a time frame, why were you -- why did you

18  want a period of time in that contract in order to

19  perform?

20  A.   Well, there is no thought -- and my discussions with

21  Ray Perry is we knew there was going to take a little bit

22  of time, in other words, to ramp up because of the way the

23  economy was.  But we felt that if we could get everything

24  out there when -- by the time it returned, we were already

25  set to take it.

339

Direct - Ryan Davis

1        So I guess -- well, re-ask your question. I'm

2    sorry, I apologize.

3    Q.  Yeah, I'm just curious why you wanted a length of time

4    in order to have that period of exclusivity.

5    A.  Because with any business it takes -- it takes some

6    time to get up and running.

7    Q.  Now, the buyout provision has been mentioned in here a

8    couple of times and what happens at the end of the fifth

9    year. Was that an important term to you?

10    A.  Absolutely it was important.

11    Q.  Why was it important?

12    A.  Well, because myself, my parents, we were putting up

13    so much money, I just -- I had to have some type of

14    security on my end.

15    Q.  Who brought the physical contract in the beginning?

16    A.  Well, Jack Handley pulled it out of his -- out of his

17    briefcase or bag, so . . .

18    Q.  And it was a hard copy form?

19    A.  Yes.

20    Q.  After the contract was signed, we've already heard

21    from Mr. Perry about going to lunch at Elway's.

22    A.  Sure.

23    Q.  Again, who was at the lunch?

24    A.  It was us four. Myself, Ray Perry, and Paco and

25    Jack.

Direct - Ryan Davis

1  Q.   And did you talk about the business relationship?

2  A.   Yes.

3  Q.   Do you know if he used the word exclusive distributor

4  contract while you were sitting there at lunch?

5  A.   I know it was used.  I can tell you right now it

6  wasn't a focal point of that conversation.  Again, my idea

7  in this entire thing was to get these guys in front of a

8  potential investor of mine and vice versa so they could

9  have some communication so this wasn't coming third party.

10  I wanted these guys to have a face-to-face interaction.

11  Q.   Was this a celebratory lunch?

12  A.   Well, yeah, for me it was.  And for me in a sense to

13  even have Ray show up to entertain the idea that he would

14  meet these guys, I -- I don't know, there was a lot of

15  potential, I guess.

16  Q.   Did you talk about the plan going forward?

17  A.   Absolutely, we did.

18  Q.   What did you talk about?

19  A.   We talked about the materials that are going to come

20  for the rest of our showroom, we talked a little bit about

21  our grand opening, we talked about how we are going to

22  tackle things, we talked about marking materials.  I mean,

23  there was a lot going on.

24      We talked about pure expansion and some of the

25  potentials that this could have.

Direct - Ryan Davis

1    Q.    So after you get the contract signed, is it -- did you

2    just sit back and rest on your laurels at that point?

3    A.    No.   We -- in fact, after the contract was signed, we

4    had a lot of work to do.   I mean, I still had had a

5    showroom to build and we still had a territory to develop.

6    In fact, there was a lot of work in front of us.

7    Q.    How long did it take before you get the showroom

8    available to open up?

9    A.    We had a soft opening in February and then we were

10   planning our grand opening in March.

11   Q.    Now, who paid for the showroom materials?

12   A.    We did.   And some of it was donated from Porcelanosa,

13   a lot of material that went on our floor and walls was

14   donated by Porcelanosa.

15   Q.    Put up Plaintiffs' Exhibit 55, please.   This is an

16   e-mail exchange between you and Paco Montilla, Jack

17   Handley's copied on this.   He talks -- Paco's telling you

18   he signed off on a sample request.   Down at the original

19   e-mail, you're writing to him talking about an open house

20   and why you built the showroom.   Can you explain to the

21   jury what you're talking about here?

22   A.    Again, this is just an e-mail reaching out that I

23   needed to get the rest of the samples so that we could hit

24   our target day of our open house of March 24th, 25th, and

25   26th.   And this is me reaching out to Paco and saying we

Direct - Ryan Davis

1   still need to get those samples out here, so -- in time for

2   our open house.

3   Q.   And this is March 12th, 2010, so it's about three

4   months after you signed the contract; is that right?

5   A.   That's correct.

6   Q.   And what you're saying here, We want to show all of

7   the Porcelanosa line, this is why I have built this

8   showroom.

9        Now, in writing that to Paco, would you think that

10   would be a surprise?

11   A.   No.   I mean, my entire showroom is Porcelanosa and I

12   had some areas where I needed tile so you only put -- the

13   only guys I could put there was Porcelanosa.

14   Q.   Why are you reaching out directly to Paco at this

15   point?

16   A.   Because I hadn't heard back on those samples yet, so I

17   reached out directly to Paco to find out what was going on

18   because, again, we were approaching our open house date and

19   I was running out of time.

20   Q.   And did you have a good relationship with Mr. Montilla

21   at this point?

22   A.   Yeah.

23   Q.   And you were reaching out to the big boss in

24   California asking for some samples, is that something you

25   felt comfortable doing?

Direct - Ryan Davis

1    A.   Yeah.  I mean, I felt comfortable calling him on the

2    phone at any point in time, too.

3    Q.   Now, were there any other products in the showroom

4    that were not Porcelanosa brand products?

5    A.   There was.  We -- we carried a thing called Pro Line

6    Drain, which is a linear drain system for shower pans.  And

7    also we had inside of our showroom what they call new heat.

8    It's a heating pad that goes underneath your tile.  And

9    then we had a few samples of granite.  That way, if

10   somebody wanted to come in and do a design or whatever and

11   they had granite countertops, since we weren't in that part

12   of the business, that they could match back splash or their

13   tile to it.  So those were the other samples that we had in

14   there.

15   Q.   Now, was there a grand opening that was referenced in

16   this e-mail?

17   A.   There was.  It wasn't quite as spectacular as we were

18   trying to make it to be because some of the materials still

19   didn't show up and the weather was an issue that weekend,

20   too, so . . .

21   Q.   What -- how was the turnout?  Not what you expected?

22   A.   It was decent, yeah.  I mean, it was a decent turnout.

23   It wasn't explosive by any means, but, yeah, we probably

24   throughout the day we probably had 2-, 250 people come

25   through.

Direct - Ryan Davis

1    Q.   Now, I want to talk about the early years of Crew Tile

2    and that -- what you were doing to develop the market

3    place.  So what was Crew's -- what were your day-to-day

4    activities, Crew Tile, in, say, 2010, the showroom is open,

5    what was Crew Tile doing to hold up its end of the

6    bargain?

7    A.   Well, I guess the couple of things that we were doing

8    is obviously continuing the maintenance with the customers.

9    We spent about three days doing constant maintenance and

10   trying to spec projects with customers that we already had

11   relationships, and then about two days out of the week we

12   were out opening up new and vetting new customers, new

13   dealers.

14   Q.   When you say "opening up new customers," what exactly

15   are you doing?

16   A.   Again, going in there, having a brief meeting with

17   them, showing them our product line, telling them who we

18   are, what we're capable of doing, how we can help them out

19   on their end making money.  And, again, negotiating floor

20   space, so . . .

21   Q.   In those -- that early period of the contract, 2010,

22   did everything work perfectly smooth with Porcelanosa as

23   you got going?

24   A.   No, I mean, it's like any other relationship.  I mean,

25   once we got going, of course there was a customer here or

Direct - Ryan Davis

1   there, maybe somebody on Porcelanosa's end that didn't know

2   the entire situation, so they developed pricing.  But we

3   knew that kind of going in.  There's always going to be a

4   couple hiccups when you're getting going.

5   Q.   Publish 57, please.

6        Now this is an e-mail dated April 13th, 2010.

7   A.   Uhm-hum.

8   Q.   So now we're about five months past the signing of the

9   contract; is that right?

10  A.   That's correct.

11  Q.   And this is you writing, again, directly to Mr.

12  Montilla and Mr. Handley.  And it looks like there's a

13  problem that's come up.  Do you recall this e-mail?

14  A.   I do.

15  Q.   Now you're talking about how a job got sold direct.

16  Can you give us some background here?  What happened?

17  A.   Well, yeah, I can give you some background.  I spec'd

18  a crematory where they cremate bodies.  The guy owned that

19  and some ice cream shops, believe it or not, and he was

20  doing them all.  And so I did the spec and I did the

21  blueprints and I put Porcelanosa inside those blueprints.

22       And when it went out to bid -- which basically

23  after the architect does that, they send it out to bid.

24  Prosource was the one bidding on it.  And they had a

25  national account, so they called Miami directly.

Direct - Ryan Davis

1   Q.   You say Miami directly.   Who in Miami?

2   A.   I'm not sure who they talked to in Miami but Miami had

3   given Prosource a price on that project, but it didn't

4   include freight or anything of that nature, so it was what

5   we call FOB, that means that that was the price of the

6   product sitting in Miami, not here.

7   Q.   Just, again, to clarify, is this Porcelanosa in

8   Miami?

9   A.   Correct.   Porcelanosa Miami, yes.

10  Q.   So the customer is getting pricing from the

11  Porcelanosa Miami office?

12  A.   That's correct.

13  Q.   Were you working directly with the Miami office?

14  A.   We weren't, no.   We worked directly with the Los

15  Angeles office.

16  Q.   So what happens?   So the -- could you not honor their

17  pricing?

18  A.   We couldn't because the shipping.   Again, it's about a

19  dollar 50 a square foot to move and so when we had a price

20  point and we were about 20 cents higher than the price they

21  got out of Miami, and when they realized they were now out

22  at that price, they wanted to go with that price.   And once

23  they realized they would have to pay for shipping, they

24  called us and wanted us to honor the Miami pricing and we

25  told them we couldn't do it.   There was no way we were

Direct - Ryan Davis

1   going to eat that.

2   Q.   Now, this middle paragraph in this e-mail, you

3   write -- you say, I have major concerns on Cheyenne

4   Mountain Resort, Presbyterian Church, huge projects with

5   big numbers are now forced to explore other options.

6        What are you talking about?

7   A.   Part of our program with Porcelanosa is that we did

8   project registration forms.  And the deal on that was if

9   you spec the project, you fill out a project registration

10  form, and it's supposed to go into a database.  And if

11  anybody else calls on that project, it's supposed to be

12  referred directly back to you.

13       So my problem was is that I had project

14  registration forms with these other jobs and I wanted to

15  make darn sure they made sure nobody else gave pricing on

16  those projects so we didn't have the same issues.

17  Q.   So what are the "forced to explore other options"?

18  What other options are you thinking about?

19  A.   Other Porcelanosa options.  I mean, within that, like

20  I said, they couldn't buy it and we weren't going to pay

21  the extra money to ship it, so we try to find another

22  project within the Porcelanosa line where we could meet

23  that price point.

24  Q.   So a lesser expensive tile within Porcelanosa so the

25  net was the same?

348

Direct - Ryan Davis

1   A.   Yeah, so we could bridge that gap without anybody

2   losing.

3   Q.   So how did this ultimately get worked out, this

4   problem with Porcelanosa?

5   A.   We allowed Miami to sell them direct -- no, I

6   apologize, we actually wound up fulfilling that order right

7   there, and then on the next couple of orders Porcelanosa

8   gave us even bigger and steeper discounts to make up for

9   our profits that we lost.

10  Q.   So Crew made the -- actually did match the price and

11  lost the money?

12  A.   Uhm-hum.  We -- well, we fulfilled the order because

13  we didn't want to upset the market.  And after telling

14  Porcelanosa, listen, we're kind of stuck between a rock and

15  a hard place, what can we do?  And they said, Well, we'll

16  give you deeper discounts on your next couple of orders to

17  make up for this one.  Go ahead and sell it and move on.

18       That's how you work through something, you find a

19  solution and move on.

20  Q.   When you say Porcelanosa, this is Mr. Montilla and Mr.

21  Handley working on this with you?

22  A.   That's correct, yeah.

23  Q.   Can you publish Plaintiffs' Exhibit 63, please.

24       Now, this is an e-mail with -- the date on this is

25  May 27th, 2010, and this is from an exchange between Joey

Direct - Ryan Davis

1   and Jack Handley.  Who's Joey?

2   A.   Joey Griebel was an employee of mine at the time.

3   Q.   Was he a salesman?

4   A.   Yeah.

5   Q.   All right.  And the original e-mail down at the bottom

6   here, he's writing, Good morning Jack, I wanted to see if

7   you could check and see if Greenauer design has been trying

8   to go direct with Porcelanosa.  I did a Lunch and Learn

9   back in January and they kind of oddly dropped -- since

10  they kind of oddly dropped off -- fallen off the radar.

11       Sorry I'm having trouble reading this in yellow.

12  First off, if there wasn't an agreement in place, could

13  Porcelanosa have sold directly to anybody they wanted to?

14  A.   Yes.

15  Q.   What's your understanding of what Joey Griebel is

16  writing to Jack on this?

17  A.   Again, he was working on a project and he wasn't

18  getting callbacks and stuff so he just wanted to check with

19  Jack to see if they reached -- reached out to him directly

20  or tried going around, or if anything happened on that

21  end.

22  Q.   So if you didn't have a contract, would you be writing

23  an e-mail like this to anybody in Porcelanosa, or your

24  sales people?

25  A.   No.

350

Direct - Ryan Davis

1    Q.   So what's Jack's response here?

2    A.   He just said here, Not that I'm aware of and I haven't

3    heard that name mentioned.

4    Q.   He didn't tell you, You know what, we'll sell anything

5    directly to anybody we want to that we can, did he?

6    A.   Well, I mean, yeah, they could, but they didn't

7    hear -- yeah.  I mean, yeah, they couldn't sell to anybody

8    directly.  It was -- I had a contract with them.

9    Q.   Now, this Lunch and Learn that's mentioned in here,

10   can you give us some context here?  What is a Lunch and

11   Learn?

12   A.   I think we touched a little bit based on it, it's -- I

13   mean, most of us -- or a foreign company or a dealer,

14   they're doing business in their business hours, so they

15   don't have a lot of time to have somebody come in and sit

16   down their entire staff and explain some things, and it's

17   really tough to do with people after hours, so a Lunch and

18   Learn is just simply we bring lunch to the client, we feed

19   their employees, and we give them, in a sense, kind of a

20   crash course or a class during lunch about our product and

21   what we do.

22   Q.   And how does that help promote Porcelanosa sales?

23   A.   Again, you're -- as soon as people get familiar with

24   the product like that, they like to use it.  So, again, it

25   helps us out because the more knowledge that people have of

Direct - Ryan Davis

1    it, the more that they like it, and the more that they like

2    you and working with you, the more that they buy from

3    you.

4    Q.    This is Crew buying people lunch and giving up your

5    lunch hour to make these things happen, right?

6    A.    Well, yeah.

7    Q.    Did Porcelanosa help support the growth of the

8    business here in Colorado?

9    A.    Yes, absolutely.

10   Q.    How were you working together?

11   A.    Well, I mean, like I said, if we need samples or racks

12   or if we were working on a project, I mean, in a sense we

13   had daily conversations with Jack and Paco, so if there was

14   ever an issue, they responded to our phone calls right

15   away.

16          And, again, we would talk to them eight, nine

17   times a day sometimes, and the support was always there.

18   If we needed something, they did what they could to get us

19   it.

20   Q.    The word "exclusive" distributor has been used a lot

21   in here and I'm curious, did the use -- did your use of the

22   word exclusive in e-mails ever create one of these kind of

23   wrinkles along the way?

24   A.    It did, yes.

25   Q.    And how so?

Direct - Ryan Davis

1    A.   Well, I told my employees to put Your Colorado

2    Exclusive Porcelanosa Dealer.  And at one point in time,

3    Jack called me and said the guy up in Pitkin County was

4    having an issue of that, all of our e-mails, because

5    technically we weren't Colorado's only exclusive

6    distributor.

7    Q.   So the use of the word "exclusive" in Colorado in the

8    same sentence was creating a problem with Balentine up in

9    Aspen?

10   A.   I believe that's his name, yeah, Balentine.

11   Q.   So are you aware of e-mails internally with Crew Tile

12   talking about the use of the word "exclusive"?

13   A.   Yes.  I mean, Jack asked us to take it off.  I advised

14   my staff to take it off.

15   Q.   Did -- was it ultimately put back on at some point?

16   A.   Yeah.

17   Q.   Why?

18   A.   Well, because I had had an exclusive distribution -- a

19   distribution contract, and it was well within my right to

20   have it on there.  And after a while of thinking of it, it

21   was a business decision for me.  I want it on my website

22   and I want it on my e-mail signatures.  We are the

23   exclusive distributor out there.

24   Q.   Aside from those few e-mails from Jack talking about

25   exclusive, was there ever a response from Porcelanosa,

353

Direct - Ryan Davis

1    either anybody at corporate, Paco Montilla, anybody saying

2    you are not an exclusive distributor?

3    A.   No, besides a couple of phone conversations and him

4    asking, and then I think he sent an e-mail or two asking us

5    to take it off.  Other than that, it never came up again,

6    no.

7    Q.   And the problem was that it was -- you weren't

8    exclusive because the contract excluded Aspen or Pitkin

9    County; is that fair?

10   A.   That's correct.

11   Q.   Could you put up Plaintiffs' Exhibit 77, please.

12          All right.  So this is an e-mail dated December

13   6th, 2010, so we're about a year after the contract is

14   signed; is that right?

15   A.   Yes.

16   Q.   All right.  And it's titled Meeting Minutes,

17   Porcelanosa Crew Tile, December 1 of 2010.  Was there a

18   meeting that took place in December of 2010?

19   A.   There was.

20   Q.   Okay.  And as we move forward -- well, before we move

21   on, it says, Cheers to a great relationship in 2011.

22          Do you see that?

23   A.   I do.

24   Q.   Is that where you -- in 2010, were you talking about

25   how things were going and how we are going to keep working

Direct - Ryan Davis

1   for the next year?

2   A.   That's -- yeah, that's correct.

3   Q.   Now, is this a summary of a meeting when Jack and

4   Montilla came out to kind of check on the progress?

5   A.   That's correct, yeah.  There were so many issues that

6   we talked about and wanted to address.

7   Q.   Before we move on, there's a -- it's -- first off,

8   Michelle Sudovich, who is she?

9   A.   She was an employee of ours.

10   Q.   Okay.  And under her e-mail signature it says,

11   Porcelanosa and Alcalagres?

12   A.   That's correct.

13   Q.   Do you see that?

14   A.   Yes.

15   Q.   Who is Alcalagres?

16   A.   That was, again, another cheaper line that we were

17   requiring an option with to complete some of our specs.

18   Q.   Did you work with them?

19   A.   No, we never wound up doing anything with

20   Alcalagres.

21   Q.   Do you know where it's manufactured?

22   A.   It is -- it's manufactured out of Spain.

23   Q.   Spain?  Is it comparable to Porcelanosa stuff?

24   A.   No.  I think that they have a few lines within their

25   massive line, but overall, about 95 percent of their line's

Direct - Ryan Davis

 1   considered a cheap tile, in my opinion.

 2   Q.   Any of the stuff that you were working with, would you

 3   consider that to be competitive with Porcelanosa?

 4   A.   No.

 5   Q.   And did you ever sign a contract with them?

 6   A.   I did not, no.

 7   Q.   Did you ever sell any Alcalagres tile?

 8   A.   We did not, no.

 9   Q.   Did you ever get any samples?

10   A.   I don't even believe we got samples, no.

11   Q.   And, again, is this something to do with -- to be used

12   for value engineering a project?

13   A.   Yes.  Again, we were looking for a cheaper tile

14   alternate to put in there so we could complete some of our

15   specifications.  So this obviously, like Sark, was an

16   option for us.

17   Q.   Did Porcelanosa know that Alcalagres was out there in

18   consideration by Crew?

19   A.   In a sense, Porcelanosa was encouraging us to find a

20   cheaper tile so that we could complete these

21   specifications.

22   Q.   And it says right -- is this Jack Handley on this

23   e-mail?

24   A.   Yeah, Jack Handley's on the e-mail.

25   Q.   So is this your understanding he would be aware that

Direct - Ryan Davis

1    Alcalagres existed?

2    A.    Yeah.   Yeah, he knew who Alcalagres was.

3    Q.    And did he ever raise any problems saying, You know,

4    you can't do that?

5    A.    No.   Not at all.

6    Q.    Now you mentioned, before we move on to these other

7    manufacturers you worked with, you mentioned Sark Tile.

8    Where were they from?

9    A.    Again, that was a cheap alternative out in Nebraska --

10   out of Lincoln, Nebraska, that Jack referred us.

11   Q.    Did you ever have a signed agreement with Sark?

12   A.    We did.

13   Q.    Do you remember what year that that contract

14   existed -- or when it was signed, sorry?

15   A.    Oh, it would have been February of 2012.

16   Q.    Publish Defendants' Exhibit A-78, please.

17         Is this the agreement that you signed with Sark

18   Tile?

19   A.    That is, yes.

20   Q.    Do you know where the template came from?

21   A.    This is the template that Jack brought out to me about

22   a month prior to it.

23   Q.    How did you get it?   How did Jack bring it to you?

24   A.    He gave it to me on -- I don't know what they call,

25   flash drive, zip drive, whatever that's called, the little

Direct - Ryan Davis

1   deal you stick in the computer.

2   Q.   Now, is it your understanding that this template that

3   you got was the template used by Porcelanosa for the 2009

4   contract?

5   A.   Yeah.  I mean, it looked a lot like it.  Again, I --

6   when I -- initially Jack introduced me to Sark and I said

7   this is something that we could move forward to work on

8   specifications, so Jack told me that he was going to bring

9   out a template of a contract that they've used in the past

10  and this is the template that he brought.

11  Q.   And this is the date on this, up top, the date, 18th

12  day of 2012, that's handwritten in on the contract,

13  right?

14  A.   That's correct, yes.

15  Q.   And the underline and strike out there is -- in using

16  Microsoft Word, does this track the edits going on?

17  A.   Say again?  I'm not too sure.  I -- I don't know why

18  19 is crossed out there.  It's 2012 is when the contract

19  was signed, so . . .

20  Q.   Okay.  There's some markups on here being changed from

21  a draft into the current form?

22  A.   That's correct, yes.

23  Q.   And let's flip to, I think, page 4 or 5.  Right there.

24  Down to subheading six, highlight that for me.  Thank you.

25          Now, in this, in the Applicable Law section, I see

358

Direct - Ryan Davis

1    that there's an address in California crossed out and an

2    address in Nebraska written in.  Whose address is that in

3    California?

4    A.    That's Porcelanosa's address.

5    Q.    Is it your understanding that on this draft,

6    Porcelanosa's address is still on it and that it is being

7    crossed out and changed in 2012 to make it now Sark Tile's

8    address in Nebraska?

9    A.    Yeah.  We sent this contract over to Sark Tile and we

10    never reviewed it enough and we didn't pull out

11    Porcelanosa's address at the bottom of the contract.  So

12    when we sent it over, when he sent it back, he crossed out

13    all their information and put it in his.

14    Q.    Now, you've heard defendants' claim here is that the

15    2009 contract was forged in 2013, and that a template was

16    circulated in April of 2013 and then made into this

17    contract in 2009.  Does that make any sense to you looking

18    at this?

19    A.    No.  Because that's the same one that my mom e-mailed

20    over to Shana just without the Sark information on it.

21    It's the same template that we had from Jack earlier.

22    Q.    And this is the one that you -- you actually used this

23    template for a -- this is the one that you actually used in

24    2012, right?

25    A.    That's correct, yes.

Direct - Ryan Davis

1    Q.   Mr. Davis, would it even have been possible for you to

2    make up a contract in 2013 if you already had it in this

3    template in 2012?

4    A.   I guess I don't think that way, but I couldn't see it

5    being possible, no.

6    Q.   Let's go back to exhibits -- Plaintiffs' 77, please.

7    Again, before we get into the content of it, I want to talk

8    a little bit more about Michelle Sudovich.  She was a -- it

9    says here she is an account manager?

10   A.   Yeah, she was an employee of ours.

11   Q.   Did she work in sales?

12   A.   She did.

13   Q.   How long did she work there with Crew Tile?

14   A.   Oh, geez, I only believe it was a year, maybe a little

15   under, maybe a little over, give or take.

16   Q.   In her role in sales, did she have an intimate

17   knowledge of the business?

18   A.   No, not intimate.  I mean, she knew the tiles, she

19   knew what she needed to do every day but she didn't know my

20   internal workings, no.

21   Q.   Would she have known anything about the contractual

22   relationship that Crew Tile had with anyone?

23   A.   I normally don't go and share that information with my

24   employees, no.  We keep that within our conversation.

25   Q.   Now, you are aware that she was deposed in this case;

Direct - Ryan Davis

1    is that right?

2    A.    Yes.

3    Q.    And you're aware that she testified about a church

4    project.

5    A.    Uhm-hum.

6    Q.    And she was talking about some property being sold,

7    some noninstalled Porcelanosa.  Are you aware of that?

8    A.    I do know about that.

9    Q.    Since she's not going to be here to testify a lot, I

10   want you to educate the jury, what happened with that

11   project with the church?

12   A.    I was working with an older associate that I'd known

13   for a long time, and they were doing a Presbyterian church.

14   And he brought me in because we were friends and I was

15   trying to spec the project.  I got Porcelanosa spec'd into

16   the entire front lobby of the church.  The problem was is

17   that the ship date wasn't going to work.  We couldn't get

18   the Porcelanosa material in time by the time that their

19   project started and we found that out late.

20          So the architect of the project had to find an

21   alternate material outside of Porcelanosa because we

22   couldn't find another material to fit the budget and the

23   material that we did find wasn't going to be here from

24   Spain in time, so they selected another product.

25          In the meantime, I felt pretty bad because it was

Direct - Ryan Davis

1   a friend and a great relationship, so they needed some tile

2   for a back janitor closet and I had some stuff from

3   Infinite Flooring & Design that was left over in stock.  So

4   feeling bad about putting their project behind because of

5   our -- our side, had put their project behind, I wound up

6   donating slash selling -- it was like 50 cents a square

7   foot for the church, had a bunch of tile for their back

8   room that I had in their warehouse from Infinite.

9   Q.   So this is some old material that you owned from

10  Infinite Flooring & Design?

11  A.   Less -- yeah.  At the end of the day, we dropped the

12  ball.  I mean, if it wasn't for -- if we would have had the

13  material on time, that project would have went smoothly.

14  And that project kind of started tumbling all because of

15  us, so I felt guilty about it.  So yeah, when they asked me

16  about it and me wanting to keep the relationship and

17  obviously my relationship with the person that I had been

18  working for a long time, I needed the -- I felt like I

19  needed to do some makeup.

20  Q.   Did you do anything underhanded in that project?

21  A.   No.  I mean, outside of donating tile to a church, I

22  guess I don't know what would be underhanded about that.  I

23  pretty much donated the tile to the church.

24  Q.   And you're aware in the deposition there she alleges

25  that you didn't tell the whole story to the church; is that

Direct - Ryan Davis

1   true?

2   A.   No.   That's not true.   I mean, in fact like I said, I

3   was the one working directly with the church and -- when

4   this problem arised, so I don't know how she would have all

5   that information, no.

6   Q.   I mean, you did it firsthand, you know how the project

7   worked out, right?

8   A.   Yeah, I was the one that was thrown in the fire pit

9   when it became a problem, yes.

10  Q.   So how did Michelle Sudovich's employment end with

11  Crew Tile?

12  A.   Well, I let her go.

13  Q.   You let her go.   Did you fire her?

14  A.   I did.

15  Q.   Did it end on good terms?

16  A.   No.   She had an explosive personality.   She was a hard

17  worker, she was actually a pretty good sales rep, she just

18  had a very explosive personality, so . . .

19  Q.   Would you be surprised if she didn't like you very

20  much after the way the employment ended?

21  A.   No, I wouldn't be surprised at all.

22  Q.   Let's move back into Exhibit 77.   Down at the -- three

23  quarters of the way down, with the spinning racks, and it

24  says, high interest from Crew Tile, action item Jack

25  Handley, send ASAP six as of today.   This is meeting

Direct - Ryan Davis

1    minutes from December 1, 2010, about a year after the

2    contract is signed.

3          Spinning racks.  What are you referring to?

4    A.   Just the rack back there, you see the one with the

5    boards.

6    Q.   This, okay.  So six of these are being placed?

7    A.   That's correct.

8    Q.   According to this e-mail, six -- you can place six as

9    of today?

10   A.   Well, yeah.  That was an action item that we needed.

11   We needed six more spinning racks because we had them

12   placed and we were waiting on them, so we were waiting on

13   them to come in so we could put them in our customers'

14   showrooms, we needed the showroom.

15   Q.   So this is more racks than you already placed,

16   right?

17   A.   That's correct.

18   Q.   Below that you're talking about 16 bravo board.

19   What's a bravo board?

20   A.   Bravo board was a large wing rack that we had.  And

21   when I say wing rack, it was -- it's kind of like -- you

22   get to turn the page, but they're really massive racks,

23   so . . .

24   Q.   And you may have heard, speaking of the racks, you

25   know, on defendants' opening statement they talked about

Direct - Ryan Davis

1   how those were Porcelanosa's racks and you -- you made an

2   inference that you shouldn't have those racks.  How did you

3   get them?

4   A.   Some of them are shipped to us from Porcelanosa and

5   donate -- I mean, the racks were given to us, but the tile

6   that went on the racks, that was mine.  So they would give

7   us the racks, I'd pay for the shipping for all the racks to

8   come from California to Colorado, but the tile that went on

9   those racks were mine.  I paid for that tile.

10  Q.   And you paid to get all these things here from

11  California; is that right?

12  A.   It's not cheap to move that stuff, as Mr. Thomaidis

13  said earlier, you know, it's heavy stuff.

14  Q.   Go to page 2 of the meeting minutes here.

15       In the third paragraph down, you talk about a

16  blitz for the beginning of the year.  What's a blitz?

17  A.   Well, a blitz -- a lot of times when you work with

18  other sales reps, in a sense, the idea of the blitz out

19  here was is that they were going to send a bunch of their

20  sales reps from California to come out here and we were

21  going to spend about two or three days to do a large

22  blanket of the entire territory.  That means that you just

23  are hitting everybody within the same amount of time.

24  Q.   The fourth bullet point down here, it says Porcelanosa

25  will send out their team to support the training.  So are

Direct - Ryan Davis

1   you out working in the dealers side-by-side with

2   Porcelanosa employees?

3   A.   Well, yes.  Jack was -- I mean, Jack went to several

4   meetings.  Jack would -- any time Jack would come out, he

5   would just travel with me to all my accounts.  I mean, he

6   can't go any other place, he would come out and strictly

7   stay with me.

8   Q.   When you're visiting -- when you're visiting your

9   accounts here in Colorado with Jack Handley, you're doing

10  it with you on behalf of Crew Tile and Jack Handley on

11  behalf of Porcelanosa side-by-side for Porcelanosa's

12  products; is that right?

13  A.   That's correct, yeah.

14  Q.   Now, at the bottom of page 2 here, there's a marketing

15  heading.  Part of the discussion is traveling to

16  California.  Crew Tile to visit California same time

17  Facings comes for training.  Do you see that?

18  A.   I do.

19  Q.   Who's Facings?

20  A.   Facings is a distributor down in Arizona.

21  Q.   And why are you traveling to California for training?

22  A.   A new product.  It was the time of year, in December,

23  that generally the tile business is a little slow, so this

24  is a good time for us to catch up on training and get

25  people traveled out to training, learn the new products so

Direct - Ryan Davis

1   when the busy time comes, you know your stuff.

2   Q.   So is this Porcelanosa during the slow season bringing

3   Crew to California to educate on products so you can build

4   a Colorado market?

5   A.   That's correct.

6   Q.   Moving to page 4 on these meeting minutes, there is

7   a -- this lunch drive to Elway's section.  There's some

8   discussion about reevaluating a pricing structure for

9   Colorado Ceramics.  Do you see that?

10   A.   I do.

11   Q.   Now, what -- first off, who's Colorado Ceramics?

12   A.   Colorado Ceramics is a dealer down in Highlands

13   Ranch.

14   Q.   Were they selling Porcelanosa products?

15   A.   They were.

16   Q.   Were they selling other products?

17   A.   They were.

18   Q.   Full-service dealer like all the other --

19   A.   Like I was at Infinite, yes.

20   Q.   Now, why does Colorado Ceramics have the same pricing

21   that Crew has, as far as you know?

22   A.   Well, technically they didn't have the same pricing,

23   but Colorado Ceramics still had an account that was

24   directly open with Porcelanosa at that time.

25   Q.   Do you know how long that account had been opened?

Direct - Ryan Davis

1    A.    By the time I got it, I would say it was maybe about a

2    year and a half, maybe a little less.

3    Q.    So did their account predate your contract with

4    Porcelanosa in December of 2009?

5    A.    Yeah, I set them up in '03 and '04.  Anybody that was

6    up here -- any dealer that was still at an account was all

7    from my work in '03 and '04.

8    Q.    So why is it that Colorado Ceramics is able to sell

9    directly at this point in time, about a year after your

10   contract?

11   A.    Well, they weren't technically.  What happened is once

12   again, once I got my exclusivity contract, I knew there

13   were dealers out there that still had open accounts.  Jack

14   told me that they were going to start working through their

15   process to close the accounts.  So to me having a contract

16   in hand, I wasn't going to run out and start screaming at

17   everybody that had an account.  I was going to go and try

18   and develop it before I shut down the other accounts, so I

19   wasn't going to step over a dollar to get to a dime, I

20   guess.

21   Q.    Now, did you and the Porcelanosa reps know about these

22   accounts when you were putting the contract together in

23   2009?

24   A.    Yeah, there was only two, the two that I knew of at

25   the time that was still active, and that was Star Flooring

Direct - Ryan Davis

1   and Colorado Ceramics.

2   Q.   And in these meeting minutes about a year later,

3   you're just -- are you discussing how you're going to bring

4   everybody in under the Crew umbrella?

5   A.   We were -- yeah, we were discussing who Jack still had

6   open on his end and who we still needed to continue to

7   close down so that they couldn't have direct accounts.

8   Q.   And in order to get them closed down, do you need

9   Porcelanosa to close them down, right?

10  A.   Yes.

11  Q.   Now, was Colorado Ceramics ultimately brought in as a

12  Crew Tile account?

13  A.   Yes.  The issue with Colorado Ceramics, they were real

14  stuck, they didn't want their pricing to change.  So what I

15  did is I had better pricing than them and I could sell to

16  them, so I had to take a lesser margin to get them

17  underneath the umbrella, but it was worth it.

18          It was part of my end to keep them happy and keep

19  them moving, so . . .

20  Q.   Exhibit 87 is not stipulated.  If we could put it up

21  on the screen for the witness, please.

22          Mr. Davis, do you recognize this?

23  A.   I do.

24  Q.   What is it?

25  A.   It's a letter that goes to Colorado Ceramics -- to

Direct - Ryan Davis

1    Sandy over at Colorado Ceramics.

2    Q.   How do you recognize it?

3    A.   Because I wrote it.

4    Q.   Is it an accurate copy of that letter?

5    A.   It is.

6         MR. CROUGH:  Your Honor, I move to admit

7    Plaintiffs' Exhibit 87 into evidence.

8         THE COURT:  Is there an objection?

9         MR. THOMAIDIS:  We have no objection, Your Honor.

10        THE COURT:  Okay.  There being no objection, 87 is

11   received into evidence and may be published to the jury.

12        (Plaintiffs' Exhibit 87 received)

13   BY MR. CROUGH:

14   Q.   And, Mr. Davis, so this is a letter that you're

15   writing to Sandy at Colorado Ceramics.  Do you know what

16   Sandy's full name is?

17   A.   Her last name is -- I'm going to butcher it, but

18   Venezia, I think.  Venezia.

19   Q.   And what are you explaining to Sandy here in this

20   letter?

21   A.   This is just a recap of the conversations between

22   Jack, myself, and Sandy.  This is just our agreement with

23   her, what we were going to do.  We were going to -- this is

24   Colorado -- their end was they needed to close down their

25   account and their account was going to get closed down with

Direct - Ryan Davis

1    Porcelanosa, POs would start going directly through us, and

2    that they needed to fill out an application form with us

3    and a credit application.

4         And in return, we would keep their pricing the

5    same, we would start shipping to them.  They now had staff

6    in town, so if they needed a sample or whatever the case

7    is -- I mean, for them it was great because they not only

8    got to keep their pricing, but then they get service just

9    right down the road now, too.

10   Q.   So if I understand you correctly, this is Porcelanosa

11   forcing Colorado Ceramics to comply with the exclusive

12   agreement?

13   A.   That's correct.

14        MR. THOMAIDIS:  Objection, Your Honor.  That

15   misstates the evidence.

16        THE COURT:  Let's rephrase.

17   BY MR. CROUGH:

18   Q.   Is it your understanding --

19        THE COURT:  Let's rephrase in a nonleading way.

20        MR. CROUGH:  Understood.

21   BY MR. CROUGH:

22   Q.   Mr. Davis, is this your -- what is your understanding

23   of what Porcelanosa did with Colorado Ceramics in order to

24   make this happen?

25   A.   We followed through with exactly what we talked about

371
Direct - Ryan Davis

1   in the meeting minutes, closing them down and putting them

2   underneath our umbrella.

3   Q.    Were there other distributors for Porcelanosa in the

4   United States?

5   A.    There's one that I know of, yes.

6   Q.    And who was that?

7   A.    Facings down in Arizona.

8   Q.    If we could publish Exhibit 82, please.

9         Now, this is an e-mail dated January 12th, 2011,

10  written by Michelle Sudovich, your sales employee, to Jack

11  Handley of Porcelanosa, Paco Montilla, Porcelanosa, and

12  you, Ryan Davis.  And she's asking on the status of when

13  Crew will be added to the website; that Facings of America

14  is still on as an authorized distributor, and Crew is still

15  not as of today.

16        Do you recall the circumstances of this e-mail?

17  A.    Yeah.  I had Michelle look on the website to see if we

18  had been added yet -- added to the website.  We were told

19  by Paco, I can't tell you how many times, that we were

20  going to get added to the website.  So of course we would

21  check every once in a while.  And I had Michelle check.

22  And when she said we weren't there, I said why don't you

23  fire off an e-mail, cc me on it, let's see if we can run

24  this down, so . . .

25  Q.    So in reading this, Crew's not on it, but Facings of

Direct - Ryan Davis

1    America is?

2    A.   That's correct.  Facings down in Arizona was on the

3    website.

4    Q.   And they're listed as an authorized distributor?

5    A.   Yup.  And that's exactly what it says.  They're a

6    distributor in Arizona for Porcelanosa.

7    Q.   Let's move to Exhibit 86 again.  Not stipulated yet.

8            Mr. Davis, do you recognize this e-mail and as

9    well as the second page of it?

10   A.   Yup.

11   Q.   What is it?

12   A.   It's a follow-up right after Michelle's e-mail.  I

13   said seriously --

14   Q.   Don't -- it's not into evidence yet.

15   A.   Sorry.

16   Q.   Yeah.  How do you -- how do you recognize this e-mail?

17   A.   I wrote it.

18   Q.   And is this an accurate depiction of the e-mail itself

19   and of the attachment to it?

20   A.   Yes.

21           MR. CROUGH:  Plaintiff offers Exhibit 86 into

22   evidence.

23           THE COURT:  86 or 88 -- wait a minute.

24           MR. CROUGH:  We're on 86.

25           THE COURT:  Any objection?

Direct - Ryan Davis

1          MR. THOMAIDIS:  Your Honor, we have no objection.

2          THE COURT:  There being no objection, Exhibit 86

3   is admitted into evidence and may be published to the jury.

4          (Plaintiffs' Exhibit 86 received)

5   BY MR. CROUGH:

6   Q.   Again, this is an e-mail February 2d, 2011 --

7          MR. THOMAIDIS:  I'm sorry, Your Honor.  I think I

8   misunderstood this.  It appears to be from Michelle

9   Sudovich below and then is there something from Ryan Davis

10  within it?  I see that -- I see it being forwarded, I

11  think.

12         THE WITNESS:  I forwarded that e-mail.

13         MR. THOMAIDIS:  So did you give any commentary on

14  this?  I hate to --

15         THE COURT:  Well, hold on.  This is a forward of

16  an original e-mail from Ms. Sudovich.

17         MR. THOMAIDIS:  And I -- and I understand, Your

18  Honor.  I'm just wondering is he going to testify about

19  something specific content-wise that you put?

20         THE WITNESS:  I wrote the e-mail, she forwarded me

21  over the picture from the website.

22         MR. THOMAIDIS:  Your Honor, we have no objection

23  to the document with that caveat.

24         THE COURT:  Okay.  Go ahead, counsel.

25         MR. CROUGH:  Okay.

Direct - Ryan Davis

1   BY MR. CROUGH:

2   Q.   So this is an e-mail dated February 2d, 2012.  You're

3   forwarding this to Jack Handley, right?

4   A.   That's correct.

5   Q.   And within it there is a screenshot of Porcelanosa's

6   website as of, it looks like, February 2d, 2011.  Is that

7   your understanding of it?

8   A.   Yup.

9   Q.   And on that screenshot, itself, on Porcelanosa's

10   website, I do see it's Facings of America listed as an

11   authorized distributor; is that right?

12   A.   That's correct, in Phoenix and Scottsdale.

13   Q.   Now, you've heard in the opening statement that

14   Porcelanosa says they have dealers but no distributors.  Is

15   that consistent with what you're reading on their own

16   website?

17   A.   It wasn't consistent with anything, no.  I mean, they

18   had two distributors:  I was one and Facings was one.

19   Q.   Now this is available for the world to see as of

20   February of 2011, right?

21   A.   It's on Porcelanosa's website.

22   Q.   And are -- why are you upset that Crew isn't on here

23   as an authorized distributor?

24   A.   Because I was told that I was -- I was told that I was

25   going to have the next spot right underneath it.  I was

Direct - Ryan Davis

1    supposed to be on that page -- Crew Tile was supposed to be

2    on that page.

3    Q.    Is it the concern of fairness here that one

4    distributor is on and the other distributor is not?

5    A.    Yeah, especially after what I have been told.  They

6    blatantly told me they were going to do it several times so

7    this is me just saying, seriously, where are we, why are we

8    not on this?  They're still on there.

9    Q.    All right.  Before we move on from the meeting minutes

10   from December of 2010, do you recall actually being at that

11   meeting with Mr. Perry?

12   A.    I do, yes.

13   Q.    Do you recall Mr. Perry talking about apologies for

14   selling directly?

15   A.    Yes.

16   Q.    And is it -- is that -- what was Paco doing during

17   that meeting?

18   A.    Again, correcting whatever issues we had.  I mean,

19   again, if there was -- if there was a direct, or if there

20   was something that happened, Paco was out there to save

21   face.  He came out to say that, I'm here to reassure you

22   guys that everything is all right and whatever hiccups have

23   happened, we will work on them, we will address them, and

24   you won't have do worry about them from here on out.

25   Q.    Okay.  There was also some testimony about discussion

Direct - Ryan Davis

1    with broadening the -- the scope of the territory.

2    A.    That's correct.

3    Q.    Do you recall that testimony?

4    A.    I do.

5    Q.    And what do you recall from that meeting?

6    A.    Well, again, it was kind of cart in front of the

7    horse.  We were still developing this territory, but Paco

8    and Jack also floated the idea during that time that if

9    this does become successful for both companies, that maybe

10   smaller territories like Kansas City, St. Louis,

11   Salt Lake City, Santa Fe, things of that nature might be

12   someplace where this concept could work again.

13   Q.    And there were a number of your employees that were

14   involved in these meetings on that day in December of 2010;

15   is that right?

16   A.    Just Michelle was at lunch with us, but yeah, during

17   the meeting minutes, all the meeting minutes went to most

18   of the employees, yes.

19   Q.    And Adela Stransky was working for you at that

20   point?

21   A.    That's correct.

22   Q.    All right.  And she was also in sales?

23   A.    She was, yes.

24   Q.    How long did she last with Crew Tile?

25   A.    Oh, geez.  I don't think she even made her 90-day

Direct - Ryan Davis

1    probationary period.  If she did, it was right around that

2    time.

3    Q.   Do you know if there would have been discussions

4    around Crew when she was there of the potential expansion?

5    A.   No, she wasn't part of any of those internal meetings

6    or those internal discussions, no.

7    Q.   Okay.  Was there discussion of -- in broadening the

8    deal, would you need to create another contract to

9    encompass that additional territory?

10   A.   Well, again, I mean, I guess it never really came to

11   discussing how we were going to put it down but, again, the

12   idea was discussed, we were -- again, I wasn't prepared to

13   go any place else until I got this done.

14   Q.   Now, how did Ms. Stransky's employment end?

15   A.   I let her go.

16   Q.   When you say let her go, did you fire her?

17   A.   I did fire her.

18   Q.   Did she leave on good terms?

19   A.   No.

20   Q.   What was the -- what happened at the end there?

21   A.   I mean, Adela really is a nice gal, I have nothing bad

22   to say to her.  It was just there was always a reason why

23   things couldn't get done.  It was -- I got a chip on my

24   windshield, I can't come to work, I was running late.  It

25   was always a reason why we couldn't get something done.

Direct - Ryan Davis

1    And as a small company I didn't -- I didn't have the luxury

2    to be able to afford people not being able to put in their

3    time, put in their share.  I mean, we were small, we were

4    trying to stay aggressive and this just wasn't part of

5    our -- part of our team.

6    Q.   Was there a dispute over a final paycheck?

7    A.   There was.  I -- she had a commission check that we

8    still owed her but she still hadn't turned in the laptop,

9    charger, cell phone charger, that are sort of things so we

10   held her final check before she --

11   Q.   In the end, did you part as friends?

12   A.   No.  No.  And she was at a bad time in her life, you

13   know.  She was going through a divorce, and I was another

14   guy that, I guess, kind of was just another dose of bad

15   news for her because I had to fire her, otherwise -- while

16   she was going through a lot of bad times in her life so I

17   can't imagine it being on the top of her happy list by any

18   means.

19   Q.   Would you be surprised if she doesn't like you very

20   much right now?

21   A.   No, I wouldn't be surprised at all.

22   Q.   Now, let's move forward in time.  As the years went on

23   through the -- from 2009 into --

24        THE COURT:  Mr. Crough, maybe this might be a good

25   juncture to take a break for the afternoon.

Direct - Ryan Davis

1              MR. CROUGH:  Happy to, Your Honor.

2              THE COURT:  All right.  Let's take our afternoon

3     break.  We will be in recess for 15 minutes.

4         (Recess at 2:59 p.m. to 3:20 p.m.)

5              THE COURT:  Mr. Davis, I remind you that you

6     remain under oath.

7              THE WITNESS:  Yes, Your Honor.

8              THE COURT:  All right.  Mr. Crough, you may

9     continue your examination.

10             MR. CROUGH:  Thank you, Your Honor.

11    BY MR. CROUGH:

12    Q.   If we could publish Plaintiffs' Exhibit 51.  It's

13    already been admitted.

14             Mr. Davis, we talked a bit about the profit

15    structure for Crew Tile and how Crew Tile made its money,

16    and I wanted to take another look at this exhibit here.

17    This is Jack Handley writing to Paco Montilla on March 4th,

18    2010.  Do you see that?

19    A.   I do.

20    Q.   And this is in approximately 2 1/2 months after the

21    contract is signed; is that right?

22    A.   That's correct.

23    Q.   And down at the bottom -- we start at the bottom, Paco

24    Montilla is writing to Jack asking about a couple of

25    different things, and one is displays for dealers.  What

Direct - Ryan Davis

1    discount off of retail or off retail is Crew Tile going to

2    offer to dealers in Colorado on Porcelanosa products?  Do

3    you see that?

4    A.    I do.

5    Q.    He says, I asked this question back in December and

6    never got a straight answer.  Is Crew Tile going to be

7    competitive?

8         Did Paco Montilla know that Crew Tile was going to

9    be selling to dealers?

10   A.    Yes.  Exactly.  That was the entire discussions and

11   that's what the contract was all about.

12   Q.    And why would -- why is there any concern about why --

13   if Crew Tile's going to be competitive?

14   A.    Well, obviously coming into a new market we wanted to

15   make sure that we didn't overprice ourselves, so he was

16   asking what type of discounts that we were going to give to

17   our dealers.

18   Q.    Now, is this part of the arrangement that you and Paco

19   and Jack had talked about of how Crew Tile's going to be

20   selling directly to dealers as a distributor?

21   A.    Yes.  That's exactly what the entire thing was

22   about.

23   Q.    And is the concern here that there's a contract in

24   place that Crew Tile wants to support, Porcelanosa wants to

25   support, and that's what you're discussing now with Jack

Direct - Ryan Davis

1    Handley and Paco Montilla?

2    A.   That's correct.  We are just going over what we

3    discussed inside the contract and -- yeah.

4    Q.   And you told Paco Montilla and Jack Handley, how Crew

5    Tile was going to be competitive so you could fulfill the

6    contract, right?

7    A.   That's correct.

8    Q.   If we could scroll back up.  Oh, sorry, before we go.

9    I'm sorry.

10         The last point of this is if he buys at 55 percent

11   off of us, what discount is he going to offer?

12         So is 55 percent, is that your -- is that Crew

13   Tile's discount?

14   A.   Yes.  And that was where we started on our discount.

15   A lot of times we get even bigger discounts than that.

16   Q.   Additional percentage beyond 55 percent?

17   A.   That's correct.  All the way down to sometimes 60, 65

18   percent, we would get off, and occasionally 70, just

19   depending on the size of the job.

20   Q.   So you're buying it at least half off, if not more?

21   A.   Yeah, minimum.

22   Q.   And then rolling back up in this e-mail, Jack

23   Handley's now communicating to Paco that he's going to add

24   a 20 to 30 percent margin based on the customer and/or

25   project.  Do you see that?

Direct - Ryan Davis

1    A.   I do.

2    Q.   Now, is that the structure that Crew Tile had in place

3    for how it was going to be selling to dealers while making

4    money?

5    A.   That's the exact structure, I think it has been

6    identified a few times here, that, yeah, normally between

7    20 and 30 percent, depending on the customers and the

8    volume and how much traffic they had with us.

9    Q.   Now, does it make sense to you if, as defendants

10   claim, there was no contract at all, why Porcelanosa would

11   be having Crew take that 20 to 30 percent margin instead of

12   Porcelanosa selling direct?

13   A.   State that one more time.  I apologize.

14   Q.   Sure.  Does it make sense to you that if there was no

15   contract in 2009, that Porcelanosa would be agreeing that

16   Crew could have the 20 percent to 30 percent margin

17   versus --

18   A.   No.

19   Q.   -- Porcelanosa just selling it direct?

20   A.   Again, that makes no sense to me.  I never dictated

21   what my -- my dealers sold to retail.  That was completely

22   up to them what they did.  So for them to know that about

23   us, yes, that -- that proves that we were a distributor.

24   Q.   If Crew wasn't here or there was no contract, then

25   Porcelanosa could just take that margin and sell direct and

Direct - Ryan Davis

1    make that much more money, right?

2    A.    That's correct.  And we wouldn't be having these

3    discussions on these e-mails.

4          MR. CROUGH:  Your Honor, may I approach the

5    timeline here?  I'd like to talk about that with the

6    witness.

7          THE COURT:  You may.

8          MR. CROUGH:  Thank you.

9          THE COURT:  Why don't you grab the microphone.

10         MR. CROUGH:  I'll get it.

11         THE COURT:  Is it up there, Deb?  I don't see it.

12         MR. CROUGH:  It's hiding.

13         THE COURT:  So much stuff up here, I can't see

14   that part of the courtroom anymore.

15   BY MR. CROUGH:

16   Q.    And, Jeremy, if you could publish 225.  It's kind of

17   small to read, so everybody can kind of follow along with

18   me.

19         So, Mr. Davis, on your screen, the timeline here,

20   especially in various colors, we've kind of worked our way

21   up through about 2011, so far, in your testimony, but I

22   want to back up to make sure we understand what this

23   demonstrative is doing.

24         So the blue area, the parties negotiate the

25   exclusive agreement.  Is that -- is that what was going on

Direct - Ryan Davis

1    in the early -- in that late 2009 period?

2    A.    Yes.    That's correct.

3    Q.    And so August 26th, Crew asked for exclusivity.    Is

4    that the contract where you -- excuse me, the e-mail we

5    showed already where you're asking, can I have all of

6    Colorado?

7    A.    That's correct.    That's when I asked for all of

8    Colorado.

9    Q.    And October 29th, we talked through a couple of

10   e-mails where Jack Handley is referring to -- customers to

11   Crew Tile as the local distributor; do you recall seeing

12   those?

13   A.    Again, that was part of our discussions, yes.    Jack

14   told me even before the contract was signed in good faith

15   that they would start referring us to -- referring to us as

16   their distributor out here.

17   Q.    Okay.    And then moving forward, November 3d, the Crew

18   Tile e-mail about honoring relationship and build on trust,

19   this is the withdrawal from the Aspen project; is that

20   right?

21   A.    That's correct.

22   Q.    So Crew backing away from a project it would have made

23   money on in order to honor the relationship and, again,

24   what's the relationship we're talking about?

25   A.    Again, exclusivity outside of Pitkin County and that

Direct - Ryan Davis

1   was kind of a gray area, so it was easier to clean it up by

2   just withdrawing.

3   Q.    Your use of building it on trust, is that how you

4   felt --

5   A.    100 percent.  I mean, I don't know how else you build

6   a relationship besides trust.  That's where it starts.

7   Q.    November 23d, we talked about how there was a -- you

8   were asking for display racks and materials for the

9   showroom so we can get started.  That was one of the

10  requirements of Porcelanosa in order to have the

11  exclusivity, right, the showroom?

12  A.    That's correct, yes.

13  Q.    And this is -- you would -- by this point, late

14  November, you're already in the Denver Design Center,

15  right?

16  A.    We're just in the first phases of it because the

17  design center allowed us in early, yes.

18  Q.    And then December 3d, the plan for it, prepare for it,

19  nail it, this is Jack Handley communicating to you about

20  the in-person meeting; is that right?

21  A.    That's correct.  That's him confirming they're coming

22  out so we could get this deal done, yes.

23  Q.    So ultimately December 8th, you executed the Denver

24  Design Center lease formalizing the space you had.

25  A.    That's correct.  That's when I signed the lease with

Direct - Ryan Davis

1   the Denver Design --

2   Q.   Do you remember the term of that lease, how many years

3   it was?

4   A.   Oh, gosh, I think we were in a -- I know it was

5   multi-year, it was a three-year lease, I believe.

6   Q.   December 14th, this is the one-day meeting, right?

7   A.   That's correct.  That's when they flew out to sign the

8   contract, yes.

9   Q.   It's a one-day, the boss from LA and the guy in charge

10  of Colorado to meet with you in one day and fly back out.

11  A.   That's correct.

12  Q.   We've also talked about the markup to the dealers, we

13  just talked about, how Crew was making money.

14  A.   That's correct.

15  Q.   And it's the understanding that you had is always that

16  Crew would be selling to dealers, Porcelanosa would be

17  selling to Crew.

18  A.   Yeah, that's what the arrangement was, so that's

19  exactly what the arrangement was.

20  Q.   And then we've also talked about an e-mail where

21  you're confirming local design firms aren't buying direct

22  from Porcelanosa.  Again if there's no contract, could

23  Porcelanosa just buy direct if they wanted to?

24  A.   Yeah, they could do whatever they want.  I mean, the

25  market was open, if there was no contract.  But obviously

Direct - Ryan Davis

1    under a contract we needed to work together.

2    Q.    Now there's an area of green under here about the

3    parties performing consistent with the contract.  And we

4    haven't gotten all the way through this, but December 14th,

5    2009, all the way up until April 10th -- and we've talked

6    briefly about this -- this Operation Shut Down that you

7    were told that they're coming and they're going to open up

8    direct, right?

9    A.    That's right, yeah.

10   Q.    Okay.  So let me fill in the gaps a little bit here on

11   some of the time frame in between.  I'd like to talk about

12   how the parties were performing consistent with the

13   contract during that time period, okay?

14   A.    Sure.

15   Q.    Now, during this period of time, so now it's 2009,

16   2010, 2011, what's going on with the housing market?

17   A.    The housing market feels like it's starting to

18   rebound, definitely on the commercial end it is and the

19   housing market is picking up, it's picked up like crazy

20   over the last couple of years.

21   Q.    Are sales for Crew Tile increasing as well?

22   A.    They are.  A lot of our specifications that we were

23   working on previously were starting to come through again.

24   A lot of these projects when you work with an architect,

25   they're just in the design phase, so by the time they

Direct - Ryan Davis

1   actually order tile, it could be two, three years down the

2   road.  So, yeah, some of the work that we had been putting

3   in was now starting to come to fruition.

4   Q.   If we could put up Exhibit 223 -- 230.  I'm sorry,

5   230.

6        Now, this is a demonstrative exhibit of Colorado

7   sales.

8            THE COURT:  What exhibit is this?

9            MR. CROUGH:  Plaintiffs' 233.

10           THE COURT:  Is that in?

11           THE CLERK:  It's under the demonstrative exhibits,

12   Your Honor.

13           THE COURT:  Oh, okay.  233, all right.

14   BY MR. CROUGH:

15   Q.   Now, Mr. Davis, this is a chart of Porcelanosa's total

16   sales in Colorado pulled from Porcelanosa's sales data.

17   Let's go back into -- so 2008, 89,938 and in the entire

18   state of Colorado.  Is that a lot of sales?

19   A.   No.  Not for a company the size of Porcelanosa, no.

20   Q.   And now in 2009, the number is up to 132-, and that's

21   the time period we've talked about here where the

22   exclusivity gets negotiated and the contract is signed,

23   ultimately, almost at the very end of 2009?

24   A.   Correct.  Those were the sales that we -- a lot of

25   sales were what we were doing when we were vetting to find

Direct - Ryan Davis

1    out if we could get good feedback, but we were selling

2    before we had the distribution contract, the exclusivity.

3    Q.    Okay.  In 2010, how are sales looking?

4    A.    I mean, 240,000 is decent for a new product,

5    especially hitting a new line, but it definitely wasn't

6    anywhere where we needed to be.

7          We knew that we were -- you know, we were a little

8    slow and we still needed to continue to pick up the pace.

9    Q.    And so sales are -- they're -- you would agree with me

10   they're increased from 2009?

11   A.    Yeah.  Yeah, they increased from 2009, I mean, almost

12   double.

13   Q.    Okay.  Now, at the end of -- in 2010, there was a

14   meeting, we've talked about how Mr. Montilla and Mr.

15   Handley came out, and we saw some meeting minutes about

16   that.  Do you recall that?

17   A.    I do, yes.  I remember looking at that.

18   Q.    And I want to talk about what's happening in -- by the

19   end of 2010, sales are on the rise, and Paco come --

20   Paco -- does he fly out for the day?

21   A.    Yeah, he flew out for the day to visit with Ray Perry

22   and myself, and Michelle was there, too.

23   Q.    And what was -- what was Paco there to tell you?

24   A.    Again, going back to a little bit earlier, he was

25   there to reassure us about our contract.  He flew out there

390

1    because he knew we were upset that there was some jobs that

2    were possibly getting slipped behind us and before we

3    really wanted to press on the gas, we needed reassurance

4    from Paco, so he flew out and he told us regardless of

5    who's underneath him or what was going on, he was going to

6    step in and get the problem corrected.

7    Q.   Were they apologizing to you?

8    A.   Yes.   Apologizing, at first, and then obviously coming

9    up with game planning on how it was going to get fixed

10   afterwards.   So half apologized to a half solution tour, I

11   guess.

12   Q.   Was Jack Handley there at that meeting?

13   A.   Jack wasn't at that meeting, no.

14   Q.   When Paco's apologizing?

15   A.   That's correct.

16   Q.   Was the apology about violating the contract?

17   A.   It was.   It was about their missed steps on their

18   side, yes.

19   Q.   A direct sale would be a violation of the exclusivity

20   contract, right?

21   A.   Absolutely.

22   Q.   And is he there telling you, affirming to you that

23   they're not going to do that anymore, they're going to

24   honor the contract?

25   A.   Yes, he came back to reconfirm our contract and say

Direct - Ryan Davis

1   that we shouldn't -- we don't have any worries with the

2   contract.  He's there to tell us, I'm here to tell you this

3   won't happen anymore and what we agreed to in that contract

4   we're going to continue to move forward with.

5   Q.   Now, in -- by the end of 2010, does the economy fully

6   recover?

7   A.   No, I mean, but it's showing glimpses.  I mean, we're

8   still -- the economy is still lagging, I would say.

9   Q.   As you move forward in 2011, sales increase again,

10  right?

11  A.   That's correct.

12  Q.   And then 2012, sales skyrocket.

13  A.   They do, yes.

14  Q.   Do you attribute that to Crew Tile?

15  A.   I contribute that to all of us, yes, our hard work,

16  absolutely, I do.

17  Q.   Let's take a look at Exhibit 225.

18       Now, we looked at the previous chart was a chart

19  of total sales, let's look at this now in reference to

20  Colorado -- Crew Tile's sales in Colorado.  So in

21  Plaintiffs' Exhibit 225, the chart on the left side is the

22  period 1-1, 2009 to 12-13, 2009.  Is that -- this is that

23  blue period on the timeline we talked about where the

24  parties were working to get this contract put together?

25  A.   Yeah.  This is where we were exploring the option or

Direct - Ryan Davis

1    exploring the idea of it, yes.

2    Q.    So this is in a short period of time period that Crew

3    Tile is there exploring the market, Crew Tile is already 33

4    percent of the sales --

5    A.    That's correct.

6    Q.    -- is that right?

7          And then the contract is then signed on 12-14, and

8    between 12-14-09 through all of 2010, you're now 83 percent

9    of sales.

10    A.    That's correct.

11    Q.    And there's a little margin up here at the top above

12    the 83 percent of the hundred.   Is that -- there's some

13    sales being sales to Aspen, right?

14    A.    I'm assuming either Aspen or a national account.

15    Q.    And are those a couple of these straggler dealers on

16    there?   We talked about Colorado Ceramic, right?

17    A.    That's correct.

18    Q.    So they're filling in that space?

19    A.    That's correct, yeah.   That's where they would be if

20    they had orders, yes.

21    Q.    And then it continues on, in 2011, same thing.

22    A.    Uhm-hum.

23    Q.    Vast majority of the sales going through Crew with a

24    chunk for Aspen and maybe an outside straggler dealer --

25    A.    That's correct.

Direct - Ryan Davis

1  Q.  -- filling in the rest of that?

2  A.  Yes.  And obviously we owned that much of the sales

3  because we owned the market.  We had the market, so . . .

4  Q.  All right.  When you say you owned the market, let me

5  have you take another look at a demonstrative exhibit.

6  227, please.

7        So we've looked at this in terms of who's who and

8  I want you to look now at the bottom, this list of the

9  dealers.  So who are these people?

10  A.  These are all dealers that we set up during the

11  time -- these are active dealers that are buying.

12  Q.  These are Crew Tile's customers buying from Crew Tile,

13  orders then to Porcelanosa come to Crew Tile, back to the

14  dealer --

15  A.  That's correct.

16  Q.  -- is that right?

17  A.  Yup.

18  Q.  And is this a comprehensive list?

19  A.  What do you mean by comprehensive?

20  Q.  I mean, is this every single person that you sold tile

21  to?

22  A.  No.  Our architects aren't on here, our specifiers

23  aren't on here, some of our builders aren't on here.  This

24  is strictly dealers.

25  Q.  Strictly the dealers.  Okay.  So we've had this

Direct - Ryan Davis

1   discussion of architects, designers, other people.  These

2   are brick-and-mortar type dealers --

3   A.   Yeah.

4   Q.   -- where you can walk into a showroom and see displays

5   like this?

6   A.   Yeah.  I'll give an example like a Carpet Exchange, a

7   lot of these are like -- most of them are a little bit more

8   higher end, but to give kind of a rough idea what they

9   are.

10  Q.   Let's move on to Exhibit 98, please.  Stipulated and

11  admitted.

12       This is another e-mail entitled Meeting Minutes.

13  And another looks like another annual kind of meeting to

14  discuss what the progress is; is that right?

15  A.   That's correct.  Yes.

16  Q.   And who is this -- who's it being sent to?

17  A.   This is me writing the e-mail, sending it to Paco,

18  Jack, sending it to our order desk, and then a rep that

19  they had of -- Dan Leon.

20  Q.   That's another sales rep for Porcelanosa?

21  A.   That's correct, yes.  He was out here also on that

22  trip.

23  Q.   So this is another in-person meeting that took

24  place?

25  A.   That's correct, yeah.  They flew out again.  They were

Direct - Ryan Davis

1    out several times.

2    Q.    And they're coming out to -- were you aware they were

3    coming out to meet with other people?

4    A.    No, Paco would normally come out for the day just to

5    visit with me for a couple of hours.  If Jack came out for

6    a couple of days, he would do nothing but travel with me,

7    so he would just go through -- go to all of my dealers, my

8    architects, and give me support.  Obviously let the

9    architects and dealers know that there's a representative

10   from Porcelanosa there supporting us, too, so . . .

11   Q.    So you're writing here, Good morning, gentlemen,

12   wanted to follow up on our understanding from Friday's

13   meeting.  Crew has agreed to $500,000 in sales for the 2012

14   year, and to start focusing on bringing in stock items.

15          Why were you agreeing to a sale plan?

16   A.    Well, for the first time we felt comfortable enough of

17   giving some -- giving some numbers to Porcelanosa and

18   obviously coming into 2012, we thought that the market was

19   changing and we could start setting some solid goals for

20   ourself, so --

21   Q.    Were sales starting to pick up, or they looked good

22   for 2012?

23   A.    Yeah, at the end of 2011, going into 2012, and most of

24   2012, we were -- we were rocking as far as being busy.

25   Q.    There's a list down below here of kind of some

396

Direct - Ryan Davis

1    line-item stuff you're asking for.  Looks to me that the

2    first five -- well, are these marketing materials?

3    A.    They are.  This is, again, another meeting minutes of

4    some of the things we discussed and what they promised to

5    send back out, so we needed more racks because we had

6    placed all the racks that we had.  There was now an

7    Urbatech working table, like an architectural table that

8    was coming out.  That's why Daniel Leon was out there, he

9    was more Urbatech, their commercial line.  We had some

10   customers that were interested in that, so we were getting

11   displays for that, too.

12   Q.    What is a D.C. gallery?

13   A.    The D.C. gallery is the back-spinning rack.

14   Q.    Again, that's the 12 to 15 Texas step racks, these are

15   the -- that's these, right?

16   A.    Yeah.  And the bravo display there is, again, that's

17   one of our large wing racks.  And all I'm asking for is not

18   the actual wing rack, but another set of boards, an updated

19   set of boards that we could slide into the rack because it

20   wasn't updated.

21   Q.    And it says it's for the Floor Club.  Who's the Floor

22   Club?

23   A.    The Floor Club was our biggest client, they're down

24   off of Jason Street.  They're a dealer that works with

25   quite a few people, a big reputation here in town.

Direct - Ryan Davis

1   Q.   And you had had your display racks there in the Floor

2   Club?

3   A.   We had several of them.   In fact, that's where our

4   working table for our commercial, our Urbatech working

5   table went, they had several of our wing rack, they had

6   several step-down racks, and I believe they had two D.C.

7   galleries.   They did well with us.

8   Q.   Now, No. 5 -- No. 7, excuse me, mentions five

9   architectural kits.   And you have immediate placement for

10   10, I guess.   What is an architectural kit?

11   A.   I think Shana brushed on it a little bit earlier.

12   Outside those small carts that are on that spinning rack,

13   we have -- there's another way to sample, too.   And they're

14   small boxes for architects, they don't have showrooms, they

15   don't need large samples, all they need to have is

16   something to slide off of a shelf and work off of, so we

17   had a small catalog of small tiles where you can kind of

18   flip through like an index box, and the architectural kit

19   would have about six of those boxes with several samples

20   inside of it, so an architect could have it on site and

21   thumb through it as they're working through things.

22   Q.   No. 8 mentions schedule meetings quarterly with Paco

23   either by travel or phone?   Why were you setting up

24   quarterly meetings?

25   A.   Again, it was all on the idea of expanding this idea

Direct - Ryan Davis

1    of possibly into other markets and we needed to continue to

2    have meetings and track progress and see where both of us

3    were at, so we wanted a commitment to make sure we were

4    having more in-person meetings, too.

5    Q.   Were you aware of any dealer who's having quarterly

6    meetings with the guy in charge of Los Angeles?

7    A.   Nobody that I know, no.

8    Q.   No. 6 mentions website placement.  There's been some

9    talk about website placement already.  Are you -- are you

10   still asking to get on the website at this point?

11   A.   Yeah.  Again, that was an ongoing discussion.  I mean,

12   we would ask, they would say yes.  They would say, Send the

13   information.  We send the information.  And then it would

14   never happen.

15        So it was just this -- it was kind of just like, I

16   don't know, chasing a -- chasing a mouse, I guess.  It was

17   a cat-and-mouse game.  It was ridiculous on how it was such

18   a simple process, they continued to guarantee us, and I

19   continued to have to ask, so . . .

20   Q.   Put up Exhibit 102, please.  It's already been

21   admitted.  The jury's already looked at this e-mail once.

22   Down at the bottom, this is Paco Montilla writing to you in

23   February of 2012, so shortly after the meeting minutes.

24   And what did he tell you here?

25   A.   I mean, just, again, I reached out to him and said his

Direct - Ryan Davis

1    response to that is send me your information and we'll get

2    it up on our website as soon as possible.

3    Q.    So you talked about it with Paco during the meeting --

4    A.    That's correct.

5    Q.    -- in January?

6          And then you're following up here in February.

7    And Paco, what's he telling you?

8    A.    He's telling me -- I mean, it's no problem, just send

9    over the information like we talked about, and we agreed to

10   and we'll get it up on the website.

11   Q.    So scroll up on the exhibit, please.  Did -- did you

12   actually give him that information?

13   A.    Yeah, I believe I sent it the next day, but, yeah, I

14   sent over the information:  our address, our hours, and

15   phone numbers, fax.

16   Q.    So whatever became of that?

17   A.    It never got on the website.  I don't know.  Again, we

18   had several conversations, even after this one, about the

19   website, so it was, like I said, just an ongoing issue,

20   so --

21   Q.    Did Mr. Montilla do what he promised that he would do

22   for you?

23   A.    No, he lied to me.  He lied to me several times about

24   the website.  It -- that's all it could be is a blatant

25   lie.  He told me he would do it and he didn't do it.

Direct - Ryan Davis

1   Q.   Let's talk about working with Jack Handley a little

2   more.  Now, in working with Jack Handley, would he refer

3   customers to Crew Tile?

4   A.   Yes.  If there was a customer that didn't know about

5   us and was looking for the Porcelanosa brand online, or

6   whatever the case is, a lot of times they would reach

7   directly out to Porcelanosa and -- in Los Angeles and then

8   they would turn around and let them know that there was a

9   distributor in Colorado and then give them our information

10  and vice versa, and then they would send that client's

11  information to us so we could also follow up with them.

12  Q.   And you -- is it -- did you receive a number of

13  e-mails from Jack with those customer inquiries asking you

14  then to reach out to them and --

15  A.   Yeah, I received them from Jack and Paco, both of

16  them.  Any time that there was any type of inquiry, I'd get

17  them from Jack and Paco.

18  Q.   Could we look at 229.  It's not stipulated.  229.

19          COURTROOM DEPUTY:  This is a demonstrative,

20  correct?

21          MR. CROUGH:  It is.  I don't know that we've used

22  it.

23          THE COURT:  Is there an objection to using it from

24  the defendant?

25          MR. THOMAIDIS:  Your Honor, we've stipulated to

Direct - Ryan Davis

1    all of the demonstratives.  No objection.

2              THE COURT:  Okay.

3              MR. CROUGH:  Okay.

4              THE COURT:  I'm not aware of that.

5              MR. THOMAIDIS:  I'm sorry, Your Honor.

6    BY MR. CROUGH:

7    Q.   So in 229, there's a chart that we've put together of

8    various e-mails and various dates.  Behind the chart -- we

9    put it together as a chart because there's a number of

10   them, trying to make it more efficient.

11             Is this a summary of -- or at least some of the

12   e-mails where Jack Handley or Paco was referring these

13   consumer customers over to Crew Tile?

14   A.   Give me one second.  I haven't seen this yet.

15   Q.   Sure.

16   A.   Yeah, this is a list of e-mails that they sent over to

17   me.  And, yeah, this is a list from Jack and Paco both

18   sending me references on there from their website or if

19   there was a phone call or whatever the case is, yeah, this

20   is a list of clients that they're sending me.

21   Q.   And it's numerous pages, so Jeremy, if you could just

22   go to page 2, on to page 3.  And then behind this exhibit

23   is a number of e-mails that are actually referenced in this

24   chart, itself.

25             I don't want to spend time going through each and

Direct - Ryan Davis

1    every one, but is this -- is this what -- customarily what

2    was going on with the relationship with Jack Handley and

3    Paco Montilla when they got to customer inquiries, they

4    would come your way?

5    A.   Yes, that is what we agreed upon, yeah, absolutely.

6    Q.   What would you do when you got those customer

7    inquiries?

8    A.   We would let the customer know who they were and they

9    would let us know who the customer was inquiring on their

10   end and we would make every effort to make contact with

11   that customer and vice versa, help them out, it was a

12   sale.

13   Q.   Now, if there was no exclusivity contract, these

14   customers have already reached out to Porcelanosa directly

15   for product; is that right?

16   A.   That's correct.  They could have sold them directly at

17   any point in time.

18   Q.   So this wouldn't be -- this is a customer asking

19   Porcelanosa for product, and instead of Porcelanosa selling

20   it directly, they're actually sending the client to you; is

21   that right?

22   A.   That's correct.  That's what was part of the

23   distribution agreement.  That's --

24   Q.   If there -- if there was no agreement, does this make

25   any sense to you?

Direct - Ryan Davis

1   A.   Listen, I've been in this industry for a long time,

2   and I -- I try to put my -- myself wearing that hat, if

3   there wasn't -- but I've never seen a company act like this

4   if there wasn't an agreement.   I can't see a company doing

5   this if there wasn't an agreement, no.   I -- you don't give

6   away your customers.

7   Q.   Porcelanosa could have made the profit on these

8   themselves, right?

9   A.   That's correct.   But it would have been in violation

10   of our agreement, so they were required to send them over

11   to us.

12   Q.   So instead, consistent with the agreement, they're

13   sending you the customer so Crew makes its 20 to 30 percent

14   markup.

15   A.   That's correct.

16   Q.   Now, were there -- would some customers still try to

17   go direct?

18   A.   Yeah.   I mean, you can't control what a customer does.

19   There's a lot of homeowners that get crafty and they get

20   online, they try to buy it through other -- it's -- you

21   can't control that part.   That's why you have to control it

22   on the manufacturing and distribution end.

23   Q.   Now, did Jack help protect the exclusivity that Crew

24   Tile had?

25   A.   Oh, yeah.   Jack would always protect it.

Direct - Ryan Davis

1   Q.   Let's -- if we could take a look at Exhibit 110,

2   please.   It's already stipulated and admitted.

3         Down at the bottom of this e-mail, is -- first

4   off, date of this, March 8th, 2012; do you see that?

5   A.   I do.

6   Q.   Do you know who Kelly Fisher is, it's

7   kfisher@porcelanosa-usa?

8   A.   I don't know her personally.  I believe I've heard the

9   name, but I don't think I've ever met Kelly.

10  Q.   And the Subject of this e-mail is pricing for a

11  Residence Inn in Glendale, Colorado, and it looks like it's

12  a Natalie Ybarra of Golden Stones looking for something for

13  the Design Force?

14  A.   Correct.  The Design Force was a client of ours just

15  off of 6th and Federal.  They do a lot of hospitality, so

16  they were an architectural firm for hospitality, hotels,

17  things of that nature.

18  Q.   So this is -- do you know who Golden Stones is?

19  A.   I don't know who Golden Stones is.  I haven't heard

20  that name, or Natalie, I haven't heard that name, no.

21  Q.   So, in essence, Design Forces is one of your dealer

22  customers and they are now being discussed on Kelly Fisher

23  internally, and Porcelanosa is being asked to help out with

24  some product specification; is that fair?

25  A.   That's what this e-mail says, yes.

Direct - Ryan Davis

1  Q.   If we could roll up the e-mail, the next one in line

2  is -- it looks like Kelly Fisher from Porcelanosa-USA is

3  now writing to Jack Handley saying, Is this you?

4         Do you see that?

5  A.   I do.

6  Q.   And then if we roll up again a little bit further, can

7  you read what Jack Handley wrote back to Kelly Fisher

8  internally at Porcelanosa and also cc'd to you?

9  A.   It says yes, they are trying to go around Crew Tile

10  for Denver.  Thank you for keeping an eye out for this.

11  Ryan, please continue to follow up on this.

12         So that was Jack protecting us from that.

13  Q.   And so do you even know Kelly Fisher?

14  A.   I didn't know Kelly Fisher, no.

15  Q.   So this is Jack Handley telling somebody that you

16  didn't even work with, that you can't go around Crew Tile

17  in Denver?

18  A.   That's exactly what this says.

19  Q.   Did you follow up with Natalie?

20  A.   Yeah, of course I did.  It was our project.  We were

21  working with the Design Force.

22  Q.   And was it surprising to you to see that Jack Handley

23  was saying that dealers -- or people can't go around Crew

24  Tile in Denver?

25  A.   No.  I mean, in fact, it was comfort.  It was right

Direct - Ryan Davis

1    after our meeting with Paco and everything else, so, again,

2    we were back feeling the trust was back there.

3    Q.    And this is the project of Residence Inn, is that

4    something that like would have been interesting to Crew?

5    A.    Yeah, hotel.

6    Q.    Let's look at Exhibit 118, please.

7          That's another e-mail from April of 2012 from Jack

8    Handley written to a Kevin Veltrie and Ryan Davis.  The

9    subject of DIA.

10   A.    That's correct.

11   Q.    What do you understand DIA to be?

12   A.    Denver International Airport.  This is the spec I did

13   through an architect with Denver International Airport.

14   Q.    Who is Kevin Veltrie?

15   A.    Kevin Veltrie worked with Brekhus Tile & Stone.  They

16   were the company that did the mockup bathrooms for the DIA

17   project.

18   Q.    And if you go down with the e-mail, just below it, it

19   says Kevin Velteri -- Veltrie, I'm sorry, and Jack Handley.

20   And you're not on this e-mail, right?

21   A.    I'm not on that first one, no.

22   Q.    What is Kevin asking Jack for?

23   A.    Pricing on material, this -- the mockup material

24   that's going in DIA bathroom.

25   Q.    Is that something -- is pricing something normally

Direct - Ryan Davis

1  Crew Tile would get?

2  A.  Correct.

3  Q.  Why is that?

4  A.  Well, because it was our territory and it was my job.

5  I spec'd the job.  I did all the work on it, I put in the

6  pricing, I put in all the materials, all of it.

7  Q.  And was the pricing, was that discretionary for you?

8  A.  Yes.

9  Q.  And could you decide, depending on the project, how

10  large a markup you wanted to put on?

11  A.  Yes.

12  Q.  And why would you change that?

13  A.  Well, again, I mean, to get the job, No. 1, you look

14  at your margins and where you can make it, but on a project

15  that size, you can start lowering your margins because of

16  quantities, so . . .

17  Q.  So there's been some discussion in the courtroom and

18  in the opening statement that Denver International Airport

19  wasn't a Crew project; is that true?

20  A.  No.

21      MR. THOMAIDIS:  Your Honor, that misstates the

22  evidence -- the opening.

23      MR. CROUGH:  I'll rephrase.

24      THE COURT:  Yeah, why don't you do that.

25  BY MR. CROUGH:

Direct - Ryan Davis

1   Q.   So, Ryan, was Denver International Airport Crew Tile's

2   project?

3   A.   Yes.  I can tell you --

4        MR. THOMAIDIS:  Your Honor, still misstates the --

5   what I said.

6        THE COURT:  Well, it misstates your opening or

7   misstates the --

8        MR. THOMAIDIS:  It's -- I'm sure he's trying to

9   testify, it's just factually inaccurate.

10       THE COURT:  I don't understand the objection.

11       MR. THOMAIDIS:  The only assertion we made that

12   Porcelanosa Los Angeles never sold tile into the Denver

13   International Airport, there was -- whether it was Crew

14   Tile's project was never an issue as far as anything that's

15   been testified about so far.

16       THE COURT:  Okay.  But my question to you is are

17   you objecting that it mischaracterizes your opening

18   statement or it mischaracterizes the evidence?

19       MR. THOMAIDIS:  It may have been Crew Tile's

20   project, but it --

21       THE COURT:  Answer my question.  Are -- is your

22   objection that it mischaracterizes your opening statement

23   or that it mischaracterizes the evidence?

24       MR. THOMAIDIS:  It mischaracterizes the evidence

25   and reaches a legal conclusion.

Direct - Ryan Davis

1    THE COURT:  What evidence -- okay.  Where did we

2  see the evidence that's being mischaracterized?

3    MR. THOMAIDIS:  We actually haven't seen any

4  evidence at this point, which is why it's being

5  mischaracterized.

6    THE COURT:  Well, but it's not -- but the evidence

7  isn't in yet.  I mean, when -- you'll have the opportunity

8  to cross this witness on this issue and then you can point

9  out the evidence that you believe is being mischaracterized

10 by the questions.

11    MR. THOMAIDIS:  Thank you, Your Honor.

12    THE COURT:  All right.  Overruled.

13 BY MR. CROUGH:

14 Q.   Let me start with the new question so we can get back

15 on track.  Was DIA undergoing any kind of construction

16 around this time?

17 A.   Yes.  They were looking at doing an expansion.

18 Q.   What was the expansion?

19 A.   Hotel, new bathrooms, some work to some of the

20 concourses, things of that nature.  Restaurants.  They have

21 that now at the DIA.

22 Q.   Is that the project that Crew Tile specified?

23 A.   It's a project that, myself with Crew Tile, specified

24 through Gensler Architects.  And I can tell you who did the

25 markup bathrooms and I can tell you who ordered the final

Direct - Ryan Davis

1    project for the project.

2    Q.    Who?

3    A.    Floors actually did the project file, the -- Floors is

4    the one that actually got the job at the very end of

5    everything, but prior to that, they wanted to do a mockup,

6    they wanted to do a couple of mockup bathrooms before they

7    went to work with the expansion project.  Originally I

8    spec'd the mockups.  And Mr. Thomaidis said that there was

9    some low -- low-volume numbers based on that.  Those were

10   the mockup bathrooms.  Menis Tile and Breckhus Tile that

11   bid on it, and Breckhus Tile was eventually the one that

12   did the mockup bathrooms.

13        After the mockups was done, they moved forward

14   with the expansion project about two years later, and

15   Floors is the one that was actually contract -- was awarded

16   the contract at the end.

17        I do know that, Mr. Thomaidis.  I worked with them

18   directly.

19   Q.    Address your answer to me, please.

20   A.    Sorry.

21   Q.    Is Jack honoring the exclusive distribution agreement

22   here for the DIA airport?

23   A.    Yes, it states it right there.  He reached back to

24   Kevin and said he did his research on this and Ryan's the

25   one to contact for pricing.  He's the one that specified it

Direct - Ryan Davis

1    through Gensler.

2    Q.    Logically to you, does it make sense that if there's

3    no contract, that Porcelanosa would have been able to just

4    sell this directly?

5    A.    He could have, yes.

6    Q.    But the contract was in place, right?

7    A.    That's correct.

8    Q.    And the contract says they couldn't do it.

9    A.    They couldn't do it.  They needed to send it back over

10   to us, and this is exactly what Jack is doing.

11   Q.    Does Jack know about the contract?

12   A.    Correct.  Jack knew about the contract.

13   Q.    Let's talk about further along into 2012.  And we've

14   got -- this is the parties continue to perform consistent

15   with the contract on the timeline there.  How did

16   Porcelanosa make you feel to be part of what was happening

17   in Colorado?

18   A.    Well, again, I mean, in 2012, you can see by the

19   numbers, and Shana coming on board, and things of that

20   nature, it was an exciting time for us.  We felt like -- I

21   guess we kind of just got around the curve, that things

22   were going to start really moving for us.  We were going to

23   start to get paychecks, things of that nature.  We were

24   starting to sell product.  And, again, a lot of our larger

25   specifications that we had were just now coming to fruition

Direct - Ryan Davis

1   and people were starting to place orders.

2   Q.   Now, there's a point in time when Jack Handley got

3   fired; is that right?

4   A.   Yes.

5   Q.   How did you learn about that?

6   A.   I didn't at first.  First Paco told me that Jack was

7   going back to Spain for a couple of weeks for training and

8   that I needed to start working through him directly on

9   pricing and things of that nature, and it was about five

10   days later that I learned through another rep out there

11   that he had been let go, he wasn't back there for training.

12   That's how I found out.

13   Q.   And when was this?

14   A.   It actually was before we went to Beverly Hills, so it

15   had to have been summer of -- late summer of 2012.  Maybe

16   August, September of 2012.

17   Q.   Okay.  And I think there's been some testimony through

18   Ms. Bastemeyer about a trip in October of 2012 to

19   California; is that what you're referring to?

20   A.   That's correct.  And I knew Jack was gone before that

21   because he wasn't at the grand opening.

22   Q.   Now, did things start changing in the relationship

23   when Jack Handley left the picture?

24   A.   Yes.  Not at first.  It wasn't evident at first, but,

25   yeah, we weren't quite as protected, I guess.  Jack did a

Direct - Ryan Davis

1    lot of legwork on his end on that -- on that side, so I
2    would say things were still going normal, but there was a
3    couple more hiccups that started to surface.
4    Q.   Did Paco tell you what happened to Jack Handley?
5    A.   Eventually -- well, no, he never -- he just said that
6    the company let him go.
7    Q.   Did he tell you the circumstances?
8    A.   He did eventually, yes.  He said that he had to let
9    Jack go for unethical business practices is what I was
10   told.  He wasn't honest and he was doing unethical business
11   practices is the statement that Paco told me.
12   Q.   So Paco told you that Porcelanosa fired Jack for being
13   unethical in his business practices?
14   A.   That's exactly what he told me.
15   Q.   Do you know if that had anything to do with his
16   relation with you?
17   A.   I didn't assume so.  I assumed if it had to do
18   something, Paco would address that during that
19   conversation, but I never once thought it had anything to
20   do with me, no.
21   Q.   In working with Jack, did you have a pretty good
22   working relationship with him?
23   A.   Yes.  Like I said, outside of the couple of hiccups --
24   but again, he would always come back and try to make things
25   better.  So again, I worked with Jack on a daily basis, and

Direct - Ryan Davis

1   phone calls, sometimes up to a dozen phone calls a day, so,

2   yeah -- I mean, I liked him, yeah.

3   Q.   Did you believe that you could trust him?

4   A.   Of course I did.  I did trust him.  I mean, in fact I

5   got my parents to put up a half a million dollars.  I went

6   out and found investors.  Yeah, I trusted him.  I trusted

7   him explicitly.

8   Q.   Did you trust Paco as well?

9   A.   Yes.

10   Q.   Is that part of the reason that you signed a contract

11   in the first place?

12   A.   Yes.

13   Q.   Is that the reason why you spent years working under

14   the contract?

15   A.   Again, like I said, yeah, that's exactly why we did

16   it.  That's why I didn't take pay, that's why I ate Top

17   Ramen for years.  It's because I trusted those guys.

18   Q.   Let's talk about that event in Hollywood.  Do you

19   recall that?

20   A.   I do, yes.

21   Q.   And what was your understanding of why you were going

22   to Hollywood?

23   A.   Well, I got an invitation from Paco, and actually it

24   was a nice little card that came out in the mail saying

25   that they were doing a grand opening at their Beverly Hills

Direct - Ryan Davis

1   showroom and that they would like to have me out as a

2   special guest.

3   Q.   Did you talk to Paco about it before you came?

4   A.   Of course I did.

5   Q.   What did you talk about?

6   A.   Well, I -- he said things are going real great out

7   there, we're excited for you guys, the owners are going to

8   be in town, we have a star-studded event, we would love to

9   have you there.  Can you make it out on these days?

10         And I said yes.  And he said then we'll go ahead

11   on our end and we'll book you a ticket and motel and get

12   you out here.

13   Q.   Did they pay for your ticket?

14   A.   Yes.

15   Q.   Did they pay for your hotel?

16   A.   Yes.

17   Q.   Tell me a little bit about the event, itself.

18   A.   It was a red carpet event.  I mean, the Porcelanosa

19   does that one thing well, they know how to make tile and

20   put on a good show.  It was a beautiful showroom.  A lot of

21   people there.  I think Shana said, I don't know, a couple

22   of actors and actresses -- actors and actresses were there.

23   A lot of people, a lot of photo ops.  I mean, a lot of

24   pictures.  It was kind of a red carpet event, so . . .

25   Q.   Did it make you feel special?

Direct - Ryan Davis

1   A.   Yeah.  I mean, we got to see the new showroom, new

2   products, we got to see vignette ideas, we got to talk to

3   everybody.  People were encouraging to us, people knew who

4   we were, which was nice.  We were a name there.

5   Q.   We had that chart shown with Crew Tile in between

6   Porcelanosa and the various dealers.  Were any of those

7   dealers out there at the event?

8   A.   None that I know of, no.

9   Q.   Do you know if anybody else from Colorado was there?

10  A.   Again, I was told throughout some point in time that

11  the guy from Balentine was up there, but I never saw him,

12  and we later went to dinner with Paco, Paco took us out to

13  dinner with his management team and it was just Shana and

14  myself that went to dinner with Paco and his management

15  team.

16  Q.   Was it nighttime?

17  A.   Yeah, high-end Italian place in Beverly Hills.

18  Q.   Is that the first time you have been to Beverly Hills?

19  A.   Yeah, I'm not a Beverly Hills type person, normally,

20  so it was a lot for me, but yeah, I enjoyed it for the time

21  that I was there, absolutely.

22  Q.   Did you have to get a new suit?

23  A.   Yeah -- I'm not -- yeah, it was tough finding suits

24  for me, so that was a fun -- fun part.

25  Q.   Now, 2013, what's -- the relationship changed; is that

Direct - Ryan Davis

1    right?

2    A.    It did.

3    Q.    We've had some discussion about the conference call

4    that happened on April 10th and we've already heard from

5    Ms. Bastemeyer who was on that call.  I'd like to hear from

6    you.

7          First off, what were you planning on doing on

8    April 10th?

9    A.    Again, I was called a couple of days before to find

10   out if our sales -- our sales staff and myself could get on

11   a Skype call to learn about some of the new products that

12   were coming out and some of the pricing and some of the

13   ideas that Paco had for that year.  So, he set up a phone

14   call and I agreed to the phone call.

15   Q.    Who was on the call on Porcelanosa's side -- or who

16   were you expecting?

17   A.    Well, the only people that identified themselves on

18   that side was Jeff and Paco.

19   Q.    And who is Jeff?

20   A.    Jeff Schnepp was, in a sense, the guy when Jeff --

21   Jack was let go, Jeff came in to fill his role, but I don't

22   believe he was -- he had the management experience or the

23   titles at the time.  I believe he was just more -- I think

24   he was a little lower than Jack, but he filled Jack's role

25   for the time being.

Direct - Ryan Davis

1   Q.   And when did you first meet Jeff Schnepp?

2   A.   It was in -- well, I had talked to him a few times on

3   the phone, but for the very first time that I really met

4   him and hung out with him was at the Beverly Hills grand

5   opening.

6   Q.   Do you recall the first business interaction that you

7   had with Jeff Schnepp?  How were you introduced to him?

8   A.   No.  I -- I think it was at the Beverly Hills is when

9   I first was introduced to him.

10  Q.   How was your relationship with Jeff Schnepp?

11  A.   I liked Jeff, we were actually friends outside of --

12  outside of the workplace, too.  I mean, Jeff was -- I mean,

13  truthfully, Jeff was just trying to fill in a role.  He

14  came in to something that he didn't know a lot about and he

15  was doing everything in the world to get caught up and kind

16  of get up -- up to pace with us, so . . .

17  Q.   Do you know, was Jeff around during the 2009 contract

18  signing?

19  A.   No.  Not -- not on our end, no.  I didn't know who

20  Jeff was at that time, no.

21  Q.   When Jeff came on board, did he still send customers

22  to you?

23  A.   Yeah.  Jeff still operated under the agreement like

24  anything else, yeah.

25  Q.   And if there was no agreement, could Jeff have just

Direct - Ryan Davis

1    taken any business he wanted to?

2    A.    Yeah.  Jeff could have done what he wanted to, yes.

3    Q.    That's not what happened?

4    A.    No, Jeff, like I said, kind of in a sense came in and

5    filled Jack's shoes.  Obviously it was different because

6    you're dealing with a different person, but the same type

7    of business was going on, yeah; business as usual.

8    Q.    So let's talk about the phone call.  What date did it

9    occur?

10   A.    April 10th, 2013.

11   Q.    And who initiated the call?

12   A.    Well, it's kind of tough to testify under that because

13   we tried several times on a Skype call and we couldn't get

14   a connection, so we eventually wound up doing a phone

15   conference.

16   Q.    Okay.  And who was on your side?

17   A.    Just Shana and myself at that time.

18   Q.    Okay.  Did you talk about new products?

19   A.    No.

20   Q.    Walk me through the phone call.  What happened?

21   A.    Like I stated before, it was a really brief phone

22   conversation.  We got on the phone and Paco simply stated

23   that they were making plans to open up a showroom in Denver

24   and that they were going to take over the Denver

25   territory.

Direct - Ryan Davis

1    Q.   Did you fight back?

2    A.   At first I was a little bit in shock.  Yeah, I guess I

3    fought back.  After the phone conversation, I called Jeff

4    back and I had some choice words to say to him because,

5    like I said, he -- he told me that this was a -- this was

6    a product knowledge meeting, not -- and that this was a

7    product knowledge meeting, so I was a little upset that I

8    was even misinformed on what was going to happen, so . . .

9    Q.   Did you -- did you mention the contract?

10   A.   Absolutely.  I told Paco, I said, Well, No. 1, you

11   can't do this.  And I guess if you do decide to do this,

12   you will hear from my lawyers.  And that was literally the

13   end of the conversation and I hung up, so . . .

14   Q.   Did Paco tell you the decision had already been made?

15   A.   Yeah.  I asked him, Why are you doing this, prior

16   to -- to hanging up.  And he told me that the decision had

17   been made, it was over his head and there was nothing he

18   could do about it is what he told me.

19   Q.   And you said after that call, you phoned up Jeff

20   Schnepp by himself?

21   A.   Yup.  I called Jeff up right away.

22   Q.   And did you tell him about the contract?

23   A.   Well, Jeff knew about the contract, and I said the

24   same thing, again, not such choice words with Jeff because

25   I was frustrated that he lied to me about what this meeting

Direct - Ryan Davis

1    was, and No. 2, about the simple fact that I carried on

2    about how you guys can't do this.  You can't do this to me.

3    Q.   Now, at this point in time, is Crew still pouring all

4    of its money into the expansion of the business?

5    A.   Yeah.  I mean, that's all we were doing, yeah.  We

6    were working on Porcelanosa.  It was taking off for us.  We

7    weren't going to work on anything outside of that, so . . .

8    Q.   By the time April 10th, 2013, came around, had you

9    taken a paycheck yet?

10   A.   I had some paychecks here and there, yes, but

11   nothing -- I mean, nothing substantial by any means, no.

12   Q.   Do you know if your parents had gotten their

13   investment back by that point?

14   A.   No, I knew for a fact they didn't have their

15   investment back.

16   Q.   Were things looking hopeful?

17   A.   Yeah.  That was the time where we were starting to get

18   excited about a paycheck and getting our investments

19   back.

20   Q.   Publish Exhibit 135, please.  It's already been

21   stipulated and admitted.

22        Now we have a little bit of background on Jeff

23   Schnepp.  We've seen this e-mail in the courtroom before.

24   This is the e-mail from the day before, April 9th, talking

25   about, Go for Operation Shut Down in Denver.  Did Jeff

Direct - Ryan Davis

1    Schnepp tell you, Go on Operation Shut Down in Denver?

2    A.    No.  Again, he told me product knowledge meeting.

3    Q.    Okay.  So would -- so Jeff Schnepp wasn't honest with

4    you when you're ready for this phone call?

5    A.    No.  In fact, I saw this for -- the first time I've

6    seen this e-mail is throughout this litigation and it was

7    pretty frustrating to find out that there was even

8    communication beforehand and knowing that he lied to me

9    now.

10   Q.    Before this date, or even seeing this e-mail, were you

11   aware that Jeff Schnepp had been -- at any point in time

12   was being dishonest with you?

13   A.    No.  I trusted him, too.

14   Q.    How did it make you feel when you saw this e-mail?

15   A.    I guess a couple of things.  One is obviously I was

16   frustrated and obviously I was upset with the entire

17   situation, but, I mean, even looking at it now is Operation

18   Shut Down Denver, that -- that makes me sound like

19   Porcelanosa is leaving Denver for good, so for me being the

20   only one in Shut Down Denver is highly concerning to me so,

21   again, I just feel like this is nothing more than an

22   assassination attempt.

23         If they were shutting down Denver, they shouldn't

24   be here.  I didn't -- I guess looking at it, I don't

25   understand, outside of my exclusivity agreement, why would

Direct - Ryan Davis

1  Denver count only for me if I was the dealer?  This just

2  tells me, you know what, you knew I was a distributor

3  because you're shutting down my entire territory because if

4  you were shutting down Denver without my distribution

5  agreement, then you would be shutting down everybody.

6        So I -- I guess, reading this, this -- I don't

7  know.  Part of -- like I said, it just frustrates me

8  because I was lied to, and at the second time it just

9  continues to prove on how I -- how it looks now that they

10  were out to shut me down.  They were out to put me under.

11  Q.  Does this e-mail indicate to you that Porcelanosa was

12  planning Operation Shut Down Denver at some point before

13  they had that call?

14  A.  Obviously the writing was on the wall for them, I just

15  wasn't with them on that until the following day when they

16  notified me of their plans.

17  Q.  Do you know how far back in time Porcelanosa was

18  planning this opening of a Denver showroom before this

19  call?

20  A.  I don't believe I can testify to the exact time, but I

21  can tell you that things weren't going as smoothly leading

22  up to this phone conversation.

23  Q.  Now, did you understand that Porcelanosa was shutting

24  you down but Porcelanosa was not shutting down Colorado?

25  A.  On that phone call, the only thing he said is that

424

Direct - Ryan Davis

1    they were moving into Colorado and they were going to take

2    over our territory, so, again, as far as who else they were

3    shutting down, I -- all I heard in that conversation was

4    they were shutting me down.

5    Q.   And all this happened after Jack Handley was fired,

6    right?

7    A.   That's correct.

8    Q.   Let's talk about the reaction to the news.  You

9    already said that you had made a phone call to Jeff Schnepp

10   and gave him some choice words.

11   A.   That's correct.

12   Q.   What else did you do?  Who did you talk to in the Crew

13   Tile group?

14   A.   Well, obviously I called up my mom.  I mean, I talked

15   to my mom, my dad, Shana.  I let Ray know what was going

16   on.  And, you know, I mean, the initial shock, what am I

17   supposed to get up and do tomorrow morning?  So, I mean,

18   our obvious thing was, listen, this thing will -- there

19   will be a solution that will present itself but right now

20   we need to, obviously, stick as business as usual.  We've

21   got orders, we've got customers coming in, we've got

22   drivers that are supposed to deliver product tomorrow,

23   things of that nature.  So we stuck with business at that

24   time, so . . .

25   Q.   Okay.  So in coming away from the phone call, did you

Direct - Ryan Davis

1    know whether Porcelanosa was opening the showroom the next

2    day, six months, a year, did they tell you that?

3    A.    No.   They never gave us a timeline, they just said

4    that they were going to come to Denver and open up a

5    showroom.   So they didn't tell me where, they didn't tell

6    me any of the logistics about it.

7    Q.    So did you need to plan not even knowing when this was

8    going to happen?

9    A.    It -- say it again.

10   Q.    Did you need to plan for your business, not -- with

11   this unknown --

12   A.    Yeah --

13   Q.    -- of when the showroom was open?

14   A.    Ultimately -- and Shana said this earlier -- I started

15   reaching out to people that I knew in the manufacturing

16   world, because I was really concerned that I had large

17   specs out there and I wasn't going to be able to fulfill

18   them.   So I did.

19        I -- and I instructed my mom to start looking for

20   some alternative contract, and she found this Sark one and

21   had sent it over.   But I was going to start talking with

22   manufacturers while they started looking at some paperwork

23   and some ways that we could design this without hurting

24   ourselves or our -- our exclusivity agreement.

25   Q.    Okay.   Let's mention the Sark Tile contract template.

Direct - Ryan Davis

1    Let's talk about that for a second.  If you could pull up

2    Defendants' Exhibit B-22.  It's already admitted.  Go to

3    the second page of that for me.

4         So this is the template that was being circulated

5    around in Crew Tile a few days after the Operation Shut

6    Down phone call; is that right?

7    A.   That's correct.  I -- like I said, I instructed my mom

8    to, hey, let's try to find some nonexclusive agreement that

9    we can possibly find another manufacturer where we can plug

10   some of these things in.  My mom said, Well, why don't we

11   look at the Sark contract, it worked back then and it's a

12   good template that Jack gave.  So she re-e-mailed that

13   template again.

14   Q.   Okay.  If we could take it -- jump back to the signed

15   copy of the Sark contract.  I think it's A-78.  Here we go.

16   So in -- Jeremy, highlight the top of that for me.

17            THE COURT:  What exhibit?

18            MR. CROUGH:  Sorry, this is Defendants' Exhibit

19   A-78, already stipulated and admitted.

20   BY MR. CROUGH:

21   Q.   So this is -- if we could all understand here, help me

22   understand, this is the contract that was ultimately signed

23   with Sark Tile back in 2012; is that right?

24   A.   That is correct, yes.

25   Q.   Okay.  And then that is the template for this contract

Direct - Ryan Davis

1   that was signed is the one that was then later circulated

2   in 2013 after the phone call for Operation Shut Down?

3   A.   That's correct.  It's the exact same contract.

4   Q.   Okay.  And --

5   A.   Minus the date and the -- and the Sark information.

6   Q.   Okay.  If we could go back to, I'm sorry, Defendants'

7   B-22.  Second page.

8        So just so I'm -- I understand, this is the

9   contract from 2012 before it was marked up and actually

10  signed with Sark Tile that's being now circulated in April

11  of 2013.

12  A.   Correct.  My mom just went back and got that template

13  that we used in 2012 and resent it over and asked if this

14  would work.

15  Q.   Okay.  And like the Sark contract that was signed in

16  2012, Jeremy, if we go to the end of this, in the

17  Applicable Law section, I believe it's page 4 -- 5 -- there

18  it is -- heading 6.

19       Now, this -- this template, this thing still has

20  Porcelanosa's address on it, right?

21  A.   That's correct.  That's the template that he delivered

22  in 2012 where we messed up and we sent it over to Sark and

23  forgot to take the address, and this is still continuing

24  the same template.

25  Q.   So this isn't a -- this isn't Crew Tile going on to

Direct - Ryan Davis

1    the Internet to download a distribution contract to try and

2    fix, as defense has suggested?

3    A.    Absolutely not.  This is just strictly a template of

4    the Sark contract from years prior.

5    Q.    Go back to the first page.  And the address on here

6    for Crew Tile Distribution, what address is that?

7    A.    That's still our address down at the Denver Design

8    District.

9    Q.    Okay.  That's the address back in 2012, right?

10   A.    Yeah.  That's the address that we had back in 2009,

11   too.

12   Q.    In 2009 and 2012, and there's been some discussion

13   that the Crew Tile was ultimately evicted from the design

14   center, right?

15   A.    That's correct.

16   Q.    And that happened in the spring of 2012, after all

17   this, right?

18   A.    That's correct.

19   Q.    Let's talk a little bit more about the design center.

20   So Crew Tile was evicted, right?

21   A.    We were.

22   Q.    So let's talk a little bit more about the

23   circumstances there.  So at the time -- you are now in

24   spring of 2012, you've been at the design center for a

25   little over two years, if my math is right?

Direct - Ryan Davis

1   A.   That's correct.

2   Q.   Okay.  And at this point in time, you, your family, is

3   pouring money into the expansion of the Colorado market,

4   which includes paying the high rent out at the design

5   center?

6   A.   That is correct.

7   Q.   And at some point in time, you fell behind on the

8   rent.

9   A.   We did.  It was expensive to be down there and -- and

10  with the market the way that it was and the design center

11  changing to retail, it kind of did cripple us a little bit.

12  And it was no excuse for where we were at, but it was tough

13  to have the high-end square footage down there at the

14  Denver Design District and then be able to have another

15  warehouse off-site, because you couldn't afford to have a

16  warehouse down in that area, so in a sense we were running

17  two facilities at the time, our warehouse and then we had

18  our showroom down there.  So it was -- cash flow was tight.

19  There was a lot of expense there having two operations.

20  Q.   So by the spring of 2012, you had fallen behind paying

21  the rent with the design center; is that right?

22  A.   That's correct, we did.

23  Q.   So you needed to get out of there?

24  A.   Yeah, we needed to make a business decision to get out

25  of there.  Yes.  The design center wasn't beneficial to us

430

Direct - Ryan Davis

1   at all.

2   Q.   Now, where did you move to?

3   A.   Well, we eventually went into our warehouse for a

4   little while.  We had two offices there and, of course, our

5   warehouse and a small little showroom there.  We were there

6   for a little while until we found another showroom and

7   warehouse out by Tile Row, which is I-70 and Quebec, and

8   that's where most manufacturers have moved to now.  So we

9   went out and kind of camped out where all the other guys

10  were.  We found a facility off what they call Tile Row.

11  Q.   There's been some discussion of the warehouse having a

12  display area in it -- in it as well.

13  A.   Uhm-hum.

14  Q.   Do you recall that?

15  A.   Yes.

16  Q.   In moving from the design center into the warehouse,

17  it's the warehouse and -- it's a warehouse and a hybrid.

18  A.   Yes.  I mean, we had a warehouse and then when you

19  walk in the front door, there was some office areas and

20  a -- and kind of a large conference area.  So we turned

21  that into where we put our displays and some of our samples

22  and, of course, put some desks in there.  So we were

23  operating out of there until we could get our showroom up

24  and moving down by Tile Row, yeah.

25  Q.   Was it less expensive at that point to not have to pay

Direct - Ryan Davis

1   design center and be able to operate out of the warehouse

2   for a period of time?

3   A.   It was about -- it was about a quarter of the price of

4   what we were paying down at the Denver Design District.

5   Q.   High rent.

6   A.   Extremely high rent.  I mean, you're down in the

7   Denver Design District, extremely high rent, so . . .

8   Q.   Why did you get on such a high rent place in the first

9   place?

10   A.   Because, again, when we first got on with the design

11   district, those were the players that we wanted to be.

12   And, again, we were only for six months until they went

13   over to retail and that crippled us a little bit.  Again,

14   I'm not placing blame but at the same token, it hurt us.

15   Q.   Did Crew take on that high rent knowing that it was

16   going to be losing money but at the same time had this

17   protection with the exclusivity agreement?

18   A.   Absolutely.  Again, we wanted to get into the right

19   spot, and we felt like at the time when we signed the

20   lease, the Denver Design District was the right spot for

21   us, even though it came with a high expense.

22   Q.   And then from the warehouse and showroom combo, you

23   ultimately opened up -- moved to a different showroom; is

24   that right?

25   A.   That's correct.  We found a showroom down off of, like

Direct - Ryan Davis

1   I said, I-70 and Quebec where we had a showroom and a

2   warehouse attached together.  So even the logistics of it

3   was a lot better for us, too.

4   Q.   Now, the money -- the back rent owed to the design

5   center, what became of that?

6   A.   Well, we knew that we had some issues.  I mean, the

7   design center let us go for quite a while and we worked

8   with them for quite a while and we knew that it was going

9   to become an issue, so eventually knowing that it was going

10  to be an issue, and they said that they couldn't work with

11  us anymore, we sought an attorney to find a compromise with

12  them so that we could get a solution to the problem.

13  Q.   Do you know if your mom signed a personal guarantee on

14  that lease?

15  A.   She did, yes.

16  Q.   And did Crew Tile actually confess a judgment agreeing

17  that the amount money was owed?

18  A.   We did.  We owed the money, yeah.  There was no doubt

19  about it.  We confessed to it and said, Yes, we owe you the

20  money.

21  Q.   And Crew Tile still owes the money; isn't that

22  right?

23  A.   Correct, yeah.

24  Q.   And does Crew intend to pay it back if they can,

25  right?

433

Direct - Ryan Davis

1   A.   Absolutely, yeah.   We had every intention to pay it

2   back.

3   Q.   And is it -- is Operation Shut Down affecting Crew

4   Tile's ability to make money so it can pay it back?

5   A.   Yeah.   That's -- that's one of the catalysts we felt

6   pretty comfortable about making that decision in 2012

7   because the way that things were going, and then to find

8   out a year later that we just didn't have any more options,

9   yeah, it was disheartening, but, yeah, we felt comfortable

10  in 2012 making that decision and confessing and saying we

11  will get you paid because we were out working and things

12  were working for us.

13  Q.   Now, going back to this April 2013 time frame where

14  defendants claim that the contract was forged out.   When

15  that copy was circulated around on e-mail, is that the

16  first time the contract existed?

17  A.   Are you -- are you talking about the template or the

18  Sark or the second e-mail?

19  Q.   Let me show you the second e-mail.   This is Defense

20  Exhibit B-26.   Already admitted.

21       This is the -- attached from Shana Bastemeyer,

22  second page is the distributor agreement here; ultimately

23  scanned and signed.   Is that the first time this contract

24  existed?

25  A.   No.

434

Direct - Ryan Davis

1   Q.   How do you know that?

2   A.   Because I was there when this thing was signed.   I

3   signed it myself and I watched my mom sign it and I watched

4   Jack sign it.

5   Q.   Now, did you ultimately talk to a lawyer around this

6   time?

7   A.   We were trying to get a meeting with a lawyer, yes.

8   Q.   Why did you want to go talk to a lawyer?

9   A.   Well, because they just said that they were taking

10  over the Colorado territory and they were going to shut me

11  off and I had an exclusivity agreement.   I needed to go see

12  a lawyer to find out what type of actions I had, what type

13  of grounds I could stand on.

14  Q.   Now, did you go forward -- did you ultimately go

15  forward with another contract with a manufacturer?

16  A.   We did not, no.   Eventually I guess that I -- in a

17  sense, I was scrambling to find some things on these jobs.

18  And I finally reached out to Ray and I said, Ray, I'm

19  frustrated with this.   I need some guidance from you.   And

20  I need to figure out what we're going to do because I have

21  an obligation to a lot of my customers and clients.

22          And that's when Ray told me, There's nothing you

23  can do.   I know that might hurt a little bit, but don't do

24  anything because right now we are under contract, too, and

25  if we start performing and start doing other things, we

Direct - Ryan Davis

1   can -- we can put ourselves in some hot water, too.  So,

2   unfortunately, he told me you got to cutoff whatever you're

3   doing right now and we need to go talk to somebody, we need

4   to go find counsel and figure out what this is all about

5   before we make any more decisions.

6   Q.   Now, at this point in time, did Crew still have two

7   copies of the contract?

8   A.   We did, yes.

9   Q.   And do you -- does Crew still have two copies?

10  A.   No, my mom wound up losing one after the first

11  attorney that we went and saw.

12  Q.   So you still have an original?

13  A.   We do.

14  Q.   And we have been looking at Exhibit 46, which is

15  plaintiffs' exhibit, which is a copy of it, but do you

16  still have the inked signature copy?

17  A.   I believe it's in you guys' possession after -- yeah,

18  we turned it over to counsel as soon as we could.

19  Q.   The inked signature page, it still exists, right?

20  A.   Correct, yes.

21  Q.   Now, let's talk about summer of 2013.  It's on the

22  time line there.  It's kind of in the orange period.

23  What's happening with Crew Tile?  Did business remain the

24  same after that April 2013 conference call?

25  A.   No.  Like I -- like it's been said, I don't know how

Direct - Ryan Davis

1    to state it better, we were slow-played, we were

2    slow-played on everything we did, from phone calls, return

3    phone calls, pricing, e-mails, samples, racks.  We were

4    slow-played across the board.

5    Q.    Was it -- was it obvious to you that Porcelanosa was

6    making good on their decision to take over the Colorado

7    market?

8    A.    I was starting to become -- I was starting to become

9    fairly convinced, yes.  I still was holding out hope, but

10   at that point in time when it continued to happen, it -- I

11   was starting to become convinced that this -- this was

12   going to work -- I was -- I was getting cut out, yeah.

13   Q.    If we could publish Exhibit 159, please.  Oh, I'm

14   sorry, before that, 150.  Sorry.  Okay.  Before down on the

15   bottom, let's move down here.

16        Okay.  So this is an internal e-mail for

17   Porcelanosa-USA, the date on this, June 20th, 2013, so a

18   little more than two months after Operation Shut Down; is

19   that right?

20   A.    That's correct.

21   Q.    Okay.  And this is -- do you know who William

22   Velasquez is?

23   A.    Yeah, William's been with them for a long time.  He

24   worked with them back when I worked with them.  He's a

25   warehouse and sample guy for them, or was.

Direct - Ryan Davis

1   Q.   So what -- if you can give us each a quick read.   It

2   looks like we're Napal samples?   What is William

3   communicating to Jeff here?

4   A.   He's just saying that there's some product that's

5   available in New Jersey, and but the Napal, another

6   product, Napal product was only available in Spain.   And

7   it's basically saying if you need orders, you need to place

8   an order with customer service and to get it approved from

9   New Jersey -- customer service and get the approved -- get

10   it approved from Paco.

11        They wanted to bring one piece from New Jersey in

12   about a week and a half and one piece from Spain, about

13   another week.

14   Q.   Okay.   So this -- if I understand, this is William

15   within Porcelanosa communicating with Jeff Schnepp within

16   Porcelanosa about some samples on a project and getting

17   them coordinated from various places?

18   A.   That's correct.

19   Q.   All right.   Summer of 2013.   If we could go up on this

20   exhibit, please.

21        And now this is Jeff Schnepp.   It looks like now

22   he's seeking the approval from Paco Montilla for this,

23   right?

24   A.   Yeah.

25   Q.   And can you read for me what it says here when Jeff

438

1    writes, "Paco," what does it say?

2    A.   It says, Will you approve 12 by 12 cut samples for

3    Crew Tile?  I know, I know, still trying to keep them

4    selling until we get there.

5    Q.   You're not on this e-mail, are you?

6    A.   I'm not.

7    Q.   What's your understanding of what is being

8    communicated here between Jeff Schnepp and Paco internally

9    at Porcelanosa?

10   A.   It looks like they're leading me on.  They want me out

11   working on projects.  They want me to continue to give them

12   information and they're not working with me, it sounds to

13   me, like I said, they're -- they're internally talking

14   about how they're going to get rid of me and how they don't

15   want to work with me any more, and here it is, they want to

16   keep me going until they can get there and actually take

17   over the rest of my stuff.

18   Q.   How do you interpret the, "I know, I know"?

19   A.   Like I said, obviously there's a lot of communications

20   between the two of them and, "I know, I know," kind of -- I

21   don't know, it just -- it's disrespectful, obviously, so I

22   mean, it's game play, it looks like.

23   Q.   Was Jeff Schnepp communicating to you during the

24   summer of 2013 that they were just trying to -- we're

25   talking, that, what, 12 by 12, so it's a one-foot cut

439

Direct - Ryan Davis

1   sample?

2   A.   That was -- that was it.   This was for a large project

3   that we were working on, too.

4   Q.   So they're -- did they tell you that they were trying

5   just to keep you selling until Porcelanosa got out there?

6   A.   No.   Like I said, on my end, all I knew is that they

7   were still working with me, but I felt that I was getting

8   slow-played, so . . .

9   Q.   Did Paco Montilla ever communicate to you that they

10   were internally communicating about this slow play you're

11   talking about?

12   A.   Again, I was pretty disappointed when I saw some of

13   these e-mails.   I knew nothing of these e-mails before this

14   process started.

15   Q.   You saw these e-mails in this litigation, right?

16   A.   Yeah.   Once this litigation started, this is the first

17   time I saw that they were having these conversations behind

18   my back.

19   Q.   If we could move on to Exhibit 159, please.

20           And this is a -- first off, did you see this

21   letter?

22   A.   I did.

23   Q.   Did they send it to you?   Let me rephrase.   Did

24   Porcelanosa send this letter to Crew Tile?

25   A.   We never got a copy of the letter, no.   We never got

Direct - Ryan Davis

1    it sent to us by Porcelanosa.

2    Q.    Were you -- did you consider yourself to be a valued

3    Porcelanosa customer as of October 31st, 2013?

4    A.    I thought I was the valued customer out here.

5    Q.    Do you recall who provided you with a copy of this

6    letter?

7    A.    One of our customers -- actually one of our customers

8    started reaching out to us asking us what this letter was

9    about.

10   Q.    And when you got this letter, what did you think this

11   letter was about?

12   A.    This was it.  They're doing it.  And they're -- and

13   it's -- they're now doing it through Texas rather than

14   LA.

15   Q.    So let's walk ourself through it.  So, first off, who

16   is proud to announce that Colorado's market is being taken

17   over?  Who's that --

18   A.    Porcelanosa-USA.

19   Q.    And who did you understand Porcelanosa-USA to be?

20   A.    All the Porcelanosa entities in the United States.

21   Q.    And --

22   A.    I always knew them as Porcelanosa-USA, always.

23   Q.    And is Porcelanosa-USA the same entity that's on the

24   contract from 2009, the exclusivity agreement with Crew

25   Tile?

441

Direct - Ryan Davis

1   A.   Yes.

2   Q.   What's the date on this letter?

3   A.   It's November 1st, 2013.

4   Q.   The date upper right.

5   A.   Oh, October 31st, 2013.

6   Q.   Did you get it on October 31st, 2013?

7   A.   I didn't get this letter until one of our customers

8   showed it to us.

9   Q.   Halloween, right?

10  A.   Yes.

11  Q.   Was it a trick or a treat to you?

12  A.   It was a trick.

13  Q.   Now, the -- they talk about here that the warehouse

14  and customer service department in Texas, which is in --

15  closest in proximity to Colorado, will be able to provide

16  better service to fulfill all of your needs.

17          Now, did you have a warehouse here in Colorado?

18  A.   I did.

19  Q.   Did you have customer service available in Colorado?

20  A.   I did.

21  Q.   Were you in the closest proximity to Colorado?

22  A.   Yes.

23  Q.   That's a dumb question.  You were in Colorado, right?

24  A.   Yes.

25  Q.   At this point in time -- well, were you able to

442

Direct - Ryan Davis

1    provide good service to everybody that you needed to by

2    this time -- point in time?

3    A.   No.  By this time we were pretty much completely shut

4    off.  We weren't -- we would try to order product and we

5    wouldn't get it, so . . .

6    Q.   So were some customers disappointed with you -- with

7    Crew Tile by the time late summer, early fall rolls around,

8    2013?

9    A.   Yes.  Yes, I think they were not -- they understood my

10   situation and they knew that I was doing everything that I

11   could.

12   Q.   Were you able to provide a level of service that

13   you --

14   A.   No.

15   Q.   -- had been before?

16   A.   No, like I said, Shana -- we were out of work come

17   September of 2013, there was nothing to do.  I mean, it

18   wasn't -- you go to work and there's nothing to do.  You

19   couldn't get product.

20   Q.   So without product, can you do business?

21   A.   Can't make a living, no.

22   Q.   Zoom out on this real quick.

23        The -- this mentioned a couple of peoples here,

24   Sara Borsiaga and Terry Douglas.  Were those Crew Tile

25   employees?

Direct - Ryan Davis

1    A.   I had never heard of those names prior to this, so I

2    don't know.

3    Q.   Do you know if they were people who were hired on by

4    Porcelanosa to now come in and work the territory that Crew

5    Tile had?

6    A.   You know, the only -- yeah, the only assumption that

7    gives me is that they are Porcelanosa-USA e-mail addresses,

8    so, again, I'm assuming they were either new support staff

9    or new sales reps that were going to come out.

10   Q.   Did you lose any customers because Crew Tile couldn't

11   get Porcelanosa product in order to provide customers with

12   what they need?

13   A.   Well, we eventually lost all of them.  I guess we

14   didn't lose them, they were taken from us.  So, yes, we

15   eventually lost all of our customers because they were

16   taken all from us.

17   Q.   Now down at the bottom of this letter, talking about

18   your understanding in this transition, look forward to

19   working with you.  Is that -- is that different than what

20   had been going on since December of 2009?

21   A.   Yes.  I mean, obviously we were the -- we were the

22   guys out here in town, so . . .

23   Q.   And who wrote -- who sent this letter?

24   A.   I don't know if I can tell you who --

25   Q.   I'm sorry, not who.  Who's it from?  "Thank you" from

444

Direct - Ryan Davis

1  who?

2  A.  Porcelanosa Texas.

3  Q.  What's your understanding of who Porcelanosa Texas is?

4  A.  I didn't know about Porcelanosa Texas until this

5  actually came up.  Porcelanosa Texas in '09 didn't exist;

6  in '10 I don't believe, exist; '11, I don't believe it

7  existed.  Porcelanosa Texas was fairly recent.

8  Q.  You get this letter.  Is it your understanding that

9  now the Porcelanosa Texas is effectively going to be the

10  Crew Tile for Colorado?

11  A.  Yes.

12  Q.  You said earlier that eventually Porcelanosa took all

13  of your customers; is that right?

14  A.  Yeah.  That's correct.

15  Q.  Jeremy, if we could publish Plaintiffs' Exhibit 107,

16  please.  Okay.  So let's start at the top.

17  Date on this, January 7th, 2014.  Who's this

18  addressed to?

19  A.  That's addressed to me.

20  Q.  Did you get it?

21  A.  I did.

22  Q.  It looks like it was sent to you by registered and

23  certified U.S. mail, return receipt requested.  Really

24  wanted to get you the letter, huh?

25  A.  They did, yes.

Direct - Ryan Davis

1   Q.   What are they telling you here?  What's the regarding?

2   What's the discussion?

3   A.   This is a letter from Manuel that's terminating

4   everything we have with Porcelanosa, even -- even being a

5   dealer.  We couldn't even being a dealer.  They were

6   terminating everything.

7   Q.   Now they're talking about an exhibitor agreement.

8   What -- what is that?

9   A.   That's just an agreement for one of the displays.

10  Q.   Okay.  Just for the display, a little kind of getting

11  ahold of these things?

12  A.   That's correct.

13  Q.   So let's move down further in the letter.  On the

14  second paragraph of this, starting, In addition, so they're

15  telling you you can't use the displays anymore.  What are

16  they -- what are they telling you here?

17  A.   They're saying that they no longer will fulfill our

18  orders or use our displays; however, if there's any orders

19  within the next 30 days that we have, they'll place those

20  and honor those orders.

21  Q.   All right.  So in the 30 days -- let's walk through

22  this.  They're telling you on January 7th, they're happy to

23  honor any orders that you're willing to place that are

24  presently pending, right?

25  A.   That's correct.

Direct - Ryan Davis

1  Q.   Okay.  Or within the next 30 days, if you make new

2  orders, they're happy to honor those.

3  A.   Yup.

4  Q.   Okay.  And then so following the expiration of the

5  aforementioned 30-day period, Porcelanosa will no longer

6  recognize Crew Tile and its affiliates as a retailer of

7  Porcelanosa products and will not supply or distribute

8  Porcelanosa product for Crew Tile's wholesale, resale, or

9  use.

10       When you read that sentence, what did you

11  understand it to mean?

12  A.   I got 30 days to do whatever I can to put the projects

13  that I have, because it's all technically coming to an

14  end.

15  Q.   Okay.  So after 30 days, it's your understanding that

16  they're not going to sell you anything.

17  A.   They wouldn't sell me a thing.

18  Q.   Now, let's move on beyond that.  This next sentence.

19  As has always been the case, Porcelanosa is not expressly

20  or impliedly responsible for compensation, reimbursement or

21  damages on account of any loss of prospective profits or

22  anticipated sales or on account of expenditures, inventory,

23  investments, leases or commitment in connection with the

24  business or goodwill of Crew Tile.

25       So let's talk about that.  So you -- they tell you

Direct - Ryan Davis

1    they're not responsible for reimbursement, damages on any

2    prospective profits.   Did you have pending projects going

3    right there?

4    A.    We did.

5    Q.    Was the DIA expansion still a pending project?

6    A.    Yes.   In fact, we had a purchase order at that time

7    with DIA for the expansion, the final purchase order.

8    Q.    And so -- and in addition -- DIA is not the only

9    project you had going, right?

10   A.    Yeah, we had several projects, we had purchase orders,

11   we had everything.

12   Q.    Okay.   And one of those things would be expected

13   profits, right?

14   A.    Yes.

15   Q.    And anticipated sales, right?

16   A.    Yup.

17   Q.    And the -- everything that you've been doing up to

18   this point for, now, several years, is expenditures, right,

19   inventory, investments, leases, commitments?

20   A.    That's correct.   Everything that we had put into it

21   they are saying that they're not going to be responsible

22   for.

23   Q.    Right.

24   A.    That's what they say.

25   Q.    And the goodwill of Crew Tile, what goodwill had you

448

Direct - Ryan Davis

1    guys been building over the last few years?

2    A.    The entire market.  I mean, our effort, our energies,

3    my money, the time that I put in the displays, the money

4    that I bought those displays with, they just walked in and

5    took it all from me.  So, yeah, they knew that I had

6    goodwill.  They absolutely knew that I had goodwill.  In

7    fact, they -- in a sense, that's admitting that you're

8    stealing my goodwill from me.

9    Q.    So in this letter, are they -- they're telling you

10   they're not going to provide you any product, they're not

11   going to do business with you any more, and any losses that

12   you incur, too bad; is that right?

13   A.    That's what they said.  That's not what I'm going to

14   take.  I'm not going to stand for what this says, no.

15   Q.    Is that why you're in this courtroom today?

16   A.    That's exactly why I'm in this courtroom.  I'm not --

17   I'm not agreeing to this.  Absolutely not.  They know darn

18   well what they did.

19   Q.    Now, this letter, they don't mention termination of

20   the exclusive distributorship agreement, do they?

21   A.    Nope.  They don't.

22   Q.    Now, in -- since this time, they've been disowning the

23   existence of that agreement, right?

24   A.    Yes.  Since this time.  Conveniently since they cut us

25   off, they now said this thing never -- never existed.

Direct - Ryan Davis

1    Q.   And let's go down to the bottom here.  Let's figure

2    out who is this -- they tell you further on -- next

3    paragraph -- perfect.  Right there.

4         So concurrent -- they're telling you you can't use

5    trademarks, trade names, patents, copyrights, designs,

6    drawings, intellectual property belonging to

7    Porcelanosa-USA, right?

8    A.   That's what it says, yes.

9    Q.   And your exclusive distributorship agreement gives you

10   the right to use that intellectual property, right?

11   A.   Absolutely it does.  Like I said, in fact, we had been

12   doing it all the way up until this point with no problem.

13   Q.   Now, who signed this letter?

14   A.   I -- again --

15   Q.   Whose name is at the bottom?

16   A.   Manuel Prior.

17   Q.   Who's Manuel Prior?

18   A.   He's the director for Porcelanosa-USA.

19   Q.   Is he sitting right here in this courtroom?

20   A.   That's him, yes.

21   Q.   Now, with Prior -- was Manuel Prior in the room with

22   you in 2009 when you signed the exclusive agreement with

23   Jack Handley and Paco Montillo?

24   A.   Manuel was not there.

25   Q.   Was Manuel at the -- at any of the meetings where you

Direct - Ryan Davis

1    took meeting minutes, met with Jack Handley and Paco

2    Montilla in 2010 when Paco Montilla came out to apologize

3    for not honoring the agreement?

4    A.    I never once had had a meeting or a conversation with

5    Manuel Prior outside of this letter.  This is the first

6    contact I ever had with Manuel Prior since I had been

7    dealing with Porcelanosa.

8    Q.    Do you know what became of Porcelanosa's business in

9    Colorado after January 2014?

10    A.    Yeah.  They built a massive showroom in the Denver

11    Design District right where mine was and they went out and

12    started servicing all my displays and calling on all my

13    dealers.  Yeah, that was -- that was the time that they

14    were hitting the streets.

15    Q.    Exhibit 174, not yet stipulated.  Please don't

16    publish.

17          Mr. Davis, do you recognize this?

18    A.    I do.  I do.

19    Q.    What is it?  Without reading it, what is it?

20    A.    It's an e-mail from one of my customers that was going

21    to place the order for the DIA expansion project saying

22    that --

23    Q.    Don't get into it, please.

24    A.    I apologize.

25    Q.    And how do you recognize this e-mail?

Direct - Ryan Davis

1    A.    Because it was sent directly to me.

2    Q.    And is this an accurate copy of it?

3    A.    That is the copy of it, yes.

4              MR. CROUGH:  Your Honor, I move to admit

5    Plaintiffs' Exhibit 174 into evidence.

6              THE COURT:  Is there any objection?

7              MR. THOMAIDIS:  Your Honor, yes.  We do object to

8    this document.

9              THE COURT:  On what grounds?

10             MR. THOMAIDIS:  We have no -- we have no idea

11   whether it's authentic.

12             THE COURT:  Any other grounds?

13             MR. THOMAIDIS:  I mean, he has no subject

14   matter -- well, I guess he does.  The only thing I can say,

15   Your Honor, is that I don't know that -- can you scroll

16   down, please -- yeah, I'm sorry, Your Honor, we can't be

17   sure that this is an authentic document.  I have no issue

18   aside from that.

19             MR. CROUGH:  Your Honor, if I may lay foundation

20   as a business record.

21             THE COURT:  Go ahead.

22   BY MR. CROUGH:

23   Q.    Was this -- down at the bottom, is this an e-mail that

24   was generated originally from Crew Tile -- or sorry, from

25   it looks like, Paradigm Tile Distributor e-mail?

452

Direct - Ryan Davis

1    A.    It came from that address, yes.

2    Q.    It came from that address?

3    A.    It was -- yes.

4    Q.    You're cc'd on the first e-mail, right?

5    A.    Correct.  This is an e-mail I sent and I got a

6    response.

7    Q.    And the next e-mail is a string.  Is this an e-mail

8    that you would keep as a business record for Crew?

9    A.    Yes.

10   Q.    Did you keep it in the ordinary course of business?

11   A.    Yes.  I mean, it's in my e-mails, yes.

12   Q.    Is it part of your business practices to keep e-mails

13   like this in order to keep track of business you're doing

14   with your customers?

15   A.    That's correct, yeah.

16   Q.    Did you have -- did you keep this e-mail as a part of

17   a routine business record for the operations of Crew Tile?

18   A.    Yes.  Absolutely.

19           MR. CROUGH:  Your Honor, I move again to admit

20   174.

21           THE COURT:  All right.  Do you have any other

22   grounds for your objection other than authenticity?

23           MR. THOMAIDIS:  Not at this time, Your Honor.

24           THE COURT:  All right.  Objection overruled.

25   Exhibit 174 is admitted into evidence.

Direct - Ryan Davis

1           (Plaintiffs's Exhibit 174 received)

2       BY MR. CROUGH:

3       Q.   Mr. Davis, you can look at the top of this e-mail.

4       First off, date is January 27th, 2014.  Do you see that?

5       A.   I do.

6       Q.   And this is 20 days after the letter you received from

7       Manuel Prior on January 7th telling you that Crew Tile is

8       not getting any more business, right?

9       A.   Yes, this is from my customer that was awarded the DIA

10      expansion project.

11      Q.   You already anticipated my next question.  Who is Kurt

12      Bowers and where did he work?

13      A.   Kurt Bowers is a project manager over at Floors.

14      Floors was awarded the DIA expansion project.

15      Q.   So can you read the first sentence that Mr. Kurt

16      Bowers writes to you.

17      A.   It says, Good morning, I was told by Porcelanosa this

18      morning that you guys were no longer a distributor and that

19      I was to start to process my order directly with them.

20      Q.   Skipping the next sentence, it starts, I am sorry --

21      it looks like there's an extra space put in for whatever

22      the point -- I'm sorry, my hands are tied because I'm being

23      directed by the manufacturer.

24           Who did you understand the manufacturer to be?

25      A.   Porcelanosa told them that they wouldn't sell us the

Direct - Ryan Davis

1    product for it, so that they needed to sell it direct to

2    them.

3    Q.   Okay.   The last sentence here, Again they stated that

4    we are no longer to process orders with you guys.   Who's

5    "you guys"?

6    A.   Us as Crew Tile Distribution.

7    Q.   Well, they're -- is it your understanding that

8    Porcelanosa is now not only sending letters to your

9    customers telling them to order from Texas, they are

10   reaching out to your existing specifications and telling

11   them, Do not buy from Crew Tile?

12   A.   That's exactly what this says.

13   Q.   What's the last thing down here that he writes to you,

14   starting again with, I'm sorry.

15   A.   I'm sorry that you spent the time on this specific

16   situation.   I would suggest calling them directly and work

17   on this.   Maybe you can get paid a fee or something.

18   Q.   Because -- would Crew Tile have made a margin on the

19   sale?

20   A.   We would have done well on the sale, yes.

21   Q.   And, again, so this is for the south terminal

22   redevelopment project, the Denver International Airport,

23   right?

24   A.   This was the big order that we had been working on for

25   several years.

Direct - Ryan Davis

1    Q.   And in getting a specification, you expect a

2    manufacturer to honor that specification, right?

3    A.   Absolutely.   We turned over the information.   We write

4    it down on a project registration form and we turned it

5    over to Porcelanosa, so they have all of our vital

6    information.

7    Q.   And isn't that the whole point of these specification

8    forms is to make sure that projects like this don't get

9    stolen?

10   A.   That they get -- that we get protected after we

11   specify them, yes, and we never -- we were protected all

12   besides from them.   We were -- we were protected by quite a

13   bit except by Porcelanosa.

14   Q.   Now, there's a chart over here.

15           MR. CROUGH:   Your Honor, may I approach again

16   quickly and I'll wrap this up by 5:00.

17           THE COURT:   Okay.

18           MR. CROUGH:   Okay.   I'd like to use defendants'

19   chart here.   I'll use the . . .

20   BY MR. CROUGH:

21   Q.   Mr. Davis -- excuse me -- we don't have much time

22   here, so I'm going to ask you:   Is this an accurate

23   representation of approved Colorado dealers?

24   A.   No.

25   Q.   Why not?

Direct - Ryan Davis

1    A.   Because I can tell you information that's outside of

2    that list that they are not dealers.  For example, Sylvia

3    Canon that's on there was an Internet acquire.  She was a

4    homeowner.  She reached out to us.  We got her in contact

5    with a designer.  The designer bought the material.  The

6    objective was, is that she had to have a delivery on a

7    Saturday morning.  I delivered the material to Sylvia

8    Cannon.  She is an elderly woman that lives in Colorado

9    Springs in a house.

10             I know for a fact Sylvia Cannon is not a dealer

11   because she was a homeowner that I stood in her bathroom

12   when I delivered the tile for her.

13             The other things when I see up there --

14   Q.   Well, one more.  Who's No. 36 on that list?

15   A.   That's me personally.

16   Q.   And whose address is that?

17   A.   That's our address.

18   Q.   So are you -- you're being added on here as a new

19   dealer as of January 7th, 2013?

20   A.   Yeah.  It looks like I'm there at that one and on No.

21   3.

22   Q.   And No. 3, okay.  This is -- well, Crew Tile,

23   that's -- that's Crew Tile before you guys came on, right?

24   That's Crew Tile being added as a -- a dealer now?

25   A.   That's correct.

Direct - Ryan Davis

1    Q.   Is Crew Tile a dealer?

2    A.   At that point, we were, but obviously after December

3    14th of '09, we weren't.

4    Q.   Any other folks on here that are not dealers, that

5    look like homeowners to you?

6    A.   Yeah.  I can tell you that No. 9 and 10 are false,

7    too, because Acierno Boyer are the specifiers of Yogaland.

8    I know that because I'm the one that specified that.  And I

9    can tell you right now that Yogurtland isn't a dealer of

10   tile.

11              THE COURT:  Mr. Crough, why don't we leave it

12   there for the day.

13              MR. CROUGH:  I've got literally two minutes.  Do

14   you want me to wrap up?

15              THE COURT:  And then you're done?

16              MR. CROUGH:  And then I'm done.

17              THE COURT:  I thought you had longer to go.

18   BY MR. CROUGH:

19   Q.   Mr. Davis, you're aware that you are being sued

20   personally in this case, right?

21   A.   I am.

22   Q.   You're aware that your parents and your fiance are

23   also being sued personally in this case.

24   A.   I'm aware of that, yes.

25   Q.   Now, is -- do you consider Porcelanosa to be a big

458

Direct - Ryan Davis

1    company?

2    A.   Massive, yes.

3    Q.   And they told you in January of 2014 that you're going

4    to get nothing like it, they're going to take your

5    customers, they're not going to sell you any more business,

6    and you don't have any recourse; is that right?

7    A.   That's correct.

8    Q.   And what's happened since you tried to fight back?

9    A.   I mean, we've been -- we've been in this process since

10   then.

11   Q.   They've been trying to squash you?

12   A.   Yeah, absolutely.  Obviously they're throwing claims

13   at me, they're throwing false accusations, they're doing

14   everything and the bus to get away from this.

15   Q.   What are you being sued for?

16   A.   Forgery, conspiracy, lying, cheating.  I mean,

17   criminal things.

18   Q.   Did you take any part of forging a contract at any

19   time with Porcelanosa?

20   A.   Absolutely not.  And I don't even know how I can say

21   absolutely not in a more definitive way.

22   Q.   Is there any way the contracts could have been forged

23   in the spring of 2013 like defendants allege?

24   A.   Obviously you saw it.  Like I said, I saw it with my

25   own eyes.  There's evidence that there's not.  No.  I was

Direct - Ryan Davis

1    there.  I saw it.  I signed it.  I know what happened.

2    Q.   A broader question.  Would you take part in a forgery

3    of any document?

4    A.   Absolutely not.  Again, definitive, absolutely not.

5    Q.   What about your background educates your moral

6    compass?

7    A.   Well, I think my background stands for why I'm

8    standing here right now.  I -- I think that they thought

9    they were going to squash me and I wasn't going to stand

10   back up.  I'm standing here right now because of my

11   background because I wasn't going to allow this to happen.

12   I wasn't going to allow these people to come in and use my

13   work, my family's work, my word, the fact that I got people

14   to invest in, trust and valor inside of this, and not only

15   did you come in and take it from me but you turned around

16   and blamed me for it.

17        So yeah, I -- I'm literally beside myself when

18   they make these claims.  It's just not, hey, we did it,

19   we're moving on.  Hey, we did it and now we're throwing you

20   under the bus.

21   Q.   Now, Ryan, last question:  What does the concept of

22   valor mean to you as a military veteran?

23   A.   Everything.  Like I said, I served my country, and I

24   was willing to serve it for my entire life in Special

25   Forces.  I'm not going to stand up here and ruin my

1   credibility, my valor, and everything that I've worked with

2   because these guys want to say that I was up to conspiracy

3   or forgery.  It's absolutely untrue.  And blatantly it's --

4   it's wrong what they're doing.

5        MR. CROUGH:  Thank you, Your Honor.  No further

6   questions.

7        THE COURT:  All right.  Thank you.  We'll leave it

8   there for today.

9        All right, ladies and gentlemen of the jury, just

10  like yesterday, I ask you to be back in the deliberation

11  room by 8:35 tomorrow morning, we'll start at 8:45.

12       Please don't discuss or do any independent

13  research into the facts, law, parties or lawyers in this

14  case.  All right.  We'll be in recess until 8:45.

15       (Proceedings concluded at 5:01 p.m.)

16

17                          **INDEX**

18  <u>Item</u>                                              <u>PAGE</u>

19                  PLAINTIFFS' WITNESSES

20  **SHANA BASTEMEYER**
    Cross-examination by Mr. Thomaidis (Cont'd)   155
21
    **RAYMOND PERRY**
22  Direct Examination by Mr. Burg                 220
    Cross-examination by Mr. Thomaidis            253
23  Redirect Examination by Mr. Burg              289

24  **RYAN DAVIS**
    Direct Examination by Mr. Crough              291
25

PLAINTIFFS' EXHIBITS

| EXHIBITS: | Offered | Received | Refused | Stipulated |
|-----------|---------|----------|---------|------------|
| 18 | 308 | 309 | | |
| 23 | 308 | 309 | | |
| 24 | 308 | 309 | | |
| 28 | 308 | 309 | | |
| 31 | 308 | 309 | | |
| 37 | 308 | 309 | | |
| 38 | 308 | 309 | | |
| 39 | 308 | 309 | | |
| 42 | 308 | 309 | | |
| 44 | 308 | 309 | | |
| 55 | 308 | 309 | | |
| 57 | 308 | 309 | | |
| 63 | 308 | 309 | | |
| 77 | 308 | 309 | | |
| 82 | 308 | 309 | | |
| 86 | 372 | 372 | | |
| 87 | 369 | 369 | | |
| 88 | 308 | 309 | | |
| 98 | 308 | 309 | | |
| 110 | 308 | 309 | | |
| 118 | 308 | 309 | | |
| 150 | 308 | 309 | | |
| 170 | 308 | 309 | | |

PLAINTIFFS' EXHIBITS

| EXHIBITS: | Offered | Received | Refused | Stipulated |
|-----------|---------|----------|---------|------------|
| 102 | 237 | 237 | | |
| 159 | 251 | 251 | | |
| 174 | 452 | 452 | | |

DEFENDANT'S EXHIBITS

| EXHIBITS: | Offered | Received | Refused | Stipulated |
|-----------|---------|----------|---------|------------|
| A-16 | 156 | 156 | | |
| A-37 | 276 | 276 | | |
| A-69 | 281 | 281 | | |
| A-78 | 308 | 309 | | |
| A-84 | 163 | 163 | | |
| B-27 | 285 | 285 | | |

\*     \*     \*     \*     \*

REPORTER'S CERTIFICATE


    I certify that the foregoing is a correct transcript

from the record of proceedings in the above-entitled

matter.

    Dated at Denver, Colorado, this 1st day of May, 2017.



_                                          _

        MARY J. GEORGE, FCRR, CRR, RMR