1346

1       IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF COLORADO
2
    Civil Action No. 13-cv-3206-WJM-KMT
3
    CREW TILE DISTRIBUTION, INC.,
4
    Plaintiff and Counterclaim Defendant,
5
    and
6
    RYAN A. DAVIS,
7   DARLYNE A. DAVIS,
    GLENN L. DAVIS,
8   SHANA L. BASTEMEYER,
    PARADIGM TILE & STONE DISTRIBUTORS, LLC, and
9   G&D DAVIS HOLDINGS, LLC,

10  Counterclaim Defendants,

11  vs.

12  PORCELANOSA LOS ANGELES, INC.,
    PORCELANOSA NEW YORK, INC.,
13  PORCELANOSA TEXAS, CORP., and
    PORVEN, LTD.,
14
    Defendants.
15
    -------------------------------------------------------------
16
                REPORTER'S TRANSCRIPT
17              (JURY TRIAL, DAY 6)
                    VOLUME VI
18  -------------------------------------------------------------

19      Proceedings before the HONORABLE WILLIAM J. MARTINEZ,

20  Judge, United States District Court for the District of

21  Colorado, commencing at 8:49 a.m., on the 20th day of

22  March, 2017, in Courtroom A801, United States Courthouse,

23  Denver, Colorado.

24

25

1   APPEARANCES

2       MICHAEL S. BURG, DAVID K. TeSELLE, and DAVID J.
CROUGH, Burg, Simpson, Eldredge, Hersh & Hardine,
3   PC-Englewood, 40 Inverness Drive East, Englewood, Colorado
80112, appearing for the plaintiffs.

4

5       JAMES N. THOMAIDIS, JARED A. BARNARD and JONATHAN T.
LIEBER, Gersh & Thomaidis, LLC, 1860 Blake Street, Suite
400, Denver, Colorado 80202, and
6   D. ELIZABETH WILLS, Wills Law Firm, LLC, 20 South Cherry
Street, Denver, Colorado 80246, appearing for the
7   defendants.

8

9           MARY J. GEORGE, FCRR, CRR, RMR
           901 19th Street, Denver, Colorado 80294
10       Proceedings Reported by Mechanical Stenography
            Transcription Produced via Computer
11

12           P R O C E E D I N G S

13       (Proceedings in open court outside the presence of the

14   jury at 8:49 a.m.)

15           THE COURT:  All right.  We have a couple of things

16   to handle before the jury comes in.  First of all, with

17   respect to testimony this morning, I mentioned yesterday --

18   on Friday that Glenn Davis would be limited to 90 minutes

19   each.  Is he a cross-endorsed witness?

20           MR. THOMAIDIS:  He is, Your Honor.

21           THE COURT:  Okay.  So and I want to emphasize,

22   again when I put limits, it doesn't mean you have to go up

23   to those limits, you are always free to sit down at any

24   time.

25           So who will be handling Mr. Davis for the

1   plaintiff?

2        MR. BURG:  I will, Your Honor.

3        THE COURT:  How much time, Mr. Burg, do you want

4   to reserve for redirect?

5        MR. BURG:  20 minutes.

6        THE COURT:  Okay.

7        MR. BURG:  And I don't think I'm going to use my

8   hour and a half, but you never know.

9        THE COURT:  All right.  So, Deb, we'll give Mr.

10  Burg a warning at the 68th minute and the 88th minute.

11       And, Mr. Thomaidis, how much time do you want to

12  reserve for your cross?

13       MR. THOMAIDIS:  Like Mr. Burg, I hope we don't go

14  an hour and a half, but would I like to preserve 20

15  minutes, too, please.

16       THE COURT:  Okay.  So 70-20 split with the same

17  warnings.

18       Second thing, Mr. Thomaidis, are we going to go

19  directly to a motion when defendant rests or is it your

20  request still that Mr. Domingot testify before a motion?

21       MR. THOMAIDIS:  Well, and, Your Honor, I would

22  like to get Mr. Domingot to testify as early as possible

23  today, only because he has to go back to California.  So I

24  guess my preference would be to put him on the stand, have

25  him testify, and then make any motions that are necessary.

1    THE COURT:  All right.  Okay.  Is there any

2    objection?

3    MR. BURG:  We have no objection, Your Honor.

4    THE COURT:  All right.  Then we'll go ahead and do

5    that.  We'll just -- you'll say in front of the jury the

6    plaintiff rests, you'll start your case, and they won't

7    know, really, why we're doing it, but I'll tell them we

8    need to take break, a recess as to them, to have argument

9    on the motion.

10    MR. THOMAIDIS:  Thank you, Your Honor.

11    THE COURT:  Yes.

12    MR. BURG:  Your Honor, on this whole issue of the

13    demonstrative and the -- I'd like to make a further record

14    on the absolute irrelevance of it --

15    THE COURT:  Oh, the --

16    MR. BURG:  If the Court finds that even though it

17    was not put on the list and it was never shown to us, but a

18    lot is going to allow it to be done, I have another

19    argument as to why it should not come in.  They would be

20    very brief.  Does the Court want me to do that now?

21    THE COURT:  No, that's not going to be necessary.

22    You anticipated where I was going next and I hadn't quite

23    gotten there yet.  We were still talking about Mr. Domingot

24    and the motion, or motions.

25    So we'll go with Mr. Domingot.  And, let's see,

1   how long have you listed him for?  Is he a cross-endorsed

2   witness?

3             MR. BURG:  He is not.

4             THE COURT:  He is not.  Okay.  Do you think you're

5   going to need a full two hours with him?

6             MR. THOMAIDIS:  At this point, I don't believe we

7   will.

8             THE COURT:  All right.  Well, we'll talk about

9   his -- the length of his examination later.

10             All right.  Turning to the issue of the

11   demonstrative exhibits, the tiles.  You -- for the record,

12   counsel have been in e-mail communication with my law

13   clerk, Mr. Foster.  He's reviewed those e-mails, he's

14   discussed them with me.  I've come to the conclusion that

15   those demonstrative tiles that the defendant wishes to show

16   to the jury were not appropriately disclosed to the

17   plaintiff prior to trial and are not listed on the exhibit

18   list so they will not be -- the defendant will not be

19   allowed to use those at trial.

20             Anything else before we bring in the jury?

21             MR. BURG:  Just, they can tell us who's going to

22   follow Mr. Domingot -- we were kind of varying different

23   people, we assume it's going to be Manuel Prior.

24             THE COURT:  Who's going to follow him?

25             MR. BURG:  Yes, in terms of the witnesses today.

1    THE COURT:  That's a good point.  Mr. Thomaidis,

2    is it your intent to follow the sequence of the witnesses

3    on your witness list or have you made any changes in those?

4    MR. THOMAIDIS:  Your Honor, at this point in time

5    I am trying to accommodate for the various subpoenas, so

6    what we had planned on doing is having Mr. Domingot testify

7    and then follow that by Ms. Jo Frank Mabary.

8    THE COURT:  Okay.  Ms. Frank will be second.  And

9    then who's after that?

10   MR. THOMAIDIS:  And then our hope is that the

11   person following that will be Wendy Kramer.

12   THE COURT:  Okay.  And then we will get the order

13   of the first four.  Who's coming in after Ms. Kramer?

14   MR. THOMAIDIS:  And then following Ms. Kramer --

15   oh, and then we would like to go ahead and take care of the

16   designated testimony of Ms. Sudovich.

17   THE COURT:  Okay.  All right.  That's good enough

18   for now.  And you recall my requirement that you disclose

19   the identity and order of the witnesses each evening before

20   the next day of trial.

21   All right.  Let's bring in the jury.

22   MR. BURG:  Your Honor, they have the names and

23   everything of this different kind of tile sitting where the

24   jury could see it, and it probably should be removed.

25   THE COURT:  Okay.  All right.

1   MR. THOMAIDIS:  It is extraordinarily heavy, so --

2   THE COURT:  Wow.  You can take it to the back room

3   there.

4   (In open court in the presence of the jury at

5   8:57 a.m.)

6   THE COURT:  Welcome back, ladies and gentlemen of

7   the jury.  I hope you enjoyed our beautiful weekend, now

8   it's back to work.

9   All right.  The plaintiff counterclaim defendants

10   may call their next witness.

11   MR. BURG:  Thank you, Your Honor.  At this time,

12   we would call Glenn Davis to the stand.

13   GLENN DAVIS, PLAINTIFFS' WITNESS, SWORN

14   COURTROOM DEPUTY:  Please be seated.  Please state

15   your full name for the record and spell your first and last

16   name.

17   THE WITNESS:  Glenn Lee Davis, G-l-e-n-n,

18   D-a-v-i-s.

19   DIRECT EXAMINATION

20   BY MR. BURG:

21   Q.   Thank you.  Good morning, Your Honor.  Ladies and

22   gentlemen of the jury, counsel.

23   Mr. Davis, can you tell the jury where you were

24   born and the year you were born.

25   A.   I was born in 1950 in a little agricultural town of

1   Sutherland, Iowa, in the northwest corner of Iowa.

2   Q.   How many people were in the town?

3   A.   800 on a busy day.

4   Q.   Okay.  And what did your -- what did your father do?

5   What was he --

6   A.   My father was a cabinetmaker, carpenter.  So in a

7   small town like that, you either built barns and cabinetry

8   or went hungry.

9   Q.   When did you start working on the farm or in the

10  cabinetry business?

11  A.   I started working with my father at the age of 10.

12  Q.   Okay.  And that was -- was that unusual for people in

13  your community?

14  A.   Not really.

15  Q.   Okay.  And when you were growing up in that small town

16  of Sutherland, can you tell the jury what sort of things

17  they taught you about being honest and -- let me ask you

18  this -- I withdraw that.

19       Was your family involved in the church in any way

20  back then?

21  A.   Yeah, my family was involved in the community and

22  church.  My father was a World War II veteran.  Both my

23  mother and father were on the church board and taught

24  Sunday school.  My father was a member of the Legion and my

25  mother was a member of the Women's Auxiliary, so they were

1   active in the community.

2   Q.   And was it your father that actually stormed the

3   Beaches of Normandy?

4   A.   Well, it --

5   Q.   Your grandfather -- was it your father?

6   A.   Yes.   Yes.

7   Q.   He was a World War II vet.   And he was the one that

8   Ryan talked about that he wanted to go into the service as

9   a result of your father's service, correct?

10  A.   Yes.   That's correct.

11  Q.   All right.   And what kind of moral lessons did you

12  learn when you were growing up on that farm and that your

13  parents taught you?

14  A.   As a -- as a child, I thought the whole world was

15  safe, honest, and sacred.   My hometown seemed like paradise

16  to me.   There wasn't anything wrong or evil.   I had a --

17  one instance as a youth playing summer baseball, Little

18  League baseball, a friend of mine wanted to borrow my

19  bicycle while I was playing ball and I told him he could.

20         At the end of the game I couldn't find my bicycle

21  or my friend.   So I walked home to our farm just outside of

22  town and found him laying there, talking to my father, with

23  my bicycle, and I knew something was more amiss than what

24  I -- than just my friend taking my bicycle.

25         And it turned out that my friend had used my

1   bicycle to go steal apples and gave the gentleman my name.

2   Then as -- that story is trivial, but has stayed with me my

3   entire life because it was my first exposure to losing

4   trust in someone.  My best friend was no longer my best

5   friend.

6   Q.   Did your father believe you when you told him it

7   wasn't you, that somebody had --

8   A.   Yes, he did.

9   Q.   -- taken your bicycle?

10   A.   Yes, he did.

11   Q.   And was that the first time in your life you were

12   wrongly accused of something?

13   A.   Yeah.  And it made me angry with my friend, that he

14   would do something like that.  He never really told me why

15   he would -- obviously to keep himself out of trouble, but

16   the betrayal factor was there.

17   Q.   Okay.  And did you meet your wife when you were in

18   high school?  Did you go to a dance?

19   A.   Yes, we did.  Small towns, 10 miles apart.  It used to

20   be the Saturday night entertainment was to go to the youth

21   dances, and it was a good time.  That was our activity for

22   the week.

23   Q.   Sounds like you fell pretty hard for her, you got

24   married pretty quickly?

25   A.   Well, no, not -- not real quick, but yeah, it was -- I

1    kind of always knew what I wanted in life with everything

2    and I always felt that when I make a decision, I make the

3    right decision.

4    Q.   How long have you and your wife been married?

5    A.   4- --

6    Q.   I'm sorry.

7    A.   Putting me on the spot.

8    Q.   A long time?

9    A.   48 years.

10   Q.   Okay.  And you had two children --

11   A.   Yes.

12   Q.   -- right?  And a son and a daughter, correct?

13   A.   A son and daughter, yes.

14   Q.   Uh-huh.  And Ryan is your son.

15   A.   Yes, he is.

16   Q.   And I think you -- I don't want to repeat and backup

17   much of the stuff, but you came to Colorado without having

18   jobs?

19   A.   Correct.

20   Q.   And you found a job.  What was your first job?

21   A.   Well, we both just -- my wife worked for a small

22   amount of time after she got out of school -- business

23   school in Minneapolis, Minnesota, and I had gone to a

24   private college there, private school.  Came out and needed

25   to start work immediately, pay rent.  So I took a job in a

1357

1    consumer electronics repair shop doing repair of television

2    sets and that sort of thing.

3    Q.    When you said you went to college, that was a

4    technical college?

5    A.    Yes, that's correct.

6    Q.    What you did you learn there, about mechanical --

7    A.    No, I got my degree in computer electronics.

8    Q.    Okay.

9    A.    And also studied communication electronics, got a

10   third class SEC license.

11   Q.    Okay.  And did you then go to work for, at that time

12   was a small division of AT&T?

13   A.    Yes, it was a manufacturing branch of AT&T called

14   Western Electric.  After several years, they changed their

15   name a couple of times, trying to decide who they wanted

16   that branch to be.  We were located in the building with

17   Bell Laboratories.  So I worked there for 36 years.

18   Q.    And during that time, this is the old United States,

19   were you allowed to get pension and stock and retirement if

20   you stayed with a company a long time?

21   A.    Yes.  The 36 years, correct.  Always enjoyed work.

22   Never regretted having to get up and go to work.

23   Q.    Did you teach your son about hard work and --

24   A.    Yes, I did.

25   Q.    -- doing what's necessary to --

1358

1    A.   Yes, I did.

2    Q.   -- do the best you can every day?

3    A.   Do the best you can and never give up.

4    Q.   Never give up.  That's, I guess, an important trait

5    for your family; is that true?

6    A.   Yeah, that's something that was -- I was taught by my

7    father, we -- he worked six days a week, 10 hours a day,

8    and I thought everybody did.

9    Q.   And at the last -- and did you have a lot of

10   responsibility when you had your last job with AT&T?

11   A.   Yes, I did.  I managed -- I managed a manufacturing

12   facility in a facility, and I had a little over a hundred

13   people that reported to me, direct reports.

14   Q.   And during that period of time, I assume you received

15   raises and promotions?

16   A.   Oh, yes.  Yes.  They rewarded you if you did well, and

17   if you didn't, you weren't around very long.

18   Q.   When were you first diagnosed with multiple sclerosis?

19   A.   In 1986.

20   Q.   And what were the symptoms that gave rise to you going

21   to see a doctor for it?

22   A.   We were on vacation and woke up one morning and I had

23   lost vision in my right eye, couldn't hear out of my right

24   ear, and my right leg was numb.

25         My children, of course, were small at that time, I

1359

1   didn't want to panic anyone, we were a couple hundred miles

2   from home -- our home in Broomfield.  So I suggested maybe

3   we leave early and they agreed, and suggested that my wife

4   drive home and I think she was kind of surprised by that

5   because I didn't give that task up easily.

6           And when we got home, I asked her to have the

7   neighbor watch the children and that she drive me to the

8   emergency room, where they diagnosed me a week later and

9   said I had it for about 10 years.

10  Q.   And are there two kinds of multiple sclerosis?

11  A.   Yes.  There's a fast acting, there's a progressive MS

12  in which you go downhill steadily, and eventually takes

13  your life.  And I'm blessed with the relapsing form in

14  which you have exacerbations brought on by fatigue, heat,

15  stress, that sort of thing, and when they -- when the

16  exacerbations goes away a lot of times you regain whatever

17  you lost, and other times you don't regain it, it's

18  permanent.

19  Q.   What did you -- did you take early retirement or quit

20  your job or -- as a result of the MS?

21  A.   No.  Nothing -- MS never got in my way.  I went for 22

22  years after without missing a day of work.

23  Q.   When -- today, are you wearing braces on your legs?

24  A.   Yes, I do.  I'm having trouble with my legs right

25  now.

1  Q.   All right.  We're going to get more into that.  Now,

2  after you retired and your wife retired -- before we do

3  that, are -- do you recall an incident in which your son

4  actually broke numerous bones in his foot jumping out of an

5  airplane when he was trying to get into Special Forces of

6  the Army?

7  A.   Yes.  Right out of high school, he decided he needed

8  some more discipline in his life, maybe, if you want to

9  call it that, and he joined the Army.  He loved boot camp.

10  He wanted to stay in boot camp, I think.  And he was

11  stationed down in Fort Carson.  And he was on maneuvers and

12  broke numerous bones in his foot and -- but he did complete

13  the maneuver, hiking out after he'd wrapped it up in duct

14  tape.

15  Q.   Do you know if he went 47 miles while his broken foot

16  was wrapped in duct tape?

17  A.   Yeah, you know, he went a long distance, 40 some

18  miles, correct.

19  Q.   Didn't give up, did he?

20  A.   No, he didn't.

21  Q.   Something you taught him?

22  A.   Yeah.  I don't know if I taught him to walk on broken

23  bones, but I taught him, you don't quit.

24  Q.   And after that, did he have some ideas about starting

25  a business?

1    A.    Yeah.   He -- he did -- he didn't know for sure what he

2    wanted to do.   He had worked for numerous other flooring --

3    small flooring companies.   And I don't know why he chose

4    flooring, but he did.

5    Q.    Did he work for Porcelanosa back in the early 2004

6    time frame, 2003?

7    A.    Yes, he did.

8    Q.    Okay.   Do you know if he went to Spain?   He was doing

9    so well at his job they sent him to Spain, do you recall

10   that, as to whether they sent him to Spain with architects

11   to learn about the products and pay for him to be over

12   there, to know more and more about Porcelanosa?

13   A.    Yes.   I believe he went possibly three times.   And he

14   took a number of different architects, engineers,

15   designers, that sort of thing, to Spain.   That was over a

16   product called the ventilated facades, I believe, which

17   hadn't been approved in the U.S. yet, but they were trying

18   to get it approved.   And Ryan was instrumental in becoming

19   one of the first in America to get involved with the

20   installation of that.

21   Q.    Did he talk to you about whether or not he was able to

22   make a living doing what he was doing?

23   A.    No -- yes, he did talk about it.

24   Q.    At Porcelanosa.

25   A.    I know he was struggling at the time.   He had a child

1362

1  on the way.

2  Q.   How often would you and he talk about some of his

3  dreams or ideas about trying to form a family business back

4  then, back in the early 200s -- 2000s, 2004, 2000 --

5  A.   Well, Ryan had always wanted he and I to get in to run

6  some sort of business together.  He never really wanted to

7  work for somebody else, other than me.

8  Q.   Okay.

9  A.   But he always wanted to have a business of his own and

10  that was kind of a dream of his, and at that point in time,

11  I felt like it might be too big of a challenge that I

12  wanted to take on, it would take too much money, too much

13  out of me.

14  Q.   Did -- at some point in time, did he -- and let me ask

15  you this:  You're familiar with Infinite Flooring?

16  A.   Oh, yes.

17  Q.   Would you describe that as a family business?

18  A.   Ryan -- Ryan started Infinite and it -- it became a

19  family business shortly after he started it.

20  Q.   And did you and your wife invest some money in that

21  business.

22  A.   Yes, we did.

23  Q.   And did you work in that business at all in terms of

24  the day-to-day running or management of that business?

25  A.   We kind of set an agreement at the beginning that I

1    wasn't going to be involved in a lot of the day-to-day

2    things.  Sometimes -- running a business would be

3    stressful, especially a small business.  You've -- you've

4    got so many commitments to make and you don't know where --

5    where and how the bills are going to get paid all the time,

6    and I -- I just felt I didn't need that pressure.

7         But I did -- I did do work as far as sometimes

8    handling some special issues that came up, but otherwise it

9    was mostly making sure that we had phone service -- I'm an

10   IT guy --

11   Q.   Do you also help in terms of some of the construction

12   work on the -- putting it together?

13   A.   Yes.  Yeah.  I helped on that support end of it, but

14   not on the -- not actually running the business.

15   Q.   And do you recall the economic crash that occurred in

16   2008 and 2009?

17   A.   Very well.

18   Q.   Do you recall whether or not they said it was the

19   worst economic circumstance in the United States since the

20   great depression?

21   A.   I think for housing, it was definitely the worst.

22   Q.   And did that affect Infinite and its ability to

23   survive during that period of time?

24   A.   Yes.  Infinite was involved in carpet, hardwood, tile,

25   vinyl.  And we had a group of installers that didn't -- did

1364

1   some of the installation and managed the jobs and

2   construction portion of it, and it was almost all

3   residential and that just -- the bottom just fell out of

4   it.

5   Q.   Okay.  And was there companies that weren't paying for

6   jobs that had been completed?

7   A.   Yeah, there's always people that feel that they don't

8   need to pay the bill after the work is done.  But it

9   really -- it really picked up at that particular time with

10  homeowners when we -- so we started to do some commercial

11  work.

12  Q.   Red Lobster and Olive Garden, did you do work for

13  them?

14  A.   We did several of them in the Denver area.  And

15  probably should have known better, because one of the

16  construction companies folded after this job was complete

17  and we didn't get paid --

18  Q.   Were you a subcontractor to that contractor?

19  A.   Yes.  And then they wanted us to bid on some

20  out-of-state work and we eventually got the bid on some of

21  out-of-state jobs.

22  Q.   Eventually, that business went out of business.  Did

23  you -- did you lose the amount of the money you put into

24  it -- some of it, anyway?

25  A.   Yeah, it didn't go out of business right away because

1365

1   of that but, yes, the money was pretty much lost.

2   Q.   And then how often would you and Ryan and your wife,

3   Darlyne, talk about the business?

4   A.   Daily, hourly.

5   Q.   Okay.  Pretty important for you putting retirement

6   money into it?

7   A.   Very important.

8   Q.   And then when did you -- did you first hear about Jack

9   Handley coming into Infinite and talking about you forming

10   a company to be their exclusive distributor for all

11   Porcelanosa's products, excluding Aspen and Pitkin County?

12   Do you recall?

13   A.   I recall my son talking about Jack coming into the

14   showroom and wanted to set a display, if we would set a

15   display.  We agreed to and started looking at some of their

16   samples.  Just above and beyond.

17   Q.   Beautiful.

18   A.   Above and beyond anything else we had seen.  And,

19   yeah, we started talking about becoming a distributor.

20   Q.   How did it make you feel?  I mean, were you excited

21   about it?

22   A.   You know, this was a Godsend to us.

23   Q.   This was in --

24   A.   This was the best thing that had happened.

25   Q.   Did you and your wife and your son talk about how much

1366

 1    money you would need to -- strike that.

 2              Did you have an understanding from Ryan that the

 3    Porcelanosa was going to require you to build a showroom, a

 4    really nice showroom?

 5    A.   We felt that we had to commit to having a nice show

 6    facility.  You had to do something that's equal to the

 7    quality and the appearance of the tile.

 8    Q.   Okay.  I want to go back, though.  When you were --

 9    when Infinite -- your wife talked about something, about

10    some double-wide trailer, office trailer, that you bought

11    and then, I think Mr. Thomaidis said you got sued for.

12              Can you explain a little more about what really

13    happened there.

14    A.   Yeah, there's a lot more to it.  My son and I went to

15    this facility, yard, storage yard, where this company

16    stored their mobile offices, double-wide.  And we had found

17    one that suited our needs.  They assured us that it was

18    fully plumbed and electrically ready and that the telephone

19    and data was all installed and ready to go.  What they

20    delivered was a totally different unit.

21    Q.   Did you complain and tell them they needed to take it

22    back?

23    A.   Yes, they had already placed it by the time -- of

24    course we're working, so it's at the end of the day, they

25    had already set it and tied it down, that sort of thing.

1   Q.   Did you finance it?  Was it through their financing

2   that you financed it?

3   A.   No.

4   Q.   Had to make payments every month?

5   A.   Sure.  We needed to make payments every month, and it

6   was like why would we pay for a pair of shoes that didn't

7   fit?  That's not --

8   Q.   Did you try to get them to take it back?

9   A.   Yes, we did.

10  Q.   And did they take it back?

11  A.   No.  Eventually, but no, not at our request.

12  Q.   They refused -- and you refused -- and you stopped

13  making payments as a result of that?

14  A.   That's correct.

15  Q.   Ultimately, did you sue them to try to get what you

16  had purchased back to make sure they gave you what you

17  really had ordered?

18  A.   No, we did not.

19  Q.   And when they sued you, did you fight them or what did

20  you do?

21  A.   We were -- we were busy trying to move forward.  We

22  thought we were -- we felt we were ready to do great things

23  with Porcelanosa and the new showroom, a different

24  showroom.  We didn't have the time or energy and it didn't

25  seem like it was financially feasible to try to dispute it,

1368

1    so we made a settlement and they agreed to it.

2    Q.    Did -- did you -- did you and your wife and your son

3    understand that you -- if you entered into this contract

4    with Porcelanosa for the exclusive distributorship in

5    Colorado, with the exception of Pitkin County and Aspen,

6    did you understand you probably were going to lose money

7    for the first two or throw years based on the economy, as

8    well as starting a new business?

9    A.    Oh, my understanding with starting small businesses is

10   that it's -- you are going to lose money for several years.

11   You need to expect that.  If you don't, you're going to get

12   a big surprise because it's difficult.  You're trying to

13   hire people, you're trying to -- you're trying to do

14   everything at once, and it takes a lot of money, a lot of

15   resources to do that.

16        And in the type of sales work or work where you

17   are dealing with other people, you have to go out and

18   establish those contacts.  That's probably the biggest

19   piece and the hardest piece of any business, is to get that

20   initial relationship going with somebody.

21   Q.    Okay.  And I want to take you up to prior to December

22   14th, 2009, did you and your wife and your son have

23   conversations about what you wanted in that agreement to

24   make you feel comfortable to go forward?

25   A.    Yes.  We had a very good relationship with

1369

1    Porcelanosa.

2    Q.    Prior to December of 2009?

3    A.    Oh, yes.  Yes.

4    Q.    Tell the jury a little bit about that.

5    A.    It seemed like any time we needed displays, samples,

6    any kind of support, they were there.  If there was any

7    type of breakage of materials, they took care of it.  I

8    mean, it was just a hand-in-hand relationship, so --

9    Q.    Were you placing displays like those into dealers even

10   prior to December 14th of '09?

11   A.    Yes, we were.

12   Q.    And was Porcelanosa delivering and giving you displays

13   and samples prior to December '09?

14   A.    Yes, they were.

15   Q.    Were you selling any of their product to the consumer

16   as opposed to dealers?

17   A.    Prior to 2009 --

18   Q.    Yes.

19   A.    -- is that correct?

20         I don't recall many consumers.  May have been

21   some, but I think most -- most of the relationships were

22   established with dealers.

23   Q.    You didn't have a written contract at that time.

24   A.    No.  No, we didn't.

25   Q.    All right.  And what provisions did you want in there

1370

1   before you were going to put up all the money to try to get

2   through the hard times before you would be able to start

3   making money?  What provisions did you want in there?  Did

4   you want -- how about the length of the contract, was that

5   an issue?

6   A.   It wasn't an issue.  We felt -- we felt going forward

7   that we were going to become a very large distributor and

8   we had -- we had a lot of contacts, we had a lot of dealers

9   that bought from us and we thought we were just going to

10  continue that growth --

11  Q.   Did you want seven years, was that something you and

12  your family discussed?

13  A.   Yes.  Originally we wanted seven years because we know

14  it takes four or five years just to get things going in the

15  right direction.

16  Q.   Ultimately, did Porcelanosa and Mr. Handley tell you

17  they would only give you five years?

18  A.   Well, they did tell me -- it came through my son,

19  correct.

20  Q.   And was that acceptable, even though you wanted seven?

21  A.   Yes, because it was always the opportunity to renew.

22  Q.   Okay.  And what about a provision in terms of that if

23  they didn't renew or if they didn't live up to the

24  contract, did you want some assurances as to an amount of

25  money that they'd have to pay you if they somehow came in

1   and didn't renew after you'd built up the business?

2   A.   Well, I had lost money the first time and I learned

3   quick.  So the second time around, yes, I needed some sort

4   of an insurance policy.  I -- my son and I talk at great

5   lengths about these kind of things and I told him that I --

6   I did have to have a guarantee.  I refused to put --

7   jeopardize my wife and my retirement without some sort of a

8   guarantee.  I mean, it's just common sense.

9   Q.   Did you and your wife and your son decide that you

10  thought $3.5 million would be fair?

11  A.   Originally with the -- when we were talking about

12  seven years, 3.5 seemed appropriate for what we saw as the

13  growth of the company.

14  Q.   And -- and now, you were not at the showroom when Mr.

15  Montilla and Mr. Handley and your wife, Darlyne, and your

16  son, Ryan Davis, were there on December 14th, '09,

17  correct?

18  A.   No, I was not.

19  Q.   Okay.  You heard Mr. Montilla say he wasn't at the

20  showroom.  Did you hear him say that under penalty of

21  perjury today -- I mean yesterday -- Friday, whenever that

22  was?

23  A.   I heard it.

24  Q.   Did you hear him say that?

25  A.   I heard it.

1372

1  Q.   Did your wife and Mr. -- and Ryan Davis and Jack

2  Handley say on the stand that he was at the showroom that

3  day?

4  A.   Yes, I did.

5  Q.   Okay.  And what was your understanding of why Mr.

6  Montilla and Mr. Handley were coming to Denver on that day,

7  for just the day?  Based on your discussions with your wife

8  and your son.

9  A.   It was solely for the purpose of looking at the

10 showroom, the Denver Design Center and signing the

11 contract.

12 Q.   All right.  When did you first see that contract?

13 A.   I saw it on the evening of December 14th, 2009.

14 Q.   And who showed you that?

15 A.   My wife.  She brought the two signed copies home with

16 her.

17 Q.   Okay.  And how did that make you feel when you saw

18 those two signed copies on December 14th, '09?

19 A.   Fantastic.

20 Q.   Fantastic why?

21 A.   Because it was the insurance policy that made me

22 comfortable to invest money to finish building out the

23 showroom and to put the money I knew I was going to have to

24 put in into the tile transactions.

25 Q.   Did you have any doubt on December 14th, '09, when

1    your wife showed you the contract, that you had an -- that

2    your family -- strike that, that Crew Tile had an exclusive

3    distributorship, excluding Aspen and Pitkin County?

4    A.    I read the contract to, yes, it's precisely that's

5    what it said.

6    Q.    Okay.  And after that contract was signed, did Mr.

7    Handley and Mr. Montilla start sending your Crew Tile all

8    the leads in the state of Colorado, to the best of your

9    knowledge?

10   A.    That was a huge bonus, in my opinion, because there

11   was so many leads that came in, and evidently they did them

12   by either phone or by e-mail, that came in from the other

13   dealers, some that we already were -- had done business

14   with, and a lot of them we hadn't.  So it was a -- it was a

15   blessing to have that many more contacts.

16   Q.    And then you saw the chart.  How much money did you,

17   your wife, and Mr. Ryan Davis put into the company

18   excluding the 50,000 that Mr. Perry put in, eventually,

19   sometime in May and June of 2010?

20   A.    Well, I know exactly numbers of what I put in and it

21   was just shy of 430,000.

22   Q.    When you say "you," you mean you and your wife?

23   A.    Correct.  I -- when I say "me," my wife is attached to

24   me.

25   Q.    All right.  Was it your understanding -- what was your

1374

1  understanding as to whether or not this was a family

2  business?  Was it a family business?

3  A.   Yeah, it was a family business, and I don't know that

4  we discussed that in great length.  We just felt that we

5  did it -- all of this together.

6  Q.   Okay.

7  A.   It was an understanding, I guess, that when my wife

8  and I put money into it, we were in.

9  Q.   Did you have promissory notes written up by some

10  lawyer before you put the money in --

11  A.   No.  We really didn't.  We trust each other's word.

12  Q.   Okay.  Did you -- do you know the difference between

13  an LLC and a partnership and a corporation?  Did you

14  understand all those legalese differences when you started

15  Crew Tile?

16  A.   When I read something, I understand the first line.

17  And after that, no.  No, I don't.  I'm -- I'm a novice at

18  that sort of thing.

19  Q.   Okay.  So did your son work hard in that business?

20  A.   Yes, he did.  Very hard.

21  Q.   Did he have a second business not only working

22  full-time for Crew Tile, but in the early mornings in the

23  winter and at night, he'd go out and plow Walmart parking

24  lots to make money so he could feed himself and his son --

25  his child?

1375

 1    A.   Yes.  Yes, he did.  Sometimes it was 24, 36 hours

 2    straight because he got done plowing snow and it was back

 3    to the showroom for business.  He -- he understood also

 4    that it's hard building a small business, especially with a

 5    child now, and he couldn't pull wage from us.  I mean, it

 6    would come out of my pocket to go into his.

 7    Q.   Right.

 8    A.   Difficult thing to sustain.

 9    Q.   They made a -- first of all, are you aware that they

10    have -- they have looked at every QuickBooks, every bank

11    account that you've ever had in Infinite or Crew Tile, that

12    they'd gone through it with their lawyers and their

13    accountants?

14    A.   I -- I suspect that they have, correct.  They have --

15    Q.   We have given them everything, haven't we?

16    A.   Yes.

17    Q.   All right.  And there was one little item in there

18    they wanted to point out to the jury about $1,000, and then

19    maybe $1200 that Crew Tile wrote to Infinite.  Do you

20    remember those?

21    A.   Yes.

22         MR. THOMAIDIS:  Your Honor, at this point he's

23    leading the witness.

24         THE COURT:  Sustained.

25    BY MR. BURG:

1376

1    Q.    Let me ask you, sir:   Why would Crew Tile write a

2    check for a thousand or $1500 to Infinite during that

3    period of time?

4    A.    Infinite was still an active business, which still had

5    bank accounts -- a banking account with it.  A pallet --

6    some of the pallets of tile are very heavy and very

7    expensive.  There's a credit limit on your debit card or

8    card that you use.  You can only do so many transactions

9    for a certain amount of dollars, and it was very easy to

10   exceed that limit in the -- in just one transaction.  Maybe

11   that limit is exceeded on the first transaction, so you

12   have to run the card again and sometimes you max out that

13   limit.  So Infinite still had a line of credit, still had a

14   bank account, so we used Infinite's line of credit to

15   complete the order.

16   Q.    And then would Crew Tile then pay back Infinite for

17   what they spent on that --

18   A.    Correct.

19   Q.    Okay.  Was that to make sure that the books were then

20   accurate?

21   A.    Correct.  Right.

22   Q.    Okay.  Now, during the first couple of years, were you

23   building a business?  Was things getting better?

24   A.    Yes.  I think -- I think you're always building the

25   business.  You always need to grow and adapt or you're

1   going to get left in the dust.

2   Q.   And through 2012, did the business continue to grow as

3   the economy got better and you continued to work hard?

4   A.   Almost -- almost magically it took a huge jump.

5   Q.   Were you excited about what was going on?

6   A.   Oh, yes, very.  Because if you do it the first year,

7   what are you going to do the second year, third year,

8   fourth year, and on and on.

9   Q.   And during that period of time, was -- did you ever

10  have any conversations with Mr. Handley or not really?

11  A.   Saying hello to him, shook his hand.

12  Q.   Would he come very often?  He'd come here to Colorado

13  a lot?

14  A.   He was here a lot, yes.

15  Q.   When he said there was -- he was only here five or six

16  times, does that seem like a correct amount as to how many

17  times he came here?

18  A.   Only if he's referring to in a six-month time frame.

19  Q.   Okay.  He was excited about the growth of the company,

20  to the best of your knowledge?

21  A.   Yeah, I believe he was because he supported us in just

22  about every way.  He helped --

23  Q.   And, in fact, was there times where people were --

24  dealers were trying to go direct and he actually jumped in

25  and stopped it?

1378

1  A.   That is correct.

2  Q.   And was that consistent with the agreement that you

3  saw on December 14th, 2009, that the dealers would not be

4  able to buy direct?

5  A.   That's why we felt so reassured that we had a great

6  relationship because he was doing those sort of things in

7  supporting those -- in doing exactly what we had talked

8  about with him.

9  Q.   Okay.  And in April of 2013, did Mr. Ryan Davis talk

10  to you about the phone call, the Close Down Denver -- Shut

11  Down Denver phone call about Porcelanosa going to go in and

12  put their own showroom in there?

13  A.   Talk is a very polite way of saying the conversation

14  that we had.  Yes, he did.

15  Q.   What did he tell you?

16  A.   That --

17  Q.   Generally.  I don't want to know, you know, what did

18  he say.

19  A.   That they were -- they were planning on opening a

20  showroom here in Denver.

21  Q.   Had -- had you already left the design center?  Had

22  you been evicted at that point in time from the design

23  center; do you know?

24  A.   Yes, we did.

25  Q.   All right.  Tell me a little bit about that.  Did

1    you -- did you build a new showroom?

2    A.    Yes, we did.    There was a -- I believe some sort of

3    fancy cabinetry type shop in the area that we had chosen so

4    we had to remove a lot of material and displays, walls,

5    that sort of thing, in order to put in our own.    It became

6    very labor intense because we did the floor --

7    Q.    Who did the labor?

8    A.    Our sales crew, Ryan, myself, my wife.    We had some --

9    some other people that we knew from the tile business

10   helped us lay some of the floor tile.    A lot of tile.

11   Q.    Did Mr. Montilla and Mr. Handley ever come to the new

12   showroom and see it, to the best of your knowledge?

13   A.    I believe Mr. Montilla did.    I know Jack Handley was

14   there lots of times.

15   Q.    Okay.    Did you become aware that Mr. Handley had been

16   fired prior to the April call that you and your son talked

17   about?

18   A.    Prior to it?    Yeah, oh, yes, yes, I did.

19   Q.    Okay.    And what -- when you found out they were going

20   to build a showroom, how did that affect you both

21   physically and emotionally?

22   A.    First of all, you get a big knot in your stomach and

23   that moves to your throat.    Devastated.

24   Q.    Was it -- did it cause your MS to get worse?

25   A.    Any -- any forms of stress that you're not -- any time

1   you're not prepared for something, the stress takes a toll

2   on you.

3   Q.   When did you start having to wear the braces on your

4   legs?

5   A.   On my right knee was several years ago; on my left

6   knee is probably in the last year.

7   Q.   Okay.  And when you found out that they were going to

8   come in and not honor their agreement, that they were going

9   to have their own showroom, did you and your wife and your

10  son have conversations about what you were going to do to

11  try to stay in business?

12  A.   Daily.

13  Q.   And --

14  A.   Daily.

15  Q.   And did you look at options about finding maybe

16  other -- other tiles or doing something different?  Did you

17  look at all the options?

18  A.   I don't know if we looked at all the options.  We

19  looked at other tile.  It -- it didn't meet our

20  expectations.  It would be a big change for us to try to

21  sell a different product.

22  Q.   Would you understand that you had to -- that you could

23  not sell pursuant to that agreement any competing tiles --

24  A.   Correct.  I -- I don't think there's any competing

25  tiles around from what I've seen.

1381

1   Q.   Did you hear Mr. Handley say the same thing, that

2   it's -- I think everyone said it's like the top of the line

3   and really nothing that would compete?

4   A.   It's above and beyond, and I think that's what led to

5   the big jump in sales with us is that it is something that

6   most people have never seen on the high-end line.

7   Q.   Was the economy getting better in 2013?

8   A.   Yes, it was.

9   Q.   And at some point in time, did you find out that

10  they'd sent a letter on Halloween 2013 to your customers?

11  A.   Yes, they did.

12  Q.   Telling them that they should buy directly from them

13  and not buy from you anymore?

14  A.   Devastating.

15  Q.   How did that affect you emotionally and physically?

16  A.   I think I started having more problems physically

17  because of my MS.  It took a toll on the whole family.

18  Q.   Why didn't you just quit?  They were now -- they --

19  basically this giant company is saying, We're not going to

20  sell through you anymore.  Why didn't you just quit?  Why

21  didn't you say, We're done, we can't do this anymore; I'm

22  physically sick?

23  A.   It doesn't matter.  We don't -- we didn't quit and we

24  had a contract that said we had a valid business

25  relationship, no reason to quit.

1382

1   Q.   Did you still -- did you continue to try to sell the

2   product at that point in time?

3   A.   Yes, we did, but unfortunately you can't fill a

4   customer or dealer order when you can't get the product.

5   Q.   Did -- at that point in time, did you start talking to

6   lawyers to see if you could find a lawyer that would take

7   your case?

8   A.   Yes, we went to see a lawyer.  I'm a little reluctant

9   about going to see attorneys.  We'd had a bad relationship

10   before trying to get money out of a -- out of one of the

11   contractors when we were Infinite, and we saw several

12   different lawyers, you have to use good attorneys.  That

13   was difficult and we determined it was going to cost too

14   much to recoup those expenses, so I had a bad notion about

15   attorneys.

16   Q.   Was the cure worse than the illness at that case, that

17   the cost of the attorney would be greater than what you

18   could -- by the time you got done, you would end up with

19   nothing?

20   A.   When you add in the fact that we paid all the

21   subcontractors and all the materials and didn't get paid,

22   yes, that would -- various --

23   Q.   Ultimately, did you hire us to bring this case?

24   A.   Yes, I did.  If we're going to hire an attorney, we're

25   going -- we need to get the best.

Case 1:13-cv-03206-WJM-KMT   Document 363   Filed 05/05/17   USDC Colorado   Page 38 of 269

1    Q.    Thank you.  That's a nice compliment.  We're trying.

2          Let me ask you -- let me ask you this:  After you

3    filed the lawsuit and they sued you, your wife, your son,

4    his fiance, for -- do you recall them doing that?

5    A.    Yes --

6          MR. THOMAIDIS:  Leading the witness, Your Honor.

7          THE COURT:  Do you recall.  That's not leading.

8    Overruled.

9    BY MR. BURG:

10   Q.    Do you recall them doing that?

11   A.    Yes, I do.  It's like having your picture plastered on

12   a Wanted poster.

13   Q.    Did you feel they were trying to intimidate you to get

14   you to drop the lawsuit by doing that?

15   A.    Oh, yes.  Yes, I think so.

16   Q.    Did you and your family talk about what you were going

17   to have to go through to bring this case all the way

18   through?

19   A.    We talked about it, but we had no idea what -- what

20   all was involved in any kind of -- the legalese of it.

21   We -- I'm totally unfamiliar with it.  Never had any kind

22   of problem like that before.

23   Q.    Did you -- did your -- was there ever any criminal

24   investigation, any -- did anybody ever come to your

25   house -- any policeman or anybody ever come to your house

1384

1  to ask you about this alleged forgery?

2  A.   No.

3         MR. THOMAIDIS:  Your Honor --

4         THE WITNESS:  No.

5         MR. THOMAIDIS:  -- defendants have never brought

6  any criminal charges in this case.

7         THE COURT:  Sustained.

8  BY MR. BURG:

9  Q.   Mr. Davis, let me ask you this:  If you had a

10 written -- if you had a written contract and somebody

11 forged their name on your contract, would you go to the

12 police?

13        MR. THOMAIDIS:  Same --

14        THE WITNESS:  I suspect I would.  I --

15        THE COURT:  Hold on.  Is there an objection?

16        MR. THOMAIDIS:  Same objection, Your Honor.  And

17 as I --

18        THE COURT:  Is it --

19        MR. THOMAIDIS:  He's actually speculating, too.

20        THE COURT:  Overruled.

21        MR. BURG:  Thank you.

22 BY MR. BURG:

23 Q.   Would you agree that if someone would forge a

24 contract, that they should go to jail?

25 A.   Something needs to happen.  I -- I guess first I would

1385

1  find out what my rights are and get some sort of expert

2  help on it.  I don't know enough about those sort of

3  things, but yeah, that's not right.

4  Q.   Now, throughout this entire proceeding, they've also

5  sued -- well, strike that.

6       You didn't sign that agreement, did you, sir?

7  A.   The contract?

8  Q.   The December 14th, '09, agreement.

9  A.   No, sir, I was not there.

10  Q.   All right.  And even though it's a family business,

11  you had never been a shareholder in that business, correct?

12  A.   No, I have not.

13  Q.   But they sued you for that, didn't they?  Didn't they

14  sue you saying that you were -- you and everybody else was

15  in some sort of conspiracy --

16  A.   Correct.

17  Q.   -- forgery?

18  A.   Correct.

19  Q.   Did you understand you were fighting a giant

20  corporation that has lots of lawyers and lots of money and

21  sells into 116 countries?

22  A.   Yes, I did.

23  Q.   Did you understand that this lawsuit could -- could

24  really harm your health?

25  A.   It already had.

1386

1    Q.   Tell the jury how it's affected your health.

2    A.   I have noticed big changes in my walk and stand.  I --

3    I say -- I would imagine everyone else here has also seen,

4    witnessed it.  My vision in my right eye is changing again,

5    getting worse.

6    Q.   What has it done to your family?

7    A.   We have probably had more intense discussions in the

8    last couple of years than we've ever had altogether about

9    anything.  A lot of emotions; lots of emotions.

10   Q.   Did you and any of your family do any of the things

11   they have accused you of, to the best of your knowledge?

12   A.   No.  No, sir.

13             MR. BURG:  May I have one second, Your Honor?

14             THE COURT:  You may.

15             MR. BURG:  I have no more questions at this time.

16        Thank you, Mr. Davis.

17             THE COURT:  Thank you.  Cross-examination.

18             MR. THOMAIDIS:  Thank you, Your Honor.

19             MR. THOMAIDIS:  Your Honor, would you mind if my

20   colleagues put up our demonstratives quickly?

21             THE COURT:  Tell me the first part of your

22   question --

23             MR. THOMAIDIS:  Would you mind if my colleagues

24   put up the demonstratives?

25             THE COURT:  Oh, that's all right.

1387

Cross - Glenn Davis

1    MR. THOMAIDIS:  Thank you, Your Honor.

2              CROSS-EXAMINATION

3    BY MR. THOMAIDIS:

4    Q.   So, Mr. Davis, I'd like to go ahead and start with a

5    preliminary question, which is:  Who brought this lawsuit?

6    A.   Pardon me?

7    Q.   Who brought this lawsuit?

8    A.   Crew Tile.

9    Q.   And do you recall when they brought this lawsuit?

10   A.   I believe it was in late 2014.

11   Q.   Okay.  Do you recall when you first retained attorneys

12   in this matter?

13   A.   First retained them would have been, I believe, June

14   of 2014.

15   Q.   Okay.  The complaint in this matter was actually filed

16   on November 22d, 2013; does that --

17   A.   The complaint?

18   Q.   Correct.

19   A.   Does that mean that's when the lawsuit was --

20   Q.   That's correct.

21   A.   Okay.

22   Q.   Is that consistent with your recollection?

23   A.   I know it was something that was -- went on in 2013.

24   I didn't know that that meant actually filing the

25   lawsuit.

1388

Cross - Glenn Davis

1    Q.   Okay.  Do you recollect when you first consulted with

2    attorneys in this case?

3    A.   I couldn't give you the exact -- exact date.

4    Q.   And you testified previously that you are a novice at

5    business.

6    A.   Correct.

7    Q.   Is there a reason why you didn't seek the assistance

8    of an attorney when you were negotiating this claimed

9    contract that exists now that you've indicated was executed

10   on December 14th, 2009?

11   A.   First of all, our trust was in Porcelanosa.  We felt

12   that there was no reason to suspect anything that wasn't

13   legitimate.

14        Second of all, I have bad experiences with

15   attorneys.

16   Q.   But you indicated earlier that you learned at an early

17   age via having your bicycle used in a, I think a

18   misdemeanor -- I'm not a criminal attorney, but I think

19   that's right -- that that made you skeptical; would you

20   agree?

21   A.   You know, I wouldn't necessarily say skeptical.  I

22   said that it was my first experience with betrayal.  I

23   don't really think it changed the way I viewed people at

24   that time.  I was a small -- I was, I think, 12 years old.

25   Q.   So were you ever afraid that you might be betrayed in

Cross - Glenn Davis

1    this situation that you were entering into with Porcelanosa

2    Los Angeles or the other defendants?

3    A.    No, but as we -- as I said earlier, that's why we

4    wanted an insurance policy.  I couldn't afford to lose

5    everything again.

6    Q.    And so wouldn't an insurance policy have consisted of

7    having an attorney that you could rely on to give you

8    advice on the contract and keep records and check

9    negotiations and things like that?

10   A.    At that time, like I said, we had complete confidence

11   with Porcelanosa, felt no reason to -- that it was

12   needed.

13   Q.    Did Ryan Davis ever tell you he was fired from

14   Porcelanosa Los Angeles, Incorporated?

15   A.    I wasn't aware of that back in 2004, no.

16   Q.    Would that have created a situation where you might

17   have distrusted the defendants in this case?

18   A.    No, it would have caused me to want to find out a lot

19   more about what happened.

20   Q.    Did Ryan Davis ever tell you that he was fired for

21   dishonesty related to Infinite Flooring & Design and its

22   creation back in 2004?

23   A.    No, he did not tell me he was fired because of it.  I

24   was aware that -- obviously aware that he was trying to put

25   something together to start a business and I knew that it

1390

Cross - Glenn Davis

1  was some disagreement over that.

2  Q.   And did he tell you that that was a conflict of

3  interest with Porcelanosa Los Angeles pursuant to some of

4  the agreements and understandings he'd signed?

5  A.   Eventually, yes.

6  Q.   And so did that not cause you to distrust Porcelanosa

7  Los Angeles or the other defendants?

8  A.   I suppose that their point of view was probably

9  accurate.  If you would -- if you're competing with your

10  own job, I can see where there would be concern.  How that

11  is dealt with is, I guess, at their discretion.  I

12  didn't -- I wasn't made aware that there was a termination

13  from it.

14  Q.   So when were you made aware that Ryan Davis was fired

15  from Porcelanosa Los Angeles?

16  A.   When was I made aware of it?

17  Q.   Yes.

18  A.   I -- it was some numerous years later.  I guess it's

19  when I read it on some paperwork.

20  Q.   What paperwork did you read it on; do you recall?

21  A.   No, no, I don't.  I don't know the name of it.

22  Q.   And you indicated -- you indicated previously that

23  Infinite Flooring & Design was primarily engaged in

24  residential business; is that right?

25  A.   Correct.

Cross - Glenn Davis

1   Q.   But then you indicated that because of some deals

2   that -- with some work that was being done for, I think,

3   Red Lobsters and Olive Gardens, Infinite Flooring & Design

4   wasn't paid; is that right?

5   A.   That's correct.

6   Q.   What caused the transition from primarily residential

7   to Red Lobsters and Olive Gardens?

8   A.   The housing collapse.

9   Q.   And so, to the best of your recollection, what

10  happened to the debts that were owed to Infinite Flooring &

11  Design following these projects not being paid for?

12  A.   Most of our vendors required some sort of guarantee,

13  personal guarantees were given and the debts that the

14  company -- the company paid off some of the debts and it

15  came -- otherwise it came back on the person that

16  guaranteed, made the agreement with the dealer -- with the

17  vendor.

18  Q.   And perhaps I'm not -- maybe I'm not articulating my

19  question properly.  What happened to the money that

20  Infinite Flooring & Design was owed for these projects

21  involving Olive Garden and Red Lobster?

22  A.   What happened to the money that we were owed?  We

23  never saw it.

24  Q.   Did you ever pursue it?

25  A.   We pursued it, correct.

1392

Cross - Glenn Davis

1   Q.   How did you pursue it?

2   A.   With attorneys.  It was out of state and so you need

3   to use the attorney of that state.  And we're here trying

4   to run a business and the attorneys are asking questions;

5   very difficult to communicate.  They needed retainers, and

6   as they started spending time going through the paperwork

7   what needed to be done, of course we were billed for those

8   hours.

9        The first attorney changed firms and I guess

10   dropped -- dropped our case.  Went to a second attorney

11   and --

12   Q.   And, Mr. Davis, I'm sorry, in the interest of time --

13   A.   Okay.

14        MR. BURG:  Your Honor, he's trying to answer the

15   question fully.  I don't -- I think he should be allowed to

16   answer it.

17        THE COURT:  I'll let him finish this question,

18   but, sir, try to listen to the question that's posed and

19   answer only the question so we can move along.

20        THE WITNESS:  Okay.  All right.

21        THE COURT:  You can finish your question -- your

22   answer now.

23        THE WITNESS:  And the second attorney just used

24   this as a money resource, so we dropped it and moved on.

25   BY MR. THOMAIDIS:

1393

Cross - Glenn Davis

1    Q.    Okay.  And so the mantra that you mentioned earlier

2    about never giving up, you gave up on collecting those

3    monies; is that right?

4    A.    We didn't give up, we felt that our money was better

5    spent moving forward with Porcelanosa.

6    Q.    I see.  And so you mentioned previously, you remember

7    a company called Pac-Van, correct?

8    A.    That's right.

9    Q.    You remember being sued by Pac-Van as RG Crew

10   Construction Services, right?

11   A.    As RG Crew, correct.

12   Q.    You indicated, when Mr. Burg was questioning you, that

13   you found a double-wide office that suited your needs; do

14   you remember that?

15   A.    Yes, I do.

16   Q.    So how did that suit your needs?

17   A.    We were looking for a space we could use to display

18   tile, that was large enough to display tile, and also it

19   had provided the office space we needed.  It needed to be

20   wired for both phone and data.

21   Q.    And so if I understand your testimony correctly, you

22   were intending to display the Porcelanosa products that

23   you've testified are luxury and, really, without

24   competition, you were going to use -- you were going to

25   display these in this double-wide office that you had

1394

Cross - Glenn Davis

1   rented?

2   A.   Correct.

3   Q.   And you had rented that; is that right?  You hadn't

4   purchased it?

5   A.   No, we did not purchase it.

6   Q.   And so ultimately, when Pac-Van sued you, was it

7   because you hadn't paid for that rented double-wide office

8   space?

9   A.   That's correct.

10  Q.   And so whose fault would that have been?  Would that

11  have been Pac-Van or would that have been RG Crew

12  Construction Services?

13  A.   Well, it started out that they delivered the wrong

14  unit.  That didn't -- didn't live up to the agreement that

15  we had.

16  Q.   And so as it relates to that unit, did you ultimately

17  accept that unit?

18  A.   I guess we used it.  Accept it, we more or less fought

19  it the entire time we had it.

20  Q.   Did you use the unit?

21  A.   Yes, we did.

22  Q.   Okay.  And then did you pay for the unit?

23  A.   Yes, eventually we did.  We settled.

24  Q.   You settled or you paid for it?

25  A.   We settled.

1395

Cross - Glenn Davis

1    Q.   Okay.  Do you remember an attorney by the name of

2    Geil?

3    A.   Yes, I do.

4    Q.   How long did you pay settlement sums to the attorney,

5    Mr. Geil, as it relates to when you were sued by Pac-Van in

6    June of 2009?

7    A.   It must have been 2 1/2 years, maybe.

8    Q.   Did you ever complete the terms of that settlement?

9    A.   Correct.

10   Q.   And, so who did -- who did Infinite Flooring & Design

11   sell products and services to when it was in business?

12   A.   From the beginning, as I said, we did carpet,

13   hardwood, tile, so it was geared primarily at

14   residential.

15   Q.   And so you testified previously that you were -- you

16   had compiled a list of dealer relationships before Crew

17   Tile Distribution had come into being; is that right?

18        MR. BURG:  Objection.  Mischaracterizes his

19   statement.  He didn't say before Crew Tile came into being.

20        MR. THOMAIDIS:  I think he did.

21        THE COURT:  All right.  I'll -- the jury can

22   decide whether that mischaracterizes.  Overruled.

23        THE WITNESS:  Will you repeat the question,

24   please.

25   BY MR. THOMAIDIS:

1396

1    Q.    Sure.   You had testified previously that you were

2    building a list of dealer relationships prior to Crew Tile

3    Distribution, correct?

4    A.    Well, we obviously had a list of clients from

5    Infinite, but I don't know that that transposed into Crew

6    Tile, no.

7    Q.    And so why would you have had a list of dealers or

8    other retailers if you were selling to the retail public,

9    yourself, as Infinite Flooring & Design?

10   A.    I don't know that I said that we had a list of other

11   dealers.

12   Q.    So you testified that you had begun putting displays

13   in before Crew Tile Distribution.

14   A.    When we were Crew Tile, correct.

15   Q.    Right.   But you testified previously that you had

16   started doing that before you were Crew Tile.

17              MR. BURG:   Objection.   Same objection, Your Honor.

18              THE COURT:   Overruled.

19              MR. BURG:   He's now answered the question --

20              THE COURT:   Overruled.   You may answer.

21              THE WITNESS:   I don't recall saying that, but

22   obviously whatever information you have that's going to

23   promote your business, you are going to use it.

24         The work -- the groundwork was laid with Crew Tile

25   out pounding the pavement.

Cross - Glenn Davis

1    BY MR. THOMAIDIS:

2    Q.   And so why was -- why was this list being compiled

3    before Crew Tile Distribution began selling Porcelanosa's

4    products?

5              MR. BURG:  Objection --

6              THE WITNESS:  I don't know --

7              MR. BURG:  Sorry, I'll withdraw.

8              THE WITNESS:  I don't know that there was a list

9    that was compiled.

10   BY MR. THOMAIDIS:

11   Q.   Did you or did you not testify previously that you

12   began to put displays in other retailers --

13   A.   That is correct.

14   Q.   -- prior to Crew Tile and prior to this exclusive

15   distributor agreement?

16             MR. BURG:  Objection, Your Honor.  Asked and

17   answered.

18             THE COURT:  All right.  But I -- I'm going to

19   overrule it because I think counsel hasn't gotten the

20   definitive answer to the question I think he's trying to

21   get to.

22             THE WITNESS:  Yes, we did.

23   BY MR. THOMAIDIS:

24   Q.   Okay.  And so why were you doing that if Infinite

25   Flooring & Design was selling to residential retail

1398

1    customers primarily?

2    A.    Infinite Flooring & Design had nothing to do with it.

3    We did it as Crew Tile.

4    Q.    So you testified previously that you and your wife had

5    discussed the business hourly and daily; do you agree?

6    A.    Well, hourly, yes.  Not every day, but yeah, there was

7    days that it was a lot of discussion went on, correct.

8    Q.    Okay.  And so how often would you discuss the business

9    with Ryan Davis?

10   A.    Well, since Ryan wasn't living at home with me, not as

11   often as I discussed it with my wife, but we talked on the

12   phone every day about things.

13   Q.    And so how much of the information that you were

14   accumulating with respect to the businesses, whether it was

15   Infinite Flooring & Design, whether it was Crew Tile

16   Distribution, whether it was RG Construction Services,

17   whether it was Paradigm Tile & Stone Distributors, how much

18   of that information were you accumulating via your son,

19   Ryan Davis?

20   A.    The majority of it, I would say.

21   Q.    And how much hands-on work did you do at any one of

22   those businesses I just described?

23   A.    Other than the building and wiring of the showroom,

24   very little.

25   Q.    So, Mr. Davis, when was Infinite Flooring & Design

1399

Cross - Glenn Davis

1    formed, to the best of your recollection?

2    A.    Sometime in 2004.

3    Q.    Okay.  And when Infinite Flooring & Design,

4    Incorporated, came into being, who were its stockholders?

5    A.    It may have been 2000 -- late 2003; I correct myself.

6    Who were the stockholders?

7    Q.    Yes, please.

8    A.    To start with, it was my son's business.  It was in

9    his name.

10   Q.    Okay.  So when Infinite Flooring & Design,

11   Incorporated, came into being, who were its stockholders?

12   A.    Again, it was -- it became a family business.  I think

13   as far as stockholders, I mean, we never viewed it as

14   having stock, although I know that's -- I guess my son and

15   my wife and I.

16   Q.    Were there any other investors in Infinite Flooring &

17   Design, Incorporated?

18   A.    Yes.  There was, I believe, one other person.

19   Q.    And who was that?

20   A.    A woman by the name of Brenda McMillan.

21   Q.    And who was Ms. McMillan?

22   A.    A friend of my son's.

23   Q.    And so did Ms. McMillan put money in Infinite Flooring

24   & Design, Incorporated?

25             MR. BURG:  Your Honor, I don't see the relevance.

1400
Cross - Glenn Davis

1   Infinite is not a party in this case.  We've had a lot of

2   testimony --

3           THE COURT:  What's the relevance of an investment?

4           MR. THOMAIDIS:  Absent the discussion about

5   Infinite Flooring & Design, Porcelanosa Los Angeles, or any

6   of the defendants wouldn't have had any basis on which to

7   figure if Crew Tile's creditworthy, so I think Infinite is

8   pretty relevant here.  In addition to that, Ms. McMillen is

9   a stockholder or she was, or an investor in Infinite

10  Flooring & Design, would be a part of the consideration

11  that anyone would consider if they were going to enter into

12  a contract of substantial value with the plaintiff and

13  counter defendants.

14          MR. BURG:  Your Honor, Jack Handley went with

15  Infinite, he started the relationship that is the subject

16  matter of this case.  The fact that Ms. McMillan may have

17  invested money years before is totally irrelevant.

18          THE COURT:  I agree with Mr. Thomaidis.  The

19  objection's overruled.  You may answer.

20          THE WITNESS:  Okay, I apologize, I will need for

21  you to repeat the question again.

22  BY MR. THOMAIDIS:

23  Q.   Did Ms. McMillen ever put money into Infinite Flooring

24  & Design?

25  A.   I believe she did, yes.

1401

Cross - Glenn Davis

1   Q.   How much?

2   A.   I'm not certain how much she put into it.

3   Q.   Can you give me an estimation?

4   A.   No, I'm sorry, I can't.   I -- I don't know the exact

5   amount.

6   Q.   Was she ever repaid, to your knowledge?

7   A.   Yes, she was.

8   Q.   And how do you know this?

9   A.   My son repaid her.

10   Q.   And so if you know your son repaid her, how much did

11   your son repay?

12   A.   That would be a question for my son, I believe.   I

13   don't know.

14   Q.   I see.   So, Mr. Davis, how much money did you put into

15   Infinite Flooring & Design?

16   A.   Right at 300,000.

17   Q.   Okay.   And how much money did you lose in Infinite

18   Flooring & Design?

19   A.   Right at 300,000.

20   Q.   And so did that not cause you any concern as you went

21   into RG Construction Services or Crew Tile Distribution?

22   A.   It caused great concern.

23   Q.   And so were you willing to invest still more money

24   despite the fact you lost the previous 300,000?

25   A.   Only if I had reassurance, a guarantee of some sort.

Cross - Glenn Davis

1    Q.    And so what was that guarantee?

2    A.    It was the contract that was signed on December 14th

3    of 2009.

4    Q.    So what ultimately happened to Infinite Flooring &

5    Design?

6    A.    What happened to them?

7    Q.    Yes.

8    A.    The business stayed open for some time, and I don't

9    know exactly which year it was that we dissolved it.

10   Q.    And so why did you dissolve it?

11   A.    There was no reason to keep it open.

12   Q.    And so why did you not just continue Infinite Flooring

13   & Design, Incorporated?

14   A.    Infinite Flooring & Design was noted and marketed for

15   selling all different types of flooring.  We wanted to go

16   directly with just one supplier and that was Porcelanosa.

17   We wanted to stay on the high end so we felt we needed to

18   create a business for that.

19   Q.    Do you remember providing testimony in this case that

20   you wanted to, quote, unquote, start new and fresh?

21   A.    That's correct.

22   Q.    So does start new and fresh mean abandon your prior

23   obligations and debts?

24   A.    We did not abandon prior obligations and debts.

25   Q.    When Infinite Flooring & Design was dissolved, did it

Cross - Glenn Davis

1    have any business debts?

2    A.   No.

3    Q.   Are you certain?

4    A.   I'm relatively certain.

5             MR. THOMAIDIS:   Okay.   Your Honor, at this time, I

6    would like to mark trial Exhibit A-54 for identification.

7             THE COURT:   A-54.

8             MR. THOMAIDIS:   And this document is not

9    stipulated and not admitted.

10            THE COURT:   All right.

11   BY MR. THOMAIDIS:

12   Q.   Mr. Davis, I can give you a paper copy if you'd like.

13   You're just going to have to tell me if you can read that

14   comfortably.

15   A.   Yes.   I can.   Yes, I can.

16   Q.   Do you recognize this document?

17   A.   No, I can't say that I recognize it.

18   Q.   Do you recognize the name at the top of this document?

19   A.   Yes, I do.

20   Q.   Do you recognize underneath it the FDBA designation?

21   A.   Yes, I do.

22   Q.   Okay.   Does this help refresh your recollection as to

23   what this is?

24   A.   No, I still really don't recognize it.

25   Q.   Okay.   If we can go ahead and back up in this document

1404

Cross - Glenn Davis

1  and blow it up, and then please go to page 7 of 51.  If we

2  could please expand this at the bottom half, which is that

3  subsection 4.

4      Do you see that?

5  A.   Yes, I do.

6  Q.   And do you see that second piece of litigation?

7  A.   Yes, I do.

8      MR. BURG:  Your Honor, he -- this witness has said

9  he doesn't recognize this.

10     THE COURT:  Well, you asked him some questions

11 about -- well, overruled.

12 BY MR. THOMAIDIS:

13 Q.   Do you recognize the defendants in that case?

14 A.   I would assume that would be Infinite and Ryan

15 Davis.

16 Q.   Does that help you recognize this document?

17 A.   No, it really doesn't, but I see what it says.

18 Q.   If we could please back up to the full size page and

19 go to page 11 of 51.  If you could please blow up section

20 18.

21     And you'll notice there there's a name, an

22 address, beginning and end dates, and a description of the

23 business; do you see that?

24 A.   Yes, I do.

25 Q.   Does that look familiar to you?

Cross - Glenn Davis

1   A.   No, it does not.  The form doesn't look familiar to

2   me.

3   Q.   Does the name, the last four digits of the Social

4   Security number, the address, the nature of the business,

5   and the beginning and ending dates, do those look familiar

6   to you?

7   A.   The name does.  The address does.  The nature of the

8   business does.  Four digits of Social Security number, no.

9   Q.   And that can be an EIN number, does that -- do those

10  last four digits of that EIN number look familiar to you?

11  A.   No, it does not.

12  Q.   Okay.  So if I could please get you to back up to the

13  full size page and go to page 12 of 51.  And if I could get

14  you to blow up sections 21 and 22, please.

15          And you'll see there on the section titled Current

16  Partners, Officers and Shareholders.

17          MR. BURG:  Your Honor, he's reading into the

18  document --

19          MR. THOMAIDIS:  I have --

20          THE COURT:  This is sustained.

21          MR. THOMAIDIS:  Sorry.  I'll ask a different

22  question.

23  BY MR. THOMAIDIS:

24  Q.   Do you recognize the name in that Section 21?

25  A.   Yes, I do.  It's my name.

Cross - Glenn Davis

1  Q.   Okay.  And do you recognize the nature of the interest

2  there?

3  A.   Yes, I do.

4  Q.   And do you recognize the percentage of interest there?

5  A.   Yes, I do.

6  Q.   Okay.  And then if you'll move down to section 22, the

7  second section there, subsection B, it talks about if the

8  debtor's a corporation.

9       MR. BURG:  Your Honor, I object.  He's talking

10  about what's in the document.  This document is not

11  familiar, he's already asked the question about his

12  ownership in Infinite.

13       THE COURT:  He's -- don't talk about the contents.

14  Don't ask a question that has in the question the contents

15  of the document that's not admitted.

16       MR. THOMAIDIS:  I'm sorry, Your Honor.

17  BY MR. THOMAIDIS:

18  Q.   Is that subsection B consistent with your recollection

19  with respect to that entity?

20       MR. BURG:  Objection, Your Honor.  He said he's

21  not familiar with the document.

22       THE COURT:  Overruled.  If you know.

23       THE WITNESS:  I -- I see it, I read it, yes.

24  That's . . .

25  BY MR. THOMAIDIS:

Cross - Glenn Davis

1    Q.    And do you recall giving testimony -- excuse me, do

2    you recall hearing testimony about Defendants' B-69 which

3    was admitted, which were two form K-9s from Infinite

4    Flooring & Design, Incorporated, from 2009?  Do you

5    remember that testimony?

6    A.    Form -- what form?

7         MR. BURG:  Are you going to show him?  Is he going

8    to show him that exhibit?

9         MR. THOMAIDIS:  Sure.  That's fine.

10   BY MR. THOMAIDIS:

11   Q.    Let's go ahead and pull trial Exhibit B-69.  And ask

12   you, please, expand the first page so Mr. Davis can read

13   it.

14        Now, you've -- this document has already been

15   admitted as an exhibit.  It's a 2009 form K-1 for Infinite

16   Flooring & Design, Incorporated.  Would you agree?  And

17   this appears to be for about --

18   A.    Yes.

19   Q.    -- the K-1 for Ryan Davis indicating a 34 percent

20   ownership in Infinite Flooring & Design; is that right?

21   A.    Just a minute.  You're ahead of me.  Okay.  Yes.

22   Q.    And then if we could please turn to the third page of

23   this document.  If you could blow up that section.

24        And this appears to be a similar 2009 schedule K-1

25   for your wife, Darlyne Davis, would you agree?

Cross - Glenn Davis

1    A.    That is correct.

2    Q.    And this appears to show that 66 percent ownership

3    interest in Infinite Flooring & Design; would you agree?

4    A.    Yes.   That's what it says.

5    Q.    Okay.   So now let's go back and take a look at the

6    document that has been marked for identification as trial

7    Exhibit A-54.

8         And if we could please go to page 12 of 51.   Could

9    you please expand sections 21 and 22.

10        So, Mr. Davis, does this look accurate to you in

11   this filing?

12   A.    I -- it's hard to say what's accurate or not.   It's

13   showing that my name owns 49 percent.

14   Q.    And, Mr. Davis -- I'm not going to ask you to answer

15   that question at the moment.

16        At this point, Your Honor, I'd like to move for

17   the admission of trial Exhibit A-54.

18        THE COURT:   Any objection?

19        MR. BURG:   Yes.   No. 1, it's not his document.   He

20   said he's not familiar with it, he didn't file that

21   bankruptcy, it's not his, he doesn't have any knowledge of

22   the specifics of it.

23        It's -- he should have used this with Mr. Ryan

24   Davis if he wanted to get in this document.

25        THE COURT:   Well, that's a different point.   I

Cross - Glenn Davis

1  think I agree with you on that.  But Exhibit A-54 is the

2  voluntary bankruptcy petition, document 1, in the discharge

3  order from Bankruptcy Judge Campbell from the United States

4  District Court Bankruptcy Court, with the court's docket

5  entries on the top.  So I think in terms of authenticity,

6  that's been established.  And that is a court document,

7  particularly documents from this Court, comes in as a

8  public record.  So the objection's overruled.

9        A-54 is admitted into evidence and may be

10  published to the jury.

11     (Defendants' Exhibit A-54 received)

12        MR. THOMAIDIS:  Thank you, Your Honor.

13  BY MR. THOMAIDIS:

14  Q.  So, Mr. Davis, what I'd like to do is turn to the

15  first page of trial Exhibit A-54, please.  And if you just

16  expand the top part there of the page, that voluntary

17  petition.

18        So it appears here that Ryan Davis is filing a

19  voluntary petition for bankruptcy; would you agree?

20  A.  Yes, he filed for personal bankruptcy, correct.

21        THE COURT:  You know, Mr. Thomaidis, before we go

22  into detail on this exhibit, I think it will probably be a

23  good time for our morning break.

24        MR. THOMAIDIS:  Thank you, Your Honor.

25        THE COURT:  All right.  Ladies and gentlemen of

Cross - Glenn Davis

1  the jury, we will be in recess for 15 minutes.

2       (Recess at 10:22 a.m. to 10:42 a.m.)

3       THE COURT:  Mr. Davis, I remind you you remain

4  under oath.

5       THE WITNESS:  Yes, Your Honor.

6       THE COURT:  Mr. Thomaidis, you may resume your

7  examination.

8       MR. THOMAIDIS:  Thank you, Your Honor.

9  BY MR. THOMAIDIS:

10 Q.   So, Mr. Davis, you recall when we went off the record,

11 we were just beginning to talk about what has now been

12 marked as trial Exhibit A-54, right?

13 A.   I believe that's the number, correct.

14 Q.   So let's go ahead and start with the first page of

15 this document.  At the top there it says Davis, Ryan A.

16 Would you agree that's your son?

17 A.   Yes, it is.

18 Q.   And underneath there it says FBDA Infinite Flooring &

19 Design.  That's the company we've been talking about this

20 morning, correct?

21 A.   That's one of the companies, yes.

22 Q.   Okay.  And the date on this -- that this was filed,

23 this bankruptcy petition, was March 22d, 2011, would you

24 agree?  It's at the top stamp.  See it in blue at the top

25 there?

Cross - Glenn Davis

1  A.   Okay.

2  Q.   Would you agree that's the date this was filed?

3  A.   3-22-11, correct.

4  Q.   Okay.  And you'll -- if you go down -- well, let me

5  ask you a preliminary question.  Did this bankruptcy filing

6  include any debts belonging to Crew Tile Distribution,

7  Incorporated?

8  A.   It belonged to Crew Tile?

9  Q.   That's correct.

10  A.   No, not to Crew Tile.

11  Q.   And how do you know that?

12  A.   I don't see -- I don't see how it would.

13  Q.   Well, this bankruptcy filing was in March of 2011,

14  which would have been approximately a year and a half after

15  the exclusive distributor agreement you claim exists was

16  signed; would you agree?

17  A.   That is correct.

18  Q.   And it would have occurred about two years after you

19  testified previously that RG Construction Services was

20  originally formed; would you agree?

21  A.   Two years?  Approximately, yes.

22  Q.   So is any of the debt that's been discharged -- or

23  that is being requested to be discharged in this bankruptcy

24  petition, is any of that -- does any of that belong to Crew

25  Tile Distribution?

Cross - Glenn Davis

1  A.   No.  I -- to my knowledge, this is my son's personal

2  bankruptcy.

3  Q.   So let's go ahead and go down -- let's go ahead and go

4  to the seventh page of this exhibit, which is 7 of 51 -- of

5  page 54.  If you could please blow up the bottom section,

6  section 4.

7          And you provided some testimony without much

8  detail a few minutes ago, but do you recollect the second

9  piece of litigation that's listed under Suits and

10 Administrative Proceedings?

11 A.   I can't say that I recognize it.  I see what it says,

12 yes.

13 Q.   Do you see it as Dal-Tile Distribution, Incorporated,

14 versus Infinite Flooring & Design?

15 A.   Yes, I do.

16 Q.   Do you recollect what that was about?

17 A.   No, I don't.

18 Q.   Okay.  Was that litigation for failure to pay for

19 tile?

20 A.   I don't recognize what it is.  I don't know that.

21 Q.   Do you recognize the name Dal-Tile?

22 A.   Yes, I do.

23 Q.   What's Dal-Tile?

24 A.   They're a distributor of flooring materials and

25 supplies.

Cross - Glenn Davis

1  Q.   And you say flooring materials and supplies; do you

2  mean tile?

3  A.   I think that they supply a variety of materials.   I

4  don't know.  Yes, tile is one of them.

5  Q.   Okay.  Do you have any firsthand recollection of this

6  litigation?

7  A.   Looking at it here now, no, I don't recognize this --

8  this particular form.

9  Q.   Was this litigation for failing to pay for displays

10  and tile you bought as Infinite Flooring & Design?

11  A.   I'm not sure what the material is.

12  Q.   Was this litigation brought about specifically for

13  Infinite Flooring & Design's failure to pay for a -- pay

14  for a large display?

15  A.   I -- I don't know what it was for, sir.

16  Q.   Okay.  Let's go ahead and move to page 11 of 51 of

17  trial Exhibit A-54.  And if you could please expand that

18  section 18, at least to the best you can.

19       And this is the Nature and Location and Name of

20  Business; do you see that?

21  A.   Yes, I do.

22  Q.   So there's a company there, Infinite Flooring &

23  Design, Incorporated, do you recognize that name?

24  A.   Yes, I do.

25  Q.   Was this located at 1070 West 124th Avenue, Suite 100,

Cross - Glenn Davis

1   Westminster, Colorado?

2   A.   That's correct.

3   Q.   Would you say that Infinite Flooring & Design's end

4   date was 3-12, 2010?

5   A.   It sounds approximately correct, yes.

6   Q.   So that would have been approximately four months

7   after the execution of the purported exclusive distributor

8   agreement in this case, correct?

9   A.   That is correct.

10  Q.   So it appears that Infinite Flooring & Design, at

11  least according to this bankruptcy filing, was in existence

12  while this contract was as well, would you agree?

13  A.   I'm not -- I was not aware that Infinite Flooring &

14  Design was named in the bankruptcy.  I thought it was -- my

15  knowledge was that it was my son's bankruptcy.

16  Q.   Okay.  Well, you testified previously that your son

17  owned and operated a snow removal business; is that right?

18  A.   That's correct.

19  Q.   What was the name of the snow removal business?

20  A.   North Face Snow Removal.

21  Q.   Do you know, was North Face Snow Removal an LLC, a

22  corporation?

23  A.   I honestly cannot say for certain what it was.  I

24  don't -- I'm not sure how my son . . .

25  Q.   And I have a couple of tax returns here I can use to

Cross - Glenn Davis

1    refresh your recollection --

2    A.   I did not fill out his tax returns, sir.  I don't even

3    fill out mine.  We have an accounting service.

4    Q.   So to the best of your recollection, was it an LLC, a

5    limited liability company, was it a corporation?

6    A.   I do not know.

7         MR. BURG:  Objection, Your Honor.  Asked and

8    answered.

9         MR. THOMAIDIS:  I'm sorry, I'll --

10        THE COURT:  Sustained.

11        MR. THOMAIDIS:  -- withdraw the question.

12   BY MR. THOMAIDIS:

13   Q.   Is there a reason why North Face Snow Removal isn't

14   listed in the bankruptcy; to the best of your knowledge?

15   A.   I have no idea.

16   Q.   Would it have been a business that your son would have

17   been engaged in in March of 2011?

18   A.   2011?  I honestly can't tell you when he formed the

19   business, itself.  I don't think it was in 2010.  I -- I do

20   not recall the exact date, sir.

21   Q.   Okay.  Please turn to page 12 of trial Exhibit A-54.

22   And if you'd please expand sections 21 and 22, please.

23        So here's the section with the Business, Current

24   Partners, Officers, Directors and Shareholders; do you see

25   that?

1416

Cross - Glenn Davis

1   A.   Yes, I do.

2   Q.   And it shows you, Glenn L. Davis.  And is that your

3   home address?

4   A.   Yes, it is.

5   Q.   And it shows you as a shareholder with a 49 percent

6   interest in Infinite Flooring & Design; would you agree

7   with that?

8   A.   Yes, I see that, correct.

9   Q.   Would you agree that that's your percentage ownership

10  in Infinite Flooring & Design?

11  A.   No, I don't -- I don't see where it would be

12  49 percent.

13  Q.   So why is 49 percent included in this bankruptcy

14  filing?

15  A.   I --

16       MR. BURG:  Objection.  Calls for speculation as

17  to --

18  BY MR. THOMAIDIS:

19  Q.   To the extent you know.

20       THE COURT:  If he knows.

21       THE WITNESS:  I do not know.  I don't even know

22  who filled this form out.

23  BY MR. THOMAIDIS:

24  Q.   And we talked briefly about trial Exhibit B-69, which

25  were 2009 K-1s for Infinite Flooring & Design a few minutes

Cross - Glenn Davis

1    ago.  Do you agree?

2    A.   Yes, I saw -- I believe it was a K-1.

3    Q.   And those demonstrated that Ryan Davis was a 34

4    percent owner of Infinite Flooring & Design; is that right?

5    A.   I --

6            MR. BURG:  Objection, Your Honor.  Time frame.

7    One is 2009, one's 2011, the two exhibits he's using, so we

8    don't have a time reference.

9            THE COURT:  Sustained.

10           MR. BURG:  Thank you.

11   BY MR. THOMAIDIS:

12   Q.   May we please turn to trial Exhibit B-69.

13           And so this is the first page of trial Exhibit

14   B-69.  Do you remember hearing testimony about this

15   document previously?

16   A.   Yes, I do.

17   Q.   And so on this schedule K-1 for 2009, the tax year

18   2009, it says that Ryan Davis is a 34 percent owner of

19   Infinite Flooring & Design, Incorporated; do you see that?

20   A.   Yes, I do.

21   Q.   Would you agree with that?

22   A.   That sounds a little more accurate, yes.

23   Q.   Okay.  And then if you'd please turn to the third page

24   of this exhibit and expand that section.

25           And this would seem to show in the same year,

1418

Cross - Glenn Davis

1   2009, a schedule K-1, that your wife, Darlyne Davis, was a

2   66 percent owner in Infinite Flooring & Design; would you

3   agree?

4   A.   That's what it says, correct.

5   Q.   Okay.  Would you say that's accurate?

6   A.   If I agree to 34 and you subtract it from a hundred, I

7   get 66, correct.

8   Q.   And that's better math than I do, so thank you.

9   A.   You're welcome.

10  Q.   So let's go back to trial Exhibit A-54.  And if we

11  could please go back to page 12 of that exhibit.  And

12  expand sections 21 and 22.  Okay.

13       So this appears to show you, Glenn L. Davis, as a

14  49 percent shareholder in Infinite Flooring & Design; do

15  you see that?

16  A.   I see that.

17  Q.   Now, which is correct, this document or the K-9s that

18  we just looked at?

19  A.   I do not know who filled this form out, sir.

20  Q.   Well, this is your son, Ryan Davis', bankruptcy

21  filing.

22  A.   I understand that.

23  Q.   And he would have had to swear that this was true

24  prior to filing it.

25  A.   Are you asking me a question -- I'm not the person to

1419

Cross - Glenn Davis

1  answer that, I don't think.  I don't know.  I -- like I

2  said, I don't even know who -- what this form is or who

3  filled it out.  I --

4  Q.   Understood.  Would you agree that you had a 49 percent

5  interest in Infinite Flooring & Design in 2011?

6           MR. BURG:  Objection, Your Honor.  Asked and

7  answered twice.

8           THE COURT:  Sustained.

9  BY MR. THOMAIDIS:

10  Q.   I'll move on.

11           So in section 22 there, it says Former Partners,

12  Officers, Directors and Shareholders.  Do you see that?

13  A.   Just a minute.  Okay.

14  Q.   And the second subsection B there, it says:  If the

15  debtor is a corporation, list all officers or directors

16  whose relationship with the corporation terminated within

17  one year immediately preceding the commencement of this

18  case.  Do you see that?

19  A.   Yes, I do.

20  Q.   And it's marked None.

21  A.   I see that.

22  Q.   Should your wife, Darlyne Davis, have been included in

23  this bankruptcy filing as a -- as an officer, director?

24           MR. BURG:  Your Honor, I'm going to object.  Calls

25  for a legal conclusion as to a bankruptcy lawyer whether --

1420

Cross - Glenn Davis

1    what should have been done in a bankruptcy filing.

2         THE COURT:   Overruled.   It's asking for a

3    factual -- it's a factual question.   You may answer if you

4    know.

5         THE WITNESS:   I do not know.   I do not recognize

6    the form.

7    BY MR. THOMAIDIS:

8    Q.   So if we could please move on to page 18 of this

9    exhibit.

10        Now, you would agree that Crew Tile Distribution,

11   Incorporated, was in operation as of March 22d, 20011;

12   isn't that right?

13   A.   It's sounds like the right time frame, correct.

14   Q.   Okay.   If we could please look at section 13 there.

15        This is a schedule of personal property.   And

16   section 13 says, Stock and Interest in Incorporated and

17   Unincorporated Businesses Itemized.   Do you see that?   And

18   it's marked None.   Is there a reason why Ryan Davis'

19   interest in Crew Trial Distribution, Incorporated, wasn't

20   included in this bankruptcy filing on March 22d, 2011?

21   A.   Again, sir, I am not even aware of who filled this

22   form out.   I don't know where it came -- I don't understand

23   where it came from.   I'm not familiar with it.

24   Q.   Okay.   And what about North Face Snow Removal, is

25   there a reason why that isn't included in this section

Cross - Glenn Davis

1   regarding personal property and stock and interest in

2   incorporated and unincorporated businesses?

3   A.   As I stated, I'm not sure that it was in existence at

4   that time, so I don't know exact dates on it.

5   Q.   So let's go ahead and move to section 19, which is a

6   little further down the page.

7           And there it says, Equitable or future interests,

8   life estates, and rights or powers exercisable for the

9   benefit of debtor other than those listed in schedule A,

10  real property.  Do you see that?

11  A.   Yes, I do.

12  Q.   Is there a reason why the exclusive distributor

13  agreement of December 14th -- or dated December 14th, 2009,

14  isn't in this section?

15          MR. BURG:  Objection, Your Honor.  It's

16  speculation.  I don't even understand the question.  Maybe

17  I didn't understand.

18          THE COURT:  Overruled.

19          THE WITNESS:  Again, sir, I do not know who filled

20  this form out.  I know I didn't.  I don't know where the

21  form came from.

22  BY MR. THOMAIDIS:

23  Q.   So let's go ahead and move to section 21, please.

24          And there it says, Other contingent and

25  unliquidated claims of every nature including tax refunds,

Cross - Glenn Davis

1   counterclaims of the debtor, and rights to set-off claims.

2   Give estimated value of each.  Do you see that?

3   A.   Yes, I do.

4   Q.   Is there a reason why the exclusive distributor

5   agreement of December 8th, 2009, isn't included in this

6   section?

7   A.   My answer as everything else is the same, sir.  I am

8   not familiar with this document.  I don't know who -- I

9   don't know where it came from.  I don't know who filled it

10  out.

11  Q.   Okay.  Could we please move to page 25 of trial

12  Exhibit A-54.  And I'm going to ask that you pull up the

13  section regarding Capco.

14       So, Mr. Davis, do you recognize the company Capco?

15  A.   I recognize the name, correct.

16  Q.   What does Capco do?

17  A.   I believe they're a supplier.

18  Q.   Do they supply stone and tile?

19  A.   I am not sure if they supply stone.  I think they

20  supply tile or some sort of a tile supply.

21  Q.   And so it appears that $7,207 of debt related to Capco

22  and tile is being discharged or subject to be discharged

23  here; would you agree?

24       MR. BURG:  Your Honor, the exhibit is admitted,

25  the document speaks for itself, so you can go through each

Cross - Glenn Davis

1   and every one of these --

2           THE COURT:  I'm going to overrule that objection.

3   Are you planning on going through each of the creditors?

4           MR. THOMAIDIS:  I don't intend to, Your Honor.  I

5   was just going to hit the highlights.

6           THE COURT:  How many of those?

7           MR. THOMAIDIS:  Well, I'll hit three and then I'll

8   stop.

9           THE COURT:  I'll limit you to three.  The jury can

10  review this document when they're deliberating a verdict.

11          MR. THOMAIDIS:  Understood, Your Honor.

12  BY MR. THOMAIDIS:

13  Q.   So do you recollect purchasing Capco tile?

14  A.   I believe so, yes.

15  Q.   Were you selling Capco Tile as Crew Tile Distribution,

16  Incorporated?

17  A.   No, we didn't do business with anyone else.

18  Q.   Okay.  So if we could please turn to page 27 of 51.

19  And if you could highlight this section, Dal-Tile.

20          So do you recall ever purchasing any Dal-Tile?

21  A.   Yes.

22  Q.   Did you purchase it with Crew Trial Distribution,

23  Incorporated?

24  A.   No.

25  Q.   You're certain?

1424

Cross - Glenn Davis

1    A.   I believe the only time we did any dealings with

2    Dal-Tile was as Infinite.

3    Q.   And this appears to be discharging or seeking to

4    discharge $22,005.51 worth of Dal-Tile; would you agree?

5    A.   I agree that's what this form says, correct.

6    Q.   Is that consistent with your recollection of Crew Tile

7    Distribution and/or Infinite Flooring & Design?

8         MR. BURG:  Objection --

9         MR. THOMAIDIS:  I'm sorry, I'll ask the question

10   again.

11   BY MR. THOMAIDIS:

12   Q.   Is that consistent with your recollection of Crew Tile

13   Distribution?

14        MR. BURG:  Asked and answered, Your Honor.  Crew

15   Tile --

16        THE WITNESS:  It had nothing to do with --

17        THE COURT:  Not as to this creditor.  Overruled.

18        THE WITNESS:  Dal-Tile had nothing to do with

19   Crew.

20   BY MR. THOMAIDIS:

21   Q.   And you're certain?

22   A.   Not after -- not after 2009.

23   Q.   And so is this debt of Infinite Flooring & Design?

24   A.   Yes, I believe so.  It was part of my son's

25   bankruptcy.  My son went back and paid a number of these

Cross - Glenn Davis

1    people back even after he filed bankruptcy.

2    Q.   So if we could please turn to page 29 of 51.  And if

3    you could blow up the bottom.  It's called Interceramic.

4         And so, to your knowledge, did Crew Tile

5    Distribution buy Interceramic tile?

6    A.   Interceramic I'm not familiar with.  I don't recognize

7    that name.

8    Q.   Do you recall Infinite Flooring & Design purchasing

9    Interceramic tile?

10   A.   As I said, I don't even recognize the name.

11   Q.   Do you recall Infinite Flooring & Design seeking to

12   discharge $4,509.19 worth of debt related to Interceramic?

13   A.   This is not -- I do not recognize the name.  This is

14   listed on my son's bankruptcy.

15   Q.   So, Mr. Davis, to the best of your recollection, is

16   there a reason that you were so excited when Jack Handley

17   stumbled into Infinite Flooring & Design's showroom because

18   your son had effectively destroyed every other relationship

19   that he had in the tile industry?

20   A.   No, sir, this is not true.  And I don't believe he

21   stumbled.

22   Q.   You don't believe -- how do you believe he came into

23   Infinite Flooring & Design's showroom?

24   A.   I believe he walked in seeing us as a tile -- in the

25   tile business and wanted to -- wanted to set a display up.

1426
Cross - Glenn Davis

1    He came to us.  We didn't go to him.

2    Q.   Was he aware that Ryan had been terminated from

3    Infinite or from Porcelanosa Los Angeles, Incorporated?

4    A.   I have no idea what his knowledge was or is.

5         MR. THOMAIDIS:  So, Your Honor, at this time, I

6    would like to please enter into evidence some stipulated

7    exhibits and try to do it fairly efficiently.

8         THE COURT:  All right.  Go ahead.

9         MR. THOMAIDIS:  Exhibit X --

10        THE COURT:  But not too fast.

11        MR. THOMAIDIS:  Okay, Your Honor.  Exhibit X,

12   Exhibit A-2, Exhibit A-9, Exhibit A-12, Exhibit A-19,

13   Exhibit A-24, Exhibit A-27, Exhibit A-29, Exhibit A-33,

14   Exhibit A-42, Exhibit A-58, Exhibit A-73, Exhibit A-82,

15   Exhibit B-14, Exhibit B-17, and Exhibit B-25.

16        THE COURT:  All of these are stipulated to?

17        MR. THOMAIDIS:  They are, Your Honor.

18        THE COURT:  Okay.  Given the stipulation of the

19   parties, the following exhibits -- defendants' exhibits are

20   admitted into evidence and may be published to the jury.

21   Exhibits X, A-2, A-9, A-12, A-19, A-24, A-27, A-29, A-33,

22   A-42, A-58, A-73, A-82, B-14, B-17, and B-25.

23        (Defendants' Exhibits X, A-2, A-9, A-12, A-19, A-24,

24   A-27, A-29, A-33, A-42, A-58, A-73, A-82, B-14, B-17 and

25   B-25 received)

1427

Cross - Glenn Davis

1    MR. THOMAIDIS:  Thank you, Your Honor.

2    BY MR. THOMAIDIS:

3    Q.   So would you please, Mr. Davis, turn with me to trial

4    Exhibit X.  Do you recognize this Secretary of State filing

5    for a company called RG Crew?

6    A.   Looks familiar, yes.

7    Q.   Do you recollect the date that it was formed?

8    A.   I could only hazard a guess.

9    Q.   Does the date in the upper right-hand corner of this

10   document of June 2d, 2009, refresh your recollection?

11   A.   Yes.  That sounds approximately right, yes.

12   Q.   So why did you form this company called RG Crew?

13   A.   RG Crew is the name of the company that we started

14   after Infinite.  As you can see, the Crew part remained

15   synonymous, but the RG was put on there -- we had a group

16   of salespeople, warehouse people, that sort of thing, that

17   we used to form RG Crew -- or with us and we felt they

18   needed some sort of a recognition in it, that's why, hence,

19   the name Crew.

20        And the RG was -- as I said earlier, my son always

21   wanted the two of us to be in business together so he used

22   his first initial and my first initial for the RG.

23        MR. THOMAIDIS:  And, Your Honor, in the interest

24   of time, I'd like to now request that I be permitted to

25   treat the witness as hostile under Rule 611.

1428

Cross - Glenn Davis

1    THE COURT:  It's been cross-examination since you

2    got up.

3    MR. THOMAIDIS:  Sorry, Your Honor.

4    BY MR. THOMAIDIS:

5    Q.  Isn't it true that this company would have been about

6    six months old when you claim the exclusive distributor

7    agreement was executed?

8    A.  Six months old?  No.

9    Q.  No?

10   A.  No.

11   Q.  Why not?

12   A.  Well, six months would put it into -- yes, it would be

13   into December.  But we were doing business as Crew Tile

14   Distribution.

15   Q.  So how many months before the purported exclusive

16   distributor agreement was executed was RG Crew created?

17   A.  I just think it would be about six months, agreed.

18   MR. BURG:  Your Honor, I object --

19   THE COURT:  Hold on, sir.

20   MR. BURG:  The date is there.

21   THE COURT:  Sustained.

22   MR. BURG:  This is a waste of time.

23   THE COURT:  Sustained.

24   BY MR. THOMAIDIS:

25   Q.  So RG Crew, at this point, had no credit history;

1429

Cross - Glenn Davis

1   would you agree?

2   A.   I don't believe so, no.

3   Q.   Didn't have any references at this time?

4   A.   I don't -- I don't recall, no.

5   Q.   You don't recall or they didn't?

6   A.   I don't recall.

7   Q.   Okay.  So why would you have been a candidate for

8   being in an exclusive distributor agreement at this time,

9   the termination provision of $2.5 million?

10  A.   We presented our -- we were -- we were not RG Crew at

11  that time, we were Crew Tile Distribution.

12  Q.   And what's the difference?

13  A.   Well, the difference is as far as when you talk about

14  the contract, the economy was in a slump -- a big time

15  slump during all of this.  2009 is when the rebound

16  started.  When the rebound started, we wanted to get back

17  into doing what we felt was going to be the right thing and

18  that was to sell Porcelanosa tile.

19          So it was when the rebound started that

20  negotiations started again between my son and Jack Handley,

21  and I believe it was late summer of 2009.

22          MR. THOMAIDIS:  And this witness is

23  cross-designated by both parties, correct?

24          THE COURT:  I think that's what you represented to

25  me this morning.

1430

Cross - Glenn Davis

1          MR. THOMAIDIS:  I'm sorry.  I wanted to make sure

2     I wasn't hopped on a tangent --

3          THE COURT:  You will get a recross.  You have

4     about 20 minutes on recross.

5     BY MR. THOMAIDIS:

6     Q.   So if you'll please turn to the fourth page of Exhibit

7     X.   Why was RG Crew's name changed?  And this would have

8     been approximately three months later.

9     A.   Oh, we felt that this was a rather crude name at that

10    the time, so we dropped the RG.

11    Q.   And so if the company was formed to sell Porcelanosa

12    tile, why didn't you think that the name was crude when you

13    formed it?

14    A.   Well, we hadn't started any negotiations, I don't

15    believe, at that time with Porcelanosa and we just decided

16    to eliminate it.

17    Q.   So what did you form RG Crew to do?

18    A.   Well, it was actually to sell tile.

19    Q.   Was it to sell landscaping?

20    A.   No.  Not -- not RG Crew, no.

21    Q.   Okay.  So you testified in your deposition in this

22    case on April 16th, 2015, that among your family, you have

23    a current net worth of approximately $1.8 million.  Do you

24    remember that testimony?

25    A.   Yes, I do.

1431

Cross - Glenn Davis

1   Q.    And what's that comprised of?

2   A.    That's comprised of, obviously, my home, stock, mutual

3   funds, CDs, money markets, various other investments.   Life

4   insurance policy.

5   Q.    Do you have stock including AT&T and Comcast?

6   A.    Correct.

7   Q.    And do you have one or two homes in Nebraska?

8   A.    I have one summer home.

9   Q.    Does your family have one or two homes in Lake

10  McConaughy, Nebraska?

11  A.    I have one.  My son has one just recently.

12  Q.    Is that included in the bankruptcy filing -- the

13  bankruptcy document we reviewed previously?

14  A.    It didn't exist at that time.

15  Q.    You're certain of that?

16  A.    Yes.  My son's -- my son's residence is a mobile home

17  and he had a fifth-wheel parked on it, I believe, at that

18  time.

19  Q.    And when did he purchase that?

20  A.    Purchase what?  The fifth-wheel?

21  Q.    No, that piece of property.

22  A.    He didn't.  He rents.

23  Q.    I understand.  It's 1995 Rosewood?

24  A.    I -- we don't go by addresses out there, sir.

25  Q.    Isn't it true, Mr. Davis, that your son purchased that

Cross - Glenn Davis

1    piece -- or that fifth-wheel that resides in Nebraska

2    shortly after the investment from Ray Perry in Crew Tile

3    Distribution?

4    A.    No.

5    Q.    You're certain?

6    A.    This -- this is one that he and Brenda McMillan owned,

7    I believe.

8    Q.    Do you have any recollection when it was purchased?

9    A.    2005, maybe.

10   Q.    Is 2010 more accurate?

11   A.    I wouldn't have any idea.  No.  No, it doesn't sound

12   accurate, but . . .

13   Q.    Okay.  As an investor and stockholder in Crew Tile

14   Distribution, were you aware that Crew Tile was evicted

15   from its showroom in the Denver Design District?

16   A.    Yes.

17   Q.    Do you know when Crew Tile was evicted?

18   A.    March, I believe, of 2009.

19   Q.    2009 or 2012?

20   A.    2012.  I'm sorry.

21   Q.    And so when did Crew Tile Distribution vacate its

22   showroom at the Denver Design Center?

23   A.    March of 2012.

24   Q.    Would it have been March or would it have been April,

25   to the best of your recollection?

1433
Cross - Glenn Davis

1   A.   I know it was early spring.  I can't attest to the

2   date.  Again, I was not involved in it.  I don't do -- that

3   was a long drive for me and I don't choose to do city

4   driving.

5   Q.   So when Crew Tile Distribution left the Denver Design

6   District -- or the Denver Design Center, what did you take

7   with you when you left?  And "you," I mean Crew Tile

8   Distribution.

9   A.   You know, I wasn't there, but as far as I know,

10  everything except what was on -- affixed to the floor and

11  walls.

12  Q.   So what happened to the product samples, tiles, and

13  the display that were at the Denver Design Center when you

14  were evicted?

15  A.   I believe they went into a warehouse.

16  Q.   Do you believe all of them went into a warehouse?

17  A.   I have no way of knowing that.  I wasn't there to move

18  it or account for it.

19  Q.   So what were you informed happened to the products and

20  displays that were in the Denver Design Center when you

21  were evicted from the Denver Design Center?

22  A.   I'm not sure that was discussed, other than it was --

23  a lot of it went into the warehouse.

24  Q.   So I'll ask the question one more time, Mr. Davis:

25  What were you informed happened to the products and the

1434

Cross - Glenn Davis

1    display that were in the Denver Design Center when you were

2    evicted from the Denver Design Center?

3    A.    Like I said, I wasn't there to move it, I only know

4    what I saw in the warehouse, and there was some displays

5    and samples, that sort of thing, in the warehouse.

6              MR. THOMAIDIS:  Your Honor, may I play a piece of

7    deposition testimony?

8              THE COURT:  Well, what deposition testimony are

9    you talking about?

10             MR. THOMAIDIS:  This would be his individual

11   deposition that was taken on April 16, 2015.

12             THE COURT:  Is there an objection?

13             MR. BURG:  Well, if it's impeachment, I have no

14   objection.  If it's not, I object.

15             MR. THOMAIDIS:  It is for impeachment, Your

16   Honor.

17             THE COURT:  All right.

18             COURTROOM DEPUTY:  You have two minutes.

19             MR. THOMAIDIS:  Thank you.

20        (Video clip played)

21             MR. BURG:  Your Honor, this next question goes --

22   is a new question.

23             THE COURT:  Stop it.  Hold on.

24             MR. THOMAIDIS:  Sorry.

25             MR. BURG:  It's a -- this is a new question now

1435

Cross - Glenn Davis

1    and his --

2                THE COURT:  I think you've gotten your

3    impeachment.

4                MR. BURG:  Yeah, it's not responsive.

5                MR. THOMAIDIS:  That's fine.

6    BY MR. THOMAIDIS:

7    Q.   So is there any concern about who owns those displays?

8    Were they Porcelanosa displays?

9    A.   I believe some were Porcelanosa's and some were

10   ours.

11   Q.   Okay.

12   A.   I don't know -- I don't know who owned what off of it.

13   When you -- when you referred to a display, there were a

14   lot of displays that we had that were simply built that we

15   built and they were affixed to the walls.  I --

16   Q.   And I understand --

17               THE COURT:  Counsel, one more question.

18   BY MR. THOMAIDIS:

19   Q.   I'm sorry.  Were they Porcelanosa displays?

20   A.   There may have been.  I -- like I said, I wasn't there

21   to do the move.  I don't know.

22               MR. THOMAIDIS:  And, Your Honor, may I please play

23   the rest of the clip?

24               THE COURT:  No, you're out of time.

25               Redirect.

1436

Redirect - Glenn Davis

1      MR. BURG:   Thank you.

2                  REDIRECT EXAMINATION

3  BY MR. BURG:

4  Q.   Mr. Davis, we spent a lot of time going over your

5  son's bankruptcy.  Do you know if he hired a lawyer to do

6  the bankruptcy?

7  A.   Yes, he did.

8  Q.   Did you and Mr. Ryan Davis hire the lawyer to file the

9  bankruptcy so that it was done right?

10  A.   Of course.

11  Q.   And that it was done correctly?

12  A.   Of course.  That's the reason we seek an attorney is

13  to make sure you're following all the rules.

14  Q.   Right.  Are you a bankruptcy expert?

15  A.   I know zero about it and I still know zero about it.

16  Q.   Okay.  And so when Mr. Thomaidis was asking you

17  questions about the bankruptcy, would you have relied on

18  the lawyer to make sure that it was accurate?

19  A.   Yes, I assume he would be the one who filled out

20  whatever forms are necessary.

21  Q.   You indicated that you believed that your son, even

22  after the discharge of bankruptcy, went back and paid

23  people money that he no longer owed them.  Do you remember

24  saying that?

25  A.   Yes, I do.

1437

Redirect - Glenn Davis

1    Q.   Do you understand that after a bankruptcy and you get

2    discharged of debt, you don't have any obligation to pay

3    that debt?

4    A.   You have -- you have a moral obligation.

5    Q.   Can you tell the -- tell the jury what debts, after

6    they were discharged in the bankruptcy, to the best of your

7    knowledge, that your son paid, even though he did not have

8    a legal obligation?  If you can recall.

9    A.   I -- Denver Hardwood sounds familiar.

10   Q.   Okay.  Anyone else?

11   A.   I -- I couldn't -- I can't give a name that --

12   Q.   Did you -- did you and your son talk about that moral

13   obligation to repay debts even though they had been

14   discharged in the bankruptcy?

15   A.   Yes, we did.

16   Q.   Can you tell the jury a little bit about that

17   conversation.

18   A.   It wasn't -- there's no sense of preaching to another

19   adult.  My son knows my values, he was raised to my values,

20   so he knew how I felt about it.  My question always was,

21   there's these people hanging that are left out there.  This

22   might be the legal solution to some problems, but they

23   still are -- we know how it felt, we had it done to us, not

24   through bankruptcy, but just people that didn't want to

25   pay, I knew exactly how it felt, and so did my son, and so

1438

Redirect - Glenn Davis

1   did my wife.

2          I just felt that that was the thing to do if at

3   all possible.  And I know that he did it to several of

4   them.  I cannot name you which ones.

5   Q.   Okay.  He didn't pay them all back, obviously.

6   A.   No, there -- there's a lot of things that my son -- my

7   son has his life and I got mine and if there's things that

8   intertwine, sometimes you kind of leave them alone, unless

9   you can help.

10  Q.   Now, he -- there's been a lot of questions about

11  Exhibit A-54 and B-69.  Do you recall that?  B-69 is the --

12  I think the K-1 --

13  A.   Correct.

14  Q.   And A-54 is the bankruptcy.  Do you see that -- do you

15  remember that?

16  A.   Yes, I remember.

17  Q.   Do you recall if the K-1 was for 2009?  If you -- we

18  can go ahead and look at it.  If we need to go back, we can

19  put it up.

20  A.   No, I --

21  Q.   B-69, do you know if it was for 2009?

22  A.   Yes, sir.

23  Q.   And the bankruptcy was filed in March of 2011,

24  correct?

25  A.   I believe those are the dates, correct.

1439

Redirect - Glenn Davis

1    Q.   Do you know whether or not the actual ownership and

2    the shareholder percentage was changed between 2009 and

3    2011?  And would that account for why there's a

4    discrepancy --

5    A.   Yeah.  I -- I cannot attest to that.  This was filled

6    out by a tax accountant -- a tax service for our income

7    tax --

8    Q.   Do you rely on them?

9    A.   Of course.

10   Q.   Do you want them to make sure they look at everything

11   and make sure it's accurate?

12   A.   I do, especially because sometimes things are more

13   difficult to go through than they should be, I suppose.

14   Q.   Okay.  And then the bankruptcy, you -- you were not

15   involved in that bankruptcy, were you, sir?

16   A.   This is one of those places where my son has his

17   business, I got ours, and we try not to -- we try not to

18   intermix them unless there's a cause.

19   Q.   All right.  I want to turn briefly to the eviction.  I

20   think where Mr. Thomaidis ended was the eviction at the

21   Denver Design Center.

22   A.   Okay.

23   Q.   Were you -- are you aware as to whether or not the

24   Denver Design Center -- first of all, are you aware that

25   the -- about how much the rent was at the Denver Design

Redirect - Glenn Davis

1    Center?

2    A.    I remember it was really high, by the time you add on

3    the outside services that they tack on it and, yes, it was

4    like 4500 sounds --

5    Q.    Okay.  And at some point in time, do you recall them

6    switching from designers and architects to opening up to

7    the consumer where the consumer could actually come in and

8    buy?

9    A.    Yes, I do.

10   Q.    And did that affect Crew Tile's business in terms of

11   that showroom location?

12   A.    Yes, it did.  We were dependent upon the professional

13   end of the consumer to come in and arrange for tile.

14   Q.    Did you have discussions with the landlord during that

15   period of time about how difficult it was, based on that

16   change, to continue to pay that rent?

17   A.    Yes.  Yes, we did.  They also required that we be open

18   on Saturdays, which is almost impossible to staff a

19   showroom for a Saturday.  Nobody wants to work six days

20   constantly.

21   Q.    Okay.  And when you fell behind in your rent, why did

22   they let you stay for so long, 10 months, if you know?

23   A.    Originally, they were excited to have Porcelanosa in

24   the design center.  This is all for designing people that

25   go in and shop for their client.  Everything in there,

Redirect - Glenn Davis

1   faucets and sinks and lights and tile.  And that was --

2   that was our main -- our main bread and butter, and to

3   start doing -- selling to moms and pops, I mean they come

4   in and they look at the tile and they say, oh, it's

5   beautiful but, my God, look at the price, so they go to

6   wherever and say, Well, we can't afford the difference.

7   So, the direct consumer was almost nonexistent for us, even

8   though they had opened it up to that.

9   Q.   And then with regard to letting you stay there for 10

10  months, did you have conversations with Jo Frank about what

11  the problems were in terms of cash flow and what was going

12  on?

13  A.   Several times a month, I believe.  My wife did, yes.

14  And Ryan.

15  Q.   Okay.  And did they discuss that with you?

16  A.   Yes, to a certain degree, yes.

17  Q.   You had conversations about it?

18  A.   I read a lot of the e-mails.  Conversations and I read

19  e-mails regarding it.

20  Q.   And at some point in time, did the Denver Design

21  Center make a deal with Porcelanosa to put their showroom

22  in the design center?

23           MR. THOMAIDIS:  Your Honor --

24           THE WITNESS:  I can only answer --

25           MR. THOMAIDIS:  -- this possibly can't have

1442

Redirect - Glenn Davis

1    subject matter about that.

2           THE COURT:  Let's lay a foundation.

3    BY MR. BURG:

4    Q.    Are you aware as to whether or not Porcelanosa built a

5    big showroom at the design center where you had been

6    previously?

7    A.    I believe it's close to the same location.  It is in

8    the design center, yes.

9    Q.    You are aware of that?

10   A.    Yes.

11   Q.    Are you aware the timing of the eviction related to

12   when Porcelanosa began to build their own showroom there?

13   A.    Yes.  Pretty good timing, yes.

14   Q.    Okay.  Did Ms. Frank tell you that that was one of --

15   let me ask you:  Did you have any conversations with your

16   son or your wife about the fact that Ms. Frank eventually

17   said you couldn't stay any more and that Porcelanosa was

18   actually going to -- or that -- do you know if she

19   disclosed that they were coming in prior to the call of

20   April 2013?

21   A.    I don't have knowledge to that, but in support of it,

22   it seems strange that that type of rent, someone would let

23   you stay rent free for that period of time.  She either had

24   great confidence in things rebounding or, I don't know, an

25   ulterior motive.

Redirect - Glenn Davis

1    Q.    Your business had been building, correct?

2    A.    It had, yes.

3    Q.    And through 2012, which we have seen the chart about,

4    correct?

5    A.    Yes.

6    Q.    Were you -- when they evicted you, did you fight them

7    based on the change of -- from just design professionals

8    and architects to consumers?  Did you fight them at all?

9    A.    Well, we -- we -- naturally we objected to it because

10   it really hurt our business.  As far as fighting, there

11   isn't a lot we can do.

12   Q.    Right.  So did you eventually enter into an agreement

13   with them to pay them a certain -- give them a judgment for

14   a certain amount of money?

15   A.    Yes, we did.  Through an attorney, correct.

16   Q.    Okay.  That was Mr. Berken, I believe?

17   A.    Correct.  Correct.

18   Q.    All right.  And with regard to Mr. Berken, do you know

19   that you agreed that not only were you going to pay them

20   the $104,000, that you were going to pay 12 percent

21   interest from that day forward?  Did you understand that?

22   A.    Pretty high interest, yes.

23   Q.    Okay.  And if you guys -- if we're successful in this

24   lawsuit, is it your intent to pay them that money,

25   including the 12 percent interest?

1444

Redirect - Glenn Davis

1   A.   Top of the list.

2   Q.   Have you had them -- have you communicated that with

3   Ms. Frank?

4   A.   That -- yes, it has been communicated to her, yes.

5   Q.   Okay.  And when you were talking to Mr. Berken, did he

6   ask you about whether or not you had a will?

7   A.   Yes, we started out talking about we need help, we

8   need to know what we can do on this.  We had the intention

9   of repaying them.  If we had been left alone, they would

10  have been repaid.

11       And we asked him what he can do for us, what do we

12  need to do?  You're the attorney, you tell us.

13  Q.   Let me go back to what you just said.  Based on what

14  was going on at Crew Tile, did you believe, based on the

15  increases from 89,000 in 2009 to -- you know, can we put up

16  that exhibit so you can look at it?

17       Nope, not that one.  There you go.

18       Now, have you seen this, this is an admitted

19  exhibit, correct?

20  A.   That's correct.

21  Q.   And based on this, and based on the increased sales in

22  the state of Colorado, did you believe that you would be

23  able to pay if things continued to improve in the economy,

24  that you believe you would be able to pay the design center

25  the money owed plus the interest?

1445

Redirect - Glenn Davis

1   A.   The 2013 numbers, projected numbers, showed yes, we

2   could pay that off.

3   Q.   Okay.  And did Mr. Berken make any recommend -- strike

4   that.

5           Let me make sure I understand.  Did you or your

6   wife, in -- at the time you talked to Mr. Berken about the

7   design center, have any estate planning, any wills,

8   anything?

9   A.   No, we had nothing and we should have had.

10  Q.   Well, did Mr. Berken make -- I don't want to -- I

11  don't want to ask you what you and he talked about, but did

12  you then have an estate plan put together --

13  A.   Yes, we did.

14  Q.   -- by Mr. Berken?

15  A.   And a will was the first piece of that.

16  Q.   Did he put together trusts?

17  A.   Yes.

18  Q.   Did you -- do you have a clear understanding of what

19  those trusts do and how they operate?

20  A.   No.  No, I don't.  I have read things on them, but I

21  don't know the legalities of it, no.

22  Q.   Okay.  And did you rely on him to do that and do it

23  properly?

24  A.   Yes, that's why we went to him, correct.

25  Q.   And when Mr. Thomaidis asked you about how much your

1446

Redirect - Glenn Davis

1    net worth was --

2    A.    Yes.

3    Q.    -- you recall him asking you that?

4    A.    Oh, yes.

5    Q.    And you indicated it was how much?

6    A.    Approximately 1.8.

7    Q.    All right.  And did that include some money that

8    ultimately that you then turned around and invested into

9    Crew Tile?

10   A.    Oh, yes.

11   Q.    Or was that already in there?

12   A.    Yes.

13   Q.    All right.  So some of that money was invested from

14   those trusts?

15   A.    That is correct.

16   Q.    Okay.  And was that a -- was that the lifetime of your

17   work for 34 years with AT&T?

18   A.    That was combined --

19   Q.    Okay.

20   A.    -- 76 years of saving.  We have always paid ourselves

21   first.  We always invested heavily, but when we -- 401(k)s

22   didn't exist when we started all of this, so there was

23   stock options and profit sharing, all that kind of stuff,

24   and that was pretty lucrative, much more than 401(k)s were.

25   But even when 401(k)s became the investment vehicle, why we

1447

Redirect - Glenn Davis

1    invested everything we could in it.

2    Q.   Does that represent the lifetime of your wife's 25

3    years of working for the Geneva Pharmaceutical, which

4    changed to Navartis, and your 34, 35 years with AT&T?

5    A.   Yes, it has.  It has -- it also includes all the years

6    that we could have -- could have and should have done

7    things and didn't for ourselves.

8    Q.   You did the best you could and you work hard every day

9    to get there?

10   A.   Yes.  Yes.

11   Q.   And when he made that recommendation that you should

12   have some sort of estate planning, did you -- did you tell

13   him no?

14   A.   No, I needed an explanation of what it could do,

15   what -- why you do that.

16   Q.   Yeah.  And this was before -- this was set up before

17   Porcelanosa came in to compete with you; isn't that true?

18   A.   Yes, that's correct.

19   Q.   It was before the October -- before they shut you down

20   in October 31st of 2013, correct?

21   A.   Yes.

22   Q.   You didn't set this up after this lawsuit was filed,

23   did you, and they countersued you?  You didn't do that, did

24   you, sir?

25   A.   No, we did not.  It was -- it was done in, I believe,

1448

Recross - Glenn Davis

1    August and September of 2012.

2    Q.    Okay.

3    A.    If my memory's correct.

4    Q.    You're not sure of the exact date?

5    A.    No.  I -- I believe that's what --

6    Q.    Just so we're clear, though, the -- and I know we've

7    established that Porcelanosa countersued you after the

8    original complaint was filed in November of 2013.

9    A.    That's correct.

10   Q.    I want to make sure you didn't go out and run and put

11   together some sort of a trust after that, did you --

12   A.    No, I did not.

13   Q.    -- after they sued you?  Okay.

14             MR. BURG:  May I have a second, Your Honor?

15             THE COURT:  You may.

16             MR. BURG:  Thank you, sir.  I have no more

17   questions.

18             THE COURT:  All right.  Recross.

19             MR. THOMAIDIS:  Thank you, Your Honor.

20             THE COURT:  Mr. Thomaidis, you have 20 minutes.

21                       RECROSS-EXAMINATION

22   BY MR. THOMAIDIS:

23   Q.    I'm going to kind of pick up where Mr. Burg left off.

24   The judgment against Crew Tile in favor of the landlord at

25   the Denver Design Center was $104,608.72; isn't that

Recross - Glenn Davis

1  right?

2  A.   That sounds correct.

3  Q.   Okay.  And you are familiar with the company called

4  Paradigm Tile & Stone Distributors, correct?

5  A.   Of course, yes.

6  Q.   When was Paradigm Tile & Stone Distributors formed?

7  A.   I am not sure of the exact date.

8  Q.   Isn't it true that it was formed on September 17th,

9  2012?

10  A.   Approximately, yes.

11  Q.   Okay.  And that would have been approximately a month

12  and a week before the Crew Tile judgment of $104,608.72 in

13  favor of the Crew Tile's landlord at the Denver Design

14  Center would have been entered; isn't that right?

15  A.   I'm not sure of the date that was on the design

16  center's claim.

17  Q.   You testified previously that we have always paid

18  ourselves first.  What did you mean by that?

19  A.   When my wife and I were working, we always made sure

20  that we put money in the bank for ourselves, for

21  retirement.

22  Q.   You also have a company called G&D Davis Holdings,

23  LLC; isn't that right?

24  A.   That was one that Mr. Berken created, yes.

25  Q.   And that's a Nevada limited liability company; isn't

1450

Recross - Glenn Davis

1   that right?

2   A.   I believe so.

3   Q.   And that was actually formed with an operating

4   agreement that was executed on August 24th, 2012; would you

5   agree?

6   A.   That sounds correct.

7   Q.   Okay.  And what assets are held in G&D Davis Holdings,

8   LLC?

9   A.   My -- my attorney gave -- did the setting up of this

10   thing, and he's the one who talked to, I guess, about the

11   details of it.

12   Q.   Now, in any event, that would have also been formed

13   approximately a month and a couple of weeks prior to the

14   entry of this judgment against Crew Tile Distribution by

15   the Denver Design Center landlord; wouldn't you agree?

16   A.   If that's what the date on the filing says.

17   Q.   And there's an underlying trust called the G&D Davis

18   Holdings Trust; isn't that right?

19   A.   Like I said, my -- our attorney set this up.  I don't

20   understand what some of the different pieces and parts are

21   that are in it.

22   Q.   To the best of your recollection, yes or no?

23   A.   For which one?

24   Q.   The G&D Davis Holdings Trust.

25   A.   Yes, that sounds right.

1451

Recross - Glenn Davis

1    Q.    And you are the managing trustee of that trust,

2    correct?

3    A.    Now you're getting into the part I don't -- yes, I

4    believe I'm the trustee.

5    Q.    And Ryan Adam Davis is the manager of that trust;

6    wouldn't you agree?

7    A.    I believe so, yes.

8    Q.    And also the LLC; isn't that right?

9    A.    I -- I can't answer for sure on that, which ones

10   are -- it always seems backwards.

11   Q.    Was G&D Davis Holdings, LLC, and this trust created to

12   avoid creditor claims?

13   A.    Sir, this was -- we went to them asking for help and

14   he set up the trust and put wills and interbebos.  And I

15   don't know what all of them are there for.  I don't know

16   what -- he consolidated assets was, I believe, the

17   description of it.

18   Q.    And Mr. Berken also handled the stipulation in

19   negotiation with the landlord at the Denver Design

20   District; isn't that right?

21   A.    Yes, he did.

22   Q.    Okay.  So was G&D Davis Holdings, LLC, and the trust

23   created to avoid creditor claims?

24   A.    I don't -- I don't know.  I don't see how.  That would

25   be something Mr. Berken would have to respond to.  He set

Recross - Glenn Davis

1   the thing up.

2   Q.   Why was G&D Davis Holdings, LLC, established as a

3   Nevada limited liability company?

4   A.   That's what my attorney used, I believe.

5   Q.   So what is the Star Dust Domestic Trust?

6   A.   I believe -- I believe that's a part of the G&D

7   Holdings.  I don't -- I don't want to give a definite

8   answer because there's different layers to this thing that

9   I don't fully understand.

10  Q.   What assets are held in the Star Dust Domestic Trust?

11  A.   I believe my residence.

12  Q.   Is there anything else?

13  A.   I believe there's -- I believe there's 1 percent of

14  the company.

15  Q.   Paradigm Tile & Stone Distributors, LLC, correct?

16  A.   Yes.

17  Q.   Okay.  What's the Radiccio Domestic Trust?

18  A.   I've heard the name.  I don't know -- I believe

19  that -- I believe that is my son's.

20  Q.   And so what does that hold?

21  A.   I'm not familiar with his trust, sir.

22  Q.   Okay.  So the Star Dust Domestic Trust was born

23  approximately two months before the judgment against Crew

24  Tile for $104,000 in favor of Crew Tile's landlord; was

25  there a correlation?

1453

Recross - Glenn Davis

1  A.    The correlation is we asked Mr. Berken to help us

2  resolve the issue.

3  Q.    Was it created to avoid creditors' claims?

4  A.    No.

5  Q.    What about G&D Davis Holdings, LLC, it was formed

6  approximately two months before this judgment was entered

7  by Crew Tile's former landlord.  Was it created to avoid

8  creditors' claims?

9  A.    I'm sorry, is that the same question?

10  Q.    No.  One was referring to Star Dust Domestic Trust; I

11  am now referring to G&D Davis Holdings, LLC.

12  A.    No.

13  Q.    What about the Radiccio Domestic Trust, was it created

14  to avoid creditors' claims?

15  A.    Radiccio, I believe, is my son's.

16  Q.    And it was also formed approximately two months before

17  the judgment against Crew Tile for $104,608.72 from its

18  former landlord.  Was it created to avoid creditors'

19  claims?

20  A.    Mr. Berken -- Mr. Berken established these to help us

21  resolve the situation with design center.

22  Q.    What assets are held in the Radiccio Domestic Trust?

23  A.    I do not know.  That is my son's trust.

24  Q.    You're familiar with Paradigm Tile & Stone

25  Distributors, LLC, correct?

1454

Recross - Glenn Davis

1    A.    Correct.

2    Q.    Is a portion of Paradigm Tile & Stone Distributors,

3    LLC, owned by the Radiccio Domestic Trust?

4    A.    I do not know for certain.

5    Q.    So let's go ahead and turn to trial Exhibit B-4,

6    please.  Do you recognize this document, Mr. Davis?  And

7    can you include the stamp at the upper right-hand corner of

8    the page, please.

9          So this appears to be a document dated September

10   17th, 2012; wouldn't you agree?

11   A.    That is what it says, correct.

12   Q.    And it's for Paradigm Tile & Stone, LLC; isn't that

13   right?

14   A.    That is correct.

15   Q.    And underneath that it gives an address, 14860 Pecos

16   Street, Broomfield, Colorado, 80023.  Do you see that?

17   A.    Yes, I do.

18   Q.    That's your address and Darlyne Davis' address; isn't

19   that true, Mr. Davis?

20   A.    That's correct.

21   Q.    Now, if we could please blow up the bottom half of the

22   page.  And it appears here that the registered agent of

23   Paradigm Stone & Tile distributors is the Radicchio

24   Domestic Trust dated 8-24, 2012; wouldn't you agree?

25   A.    Just a moment.  Yes, that's what it says.

1455

Recross - Glenn Davis

1   Q.   Again, and it appears that Radicchio Domestic Trust

2   dated 8-24, 2012 was the same address of 14860 Pecos

3   Street, Broomfield, Colorado 80023; isn't that right?

4   A.   I see that, yes.

5   Q.   So why is the Radiccio Domestic Trust using your home

6   address?

7   A.   I suspect it was put on there for a mailing address.

8   Q.   So why did you create Paradigm Tile & Stone

9   Distributors, LLC, Mr. Davis?

10  A.   I believe that was to go after a different market.

11  Since Crew Tile had been more or less abandoned by -- by

12  the customer base at the design center, we created one that

13  wanted to go after the architects, more specifically

14  designers, that sort of thing.

15  Q.   Okay.  So let's go ahead and take a look at Exhibit

16  B-10, please.  Can you please blow up the top half of this

17  page.

18        This is an e-mail from an individual named Lauren

19  Duran at Porcelanosa, dated November 14th, 2012.  Do you

20  see that?

21  A.   Yes, I do.

22  Q.   And here Ms. Duran says, Unfortunately, I cannot

23  process this PO since it is a different name and

24  information than what is associated with your current

25  account.  We need all POs to have the Crew Tile header

1456

Recross - Glenn Davis

1   until a new account has been opened for Paradigm.

2           Do you see that?

3   A.   Yes, I do.

4   Q.   So was Porcelanosa Los Angeles willing to sell tile to

5   Paradigm Tile & Stone Distributors?

6   A.   It appears they didn't have any other account

7   established with us, with Paradigm, so it was -- all

8   purchasing was done as Crew.

9   Q.   And, in fact, Porcelanosa Los Angeles really never

10  sold any tile to Paradigm Tile & Stone Distributors, LLC,

11  did they?

12  A.   I can't answer that without seeing records.

13  Q.   Let's go ahead and turn to trial Exhibit B-11.

14          Do you recognize this document, Mr. Davis?

15  A.   Oh, it appears it's an account application for

16  Paradigm Tile & Stone.

17  Q.   And it would be dated November 15, 2012, so that would

18  have been one day after you received the e-mail from Ms.

19  Duran that we talked about previously; isn't that right?

20  A.   Yes, it appears that she put in an application,

21  correct.

22  Q.   And so why are you applying for a new account about

23  eight months after Crew Tile did the same in another

24  application, which can be demonstrated by the

25  demonstrative, and also I can put that up on the screen if

1457

Recross - Glenn Davis

1   it's easier for you.

2   A.   Okay.

3   Q.   I know we can throw that up there.  Let me go ahead

4   and I'll just withdraw the question and we'll move on, in

5   the interest of time.

6        So it appears that this application says, Tile

7   distribution, under Principal Type of Business.

8        Do you see that?

9   A.   Tile distributor, correct.

10  Q.   Why is Paradigm Tile & Stone Distributors engaged in

11  tile distribution if its services were so different than

12  Crew Tile Distribution?

13  A.   They were still distributing tile; they were still

14  distributors.

15  Q.   Okay.  So let's go ahead and move down to section 2 of

16  page 1, please.  If you could just blow that up.

17       So this appears to show Ryan Davis and you, Glenn

18  Davis, as the owners, partners and corporate officers.  Do

19  you see that?

20  A.   Yes, I do.

21  Q.   Would you say that was accurate for Paradigm Tile &

22  Stone Distributors?

23  A.   I would say it's consistent with the way that we did

24  the business, that it was, again, a family owned and run

25  business.

1458

Recross - Glenn Davis

1   Q.   And if it was a family owned and run business, why is
2   your wife, Darlyne Davis, not listed here as a owner,
3   partner or corporate officer?
4   A.   I don't know.  I don't see the relevance of it.  I
5   mean, it's an application for credit.  If my name is on
6   there my wife is responsible for me, too, so . . .
7   Q.   Wasn't this the document that would permit Paradigm
8   Tile & Stone Distributors, LLC, to sell tile products
9   manufactured by Porcelanosa and distributed by Porcelanosa
10  Los Angeles?
11  A.   Yes.  They knew who we were.  It's not like we were
12  some stranger.  They had known us for a long time.  They've
13  sold us a lot of tile.
14        MR. BURG:  Your Honor, I'm going to object for
15  completeness, because I think this is not complete.  Her
16  name is on this page.  He's trying to fool --
17        MR. THOMAIDIS:  I'm not trying to fool anyone.
18        MR. BURG:  Her name is on this.
19        THE COURT:  Well --
20        MR. THOMAIDIS:  Section 1 says, List individuals
21  authorized to charge to this account, and section 2 says,
22  Please list all owners, partners, corporate officers.
23        MR. BURG:  Right, but her name is -- he just said
24  her name was not on this.  Her name is on this in section
25  1.

1459

Recross - Glenn Davis

1  THE COURT:  But it's not on the section he's
2  referring to.  Overruled.
3  MR. THOMAIDIS:  Thank you, Your Honor.
4  BY MR. THOMAIDIS:
5  Q.  So let's move to another section that may be more
6  relevant.  Look at the bottom.  Section 2, has the firm or
7  any of its principals ever been bankrupt?  Do you see that?
8  A.  Yes, I do.
9  Q.  And you marked -- well, your wife marked "no" here.
10  Would you agree?
11  A.  That's what it appears.
12  Q.  And so that would be untrue, wouldn't it?
13  A.  What's the date on this again?
14  Q.  This was dated November 15th, 2012.
15  A.  I don't know.  I didn't fill out the form.
16  Q.  But that statement is untrue; would you agree?
17  A.  I don't know if they're talking personal bankrupt or
18  what type of bankruptcy, but --
19  Q.  Mr. Davis --
20  A.  Yes.
21  Q.  Was this a dishonest statement?
22  A.  Is what a dishonest statement?
23  Q.  Is the statement:  None of the firm or any of its
24  principals have ever been bankrupt a dishonest statement?
25  A.  No, okay, it appears that the wrong box is filled out,

1460
Recross - Glenn Davis

1    yes.

2    Q.   It does, indeed.

3         Can we please turn to the fourth page of this

4    trial exhibit.  And can you please blow up paragraphs 10

5    and 11.

6         You see the paragraph 10 there says that all

7    credit arrangements, if extended to customer, are personal

8    to the customer and cannot be transferred or assigned by

9    the customer without a written consent of Porcelanosa,

10   which may be arbitrarily withheld without reason?

11        Do you see that?

12   A.   Yes, I do.

13   Q.   Did that give you any concern with respect to the

14   exclusive distributor agreement that you claimed was signed

15   on December 14th, 2009?

16   A.   No.  I guess I don't see the correlation between the

17   two.

18   Q.   And this language is substantially the same as the

19   other four account applications you'd filled out

20   previously; wouldn't you agree?

21   A.   That I filled out?  That our company filled out.

22   Q.   That a member of the Davis family filled out.

23   A.   Probably so, yes.  I . . .

24   Q.   So what about the next paragraph down, paragraph 11?

25   It says, That this agreement supersedes and takes place of

1461

Recross - Glenn Davis

1    all prior agreements between Porcelanosa and the customer.

2         Do you see that?

3    A.   Yes, I do.

4         COURTROOM DEPUTY:  You have two minutes.

5    BY MR. THOMAIDIS:

6    Q.   Did that give you any concern with respect to the

7    exclusive distributor agreement that you claim was signed

8    on December 14th, 2009?

9    A.   This is a credit application, correct?

10   Q.   Mr. Davis.

11   A.   No, I don't see whether -- even remotely close.  One

12   is a credit agreement.

13   Q.   So this language is substantially the same as the

14   other four similar agreements you signed before, correct?

15   A.   I don't know that it is without looking at it, but I

16   assume that it's a standard form.

17   Q.   Did you ever hire an attorney to advise you with

18   respect to whether this superseded the exclusive

19   distributor agreement?

20   A.   No.

21   Q.   Did you ever hire an attorney to advise you whether

22   any of the others superseded the exclusive distributor

23   agreement?

24   A.   No, because it's a credit application.

25        MR. THOMAIDIS:  I have no further questions, Your

1    Honor.

2           THE COURT:  All right.  Thank you.  Mr. Davis, you

3    may step down.

4           The plaintiff counterclaim defendants may call

5    their next witness.

6           MR. BURG:  Your Honor, at this time, the plaintiff

7    and counterclaim defendants rest.

8           THE COURT:  All right.  Thank you.  All right.

9    Ladies and gentlemen of the jury, the plaintiff

10   counterclaim defendants are done putting on their evidence

11   in this case.

12          Instead of going directly to start the defendants'

13   case, we're going to take our lunch break now.  We will be

14   in recess until five minutes after 1:00.

15        (Jury left the proceedings at 11:59 p.m.)

16          MR. BURG:  Your Honor, I have one -- not really

17   request, but I -- we have been working on closings.

18          THE COURT:  Right.

19          MR. BURG:  And I'm getting older and I don't know

20   how many more I am going to be able to do and I want it to

21   be really good, so I'm requesting 55 minutes.  And I know

22   you haven't decided, but I wanted to at least give you that

23   input, which would be for both the closing and the

24   rebuttal.

25          THE COURT:  Yeah, I haven't decided, but 55

1    minutes definitely you will get at least that.  I was

2    thinking a little bit more.

3         MR. BURG:  Thank you very much.  I appreciate it.

4         (Recess at 12:00 p.m.)

5                   AFTERNOON SESSION

6         (In open court outside the presence of the jury at

7    1:06 p.m.)

8         THE COURT:  All right.  Mr. Thomaidis, your first

9    witness is going to be Mr. -- one second -- Mr. Domingot,

10   right?

11        MR. THOMAIDIS:  That's correct, Your Honor.

12        THE COURT:  So you asked for six -- two hours, 120

13   minutes.  I'm going to give you 90 minutes.  And is he

14   cross-endorsed?

15        MR. THOMAIDIS:  He is not, Your Honor.

16        THE COURT:  So how do you want to divide your

17   direct and redirect?

18        MR. THOMAIDIS:  I guess probably an hour, and a

19   half an hour respectively, please.

20        THE COURT:  60-30.  All right, you will be given

21   two minute warnings at 60 and 30.  So not cross-endorsed,

22   so plaintiff will not get a recross.  You asked for 30

23   minutes, I'll give you all of your 30 minutes.  You will

24   have a two minute warning.

25        MR. BURG:  Thank you.

1    THE COURT:  Yes.  Mr. Burg.

2         MR. BURG:  With regard to this time line, when Mr.

3    Thomaidis set it up I thought he was going to use it with

4    the witness, which he did not.  I would hope that he would

5    put it away now and not have it just up there the whole

6    time without using it for your witness.

7         THE COURT:  It shouldn't be up there -- are you

8    going to use it with Mr. Domingot?

9         MR. THOMAIDIS:  I actually -- I apologize, Your

10   Honor.  I had good intentions to use it.  But I will -- I'd

11   like to use the one on the -- closest to you, but I can

12   take the others down.

13        THE COURT:  Are you going to use it with the next

14   witness?

15        MR. THOMAIDIS:  I would like to briefly, please.

16        THE COURT:  That's fine.  That's your -- if that's

17   your intent, it can stay up.  The other one should be taken

18   down.

19        MR. THOMAIDIS:  It is, Your Honor, and I will.

20   Thank you.  May I --

21        THE COURT:  Yup, go ahead.

22        MR. THOMAIDIS:  It's going to be the most exercise

23   I get all week.

24        MR. BURG:  Well, Your Honor, just for the record,

25   Mr. Domingot was not involved with the Porcelanosa at any

1   of those dates.  He, in fact, had his own company buying

2   from Porcelanosa from 2005 through 2009.  And he may have

3   some knowledge of opening up Infinite, but I understand

4   he -- if he uses it, then we'll go from there.

5          THE COURT:  Okay.  Yeah, we'll see how the

6   evidence comes in.

7          Let's bring in the jury.

8       (Jury was present at 1:10 p.m.)

9          THE COURT:  All right.  The defendants

10  counterclaimants may call their first witness.

11         MR. THOMAIDIS:  At this time, Your Honor,

12  defendants and counterclaimants would call Jose Josep

13  Domingot.

14         THE COURT:  All right.

15         COURTROOM DEPUTY:  Right here, sir.  Just face me

16  and raise your right hand, please.

17         JOSE DOMINGOT, DEFENDANTS' WITNESS, SWORN

18         COURTROOM DEPUTY:  Please be seated.

19         THE WITNESS:  Thank you.

20         COURTROOM DEPUTY:  State your full name for the

21  record and spell your first and last name.

22         THE WITNESS:  My name is Jose, last name is

23  Domingot.  Spelling J-o-s-e, D-o-m-i-n-g-o-t, as in Texas.

24                     DIRECT EXAMINATION

25  BY MR. THOMAIDIS:

1466

Direct - Domingot

1   Q.   Mr. Domingot, thank you very much for joining us

2   today.  I realize you have been waiting outside for a

3   while, and I appreciate it.

4        Can you please tell us where you presently reside.

5   A.   I reside actually in Orange County, California.

6   Q.   And can you please tell the Court and the jury what

7   your present occupation is.

8   A.   Yes.  I am a vice president for a business involvement

9   of a Spanish company located in Madrid with headquarters in

10   Madrid, with a subsidiary office in Newport Beach,

11   California.

12        Our business is we own, manage and operate theme

13   parks, aquatic parks, aquariums, modern entertainment

14   centers, family entertainment centers.  And what I do for

15   the company is find relationships between motion pictures,

16   Sony, Paramount, Fox, Hasbro, and acquire their -- initiate

17   and acquire their intellectual property for convincing and

18   acquiring lease spaces inside shopping centers.

19        And then we build the theme with the intellectual

20   property, we manage it and we operate it.

21   Q.   And would you please tell the jury -- and you may have

22   said it, I may have missed it -- what's the name of your

23   current employer?

24   A.   I'm sorry, Parques Reunidos in Madrid, and in United

25   States they have a subsidiary company under the name of

Direct - Domingot

1    Palace Entertainment.  It's P-a-r-q-u-e-s, second word,

2    Reunuidos, R-e-u-n-i-d-o-s.

3    Q.    And so, Mr. Domingot, would you please tell us just

4    briefly a bit about your educational background.

5    A.    Yeah.  My official background, I have a college degree

6    from the University of Barcelona in business -- in

7    business.  Then I got an MBA for the University of the

8    Americas in Louisiana.  Then I got another MBA for the

9    Center -- Centro de Estudios Empresariales de Barcelona for

10   studios -- I'm going to spell it.  It's C-e-n-t-r-o, d-e,

11   E-s-t-u-d-i-o-s, E-m-p-r-e-s-a-r-i-a-l-e-s.

12        Then I also -- I'm a R & D for the rest of the

13   year for the administration for the May 3d to May 4th as an

14   entity of the Bureau of Industry and Security for the

15   United States.

16   Q.    And so what does your job with the Bureau of Security

17   and Industry for the United States consist of?

18   A.    The job is to learn what are the business notes or any

19   formation that related to companies like ours, to protect

20   the export and administration of the public relations.

21   Q.    And so, Mr. Domingot, did you ever work for

22   Porcelanosa Los Angeles, Incorporated?

23   A.    Yes, I did.

24   Q.    And approximately when did you work for Porcelanosa

25   Los Angeles?

Direct - Domingot

1    A.    I remember real well the day I started because it was

2    the day before September 11.  And I finalized my job, I

3    resigned from Porcelanosa Los Angeles, I think late 2004 or

4    beginning 2005.

5    Q.    And so do you recollect what your job title or job

6    titles were when you were with Porcelanosa Los Angeles?

7    A.    Yes, I do.  I was the general manager for Porcelanosa

8    Los Angeles.

9    Q.    And did you always have that position?

10   A.    I had the position until, I think, beginning of 2004,

11   then they changed my responsibilities to sell containers to

12   our customers in the United States.  We do it from

13   Porcelanosa Spain to United States.

14   Q.    And so what was your job title when your job

15   responsibilities changed?  Was it still general manager or

16   was it something else?

17   A.    It was exactly the same.  I -- they didn't define

18   it.

19   Q.    And so why did you come to leave Porcelanosa Los

20   Angeles?

21   A.    I left Porcelanosa Los Angeles because I requested to

22   Mr. Colonques -- I requested to hire a chief financial

23   officer, CFO, for our office.  At that time, he told me

24   that he will look for it.  And he thought it was a better

25   idea to have a CEO, chief executive officer, who also can

Direct - Domingot

1    manage any other office around United States.

2          And I left because -- let's say that his ideas at

3    that time and my ideas on my strategic plan that I build

4    was -- were not in the same page.  And I can consider that

5    two intelligent men can easily disagree.  That's why I wait

6    until the next general manager meeting in Spain and to meet

7    face-to-face Mr. Colonques, which always has been very

8    grateful, solid company.  And I preferred to resign in

9    person than sending a note.  And this is why I did it.

10   Q.   And so when you were working for Porcelanosa Los

11   Angeles, did you consider it to be an ethical company?

12   A.   Absolutely.

13   Q.   Did you consider it to be a -- did it perform by the

14   rules?

15   A.   Absolutely.

16   Q.   And so, Mr. Domingot, do you remember a Ryan Davis as

17   being an employee of the company while you worked with

18   Porcelanosa Los Angeles?

19   A.   Yes, I do.  I hired him.

20   Q.   And do you recollect any of the things that you

21   considered in making the decision to hire Ryan Davis?

22   A.   Yeah.  At the time, he came with knowledge of already

23   selling tile in the past and I think that it was an added

24   value.  It was our first immersion in this market in

25   Colorado, and then we provide training, we provide

Direct - Domingot

1  information about all of our product lines, all of our

2  factories that Porcelanosa owns.

3          Also I think that, you know, he knew some contacts

4  as well, and this made me -- after interviewing several

5  other candidates, that made me feel that he was the right

6  candidate for the position as a sales rep for -- sales

7  representative for Porcelanosa Los Angeles.

8  Q.   And that was based in Denver, Colorado?

9  A.   Yes.

10  Q.   And so tell me a little bit -- tell the Court and the

11  jury a little bit about what Porcelanosa Los Angeles'

12  operations consisted of when you made the decision to hire

13  Mr. Davis.

14  A.   Basically Porcelanosa Los Angeles, what they -- they

15  have several factories that they produce themselves,

16  product lines for the homes from ceramic tiles, porcelain

17  tiles, stone, bathroom fixtures, bathroom furniture,

18  kitchens, that was -- and then having all this product

19  line, what we were looking in United States is to sell

20  directly to design centers, dealers, architects, designers.

21  This is what the focus was.

22  Q.   Okay.  And so in terms of physical operations in

23  Colorado during the time that you were general manager of

24  Porcelanosa Los Angeles, was there a physical location in

25  Colorado?

Direct - Domingot

1   A.   Yes.   We -- first of all, I remember that he started

2   working remotely and then we would find -- I thought it was

3   a very good idea to have a small showroom where Ryan could

4   bring designers, builders, architects, to show the product

5   lines.   Even at that -- it was very, very tiny showroom,

6   potentially a thousand square feet, more or less,

7   approximately.

8          And I -- Ryan brought a team of constructors,

9   contractors, and we build even vignettes, the same way that

10  Porcelanosa wants it.   We didn't want to just have the

11  tile, we wanted to build something like impress people.

12  Very tiny place.   Potentially it was about a thousand

13  square feet, I do not know exactly where right now.

14         It has two offices, I think it had -- I think one

15  or two bathrooms, I guess.   I don't know.

16  Q.   Okay.   Thank you.   To your recollection, did that

17  facility -- that warehouse and showroom -- I don't want to

18  misquote you, would you consider it a warehouse or would

19  you consider it a showroom?

20  A.   It was a showroom.   A warehouse -- didn't have the

21  space for our warehouse.   Potentially we had that mini area

22  where some offices were placed.   We ship it directly from

23  Los Angeles to over there, but it may fit potentially the

24  size of two pallets.   I don't think it was bigger than

25  that.

1472

Direct - Domingot

1  Q.   Okay.  So were you carrying any inventory in that

2  facility, to the best of your recollection?

3  A.   No.

4  Q.   So did there come a time when Ryan Davis' employment

5  with Porcelanosa Los Angeles ended?

6  A.   I'm sorry?  When or how?

7  Q.   Did there -- the question is just:  Did there come a

8  time when --

9  A.   Oh, yeah.  Yeah, yeah, yeah.

10 Q.   -- Ryan Davis' employment with Porcelanosa Los Angeles

11 ended?

12 A.   Yes.  Yes.  We find out there was an application -- a

13 customer application that our accounting manager from

14 Porcelanosa Los Angeles informed me that it seemed to be

15 strange because it was signed under Davis' name.

16        At that time, it was -- I can say that at the time

17 the performing of Ryan was not as at the beginning.  The

18 energy was a little bit lost.  And when we find out this, I

19 questioned him, say, Is this your facility?  And he told me

20 yes, it was a facility that he was looking with his family,

21 that's all.

22        At the time -- I said at the time, I think this is

23 a conflict of interest.  We are conflict of interest.  I

24 have to let this relationship departing.  So we have to let

25 him go.

Direct - Domingot

1    Q.   Do you recall was Mr. Ryan Davis -- did he resign from

2    Porcelanosa Los Angeles or was he terminated from

3    Porcelanosa Los Angeles?

4    A.   I terminate him.

5    Q.   Okay.  So I'm going to ask that we please turn to

6    trial Exhibit A, which is neither stipulated to nor

7    admitted.  And I'd like to give it to Mr. Domingot for

8    identification.

9              COURTROOM DEPUTY:  Do you want paper or --

10             THE WITNESS:  No, this is fine.  Thank you very

11   much.

12   BY MR. THOMAIDIS:

13   Q.   So, Mr. Domingot, have you ever provided testimony

14   before?

15   A.   Never.

16   Q.   Okay.  The screen in front of you has some stuff and

17   we will -- I'll try to follow along so it can -- you can

18   familiarize yourself with these documents.

19             Actually, would you mind, just go -- just slowly

20   scrolling through the pages for Mr. Domingot.  And then

21   back to page 1.

22             So, Mr. Domingot, do you recognize this document?

23   A.   Yes.

24   Q.   What is it?

25   A.   It's the Standards of Conduct of Porcelanosa Los

Direct - Domingot

1    Angeles that we give to all of the employees when they were

2    hired.

3    Q.   Okay.  So all employees were required to sign this

4    document?

5    A.   All of them.

6    Q.   Okay.  Did you, as the general manager of Porcelanosa

7    Los Angeles, sign this document?

8    A.   Absolutely.

9    Q.   What was this document supposed to do?

10   A.   So all the -- the best way of doing business, best

11   practices that Porcelanosa expects from all the employees

12   that work for Porcelanosa Los Angeles, basically.

13   Q.   And so would this document have been -- or this record

14   been kept in the course of regularly conducted activities

15   of Porcelanosa Los Angeles?

16   A.   We kept all these documents from everyone, yes, sir.

17   Q.   Okay.  And so it sounds like making this record would

18   have been something that you did in the regular course of

19   your activity as general manager of Porcelanosa Los

20   Angeles; is that right?

21   A.   We enforce them.  We enforce to -- when we hire some

22   candidate, all of them, they have to sign it --

23   Q.   Okay.

24   A.   -- so  . . .

25   Q.   And this document would have been made at or near the

1475

Direct - Domingot

1    time that you were general manager of Porcelanosa Los

2    Angeles; is that right?

3    A.    Here again, absolutely.

4         MR. THOMAIDIS:   Okay.   So at this time, Your

5    Honor, we would move to admit defendants' trial Exhibit A

6    for identification into evidence.

7         THE COURT:   Any objection?

8         MR. BURG:   No objection.

9         THE COURT:   All right.   There being no objection,

10   Exhibit A is admitted into evidence and may be published to

11   the jury.

12        (Defendants' Exhibit A received)

13   BY MR. THOMAIDIS:

14   Q.    So, Mr. Domingot, a couple of other questions I have

15   for you here.   The first paragraph -- or, excuse me, the

16   first sentence of the second paragraph in this document

17   says, The following actions by employees, while not all

18   inclusive, may result in disciplinary action including

19   termination.

20        Do you see that?

21   A.    Yes.

22   Q.    So did you take that statement seriously?

23   A.    Yes.

24   Q.    Okay.   Did any violations of this document by

25   employees ever result in their termination?

1476

Direct - Domingot

1   A.   Yes.

2   Q.   Okay.  To your recollection, did a violation of the

3   terms of this document result in Ryan Davis' termination?

4   A.   I have to get all the document, but basic termination

5   for Ryan Davis was conflict of interest --

6   Q.   Okay.

7   A.   -- because I considered that if he was involved in any

8   way being a partner with operating that office and working

9   as employee, I consider this a problem.

10  Q.   Understood.  Let's go ahead and move on to the second

11  bullet in this document, page 1.

12       That bullet says, Dishonesty of any kind.  Would

13  you have considered the conflict of interest that you

14  described with respect to Ryan Davis to have been

15  dishonest?

16  A.   Yeah.

17  Q.   Okay.  And let's go ahead and move on to paragraph --

18  or bullet 8 there at the bottom of the page.

19       Do you remember Ryan Davis ever identifying to you

20  that he was, in fact, affiliated with Infinite Flooring &

21  Design when you received an application?

22  A.   Before seeing the application, no.

23  Q.   Okay.  On the application, did he ever identify

24  himself as being affiliated with or owning that entity with

25  either himself, individually, or his mother?

Direct - Domingot

1    A.   We find out that it was a name of his mom, his mother.

2    And then accounting manager, Marcela Giron, he mention it

3    to me and then that's why I call Ryan.

4    Q.   Okay.  Now, Mr. Domingot, would you have considered

5    that to be the false production of a document in the course

6    of Porcelanosa Los Angeles' business?

7    A.   Well, the document for me was as a company who wants

8    to become a dealer of Porcelanosa.  That's a regular

9    document, that's an acceptable document.  I think it's like

10   any other company would like to become a dealer of

11   Porcelanosa.  The thing is that when we investigate it and

12   Ryan Davis was engaged with that business practice, this is

13   when I consider a conflict of interest.  He cannot be in

14   both places.

15   Q.   Understood.  So if we could turn to the second of

16   three pages of this exhibit.  At the top there, bullet 10,

17   it says, Moonlighting involving a conflict of interest.

18        Do you see that?

19   A.   Yes.

20   Q.   As general -- as general manager of Porcelanosa Los

21   Angeles, what does the term "moonlighting" mean to you?

22   A.   Well, to be not mentioning something and do it

23   anyways.  Or covering something without communicating it,

24   so . . .

25   Q.   And so did you consider Ryan Davis' conduct, as you've

Direct - Domingot

1   described previously to have been moonlighting, involving a

2   conflict of interest?

3   A.    During that process when we found the application,

4   yes.

5   Q.    So then if we could please turn to the third page of

6   this document.  And if you could blow up that last section.

7        Now, you indicated that you had actually hired

8   Ryan Davis; is that right?

9   A.    Yes, I did hire him.

10  Q.    And so when you hired Ryan Davis, did you ask him to

11  fill out this document and sign it?

12  A.    Yeah.  Potentially not the same day, when I hired him,

13  but when we brought in to Porcelanosa Los Angeles for

14  training, then our HR manager provided Ryan with the

15  paperwork.

16  Q.    And so do you recall -- and I realize it's been a very

17  long time, but do you recall Ryan Davis' signature?

18  A.    Yeah.  I can recognize this one as his signature.

19  Q.    Okay.  So would you, to the best of your estimation,

20  would this have been Ryan Davis' signatures?

21  A.    Yeah, I think so.

22  Q.    Okay.

23  A.    I think so.

24  Q.    And then I'd like you to look specifically at the date

25  of this document.

1479

Direct - Domingot

1    A.    Uhm-hum.

2    Q.    And could you please blow up 2-5, 2002.  So, Mr.

3    Domingot, did you sign this date for Mr. Davis, yourself?

4    A.    Absolutely --

5    Q.    Okay.

6    A.    -- that's not my numbers.

7    Q.    Okay.  So can we now please go to trial Exhibit B.

8    And this document also is neither admitted nor stipulated

9    to.

10         Now, Mr. Domingot, do you recognize this letter?

11   A.    Yes.

12   Q.    What is it?

13   A.    This is -- let me see -- yeah, this is a request that

14   I wanted to have from all the sales reps about all the

15   performance --

16         MR. BURG:  Your Honor.  Your Honor, it's not

17   admitted yet.  I think he has to lay the foundation before

18   the witness can discuss it.

19         THE COURT:  All right.

20         MR. THOMAIDIS:  Sorry, Your Honor.  I let him go

21   further than I should have.

22         THE COURT:  Okay.

23   BY MR. THOMAIDIS:

24   Q.    So, Mr. Domingot, just for the clarity, for your

25   understanding, I'm going to ask you some questions just

1480

Direct - Domingot

1   generally to know if you know what this document is.  I'll

2   ask that you not get into great detail until I finish those

3   questions, please.  Thank you.

4          So you do recognize this document, yes?

5   A.   Yes.

6   Q.   Okay.  And does that day look like approximately the

7   date you would have been sending a document like this?

8   A.   Yes, I think so.

9   Q.   And does it look like a correspondence that you would

10  have sent while general manager of Porcelanosa Los

11  Angeles?

12  A.   Yes.

13  Q.   Okay.  And would this document have been produced in

14  the course of regularly conducted business activities?

15  A.   Yes.

16  Q.   Okay.  And would making a record of these kind of

17  things been a process that would have been part of the

18  business activities of Porcelanosa Los Angeles?

19  A.   Yeah.

20          MR. THOMAIDIS:  Okay.  So, Your Honor, at this

21  time, I would move for the admission of Defendants'

22  Exhibit B.

23          MR. BURG:  Your Honor, may I do a brief voir dire

24  of the document?

25          THE COURT:  You may.

1481

Voir Dire - Domingot

1    MR. BURG:  Thank you.

2    MR. THOMAIDIS:  I was all settled in.

3                VOIR DIRE EXAMINATION

4  BY MR. BURG:

5  Q.    Mr. Dom- -- is it Domingo or Domingot?

6  A.    Domingot.

7  Q.    Domingot, okay.

8         In looking at this document, I see your name, but

9  then I see a signature underneath it.  That is not your

10 signature, is it?

11 A.    Let's see.  No, it's not my signature.

12 Q.    Okay.  So do you know whether or not this actually was

13 signed by you and sent by you when it's signed by somebody

14 else?

15 A.    I -- I do not know.

16 Q.    Okay.

17 A.    They not come from me --

18 Q.    It says it's from you, but it's signed by somebody

19 else?

20 A.    Yeah.

21 Q.    So you can't verify that this document is something

22 that was sent by you with a signature that's not yours.

23 A.    That signature is not mine.

24 Q.    All right.

25                MR. BURG:  Thank you.  Your Honor, at this time, I

1482

Direct - Domingot

1   would object to it on the basis that while the memo appears

2   to be from him, the signature clearly is not his.

3         MR. THOMAIDIS:  And, Your Honor, I think I was

4   going to get to that.  It appears from the text of the

5   memorandum that he was actually asking for each of the

6   employees that were referenced in the To line to sign and

7   return this document.  And this document actually came

8   from, I believe, another employee's employment file.  That

9   individual goes by the name of Dalke, and that is his

10  signature.

11        THE COURT:  Well, all I have for evidence of that

12  is your statement.

13        MR. THOMAIDIS:  Understood, Your Honor.

14        THE COURT:  That is not evidence.  The objection's

15  sustained.  Exhibit B is refused.

16        MR. THOMAIDIS:  Okay.

17        THE WITNESS:  I will say something.

18        THE COURT:  No, there's no question pending, sir.

19        THE WITNESS:  Okay.

20                   DIRECT EXAMINATION (Continued)

21  BY MR. THOMAIDIS:

22  Q.   That's all right.

23  A.   Okay.

24  Q.   That was -- it's fine.

25        THE COURT:  Next question, counsel.

Direct - Domingot

1        THE WITNESS:  Sure.

2    BY MR. THOMAIDIS:

3    Q.   So may we please turn to trial Exhibit C.

4        MR. BURG:  I'm sorry, what?

5        MR. THOMAIDIS:  Trial Exhibit C.

6        MR. BURG:  C?

7    BY MR. THOMAIDIS:

8    Q.   So, Mr. Domingot, do you recognize this document?

9    A.   Yes.

10   Q.   And is this an e-mail that you sent?

11   A.   Yes.

12   Q.   Is this an e-mail that you sent on March 15th, 2004?

13   A.   Yes.

14   Q.   Do you have any recollection of the subject line of

15   this e-mail?

16   A.   Well, let me see.  Yeah, I think that at the time is

17   when I was requesting some information, weekly information

18   about visits, sales, performing -- performing jobs, because

19   I didn't see sales coming up, or possibly developing

20   business as we expected, so I wanted to have more

21   information exactly, and I want to have a little bit of an

22   analysis of what Ryan was doing on a weekly basis.

23   Q.   So was this document made within the time that you

24   were the general manager of Porcelanosa Los Angeles,

25   Incorporated?

Direct - Domingot

1    A.    Yes.

2    Q.    And was this document something that you would have

3    produced in the course of a regularly conducted business

4    activity for Porcelanosa Los Angeles?

5    A.    Yes.

6    Q.    And was this record something that you would have done

7    normally in the course of being the general manager of

8    Porcelanosa Los Angeles?

9    A.    Absolutely.  For any other employee that I do not see

10   good performing.

11           MR. THOMAIDIS:  Okay.  And so, Your Honor, at this

12   time, we would move defendants' trial Exhibit C from

13   identification into evidence.

14           THE COURT:  Any objection?

15           MR. BURG:  No objection, Your Honor.

16           THE COURT:  There being no objection, Exhibit C is

17   admitted into evidence and may be published to the jury.

18           MR. THOMAIDIS:  Thank you, Your Honor.

19      (Defendants' Exhibit C received)

20   BY MR. THOMAIDIS:

21   Q.    So, Mr. Domingot, can you just explain for the jury

22   what you were saying in this e-mail.

23   A.    Two weekly call reports.  Two weekly call reports.

24   All formal activities in the past week.  I wanted to

25   exactly know what activities he had accomplished within the

Direct - Domingot

1   past week and then what activities he has prepared for

2   visits or visiting builders or visiting contractors or

3   visiting designers to generate business for Porcelanosa Los

4   Angeles.

5   Q.   Okay.  And so who is Bryan Levine in the CC line of

6   this e-mail?

7   A.   Bryan Levine is -- Bryan Levine was our HR director

8   for Porcelanosa Los Angeles.

9   Q.   To your knowledge, did Mr. Levine ultimately leave the

10  company?

11  A.   Mr. Levine, yes, left the company.

12  Q.   And you left the company?

13  A.   I left the company.

14  Q.   And you say, Ryan, I need to receive every Friday the

15  two weekly call reports.

16  A.   I request of him to receive -- send me the two weekly

17  call reports.  One for the job that he did the past week

18  and the prospect week -- the prospect jobs that he intended

19  to do for the following week.

20  Q.   And so was one of Ryan Davis' job responsibilities to

21  provide these weekly call reports?

22  A.   Yes.

23  Q.   And was he failing to do so at this point in time?

24  A.   I -- yes.

25  Q.   To your knowledge, did he correct that problem after

1486

Direct - Domingot

1   this e-mail was sent?

2   A.   I -- I would like to say I guess, but when -- if he

3   did it or if he did not do -- or if he didn't do it, I do

4   not recall it.   Whatever I recall is that my decision for

5   termination was due to finding that he was involved with

6   Infinite Flooring.

7   Q.   I understand.   You say here at the bottom of this

8   e-mail, I also want to let you know if you are not

9   accomplishing this mandatory work function, you will be

10  provided with a written warning.

11        To your knowledge, did you ever give Ryan Davis a

12  written warning for this performance issue?

13  A.   I -- I do not remember.   I do not recall if I wrote a

14  written warning to Ryan Davis.

15  Q.   Okay.   Would you have considered -- Mr. Domingot, as

16  the general manager of Porcelanosa Los Angeles,

17  Incorporated, would you have considered Ryan Davis to be an

18  exemplary employee?

19  A.   Exemplary?

20  Q.   Exemplary employee?

21  A.   I would like to say that at the beginning he came with

22  a lot of energy, with a lot of, you know, willing to grow

23  the business, very enthusiastic, very engaged.   After, you

24  know, even -- I remember he -- he knew builders in Colorado

25  and he was also engaging with all of them at the beginning

Direct - Domingot

1   of his professional work in Porcelanosa Los Angeles.

2   Even -- he brought architects from Colorado to the

3   Porcelanosa headquarters office in Castellon, so at that

4   time I can say that he was engaged.  He was totally

5   enthusiastic with the brand, enthusiastic with the color

6   blinds.

7           When I start sending -- when I send all these

8   e-mails to him, I can say that he was not because they -- I

9   will weight a salesperson because his performance and sales

10  drop to the company, so at that time he was not doing it.

11          So for, you know -- and I can say when we hire

12  somebody, or other company, or any company hires somebody,

13  and he is enthusiastic, the case of Ryan Davis and later

14  on, he wasn't.

15  Q.   So if we could please move to Defendants' Exhibit D.

16  Now, this document has been admitted in part and rejected

17  in part, and I think that at last count, we were -- we had

18  admitted pages 1, 2, 4, and 5.  And what I would like to

19  do -- I would like to use page 3 for just a moment to

20  refresh Mr. Domingot's recollection under 803(5).

21          THE COURT:  Your --

22          MR. BURG:  Your Honor, there's been no question to

23  refresh his recollection yet, so --

24          MR. THOMAIDIS:  I understand, I just want --

25          THE COURT:  You have to establish that he has no

Direct - Domingot

1   present recall of the matter before his memory's refreshed.

2   BY MR. THOMAIDIS:

3   Q.   Mr. Domingot, you testified previously that you

4   recalled an account application being submitted for a

5   company called Infinite Flooring & Design; is that right?

6   A.   That's right.

7   Q.   And you recall that an account person in, I believe

8   you said, Los Angeles, had brought it to your attention; is

9   that accurate?

10  A.   That's right.

11  Q.   And do you recall what ultimately happened to that

12  account?

13  A.   Okay.  When we opened an account, we request two kind

14  of documents:  One was the customer application and the

15  other one was the credit application.  In that account --

16  let me see -- in that account, we -- I think we open it as

17  a customer account, as a dealer account, but we terminate

18  Ryan Davis.  I think so.

19       And then I think is -- I continued the

20  relationship with Infinite Flooring because Ryan Davis knew

21  the market.  I think so.

22       MR. THOMAIDIS:  Okay.  So, Your Honor, may I pull

23  up trial Exhibit D, again, and use that page for -- to

24  refresh his recollection with respect to what ultimately

25  happened to the account?  I'm sorry.

Direct - Domingot

1    THE COURT:  You have to establish that he doesn't

2    have present memory of what you're asking him.

3    MR. THOMAIDIS:  Okay.

4    THE COURT:  If you ask the question and he says he

5    doesn't remember, then you can use the document to refresh

6    his recollection.

7    BY MR. THOMAIDIS:

8    Q.   Mr. Domingot, is your recollection that you left the

9    account open or is your recollection that you closed the

10   account?

11   A.   I think that at the beginning we wanted to continue,

12   it was a decision to close the account.  I think so.

13   Q.   Okay.  So let's go ahead and look at the admitted

14   pages of this document.  Perhaps that will get the job

15   done.

16   THE COURT:  That's fine.

17   BY MR. THOMAIDIS:

18   Q.   So can you please blow up the top half of this e-mail.

19   So do you recall being cc'd on this e-mail

20   correspondence?

21   A.   Honestly, I do not recall if I -- but because my name

22   was there, obviously I was cc'd.

23   Q.   Okay.  So do you recall Ryan Davis sending over an

24   account application that he already had some orders for?

25   A.   I -- I guess.  I think so.

Direct - Domingot

1  Q.   Okay.  And then he goes on to say, They are COD and

2  set up as a design center.  Please let me know when they

3  are up and running.

4        Do you see that?

5  A.   Yeah.

6  Q.   Did you know who he's referring to at this time?

7  A.   No, but I can recall that the design centers, because

8  the type of business that they have, they do not have COD,

9  cash on delivery.  The design centers, because they were

10  buying for builders, they have some net sale -- net sales.

11  Net sales, I believe.  I think so.

12  Q.   Okay.  And so to your recollection, did Ms. -- and I

13  believe it's -- is it Jerone, the pronunciation?

14  A.   I'm sorry?

15  Q.   Mirasol -- is it pronounced Jerone?

16  A.   Giron.

17  Q.   And did Ms. Giron ultimately set up Infinite Flooring

18  & Design and tell you when -- or tell anyone at Porcelanosa

19  when they were up and running?

20  A.   I guess so.  But I think that it was -- because it

21  wasn't that conflict of interest, we -- I can say that we

22  were identifying the account for Infinite Flooring, I think

23  that the account was open.  I think so.  But I'm -- I don't

24  have a --

25  Q.   So in this e-mail from Ryan Davis to Ms. Giron copying

Direct - Domingot

1   you, did he identify himself as being affiliated with

2   Infinite Flooring & Design?

3   A.    No.

4   Q.    And at this point in time, were you aware that Ryan

5   Davis was affiliated with Infinite Flooring & Design?

6   A.    I don't think so.

7   Q.    Did -- to your recollection, did Ryan Davis ever call

8   you or e-mail you or communicate with you in some way

9   indicating that he was affiliated with Infinite Flooring &

10  Design?

11  A.    No, I recall, I remember, that when we brought -- when

12  Marisol brought me this paper -- because the name of Ryan's

13  mom -- Ryan's mother was there, I remember that I called

14  Ryan on the phone and I questioned him, Is this a company

15  that you're involved, or something like that.

16         Then he told me the truth, yes, to be honest, yes,

17  I'm going to be involved.

18  Q.    And so how long had the company been set up as an

19  account to the best of your recollection when you

20  identified that?

21  A.    I -- I don't know.

22  Q.    Okay.  Let's go ahead and turn to the -- let's go

23  ahead and turn to the fourth page of this document, please.

24  And -- perfect.

25         So, Mr. Domingot, do you recognize this document?

1492

Direct - Domingot

1   A.   Yes, I remember this.

2   Q.   And so how do you recognize this?

3   A.   I remember this because this is what we -- Marisol

4   brought me when she pointed out that Darlyne Johnson, and

5   then we didn't know who was Darlyne Johnson, but later on

6   the -- underneath this, it came up Darlyne Davis, and then

7   we were questioning it, who is Davis when the name of the

8   application goes under Johnson?

9        And then we start finding out.  And I remember

10   that brought up to my attention, and I think that this is

11   the time, and I cannot assure if it was the same day that

12   we find out or the next day that we find out that I call

13   Ryan.

14   Q.   And so when you called Ryan Davis, did you ask him who

15   is Darlyne Johnson?

16   A.   Yeah.  I -- I had to ask him who is Darlyne Johnson,

17   or why is this also Darlyne Davis?  And because this last

18   name is the same, some a little bit confusing, and that's

19   why I asked the question.

20   Q.   And so do you recall what the explanation that Mr.

21   Davis gave you was?

22   A.   I remember he said that, yes, it's a company that he

23   was doing with his parents and he's going to be involved

24   with.  That's why I decide to make the adjustment and

25   terminate him.

Direct - Domingot

1    Q.    Okay.  And so, Mr. Domingot, would you have considered

2    this to be a -- this conflict of interest, would you have

3    considered that to be dishonest with respect to his

4    employment with Porcelanosa Los Angeles?

5    A.    Yes, I do.  Yes.

6    Q.    So now if we could please turn to trial Exhibit F.

7          Now, Mr. Domingot, if you'd like -- I'll ask --

8    this document has neither been admitted nor stipulated to.

9          And could you just scroll through the document

10   briefly for his edification.

11         So, Mr. Domingot, do you recognize this document?

12   A.    Yes.

13   Q.    And what is it exactly?

14   A.    It's a document that we provide to all the employees

15   as to, it's mentioned here, the conflicts of interest

16   agreement.

17   Q.    And is this a document that all employees are required

18   to sign?

19   A.    Yes.

20   Q.    And when you were the general manager of Porcelanosa

21   Los Angeles, did you also sign this document?

22   A.    Absolutely.

23   Q.    Okay.  Was this document made while you were a general

24   manager for Porcelanosa Los Angeles?

25   A.    Yes.

1494

Direct - Domingot

1   Q.   And was it kept in the course of Porcelanosa Los

2   Angeles' regularly conducted business activities?

3   A.   Absolutely.

4   Q.   And was keeping this record and others like it a

5   regular practice in your job as general manager?

6   A.   Absolutely.

7   Q.   Okay.

8   A.   All this documents, also we had general counsel in

9   Miami that always approved.

10         MR. THOMAIDIS:   And so, Your Honor, at this time,

11   the defendants would move defendants' trial Exhibit F for

12   identification into evidence.

13         THE COURT:   Any objection?

14         MR. BURG:   No objection.

15         THE COURT:   There being no objection, Exhibit F is

16   admitted into evidence and may be published to the jury.

17       (Defendants' Exhibit F received)

18         MR. THOMAIDIS:   Thank you, Your Honor.

19   BY MR. THOMAIDIS:

20   Q.   So, Mr. Domingot, please tell me what this document

21   was supposed to do.

22   A.   Well, provide knowledge to all the employees of

23   Porcelanosa Los Angeles about everything that we consider

24   as conflict of interest, and they should be aware.  And if

25   they do something that is such paper -- written in this

1495

Direct - Domingot

1  agreement, should be a possible termination of

2  employment.

3  Q.   And it says there in the first line, Employees must

4  avoid entering into transactions where it may appear that

5  they're improperly benefiting from their employment with

6  the company.

7           Do you see that?

8  A.   Yes.

9  Q.   Would you have considered Mr. Ryan Davis' engagement

10  or affiliation with Infinite Flooring & Design to have been

11  contrary to that provision?

12  A.   Yes.   This is a breach of contract.

13  Q.   And then if you move on to the next line, it says,

14  This includes the use of an employee's relationship with

15  the company for personal profit or advantage, either

16  directly or indirectly.

17  A.   Yes.

18  Q.   Would you consider Ryan Davis' engagement or

19  affiliation with Infinite Flooring & Design, Incorporated,

20  to be a violation of that provision?

21  A.   Yes, I do.

22  Q.   Okay.   And it goes on to say, A situation that may

23  involve a conflict of interest between personal interests

24  and the interests of the company must be discussed with the

25  human resource manager and the general manager in order to

1496

Direct - Domingot

1   protect an employee's interest and those of the company.

2           Do you see that?

3   A.   Yes, I do.

4   Q.   So when this customer application for Infinite

5   Flooring & Design was brought to your attention, had Ryan

6   Davis discussed that matter with either the human resource

7   manager or you, as the general manager, in order to protect

8   the employee's interest and also those of the company?

9           MR. BURG:   Your Honor, I'm going to object as to

10  part of it, as to whether he knows whether he talked to the

11  resource manager or not.

12          THE COURT:   One second.

13          Yeah, that's sustained.   Why don't you rephrase

14  it.

15          MR. BURG:   Thank you.

16          MR. THOMAIDIS:   Understood, Your Honor.

17  BY MR. THOMAIDIS:

18  Q.   Did Ryan Davis ever bring the matter of Infinite

19  Flooring & Design to your attention prior to you

20  identifying it in the account application?

21  A.   No.

22  Q.   And, to your knowledge, did Ryan Davis ever bring that

23  matter regarding Infinite Flooring & Design to the human

24  resource manager's attention?

25  A.   I do not know.

Direct - Domingot

1   Q.   And who would the human resource manager at that time

2   be, if you recollect?

3   A.   Marisol Giron.  Well, Marisol or Brian Levine.

4   Q.   Okay.

5   A.   Mirasol Giron -- before I hired Bryan Levine as HR

6   director, Marisol, he was accounting, and having all these

7   paper boards and providing this kind of information to the

8   employees.

9   Q.   And so bullet 1 there, same page, just slightly

10   further down, it says, on an activity that may cause such a

11   conflict is, Having a financial interest in an outside

12   concern that does business with or is a competitor of

13   Porcelanosa Los Angeles and in parentheses, except where

14   such ownership consists of securities of a publicly owned

15   corporation regularly traded on a public stock exchange.

16          Do you see that?

17   A.   Yes.

18   Q.   Would you have considered Ryan Davis' affiliation with

19   Infinite Flooring & Design at this time to be having a

20   financial interest in an outside concern doing business

21   with Porcelanosa Los Angeles?

22   A.   I guess so.

23   Q.   And that would have been in violation of this conflict

24   of interest agreement; would you agree?

25   A.   That's right.

Direct - Domingot

1    Q.   So if we could move to paragraph 5, please.

2         And this one says, Representing Porcelanosa Los

3    Angeles in any transaction in which there may be or is a

4    conflict of interest.

5         Do you see that?

6    A.   Yes.

7    Q.   Would you have considered Ryan Davis' affiliation or

8    ownership interest in Infinite Flooring & Design at the

9    time to have been a violation of this provision?

10   A.   Yes, I do.

11   Q.   Okay.  And that would have also placed him in

12   violation of the terms of this conflict of interest

13   statement; would you agree?

14   A.   I agree.

15   Q.   Okay.  So then if we could turn to the next page of

16   this document.  And if you could blow up the top page

17   there, the top portion of the page.

18        Now, you indicated previously that you had hired

19   Ryan Davis.  Did he sign this document as part of the

20   hiring process or subsequent in his employment?

21   A.   He should.  He did.

22   Q.   Okay.  And does that look like Ryan Davis' signature,

23   based on your recollection?

24   A.   I guess.

25   Q.   And it says there, I have carefully read this conflict

1499

Direct - Domingot

1    of interest agreement and I agree to the above conditions

2    of employment.

3            Do you see that?

4    A.   Uhm-hum.

5    Q.   Was agreement to this document a condition of ongoing

6    employment with Porcelanosa Los Angeles?

7    A.   I don't -- can you rephrase it again?

8    Q.   Certainly.  An employee signing this document --

9    A.   Yes.

10   Q.   -- was that a condition of being employed by

11   Porcelanosa Los Angeles?

12   A.   Oh, yes.  Yes, yes.

13   Q.   And this appears to be dated.  If you could just blow

14   up that date --

15   A.   Uhm-hum.

16   Q.   -- this appears to be dated June 29th, 2004.  Would

17   you agree?

18   A.   Yes.  Yes.

19   Q.   Now, did you date this document for Mr. Davis when he

20   signed it?

21   A.   I do not -- I did not and I do not write any dates for

22   Mr. Davis or any other employee of Porcelanosa Los

23   Angeles.

24   Q.   Understood.

25   A.   They do it.

Direct - Domingot

1    Q.   And so when you date a document after putting your

2    signature on it, would you typically consider the date a

3    portion of your signature?

4    A.   Always when I sign a document immediately I put the

5    date of -- that I sign.

6    Q.   Okay.  And is that always?

7    A.   Absolutely, I think so, yeah.

8    Q.   Okay.

9    A.   Otherwise it's not -- it's not the meaning.

10   Q.   Understood.  So if we could please now move on to

11   Defendants' Exhibit I, which is admitted at this point.

12          And I'll ask that -- actually, before we blow

13   anything up, can you just briefly scroll through this

14   document.  We do have paper copies of these if you'd like,

15   but I . . .

16   A.   I can read with papers and I can read with no

17   papers.

18   Q.   Fair enough.  Do you recognize this document?

19   A.   Yes, I do.

20   Q.   Okay.  What is this?

21   A.   This is the employee termination form from Porcelanosa

22   Los Angeles.

23   Q.   Okay.  And do you recall filling this document out or

24   directing this document be filled out?

25   A.   I recall that to fill out this document was made by

Direct - Domingot

1    Brian Levine, who is -- who was the HR -- the actor for

2    Porcelanosa Los Angeles, also from Marisol, because he had

3    experience in the past in that matter.

4    Q.    Now is Marisol a he or she?

5    A.    She, I'm sorry.

6    Q.    I'm sorry.  I just wanted to make sure I understand.

7    A.    I got my definitives in -- my daughter tells me the

8    same.

9    Q.    So this appears to have a date of July 21st, 2004;

10   would you agree?

11   A.    Yes.

12   Q.    And this involves an employee, Ryan Davis.  Do you

13   remember this?

14   A.    Yes.

15   Q.    Okay.  And then the last day worked there, says

16   July -- it looks like 21 has been scratched out and it's

17   July 20, 2004.  Do you see that?

18   A.    Yes.

19   Q.    To your recollection, did you put that zero in place

20   of the 1?

21   A.    No.

22   Q.    Do you remember who did?

23   A.    No.

24   Q.    And then it appears there that the job title is

25   outside sales representative.  Is that consistent with your

Direct - Domingot

1    recollection of Ryan Davis' job title on or about July

2    21st, 2004?

3    A.   Yes.

4    Q.   And based on this top portion of the document, would

5    you say that Ryan Davis was terminated on July 21st, 2004,

6    or July 20th, 2004?  And if you don't recollect --

7    A.   I don't recall.

8    Q.   And then underneath there it says, Reason of

9    termination:  Conflict of interest.  Ryan is involved with

10   a company that is in competition with Porcelanosa Los

11   Angeles in Colorado.  Ryan did not disclose his involvement

12   to the company as required by the company's policy on

13   conflict of interest.

14          Do you see that?

15   A.   Yes.

16   Q.   Is that consistent with why Ryan Davis was terminated

17   from Porcelanosa Los Angeles in July of 2004?

18   A.   Yes, it is.

19   Q.   Okay.  And then if we can move down to the bottom half

20   of the page.  Now, it says at the top there, To be

21   completed by supervisor.  Would you have been considered

22   the supervisor in this situation?

23   A.   I was the maximum supervisor for this, yeah.

24   Q.   And it says there, termination.  It's either

25   resignation, discharge or other.  What does the term

1503

Direct - Domingot

1  "discharge" mean if that box is checked or if that circle

2  is X'd?

3  A.   I'm sorry, wait.  Oh, discharge, right?

4  Q.   That's correct.

5  A.   Which means terminated.

6  Q.   Okay.  And then the reason for termination appears to

7  be, again, a conflict of interest between Ryan and

8  Porcelanosa Los Angeles; would you agree?

9  A.   I agree.

10  Q.   And it appears to be his last day of work would have

11  been July 20th, 2004.  Would you agree with that, to the

12  best of your recollection?

13  A.   I see this date here.

14  Q.   Understood.  Underneath there it says, Eligibility for

15  rehire.  And the circle is -- for "no" is X'd; do you see

16  that?

17  A.   Absolutely.

18  Q.   Was Ryan Davis eligible for retire in July of 2004

19  when he was terminated from Porcelanosa Los Angeles?

20  A.   No.

21  Q.   And why was that?

22  A.   Because I consider that that action that it happen, he

23  will not be acceptable for rehiring him versus somebody

24  else.  We would prefer to have a new employee on board and

25  go through the process.

Direct - Domingot

1    Q.   And is that because you considered Mr. Davis' conduct

2    to be dishonest?

3    A.   Yes.

4    Q.   Okay.  So if we can please turn to the second page of

5    this document.

6         And then this appears to be a notice as -- to

7    employees as to change in relationship.  Now, were these

8    two documents typically provided together with one another?

9    A.   Yes.

10   Q.   Okay.  And this gives the involuntary discharge

11   effective of -- as of July 20th, 2004, which is consistent

12   with the previous document, correct?

13   A.   Yes.

14   Q.   And then why was your -- well, let me ask a different

15   question.  Is that your signature under Supervisor's

16   Signature?

17   A.   Yeah.  I recognize the signature as my signature.

18   Q.   Okay.  Why do you recognize it as your signature?

19   A.   Because I recognize my signature because I recognize

20   the paper, I recognize that type of paper, signed; even my

21   numbers on the date are my numbers.  I have a

22   particularly -- when I put two numbers, for instance '04, I

23   put the apostrophe on it.  That's my -- also my signature

24   on the numbers as well.  That's it.

25   Q.   Okay.  So this is your signature?

Direct - Domingot

1   A.   Oh, on the 7 is the European 7 as well.

2   Q.   So tell the Court and the jury what you mean by

3   European 7.

4   A.   Well, European 7 is in Europe, we write the 7s like

5   this one that shows on the screen.  In United States, from

6   my experience, I see many 7s write it with three -- I don't

7   know how to describe it, I can draw it, but they don't have

8   the crossing one, and they have three portions to make a

9   number.  I don't know.  Can I draw one?

10  Q.   It's -- thank you very much.  I appreciate -- no, I

11  appreciate the offer, and I think most of us understand

12  what you're talking about, so thank you.

13       So suffice to say, this is an example of your

14  date, correct?

15  A.   Yes.  Yes.

16  Q.   And then if we can move to the next section down.

17       Now, would you say to the best of your

18  recollection this is Ryan Davis' signatures.

19  A.   I guess.

20  Q.   I'm sorry?

21  A.   I guess.

22  Q.   Okay.

23  A.   I think.

24  Q.   And what about those dates, are those dates consistent

25  with what Ryan Davis would have signed consistent -- or

Direct - Domingot

1    associated with his signature?

2    A.    I guess.

3    Q.    Okay.  And so let's go ahead and move to the third

4    page of this document.  And if we can -- if we can please

5    blow up the bottom portion of the page.

6         Now, is that an example of your signature in the

7    bottom section, Signature of person issuing final paycheck?

8    A.    Yes.

9    Q.    And you're certain that that's your signature?

10   A.    Yes.

11   Q.    Okay.  And the date over there appears to be the same

12   day, 7-20 of 2004; would you agree?

13   A.    Yes.

14   Q.    And is that the date that you wrote him that --

15   A.    That's my numbers.

16   Q.    Okay.  And do you remember when you signed this, did

17   Ryan Davis sign it at approximately the same time in your

18   presence?

19   A.    I think we did it together because when I found out

20   that he was engaging with this company -- of course I was

21   in California, he was here in Colorado, and I have -- when

22   I do this, I have to do it in person.  I think it's the

23   most appropriate way.  The parting parts, checking also

24   that he takes everything from the office.  And I came to --

25   I think I came to Colorado to do it, yes.

Direct - Domingot

1  Q.   So why, in your opinion, would you do something like

2  that in person?

3  A.   Because I think it's the most appropriate way to do it

4  and, yes, checking also that the company -- or the office

5  is -- stays in good shape.  I try to separate parties with

6  no conflicts possible.  And that's all.  I think it's -- I

7  think it's the right thing to do.

8           COURTROOM DEPUTY:  You have two minutes.

9           MR. THOMAIDIS:  Okay.  Thanks.

10  BY MR. THOMAIDIS:

11  Q.   So let's go ahead and now turn to Plaintiffs' --

12  excuse me, Defendants' Exhibit J, which is also admitted.

13           Now, Mr. Domingot, do you recognize this document?

14  A.   No.

15  Q.   And let's go ahead and just briefly scroll through the

16  three pages.

17           Now, do you ever recall negotiating this document?

18  A.   No.

19  Q.   Do you ever recall sitting with Ryan Davis and

20  discussing the terms of this document?

21  A.   No.

22  Q.   Do you ever recall signing this document?

23  A.   No.

24           MR. THOMAIDIS:  And, Your Honor, I will remain --

25  or hold on to my final questions for redirect.

1508

Cross - Domingot

1    THE COURT:   All right.   Cross-examination.

2                    CROSS-EXAMINATION

3    BY MR. BURG:

4    Q.   Good afternoon, Your Honor, ladies and gentlemen of

5    the jury, counsel.

6            Mr. Domingot, you and I met back in March of 2015,

7    correct, when I --

8    A.   Yes, we did.

9    Q.   I took your deposition, right?

10   A.   Yes, I remember.

11   Q.   And I see your attorney's here with you.

12   A.   Yes.

13   Q.   Did Porcelanosa pay for you and your attorney to fly

14   out here?

15   A.   I -- they pay for me.   I do not know if they pay for

16   my employee -- for someone, my attorney.

17   Q.   Okay.   Have you talked -- since our deposition, have

18   you talked to any -- either the lawyers for Porcelanosa or

19   people who are -- who work for Porcelanosa?

20   A.   Yes, I did.

21   Q.   How many times?

22   A.   Mr. -- him, he call me.   We met about a month ago,

23   something like that, in Santa Ana, because he wanted to get

24   together with my attorney and myself for further

25   investigation.

1509

Cross - Domingot

1   MR. THOMAIDIS:  And, Your Honor, all of this is

2   well beyond the scope of direct.

3   THE COURT:  Well, I'll let it go for now.  Go

4   ahead.

5   MR. BURG:  Thank you.

6   BY MR. BURG:

7   Q.   And how long did you meet with Mr. Thomaidis?

8   A.   I met him about, like I said, about a month ago

9   because he wanted to --

10  Q.   But how long -- I'm sorry.  How long did the meeting

11  last?

12  A.   Oh, probably about -- I don't remember well, but

13  probably about two hours, something like that.

14  Q.   Did they show you documents?

15  A.   He showed me some documents, yeah.

16  Q.   Yeah.  Did he tell you more about the case, about

17  their claims and the claims we have?

18  A.   No.

19  Q.   Okay.  And who else was present beside Mr. Thomaidis

20  and your lawyer?

21  A.   Our attorney -- my attorney.

22  Q.   All right.  Now, you've changed jobs since I talked to

23  you --

24  A.   Yes.

25  Q.   -- right?

Cross - Domingot

1    A.    I did.

2    Q.    And now, you're -- it looks like you've got a better

3    job now?

4    A.    I think -- yeah.  Very good job.

5    Q.    Good for you.

6    A.    Thank you.

7    Q.    In 2005, when you left -- when you were leaving

8    Porcelanosa, do you recall asking them if you could buy

9    direct from the factory and set up your own company to

10   distribute their product in Los Angeles?

11   A.    That's correct.  I went to Porcelanosa for two

12   reasons:  I went to present my resignation that I give to

13   Mr. Calonques.  At that time I remember that he did not

14   want to accept it.  He wanted to give me a very nice

15   expressive -- expressive affair from his office.  And --

16   but at the same time, I knew that, like I said before, two

17   intelligent people can easily disagree, and I could not

18   continue working the company.

19        And then what I proposed is I told him, I wanted

20   to consider to open a company in California and I would

21   like to buy your products directly from Porcelanosa Spain

22   and specifying in arc -- specifying in hotels, shopping

23   centers, and restaurant chains.

24   Q.    All right.  And you -- and you asked them that, and it

25   was because you wanted to get better prices if you could

Cross - Domingot

1   buy from the factory direct, otherwise you weren't going to

2   do the deal, correct?

3   A.   It's a possibility, but also Porcelanosa -- I wanted

4   to do it because I didn't want the CEO that was in charge

5   to get one penny from me while I was operating my

6   company.

7   Q.   Sure.  And you actually established that company, but

8   it went out of business in 2009 because of the complete --

9   let's see, it went out of business because of the economy

10   was so bad in the building business --

11   A.   Well, in the building business and in my -- in my

12   segment, where I was selling it, because I was focused on

13   shopping centers, hotels, and restaurant chains.  Because

14   these three markets were the -- the market first started

15   crashing in 2007, 2008.  The projects were delayed, they

16   were canceled, they were -- so I had to close the position,

17   close my company, and find a new job.

18   Q.   So even though you had been working as a general

19   manager for Porcelanosa, even though you went to Spain and

20   got better pricing, the economy was so bad that you had to

21   close the company and move on, correct?

22   A.   I think everybody knows that the economy was very bad

23   at that time.  Yes.

24   Q.   And anybody who would say differently either was

25   sleeping through that time or they're not telling the

1512

Cross - Domingot

1    truth?

2    A.    Exactly.  I agree.

3    Q.    And you and Mr. Davis, when you hired him, you -- you

4    were very impressed with him, weren't you?

5    A.    Yes.

6    Q.    And you and he had a really great relationship, didn't

7    you?

8    A.    Yeah, I got business professional -- business

9    relationship.

10   Q.    Right.  And he was very knowledgeable about the tile

11   industry, correct?

12   A.    Correct.

13   Q.    And you also -- you and he actually went to Spain on

14   three occasions with architects that he knew who he brought

15   over there to learn the -- about the products from

16   Porcelanosa, correct?

17   A.    Yeah.  I do not know on three occasions, I do not

18   recall three occasions, but I recall that one of the

19   business that he brought, I think six or seven -- sorry --

20   six or seven architects from two or three different

21   firms.

22   Q.    Right.  And he -- he knew -- and actually he was

23   trained on the ventilated facades --

24   A.    Correct.

25   Q.    -- when he was in Spain, correct?

1  A.   Yes.   The ventilated facades was one of the products

2  that Porcelanosa wanted to push because it was good

3  product, it was really very well accepted in Europe, and we

4  wanted to enter into the U.S. market.

5  Q.   And as far as you know, from the time you left

6  Porcelanosa, have the ventilated facades been approved for

7  use in the United States?

8  A.   I don't know anything else in Porcelanosa; no

9  relationship with them.

10  Q.   You moved on.   But at the time you were there and Mr.

11  Davis was back with you in Spain learning about the

12  ventilated facades, it was not approved in the United

13  States, correct?

14  A.   Yes, that's correct.

15  Q.   All right.   And the truth is that when -- when you

16  talked to Mr. Davis about this Infinite Flooring, he

17  immediately said that was his mother, right?   He didn't say

18  no, or she's a different person.   He said, That's my mom.

19  A.   No, no, he brought it up openly, yes.

20  Q.   Right.   And, in fact, when -- and you remember when I

21  took your deposition, do you remember telling me that you

22  told him that you couldn't accept the deals and you felt

23  bad about that, and that you -- they would -- you and he

24  would have to split amicably?

25  A.   Yeah, I mean, that means --

Cross - Domingot

1        MR. THOMAIDIS:  Your Honor --

2        THE WITNESS:  I was an employee --

3        THE COURT:  One second, sir.  One second.

4        MR. THOMAIDIS:  I'm sorry.  That misstates the

5    record -- the testimony.

6        THE COURT:  Is that your only objection?

7        MR. THOMAIDIS:  It is, Your Honor.

8        THE COURT:  Overruled.

9    BY MR. BURG:

10   Q.   Okay.  You told -- you and he split amicably; you were

11   still --

12   A.   We -- I -- every time that I terminate an employee, I

13   try to explain amicably so they could not sue the company.

14   And one of my functions is to protect the company from any

15   other things happening.

16   Q.   So do you recall telling -- let me ask you this:  Do

17   you remember him saying to you, I would like to open a

18   dealership in Colorado and buy products from Porcelanosa?

19        Do you remember him telling you that?

20   A.   Yeah, yeah.  Maybe.  Yeah.

21   Q.   In this conversation?

22   A.   I don't know.

23   Q.   And do you remember saying to him, You know what, that

24   would be fine, but at that time, because he -- because of

25   the conflict, you wouldn't be able to do it at that point

Cross - Domingot

1    in time; do you remember that?

2          MR. THOMAIDIS:  This is leading the witness, Your

3    Honor.

4          THE WITNESS:  I do not understand.

5    BY MR. BURG:

6    Q.  You don't recall that?

7          THE COURT:  It's cross-examination.

8          MR. BURG:  Can we play 19 -- 19 and 22 through

9    2003 of Mr. Domingot's deposition.

10         MR. THOMAIDIS:  Your Honor, was there anything to

11   be impeached?

12         MR. BURG:  He said he didn't recall.

13         THE COURT:  Wait one second.  I think you need to

14   lay that foundation again.

15   BY MR. BURG:

16   Q.  Okay.  Did you -- did you tell him, saying -- did you

17   say to him, You know what, that would be fine, but at that

18   time with Ryan, prior to his departure as an employee, we

19   opened a small, small office probably double the size of

20   this office.

21         Do you remember saying that?

22   A.  Okay.

23   Q.  You do?

24   A.  For him --

25   Q.  Yeah, you said that to me in response to my

1516

Cross - Domingot

1  question?

2  A.  I'm getting lost.  Can you start all over?

3  Q.  I have very short time here so I'm trying to get

4  through this.

5       Do you remember him saying to you, I would like to

6  open a dealership in Colorado and then buy products from

7  Porcelanosa?

8  A.  Yes.

9  Q.  Do you remember telling him, You know what, that would

10  be fine?

11       Do you remember telling him that?

12  A.  It could be, yeah.  It could be because he already

13  knew -- like I said before, he already knew some customers,

14  some architects, some dealers.  He knew some market.

15  Q.  Right.  And not only that, you trusted him so much

16  that after he was let go, you asked him to stay for another

17  two months.  Do you remember that?

18  A.  We have to --

19       MR. THOMAIDIS:  Your Honor, there is no testimony

20  in the record about that.

21       THE COURT:  Well, it's -- he's --

22       MR. THOMAIDIS:  Sorry.

23       THE COURT:  It's cross-examination.  He can deny

24  it.  If that's not true, that's not true.

25  BY MR. BURG:

Cross - Domingot

1   Q.   Sir, did you ask him to stay another two months?

2   A.   Yeah, we had to maintain the office open, otherwise

3   Porcelanosa -- Porcelanosa Los Angeles' office in Colorado

4   would be nowhere, with no representation.   So because I

5   had -- and I wanted to follow up with a nice split, I ask

6   him this, by the time we would hire in somebody else to

7   replace him.

8   Q.   Right?

9   A.   To take care of the office.

10  Q.   You asked him, you said, Would you stay two months

11  while I find someone else to take your place?

12  A.   Yeah.

13  Q.   And he agreed to and stayed the two months, didn't he?

14  A.   Well, agree two months, yes, just picking up the

15  phone.   But I know that his involvement was not there.

16  Q.   Right.

17  A.   Yes, to maintain potential new orders coming up or

18  something like that.

19  Q.   So you asked him to stay the two months and he said

20  yes, and he stayed the two months after you fired him,

21  correct?

22  A.   Yeah.

23  Q.   Okay.  Did you have any issues with Mr. Davis in terms

24  of his work ethic or his cooperation?

25  A.   No, at the beginning when he was hired, no, no.   And

1518

Cross - Domingot

1   then there was some issues that we had when construction of

2   the vignettes of the showroom, it happened that, you know,

3   the landlord complained to us, and this happen also when we

4   were hired, and I remember that, when we hired the -- his

5   substitute, I can remember that I received complaints from

6   her because she was afraid of Mr. Ryan for going to the

7   office and she was scared about it.

8   Q.   Sir, do you remember me asking you the question:  Did

9   you ever have any issues with Mr. Davis in terms of his

10  work ethic or his cooperation?  Do you recall telling me,

11  None?

12  A.   At the beginning, no.  But later on, cooperation --

13        MR. BURG:  Your Honor --

14        THE WITNESS:  Cooperation from the business to the

15  company, at that time he was not cooperating, he was not

16  involved.

17        MR. BURG:  Your Honor, I would like to play

18  page 22, line 14, through 22, 16, please.

19        THE COURT:  Go ahead.

20      (Deposition played)

21  BY MR. BURG:

22  Q.   Thank you.  Now, I also want to talk to you about --

23  isn't it true, Mr. Davis, after he left Porcelanosa, is he

24  wanted to be able to sell these ventilated facades in

25  Colorado, Utah, New Mexico, and Arizona?  Isn't that true,

1519

Cross - Domingot

1    sir?

2    A.    I don't think so.

3    Q.    No?

4    A.    I'm not aware.

5    Q.    Okay.  Why don't we play page 33, 13 and -- to 33,

6    19 -- line 13 through 19.

7         (Deposition played)

8    BY MR. BURG:

9    Q.    Thank you.  Now, sir, I'd like to now look at the

10   exhibit that we just looked at, Exhibit -- what's the

11   number -- J?  Can we put up J.

12         And I want to go to the last page, sir.  And I

13   asked you --

14   A.    Uhm-hum.

15   Q.    -- I would like to have you look, is that your

16   signature on the -- on that document, sir?

17         Do you recall your answer was, Yeah --

18   A.    I recall -- yeah.  Looks like my signature, but I

19   didn't sign it.

20   Q.    Okay.

21   A.    I didn't recall to sign it.

22   Q.    Right.

23   A.    Looks like my signature, yes.

24   Q.    Okay.  So you told me that:  Yeah, but I don't recall

25   signing this.

1520

Cross - Domingot

1    And I asked you again:  Okay, does it look like

2    your signature?

3    And you recall your answer to that?

4    A.    I recall that I was saying the same, looks like my

5    signature, I want to be signature, the numbers are not the

6    ones that I have, because also I can identify a 4 and I

7    never do closed 4s, I do open 4s.  I do not --

8    Q.    I --

9    THE COURT:  Hold on.  Let him finish his answer,

10   please.

11   BY MR. BURG:

12   Q.    Oh, I'm sorry.

13   A.    I do not recall that I signed this paperwork because

14   I -- it is going on Porcelanosa Group, and Porcelanosa

15   Group -- I don't know if it's a company.  We had a branding

16   name under Porcelanosa Grupo.

17   And then I remember that the company at that time

18   they were establishing a company nationwide under the name

19   of Porven, so --

20   Q.    The translation of grupo in English is group,

21   correct?

22   A.    Yeah.

23   Q.    Correct?

24   A.    Correct, yes.

25   Q.    All right.  And then I asked you about that and you

Cross - Domingot

1   said, yeah -- do you recall saying, It looks like my

2   signature.  Can I speak with my lawyer?

3           Do you remember saying that?

4   A.   I remember that.

5   Q.   All right.  And, in fact, I asked you again later on,

6   after we looked at some more of your signatures, as to

7   whether or not that looked like your signature and you

8   recall telling me, yeah, it looked like your signature, but

9   the date didn't look right to you, correct?

10  A.   Exactly the same.  Exactly, yeah.  The date is not my

11  date, the signature looks like my signature.  I do not

12  recognize the signature, I did not sign that signature.

13  Q.   Okay.  Now, do you remember -- are you aware that in

14  2009, prior to December 14th of 2009, that Mr. Davis sent

15  this agreement -- or whatever it is, he said it was not

16  really an agreement, it was sort of you and he had sat

17  down -- you don't remember sitting down with him and going

18  over this?

19  A.   No, I don't.

20  Q.   Okay.  And that he sent it to Mr. Handley and Mr.

21  Montilla, and they had their lawyers look at it.  Did

22  anyone ever, in 2009, send this to you to ask you if that

23  was your signature and whether you signed it?

24  A.   No.

25           MR. THOMAIDIS:  Compound, and he has no firsthand

1522

Cross - Domingot

1    knowledge of any of this stuff.

2              THE COURT:  Overruled.  He was asking if he knew.

3              THE WITNESS:  No.

4    BY MR. BURG:

5    Q.   Would you have expected that if this signature and

6    this agreement, or whatever it is, was sent to Porcelanosa

7    and they had a question about your signature, would you

8    have expected them to contact you and ask you if that was

9    your signature?

10   A.   Nobody contact --

11             THE COURT:  Hold on, sir.

12             THE WITNESS:  Nobody contact --

13             THE COURT:  Hold on, hold on.

14             MR. THOMAIDIS:  I'm sorry.  Sometimes I need to

15   fit in an objection.

16             THE COURT:  You need to jump up and make your

17   objections quicker before your witness -- the witness

18   answers the question.

19             MR. THOMAIDIS:  He has no firsthand knowledge of

20   this, and he's already testified to it, so this is a

21   duplicative question.

22             THE COURT:  One second.  Sustained.  Next

23   question.

24   BY MR. BURG:

25   Q.   Mr. Domingot, are you -- are you saying that someone

1523

Cross - Domingot

1    forged your signature on that, even though it looks like

2    it?  Are you saying that?

3    A.   I'm saying that I did not sign it.  I'm saying that

4    this is not -- looks like my signature.  I do not sign it,

5    my signature without my appropriate date.  I do not sign

6    any paperwork that I do not represent properly the company

7    in that paper.  So I am not engaged at all with Porcelanosa

8    Grupo or Porcelanosa Group, and --

9    Q.   When was the first time that you saw this document?

10   When was the first time Porcelanosa showed you this

11   document?

12   A.   When you -- when you showed it to me.

13   Q.   Okay.  And so prior to that time, even though when

14   they had it -- and the testimony is they've had it since

15   '09, and that's been confirmed by witnesses on the stand --

16        MR. THOMAIDIS:  Well --

17   BY MR. BURG:

18   Q.   At no time prior to that --

19        THE COURT:  Let him finish the question.

20   BY MR. BURG:

21   Q.   At no time prior to that did Porcelanosa ask you about

22   the document or ask you about your signature?

23   A.   That --

24        MR. THOMAIDIS:  Your Honor, that misstates the

25   evidence and he would have no --

Cross - Domingot

1    THE COURT:  He has no knowledge.  Sustained.

2    BY MR. BURG:

3    Q.   Mr. Domingot, that looks like your signature, correct?

4    A.   Like I said --

5    MR. THOMAIDIS:  It's been asked and answered, Your

6    Honor.

7    THE COURT:  Sustained.

8    BY MR. BURG:

9    Q.   Okay.  And other than the fact that you don't recall

10   signing it and the date, you don't really know anything

11   more about this document; isn't that true.

12   May I have a minute, Your Honor?

13   THE COURT:  Did he -- did you answer, sir?

14   THE WITNESS:  I'm sorry?

15   THE COURT:  Did you answer?

16   THE WITNESS:  Yeah, I said no.

17   MR. BURG:  Yeah, he did.

18   THE COURT:  There's nothing on the record about

19   it.

20   MR. BURG:  Can you read back --

21   THE COURT:  You have to make an oral answer for

22   the court reporter.

23   THE WITNESS:  I said no.  I said no.

24   THE COURT:  Okay, because there's no "no" in the

25   record.

Cross - Domingot

1   All right.  You may have a minute.

2   MR. BURG:  Thank you.

3   No more questions, Your Honor.

4   THE COURT:  All right.  Redirect.  You have 31

5   minutes in redirect, Mr. Thomaidis.

6   MR. THOMAIDIS:  Thank you, Your Honor.

7   The first thing that I'd like to do is make a

8   record with respect to the deposition clip that Mr. Burg

9   played a couple of minutes ago.

10   MR. BURG:  Your Honor, I'm going to ask him to

11   approach if he's going to make some sort of a record.  I

12   don't know what he's going to say but I'm a little nervous

13   about it.

14   THE COURT:  Wait.  What do you mean you want to

15   make a record?

16   MR. THOMAIDIS:  Well, may we approach?

17   THE COURT:  All right.

18      (Discussion at side bar)

19   THE COURT:  Go ahead.

20   MR. THOMAIDIS:  So that piece of deposition

21   testimony that was played --

22   THE COURT:  Which one?  He played two.

23   MR. THOMAIDIS:  Well, the first one in the series

24   where he's talking about the contracts that they had in

25   place at the time, Mr. Domingot goes on to say that he

Cross - Domingot

 1    actually would not have exclusivity, and he would certainly

 2    haven't had that while he was an employee of the company.

 3    So what he was asking was in the context of his being an

 4    employee of the company, they had taken a trip with a bunch

 5    of suitcases full of tile, and he was responding to that.

 6    It had nothing to do with Mr. Davis' post-termination

 7    rights and responsibilities and --

 8             THE COURT:  Okay.  Well, I'll let you respond.

 9             MR. BURG:  I don't know what he's talking about.

10    There were four things that were said.  One, that he kept

11    him on for two months afterwards, which had nothing to do

12    with the deposition clip.

13             MR. THOMAIDIS:  That doesn't appear that was the

14    case.

15             THE COURT:  Let him --

16             MR. BURG:  No. 2, he testified that Mr. Davis was

17    a good employee and that he had no problems with him, he

18    said none.  I asked him specifically, Did you have any

19    problems with him?  And that was one of the clips I used

20    was he said, None.

21             The other clip I used had to do with -- I have to

22    get my paper to be sure what it was.

23             THE COURT:  No, I think I can rule.  First of all,

24    if you think anything that was elicited on cross is

25    misleading or incomplete, you can correct that on

Cross - Domingot

1    redirect.

2            MR. THOMAIDIS:  Understood, Your Honor.

3            THE COURT:  But it's not -- it's improper for you

4    to get up there and make what you think is the correction

5    through statements from you.

6            MR. THOMAIDIS:  I understand.

7            THE COURT:  If there was -- if there was a

8    confusion or something that was misstated and you want to

9    correct it, you have to do it, but through your witness.

10           MR. THOMAIDIS:  Understood.  So, Your Honor, may I

11   ask the Court's permission to go ahead and play the

12   complete clip of the video deposition section than that Mr.

13   Burg played?

14           THE COURT:  Any objection?

15           MR. BURG:  It depends on if it's on the same

16   subject and it's a question of whether or not it's

17   completeness.  I would like to know what he's going to show

18   so I can know whether I have an objection.  I don't know --

19           THE COURT:  What do you intend to show?

20           MR. THOMAIDIS:  It's the same question.

21           THE COURT:  Just the remainder -- how much further

22   do we go?

23           MR. THOMAIDIS:  I think about 10 seconds maybe.

24           THE COURT:  You can do it.

25           MR. THOMAIDIS:  Okay, Your Honor.

1528

Redirect - Domingot

1    MR. BURG:   Thank you, Your Honor.

2         (End of discussion at side bar)

3         THE COURT:   Hold on.  Go ahead, Mr. Thomaidis.

4         MR. THOMAIDIS:   So, Your Honor, at this time,

5    defendants are going to go ahead and play the clip that Mr.

6    Domingot gave in his deposition with, I think, the proper

7    context.

8         MR. BURG:   What line and what page?

9         MR. THOMAIDIS:   So this is page 33, line 13

10   through line -- or through page 34, line 7.

11        (Deposition played)

12                    REDIRECT EXAMINATION

13   BY MR. THOMAIDIS:

14   Q.   Okay.  So, Mr. Domingot, a couple of preliminary

15   questions.  At any point did myself or any other attorneys

16   associated with Porcelanosa Los Angeles, or any of the

17   other defendants in this case, coerce or intimidate you

18   into giving testimony?

19   A.   No.

20   Q.   And at any point did myself or any of the other

21   attorneys representing Porcelanosa Los Angeles and the

22   other defendants in this case, ever offer you money for

23   your testimony in this case?

24   A.   No.

25   Q.   And to your recollection, when was the first time you

1529

Redirect - Domingot

1    learned that there had been a conflict between the

2    plaintiff in this case and the defendants in this case?

3    A.    When I receive -- when I receive the subpoena.

4    Q.    That subpoena was from whom?

5    A.    I think it was from you.  From you.  I don't recall,

6    honestly.

7    Q.    And that's fine.  Do you recall Mr. Burg questioning

8    you in a portion of which we just saw?

9    A.    Oh, yeah, I remember that we went to the deposition,

10   he was there, you were there, my attorney was there, all

11   the people were there, so . . .

12   Q.    And so do you recall whose law firm subpoenaed you to

13   testify at that deposition?

14   A.    What -- what -- I don't know -- I am not a legal

15   expert, I don't know who -- somebody called me and I showed

16   up.  I didn't know why I was there, so that's all.

17   Q.    Understood.  Let's talk about attorneys for just a

18   couple minutes.  Mr. Domingot, under what circumstances do

19   you engage the assistance of an attorney?

20   A.    Support, explanation of things that happened.  If I

21   need to make an agreement, if I need to review a

22   nondisclosure agreement, I work with lawyers and law firms

23   for them to write the agreements that I have to present to

24   other parties, to be executed by the company I want to work

25   with and our company in this case.  Something like that.

1530

Redirect - Domingot

1  Q.   Okay.  So would you ever sit down and draft a contract

2  with a party that you didn't have the input of an attorney

3  on?

4  A.   No.

5  Q.   And you're certain?

6  A.   I'm certain.  I -- I am not qualified for writing any

7  agreement.  I am a business developer, I am not a lawyer.

8  I do not know strictly how to write an agreement, and I

9  don't know how to speak proper English.  I can communicate

10  but a hundred percent so, I cannot do it.

11  Q.   Understood.  And so when you were the general manager

12  of Porcelanosa Los Angeles, Incorporated, would you have

13  sat down and drafted a contract with someone without the

14  assistance of an attorney?

15        MR. BURG:  Objection, Your Honor.  Leading.

16        THE COURT:  You may answer.

17        THE WITNESS:  I never wrote any agreement with --

18  when I was in Porcelanosa Los Angeles or working for any

19  other company that I've been involved.

20  BY MR. THOMAIDIS:

21  Q.   Okay.  So can we please take another look at trial

22  Exhibit J.  So I'd like to briefly walk through a couple

23  of -- actually, I have a preliminary question.

24        You had mentioned to Mr. Burg when he was

25  questioning you that there was somebody who was apparently

1531

Redirect - Domingot

1    scared of Ryan Davis.  Who was that individual?

2    A.    I receive -- it was -- her name was Wendy.  She was

3    the person who we hire to run the office in Colorado, in

4    Denver.  At the time she was training, she came to Los

5    Angeles like any other employee, got the training, go back

6    to Colorado.  And she send us a note to the office saying

7    that she was afraid of Ryan Davis and she was scared.

8              MR. BURG:  Your Honor -- I'm sorry, I should have

9    objected earlier.  I didn't realize we were going to get

10   into hearsay.

11             THE COURT:  Sustained.

12             MR. BURG:  I ask that it be stricken.

13             THE COURT:  Sustained.  One second.  Is this

14   individual going to be one of your witnesses?

15             MR. THOMAIDIS:  Actually, Your Honor, I believe

16   she is.

17             THE COURT:  Well, then why --

18             MR. THOMAIDIS:  I'm sorry, I -- I wasn't sure

19   where he was going to go with the previous question, but

20   I'll just withdraw the question and ask --

21             THE COURT:  No, it's sustained and the testimony

22   is stricken.  I mean, if you want to go into that, you go

23   through -- into that testimony through that witness.

24             MR. THOMAIDIS:  Understood, Your Honor.

25   BY MR. THOMAIDIS:

1532

Redirect - Domingot

1    Q.   So, Mr. Domingot, most of this information at this

2    point is well over a decade old; would you agree?

3    A.   Yes.

4    Q.   And it's sometimes difficult to remember some of this

5    information; would you agree?

6    A.   Yes.

7    Q.   But just for my edification, everything that you have

8    said today is true to the best of your recollection; is

9    that right?

10   A.   Absolutely.

11   Q.   Okay.  So let's go ahead and move on to the first

12   paragraph of this document.  If we could just please blow

13   up the first -- actually, I'm going to ask you -- basically

14   the introduction, the first two paragraphs, please.

15        Now, Mr. Domingot, would you please take a look at

16   this and tell me -- first and foremost, this document is

17   dated Thursday, July 29th, 2004; would you agree?

18   A.   Yes.

19   Q.   And that would have been based on the employment

20   records that we looked at previously, approximately either

21   eight or nine days after you had terminated Ryan Davis from

22   his employment at Porcelanosa Los Angeles; is that right?

23   A.   That's right.

24   Q.   And would you have signed a document like this, this

25   exclusivity agreement, nine days after -- or maybe eight

1533
Redirect - Domingot

1   days after terminating Mr. Davis' employment with

2   Porcelanosa Los Angeles?

3           MR. BURG:  Objection, Your Honor.  Leading.

4           THE COURT:  Overruled.  You may answer.

5           THE WITNESS:  No.

6   BY MR. THOMAIDIS:

7   Q.   And you're certain?

8   A.   I'm certain.

9   Q.   Okay.  So, Mr. Domingot, in your own words, can you

10  please explain for the Court and the jury what a ventilated

11  facade is.  At least to the best of your recollection.

12  A.   The best of my recollection, ventilated facades is

13  a -- is a system of porcelain tiles on frames, that they

14  are attached into the facade off a building to provide

15  energy efficiency in wintertime for saving more heating and

16  also in summer -- in summertime for saving -- for providing

17  savings and energy savings while using the air

18  conditioning.

19          Basically this is -- the ventilated facade also

20  has a connotation for design decoration, but basically what

21  I recall this -- this is the main -- the main functionality

22  of a ventilated facades.

23  Q.   Okay.  And so if we turn back to the first two

24  introductory paragraphs of this document that's trial

25  Exhibit J, are there any other issues with that paragraph

1534
Redirect - Domingot

1    that immediately come to your attention?

2    A.   I'm sorry?

3    Q.   Are there any other issues or problems or errors with

4    those two paragraphs that come to your attention?

5    A.   Well, this contract is between Infinite Flooring &

6    Design and Porcelanosa Group.  Again, if we call

7    Porcelanosa Group or Porcelanosa Grupo, there was no

8    Porcelanosa Group or Porcelanosa Grupo in Anaheim,

9    California.

10   Q.   Okay.  And so what would the proper spelling of that

11   have been?

12   A.   I guess the proper spelling would be Porcelanosa

13   Grupo, G-r-u-p-o, if it was a company in Anaheim,

14   California.

15   Q.   Who was actually based in Anaheim, California, at this

16   time?

17   A.   Porcelanosa Los Angeles.

18   Q.   Okay.  And so then if we could move down to the first

19   section there with the Roman Numeral I.

20        So this contract says, IFD has the exclusive right

21   to distribute all products associated with the ventilated

22   facades to include tile, framing and bracketing in

23   Colorado, Utah, New Mexico and Arizona territories.

24        Do you see that?

25   A.   Yes.

1535

Redirect - Domingot

1   Q.   Now, would you have had the authority to enter into a

2   contract giving an exclusive right to distribute all

3   products associated with ventilated facades?

4   A.   No, absolutely not.  And this is one of the things

5   that Porcelanosa does not finish this here with anybody, so

6   I couldn't do it.

7   Q.   And would you have had the authority to -- I'm sorry.

8   A.   I could not offer it.

9   Q.   Okay.  And so would you have had the authority to

10  offer up such an opportunity in Colorado, Utah, New Mexico,

11  and Arizona territories?

12  A.   Under this conditions, no.

13  Q.   Okay.  Would you have negotiated a contract with this

14  kind of a provision in it?

15  A.   No.

16  Q.   Okay.  And then if you'll look a little further down

17  in the paragraph, it says, This agreement is binding for

18  seven years from the date the system is approved in the

19  United States.

20       Do you see that?

21  A.   Uhm-hum.

22  Q.   Now, you testified previously that this system wasn't

23  approved in the United States; is that correct?

24  A.   That's correct.

25  Q.   Is it approved as we -- strike that.

Redirect - Domingot

1    So would you have entered into a contract related

2    to ventilated facades that would have bound anyone that you

3    were working for for a period seven years?

4    A.   I do not understand the question.  I do not understand

5    the --

6    Q.   Would you have or could you have bound Porcelanosa Los

7    Angeles, for example, to a contract with a period of seven

8    years?

9    A.   What does it mean, bound?

10   Q.   Let's see.  Obligated under contract.

11   A.   No.

12   Q.   And would you have signed an agreement that would have

13   permitted this contract to go for some indefinite period of

14   time, given the system hadn't been approved in the United

15   States?

16   A.   We -- in normal professional career, I haven't seen a

17   contract like this with all these specs.

18   Q.   And then if you move down in the paragraph, it says,

19   PG also agrees that it will assist in the installation of

20   the first three projects that are specified with the

21   ventilated facades to ensure proper installation

22   techniques.

23        Do you see that?

24   A.   Yes.

25   Q.   Now, would you have agreed to a provision like this

1537

Redirect - Domingot

1   where this PG entity was supposed to install the first

2   three projects?

3   A.   No.

4   Q.   What would you have expected in return if there was a

5   contract like this that was being offered hypothetically?

6   Would there be reciprocal obligations for Infinite Flooring

7   & Design?

8   A.   Nothing.   No.

9   Q.   Okay.   And so let's go ahead and move on to

10   paragraph 3, Roman Numeral III.   And this says, PG will be

11   responsible for updating IFD with all catalogs, brochures

12   and samples in an immediate time frame of the date needed.

13         Do you see that?

14   A.   Yes.

15   Q.   Would you have drafted a provision of a contract that

16   would have referred to something like an immediate time

17   frame of date needed?

18   A.   No.   Because from my experience, if somebody would

19   like to come out -- become a distributor, they have to have

20   enough catalogs and requested on time because it could be a

21   delays for production, could be the company doesn't have

22   it, it could be transportation delays, so, no.

23   Q.   And then the last sentence of that section says, Any

24   marketing by PG in the listed territories will have to

25   reference IFD as its sole distributor.

1538

Redirect - Domingot

1  Do you see that?

2  A.   Yeah.

3  Q.   Would you enter into an agreement with a company like

4  Infinite Flooring & Design in its youth, as it was, would

5  be the sole distributor of any product like this?

6  A.   No.

7  Q.   Let's move to paragraph 4, please -- Roman Numeral IV.

8       And that says, PG will guarantee that there will

9  be no more than 3 -- a 3 percent price increase annually

10  from the time of approval to the time of termination of

11  this agreement to include all shipping and import/export

12  costs.

13  Do you see that?

14  A.   Uhm-hum.

15  Q.   Would you have ever agreed to a contract with this

16  type of a provision limiting a company to only a 3 percent

17  price increase?

18  A.   No.

19  Q.   Why?

20  A.   Because it's uncertain.  It could be, you know,

21  suppliers that I know that I have been working with, they

22  cannot put this provision because suppliers take increased

23  prices, and I really don't know how much they increase, so

24  we need to prepare our margins, we need to prepare our

25  price list.  And until we know these absolutely, nobody can

Redirect - Domingot

1  commit.

2  Q.   Understood.  Now if we could move to Roman Numeral VI

3  at the bottom of the page.  And if you look at the last

4  sentence of this section, it says, This contract is binding

5  between each party and cannot be withdrawn or adjusted due

6  to the termination of employment, disability, death,

7  et cetera, of the authorized signature.

8        Do you see that?

9  A.   Yes.

10  Q.   Would you have enter -- have entered into a contract

11  like this that included a provision such as this one?

12  A.   No.

13  Q.   Why is that?

14  A.   It is confusing.  Right now, on my opinion is -- the

15  mention of employment between two companies, if there is

16  information like this -- so in a contract like this,

17  between two companies, at the mention of employment, it

18  does not make sense because there is no employment

19  engagement.

20  Q.   So does this reference a period to be referencing an

21  individual rather than a company?

22  A.   I guess so.

23  Q.   Would that individual have been Ryan Davis?

24  A.   I don't know.

25  Q.   Okay.  Let's go ahead and turn to the second page of

1540

Redirect - Domingot

1     this document.  Now, you'll notice, first of all, that the

2     first page was in Roman Numerals and this one has switched

3     to Arabic numerals; would you agree?

4     A.    Yes.

5     Q.    Would you have ever drafted or signed a contract in

6     which that kind of a change took place?

7     A.    I never drafted a contract and I haven't seen in two

8     pages that the clauses of a contract it changes from Roman

9     to numeral -- numerical numbers.

10    Q.    And you'll also notice that Roman Numerals II, III,

11    IV, V, and VI are substantially identical to Arabic

12    numerals 6, 7, 8, 9, and 10.  Would you agree?

13    A.    Yes.

14          THE COURT:  Can we blow this up?  It's very tiny

15    font.

16          MR. THOMAIDIS:  Oh, I'm sorry, Your Honor.  Is

17    it -- and can you just blow up 2 through 6, please.

18    BY MR. THOMAIDIS:

19    Q.    There's a portion of 6, anyway.  And now if we can go

20    to the next -- oh, perfect.  Oh, for a second, anyway.  And

21    then if we can just -- is it possible to blow up 6, 7, 8,

22    9, and 10 just a little bit?  So, I hope that helps

23    everyone a little bit.

24          But would you have ever signed a contract with

25    this kind of redundancy in it?

1541

Redirect - Domingot

1   A.   No.

2   Q.   And so if we could please turn to the third page of

3   the document.  And if you could please expand the signature

4   blocks and the last two lines of the contract.  And the top

5   line there says, This is a legal binding agreement between

6   IFD and PG.  If the agreement is breached or broken, IFD

7   and PG have legal rights to seek damages to include lost

8   profits, attorney's fees, travel.

9        Would you have ever signed a contract -- would you

10  have ever have negotiated a contract with this type of a

11  provision in it?

12  A.   No.

13  Q.   Would you ever have signed a contract with this type

14  of a provision in it?

15  A.   No.

16  Q.   What's the proper spelling of the word "breach" if you

17  know.

18  A.   Let me see.  B-r-e-e-c-h.  B-r-e-e-c-h.  No,

19  b-r-e-a-c-h.

20  Q.   Okay.  Thank you.  So now let's go ahead and take a

21  look at the signature blocks.  Now, I want you to look --

22  and can you blow up this Porcelanosa Group section at the

23  bottom, please.

24       So, Mr. Domingot, would you please take a moment

25  to look very closely at that signature at the bottom under

1542

Redirect - Domingot

1   Porcelanosa Group.  And I'd like you to tell me if that is

2   your signature.

3   A.   It is not my signature.

4   Q.   And you're absolutely certain?

5   A.   I'm absolutely certain.

6   Q.   And so as you sit here today, under oath, you're

7   certain that this is not your signature?

8   A.   It is not.

9   Q.   Okay.  And then if we move just over a bit, you'll see

10   a date.  Do you see that?

11   A.   Yes.

12   Q.   And is that your handwriting in that -- that date?

13   A.   It is not.

14   Q.   And you're certain?

15   A.   A hundred percent.

16   Q.   Why?

17   A.   Number seven, I do the European sevens.  No. 4, I do

18   the open fours.  Also when I sign a document that has the

19   year with the last two digits, I put an apostrophe on it.

20   Q.   And that's as we discussed previously?

21   A.   Yeah.  Then I can say these are not my -- well, these

22   are not my twos.  So that's not my writing.

23   Q.   Okay.  And so were you ever present with Ryan Davis

24   and did the two of you ever draft this contract together?

25   A.   No.

Redirect - Domingot

1  Q.   You're absolutely certain?

2  A.   A hundred percent.

3  Q.   And did you and Ryan Davis ever sit down and sign this

4  document together at the same time and same place?

5  A.   No.  No.

6  Q.   And you're certain?

7  A.   A hundred percent.

8  Q.   Okay.  And you, as the general manager of Porcelanosa

9  Los Angeles, would have never had the authority to enter

10 into a contract like this if this contract actually

11 existed; is that right?

12 A.   No.  Because it --

13 Q.   And you're absolutely certain?

14 A.   A hundred percent.  Porcelanosa, not just Los Angeles,

15 all Porcelanosa does -- for my knowledge when I was there,

16 they do not have exclusivity agreements.

17          MR. THOMAIDIS:  Thank you, Mr. Domingot.  I have

18 no further questions.

19          THE COURT:  All right.  May this witness be

20 excused?

21          MR. THOMAIDIS:  They may, Your Honor.

22          THE COURT:  All right.  He may?

23          MR. BURG:  Yes.

24          THE COURT:  And for the defendant?  Mr. Domingot,

25 thank you so much for joining us, you are excused, you may

1544

Redirect - Domingot

1     step down.

2              THE WITNESS:  Have a good one.

3              THE COURT:  One second.  Mr. Thomaidis, is there

4     going to be a motion at this time?

5              MR. THOMAIDIS:  There will be, Your Honor.

6              THE COURT:  Okay.  So this is what we're going to

7     do, ladies and gentlemen of the jury.  We're going to take

8     our afternoon break a little early, but for you, it's going

9     to last longer than for us because while the rest of us

10    will take a 15-minute break, we have to come back, and the

11    law requires that certain things be discussed outside your

12    presence, and so you will have to wait until we're done

13    with all of that legal arguments and some rulings.

14             I have no way of knowing how long it will take.

15    At a minimum, you have at least 30 minutes to stretch your

16    legs, go outside if you want, and -- but I'm not saying it

17    will be 30 minutes, but all right.

18             We'll be in recess.

19         (Jury left the courtroom at 3:00 p.m.)

20             THE COURT:  We'll take our 15-minute break and I

21    will come back out on the bench and we'll have our Rule 50

22    motion.

23             MR. THOMAIDIS:  Thank you, Your Honor.

24         (Recess taken 3:00 to 3:17 p.m.)

25             THE COURT:  All right.  Is there a motion from the

1545
Redirect - Domingot

1  defendants counterclaimants?

2      MR. THOMAIDIS:   There is, Your Honor.   May I take

3  the podium?

4      THE COURT:   You may.   Let me just say this to both

5  counsel who will be arguing this motion, let's do it as

6  succinctly and as efficiently as possible.   We can't seem

7  to catch up to our schedule on the witness list, and if we

8  go into Friday, I'm going to let you guys tell the jury,

9  and let them take their wrath out on you guys and not out

10 on me.

11     Go on.

12     MR. THOMAIDIS:   Thank you, Your Honor.   At this

13 time, pursuant to Federal Rule of Civil Procedure 50(a)(1),

14 defendants' Porcelanosa Los Angeles, Incorporated,

15 Porcelanosa New York, Incorporated, Porcelanosa Texas

16 Corporation, and Porven Limited, move for a judgment as a

17 matter of law in favor of the defendants and against the

18 plaintiff for the following claims for relief:

19     The first claim for relief, breach of contract,

20 the second -- excuse me, the third claim for relief,

21 quantum meruit, the fourth claim for relief, unjust

22 enrichment, the fifth claim for relief, which is

23 declaratory relief.   The defendants seek judgment

24 against -- excuse me, defendants seek judgment against the

25 plaintiff on the above-mentioned claims for relief.

Redirect - Domingot

1    Given the absence of any evidence from which a

2    reasonable jury could find that plaintiff -- could find in

3    favor of plaintiff, this Court should enter judgment as a

4    matter of law in favor of the defendants pursuant to

5    Federal Rule of Civil Procedure Rule 50.

6    Judgment as a matter of law is appropriate where

7    no rational jury could find for the plaintiff.  Because the

8    plaintiff has failed to come forward with evidence from

9    which a rational jury could find in their favor, this Court

10   should enter judgment in -- against plaintiff as a matter

11   of law at this time.  And then I could elaborate on facts.

12   THE COURT:  Well, why don't you break down your

13   argument by the claim, which -- I mean, for example, breach

14   of contract, existence of the contract, how -- how is it

15   that you're arguing that I could find that no reasonable

16   juror could conclude that there was, in fact, an agreement

17   between the parties?  Because, as you know, the bar is

18   very, very high on a Rule 50(a) motion.  I have to

19   effectively -- to take that claim away from the jury, I

20   have to find that no rational sentient being could conclude

21   that there was an agreement.  How I could do that with the

22   evidence that's come in?

23   MR. THOMAIDIS:  I understand, Your Honor.  The

24   defendants have not only stated but have maintained, and I

25   think successfully during the course of the trial thus far,

1547

Redirect - Domingot

1   that they never saw nor signed the purported exclusive

2   distributor agreement dated December 8th, 2009 --

3        THE COURT:  But the plaintiffs have testified that

4   they -- that the document was signed and that they

5   witnessed it.  If there ever was a case in a trial that

6   I've presided over that there was absolutely no gray area,

7   no middle ground, it's one or the other, it's this case.

8   All right?

9        But, having said that, plaintiffs have put on

10  evidence that, if the jurors believe them, they could -- in

11  my view, they could find that there was an agreement and a

12  breach.

13        MR. THOMAIDIS:  Understood.  And defendants have

14  provided evidence, we believe, that there's been ample

15  documentation set forth indicating that the document would

16  have been created by plaintiff and counter defendants in

17  the course of their business activities both as Infinite

18  Flooring & Design, also as Crew Tile Distribution,

19  Incorporated, and also as Paradigm Tile & Stone

20  Distributors.

21        I'll just rattle these off if given the

22  opportunity to do so.

23        THE COURT:  Go ahead.

24        MR. THOMAIDIS:  The Porcelanosa defendants in this

25  case -- or, excuse me, the Porcelanosa defendants'

1548

Redirect - Domingot

1    witnesses in this case did not de -- deny ever having seen

2    or signed the purported agreement until 2013.  The

3    agreement is dissimilar to any other agreements that were

4    valid and signed by the parties in this case.

5         There are no similar agreements in evidence

6    between either Porcelanosa Los Angeles or any other

7    defendant and any other -- any other similarly situated

8    dealer or distributor in this matter within the United

9    States.

10        Porcelanosa has maintained, I think successfully,

11   that it has a company policy against the entering into

12   exclusivity agreements with any dealer or distributor in

13   the United States of America.

14        The alleged exclusive distributor agreement was

15   signed by Jack Handley, even while other higher-ranking

16   executives were in the room, both of whom have denied

17   signing the document.

18        Although Crew Tile claims that the three original

19   copies were executed, only one has successfully found its

20   way into this case, which I suspect may be the subject of

21   additional testimony later.

22        The following extensive discovery --

23        THE COURT:  I don't think you need to get into

24   discovery.  I think I understand the gist of your argument

25   with respect to the breach of contract -- the breach of

Redirect - Domingot

1    contract.  Why don't you address your motion to the other

2    claims.

3              MR. THOMAIDIS:  With respect, Your Honor, to --

4    with respect to the equitable claims for relief, I believe

5    the defendants at this point have shown that -- that with

6    the eviction from the Denver Design Center in March and

7    April of 2012, that there -- any value that would have

8    potentially been provided to the defendants would have gone

9    with it, and that's assuming for a moment that Porcelanosa

10   Los Angeles didn't provide all the materials that were in

11   that showroom.

12             So I don't believe that there's any value at this

13   point that has been demonstrated through the evidence with

14   respect to either Porcelanosa being required to -- with

15   respect to Porcelanosa being required to compensate for

16   some benefit that was conferred on them.  And that's not

17   withstanding the fact that we haven't seen any evidence at

18   this point that the dollar figures the plaintiff has set

19   forth are accurate.

20             THE COURT:  Okay.  One thing I think neither side

21   has considered, because we got jury instructions from you

22   folks on the unjust enrichment and quantum meruit claim,

23   but equitable claims don't go to the jury, right?  By

24   either side.

25             MR. THOMAIDIS:  I'm sorry, may I continue?

1550

Redirect - Domingot

1    THE COURT:  Go ahead.

2    MR. THOMAIDIS:  So in addition to that, any

3    benefit that might have been provided in the context of

4    Crew Tile Distribution was effectively extinguished when

5    plaintiff and counter defendants created Paradigm Tile &

6    Stone Distributors, LLC.

7    It was a company that operated out of a different

8    location, it was a company that was representing itself as

9    separated, it was in fact a separate legal entity.  And so

10   any equitable benefit that could have conceivably existed

11   with Crew Tile Distribution, which we believe there is

12   none, certainly wouldn't have been conferred to Paradigm

13   Tile & Stone Distributors, particularly given its

14   ostensible different --

15   THE COURT:  I just told you that the equitable

16   claims are not going to the jury, so this argument should

17   be saved for a post-verdict motion as appropriate.

18   MR. THOMAIDIS:  Thank you.  I think I

19   misunderstood, Your Honor.  I'm sorry.

20   And then I believe that the declaratory judgment

21   is going to be in the exact same category, if I'm not

22   mistaken.

23   THE COURT:  Equitable claim.

24   MR. THOMAIDIS:  So we are left with the breach of

25   contract claim.

1551

Redirect - Domingot

1   THE COURT:  Right.  Now, there is -- I will tell

2   counsel this -- there are -- there may be factual issues

3   that are relevant to the equitable claim that will go to a

4   jury.

5       So I had a trial recently where there was an

6   unjust enrichment claim, and one of the affirmative

7   defenses to unjust enrichment is unclean hands and that's a

8   factual determination that I sent to the jury, which is

9   what we're most likely going to be doing here, but the

10  claim, itself, is not going to go.

11      MR. THOMAIDIS:  Understood, Your Honor.

12      THE COURT:  All right.  So are you done?

13      MR. THOMAIDIS:  I am, Your Honor.

14      THE COURT:  All right.  I'll hear from the

15  plaintiff.

16      MR. TeSELLE:  Thank you, Your Honor.  Yes, and I

17  appreciate the clarification.  We didn't know how you

18  handled, in your courtroom whether you had interrogatories

19  or things that you wanted --

20      THE COURT:  Yeah, because I think some of my

21  colleagues might use the jury's as an advisory jury --

22      MR. TeSELLE:  Right.

23      THE COURT:  I understand.  But not -- now, so

24  explaining that and clarifying that and it will clarify

25  things for the charging conference on the instructions.

1552
Redirect - Domingot

1     MR. TeSELLE:  Thank you, Your Honor.  So as I

2  understand it, the one claim that the defendants

3  counterclaimants are moving for dismissal on now is the

4  breach of contract claim.  He rattled off a couple of

5  different points.

6     I do want to cite some authority.  One of the

7  arguments that was made was that Mr. Handley signed the

8  document with other principals in the room.  Under Colorado

9  Supreme Court decision, *Willey v. Mayer*, 876 P.2d 1260,

10  Colorado 1994, A principal may be bound by an agent's

11  actions if the agent acts pursuant to either actual or

12  apparent authority regardless of whether the principal has

13  knowledge of the agent's conduct.

14     And the law goes to whether it was reasonable to

15  assume a person had that authority.

16     Obvious -- as the Court has already referenced, we

17  have two starkly different stories and understandings of

18  the facts here.  But the plaintiffs have already testified

19  that Mr. Montilla was in the room, that he was the boss of

20  the entire western United States out of the Porcelanosa Los

21  Angeles office; that he was there with Mr. Handley to sign

22  that document that day; and it would be reasonable for one

23  to assume that he had the apparent authority to sign that

24  contract as being in charge of Colorado.

25     Mr. Handley also testified that Porcelanosa-USA

Redirect - Domingot

1    was a trade name that was used to refer to all the United

2    States organizations here domestically, and that they

3    entered into contracts under that name.  There's also in

4    evidence -- Mr. Prior has not yet testified, but there also

5    is in evidence his letter from 2014 where he terminated the

6    remaining exhibitor agreement, if the letter -- where he

7    signed on behalf of Porcelanosa-USA terminating those

8    agreements from his office in New York.

9          So I think there's ample evidence with the very --

10   from the plaintiffs' standpoint, the very low bar at this

11   point that the breach of contract claim should not be

12   dismissed.

13         And as the Court has indicated as to the equitable

14   claims, and I won't address those unless you need me to --

15         THE COURT:  No, I don't think we need to.

16         MR. TeSELLE:  Thank you.

17         THE COURT:  All right.  I'm -- just for

18   completeness of the record, I'm going to read a quick

19   ruling on a portion of the motion.

20         To the extent that the defendants' motion is

21   addressed to the defendants' equitable claims for unjust

22   enrichment and/or quantum meruit those claims are not

23   susceptible to a motion for judgment as a matter of law

24   under Rule 50.  By its own terms, Rule 50 provides for

25   judgment as a matter of law only in, quote, a jury trial,

1554
Redirect - Domingot

1   end quote.

2          Plaintiffs' alternative claims for unjust

3   enrichment and/or quantum meruit are both equitable claims.

4   Citing to *Lewis v. Lewis*, 189 P.3d 1134 at 1140, Colorado

5   Supreme Court at 2008, and *Matter of Gilbert*, 346 P.3d 1018

6   at 1023, also a Colorado Supreme Court decision from 2015.

7          These claims are, therefore, tried to the Court

8   under the Federal Rule of Civil Procedure 39(b), and they

9   will not be submitted to the jury, although, as I mentioned

10  previously, to the extent that the Court makes

11  determinations on these claims, it will apply the jury's

12  findings as to any common questions of fact.  See generally

13  *Colorado Visionary Academy v. Medtronic*, 397 F.3d 867 at

14  875, Tenth Circuit, 2005.

15         And as I already mentioned to counsel

16  specifically, I know we will be giving the -- in the

17  Court's set of instructions, you will find an instruction

18  on unclean hands as it relates to unjust enrichment.

19         Accordingly, to the extent that the defendants'

20  motion for judgment as a matter of law is directed to the

21  plaintiffs' equitable claims, the motion is denied.

22         With respect to the remainder of the motion, I

23  want to take that motion under advisement and rule on it

24  when and if it's renewed at the conclusion of all the

25  evidence.

Redirect - Domingot

1    All right.  Let's bring back the jury.  Actually,

2    sorry, we didn't talk about timing of the witnesses.

3    Sorry, Deb.

4         Your next motion is -- your next motion -- your

5    next witness is Barbara Frank; is that right?

6         MR. THOMAIDIS:  That's correct, Your Honor.

7         THE COURT:  All right.  Do you think you will need

8    a full hour for her?

9         MR. THOMAIDIS:  I don't believe so, Your Honor.

10        THE COURT:  Can you do it in 45 minutes?

11        MR. THOMAIDIS:  I will certainly try.

12        THE COURT:  Okay.  I'm going to limit you to 45

13   minutes.  How much do you want to -- she's not

14   cross-endorsed, I take it.

15        MR. BURG:  Right.

16        MR. THOMAIDIS:  She's not, Your Honor.

17        THE COURT:  All right.  How much do you want to

18   reserve for redirect?

19        MR. THOMAIDIS:  10 minutes.

20        THE COURT:  All right.  So 35 minutes and 10

21   minutes.  There will be no recross from the plaintiff.  And

22   you'll get your full half hour with a two-minute warning.

23        MR. TeSELLE:  Thank you.

24        THE COURT:  All right.  Let's bring in the jury.

25        I'm going to limit you, Mr. Thomaidis, to one hour

Direct - Mabary

1    for Wendy Kramer.

2              MR. THOMAIDIS:  Thank you, Your Honor.

3              THE COURT:  How do you want to split that?

4              MR. THOMAIDIS:  May I have 15 minutes on redirect?

5              THE COURT:  Sure.  Okay.

6         (Jury was present at 3:33 p.m.)

7              THE COURT:  All right.  The defendants and

8    counterclaimants may call their next witness.

9              MR. THOMAIDIS:  Thank you, Your Honor.  At this

10   time, defendants and counterclaimants would call Joanne

11   Barbara Frank Mabary.

12             COURTROOM DEPUTY:  Right here, ma'am.  Just stand

13   here and raise your right hand.

14        BARBARA MABARY, DEFENDANTS' WITNESS, SWORN

15             COURTROOM DEPUTY:  Please be seated.  State your

16   full name for the record and spell your first and last

17   name.

18             THE WITNESS:  Barbara Joanne Mabary.

19   B-a-r-b-a-r-a, Mabary, M-a-b-a-r-y.

20                       DIRECT EXAMINATION

21   BY MR. THOMAIDIS:

22   Q.   Thank you for being with us today.

23             Would you please explain to the Court and jury

24   what your present occupation is.

25   A.   I work for CFPM, LLC.  And I am a marketing and --

1557

Direct - Mabary

1   director of marketing and leasing.

2   Q.   Okay.  And so what does that position entail?

3   A.   Well, I supervise the marketing for the Denver Design

4   District, and I'm responsible for finding new leads for

5   leasing and keeping us fully leased, if possible.

6   Q.   Okay.  And how long have you worked in a position

7   where you were affiliated with the Denver Design District

8   or Denver Design Center?

9   A.   About 20 years.

10  Q.   Okay.  And so how long have you worked in commercial

11  real estate?

12  A.   20 years.

13  Q.   Okay.  And during that time, approximately how many

14  tenants or people were you leasing property to?  How many

15  tenants have you worked for -- or excuse me, have you

16  worked with?

17  A.   Altogether, probably 150.

18  Q.   Okay.  And so explain just briefly for everyone's

19  edification how your position has changed during the time

20  that you've worked with the Denver Design District and your

21  employer.

22  A.   Well, I initially was the marketing director, then I

23  became the executive director of the Denver Design Center.

24  We purchased the collection, we now own about 70 acres.  It

25  morphed into CF Property Management, and then CFPM now.

Direct - Mabary

1   The same entity.

2            As such, I became executive vice president, and

3   now we're again morphing and I'm doing leasing and

4   marketing.

5   Q.   I see.  And so was there ever a time that you became

6   familiar with a company called Crew Trial Distribution,

7   Incorporated?

8   A.   Yes.

9   Q.   And approximately when was that?

10  A.   Eight, nine years ago.

11  Q.   Okay.  And so what do you recollect about Crew Tile

12  Distribution?

13  A.   They came to me interested in leasing space.

14  Q.   Okay.  And who was "they"?

15  A.   Ryan Davis.

16  Q.   Okay.  And so when Mr. Davis approached you about

17  leasing space, what were -- what was the gist of the

18  conversation, to the extent you can recollect it?

19  A.   That he had this Crew Tile and that he wanted to lease

20  space and open a showroom.

21  Q.   Okay.  Do you remember approximately when that was?

22  A.   I think it was in 2009.

23  Q.   Okay.  Do you remember -- I realize it's been a long

24  time, but do you have any recollection of a specific date?

25  A.   I don't have any of those documents in front of me, so

Direct - Mabary

1    I would prefer to be absolutely accurate.

2    Q.    I understand.  And I would like to help you with that

3    right now.

4    A.    Thank you.

5    Q.    I would like to -- and this is, I believe, a

6    stipulated exhibit -- this is trial Exhibit A-11.

7          So at this time, I'd move for the admission of

8    trial Exhibit A-11.

9          THE COURT:  All right.  Given the stipulation of

10   the parties, A-11 is admitted into evidence and may be

11   published to the jury.

12        (Defendants' Exhibit A-11 received)

13   BY MR. THOMAIDIS:

14   Q.    So do you recognize this document?

15   A.    Yes.

16   Q.    And what is it?

17   A.    It's a letter of intent.

18   Q.    And so are you able to tell from this document, and

19   given this, are you able to tell approximately when it was

20   drafted?

21   A.    Yes.  It was drafted November 13th, 2009.

22   Q.    Okay.  And so would that correlate in any way with the

23   time you spoke first -- first spoke with Ryan Davis?

24   A.    Well, I would have spoken with him earlier, and this

25   would be a result of those conversations.

Direct - Mabary

1   Q.   Okay.  And so when you spoke with Mr. Davis about Crew

2   Tile Distribution's desire to rent space in the Denver

3   Design District, did he tell you who the owner of Crew Tile

4   Distribution was?

5   A.   I thought he was.

6   Q.   Okay.  Why did you think that, do you remember?

7   A.   Well, when he came to me, he represented that he

8   was -- I don't know if he exactly said owner, or president,

9   but he came to me as representing Crew Tile, so I thought

10  he was the owner.

11  Q.   Okay.  And so when Mr. Davis approached you, what did

12  he indicate that Crew Trial Distribution, Incorporated,

13  would be doing?

14  A.   It was just a tile showroom.  I -- nothing more than

15  that.

16  Q.   Okay.  And did you ever have an opportunity to meet

17  Darlyne Davis?

18  A.   Not until later.  I did have an opportunity, yes.

19  Q.   And when did you first meet Darlyne Davis, to the best

20  of your recollection?

21  A.   I think it was when we signed the lease, but I'm not

22  for sure about that, but I think it was just when we signed

23  the lease.

24  Q.   Okay.  And do you recollect any of the additional --

25  any additional events between the time that this letter of

Direct - Mabary

 1    intent was presumably signed and the time that the lease

 2    was signed?

 3    A.    There were just negotiations about the lease

 4    document.

 5    Q.    Okay.  Were there any special terms of negotiation

 6    that you remember related to Crew Tile Distribution?

 7    A.    Yes, I do remember that they got five months free

 8    rent.

 9    Q.    Okay.  And why do you remember that?

10    A.    It was unusual.

11    Q.    Why was it unusual -- or maybe what were the

12    circumstances that caused you to offer up that incentive to

13    Crew Tile Distribution?

14    A.    Normally a showroom gets a bit of time to do their

15    tenant finish, and since they are not open for business

16    yet, that gives them an opportunity to do their tenant

17    finish without paying rent.  It was unusual to give them

18    five months.  It was a recessionary time and so it was

19    definitely an inducement to get the lease signed.

20    Q.    And so what was a more typical provision, based on

21    your experience, in terms of giving deferred or free rent?

22    A.    Two to three months is normal.

23    Q.    Okay.

24    A.    For interior design showrooms.

25    Q.    I see.  And so were there any other special

1562

Direct - Mabary

1 | concessions that were given by the landlord to Crew Tile

2 | Distribution at the time?  To the extent that you can

3 | recollect.

4 | A.   I don't remember anything specifically that was so

5 | different.

6 | Q.   Okay.  How would you characterize Crew Tile

7 | Distribution in terms of a company?  Do you think it was

8 | well run?

9 | A.   No.

10 | Q.   Why is that?

11 | A.   They immediately ran into financial trouble.  They --

12 | without knowing the Denver Design Center, who most people

13 | might not, the showrooms there are for very high-end

14 | clients, and they literally look like the inside pages of

15 | magazines.  They're beautiful.  Crew Tile was not like that

16 | at all.

17 | Q.   How so?

18 | A.   It was just a couple of displays.  There were some

19 | tile on the floor like a patchwork quilt.  Some tile on

20 | the -- on the walls.  It did not show well like the other

21 | showrooms.  It didn't compete.  You're asking if it was a

22 | well-run showroom.  Would you repeat your question?

23 | Q.   I'm sorry, I -- well, I think I asked specifically

24 | about the management.  Did you consider Crew Tile

25 | Distribution to be a well-managed company?

Direct - Mabary

1    A.    The answer is still no.  Okay?  So as part of their

2    lease -- all the design center leases, they participate in

3    a marketing fund, and as part of that marketing fund,

4    they're included in the directory, they're included in

5    marketing materials and newsletters.

6         And the market -- we have major market once a year

7    and so there's no additional charge to them.  And Crew Tile

8    didn't participate in those things, they didn't promote

9    themselves.  They were never in a newsletter, never

10   submitted when submittals were requested of the showrooms.

11        I remember having a major market where we had

12   hundreds of designers who come and speakers fly in from all

13   over the country, and they're there to do presentations

14   within the showrooms, and they -- the showrooms will have

15   lunches, they'll have elaborate catering going on to induce

16   the designers to come.  And they never participated.  My

17   recollection is that they had a bowl of grocery store candy

18   in their showroom and that was it.

19        They also -- in terms of management, they ran into

20   financial trouble right away.

21        I don't know if you want me to go on about that or

22   if you want to ask me later.

23   Q.    Let me ask you a preliminary question.  What

24   happened -- you mentioned the showroom was -- well, how

25   would you characterize the showroom in relation to the

Direct - Mabary

1    other showrooms in the Denver Design Center?

2    A.    It didn't compete.  It was not -- it just was not

3    attractive like the other showrooms.

4    Q.    Okay.  And so what does that mean, to be not

5    attractive like the other showrooms?

6    A.    This -- it was a hodgepodge of displays, in my

7    estimation.  That's my opinion.  And it was not -- it just

8    didn't show the product that other people might be more

9    interested in.

10   Q.    Okay.  And so you mentioned previously that they

11   immediately ran into financial difficulties.  Would you

12   please expand on that.

13   A.    Well, we first had to chase them for the security

14   deposit.  And then immediately we were having trouble

15   getting rent payments from them.  And so we -- there was

16   lots of conversations about when is the check coming, and

17   promises that they would pay on time or whatever and they

18   didn't.  And so we had trouble with collecting rent from

19   them.

20          In the end, we -- we got a judgment against them

21   for about $100,000, for which they have not paid, and we

22   have not been able to collect.  So I -- I think that's --

23   Q.    Thank you.

24   A.    -- if there are any other questions.

25   Q.    If we could refer back to trial Exhibit A-11 just very

1565

Direct - Mabary

1    briefly.

2              At the bottom there, it appears to be Crew Tile

3    Distribution by Ryan Davis.  Do you see that?

4    A.   Yes.

5    Q.   Did Ryan Davis ever sign this document?

6    A.   No.

7    Q.   Did anyone ever sign this document, to your

8    recollection?

9    A.   Yes, Darlyne did.

10   Q.   She signed the letter of intent?

11   A.   That -- I had Ryan on here because I thought that's

12   who I was dealing with.

13   Q.   So how did that situation come to pass?  Why did the

14   parties change?

15   A.   When I got the signed letter of intent back, it had

16   Darlyne's name on it as president.

17   Q.   And did that cause you any concern?

18   A.   I was curious about it.

19   Q.   Why were you curious about it?

20   A.   It's a change of -- it made me wonder who I was

21   dealing with and I alerted the owners.

22   Q.   And so were there any remedial measures that you or

23   the others at your company ever put in place with respect

24   to this concern?

25   A.   No, we moved forward with the lease.

Direct - Mabary

1   Q.   Okay.  And so I'm going to ask that we please now turn

2   to trial Exhibit A-15.  Now, I can give you a paper copy of

3   this document, but do you recognize it?

4   A.   Yes, that's -- that's our lease.  Sorry.

5   Q.   Okay.  And would you -- if I asked you to reference a

6   couple of provisions in this document, would it be easier

7   for you to use the paper copy or to use -- or for us to

8   navigate electronically?

9   A.   If it's going to pop up here, I can see it.  I'm

10  familiar with this standard lease.

11  Q.   Okay.  Perfect.  So do you recognize this as being a

12  standard lease?

13  A.   It is.

14  Q.   And is this something that you would have drafted?

15  A.   Our attorneys drafted.

16  Q.   Okay.  And so was it your standard to have attorneys

17  draft documents like this when a new tenant was coming

18  in?

19  A.   Yes.  We would get -- if there were negotiated items,

20  I would -- they went through our owners and then the

21  attorney would make changes, yes.

22  Q.   Okay.  And was -- was your employer or were you ever

23  in the habit of doing these documents or drafting these

24  documents without the input of an attorney?

25  A.   No, we have input from our attorneys.

Direct - Mabary

1   Q.   Always?

2   A.   I think so.  I . . .

3   Q.   It's --

4   A.   I mean, there are things like dates or there might be

5   things like that, but other than that, no.

6   Q.   Understood.  And so what do you recollect about the

7   signing of this particular lease?

8   A.   It -- can you be more specific?

9   Q.   Certainly.  Who ultimately signed this lease.  And

10   maybe it would be best to turn to --

11   A.   I think it's Darlyne that signed it.

12   Q.   Yeah.  And I'm going to ask that we please turn to the

13   second to last page of the document, which is page 25 of

14   26.

15        Now, do you recognize this page?

16   A.   Yes.

17   Q.   So you testified previously that you were under the

18   impression that Ryan was going to sign these documents; is

19   that right?

20   A.   Initially I thought Ryan Davis, yes.

21   Q.   And so it appears that Darlyne Davis has now signed as

22   the president of Crew Tile Distribution; do you agree?

23   A.   Yes.

24   Q.   And so do you remember the circumstances by which you

25   and Ms. Davis -- Mrs. Davis signed this document?

1568

Direct - Mabary

1    A.    Well, we signed it in our office.  It was notarized.

2    Q.    Okay.  And was there anything specifically you

3    remember about the meeting and the process of notarizing

4    the contract?

5    A.    Sarah Ball is our notary.

6    Q.    Okay.  So it would appear that this document is

7    negotiated -- or was drafted in your office, right?

8    A.    It was signed in our office.

9    Q.    I'm sorry, signed in your office.

10   A.    Yes.

11   Q.    Okay.  And so I have a couple of questions about this

12   document specifically.  When this document was signed on

13   December 8th, 2009, did you ever have occasion to have any

14   conversations with any representative of Crew Tile

15   Distribution about them having an exclusive distributor

16   agreement with Porcelanosa Los Angeles or any other

17   Porcelanosa entity?

18   A.    I remember them saying that they were going to

19   represent Porcelanosa, but I don't get involved in the

20   representation of multi-line showrooms.  Those are private

21   agreements they have with the manufacturers.  We're like

22   the Cherry Creek mall, we lease to Nordstrom's or all the

23   little stores inside.  We don't really get involved with

24   what manufacturers they line -- they represent.

25   Q.    I understand.  So with this lease, when it was

Direct - Mabary

1   executed on December 8th, 2009, were the -- was the tenant

2   permitted to sell retail out of its showroom in the Denver

3   Design Center?

4   A.   Yes.

5   Q.   Was there ever -- is there any reference in this

6   contract to any prohibition against selling retail out of

7   the Denver Design Center --

8   A.   No, actually, to the opposite.  There's a clause that

9   says that their use can be retail or wholesale.

10  Q.   And so if we were to give you a paper copy of this

11  document, would you be able to reference the provision or

12  provisions of this lease that say that?

13  A.   Yes.  It's actually, I think, on the first page.

14  Q.   Okay.  Would you mind pointing it out.

15  A.   Okay.

16  Q.   And maybe I should -- in the interest of time --

17  A.   It's there.

18  Q.   Yeah, would you mind looking at provision K in 1.1.

19  A.   Yes.  It says, Permitted use of the demised premises

20  by tenant:  Retail and wholesale to the trade only showroom

21  and for no other purpose.

22  Q.   Okay.  And so was this communicated to Ryan Davis and

23  Darlyne Davis when this lease was signed on December 8th,

24  2009?

25  A.   Certainly.  They had the lease document for some

1570

Direct - Mabary

1    time.

2    Q.   Okay.  How long would you say they had this lease

3    document?

4    A.   I don't know.  Usually it takes a month or so to go

5    through the lease document.

6    Q.   So they would have had a draft of the lease

7    document --

8    A.   Oh, yes --

9    Q.   -- itself for a month, would you say?

10   A.   Ish, yeah.

11   Q.   Okay.  And so --

12   A.   They are signing the document, so they obviously saw

13   what was in it.

14   Q.   I understand.  So was there ever a time when Crew Tile

15   Distribution couldn't sell retail out of its showroom in

16   the Denver Design Center?

17   A.   Not at all.

18   Q.   And was there ever a time that that changed from what

19   is outlined in this lease document?

20   A.   Not at all.

21   Q.   Okay.

22   A.   Many of the showrooms at the collection sell wholesale

23   and retail.

24   Q.   Okay.

25   A.   They were just one of several.

1571

Direct - Mabary

1    Q.   And so would you say that the management of Crew Tile

2    Distribution was aware of that when they signed this lease

3    in December of 2009?

4             MR. TeSELLE:  Object to foundation.

5             THE WITNESS:  Yes.

6             THE COURT:  Overruled.  You're fine, ma'am.

7             THE WITNESS:  Okay.

8    BY MR. THOMAIDIS:

9    Q.   So you had mentioned previously that Crew Tile

10   Distribution ran into financial difficulties; is that

11   right?

12   A.   Yes.

13   Q.   Would you please elaborate on what those financial

14   difficulties were.

15   A.   Well, they weren't paying their rent on time; they

16   were in default of their lease.

17   Q.   And so you had testified previously about providing

18   five months of deferred rent.  How soon after that five

19   months of deferred rent expired did Crew Tile Distribution

20   fall into default?

21   A.   I don't remember the exact amount of time, but I think

22   it was within -- I'm -- about six months or so, or less.

23   It was not very long.  I -- I don't remember the exact

24   date.

25   Q.   Okay.  And so what kind of remedial measures did you,

1572

Direct - Mabary

1   as the landlord, take with respect to Crew Tile when they

2   fell into default under the terms of the lease?

3   A.   Well, we kept asking for checks.  We were asking for

4   some of their financial documents to see what kind of shape

5   they were in.  We were concerned that they were immediately

6   having financial trouble.

7   Q.   Okay.  And so to your recollection, did Crew Trial

8   Distribution, Incorporated, ultimately perform its

9   obligations under the terms of this lease that's been

10  marked as A-15?

11  A.   Not at all.

12  Q.   How so?

13  A.   They were in default of their lease.  They weren't

14  always open when they were supposed to be open.  And they

15  owed us a lot of money.  And so in the end, they were --

16  we -- well, they left.  We had to have them leave.

17  Q.   I'm sorry, I am -- what does it mean when you say you

18  had to have them leave?

19  A.   I don't know the exact term to use.  They were --

20  Q.   Would the term "evicted" be appropriate?

21  A.   Yes.  Yes.  Thank you.

22  Q.   Okay.  So you ultimately evicted Crew Tile

23  Distribution --

24  A.   Yes, we did.

25  Q.   -- from the design district?

Direct - Mabary

1    A.    Yes.

2    Q.    When you evicted Crew Tile Distribution from the

3    Denver Design District, do you recall what they left

4    behind?

5    A.    Yes.

6    Q.    Okay.  Would you mind elaborating for the Court and

7    the jury.

8    A.    They left behind some of their fixtures.  They left

9    behind a lot of the tenant finish that was like tile and so

10   on on the floor that was unusable for any other tenant

11   because it was squares larger than this, but each one

12   contained different kinds of tile, so it looked like just a

13   big patchwork of tile.

14        There was tile all over the walls.  There was

15   internal buildout that they had put in.  There was a shower

16   in the corner, I remember.  They had put down some floor

17   that we had to remove, in addition to the tile, because

18   some of their fixtures were on top of the flooring and it

19   was damaged.  So we had to remove all the floor.

20        There was quite a bit of -- as part of the lease,

21   they're supposed to leave it in the condition it was --

22   that they received it, and they did not leave it in that

23   condition.

24   Q.    And so has anyone at Crew Tile Distribution ever

25   indicated to you who those fixtures and that tile and those

1574

Direct - Mabary

1   displays belonged to?

2   A.   What manufacturer?

3   Q.   Yeah.  Whether they were Crew Tile Distribution's or

4   someone else's.

5   A.   No.  They didn't.

6   Q.   Okay.  Were those items that were left in the showroom

7   when Crew Tile Distribution was evicted, what ultimately

8   happened to them?

9   A.   They were abandoned and they were demo'd by us so that

10  we could show the space to other prospective tenants.

11  Q.   And so when you say demo'd, does that mean thrown

12  away?

13  A.   Yes.

14  Q.   Okay.  And so in being evicted and vacating the

15  showroom at the Denver Design District, is there anything

16  that you remember that Crew Tile Distribution took that was

17  noteworthy?  Like did they take anything from the showroom

18  or did they leave it as it was?

19  A.   No, they took all the light fixtures, which are

20  supposed to be owned by the landlord for the lease.  The

21  light bulbs and so on.  There were quite a bit of them.

22  Q.   I see.  So if I understand your testimony correctly,

23  they left the tile and the fixtures and the displays, but

24  they took the light fixtures?

25  A.   Uhm-hum.

1575

Direct - Mabary

1    Q.   And who did those light fixtures belong to?

2    A.   The landlord; it's in the lease.

3    Q.   I see.  What was the value of those light fixtures, to

4    the extent you can recollect?

5    A.   I don't remember.  It was -- I don't remember the

6    value, sorry.

7    Q.   Okay.  And so, Ms. Mabary, did anyone at Crew Tile

8    Distribution ever indicate to you that Crew Tile

9    Distribution was going to sell its business to Porcelanosa

10   Los Angeles or some other company?

11   A.   They -- there was reference to that in one

12   conversation, and it was really in reference to that we're

13   going to be bought by -- they were talking to Porcelanosa

14   about buying them, and I think it was to encourage us to

15   hold on or that there would be money coming because of

16   that.

17   Q.   I see.  And so did you ever come to find out that

18   there were any truth to those assertions?

19   A.   Well, I never heard that they were sold to

20   Porcelanosa, so -- so I guess not.

21   Q.   And so who made those representations to you, to the

22   best you can recollect?

23   A.   I think it was Darlyne.  I think so.  It might have

24   been Ryan, but I can't remember for sure.

25   Q.   Okay.  And do you remember any of the specifics of

Direct - Mabary

1    what they told you?

2    A.   Just that they were trying to sell to Porcelanosa,

3    that they had conversations with -- the way I remember it,

4    they had conversations with Porcelanosa and that

5    Porcelanosa wanted to purchase them.

6    Q.   I see.  And so do you remember anything else that

7    Darlyne Davis told you with respect to the potential buyout

8    of Crew Tile Distribution by Porcelanosa Los Angeles or

9    another Porcelanosa company?

10   A.   She -- well, first of all, it was always just

11   Porcelanosa.  I don't know what -- the difference between

12   the entities, so I don't recall anything more specific

13   about it.

14   Q.   Okay.  And so when Crew Tile Distribution vacated

15   their showroom at the Denver Design Center, was there any

16   damage done to the showroom?

17   A.   Yes.  The -- the showroom had to be returned to its

18   original condition so we could lease it to someone else.

19   No one else would lease it with those fixtures left in

20   there or with the problem with the floor and the walls, and

21   so all that damage had to be repaired.

22   Q.   And so approximately how much did that cost to repair,

23   if you can recollect?

24   A.   I don't remember exactly, but we got a bid, we had it

25   taken care of, and the landlord had to pay for it.

Direct - Mabary

1  Q.   Okay.  And so do you recall whether your employer

2  CFPM, LLC, ever initiated any legal proceedings to collect

3  money owed from Crew Tile Distribution?

4  A.   Yes, we did.

5  Q.   And what do you recollect about that?

6  A.   Well, we have a judgment against them for about

7  $100,000.  And we tried to collect, I think some of that

8  money.  And I think we got about $83 from Bellco, I

9  believe, a credit union.  And that's all we've ever been

10  able to collect.

11  Q.   And so when you say you got from a bank account, were

12  you garnishing that bank account?

13  A.   Yes, we were.  Yes.

14  Q.   I see.  And do you have any recollection of when you

15  sought to garnish that bank account belonging to Crew Trial

16  Distribution, Incorporated?

17  A.   I don't have a -- I don't have the documents, so I

18  don't have a date exactly, but we did try to garnish and --

19  and there was, I think it was right before the judgment,

20  there was a quitclaim deed done by Darlyne Davis on her

21  house, so we were hopeful to get something that -- but then

22  the quitclaim deed changed the entity on her house, so

23  there was no way of us to collect anything from that.

24  Q.   And do you by any chance remember what that entity

25  was?

1578

Direct - Mabary

1   A.   I don't.

2   Q.   Okay.  If I was to show you a document, would it

3   refresh your recollection?

4   A.   Probably.

5   Q.   So I would like to please mark for identification

6   trial Exhibit B-5.

7           MR. TeSELLE:  I'm sorry?

8           MR. THOMAIDIS:  B-5.

9   BY MR. THOMAIDIS:

10   Q.   And, Ms. Mabary, do you recognize this document?  And

11   it may be difficult to see.  If it is, we can try to expand

12   it for you.

13   A.   Yes, I do.

14   Q.   Does that refresh your recollection as to what that

15   entity was?

16   A.   Well, it looks like it went from Darlyne -- Glenn and

17   Darlyne Davis to G&D Davis Holdings, LLC, and that they had

18   a limited liability company.

19   Q.   And is that consistent with what you saw previously?

20   A.   Yeah, I believe so.

21   Q.   Okay.  And so --

22   A.   And she had guaranteed the lease, so that should have

23   been something -- an asset that we would have looked to.

24   Q.   I see.  So did you look at that asset or look to try

25   to obtain that asset through counsel?

Direct - Mabary

1   A.   Yes.  We had an attorney, yes.

2   Q.   Okay.  And so to -- up through today's date, have you

3   ever been able to collect any money on that judgment?

4   A.   No.  Well, no, I think we collected $83, maybe,

5   something like that.  Not on the quitclaim, but on -- and

6   I'm not sure about the 83.  It could be 79 or -- it was in

7   that range.

8   Q.   Understood.  But aside from the 80 or so dollars that

9   you collected through garnishing that bank account, have

10  you collected any additional monies with respect to your

11  judgment?

12  A.   No.

13  Q.   So can we please take a quick look at trial Exhibit

14  B-9.  This has actually already been admitted.

15       Now, do you recollect this document?  And we can

16  expand a portion of it.  How about that?

17  A.   Yes.

18  Q.   So is this consistent with your recollection of the

19  judgment that --

20  A.   It is.

21  Q.   -- CFPM had?

22  A.   Yes.

23  Q.   Is this the original judgment amount is $104,608.72?

24  A.   And there was some -- I think some interest on there

25  after that.

1580

Direct - Mabary

1    Q.   And so I'd like to go back briefly to the time that

2    Crew Tile Distribution vacated their showroom, if I could.

3    A.   Okay.

4    Q.   Did they ever contact you about making payment

5    arrangements with respect to the amount -- outstanding

6    amounts they owed?

7    A.   Payment -- no, they just kept promising to bring

8    checks.

9    Q.   No, I'm referring to after they vacated the premises.

10   A.   Oh, I don't recall.  I don't recall them making

11   payment arrangements, no.

12   Q.   Okay.  Did they ever contact you as the representative

13   of the landlord?

14   A.   I don't recall them doing that, no.

15   Q.   And what about prior to their being evicted from the

16   Denver Design Center, do you remember having difficulties

17   collecting rent at that time?

18   A.   Yes.  That's why they were evicted.

19   Q.   And so what difficulties did you have?

20   A.   Well, they would promise to drop off a check or pay

21   for half and they didn't.  We had to chase them constantly

22   for the money.  There were promises made and not kept.

23   Q.   Okay.  And in the course of your business dealings

24   with Crew Tile Distribution, do you recall whether Crew

25   Tile Distribution was carrying any other product lines in

Cross - Mabary

1    its showroom while they were at the Denver Design Center?

2    A.    I think there were eight different product lines

3    there.

4            COURTROOM DEPUTY:  You have two minutes.

5            MR. THOMAIDIS:  Thank you.

6    BY MR. THOMAIDIS:

7    Q.    Do you have -- I'll move on in the interest of time.

8            So I guess I'll close with, in your opinion, based

9    on your experience with the Denver Design Center and in the

10   commercial real estate industry, would you consider Crew

11   Tile Distribution to be a company that you would want to do

12   business with in the future?

13   A.    I would not lease to them, no.

14   Q.    Okay.  In any context would you do business with them?

15   A.    No.

16           MR. THOMAIDIS:  Thank you.  I have no further

17   questions.

18           THE COURT:  Cross-examination.

19           MR. TeSELLE:  Thank you, Your Honor.

20                          CROSS-EXAMINATION

21   BY MR. TeSELLE:

22   Q.    Ms. Mabary, Your Honor, jury.

23           Just so -- just to orient the jury, they have seen

24   some e-mails and heard some testimony about a Jo Frank.

25   A.    Yes.

1582

Cross - Mabary

1   Q.   That was your name from a previous marriage, correct?

2   A.   It is.

3   Q.   And if I can start with Defendants' Exhibit B-8.

4        Is that in evidence, Mr. Crough?  If not, I'll

5   stipulate --

6        MR. CROUGH:  One second.  I show it's in.

7        MR. TeSELLE:  Your Honor, this is a defense

8   exhibit.  We would stipulate to its admissibility and I ask

9   that it be moved into evidence.

10       THE COURT:  I don't see a stipulation, but does

11  the defendant object to its own exhibit?

12       MR. THOMAIDIS:  We have no objection, Your Honor.

13       THE COURT:  All right.  There being no objection,

14  B-8 is received into evidence and may be published to the

15  jury.

16       (Defendants' Exhibit B-8 received)

17  BY MR. TeSELLE:

18  Q.   Okay.  Ms. Mabary, there's never been any dispute on

19  Crew Tile's part that they actually do owe you back rent,

20  correct?

21  A.   I am not aware of their dispute.  I mean, it's a

22  judgment, so . . .

23  Q.   And, in fact, they didn't force you to go forward --

24  they actually confessed that judgment, correct?

25  A.   Well, that's --

Cross - Mabary

1    Q.    They confessed that they owed -- that they owe that

2    money, correct?

3    A.    Yes, that's how the document is drafted, as a

4    confession.

5    Q.    And the jury hasn't seen this before, so I'm just

6    walking through this for them.   If we look at Exhibit B-8,

7    that's a confession of judgment where if you look at the

8    second page, Darlyne Davis signs both as the owner of Crew

9    Tile Distribution and individually, confessing to the full

10   judgment, correct?

11   A.    Yes.   When she signed the lease, she signed it as

12   president, not owner.

13   Q.    Okay.   Now, I understand that, but if you can just

14   answer my questions, Mr. Thomaidis will be able to ask you

15   questions to follow up.   I have a very limited amount of

16   time here.

17   A.    Sorry.

18   Q.    My point is that they actually confessed and agreed

19   they owed you that money, correct?

20   A.    Yes.

21   Q.    And that 100 some thousand dollars includes both the

22   back rent that they owed you plus the other damages that

23   you testified here today, correct?

24   A.    Yes.

25   Q.    Where you actually went and got a -- an estimate of

1584

Cross - Mabary

1   what it would take to repair things, that's all included in

2   that amount, and Crew Tile has always agreed that they --

3   they owe you that money, correct?

4   A.   Yes.

5   Q.   And they've communicated to you, either directly or

6   through counsel, that if they're able to -- if they're ever

7   able to, Crew Tile intends to pay you back that money,

8   correct?  That's what they've indicated to you --

9   A.   That's a legal document, so all I know is it's a

10  confession of judgment.  I don't know that it's -- I'm not

11  an attorney.

12       Does it -- does that mean that any time in the

13  future they may pay us back?  I guess so.

14  Q.   Okay.

15  A.   I'm not an attorney.

16  Q.   If we can turn to an exhibit which you were shown on

17  direct, A-15, the lease agreement.

18  A.   Yes.

19  Q.   First of all, you understand that Porcelanosa's a very

20  high-end luxury tile, correct?

21  A.   Yes.

22  Q.   Have you heard it basically referred to as the Ferrari

23  of tile?

24  A.   No, I've never heard that.

25  Q.   Okay.  But do you -- you're aware that -- well, let me

Cross - Mabary

1   back up, because you talked a little bit about this before.

2            The Denver Design Center is a very high-end luxury

3   place, correct?

4   A.   Yes.

5   Q.   During this time period when we're talking back in the

6   2008-2009 time frame, you had to actually be working with a

7   designer or some professional who would actually get a card

8   that would allow them access to this exclusive club?

9   A.   Sir, that's not true.

10  Q.   Okay.

11  A.   During that time period, we were even open on the

12  Saturdays and we had interior designers on duty that would

13  help anyone who came in if they needed help.  And the

14  showrooms out on the street, most of them, which is one of

15  them was Crew Tile, could sell retail or wholesale, and a

16  lot of them did.

17  Q.   To the trades.

18  A.   No.  No, retail to the consumers or to the trade.

19  Q.   Let's look back at what you read into evidence on the

20  first page of the lease agreement.  Under section 1.  1.1,

21  Certain Basic Lease Provisions.  Under K, it says,

22  Permitted uses of the demise premises by tenant:  Retail

23  and wholesale to the trade only.  Do you see that?

24  A.   Yes.

25  Q.   That means you can sell retail and you can sell to the

Cross - Mabary

1   trade?

2   A.   Only.  Those are the two things -- two choices you

3   have.

4   Q.   And do the -- the T is capitalized.  Do you understand

5   what that means in a legal document like this when there's

6   a capitalized --

7   A.   Well, in this situation, to the trade, it's in our

8   industry, that's the way it's used.  To the trade, trade is

9   usually capitalized.

10  Q.   Okay.  If we look at -- and the front page, that's

11  just kind of a basic listing of -- kind of the overview of

12  the terms of this lease agreement, correct?

13  A.   Yes.

14  Q.   And then the rest of the lease agreement has a lot of

15  legalese and the more defined, more in-depth requirements

16  or --

17  A.   Yes.

18  Q.   -- provisions.

19       And if we turn to page 6 of this exhibit, ma'am,

20  if you look at 3.4, Public Limitations.

21       Do you see that?

22  A.   Yes.

23  Q.   And what this says is, By executing this lease, tenant

24  acknowledges that the property is currently by

25  landlord's -- that's you, correct --

1587

Cross - Mabary

1    A.    Yes.

2    Q.    -- sole decision being operated as a design center

3    available to the trade and retail only.

4          Do you see that?

5    A.    Yes.

6    Q.    Okay.  It goes on and talks there may be promotional

7    events open to the general public.  Do you see that?

8    A.    Yes.

9    Q.    But this is putting a limitation that this is a design

10   center that's available to the trade and retail only,

11   correct?

12   A.    That is a throw-back from the old lease that we used

13   to use just for the west building.  But the first page is

14   very clear that they could sell retail, and most of those

15   showrooms out there did.

16   Q.    Okay.  You had the assistance of counsel when this

17   lease was prepared, correct?

18   A.    Right.

19   Q.    And you would expect that they would make sure that

20   all the provisions that are going to be binding on my

21   client are true and correct and accurate, correct?

22   A.    So it looks like there's a conflict here and that was

23   an oversight.

24   Q.    Okay.  And -- but you would agree that, based upon

25   Section 3.4, somebody reading that, as you've just said,

1588

Cross - Mabary

1    would understand that they had a restriction on how they

2    could use their showroom during that time frame, correct?

3    A.    But this also says that it's operated as a design

4    center available to the trade, meaning members of the

5    trade, designers, architects and builders, and retail only.

6    So it says retail.

7    Q.    And, in fact, it's actually a default under the

8    agreement if they violate this provision, correct?

9    A.    But it says, it's available to the trade and retail

10   only.

11   Q.    Ms. Mabary, it's actually a default if they violate

12   Section 3.4 of this agreement, correct?

13   A.    I --

14   Q.    If you know?

15   A.    Okay.  Yes, it could be a default.  But you're saying

16   that it -- that it's only to the trade.  It says "and

17   retail only."

18   Q.    Okay.  Let's look back at that first page that you say

19   is clear -- this whole page is clear and accurate, correct?

20   A.    It says that they can sell to the retail and to --

21   Q.    Ms. Mabary, just my -- just my question.  Maybe I

22   wasn't clear on it.

23         I'm turning back to the first page of the standard

24   lease, okay?

25   A.    Okay.

Cross - Mabary

1    Q.    And that has the summary overview of the key

2    provisions in the lease agreement, correct?

3    A.    Yes.  And are you referring to K?

4    Q.    No, now I'm asking you generally.  That's what this

5    is, is a summary of the provisions in the lease agreement,

6    correct?  Is that fair?

7    A.    It's not just a summary.  It is part of the --

8    Q.    Part of the agreement.

9    A.    Yes, part of the agreement.

10   Q.    That was not a trick question.  Just wanted to make

11   sure we're in agreement.

12         You've reviewed this document before today,

13   correct?

14   A.    Yes.

15   Q.    You've reviewed this first page, and it's complete and

16   accurate to the best of your knowledge, correct?

17   A.    To the best of my knowledge.

18   Q.    Okay.  And, in fact, do you remember when you

19   testified here just a little bit ago that one of the

20   concessions that you gave to Crew Tile was that they got

21   five months of free rent?

22   A.    Yes.

23   Q.    Do you remember that testimony?  If you look at

24   provision L, Basic Rent:  See Section 4.1, based upon the

25   following annual amounts.  For the first month, it has a

1590

Cross - Mabary

1  monthly rent of zero, correct?

2  A.   Yes.

3  Q.   But then for each of these succeeding months, there's

4  actually a monthly base rent, and a total annual basic rent

5  listed for each month after December of 2009, correct?

6  A.   Yes.

7  Q.   In fact -- and that's true and accurate, correct?

8  A.   Yes.  I think so.

9  Q.   And under this lease agreement, which was prepared by

10  your lawyers, which is notarized in your office, they had

11  an obligation, based upon this agreement, to start paying

12  you rent as of January 1st, 2010; isn't that correct?

13  A.   Would you scroll down?  Because I think there's a

14  provision about the deferred rent which clarifies that.

15  Q.   Okay.  So deferred rent as opposed to rent free; is

16  that your testimony?

17  A.   Yes.  It -- they did not have to pay rent unless they

18  went into default of the lease.  If they were in default of

19  the lease, then the back rent -- that deferred rent became

20  owed and due.

21  Q.   Okay.  So just to clarify, it was not rent free, it

22  was a deferred amount that they would still be obligated

23  on --

24  A.   If they went into default.

25  Q.   -- through the agreement?

Cross - Mabary

1    A.    Yes.

2    Q.    Thank you.  In fact, you also understand Section 4.5,

3    that they were obligated and they did pay you a security

4    deposit upon the execution of the lease.  You remember

5    that, correct?

6    A.    They didn't pay the day we executed the lease.  We did

7    have to chase them, as I recall, to get the security

8    deposit.

9    Q.    Okay.  If we look at Section 4.5 of the agreement,

10   security deposit, doesn't it say, Upon the execution of

11   this lease, tenant shall deposit with landlord the amount

12   specified as security deposit?

13   A.    Yes, I --

14   Q.    Ult- -- I'll let you finish.

15   A.    Yes, it does say that.

16   Q.    And ultimately they did pay you that security deposit.

17   A.    I believe they did.

18   Q.    I'd --

19   A.    I don't have my accounting records and I have a lot of

20   tenants, so I'm doing that from my memory and I'm telling

21   you the best that I can.

22   Q.    Okay.  If we look to the last page of this document,

23   Exhibit -- well, it's not the last page, I apologize.  The

24   last page is the notary.  But the signature page, which is

25   page 25.

Cross - Mabary

1   A.   Okay.

2   Q.   Okay.  You were aware, or you were in the office when

3   Darlyne Davis signed this President of Crew Tile

4   Distribution, correct?

5   A.   Yes.

6   Q.   Okay.  You agreed to move forward with the lease with

7   her representing that she was the president of Crew Tile

8   Distribution, correct?

9   A.   Yes, we did.

10  Q.   You didn't have a problem with that at that time,

11  correct?

12  A.   No, we went -- we moved forward with it.

13  Q.   All right.  You had a belief from your first meeting

14  with Ryan Davis that he represented the company and that,

15  therefore, he was either the owner or the president, that

16  was -- do you remember that testimony you gave earlier here

17  today?  Correct?

18  A.   I -- yes, he represented -- to me, he represented that

19  this was his company, but then I later learned that

20  actually his mother was the president and would be signing

21  the lease.

22  Q.   Okay.  And that's, in fact, what she did, correct?

23  A.   Yes.

24  Q.   Can you -- can you look at -- under Tenant, you see

25  the name of my client?

Cross - Mabary

1    A.    Crew Tile Distribution.

2    Q.    Okay.  Is it misspelled?

3    A.    I guess it is.

4    Q.    Is that the first time you saw that there's a

5    misspelling in a contract that was prepared by your lawyers

6    as the binding lease agreement in this case?

7    A.    I've seen a lot of misspellings from attorneys.

8    Q.    Okay.  That's not an unusual situation that contracts

9    have misspellings from time to time, even in something as

10   important as the name of one of the parties that's

11   involved, correct?

12   A.    Oh, no, this just says distribution, and it's spelled

13   d-i-s-t-i-r-b-u-t-i-o-n.

14   Q.    Correct.  Do you remember your testimony here earlier

15   also about the showroom and that it wasn't -- it wasn't up

16   to the quality of the other tenants that you had at the

17   Denver Design Center?

18   A.    Yes.

19   Q.    Can we look at Plaintiffs' Exhibit 52, please.  Have

20   you seen this before?

21   A.    I haven't seen this photo, no.

22   Q.    Okay.  I'm going to represent to you that there's been

23   a number of witnesses already in the case, including

24   representatives of Porcelanosa, including the -- that saw

25   the showroom when it was in place.

Cross - Mabary

1   A.   Okay.

2   Q.   Is this a fair depiction of the condition of the

3   showroom in the Denver Design Center and the two -- once

4   it -- once it was constructed, once they completed the

5   construction?

6   A.   That was one wall of it, I guess.

7   Q.   Okay.  And is it your opinion and your testimony here

8   that that is not -- that is not a good representation of

9   the product?

10   A.   I don't know if it's a representation of the product.

11   I can just say it didn't compete with the other showrooms.

12   And that you're asking my opinion, so I'm just saying it

13   was -- the showrooms were magnificent and I don't know if

14   it represents Porcelanosa at the time.  I don't know.

15   Q.   But in terms of you don't find that to be a luxurious

16   presentation?

17   A.   No.

18   Q.   Okay.  If we could also look at Plaintiffs'

19   Exhibit 53.  Is this now another shot of a different area

20   of the showroom showing the tile and the product at the

21   showroom as it existed in that basic time frame once it was

22   constructed?

23   A.   I think that's -- that's -- I haven't seen this photo

24   before, but that's been a lot of years, but I think that's

25   probably a picture of what was in there.  And your

Cross - Mabary

1    question, sorry?

2    Q.   Okay.  So -- but I want to make clear, because you

3    were asked different questions at different times, and one

4    may get confused about when there was tile on the floor or

5    these kind of things.  This is the depiction, this is what

6    it looked like during the 2010-2011 time frame before you

7    had to evict them, correct?

8    A.   Yes.

9    Q.   Now --

10   A.   I don't -- so what was your question, sir?

11   Q.   You answered it.

12   A.   Okay.

13        MR. TeSELLE:  One second, Your Honor.

14        THE COURT:  Sure.

15   BY MR. TeSELLE:

16   Q.   You were also asked some questions about the time

17   frame of 2008 and 2009.  That was a -- I think you used the

18   word recessionary or recession time period?

19   A.   2009 was.  I think the recession, probably from the

20   very beginning was 2008, but . . .

21   Q.   At that point in time, that had a pretty significant

22   impact on construction, correct?

23   A.   Yes, it did.

24   Q.   And by extension, that had a pretty significant impact

25   on you and your business, correct?

1596

Cross - Mabary

1   A.   It did to some of my showrooms.

2   Q.   Now, at some point in time, it -- at some point in

3   time, Porcelanosa contacted the Denver Design Center about

4   opening their own showroom directly; isn't that correct?

5   A.   Yes.

6   Q.   And that was approximately in -- when was it -- let me

7   make sure you -- is that not in evidence?

8        When was it that Porcelanosa first contacted you

9   to say that they were now going to open their own showroom

10   in the Denver Design Center?

11  A.   You know, I -- it's been a lot of -- it's been a lot

12  of years.  So I remember that we evicted Crew Tile and then

13  they were -- for a short time represented within another

14  showroom DSKB.  And it was after that time period that they

15  contacted me directly and said they wanted to have their

16  own showroom.

17  Q.   Who contacted you directly?

18  A.   It was their corporate office from Porcelanosa.

19  Q.   Okay.  Do you know what location contacted you?

20  A.   I -- why, is there a difference in the entities?

21  Q.   I'm just asking if you know.  Do you remember who it

22  was you talked to?

23  A.   No, it was Porcelanosa.  I don't -- I mean, they're in

24  New York, they're in LA.  I don't recall.

25  Q.   So the eviction was sometime in 2012, correct?

1597

Cross - Mabary

1   A.   I believe it was.

2   Q.   Okay.  And after that point, you said Porcelanosa, the

3   product, was in a different showroom, DK -- can you say it

4   again?

5   A.   DSKB.

6   Q.   DSKB, thank you.  But after a short period of time,

7   Porcelanosa asked you about wanting to open up a showroom

8   in the exact same location where Crew Tile's place had

9   been, correct?

10  A.   No, it wasn't the exact same location.

11  Q.   In the same -- in the same design center.

12  A.   In the same design center.

13  Q.   In the same building?

14  A.   Same building.

15  Q.   Thank you.  And to your knowledge, who was it who set

16  up DSKB's Porcelanosa display?

17  A.   I have no idea.

18  Q.   Was it Crew Tile?

19          MR. THOMAIDIS:  Your Honor, asked and answered.

20          THE COURT:  Sustained.  She has no idea.

21          MR. TeSELLE:  Withdrawn.

22  BY MR. TeSELLE:

23  Q.   And, in fact, some time in April of 2014, Porcelanosa

24  actually did open the showroom in the Denver Design Center,

25  correct?

Cross - Mabary

1    A.    I can't confirm the date because I don't have any of

2    those documents.  It was later.  It was after they were in

3    DSKB and I -- I don't have those documents.

4    Q.    Okay.

5    A.    I'm sorry, I don't -- I don't want to say something

6    that's wrong.

7    Q.    Fair enough.

8          And in an attempt to refresh the witness'

9    recollection, can I show just her plaintiffs' trial Exhibit

10   175 -- or, I'm sorry, 176.

11         I'll represent to you this is a -- well, strike

12   that.

13         Does this refresh your recollection as to when

14   Porcelanosa would have had its grand opening and opened at

15   the Denver Design Center?

16         MR. THOMAIDIS:  Your Honor, this has not been

17   stipulated to.  It has not been admitted as an exhibit.

18         THE COURT:  He's refreshing recollection.

19         MR. THOMAIDIS:  Oh, I'm sorry.

20         THE COURT:  If it refreshes your recollection.

21         MR. THOMAIDIS:  I apologize, Your Honor.

22         THE WITNESS:  Okay.  It looks like that time

23   frame, yes.

24   BY MR. TeSELLE:

25   Q.    The time frame being April of 2014?

1  A.   What was -- it is to say it is opening or grand -- or

2  it will be expanding?  I would have to read it.

3  Q.   Okay.

4  A.   It does say it's a grand opening, but the date of

5  the -- that this is posted is April 16th, 2014, so I would

6  assume that, but I have not looked at it, I haven't read

7  it.

8  Q.   And they actually opened, and do they still have that

9  showroom today?

10  A.   They do, they do.

11  Q.   Okay.  And, in fact, do you know how long it took

12  Porcelanosa to actually build its showroom?  You talked

13  about the five- or six-month period that I think it was

14  typical for people to actually buildout.  Do you know how

15  long that took Porcelanosa to do before they were ready to

16  move in?

17  A.   I don't know exactly.  I really didn't -- I didn't

18  look up all those things.  I didn't expect to have those

19  questions today.

20  Q.   I apologize.

21  A.   Okay.  I'm sorry, I just don't know.  I don't

22  remember.

23       MR. TeSELLE:  Thank you.  I have no more

24  questions, Your Honor.

25       THE COURT:  Thank you, Mr. TeSelle.

1600

Redirect - Mabary

1   Redirect.  You have 10 minutes, Mr. Thomaidis.

2   MR. THOMAIDIS:  Thank you, Your Honor.

3   REDIRECT EXAMINATION

4   BY MR. THOMAIDIS:

5   Q.   So, Ms. Mabary, I have a couple of questions for you.

6   May we please pull up trial Exhibit A-15 again,

7   please.

8   And so if you could please turn to the second page

9   of this document.

10  A.   Yes.

11  Q.   And up there, can you please blow up that section at

12  the top of the page with the asterisk.

13  And would you just, Ms. Mabary -- can you expand

14  that to include the whole provision.

15  So, does that asterisked area clarify this issue

16  with regard to deferred rent?

17  A.   I didn't know there was still a question about it.

18  What was the question?

19  Q.   Oh, I'm sorry.  I think that there was some -- still

20  some question as to whether deferred rent meant that you

21  didn't have to pay it when it was due and if you didn't, it

22  would then accrue against you; is that right?

23  A.   If you go into default, you owe all that five months

24  of free rent back, yes.

25  Q.   Understood.  So this would appear to be a provision

Redirect - Mabary

1   that Crew Tile Distribution, its owners, and managers would

2   have been aware of when they were entering into this lease;

3   would you agree?

4   A.   I would agree.

5   Q.   Okay.  And so, Ms. Mabary, how many evictions have you

6   had to make of commercial tenants over the course of the

7   last 20 years?

8   A.   Maybe four.

9   Q.   And so Crew Tile is one of those four?

10  A.   I -- I would have to think about it, but yeah, very

11  few.

12  Q.   So if you look at the lease agreement on page 1, it

13  would appear that this lease is for approximately 1693

14  square feet.  To the best of your knowledge, is this

15  comparable to, smaller, or larger than most of the

16  showrooms --

17  A.   Most of the showrooms are larger.

18  Q.   Okay.  Substantially larger or just larger?

19  A.   Substantially larger.

20  Q.   Okay.  And so just so we're clear, there's some

21  discussion about what would happen after Crew Tile

22  Distribution vacated the Denver Design District; do you

23  remember that --

24  A.   Yes.

25  Q.   -- just a few minutes ago?

1602
Redirect - Mabary

1     Have any of the representatives of Crew Tile

2   Distribution, either Darlyne Davis or Glenn Davis or Ryan

3   Davis, or any other representative of Crew Tile

4   Distribution, have they ever contacted you and said, Hey,

5   we're really going to pay this back rent --

6   A.    Never.

7   Q.    Okay.  You're certain of that?

8   A.    I'm certain.

9   Q.    Okay.  And if you could please turn back to

10  Exhibit 53, which was a photo that we had used previously.

11        And so, Ms. Mabary, if you could take just a

12  moment to look at this.  Are those -- at the top of the

13  page there, are those light fixtures that were missing when

14  Crew Tile Distribution vacated the showroom in the Denver

15  Design District?

16  A.    I think they are.

17  Q.    And so what part of those were missing?

18  A.    I think it was -- I think it was the track and the

19  light bulbs and everything.

20  Q.    I see.  And everything else here was left behind?

21  A.    I don't -- I mean, they might have taken one display

22  down.  I don't -- I can't say specifically which display,

23  but I think -- as my recollection is they left them.

24        MR. THOMAIDIS:  Thank you.  I have no further

25  questions.

1603

Redirect - Mabary

1    THE COURT:  All right.  May this witness be

2   excused?

3    MR. TeSELLE:  She may.

4    MR. THOMAIDIS:  She may, Your Honor.

5    THE COURT:  All right.  Ma'am, thank you for

6   joining us.  You are excused and may step down.

7    THE WITNESS:  Thank you.

8    THE COURT:  Defendants/counterclaimants may call

9   their next witness.

10    MR. THOMAIDIS:  And, Your Honor, we were informed

11   a few minutes ago that apparently Ms. Kramer had a doctor's

12   appointment that she had to attend, and so I'm wondering

13   with -- if it's okay with the Court, if we maybe go into

14   Jeff Schnepp's designated video deposition testimony and I

15   will present her first thing in the morning.

16    THE COURT:  Yeah.  I mean, when did you find out?

17   Because I thought you told me at the break that she was

18   next.

19    MR. THOMAIDIS:  And I -- now -- I don't think I

20   said that at the break, but if I did, it was -- I

21   apologize --

22    THE COURT:  I asked you who was your next witness

23   and that's when I told you that you were going to be

24   limited to 60 minutes with her, from 90.

25    MR. THOMAIDIS:  And my recollection -- all right.

Redirect - Mabary

1    Yes, Your Honor, I do think I said that I was going to

2    limit myself to 60 minutes.  I was not aware of this issue

3    at the time.

4            THE COURT:  Well, hold on.  Remember we discussed

5    the sequence of your witnesses and you gave me the next

6    four.

7            MR. THOMAIDIS:  I do, Your Honor.  And I

8    apologize.

9            THE COURT:  Mr. Schnepp is not in those --

10           MR. THOMAIDIS:  I understand.

11           THE COURT:  -- Ms. Kramer -- okay, I accept that

12   with Ms. Kramer, but why are we going to the deposition

13   that you said was coming first of the depositions?

14           MR. THOMAIDIS:  And with respect to Ms. Stransky?

15           THE COURT:  Sudovich.  You told me -- you told me

16   Domingot, Frank, Kramer, Sudovich.

17           MR. THOMAIDIS:  And I apologize, Your Honor, my --

18           THE COURT:  So, Ms. Kramer is not here, I'll

19   accept that.  Why don't we do Ms. Sudovich's deposition

20   next?

21           MR. THOMAIDIS:  Well, the problem with Ms.

22   Sudovich -- and, again, I am truly sorry, but we're going

23   to have to have a reader for that, which means that I'm

24   going --

25           THE COURT:  Oh, that's not a video.

1605

Redirect - Mabary

1    MR. THOMAIDIS:  I'm sorry, Your Honor, it isn't.

2    THE COURT:  Is Mr. Schnepp's a video?

3    MR. THOMAIDIS:  It is, Your Honor.

4    THE COURT:  All right.  Go ahead.

5    MR. THOMAIDIS:  Thank you.  I appreciate it.

6    THE COURT:  How long is it?

7    MR. THOMAIDIS:  54 minutes, Your Honor.

8    THE COURT:  Okay.  We'll listen to it until --

9    we'll go to 10 after 5:00 tonight in an effort to try to

10   catch up and we'll -- I'll listen to the remainder of

11   tomorrow.  And then you'll have Ms. Kramer here?

12   MR. THOMAIDIS:  I will, Your Honor.

13   THE COURT:  And then who's coming after Ms.

14   Kramer?

15   MR. THOMAIDIS:  Would you like to finish the

16   deposition testimony of Mr. Schnepp?

17   THE COURT:  I'm not going to tell you how to put

18   on your case.  Who's coming after Ms. Kramer?

19   MR. THOMAIDIS:  My proposal would be to then do

20   Ms. Sudovich, so Michelle Sudovich's recorded deposition

21   testimony.

22   THE COURT:  All right.  Okay.  Let's start Mr.

23   Schnepp's deposition.

24   MR. THOMAIDIS:  Thank you, Your Honor.

25   (Video deposition played to the jury)

Redirect - Mabary

1   THE COURT:  You know, why don't we stop it there.

2   A good place to stop for the day while they're looking for

3   their papers.

4   All right, ladies and gentlemen of the jury, we'll

5   recess for today.  Just like prior days, I'd like you to be

6   back in the deliberation room by 8:35.  We will try to get

7   to you as close to 8:45 as possible.  Please do not discuss

8   with or do any independent research into the facts, the

9   law, the issues, or the attorneys in this case.

10   We will be in recess until 8:45 tomorrow morning.

11   (Jury left the courtroom at 5:08 p.m.)

12   MR. BURG:  Your Honor, we have a problem.  They

13   omitted part of the testimony that was supposed to come in

14   on this deposition.

15   THE COURT:  Someone's watching this very

16   closely.

17   MR. BURG:  We are.  Mr. Crough is.  And they

18   admitted it and it was supposed -- you reviewed it, and

19   part of it was supposed to come in and they took it out.

20   THE COURT:  Sit down.  Is there a designated

21   portion that was left out?

22   MR. CROUGH:  Yes, Your Honor.  It's plaintiffs'

23   designation, starts at page 104, line 10.  It's the entire

24   discussion about what Mr. Schnepp knows about Jack Handley

25   being fired, and circumstances of what Jack Handley was

Redirect - Mabary

1  doing.

2          The only portion of that testimony that you

3  removed over -- on the -- sorry, you sustained defendants'

4  objection to 107, lines 9 through 16, but everything

5  between 104, line 10, 105, 106, all the way up to 107-8, is

6  in, and that was just completely omitted from the section

7  of testimony we just heard.

8          THE COURT:  One second.  Let me get out my ruling.

9          All right.  Tell me the lines again that were

10  designated but plaintiffs claim were left out.

11          MR. CROUGH:  Designated lines page 104, 10, 11,

12  page 105, 4 through 15; page 106, 13 to 17 and 20 to 25 and

13  line 7 --

14          THE COURT:  Hold on.  After 106, what?

15          MR. CROUGH:  Sorry, 106 is lines 13 to 17 and 20

16  to 25.  And 107, line 1 through line 8.

17          THE COURT:  All right.  Where approximately are we

18  now?

19          MR. CROUGH:  We left off approximately page 117.

20          THE COURT:  Mr. Thomaidis.

21          MR. THOMAIDIS:  Your Honor, I am showing in our --

22  and I did this, so I take full responsibility.

23          THE COURT:  You did this, the splicing of this

24  video?

25          MR. THOMAIDIS:  No, no, no, I'm sorry --

Redirect - Mabary

```
 1        THE COURT:  So you're --

 2        MR. THOMAIDIS:  May I make --

 3        THE COURT:  You have more skills than I thought.

 4        MR. TeSELLE:  You do a lot of work.

 5        MR. THOMAIDIS:  I am without a doubt less skilled

 6   than you thought.  No, actually, I went through -- on the

 7   night you made the order, I went through and highlighted

 8   these and it was late, and I -- I'm showing these as being

 9   excluded.  However, if I did -- if they were to be

10   included, the omission was unintentional and my fault

11   entirely.  So I'm happy to make whatever arrangements are

12   necessary to fix this issue.

13        THE COURT:  All right.  So basically, then,

14   plaintiffs' contention is that the designated testimony of

15   pages 104, 105, 106, and 107 were omitted.  I think that's

16   probably the easiest way to describe it.  Is that correct?

17        MR. CROUGH:  That's correct.

18        THE COURT:  All right.  I think the only way we

19   can do this is if you, tonight, resplice your video, put

20   these four pages back in there, and then we'll have to

21   resume this deposition prior to -- let's see, so 98 would

22   have been the last designated testimony -- page 98, before

23   the omitted one.  Is that correct, Mr. Crough?  Because

24   my -- what I have here is we go from page 98 --

25        MR. CROUGH:  Yeah, you're correct, Your Honor.
```

Redirect - Mabary

1    THE COURT:  Okay.  What then we will have to do is

2    then we'll have to rewind the video to where the deponent

3    ends on page 98, line 22, we'll splice back in the

4    designated testimony on pages 104, 105, 106, and 107, and

5    then continue forward.

6         Do you agree, Mr. Crough, that that would take

7    care of the situation?

8         MR. CROUGH:  It would, Your Honor.

9         THE COURT:  All right.  Mr. Thomaidis, is that

10   something that technically your firm can do tonight?

11        MR. THOMAIDIS:  Absolutely.

12        THE COURT:  All right.  Let's do that.  And what I

13   would like you guys to do is, as you did with the

14   explanation for Mr. Glenn Davis' medical situation, is

15   to -- you can just handwrite something out that you can

16   agree on how I will explain this to the jury tomorrow, then

17   hopefully I can read something that's stipulated to, and

18   then they won't be scratching their heads as to why we're

19   going back to cover matters that's already been covered.

20        MR. THOMAIDIS:  And I'll make this representation

21   on the record, I'm happy to provide you what we've done

22   with Adela Stransky if you would like to look at it in

23   advance of the testimony.

24        MR. BURG:  We certainly can do that to make sure

25   we're -- you know, that it's all in there.  I -- I think

1610

Redirect - Mabary

1  obviously we will stipulate to some sort of explanation

2  that it was inadvertently left out.

3       We also need a list of who's going to testify

4  tomorrow, Your Honor.

5       THE COURT:  Well, that you folks -- you know,

6  you're supposed to take care of that amongst yourselves.  I

7  don't have to sit up here while you are doing that.

8       MR. BURG:  We've asked and we don't get an answer.

9  This is the third or fourth time you've asked --

10      THE COURT:  Okay, well --

11      MR. BURG:  We need answers.

12      THE COURT:  The way I understood it from my

13  colloquy with Mr. Thomaidis earlier, was we would finish

14  Mr. Schnepp's deposition, then you go to Ms. Kramer, then

15  we do Ms. Sudovich's deposition.  Let's -- just to be safe,

16  who comes after Ms. Sudovich's deposition?

17      MR. THOMAIDIS:  May I have just a moment, Your

18  Honor?

19      THE COURT:  You may.

20      MR. THOMAIDIS:  So, Mr. Joey Griebel is

21  testifying -- is subpoenaed to testify here at 2:00

22  tomorrow afternoon.  So I would anticipate that it's going

23  to go -- the completion of Jeff Schnepp in the morning,

24  followed by Ms. Kramer -- Wendy Kramer, and then we will do

25  the deposition testimony of Ms. Sudovich followed --

Redirect - Mabary

1        THE COURT:  How long is the Sudovich deposition?

2        MR. THOMAIDIS:  Approximately an hour, Your

3   Honor.

4        THE COURT:  Okay.  Then we'll go to Mr. Griebel.

5        MR. THOMAIDIS:  That's correct, Your Honor,

6   Griebel.

7        THE COURT:  Just in case we still have time, who

8   comes after that?

9        MR. THOMAIDIS:  And then following that, I think

10  we had intended to call Mr. Prior.

11        THE COURT:  Okay.  And he's here, so we shall --

12  we won't have any down time.  All right.  Does that take

13  care of everything -- one second.

14        Okay.  Boy, it's great to have great law clerks.

15        Total rewind.  Look on my order on 326, the last

16  page.  Per my motion *in limine* order, the very pages that

17  were excluded were supposed to be excluded.  So this is,

18  as -- let me just make sure here.  Yup.

19        Pursuant to the Court's order regarding pretrial

20  evidentiary motions, ECF 279, at lines 22 through 24 and

21  the Federal Rules of Evidence 404(b) and 608(b), the

22  testimony designated from lines 104 -- page 104, line 10,

23  through page 107, line 16 of Mr. Schnepp's deposition is

24  excluded and should be redacted from the parties'

25  presentation.

1612

Redirect - Mabary

1     So, Mr. Thomaidis, it looks like there was nothing

2  for you to apologize for.

3     All right.  We're in recess until 8:45 tomorrow

4  morning.

5     (Proceedings concluded at 5:20 p.m.)

6

7

8                         **INDEX**

9  <u>Item</u>                                              <u>PAGE</u>

10             PLAINTIFFS' WITNESSES

11  **GLENN DAVIS**
    Direct Examination by Mr. Burg                  1352
12  Cross-examination by Mr. Thomaidis              1387
    Redirect Examination by Mr. Burg                1436
13  Recross-examination  by Mr. Thomaidis           1448

14

15             DEFENDANTS' WITNESSES

16  **JOSE DOMINGOT**
    Direct Examination by Mr. Thomaidis             1466
17  Voir Dire Examination by Mr. Burg               1481
    Direct Examination by Mr. Thomaidis (Cont)      1482
18  Cross-examination by Mr. Burg                   1545
    Redirect Examination by Mr. Thomaidis           1528
19
    **BARBARA MABARY**
20  Direct Examination by Mr. Thomaidis             1556
    Cross-examination by Mr. TeSelle                1581
21  Redirect Examination by Mr. Thomaidis           1600

22

23  RULE 50 MOTION:                                 1545

24  FINDING BY THE COURT:                           1553

25

1613

Redirect - Mabary

DEFENDANTS' EXHIBITS

| | EXHIBITS: | Offered | Received | Refused | Stipulated |
|---|---|---|---|---|---|
| 3 | A | 1475 | 1475 | | |
| 4 | A-2 | 1426 | 1426 | | |
| 5 | A-9 | 1426 | 1426 | | |
| 6 | A-11 | 1559 | 1559 | | |
| 7 | A-12 | 1426 | 1426 | | |
| 8 | A-19 | 1426 | 1426 | | |
| 9 | A-24 | 1426 | 1426 | | |
| 10 | A-27 | 1426 | 1426 | | |
| 11 | A-29 | 1426 | 1426 | | |
| 12 | A-33 | 1426 | 1426 | | |
| 13 | A-42 | 1426 | 1426 | | |
| 14 | A-54 | 1408 | 1409 | | |
| 15 | A-58 | 1426 | 1426 | | |
| 16 | A-73 | 1426 | 1426 | | |
| 17 | A-82 | 1426 | 1426 | | |
| 18 | B | 1480 | | 1480 | |
| 19 | B-8 | 1582 | 1582 | | |
| 20 | B-14 | 1426 | 1426 | | |
| 21 | B-17 | 1426 | 1426 | | |
| 22 | B-25 | 1426 | 1426 | | |
| 23 | C | 1484 | 1484 | | |
| 24 | F | 1494 | 1494 | | |
| 25 | X | 1426 | 1426 | | |

1614

Redirect - Mabary

1              *       *       *       *       *

2                    REPORTER'S CERTIFICATE

3

4          I certify that the foregoing is a correct transcript

5     from the record of proceedings in the above-entitled

6     matter.

7          Dated at Denver, Colorado, this 1st day of May, 2017.

8

9

10

11     _                                            _

12                    MARY J. GEORGE, FCRR, CRR, RMR

13

14

15

16

17

18

19

20

21

22

23

24

25