IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-3206-WJM-KMT

CREW TILE DISTRIBUTION, INC.,

Plaintiff and Counterclaim Defendant,

and

RYAN A. DAVIS,
DARLYNE A. DAVIS,
GLENN L. DAVIS,
SHANA L. BASTEMEYER,
PARADIGM TILE & STONE DISTRIBUTORS, LLC, and
G&D DAVIS HOLDINGS, LLC,

Counterclaim Defendants,

vs.

PORCELANOSA LOS ANGELES, INC.,
PORCELANOSA NEW YORK, INC.,
PORCELANOSA TEXAS, CORP., and
PORVEN, LTD.,

Defendants.

-------------------------------------------------------------

REPORTER'S TRANSCRIPT
(JURY TRIAL, DAY 7)
VOLUME VII
-------------------------------------------------------------

Proceedings before the HONORABLE WILLIAM J. MARTINEZ,

Judge, United States District Court for the District of

Colorado, commencing at 8:46 a.m., on the 21st day of

March, 2017, in Courtroom A801, United States Courthouse,

Denver, Colorado.

```
 1                          APPEARANCES

 2          MICHAEL S. BURG, DAVID K. TeSELLE, and DAVID J.
       CROUGH, Burg, Simpson, Eldredge, Hersh & Hardine,
 3     PC-Englewood, 40 Inverness Drive East, Englewood, Colorado
       80112, appearing for the plaintiffs.
 4
            JAMES N. THOMAIDIS, JARED A. BARNARD and JONATHAN T.
 5     LIEBER, Gersh & Thomaidis, LLC, 1860 Blake Street, Suite
       400, Denver, Colorado 80202, and
 6     D. ELIZABETH WILLS, Wills Law Firm, LLC, 20 South Cherry
       Street, Denver, Colorado 80246, appearing for the
 7     defendants.

 8

 9                 MARY J. GEORGE, FCRR, CRR, RMR
                901 19th Street, Denver, Colorado 80294
10           Proceedings Reported by Mechanical Stenography
                Transcription Produced via Computer
11

12                   P R O C E E D I N G S

13          (Proceedings in open court outside the presence of the

14     jury at 8:46 a.m.)

15          THE COURT:  There's one thing I wanted to cover

16     with everyone before the jury came out and I think maybe

17     Deb has already raised this issue with you, but as you have

18     observed, Mary does not transcribe the depositions that are

19     being read, so both the impeachment deposition excerpts

20     that the plaintiff has used and the substantive deposition

21     portions that the defendants' going to use, they need to be

22     prepared as an exhibit and they have to be labeled and each

23     side should look at it so then each side can then make a

24     motion, hopefully unobjected to, we'll enter it into the

25     record.
```

1    The other thing to remember is that it doesn't go

2  back into the deliberation room, so we don't hear a witness

3  testimony twice.  All right.

4    MR. BURG:  Your Honor, I have one matter I want to

5  bring up.

6    THE COURT:  Sure.

7    MR. BURG:  For the first time we hear that Wendy

8  Carlson may be called today.  She is their alleged expert

9  on the handwriting expert.  And I would -- I am asking two

10  issues:  One, I want to make a record of the *Daubert* motion

11  that we filed that was denied and I want to make a record

12  for the Tenth Circuit on that based on lack of any

13  credentials, not following any standards, going to an

14  uncredited school, and -- and --

15    THE COURT:  Don't you think you've made your

16  record by your motion?

17    MR. BURG:  Well, I'd like to make another record,

18  though.

19    THE COURT:  Go ahead.

20    MR. BURG:  Because I -- again, normally we'd have

21  a *Daubert* hearing, which we did not have here.  And I

22  certainly am not requesting that I do it with her on the

23  stand, but I am requesting, so the Court is aware, of all

24  of the things that she does not follow in terms of

25  peer-review, her education, her background, all of those

1    things.

2           THE COURT:  Well, I'm aware of it because you

3    filed your motion.  And you've raised all those issues and

4    I ruled on it.  We also said in the order, I believe, that

5    all those matters are -- are fair game for a vigorous

6    cross-examination.

7           MR. BURG:  I --

8           THE COURT:  But I -- in terms of your record that

9    you objected to her being qualified under Rule 702 to give

10   expert testimony on this issue, I can't see how the

11   folks -- the good folks across the street could hardly take

12   a position that you haven't made your record.

13          MR. BURG:  Well, I -- this is such an important

14   issue that --

15          THE COURT:  I understand.  But --

16          MR. BURG:  -- an important witness --

17          THE COURT:  You've made your record, you've raised

18   it again this morning.  I think all that's left now is for

19   you to -- you don't have to repeat to me the argument --

20   I'm not going to change my ruling.  And you use all that

21   information -- all those points as fair game for

22   cross-examination.

23          MR. BURG:  Okay.  So just so we're clear, you're

24   basically taking -- I'm being told that I cannot make an

25   additional record in that --

1    THE COURT:  I don't know what more record you want

2  to -- you -- everything you've said so far you raised in

3  your motion and we considered it when ruling on the motion

4  and in the order, so you --

5    MR. BURG:  There --

6    THE COURT:  -- you don't need to raise the same

7  arguments twice.

8    MR. BURG:  There may be some additional -- I mean,

9  normally I would voir dire the expert.  Here I will not

10  because we already had a *Daubert* motion.  So I'm requesting

11  to be able to do that.  I don't think it would take more

12  than five minutes.

13    THE COURT:  Request -- what exactly are you

14  requesting?

15    MR. BURG:  That I be allowed at some point in

16  time, before she testifies, to go through her deposition as

17  to what she said in terms of the lack of her qualifications

18  under the rules under *Daubert*, or *Daubert*, and *Kumho Tire*,

19  and to go through about her ability to analyze

20  personalities better than psychiatric tests or

21  psychological tests --

22    THE COURT:  Okay.  I'm not going to allow that.

23  You have made all of those arguments in your motion.

24  You've preserved your arguments.  They're there on the

25  record.  The folks across the street can review that.  I'm

1   not going to allow you to do that again.  I will allow you

2   to use all those arguments on cross-examination.

3            MR. BURG:  All right.

4            THE COURT:  All right.

5            MR. BURG:  Thank you.

6            THE COURT:  Let's bring in the jury.

7        (Jury was present at 8:52 a.m.)

8            THE COURT:  Good morning, ladies and gentlemen of

9   the jury.  Welcome back to day 7 of our trial.  We will

10  resume this morning with the continuation of the video

11  deposition of Mr. Schnepp.

12       (Video deposition continued to be played to the

13  jury)

14           THE COURT:  Hold on a second.  We've already gone

15  through this.  We've already seen this.

16           MISSUS:  I understand, Your Honor.  Yesterday I

17  thought you had said we stopped at page 98.  So --

18           THE COURT:  No, no, no, no.

19           MISSUS:  I'm sorry.

20           MR. THOMAIDIS:  I'm sorry, that's probably my --

21           THE COURT:  We went around in a long circle.  The

22  end result was we're going to start this morning where we

23  left off yesterday.

24           MISSUS:  Right.

25            THE COURT:  Yeah, this is the point.  The

 1    ruffling of all the papers.

 2        (Video deposition continued to be played to the jury)

 3        MR. CROUGH:  Objection, Your Honor.  We missed

 4    another part.

 5        THE COURT:  Hold on.  Let's stop it.

 6        MR. CROUGH:  May we approach?

 7        THE COURT:  All right.  Counsel, approach.

 8        (Side bar conference held)

 9        MR. CROUGH:  So Jeff Schnepp, the part we just

10    missed, is on page 123, lines 5 to 16.

11        MR. THOMAIDIS:  123.

12        MR. CROUGH:  You cut out 123, 20.  Down below.

13        MR. THOMAIDIS:  Lines 5 through 16.

14        MR. CROUGH:  It jumped from here, I've never seen

15    an agreement like this since I worked for the company.

16    Skipped this section about his knowledge of whether or not

17    Jack Handley and Paco Montilla came out to negotiate or was

18    aware of any those of meetings and then went straight to

19    this Beverly Hills grand opening.  So the piece we're

20    missing --

21        THE COURT:  So it's 123 --

22        MR. CROUGH:  We're missing 123, 5 to 16.

23        THE COURT:  That was not excluded.

24        MR. THOMAIDIS:  1234 -- 123.

25        THE COURT:  Five through 16.

1   MR. THOMAIDIS:  I have it -- I have it marked as

2  excluded.  It may have been my error.

3   THE COURT:  123 was excluded starting line 20.

4   MR. CROUGH:  Yeah.

5   THE COURT:  Line 20 to line 24.

6   MR. THOMAIDIS:  123 -- okay.  So this is -- so was

7  this not subject to another exclusion?

8   THE COURT:  Nope.

9   MR. THOMAIDIS:  Okay.  Then I apologize.

10   THE COURT:  Okay.  So these lines are not on what

11  she has here, right?

12   MR. THOMAIDIS:  That's correct.  And I actually --

13  I mean, what I did in red here is my -- what I did when I

14  went through and verified your order.  So it was my error.

15  Well, all right.  So how do you want to -- have you got

16  this stuff designated?

17   MR. CROUGH:  No, these are your designations.

18   MR. THOMAIDIS:  Well, no, do you have the video --

19  did you do a clip?

20   MR. CROUGH:  I can have Jeremy clip this quickly.

21   MR. THOMAIDIS:  I mean, I can ask Carrie to do it

22  as well.  I'm sorry, Your Honor.

23   THE COURT:  Who could do it more efficiently?

24   MR. THOMAIDIS:  I don't know the answer, I'm

25  afraid.

 1        THE COURT:  Probably will be -- did she do that

 2   when you're --

 3        MR. THOMAIDIS:  As a matter of fact, I can ask her

 4   to do that right immediately.

 5        THE COURT:  Why don't we do that.  I think it will

 6   be better if it came through you, your witness, and have

 7   her go back to -- let's see, what was in after 120 --

 8        MR. CROUGH:  It starts at --

 9        THE COURT:  Right, but where -- what was the last

10   thing that came in that was not excluded before that?

11        MR. THOMAIDIS:  Line 5 of 123?

12        THE COURT:  Okay.  That was read.  Okay.  So if

13   she goes back to line 5 and basically have her add from 6

14   through --

15        MR. CROUGH:  If she adds --

16        THE COURT:  6 through 16.

17        MR. THOMAIDIS:  Now are you going to have any

18   objection to this objection if we just -- if it stays in,

19   my objection to form and foundation?

20        THE COURT:  Oh, just leave --

21        MR. THOMAIDIS:  I just didn't want to -- all

22   right.

23        MR. CROUGH:  That's fine.

24        THE COURT:  So we'll do it right now.  Okay.

25        MR. THOMAIDIS:  I'll get it done quickly.

 1          MR. CROUGH:  And I caught it within a page,

 2   so . . .

 3          THE COURT:  Okay.

 4          MR. THOMAIDIS:  All right.  And I think it would

 5   be for the best if we handed you off the Stransky, so we

 6   look at it now.

 7          MR. CROUGH:  Sure.

 8          MR. THOMAIDIS:  Thank you.

 9          MR. CROUGH:  Thank you.

10      (End of discussion at side bar)

11          THE COURT:  All right, members of the jury, there

12   were about 10 lines that were inadvertently omitted, so the

13   defendants' team is going to quickly try to patch those in

14   there and then we'll start back from -- it's not too far

15   back from where we were and we'll play those through and

16   we'll catch those 10 lines.

17          MR. THOMAIDIS:  So we're working on taking care of

18   that right now, Your Honor.

19          THE COURT:  Okay.  How long do you think it will

20   be?

21          MISSUS:  Five minutes.  A little bit.

22          THE COURT:  All right.  Why don't we take a very

23   brief recess.

24      (Recess taken 9:03 a.m.)

25      (Proceedings were held outside the presence of the

1625

1    jury at 9:12 a.m.)

2              THE COURT:  Let's start the tape just before the

3    part that was spliced back in.

4              MISSUS:  I have it starting right at that spot.

5    Is that okay?

6              MR. BURG:  Your Honor, it needs to have some

7    context.

8              THE COURT:  Right.  If we could just go back a few

9    lines.

10         (Jury was present at 9:12 a.m.)

11             THE COURT:  Are we ready to proceed, Mr.

12   Thomaidis?  We are?

13         Okay.  So we're going to back up a few lines and

14   then play it through and hopefully it will all be

15   rectified.

16         (Video deposition continued to be played to the jury)

17             THE COURT:  Is that it?

18             MR. THOMAIDIS:  That's all, Your Honor.

19             THE COURT:  All right.

20   Defendants/counterclaimants may call their next witness.

21             MR. THOMAIDIS:  Defendants and counterclaimants

22   call Wendy Kramer.

23             THE COURT:  Mr. Thomaidis, you have 45 minutes on

24   direct.

25             MR. THOMAIDIS:  Thank you, Your Honor.

Direct - Kramer

1    COURTROOM DEPUTY:  Right here.  You get to face me

2    and raise your right hand.

3          WENDY KRAMER, DEFENDANTS' WITNESS, SWORN

4    COURTROOM DEPUTY:  Please be seated.  State your

5    full name for the record and spell your first and last

6    name.

7          THE WITNESS:  Wendy Porter Kramer.  W-e-n-d-y,

8    P-o-r-t-e-r, K-r-a-m-e-r.

9          COURTROOM DEPUTY:  Thank you.

10                    DIRECT EXAMINATION

11   BY MR. THOMAIDIS:

12   Q.   Thank you, Ms. Kramer, for being here today.  I

13   appreciate it.

14          Would you please tell the Court and the jury where

15   you presently reside.

16   A.   I live in Mancos, Colorado, which is near Durango,

17   southwest Colorado.

18   Q.   And do you -- what are -- what are you presently

19   engaged in in terms of employment?

20   A.   I'm not.  I'm waiting for a disability hearing for --

21   I have an immune disorder.  I do currently design custom

22   homes on the side.

23   Q.   Okay.  And did you work for, at some point,

24   Porcelanosa Los Angeles, Incorporated?

25   A.   Yes, I did.

Direct - Kramer

1    Q.   Can you tell me when, to the best of your

2    recollection.

3    A.   Yeah, I believe it was 2004, 2005.  Close to that.

4    Q.   And what was your job title when you were employed

5    with Porcelanosa Los Angeles?

6    A.   I was a sales rep for the Colorado satellite office of

7    Porcelanosa.

8    Q.   Okay.  And who hired you for that position, if you can

9    recollect?

10   A.   Joseph Domingot and Wayne Donaldson.

11   Q.   Okay.  And do you remember what Josep Domingot's --

12   Domingot's job title was at the time?

13   A.   I believe he was general manager of the LA -- LA

14   facility for Porcelanosa.

15   Q.   Okay.  And who was Wayne Donaldson, to the best --

16   A.   I believe he was a sales manager.  He worked under

17   Josep.  I believe Josep's boss was Joaquin, who I also

18   knew, so . . .

19   Q.   And so do you recollect any of the details of you

20   being hired with the company?

21   A.   Well, I do remember, just because it was a turning

22   point of my life.  I had owned my own tile company

23   previously, and design company, and things weren't going so

24   well between my husband and I from Hungary, so it was my

25   escape to be able to become independent from that company

1628

Direct - Kramer

1    and from him.

2          So it was -- it was an exciting time.  I know I

3    met them at the Holiday Inn near the airport in Denver,

4    both of them, because I do remember being down there, and

5    we had discussions over what it would involve.

6          I also remember that there was a flavor of -- they

7    weren't quite sure about the current sales representative,

8    and so my understanding was that I would most likely be

9    training to take the accounts over.  That was what I -- I

10   can't remember specifically what they told me about the

11   sales rep, but that maybe it -- they weren't sure about

12   that --

13   Q.   Okay.

14   A.   -- situation.

15   Q.   And do you recollect who that sales rep was?

16   A.   Ryan Davis.

17   Q.   Okay.  And so when you joined the company, did you

18   consider it to be a good company to work for?

19   A.   Porcelanosa products are -- I was certainly enamored

20   from a design perspective -- state-of-the-art, way ahead of

21   what we had in the United States previously.  The

22   management, and even some of the team in Spain that we

23   talked about were very professional and I was very proud to

24   work there.  I -- I was very excited.

25   Q.   Did you consider them to be a ethical company?

Direct - Kramer

1  A.    Absolutely, yes.  Absolutely.  I had no problems with

2  honesty; communication was very good.  I mean, there were a

3  few in the warehouse in Anaheim that were more difficult,

4  but as far as my -- who I reported to, Josep and Wayne were

5  very cordial to me and respectful and honest.  I found them

6  to be quite honest.

7  Q.    Did you ever have any reason to distrust what they

8  were saying to you?

9  A.    No.

10  Q.    Okay.  So, Ms. Kramer, do you recollect why you left

11  Porcelanosa Los Angeles?

12  A.    Well, I liked to think of it as that I didn't fail in

13  Denver, but I think I could have done a little bit better.

14  But because of the change in management, I believe -- my

15  personal thought is after Josep left, I believe the passion

16  was gone.  I believe -- I mean, they tried to recruit me to

17  LA.  I had lengthy conversations and negotiations of moving

18  to Miami, working under Joaquin.

19        So I know they found that I had value, but that

20  Denver may not be where they wanted to -- it just wasn't

21  working.  I think financially it wasn't working in Denver

22  so well.  So that's at least what I was told, so . . .

23  Q.    So did Porcelanosa Los Angeles make a decision to

24  close the facility they had in Denver?

25  A.    Yes.

1630

Direct - Kramer

1    Q.    Okay.

2    A.    Yes.

3    Q.    And they offered you the opportunity to relocate, but

4    you declined; is that accurate?

5    A.    Yes, they offered a position to me in San Diego and

6    in -- in Florida.

7    Q.    Okay.  Do you recall whether you were in attendance

8    when Ryan Davis' employment with Porcelanosa Los Angeles

9    was ended?

10   A.    I have thought about that many, many times.  I don't

11   believe I was right there because I was kind of afraid

12   about it.  I -- I knew it would be kind of ugly, so I -- I

13   know I was nearby, if I was in the car or around the

14   corner.  I know I was very close by, but I -- I don't

15   believe I witnessed it.

16   Q.    Okay.

17   A.    I don't think I wanted to.

18   Q.    Why were you afraid, to the extent you can recollect?

19   A.    Because I thought that Ryan was explosive and violent.

20   I had seen and heard conversations on the phone.  I know

21   conversations with me were a little bit scary, and I know

22   that because I had something to do with reporting --

23              THE COURT:  Finish your answer.

24              THE WITNESS:  With reporting some of the conflict

25   of interests, I felt that he may try to maybe retaliate

1631

Direct - Kramer

1    against me.  Also --

2              THE COURT:  Hold on, ma'am.

3              MR. CROUGH:  Your Honor, I object to the extent

4    she's relying on hearsay.  She's mentioning what she

5    overheard, things that are -- that she can't testify to.

6              THE COURT:  Well, to the extent they're from Mr.

7    Davis, it's not hearsay.

8              MR. CROUGH:  Understood.

9              THE COURT:  So, ma'am, if you could limit your

10   answers if you're talking about what other people say.  You

11   can only talk about what Mr. Davis said; other third

12   parties let's not go into.

13             THE WITNESS:  Okay.

14   BY MR. THOMAIDIS:

15   Q.   So do you have any firsthand recollection in the

16   interactions that you had with Mr. Davis that would have

17   led to your feelings you just described?

18   A.   Yes, many times he expressed -- I don't know if it

19   would be discomfort, angst, about me and my communication

20   with Anaheim, meaning Josep and Wayne.

21             He said I -- I talk too much to them, I shouldn't

22   tell them everything, I shouldn't have so much -- so many

23   discussions with them.  So I know that he was upset about

24   that.

25             I also know that he expressed a lot of the things

Direct - Kramer

1  that I was trying to do for the company as far as I got to

2  create my own database for customer contact, that that was

3  silly.  I just didn't -- felt like I didn't have support,

4  and I felt like he and -- I don't know if it was the

5  receptionist or the person that -- the only other person at

6  our little facility was, I believe Michelle, and I know

7  that they were close, and I certainly didn't feel welcome

8  and there were many, many times that I heard -- I heard --

9  I mean, I don't know if this is okay, I heard conversations

10  on the phone that were quite volatile.

11          I mean, I heard yelling in the office next to me.

12  And I don't know if that's hearsay, but --

13          THE COURT:  Well, okay, listen to what I'm saying,

14  ma'am.  If you're talking about what Mr. Davis said, you

15  can go into that; anyone else, you cannot.

16          THE WITNESS:  So I don't know who he was talking

17  to.  I have --

18          THE COURT:  If you don't know who it is, then you

19  can't --

20          THE WITNESS:  Okay.  I just heard loud noises.

21  BY MR. THOMAIDIS:

22  Q.  So to the best of your recollection, when Mr. Davis

23  was discouraging you from communicating with Anaheim, what

24  did he say to you?

25  A.  He -- he just discouraged me.  I mean, I remember him

Direct - Kramer

1    specifically saying, You talk too much to Wayne and Josep.

2    And that was just all there was to it.

3            I also talked to him about what I believed was --

4    just behaviors I saw from him that I thought maybe he

5    should discuss with Anaheim.

6    Q.    And what were those behaviors?

7    A.    Well, I believed he was running another business.

8    Q.    Do you have any other concerns?

9    A.    Well, I didn't feel safe there working with him.

10   Q.    Anything else?

11   A.    No.

12   Q.    I would like to get back for just a couple of minutes

13   for the -- to the comment you made about discouraging

14   communication with Anaheim -- by "Anaheim," you're

15   referring to Porcelanosa Los Angeles, correct?

16   A.    Yes.  Yes.

17   Q.    The -- did he recollect to you -- did he say anything

18   else to you regarding the specifics of why he thought you

19   were communicating too much with Porcelanosa Los Angeles?

20   A.    Well, one point when I confronted him, I believe I

21   told him, Look, why don't you just go on commission so that

22   you could still keep your other company?  Obviously because

23   I witnessed him not coming to work for weeks at a time and

24   not having communication with him, I believed that that was

25   where his passion was, that is where his interests and,

Direct - Kramer

1   maybe, even financially, that's where he was spending his

2   time.

3         So I knew, because I had signed an agreement, I

4   believed he had, too, about conflict of interest, and

5   because I also had an established company, Eurotile, which

6   was what I ran with my husband at the time, I was very

7   careful, so careful to talk to Wayne and Josep and tell

8   them about what my current situation was.  And so I felt

9   that since he wasn't, that was maybe going to harm our --

10  our future as far as the Colorado Porcelanosa branch.

11  Q.   Okay.  So may I please turn to what has previously

12  been entered as trial Exhibit F.  And it is previously in

13  evidence, so . . .

14        So, Ms. Kramer, as it relates to these documents,

15  they're going to pop up on your screen there, I can give

16  you a paper copy if you have difficulty reading it, but I'm

17  just going to ask that we scroll through the two pages of

18  this document.  And go back to page 1.

19        So is this the document you referenced a few

20  minutes ago?

21  A.   Yes.  Is this mine?

22  Q.   Well, let's turn to the second page and I will ask you

23  the question.  Can you explode the second --

24  A.   Okay.  So he did.

25  Q.   Well, is this the document you were referring to as

1635

Direct - Kramer

1    the document --

2    A.    Yes.

3    Q.    -- conflict of interest statement?

4    A.    Yes.

5    Q.    And so do you recollect signing this document when you

6    were with Porcelanosa Los Angeles?

7    A.    If it wasn't the exact document, it was very close to

8    the same gist.

9    Q.    What was your understanding of what this document

10   said?

11   A.    I probably didn't read it real carefully, but I knew

12   that right from the top, that it meant that you were not to

13   run other businesses or that could possibly compete with

14   Porcelanosa.

15   Q.    Okay.  And then can we just take a quick look at

16   paragraph 1, the numerical paragraph 1.

17         And that provision -- I have a habit of reading

18   it, but I'll let you read it yourself.

19         Now, with respect to the tile business that you

20   said you had prior to becoming an employee of Porcelanosa

21   Los Angeles, was it -- did you communicate that potential

22   conflict to Mr. Domingot when you began your employment or

23   during the course of your employment?

24   A.    I think I told him about it in the interview, both

25   Wayne and Josep, because I believe I expressed to them

1636

Direct - Kramer

1     why -- why I was leaving, because I didn't want them to

2     think maybe I just failed that company, so I wanted them to

3     know it was more of a personal nature.

4     Q.    Understood.  And so when you said that -- that you

5     felt that Ryan Davis was in violation or he had a conflict

6     of interest, were you referring to this document and this

7     provision or were there other provisions that you were

8     referring to?

9     A.    Yeah, just ethically, yes.

10    Q.    So what was your understanding of what Mr. Davis was

11    engaged in that led you to believe that there was a

12    conflict of interest?

13    A.    I wasn't sure at first.  The big clue to me, of course

14    he was coming in to the little office we had with what

15    looked like tile clothes, like clothes that had mortar on

16    them.  I mean, I was very familiar with tile work.  So it

17    looked like that.

18          And I believe I was in -- I was at a meeting

19    some -- one of the businesses, and I saw a truck, it was a

20    blue truck that looked like a work truck, newer truck, and

21    it had like a camper on it and it had a big "I" on it like

22    a different company, and I asked him what's the "I" for?

23    And he said, My other business.

24    Q.    And so is it your understanding that Mr. Davis was

25    installing tile?

Direct - Kramer

1    A.   Well, I saw -- from a tile perspective, I mean even if

2    I didn't actually install tile very often, myself, if I go

3    to job sites and end up checking work or kneeling down,

4    there were a lot of times I did get messy.  So I didn't

5    know, and I couldn't say, whether he was actually

6    installing tile or not.  I knew, though, that from the

7    clothing, he was on some sort of a job site.

8         At the time, I wasn't sure but I kind of -- and

9    still to this day I'm not sure if I'm right, but I -- I

10   assumed it was part of this company that he was doing jobs

11   there, because I know it wasn't -- we had nothing to do

12   with installation at Porcelanosa, what we were doing.  We

13   were selling tile, we were representing product.

14   Q.   And so in any event, when you confronted Mr. Davis on

15   this issue, he did say this was his other business?

16   A.   Yes.  Well, the -- I asked him what the "I" meant on

17   the truck and then I got a little sleuthy and started

18   Googling and I found a company.

19   Q.   Okay.  So I'm going to ask that we now turn, please,

20   to trial Exhibit J.

21        Now, Ms. Kramer, I'm going to ask that we -- I'm

22   going to slowly scroll through the document.  I'd like you

23   to tell me if you recognize this document, first of all.

24   A.   I was not aware of this document at all at the time.

25   Q.   Okay.  And so when you were an employee of Porcelanosa

Direct - Kramer

1   Los Angeles and you were engaged in being a sales rep,

2   would you have known if Mr. Davis had an exclusive

3   agreement with Porcelanosa Los Angeles or any other

4   Porcelanosa company because of your sales activities?

5           MR. CROUGH:  Objection.  Foundation.

6           THE COURT:  Let's get some foundation.

7   BY MR. THOMAIDIS:

8   Q.   So tell me a little bit about what you did as a

9   salesperson in Denver for Porcelanosa Los Angeles.

10   A.   Well, I had represented products --

11   Q.   And let's just -- just tell me, from your own

12   recollection, what products you were selling.  Were you

13   selling the entire Porcelanosa product line at the time?

14   A.   No.  I mean, there were catalogs that were huge.  I

15   mean, what I was told and what I understood was the

16   Porcelanosa was one of the largest tile manufacturers, if

17   not the largest tile manufacturers in the world, at the

18   time, in Spain.  I believe that the U.S. had prepared

19   catalogs and products that they were going to bring in,

20   import, and distribute.

21           So I believe -- I mean, from the products that I

22   was shown, I was supposed to sell all those things.  Some

23   were special ordered.  They had vanities and plumbing

24   fixtures that we certainly didn't specialize in.  Most of

25   what I sold was tile, but if somebody really wanted

1639

Direct - Kramer

1   something else, they could get that.

2   Q.   And so are you familiar with what's called a

3   ventilated facade?

4   A.   Yes.

5   Q.   So what was a -- or what is a ventilated facade?

6   A.   Wow, going way back, I believe it was kind of a

7   state-of-the-art product that Porcelanosa had that had a

8   special bracket system.  It wasn't just a typical install

9   of mortar.  They had like metal brackets and -- as I

10   recall, they were wall applications and they were -- they

11   were beautiful.

12   Q.   Okay.  So were you permitted, as a salesperson of

13   Porcelanosa Los Angeles, to market and sell ventilated

14   facades?

15   A.   Yes, I believe I was.

16   Q.   Okay.  And so during the course of your employment as

17   a salesperson at Porcelanosa Los Angeles, were you ever

18   aware of any prohibition or any exclusivity that Mr. Ryan

19   Davis might have had with respect to ventilated facades?

20   A.   No, and I -- that -- that would be a very big surprise

21   because I would have to know that to avoid the product in

22   my -- you know, we dealt with Carpet Exchange and, geez,

23   really large tile distributors here in Denver, and I -- I

24   would know that.

25   Q.   Okay.  And if Mr. Domingot had signed a contract like

1640

Direct - Kramer

1    that, was your communication as a salesperson with him

2    frequent enough where he would have told you that that was

3    a document that he had executed?

4            MR. CROUGH:  Objection.  Foundation on --

5            THE COURT:  Sustained.

6    BY MR. THOMAIDIS:

7    Q.   So how frequently would you say that you spoke with

8    Mr. Domingot during the course of your -- the functions of

9    your job as an outside salesperson for Porcelanosa Los

10   Angeles?

11   A.   Quite a bit.  He and Wayne were really interchangeable

12   for the most part.  I probably had more day-to-day contact

13   with Wayne; but Josep, if there were a bigger question, a

14   bigger sale, we would -- I would always talk to him.  And I

15   liked him a lot.  He -- he was fun to talk to.

16           So my question here -- well, I don't know if I'm

17   out of turn, but I'm noticing the date and I believe that's

18   very close to when he was let -- Ryan was let go.

19   Q.   So let me -- and let me hold off on that for a second.

20   A.   Oh.

21   Q.   I want to make sure I follow up on some of my previous

22   questions.  Most specifically, on a weekly basis, how often

23   would you say you interfaced with Mr. Domingot?

24   A.   Maybe once a week, twice a week.  It depends, during

25   the situation with Ryan, it was a lot more often.

1641

Direct - Kramer

1    Q.    And why was it a lot more often with the situation

2    with Ryan Davis?

3    A.    Because I didn't think I wanted to stay.

4    Q.    And that was because of Mr. Davis?

5    A.    A lot -- a lot of -- a lot of that because I had no

6    coordination.   There were -- I asked for help, I asked for

7    files.   There were -- obviously he wasn't willing to do

8    that.

9    Q.    And so what time frame were you with Porcelanosa Los

10   Angeles in Denver?

11   A.    Did I answer that?   I think --

12   Q.    I think you did, and I apologize.

13   A.    I believe I -- I know for sure when I left was like

14   spring or summer of 2005.   That part I know.   As far as

15   when I started, it could have been -- I think it was only a

16   year, year and a half.

17   Q.    So can we turn to the third page of trial Exhibit J,

18   please.

19         So you see there's two dates there, both of them

20   say July 29th, 2004.   Were you employed with Porcelanosa

21   Los Angeles at that time?

22   A.    Yes.

23   Q.    And so if there was a contract that would have

24   infringed on the -- if Mr. Domingot was executing a

25   contract that would have somehow modified the product line

1642

Direct - Kramer

1    that you were selling as an outside salesperson, do you

2    believe he, as general manager, would have indicated that

3    to you?

4           MR. CROUGH:  Object.  Foundation.

5           THE COURT:  Overruled.  You may answer.

6           THE WITNESS:  Help me out again.

7    BY MR. THOMAIDIS:

8    Q.   I'm sorry.  If Mr. Domingot was negotiating a contract

9    with someone that would have limited what you could have

10    sold as a outside salesperson for Porcelanosa Los Angeles,

11    would he, as general manager, have told you?

12    A.   Yes.

13           MR. CROUGH:  Objection, Your Honor.

14    Speculation.

15           THE COURT:  Overruled.

16           THE WITNESS:  Absolutely he would have told me.

17    BY MR. THOMAIDIS:

18    Q.   Okay.

19    A.   What -- maybe you're going to get to this, too, but --

20    Q.   Well, so let's go ahead and turn our attention back to

21    trial Exhibit J.

22          Did you have -- did you ever have an occasion to

23    discuss with Mr. Davis whether he had an exclusive

24    agreement to sell ventilated facades within a, as this

25    document says, a four-state region in the United States?

1643

Direct - Kramer

1  A.   No.   No, certainly not.

2  Q.   Okay.   So tell me a little bit about what you remember

3  when Mr. Davis was terminated from Porcelanosa Los Angeles.

4  Do you have any specific firsthand recollections of those

5  events?

6  A.   Like I said, I cannot remember if I was in the office

7  next door to his office or if I was -- I believe I asked to

8  be off property, or in my car somewhere.   I do know when

9  Wayne talked to me, Well, we're going to do it, because he

10  had discussed it for quite a while with Josep, that I said,

11  Well, do you want me around the corner with my hand on

12  9-1-1?   Because I -- we -- I expected it to be volatile.   I

13  had seen behaviors and I was afraid, so . . .

14  Q.   And so what did Mr. Domingot and Mr. Donaldson say to

15  you when you asked them that, to the extent you --

16          MR. CROUGH:   Objection, Your Honor.   Direct

17  hearsay question.

18          THE COURT:   Sustained.

19  BY MR. THOMAIDIS:

20  Q.   Do you have any other recollections of what that

21  conversation consisted of when Mr. Ryan Davis was going to

22  be terminated?

23          MR. CROUGH:   Same objection, Your Honor.   Calls

24  for hearsay.

25          THE COURT:   Let me see this.   You can ask what she

Direct - Kramer

1    remembers of the conversation.

2    BY MR. THOMAIDIS:

3    Q.   So do you remember anything else related to the

4    decision or the conversations with respect to Mr. Ryan

5    Davis' termination?

6    A.   Certainly had discussions with the HR manager.  His

7    name started with a B.  Bryan, maybe.  That -- they kept

8    telling me, Don't worry, it's going to happen.

9               MR. CROUGH:  Your Honor, she's -- it's hearsay.

10              THE COURT:  Why are we even --

11              MR. THOMAIDIS:  I'll move on, Your Honor.

12              THE WITNESS:  Okay.

13   BY MR. THOMAIDIS:

14   Q.   So at this time, I would like to -- I'd like to move

15   on to defendants' trial Exhibit G.  And this is not

16   admitted and not stipulated to.

17              And so, Ms. Kramer, I'd like to ask you to just

18   take a brief look at this document and tell me if you

19   recognize it.

20              COURTROOM DEPUTY:  Do you want the paper document?

21              THE WITNESS:  No, I -- no.  I do remember.  I

22   wrote this to HR and to Josep and -- oh, it is Bryan.  HR

23   and Josep and Wayne.

24   Q.   Okay.  Do you recall -- well, let me ask you a couple

25   of questions.  So, first of all, you do recognize this

1645

Direct - Kramer

1   document, correct?

2   A.   Yes.

3   Q.   And you did write it.

4   A.   Yes.

5   Q.   And so what is it, without going into specifics?

6   A.   Because I had reported what I had discovered about his

7   other company --

8   Q.   So, Ms. -- let me stop you there for just a second.   I

9   just want to establish a foundation that you recognize the

10   document.

11   A.   Yes, I do.   I was asked to write it by HR.

12   Q.   Okay.   And so, just quickly, is it in substantially

13   the same condition as when you last saw it?   And we can

14   scroll through the -- each page of the two if you'd like.

15         Does that look to be the same document that you

16   submitted?

17   A.   Yeah, I'd have to read it word-for-word to see if it's

18   been adjusted, but I know I bullet-pointed it, I know it

19   was just some random observations, so it looks -- I don't

20   see anything I -- at this moment, unless you want me to

21   really read through the whole thing.

22   Q.   Well, I'd like you to flip to the second -- we'll flip

23   to the second page for you.

24         And I -- is that your signature at the bottom?

25   A.   Yes.

1646

Direct - Kramer

1        MR. THOMAIDIS:  Okay.  So at this time, Your

2    Honor, I would move defendants' trial Exhibit G from

3    identification into evidence.

4        THE COURT:  Any objection?

5        MR. CROUGH:  Your Honor, plaintiff objects,

6    there's hearsay all over this document, talking about what

7    people heard, other people said, overheard phone

8    conversations, conversations with nonthird parties, it's --

9    beyond that, she can't authenticate it as a business

10    record.  It's not admissible, Your Honor.

11        THE COURT:  I'll sustain that.  It's better for

12    you just to ask her what happened as opposed to relying on

13    this document.

14        MR. THOMAIDIS:  Understood, Your Honor.

15    BY MR. THOMAIDIS:

16    Q.   So you had recollected that you had -- that you had an

17    interaction with Mr. Davis in the parking lot with respect

18    to the -- his work vehicle; is that right?

19    A.   Yes.

20    Q.   Okay.  And so do you recall any of the other

21    interactions or any of the other communications that you

22    had with him at that time?

23    A.   I know that he asked at one point if my husband,

24    Yanni, would do some tile installation for his mother.  He

25    was -- he was getting ready to go to Spain for what, I

Direct - Kramer

1 believe, was a Porcelanosa event and he asked if Yanni

2 would be interested in working for his mom, that he had a

3 school and big projects that he had to do.

4         And I said that I needed to okay that with Wayne

5 and I talked to Wayne at some point.  And he said, Well,

6 yeah, absolutely not.  And don't get involved with that.

7 Don't you or Yanni get involved with that company.  So I

8 knew that they were somewhat aware.

9 Q.   Okay.  And during that conversation, did you indicate

10 to Ryan Davis that you were concerned about a potential

11 conflict of interest?

12         MR. CROUGH:  Objection, Your Honor.  Leading.

13         THE COURT:  Sustained.

14         MR. THOMAIDIS:  She's already testified to that,

15 Your Honor.

16         THE WITNESS:  Yeah, I did --

17         THE COURT:  Hold on, hold on.

18         THE WITNESS:  Excuse me.

19         THE COURT:  What did you say?

20         MR. THOMAIDIS:  I said during that meeting, did

21 you indicate --

22         THE COURT:  No, what did you just say right now to

23 me?

24         MR. THOMAIDIS:  I said I think she's testified to

25 that.

Direct - Kramer

1    THE COURT:  Why are you asking her again?

2    MR. THOMAIDIS:  I want to make it clear again for

3    the record.  I can move on.

4    THE COURT:  Go ahead.

5    BY MR. THOMAIDIS:

6    Q.   Do you recall anything that Ryan Davis said to you in

7    that conversation when he had invited your husband to work

8    on tile projects with his mother?

9    A.   I told him that I needed to talk to Wayne.  And then I

10   had told him Wayne said no, and we can't do that.  And I

11   remember telling -- well, not telling, but suggesting to

12   Ryan at that time to -- that he needed to just tell him so

13   he could set up a different arrangement so he wouldn't be

14   violating the agreement, not to mention this salary that he

15   was getting for what I could not see as showing up to work.

16   Q.   So tell me a little bit about Ryan Davis' work

17   attendance habits to the extent you can recollect them.

18   A.   I do remember that because I was -- I was pretty gung

19   ho when I started, and I really needed some information on

20   how they did things and I just didn't get help at all.  And

21   he wasn't there; he was rarely there.  I -- I would say

22   there were weeks at a time that he wasn't there.

23   And so Rochelle, which was kind of a friend of

24   his, it seemed, but she worked at the company, she answered

25   the phones, did a lot of faxes and things, she -- she would

1649

Direct - Kramer

1    call him for me or ask him questions or try to answer

2    questions I needed.  Initially she wasn't very helpful at

3    all to me, like she acted offended that I was there, I did

4    not feel welcome.

5            And I was afraid about some of the -- just some of

6    the treatment.  I thought I'll never last because of

7    what -- something's going on here.  It isn't good.

8    Q.   And so did management reassure you that you would be

9    okay and that they would be there to assist you?

10   A.   Yes.

11           MR. CROUGH:  Objection, Your Honor.  Calls for

12   hearsay.

13           THE COURT:  Sustained.

14   BY MR. THOMAIDIS:

15   Q.   So did Porcelanosa Los Angeles do anything to assist

16   you to be successful in your employment?

17   A.   Yes.  They brought me out to Anaheim.  And when I

18   asked them questions about Ryan, it -- I got either

19   directly or indirectly from Wayne and Josep that --

20           MR. CROUGH:  Your Honor, she's continuing to

21   testify to hearsay.

22           THE COURT:  Try to stay away from that.

23           THE WITNESS:  I'm sorry.

24           THE COURT:  Answer the question -- listen closely

25   to the question and then just answer the question.  He

Direct - Kramer

1     asked about what the company did to support you.  You don't

2     have to go into the conversations of what people said.

3            THE WITNESS:  They were helpful --

4            THE COURT:  That's a big deal in the law, so -- as

5     can you see how many objections that you're getting, so go

6     ahead.  Stay away from that, please.

7            THE WITNESS:  Yes, they were very supportive,

8     especially Wayne and Josep were very supportive and wanted

9     me to stay, and they offered a lot of ideas, they -- I was

10    given a lot of product catalogs.  And at my suggestion we

11    were going to divide some things geographically as far as

12    accounts went.  And I was very concerned about that because

13    I didn't want to step on toes as far as sales rep goes,

14    that's a real touchy issue.

15           And we all came with some pretty good geographic

16    and different -- how to separate that and how to divide it.

17    And they were very supportive of making sure that I had a

18    chance to make it because we had salary and there were --

19    there were commission compensations, I believe.

20    Q.   Okay.  So do you remember anything else about the

21    decision specifically to terminate Ryan Davis' employment?

22    A.   As I recall, like from the start of the interview,

23    that was my understanding that their -- I was not told

24    directly what the problem was, but they wouldn't speak

25    about what -- Don't worry about him, don't worry about him.

1651

Direct - Kramer

1    Oops.  Sorry.

2           But they -- my understanding and my feeling was

3    that he was not going to be there, and many times I was

4    told by him -- he told me that he --

5           THE COURT:  You can say anything that Mr. Davis

6    said.

7           THE WITNESS:  Yes, Mr. Davis, I can mention that?

8           THE COURT:  Yes, you can.

9           THE WITNESS:  Mr. Davis told me -- and I don't

10   even remember what this company was, but he kept saying, I

11   just got an offer from Turner, I don't need these accounts.

12   I'll give you all my accounts because I don't need them.

13          So from both sides I knew that he was -- his plans

14   were not to stay there long, and Porcelanosa was not

15   seeming to support him, from my point of view.

16   Q.   Okay.  Did he ever give you any of the details of this

17   job offer that he had with Turner Construction -- with

18   Turner?

19   A.   Oh, I didn't know it was construction.  I knew it was

20   a big company having to do with either design or -- all he

21   kept saying was Turner.  And I do remember something like

22   he got like 100,000, 80,000 -- a large sum of money that at

23   the time I was like, well -- I asked him, Why are you

24   staying here?  If you have this job in the -- in the hand,

25   why would you stay here?

1652

Direct - Kramer

1    Because as I recall I think we made like 60 a
2    year, at least I did, something like that.  So it was
3    substantially higher.  He kept saying he didn't need this
4    job because of that.  And I remember telling him, Why don't
5    you talk to them, if you could do commission, too, and do
6    the other thing.

7    I really didn't want him to be in trouble, I
8    just -- I just didn't want us to fail in Colorado.
9    Q.   Understood.  And so, to your knowledge, did he ever
10   take this position with Turner that he indicated he had?
11   A.   I just can't remember that.  I -- not to my
12   recollection, he just mentioned it.  I don't know that he
13   ever took the job.
14   Q.   Okay.  And so you'd indicated that Mr. Davis would
15   often not be in the showroom for weeks at a time, I think
16   that was your testimony?
17   A.   Yes.
18   Q.   Do you remember any other details about his
19   performance of his job responsibilities while an employee
20   as an outside salesperson to Porcelanosa Los Angeles?
21   A.   I do remember at one point I was so concerned that he
22   would know that I had been communicating my observations to
23   Wayne and Josep, so I believe that they came up -- we all
24   came up together, that means me and Wayne and/or Josep,
25   came up with a requirement that we would have to log our --

Direct - Kramer

1    our contacts with clients and that he would issue that memo

2    so that it seemed like I was being asked to do the same

3    thing.

4         And I was being asked to do the same thing, I was

5    already doing that, but I was asked to do it at the same

6    time he was so he didn't think that this was because I

7    noticed that he wasn't there at all and that it was -- it

8    was my fault that he was going to have to be making a log

9    that I was going to do it, too.

10   Q.   To your knowledge, did Ryan Davis ever discipline for

11   failing to do telephone logs or for other logs?

12   A.   I just don't recall.

13   Q.   Do you have any other recollections of any performance

14   issues or acts of dishonesty or problems that Mr. Davis had

15   while employed with Porcelanosa Los Angeles?

16   A.   I do know that when we -- when Wayne did come one time

17   and we went to see a company, I believe it was part of

18   Pueblo that's newer, like when you -- it's North Pueblo, or

19   East Pueblo -- I don't know, there's a part of Pueblo

20   that's kind of separate from Pueblo.  It was a big client

21   that he had -- he had discussed that he sold all these

22   containers to.

23        And I know that Wayne and I got there and Wayne

24   took me outside and he said, This is not what he said it

25   was.  And I was surprised because the client didn't seem to

1    be talking the -- about the same things as Ryan had

2    mentioned to us.  I thought it was a matter of dishonesty.

3    Q.    Okay.

4    A.    And, again, I was always afraid that the company

5    wouldn't do well, now I wouldn't do well there, so it was a

6    tough position to be in as far as the blatant dishonesties

7    with running another company, not doing -- not contacting

8    other people, or our customers.  There were customers that

9    would call in of his that had just ordered in the past and

10   I believe because the product was so really avant-garde or

11   cutting edge on design, that some of the people would

12   really push to order.  We didn't have to push the stuff

13   hard.

14        So there are a lot of times I tried to handle

15   those documents, and I knew that a lot of times -- I saw

16   Rochelle signing -- signing documents for Ryan because he

17   wasn't there.  I -- she covered for him quite a bit on

18   documents and preparing documents that were always -- I did

19   see some discrepancies with Rochelle over a document that

20   Ryan had made involving a customer that was kind of a

21   cutting and pasting situation, like she cut up some of the

22   document and pasted it to sound better to send off.

23        Who it was to, I don't -- I just can't recall, but

24   I remember trying to help her with a machine and I said,

25   Put white paper behind it.  But I had no idea what it was

1655

Direct - Kramer

1 and what it was about, but afterwards, I thought -- I kind

2 of had my own ideas.

3 Q.   Understood.  So tell me what ultimately happened to

4 the showroom that Porcelanosa Los Angeles had in Denver.

5 Did it -- did it close?  Did they just make the decision

6 that it was not cost-effective, to the extent you can

7 recollect?

8 A.   Yes.  And after they tried to recruit me and I -- I

9 was searching for jobs in Denver at the time because I

10 didn't want to relocate with a little daughter, and so I

11 remember discussing with them, and I actually helped them

12 find a contractor, a friend of mine, that could like move

13 out all the tile and -- and close -- close the facility.

14 So I know that we emptied it.  As a matter of fact, I got a

15 table, a glass table, I still have in my -- at my house.

16 And I asked if I could have that and some kind of art that

17 was on the wall because there was nowhere to put this

18 stuff.  It was too expensive to ship it all the way back.

19       Which reminds me.  I don't know if this is

20 pertinent or not, but one of the things I -- a couple of

21 things I saw at the warehouse --

22       MR. CROUGH:  Objection, Your Honor.  There's no

23 question pending.

24       THE COURT:  Right.  You can't just go off on

25 tangents, ma'am.

Direct - Kramer

1    THE WITNESS:  Oh, yeah.  Okay.

2    THE COURT:  Just answer the question.

3    BY MR. THOMAIDIS:

4    Q.    What did you see at the warehouse?

5    A.    Well, I saw that truck with the big "I" backed up

6    loading tile, so -- several times.  I saw that several

7    times.  And I always wondered where that was going and

8    how -- because we didn't -- we had samples, we were

9    supposed to carry samples only at the warehouse, so we

10   could make boards, which I did.

11        And there were large quantities of tile going out.

12   That's all I know, in that truck.  I don't know where it

13   went, why.

14   Q.    So this was Porcelanosa tile in the Infinite Flooring

15   & Design truck?

16   A.    Yes.  Items.  And I can't tell you how much, what

17   item.  I know there was tile and there were things.  There

18   was another guy that drove that truck that was a younger

19   guy that seemed to always be with Ryan in the truck, or a

20   lot of times.

21   Q.    So how many times would you say you witnessed this

22   happen?

23   A.    I saw that truck maybe 10 times.  I --

24   Q.    And how many times did you see it at the warehouse

25   taking tile?

Direct - Kramer

1    A.    Maybe -- maybe twice.  I -- three times at the most.

2    Q.    So, Ms. Kramer, do you recollect when you were -- when

3    you left Porcelanosa Los Angeles, were you eligible for

4    rehire?

5    A.    I believe I was.  I mean, I -- they had tried to

6    recruit me to Miami and then to San Diego, so -- I can't

7    remember what the document said, but I think it was -- it

8    was on good terms.  I really didn't like the new manager

9    like I did Josep, but he -- he was okay.

10        And I -- I turned in my stuff.  I had a laptop and

11   a phone, and I remember when I mailed it, I was already at

12   a different company in Denver, and at the Denver Design

13   Center, because I remember mailing it from there.

14        COURTROOM DEPUTY:  You have two minutes.

15   BY MR. THOMAIDIS:

16   Q.    So, Ms. Kramer, just a couple of other questions and

17   I'll wrap it up.

18        First question:  Has anyone from Porcelanosa Los

19   Angeles, or any other Porcelanosa entity in the United

20   States, ever contacted you and threatened you with respect

21   to this litigation or any other litigation?

22   A.    No.  I still love their tile.  I'd still work for them

23   in some capacity.  No.

24   Q.    Okay.  Have I ever threatened you in terms of

25   providing your testimony here today or with respect to any

Direct - Kramer

1  of your recollections of the time at Porcelanosa Los

2  Angeles?

3  A.   No.

4  Q.   Okay.  And as you sit here today, you recognize that

5  you're under oath and that everything that you've said is

6  the truth and as best you can recollect it, correct?

7  A.   Yes.

8         MR. THOMAIDIS:  Okay.  I have no further

9  questions.

10        THE COURT:  All right, we'll take our morning

11 break at this time.  We will be in recess for 15 minutes.

12       (Jury left the courtroom at 10:25 a.m.)

13        THE COURT:  Ms. Kramer, because you're in the

14 middle of your testimony, I direct you not to speak with

15 any of the lawyers during your break.

16        THE WITNESS:  Okay.  Thank you.

17      (Recess at 10:25 a.m. 10:41 a.m. outside the presence

18 of the jury)

19        MR. THOMAIDIS:  Your Honor, briefly, I just wanted

20 to make sure, before we jump into Ms. Sudovich, there is

21 one reference in the designated deposition transcript where

22 Ms. Sudovich is mentioning Ryan Davis as the father of her

23 son.

24        MR. BURG:  It's been -- it's out.

25        THE COURT:  Well --

Cross - Kramer

1    MR. THOMAIDIS:  It's not presently out, Your

2  Honor, and that's why I wanted to bring it to the Court's

3  attention.

4    THE COURT:  What is not presently out?

5    MR. THOMAIDIS:  That specific reference in this

6  document is one that -- whether it was something that the

7  Court decided to leave in --

8    THE COURT:  Yes.

9    MR. THOMAIDIS:  Okay, I just wanted to verify.

10    THE COURT:  Bring in the jury.

11    (In open court in the presence of jury at 10:42 a.m.)

12    THE COURT:  Ms. Kramer, I remind you you remain

13  under oath.

14    THE WITNESS:  Thank you.

15    THE COURT:  All right.  Cross-examination.

16  Counsel, you have 30 minutes.

17    MR. CROUGH:  Thank you, Your Honor.

18                     CROSS-EXAMINATION

19  BY MR. CROUGH:

20  Q.   Good morning, Your Honor, members of the jury,

21  counsel.

22    Ms. Kramer, we've never met; is that right?

23  A.   True.

24  Q.   We've never spoken.

25  A.   I don't think so.

Cross - Kramer

1    Q.    In fact, you've never spoken to anybody at the Burg

2    Simpson law firm; is that right?

3    A.    No.

4    Q.    Prior to coming here to testify today, you did speak

5    with counsel for the defendants, correct?

6    A.    Yes.

7    Q.    You met with them in person as well, correct?

8    A.    No.

9    Q.    Never?

10   A.    No.

11   Q.    Did they show you any documents prior to coming to

12   testify?

13   A.    They sent me two PDFs of some documents, yes.

14   Q.    What documents did you see?

15   A.    I saw my own writing.  They asked me to clarify that I

16   wrote that.  I believe they sent me my termination

17   agreement or the -- it was a form that showed when I left.

18   Q.    Did they send you a copy of the ventilated facades

19   exclusivity agreement they showed you here in your direct

20   testimony?

21   A.    Yeah, but I -- I believe it was there because I

22   remember seeing a date -- the dates.

23   Q.    Okay.  That was a document that they provided to you

24   in preparation for your testimony; is that right?

25   A.    He sent that a couple of months ago.  He said, I just

Cross - Kramer

1    wanted you to remember -- yeah.  I guess so.  It wasn't --

2    I didn't feel like it was preparing me for my testimony, as

3    much as it was to ask if I had seen it.

4    Q.   How many times did you speak with defendants' counsel

5    prior to testifying here today?

6    A.   I -- I can't say.  I -- I know I haven't spoken to Jim

7    for a couple of weeks.

8    Q.   Okay.  Can you give me an estimate.  Was it five

9    times, 10 times?

10   A.   I would say maybe Jim, personally, maybe three.

11   That's my guess.  Three.

12   Q.   How long -- let's start with the first conversation.

13   What did you talk about?

14   A.   I believe I talked to somebody else that must have

15   been in his law firm, because it was a woman, like months

16   before he called me.

17   Q.   Did they tell you what Porcelanosa's claiming in this

18   case?

19   A.   No.  She asked me what I remembered about working at

20   Porcelanosa.  I still don't know -- I don't know a lot of

21   details about exactly now or what the outcome is.  I asked

22   several times, is this a criminal trial, is this -- because

23   I -- the honest truth is I'm losing my right eye, I'm very,

24   very sick, and it was very difficult to come up here.  And

25   the doctor said no, so I could have not -- not agreed to

Cross - Kramer

1    come.  The only reason I'm coming is because I feel

2    compelled ethically to do so.

3    Q.    Okay.  Let's move on to try to get you in and out of

4    here, then, okay?

5    A.    Okay.

6    Q.    Now, you're not aware of conversations that took place

7    between Josep Domingot and Ryan Davis about Mr. Davis'

8    other company, Infinite Flooring & Design; is that right?

9    The three of you never sat down and talked about --

10   A.    No, no.

11   Q.    -- Ryan Davis' other company, the floor design?

12   A.    No.

13   Q.    And your understanding is that when you were being

14   brought on, you were being brought on as a replacement for

15   Ryan Davis; is that correct?

16   A.    That was my belief and I can't tell you exactly why.

17   Q.    And you were brought on in the spring of 2009 --

18   excuse me, spring of 2004 and then you left in the spring

19   summer of 2005, approximately one year --

20   A.    That sounds right.  That sounds right to me.

21   Q.    Yeah.  Now, you're not aware that Mr. Domingot knew

22   about Infinite Flooring & Design, the other company Ryan

23   Davis was involved in, in March of 2004, are you?

24   A.    Say it again.

25   Q.    You're not aware that Mr. Domingot knew about Infinite

1663

Cross - Kramer

1   Flooring & Design --

2   A.   Yes.  He knew, yeah.

3   Q.   And he knew in March of --

4   A.   I told him.

5   Q.   -- 2004?

6           THE COURT:  Ma'am, you need to wait for counsel to

7   finish his question and then you can answer and then he'll

8   let you finish your answer --

9           THE WITNESS:  I'm sorry.

10          THE COURT:  Because we have a court reporter here,

11  ma'am, she can't take down two voices at once.  So I know

12  it's -- it's a natural thing to talk over each other, but

13  try not to do that.

14          THE WITNESS:  I'm sorry.

15          THE COURT:  It's all right.

16  BY MR. CROUGH:

17  Q.   Let me clarify.  Is it your testimony that Mr.

18  Domingot learned about Infinite Flooring & Design because

19  you told them about it?

20  A.   That's my belief.

21  Q.   Okay.  It's your belief that Mr. Domingot did not know

22  about Infinite Flooring & Design prior to you telling them

23  about it?

24          MR. THOMAIDIS:  Calls for speculation, Your Honor.

25          THE COURT:  Overruled.

Cross - Kramer

1    BY MR. CROUGH:

2    Q.    You may answer.

3    A.    Could you please clarify for me if that means knowing

4    that an Infinite Flooring -- because I believe they were a

5    customer.  So did he know they existed?  Yes, but the

6    relation to Ryan is -- is -- could you specify that for me,

7    because I'm --

8    Q.    Is it your testimony that Mr. Domingot did not know

9    about the relationship between Ryan Davis and Infinite

10   Flooring & Design before you told Mr. Domingot about it?

11   A.    I thought so.  I thought so.

12   Q.    Okay.  You're not aware that Mr. Domingot came in here

13   yesterday to testify before this jury, are you?

14   A.    No.

15   Q.    And that Mr. Domingot testified that he spoke with

16   Ryan Davis.  Asked him about Infinite Flooring & Design and

17   his relationship in March of 2004, and Ryan said, Yes, I'm

18   involved.

19            MR. THOMAIDIS:  Objection, that misstates the

20   testimony.

21            THE COURT:  We'll let the jury figure that out.

22   Overruled.  Go ahead.

23   BY MR. CROUGH:

24   Q.    You're not aware of that conversation, are you?

25   A.    Not specifically.

Cross - Kramer

1    Q.    You're not aware that Mr. Domingot and Mr. Davis

2    agreed that Mr. Davis, working with Infinite Flooring &

3    Design, was a potential conflict of interest?

4    A.    Could you rephrase?  I'm not sure what you're asking

5    me.  I -- I don't think Josep knew about Ryan's level of

6    participation in Infinite Flooring.  I don't think he knew

7    that before I told him.

8    Q.    Okay.  So you're not aware that there was an agreement

9    between Mr. Domingot and Ryan Davis that his involvement

10   with Infinite Flooring & Design and working for Porcelanosa

11   was a potential conflict of interest?  You're not aware of

12   that, are you?

13   A.    No.

14   Q.    Okay.  You're not aware that Mr. Domingot and Mr.

15   Davis agreed that Mr. Davis would stay on with Porcelanosa

16   for a few months during the transition period, even while

17   he was working with Infinite Flooring & Design?  You don't

18   know that, do you?

19   A.    Surprises me.  No.

20   Q.    And, in fact, when you're meeting with Mr. Thomaidis

21   or speaking with anybody's law firm, he never told you

22   that, did he?

23   A.    No.

24   Q.    Now, that was your understanding that you were there

25   for a -- to replace Ryan Davis during the transition

Cross - Kramer

1    period, correct?

2    A.    Yeah, I didn't know about a transition period, but I

3    was going to replace him, yes.

4    Q.    You already thought of my next question.  You weren't

5    aware that you were being brought in during the transition

6    period where Mr. Davis had agreed with Mr. Domingot to stay

7    on, while at the same time working with Infinite Flooring &

8    Design?

9    A.    No.

10    Q.    Could we pull up Defendants' Exhibit F, please.

11            You gave some testimony about this conflicts of

12    interest document.  If we could flip to the second page of

13    it, please.

14            You'll see the date on that is June 29th, 2004.

15    Do you see that?

16    A.    Yes.

17    Q.    And the handwritten name and the signature underneath

18    it, I'll represent to you, is Ryan Davis, the man sitting

19    right here.

20    A.    Yes.

21    Q.    And you weren't aware that this document was signed

22    several months after Mr. Domingot and Mr. Davis had already

23    agreed that Davis would transition and stay on with

24    Porcelanosa while working with Infinite Flooring & Design?

25            MR. THOMAIDIS:  Your Honor, that misstates the

Cross - Kramer

1    evidence.

2           THE COURT:   I'm going to sustain that one.

3    BY MR. CROUGH:

4    Q.   You would agree that Mr. Davis left Porcelanosa's

5    employment some time in July of 2004; is that correct?

6    A.   Yes.

7    Q.   Okay.  And this document is dated shortly before June

8    of 2004, correct?

9    A.   It says that.

10   Q.   Okay.  And you were not aware that Mr. Davis and Mr.

11   Domingot had made this agreement for a transitional period

12   for a few months to help train a replacement?

13          MR. THOMAIDIS:   Your Honor, this witness would

14   have no personal knowledge.

15          THE COURT:   Sustained.

16          THE WITNESS:   No, but to answer --

17          THE COURT:   Ma'am, ma'am --

18          THE WITNESS:   Got it.

19   BY MR. CROUGH:

20   Q.   Let's talk about the ventilated facades.   You

21   mentioned some familiarity with that, correct?

22   A.   If they're what I think they are, yes.

23   Q.   Why don't you explain to me what you think they are.

24   A.   I think they're a bracketed wall application of -- of

25   tile product.

Cross - Kramer

1   Q.   And you testified that during your period of

2   employment between 2004 and 2005, were you both marketing

3   and selling ventilated facades; is that correct?

4   A.   I'm not sure if I made a sale.  I'm not sure if I

5   actually sold that product.

6   Q.   But you were marketing that product.

7   A.   I -- I remember discussing the product.  I think it

8   came up with -- in a Parade of Homes situation, but I

9   don't -- I don't remember actively selling it at a tile

10  distributor company or trying to rep it like that, so I

11  don't -- I mean, I do -- I'm familiar with it, but can I

12  recall actually selling it or trying to sell it?  I don't.

13  I don't remember that.

14  Q.   And you are aware that ventilated facades were not

15  approved for installation in the United States in 2004 and

16  2005, correct?

17  A.   I can't remember.

18  Q.   Are you aware that the ventilated facades still to

19  this day are not approved for use in the United States?

20  A.   No.  Not aware of that.

21  Q.   And you weren't part of any conversations between

22  Josep Domingot and Ryan Davis regarding ventilated facades,

23  correct?

24  A.   I was not part of the conversation, no.

25  Q.   You weren't aware that Mr. Davis was sent multiple

Cross - Kramer

1    times to Spain to be trained on ventilated facades, were

2    you?

3    A.   I knew he had been to Porcelanosa Spain, but I -- I

4    didn't think it was for that.  I don't remember being told

5    it was for a specific reason.

6    Q.   And I think during your testimony, you mentioned that

7    Ryan Davis was sent to Spain in the brief period of time

8    your employments overlapped, right?

9    A.   Yes, yes, yes.

10   Q.   Okay.  So you weren't aware that he was sent back to

11   Spain and was there training with architects that he had

12   brought from Colorado to be trained on the ventilated

13   facade product, do you?

14   A.   I know that he said because I met somebody that said

15   they were an architect and said they had gone to Spain with

16   him.

17   Q.   So you were aware that Ryan Davis had knowledge about

18   the ventilated facade product.

19   A.   I didn't -- I didn't remember him knowing about

20   ventilated facades at all, or discussing it with him.

21   Q.   But you weren't part of the conversations between Mr.

22   Domingot and Mr. Davis regarding the potential for Infinite

23   Flooring & Design and Porcelanosa to work on ventilated

24   facade projects in the future.

25             MR. THOMAIDIS:  Asked and answered, Your Honor.

1670

Cross - Kramer

1    THE COURT:  Give me one second.  Sustained.

2    BY MR. CROUGH:

3    Q.   Were you aware that Porcelanosa paid Mr. Davis to go

4    to Spain with Mr. Domingot?

5    A.   No, I wouldn't be surprised if Josep went with him,

6    but I -- no.

7    Q.   You gave some testimony about an Infinite Flooring &

8    Design truck being on the premises and tile being loaded in

9    that truck; do you recall that?

10   A.   Yes.

11   Q.   You don't have any personal knowledge of what was

12   happening with that tile product, correct?

13   A.   No, I don't.

14   Q.   You don't know if it was being sold to an Infinite

15   Flooring & Design account, correct?

16   A.   I do not.

17   Q.   Okay.  You don't know if it was being delivered to a

18   customer.

19   A.   I do not.

20   Q.   Okay.  You -- in your testimony -- correct me if I'm

21   wrong -- you suggested that there was something --

22   something underhanded going on, that -- you don't have any

23   knowledge of that, right?

24   A.   Well, I was suspect of the truck with the "I" on it

25   because when I asked Ryan to tell them about it, at that

Cross - Kramer

1   time he certainly didn't tell me he ever told them about

2   Infinite Flooring.  He said he didn't want to tell them

3   about it and that then he said to me, Your -- your secrets

4   are safe with me in Colorado, like -- and I said what

5   secret?  There were definitely -- he insinuated to me in

6   that conversation that there -- that they did not know

7   about Infinite Flooring because I directly told him to tell

8   them.

9   Q.   Okay.  So when Mr. Domingot testified here yesterday

10  that he was aware of Infinite Flooring & Design, does that

11  change your perspective?

12  A.   It certainly surprises me.

13          MR. THOMAIDIS:  Your Honor, she has no personal

14  knowledge of this, Your Honor.

15          THE COURT:  Hold on.  Let me --

16          MR. CROUGH:  I'm asking for her perspective.

17          THE COURT:  Well, why don't you rephrase because,

18  you know, Mr. --

19          MR. CROUGH:  I'll rephrase, Your Honor.

20          THE COURT:  Yeah.  I mean, when -- yes, it --

21  that's how the witness testified, but it was after a period

22  of time.  And I think it's not clear to the witness when

23  you're talking about.

24          MR. CROUGH:  Sure.

25  BY MR. CROUGH:

Cross - Kramer

1  Q.  During the period of time in summer of 2004, is it

2  consistent with your understanding at that point and what

3  you recall that Josep Domingot already knew that Infinite

4  Flooring & Design and Ryan Davis were in business together?

5       MR. THOMAIDIS:  I believe this has been asked and

6  answered, Your Honor.

7       THE COURT:  Overruled.

8  BY MR. CROUGH:

9  Q.  You can answer.

10  A.  Could you repeat it, because I'm not sure where you

11  are going with this, so I don't know what you're asking of

12  me.  Just rephrase for me.

13  Q.  Well, what I'm trying to understand is that you've

14  testified to this -- what you saw.  And I'm saying, is what

15  you saw consistent with Mr. Domingot already knowing that

16  Ryan Davis and Infinite Flooring & Design were working

17  together?

18  A.  I'm surprised and did not know that Josep knew about

19  Infinite Flooring and any work in the future for them.

20  Q.  Did you know that the departure of Ryan Davis with

21  Porcelanosa was described as amicable by Mr. Domingot?

22       MR. THOMAIDIS:  Your Honor, that misstates the

23  testimony.

24       THE COURT:  I'll let the jury make that decision

25  for themselves.  Go ahead.

1673

Cross - Kramer

1    THE WITNESS:   That surprises me because I know

2    that -- and certainly through Wayne, that it -- they

3    were -- we were all afraid -- Josep said to me -- oop,

4    can't say that?

5    BY MR. CROUGH:

6    Q.   Nope.

7    A.   My understanding is that he was disappointed and he

8    seemed very sad at the time about it, and Wayne was

9    probably irritated, and I was afraid, so -- regarding his

10   termination.

11   Q.   So would you agree that what you just described is not

12   what normally would be considered an amicable departure?

13   A.   Yeah, no.

14   Q.   And you testified the Denver office, itself, closed in

15   2005; is that right?

16   A.   That sounds right.

17   Q.   You were offered a position someplace else --

18   A.   Yes.

19   Q.   -- but ultimately you didn't take that and Porcelanosa

20   shuttered their doors in Colorado; is that right?

21   A.   To my knowledge, yeah, because we cleared everything

22   out.

23   Q.   Okay.   So all Porcelanosa on the -- in Colorado staff,

24   operations, ceased when you left in the summer of 2005; is

25   that right?

1674

Cross - Kramer

1  A.   That was my understanding.

2  Q.   The physical office closed; is that right?

3  A.   Yes.

4  Q.   Any employees stay around that you're aware of?

5  A.   I was the only one at that time, I believe, so nobody

6  that I knew.  I didn't know what their plans were for it at

7  that point.

8  Q.   So when you left in 2005, Porcelanosa effectively left

9  with you; is that fair?

10  A.   That's -- that was my belief.

11  Q.   And as of 2005, that ended your relationship with

12  Porcelanosa professionally as an employee, correct?

13  A.   Yes.

14  Q.   You never went back to work for them?

15  A.   No.

16  Q.   Have you done any business with them since?

17  A.   No.

18  Q.   Okay.  So your knowledge of any events going on in

19  this case ends in summer of 2005, approximately 12 years

20  ago, right?  Is that right?

21  A.   Say that again, please.

22  Q.   Your knowledge of any events that occurred between

23  these parties ends as of June of -- sorry, summer of 2005,

24  12 years ago?

25  A.   Oh, after I left, I have never heard anything about

1675
Redirect - Kramer

1    the company, Ryan, or any of it.

2    Q.   Okay.  And that was until the lawyers contacted you

3    and provided you some documents and asked you to come

4    testify, right?

5    A.   Yeah.

6           MR. CROUGH:  Nothing further, Your Honor.

7           THE COURT:  All right.  Redirect.

8           MR. THOMAIDIS:  Thank you, Your Honor.

9           THE COURT:  You have 15 minutes, Mr. Thomaidis.

10                    REDIRECT EXAMINATION

11   BY MR. THOMAIDIS:

12   Q.   So, Ms. Kramer, would you say that the Porcelanosa

13   brand name was well-known in Colorado in 2004 and 2005?

14   A.   In our tile world, yeah, it's hard to get -- I mean,

15   would random people know on the street what Porcelanosa is?

16   Probably not.  Would they probably know Dal-Tile?  Probably

17   so.  So it's all relative.  I didn't know about the tile

18   before I started working for them.

19   Q.   So would you say to the general public, the

20   Porcelanosa brand was well-known in Colorado in 2004 and

21   2005 --

22   A.   No.  No, unfortunately, no.

23   Q.   Okay.  Is it your belief as the former employee of

24   Porcelanosa Los Angeles, that Ryan Davis did anything to

25   change that perception in Colorado?

1676

Redirect - Kramer

1    MR. CROUGH:  Objection, Your Honor.

2  Speculation.

3    THE COURT:  Overruled.

4    THE WITNESS:  When I came on, I had a lot of large

5  clients -- what I would consider large clients.  When I

6  would stop by, they would ask me -- they said, We need more

7  product, we need more.  We've asked for this, we've asked

8  for that, we're not receiving anything.

9    So my opinion was that I had a lot of work to do

10  because even the name companies were not aware of

11  Porcelanosa.

12  BY MR. THOMAIDIS:

13  Q.   Okay.  And so based on your recollection, did Ryan

14  Davis sell a lot of Porcelanosa product in Colorado when

15  you and he were both employees?

16  A.   Not to my knowledge.  I do know -- again, I mentioned

17  some -- there was a situation with a company in Pueblo

18  where there were like containers full of tile, but it ended

19  up to be not what we had thought it was, but I didn't

20  see -- I never saw him carrying samples or making boards or

21  selling the product, no.

22    And I had a lot of customers come to me with

23  complaints that they didn't -- they weren't able to get

24  orders or help.

25  Q.   Okay.  So you provided some testimony previously

1677

Redirect - Kramer

1    regarding seeing a blue truck with an "I" on it.  Do you

2    remember that?

3    A.    Uhm-hum.

4    Q.    And it occurred to me, with the assistance of my

5    colleagues, did you mean an eye as in a seeing eye, as in

6    a --

7    A.    No, it was the letter "I."

8    Q.    Did you have an understanding of what "I" meant?

9    A.    I Googled and figured it out, that it was Infinite --

10   or Infinity -- Infinite Flooring.

11   Q.    Is it consistent with your recollection this was

12   Infinite Flooring & Design?

13   A.    Yeah, because I looked it up and I think the

14   proprietor's last name was the same as his.

15   Q.    Do you remember who that proprietor was?

16   A.    It was his mom, it was like the -- somebody Davis.  I

17   don't know -- I can't remember.  Denise?  I can't remember

18   her first name.

19   Q.    Okay.  And are you aware that Crew Trial Distribution,

20   Incorporated, which is a Davis family company, is the

21   plaintiff in this case?

22   A.    Yes.  Yes, I was told that.  I was surprised about

23   that.

24   Q.    And so you were aware that they actually brought this

25   lawsuit?

1678
Redirect - Kramer

1    A.   Yeah.  You told me that.  Yes.

2    Q.   All right.  And you were aware that it wasn't

3    Porcelanosa Los Angeles or any of the other defendants in

4    this case that are here of their own free will; is that

5    right?

6    A.   Right.

7              MR. CROUGH:  Objection, Your Honor.

8              THE COURT:  Overruled -- I mean -- I meant to say

9    sustained.  You're asking her for a legal conclusion as to

10   why the parties are forced to be here.

11             MR. THOMAIDIS:  I'll withdraw the question, Your

12   Honor.

13   BY MR. THOMAIDIS:

14   Q.   Was it your understanding when you were hired with

15   Porcelanosa Los Angeles that you were to be replacing

16   someone in Colorado?

17   A.   Yes.

18   Q.   And did anyone in Porcelanosa Los Angeles tell you

19   specifically who or why?

20   A.   I don't believe Josep Domingot did, but I do believe

21   Wayne did, at some point, tell me that.

22   Q.   And did he articulate to you, You are replacing Ryan

23   Davis who is our present outside sales rep -- I'm sorry,

24   I'll withdraw the question.

25             Did they give you any additional specifics?

Redirect - Kramer

1    A.    No.

2    Q.    Okay.  Were there any other outside salespeople in

3    Colorado at the time?

4    A.    For Porcelanosa?

5    Q.    Yes, ma'am.

6    A.    No.  I believe there was just Rochelle that did

7    paperwork, that kind of manned the little showroom, and

8    then Ryan and then myself.

9    Q.    Okay.  And so to the best of your recollection, did

10   you replace Ryan Davis in the state of Colorado for

11   Porcelanosa Los Angeles?

12   A.    Yes.

13          MR. THOMAIDIS:  Okay.  I have no further

14   questions, Your Honor.

15          THE COURT:  All right.  Thank you.  May this

16   witness be excused?

17          MR. THOMAIDIS:  She may, Your Honor.

18          THE COURT:  For the plaintiff?  Mr. Crough?

19          MR. CROUGH:  She may be excused, yes, Your

20   Honor.

21          THE COURT:  Ms. Kramer, thank you so much for

22   joining us.  You may step down.  You are excused.

23          The defendants/cross -- or counterclaimants may

24   call their next witness.

25          MR. THOMAIDIS:  At this time, Your Honor,

1680

Redirect - Kramer

1    defendants and counterclaimants would call Michelle

2    Sudovich via deposition.

3                THE COURT:  All right.

4                MR. BURG:  Your Honor, may we approach?

5                THE COURT:  Okay.

6           (Side bar conference held)

7                MR. BURG:  I have Mr. Crough here with me because

8    I'm really confused about this.

9                THE COURT:  Okay.

10               MR. BURG:  I don't have your ruling on the motion

11   *in limine*, but my understanding of the motion *in limine* was

12   granted with regard to anything containing the personal

13   relationship between Ms. Sudovich and Mr. Davis.  That

14   would include the fact that they had a child together.

15               THE COURT:  I would have to look -- do you have a

16   response to that?

17               MR. THOMAIDIS:  I --

18               THE COURT:  I would have to look at the order.

19               MR. THOMAIDIS:  I have to look real quick.

20               MR. CROUGH:  Jim, before, you mentioned there's a

21   designated portion of the testimony that still exists about

22   their child.

23               MR. THOMAIDIS:  Page 12.  This is the disputed

24   paragraph right here, Your Honor.  I -- at some point --

25               THE COURT:  Okay.  You know what I'm going to do,

Redirect - Kramer

1    I'm going to take a quick trip back to chambers and look

2    after the order and talk with my law clerk because I hear

3    the point you're making, but I think there's -- I need to

4    review the order to see --

5         MR. BURG:  I don't have it in front of me, Your

6    Honor, and I appreciate that -- Mr. Thomaidis bringing this

7    up before --

8         MR. THOMAIDIS:  I apologize for not having the

9    order, too, so . . .

10        THE COURT:  All right.  So I'm going to tell the

11   jury that we'll take a very brief recess and I'll go look

12   at it and come back up.

13        (End of discussion at side bar)

14        THE COURT:  Ladies and gentlemen of the jury,

15   there's a legal issue that's come up that I need to go back

16   into my chambers to look into.  So we're going to go to a

17   brief recess.  And it shouldn't be that long, five, 10

18   minutes, maybe, and then we'll come back.

19        (Recess 11:11 a.m. to 11:19 a.m. outside the presence

20   of the jury)

21        THE COURT:  All right.  I've had occasion to

22   review my motion *in limine* order as well as the now

23   objected to designated testimony and I agree with the

24   plaintiff that it's within the ambit of the order, and I

25   think also under 403, the prejudice of some of this

1682

Redirect - Kramer

```
 1    testimony outweighs its probative value.  So I think we're

 2    lucky that we're going to have a reader here instead of

 3    slicing, so it's -- I think it's important for context for

 4    the jury to hear how it is that Michelle Sudovich came to

 5    work for Crew Tile.

 6              So really, I think all we need to do is just

 7    delete three words, "my son's father."  And then she --

 8    then everything else reads consistent and accurately as to

 9    how it is she came to know about Crew Tile and how it is

10    she came to work there.  Does that satisfy both sides?

11              MR. BURG:  It does, Your Honor.

12              THE COURT:  All right.  Mr. Thomaidis?

13              MR. THOMAIDIS:  Yeah, I --

14              THE COURT:  You brought up -- you brought this

15    issue up.

16              MR. THOMAIDIS:  No, you're absolutely right, and I

17    want to make a note that under 803(11), family history, I

18    guess is admissible --

19              THE COURT:  Okay.

20              MR. THOMAIDIS:  I personally -- the bottomline

21    is --

22              THE COURT:  I made my ruling.  I'm asking you, do

23    you have an objection to that?

24              MR. THOMAIDIS:  I do not, Your Honor.

25              THE COURT:  Okay.  So who's going to be reading?
```

Redirect - Kramer

1   Okay.  Ma'am, did you hear what I just said and are you

2   comfortable -- are you ready to go?

3          WOMAN:  Yes.

4          THE COURT:  And do you know which words to

5   exclude?

6          MR. BURG:  I also would hope you would tell the

7   reader that she's not to use emphasis or inflection to give

8   it different than just the words on the deposition, which

9   is the normal, you know, like, Oh, my God, as opposed to

10  just reading it --

11         THE COURT:  Right.  We'll just read it in a

12  neutral fashion.  Okay.  Let's bring in the jury.

13         MR. THOMAIDIS:  Point of clarification.  Do you

14  want me to read all of the attorney's parts?

15         THE COURT:  You're reading the whole -- it's

16  your -- your witness that's testifying via deposition.

17         MR. THOMAIDIS:  Understood.

18         THE COURT:  Are we going to get on the record --

19  how are affiliated or related to the parties or the law

20  firms here?

21         WOMAN:  I work in the office for Gersh --

22         THE COURT:  All right.  So why don't we just ask

23  her, so the jury knows who she works for and all that, and

24  we'll -- you can explain how this works.

25         (Jury was present at 11:22 a.m.)

1684
Redirect - Kramer

1    THE COURT:  All right.  The

2  defendants/counterclaimants may call their next witness.

3    MR. THOMAIDIS:  Thank you, Your Honor.

4    THE COURT:  You know what, Mr. Thomaidis, I think

5  it's probably better that I explain how this works.  You

6  can stay up at the lectern.

7    So, members of the jury, nowadays depositions are

8  being taken videotaped, as you've seen, and then they are

9  also being taken the old-fashioned way, which is no video,

10  it's a witness, the lawyers' in a room with a court

11  reporter, and then all we have from that deposition is the

12  actual hard copy paper transcript.  So there's nothing

13  visually for you to see in this following deposition.

14    So this young lady is going to be reading the part

15  of Ms. Sudovich, the deponent.  And the questions and the

16  answers will be as they came in in the deposition, as I

17  have allowed them to come in over objections.

18    Go ahead, Mr. Thomaidis.

19    MR. THOMAIDIS:  May I read the brief statement

20  that was highlighted at the beginning of the deposition,

21  whereupon the proceeding -- the following proceedings, for

22  context?  It was highlighted and it was not an issue for --

23    THE COURT:  Oh, got it, got it.  Sure.

24    MR. THOMAIDIS:  Okay.  So whereupon the following

25  proceedings were taken pursuant to Federal Rules of Civil

1685

Redirect - Kramer

1    Procedure, Michelle Sudovich having been sworn to tell the

2    truth, testified as follows.

3        (The deposition was read to the jury, but not reported

4    herein)

5            MR. THOMAIDIS:  Sorry, Your Honor.  May I have a

6    moment?

7            THE COURT:  Sure.

8        (Deposition continued to be read)

9            MR. THOMAIDIS:  Your Honor, may I have a moment?

10           THE COURT:  Why?  Your next one is 251.

11           MR. THOMAIDIS:  I believe that one was stricken.

12           THE COURT:  Okay.  I don't have any --

13           MR. CROUGH:  257.

14           MR. THOMAIDIS:  That's the next one I have.

15           THE COURT:  Okay.  Go ahead.

16           MR. THOMAIDIS:  Okay.

17       (Deposition continued to be read to the jury)

18           MR. THOMAIDIS:  That's the end of the deposition,

19   Your Honor.

20           THE COURT:  All right.  Thank you very much.

21       I'm going to discuss a couple of things with the

22   lawyers, but we'll take our lunch break now.  We will be in

23   recess until 1:30.

24       (Jury left the proceedings at 12:28 p.m.)

25           THE COURT:  All right.  Mr. Thomaidis, Joey

1686

Redirect - Kramer

1   Griebel is next and then after that is Mr. Prior, correct?

2            MR. THOMAIDIS:  That's correct, Your Honor.

3            THE COURT:  All right.  So here's what we're going

4   to do with Mr. Griebel.  I'm going -- is he

5   cross-endorsed -- are either of these witnesses

6   cross-endorsed?

7            MR. BURG:  No.  No, Your Honor.

8            THE COURT:  So I'm going to give the defendants 60

9   minutes with Mr. Griebel.  How would you like to apportion

10  that between direct and redirect?

11           MR. THOMAIDIS:  May I do 45 and 15, Your Honor?

12           THE COURT:  Whatever you want.  Okay.  So there

13  will be no recross for either Mr. Griebel or Mr. Prior.

14           With Mr. Prior, I'm going to give -- and I'm going

15  to give plaintiff the full 30 minutes that you requested.

16  With Mr. Prior, I'm going to limit you to 75 minutes, an

17  hour and 15 minutes.  How would you like to break that

18  down?

19           MR. THOMAIDIS:  Your Honor, may I do 70 and 20

20  respectively?

21           THE COURT:  Well, that doesn't add up to --

22           MR. THOMAIDIS:  Sorry, 70 -- trying to do the math

23  here.

24           THE COURT:  Total 75.

25           MR. THOMAIDIS:  55 and 20, Your Honor.

1687

Redirect - Kramer

1    THE COURT:  55 and 20.  All right.  I'm going to

2  give plaintiff 45 minutes in cross.  How would you like

3  to -- you only get one cross, so I'm going to give -- you

4  only get cross, so you're going to get 45 minutes in cross.

5    (Recess at 12:29 p.m.)

6                    AFTERNOON SESSION

7    (Proceedings were held in open court outside the

8  presence of the jury at 1:31 p.m.)

9    THE COURT:  Mr. Thomaidis, I understand there --

10 you may be switching the order of your next witnesses.

11   MR. THOMAIDIS:  Actually, over the lunch break, I

12 think we've reconciled any problem and we're going to

13 proceed as we discussed previously.

14   THE COURT:  Excellent.  Let's bring in the jury.

15   (Jury was present at 1:33 p.m.)

16   THE COURT:  Defendants/counterclaimants may call

17 their next witness.

18   MR. THOMAIDIS:  At this time, Your Honor, the

19 defendants and counterclaimants call Joseph Griebel.

20   THE COURT:  All right.

21   COURTROOM DEPUTY:  If you'll come right up here,

22 sir.  And just face me and raise your right hand.

23   JOSEPH GRIEBEL, DEFENDANTS' WITNESS, SWORN

24   COURTROOM DEPUTY:  Pleased be seated.  State your

25 full name for the record and spell your first and last

1688

Direct - Griebel

1    name.

2              THE WITNESS:  It's Joseph Paul Griebel.  And it's

3    J-o-s-e-p-h, G-r-i-e-b-e-l.

4              COURTROOM DEPUTY:  Thank you.

5              THE COURT:  Mr. Thomaidis, you have 45 minutes for

6    direct examination.

7              MR. THOMAIDIS:  Thank you, Your Honor.

8                        DIRECT EXAMINATION

9    BY MR. THOMAIDIS:

10   Q.   Mr. Griebel, thank you very much for being here with

11   us today.  Can you please tell the Court and the jury what

12   your present occupation is.

13   A.   I'm an account manager for Harris Corporation.

14   Q.   And what does Harris Corporation do?

15   A.   We sell -- we essentially are a defense contractor.

16   Q.   Okay.  And so what does an account manager do for the

17   Harris Corporation?

18   A.   I manage software sales for Geospatial Solutions.

19   Q.   And so would you please, just briefly, for everyone's

20   benefit, tell us about your educational background.

21   A.   I went to some college and then decided to stop going

22   and just graduated from high school is about the extent of

23   it.

24   Q.   Okay.  And so tell us a little bit about your

25   professional background, please.

1689

Direct - Griebel

1   A.   I've kind of been all over.   I did tile installation

2   for a while and then I went into another defense contractor

3   and did IT stuff for a while with Northrop Grumman, and

4   then I went back over to Ryan's for a while and did project

5   management and tile sales, and did kind of all of their

6   website design and IT stuff there.

7        And then I moved back over to -- it was Exelis,

8   which is now Harris Corporation.   And I went into an IT

9   role and now I'm in their sales team.

10  Q.   I see.   And so when you said Ryan's just a few minutes

11  ago, what were you referring to?

12  A.   Oh, so it was Infinite Flooring & Design.

13  Q.   Okay.

14  A.   And then later on for Crew Tile.

15  Q.   Okay.   And so how long have you known Ryan Davis?

16  A.   Since 2006 or 2007.

17        THE COURT:   Mr. Griebel?

18        THE WITNESS:   Yes.

19        THE COURT:   Could you take the gum out of your

20  mouth.   I think it would help the court reporter

21  understand --

22        THE WITNESS:   Sorry.

23        THE COURT:   -- your testimony.   Thank you.

24        COURTROOM DEPUTY:   Can you scoot up and put your

25  elbows right on there.   Thank you.

Direct - Griebel

1   BY MR. THOMAIDIS:

2   Q.   And so, Mr. Griebel, during the time that you knew

3   Ryan Davis from approximately 2006 to 2007, presumably,

4   until the present, did you get to know him fairly well?

5   A.   Yes.

6   Q.   Okay.  What is Ryan Davis' educational background, to

7   the best of your recollection?

8   A.   I don't know.

9   Q.   Okay.  Did he graduate from Regis?

10  A.   I don't know.

11  Q.   Okay.  So what else -- did you work for any other tile

12  companies aside from Infinite Flooring & Design and Crew

13  Tile Distribution?

14  A.   No, I didn't.

15  Q.   And so, for example, during your time with Infinite

16  Flooring & Design, did you -- what was your specific job

17  title?

18  A.   I was kind of -- I started out kind of like as the

19  grunt.  I would go and deliver supplies to job sites and

20  then I would help clean up small stuff, like if it needed

21  grouting or if it needed cleanup, I would do that sort of

22  thing.  And then slowly taught me how to lay tile and I did

23  a little bit of that.

24  Q.   Okay.  Was there anything else involved with your

25  job -- excuse me, with Infinite Flooring & Design?

Direct - Griebel

1    A.   No, that was it.

2    Q.   Okay.  Now, what about Crew Tile Distribution?

3    A.   So there I did sales for Crew Tile, so I helped

4    establish I-70 north and then up into the mountains, so

5    like Vail and that whole area.  And then I also built the

6    website and then helped set up the e-mail accounts and

7    developed like the little media stuff we'd send out.

8    Q.   Okay.  And so if I understand your testimony

9    correctly, you began working for the Davises -- the family,

10   the Davises, with the company Infinite Flooring & Design,

11   Incorporated; is that right?

12   A.   Yes.

13   Q.   Okay.  And so can you just elaborate for me what

14   exactly Infinite Flooring & Design did.

15   A.   Infinite Flooring & Design did flooring installation.

16   It was mainly hardwood and tile and then some carpet.

17   Q.   Okay.  Did it do anything else?

18   A.   That was the main thing I knew.

19   Q.   Okay.  And what types of products did Infinite

20   Flooring & Design carry at the time?

21   A.   Tile, hardwood, carpet.

22   Q.   Okay.  So hardwood manufacturers, what were some of

23   the manufacturers of hardwood products that Infinite

24   Flooring & Design carried?

25   A.   The only one I -- I know there's more, but the only

1692
Direct - Griebel

1   one I remember is Denver Hardwood.

2   Q.   Okay.  And you can't recollect any others aside from

3   that one?

4   A.   No.

5   Q.   Okay.  What about carpet products, what type of carpet

6   products did Infinite Flooring & Design carry?

7   A.   There were quite a few as well.  Shaw, I think, was

8   one of the carpet products.

9   Q.   Okay.  Do you recollect any others?

10   A.   That's the main one I can remember.

11   Q.   Okay.  And what about tile products, what type of tile

12   products did Infinite Flooring & Design carry?

13   A.   Dal-Tile, Arizona Tile, Interceramic.  I think those

14   are the main ones I remember.

15   Q.   Okay.  And so can you please recollect, at least to

16   the best you can, what the time frame was with your

17   employment with Infinite Flooring & Design.

18   A.   I believe it was summer 2006 through, I think, the

19   winter of 2006.

20   Q.   And so you would have worked with Infinite Flooring &

21   Design for approximately six months?

22   A.   I think around there.  I can't remember the exact

23   month I left.  It was in the winter time frame.

24   Q.   Okay.  And then if I understood your previous

25   testimony correctly, you went to a defense contractor?

1693

Direct - Griebel

1    A.    Yes.

2    Q.    Okay.  And so how long did you work for that defense

3    contractor?

4    A.    I think it was until late summer 2007.  Might have --

5    it might have been August, September.

6    Q.    And so what did you do following that work?  Did you

7    go back to work for Infinite Flooring & Design?

8    A.    I did.

9    Q.    Okay.  And so for what time period did you then work

10   for Infinite Flooring & Design?

11   A.    From 2007 -- maybe it was 2008.  I know I left in

12   October 2010.  So I think it would have been 2008 to 2010.

13   I'm having trouble remembering the date I started the

14   second time.

15   Q.    Okay.  And that's fine.  So why did you leave Infinite

16   Flooring & Design, Incorporated?

17   A.    Because I really liked the IT stuff and I wanted to do

18   that primarily.

19   Q.    Okay.  Did Infinite Flooring & Design go out of

20   business?

21   A.    Yes.

22   Q.    Okay.  Did it go out of business because it wasn't

23   making any money?

24   A.    I would -- I think so.

25   Q.    Okay.  Did you ever not get paid from Infinite

1694

Direct - Griebel

1    Flooring & Design?

2    A.    There were lapses in payment, but they eventually

3    caught up.

4    Q.    And so how many times would you recollect there were

5    lapses in payment, as you described?

6    A.    I would bet there's probably five or so times.

7    Q.    And was this just in the span of time between 2008 and

8    2010, or did this span back into the 2006 time frame you

9    described previously?

10   A.    It would have been the 2008 one.

11   Q.    Okay.  And is it your recollection that they always

12   caught up or paid you what you were due?

13   A.    Yes, they did.

14   Q.    And so did you begin your employment with Crew Trial

15   Distribution, Incorporated, immediately after Infinite

16   Flooring & Design?

17   A.    There was a couple of months in between -- in between

18   Infinite and Crew Tile.  We tried to do a little like

19   landscaping deal and it never really took off.

20   Q.    So what were your dates of your employment with the

21   landscaping company you just described?

22   A.    That would have been -- so it was still -- it was

23   still with Ryan, it was in between the end of Infinite.  I

24   think it would have been like April or May of 2008 and then

25   I want to say we started like Crew Tile specific in July or

Direct - Griebel

1   August of 2008.  So it would have been three or four

2   months.

3   Q.   And so your recollection was that was in 2008?

4   A.   No, 2009.  Sorry.

5   Q.   What was the name of the landscaping company you just

6   described?

7   A.   It was RG Crew Construction.

8   Q.   And so what exactly did you do for RG Crew

9   Construction following your employment with Infinite

10   Flooring & Design?

11   A.   I went out and tried to sign up people for -- you

12   know, on landscaping their yards.  We ended up doing -- I

13   think we had two or three jobs in the interim and I would

14   go out to new development neighborhoods and I made fliers

15   for it and built a little website and go and try to get

16   people to hire us to landscape their yards.

17   Q.   And so whose idea was it to have RG Crew Construction

18   do landscaping?

19   A.   I think it was -- it was both Ryan and I's.  I had

20   done a little bit of landscaping prior to working for

21   Infinite the first time, so I had some background there,

22   and we decided that it was something that we could -- we

23   could try and do, so we did that and it just didn't take

24   off.

25   Q.   Now, is there a reason, that you can recollect, that

Direct - Griebel

1    you and Mr. Davis, Ryan Davis, didn't pursue another tile

2    related endeavor given your experience with Infinite

3    Flooring & Design?

4    A.    Yeah.   At that time, the -- like the new construction

5    in Colorado was really slow, so it was tough to get new

6    houses -- or the new customers to sign up to have their

7    houses done or get tile done just because of the economy

8    was so bad.

9    Q.    And so what was the rationale behind doing

10   landscaping?

11   A.    It was something that we knew we could physically do

12   and that there would still be -- they are still building

13   new houses so people would still have that need.   So we

14   thought maybe if the new construction stuff wasn't taking

15   off, that maybe landscaping would be.

16   Q.    And so what led you and Ryan Davis to believe that

17   doing landscaping for new construction, new homes,

18   residences, would have been more successful than doing

19   tile?   If you can recollect.

20   A.    I can't really.

21   Q.    Was that something that you thought you could make

22   money at?

23   A.    Yes.

24   Q.    So was RG Crew Construction able to get business in

25   landscaping?

Direct - Griebel

1   A.    It was a handful of jobs, but not a sustainable --

2   like long-term business.

3   Q.    And how many jobs did you get?

4   A.    I want to say -- I think it was three.

5   Q.    Okay.  Do you remember when you provided deposition

6   testimony in this case on August 27th, 2015?

7   A.    Yes.

8   Q.    Okay.  Do you remember the answer that you gave to

9   that question when you gave that deposition testimony in

10  August?

11  A.    I think it was three.  Or was it two?  Sorry.

12          MR. THOMAIDIS:  Your Honor, at this time I'd like

13  to play the deposition.  It's a very short clip.

14          THE COURT:  Any objection?

15          MR. CROUGH:  No objection, Your Honor.

16          THE COURT:  All right.  Go ahead and play it.

17          MR. THOMAIDIS:  Apparently we're not going to be

18  playing the clip, Your Honor.

19          THE COURT:  Okay.

20  BY MR. THOMAIDIS:

21  Q.    So is it your recollection, Mr. Griebel, that you did

22  one, two or three landscaping jobs during the course of RG

23  Construction Services' time?

24  A.    Two.  I think two.  I'm trying to remember the best I

25  can, I'm sorry.

1698

Direct - Griebel

1    Q.   No, no.  And that's fine, and I understand.

2         MR. THOMAIDIS:   I -- may I have one moment, Your

3    Honor?

4         THE COURT:   You may.

5    BY MR. THOMAIDIS:

6    Q.   So, Mr. Griebel, I'm going to move on.  I do want to

7    refresh your recollection, I need to pull the necessary

8    information.  Did you work on anything other than

9    landscaping when you were at RG Crew Construction?

10   A.   My focus was the landscaping.  I think there was still

11   a handful of tile jobs that were finishing out.

12   Q.   Okay.  And so to your recollection, would Ryan Davis

13   have been working on landscaping related matters during RG

14   Crew Construction's time?

15   A.   He -- he was overseeing everything.  I think -- I'm

16   trying to remember at -- the time line on this.  He would

17   have -- he would have had a part of the landscaping.

18   Q.   Okay.  Would that have been a hundred percent of his

19   time, to your recollection?

20   A.   I don't think so.

21   Q.   Okay.  And you had mentioned some tile projects that

22   were being finished.  Can you tell me what those tile

23   projects were.

24   A.   The one that I remember that I got pulled off on was

25   at Wazee, a building downtown.  And I had to go help lay

Direct - Griebel

1    some tile and I . . .

2    Q.    Okay.  Now, do you remember, was that a job that was

3    associated with RG Crew Construction, was that a job that

4    was associated with Crew Tile Distribution, or was that a

5    job that was associated with Infinite Flooring & Design?

6    A.    I don't know what it would have been under.

7    Q.    Do you have an approximate date that this project

8    occurred?

9    A.    Summer 2009.

10   Q.    Okay.  Were there any other tile projects that you can

11   recollect from the summer of 2009?

12   A.    That was the main one that I got pulled in on.

13   Q.    And so who is Darlyne Davis?

14   A.    That's Ryan's mother.

15   Q.    Okay.  When you were working for -- working at RG Crew

16   Construction, and it was doing landscaping in the summer of

17   2009, was Darlyne Davis also involved in that business?

18   A.    Yeah, she would have been kind of the admin payroll.

19   Q.    Okay.  And did RG Crew Construction, in the summer

20   2009, have a location that it was conducting business out

21   of?

22   A.    I mean, we -- sometimes we would work out of Ryan's

23   house.  Darlyne primarily worked out of her house.

24   Q.    And when you say Ryan's house, is there an address

25   that you can recollect?

Direct - Griebel

1    A.    I don't remember the address.  It was in Henderson.

2    Q.    Okay.  And when you say Darlyne's house, is there an

3    address you can recollect?

4    A.    It's Broomfield, Colorado.

5    Q.    Was it on Pecos Street?

6    A.    Yes.

7    Q.    Okay.  And so to your knowledge, with RG Crew

8    Construction, did they ever have a mobile office unit that

9    they had used related to the landscaping?

10   A.    I think towards the end before we became Crew Tile, we

11   moved over to a Commerce City and there was a mobile unit

12   there.

13   Q.    Okay.  What was that mobile unit -- at least to the

14   extent you know when you worked there, what was that mobile

15   unit supposed to do, or supposed to house?

16   A.    Towards the end, it was going to be like more of a --

17   the tile showroom before we got the real tile showroom, so

18   we just kind of set up our offices there and worked out of

19   it.

20   Q.    I see.  And so what was your understanding that would

21   be shown in that mobile office in Commerce City?

22   A.    It was Porcelanosa tile.

23   Q.    Okay.  Was there anything else?

24   A.    At that time, I don't think so.

25   Q.    So was RG Crew Construction not successful?

Direct - Griebel

1    A.    No, it was -- it was too tough to establish new

2    business.

3    Q.    And that was the new business --

4    A.    For landscaping.

5    Q.    -- for landscaping?

6    A.    Yes.

7    Q.    So I'm going to -- and this has actually been marked

8    as an exhibit -- I'd like to refer the witness to trial --

9         THE COURT:  It's been marked as an exhibit or

10   admitted as an exhibit?

11        MR. THOMAIDIS:  I'm sorry, it is marked and

12   admitted as an exhibit, Your Honor.

13   BY MR. THOMAIDIS:

14   Q.    The -- this is going to be trial Exhibit X.  And so if

15   you could just blow up the top half of this page.

16        I'll represent to you that this is a document that

17   was pulled from the Colorado Secretary of State's website.

18   Do you recognize the domestic entity name corporation on

19   No. 1 there?

20   A.    Yes.

21   Q.    Is that consistent with the company you worked for?

22   A.    Yes.

23   Q.    And then up in the upper right-hand corner of that

24   document, you'll see a date and time, which is the date and

25   time of the filing of the Articles of Incorporation for

Direct - Griebel

1    this company.

2            Does June 2d, 2009, is that consistent with your

3    recollection on when RG Crew Construction -- you were

4    working for them?

5    A.    Yes.

6    Q.    Okay.  And so this is a company that you had testified

7    previously was doing landscaping, correct?

8    A.    Yes.

9    Q.    Okay.  And this is the economy you testified

10   previously wasn't successful because it was too difficult

11   to enter the market; is that right?

12   A.    Yes.

13   Q.    So now if you could please turn to the fourth of

14   the -- the fourth page of 21.  And if you could just kind

15   of blow up the top half of the page again.

16           Now, you had indicated that you were also employed

17   by Crew Tile Distribution, correct?

18   A.    Yes.

19   Q.    Were you aware, as an employee, that RG Crew became

20   Crew Tile Distribution?

21   A.    No, I didn't know that piece.

22   Q.    Okay.  And can you just get rid of the blown-up

23   section.  And blow up the e-filing note at the top on the

24   right.

25           So is it consistent with your recollection that RG

Direct - Griebel

1  Crew Construction became Crew Tile Distribution in

2  September, mid-September, of 2009?

3  A.   Yes.

4  Q.   And so why is that consistent with your recollection?

5  A.   I remember late summer 2009 we went out and visited

6  Jack out at Porcelanosa in California, and since the

7  landscaping stuff wasn't really taking off, Ryan had came

8  up with the -- or made the decision that we were going to

9  sell Porcelanosa tile.

10 Q.   And so do you have any idea how he came to the

11 decision that you were going to sell Porcelanosa tile?

12 A.   I know he was --

13         MR. CROUGH:  Objection.  Foundation, Your Honor.

14         THE COURT:  Sustained.

15 BY MR. THOMAIDIS:

16 Q.   Do you recall anything in that time frame that would

17 indicate the basis on which you decided -- the company

18 decided to sell Porcelanosa tile?

19 A.   He was just familiar with it and knew that there

20 would, you know, the -- the new construction was starting

21 to come back, so he knew that there might be a market for

22 the high-end tile in Colorado.

23 Q.   Okay.  And at that time, had he had any discussions,

24 to your knowledge, with anyone from Porcelanosa?

25 A.   I don't know if he had.

1704

Direct - Griebel

1   Q.   Okay.  And so give me an approximation for when that

2   date was, at least to the best of your recollection.

3   A.   I would -- I want to say it was sometime in like late

4   August that we went out to California, because I remember

5   it was still pretty warm out.  Or maybe -- no.

6   Q.   So is it your recollection that after August of 2009,

7   you began to sell Porcelanosa brand products?

8   A.   Yes.

9   Q.   Okay.  So I'd now like to turn to defendants' trial

10  Exhibit Z.  And this is an exhibit that is neither

11  stipulated to nor admitted at this time.

12         And I would like to ask -- I'm sorry?  Oh, I'm

13  sorry, I guess it is stipulated to.  Oh, okay.  I guess it

14  is stipulated to, so given that, I'd like to move for its

15  admission as evidence.

16         THE COURT:  One second.  All right, given the

17  stipulation, Exhibit Z is admitted into evidence and may be

18  published to the jury.

19      (Defendant's Exhibit Z received)

20  BY MR. THOMAIDIS:

21  Q.   So, Mr. Griebel, would you take just a minute to look

22  at this e-mail.

23         Now, do you recall sending this?

24  A.   I don't recall it, but it looks like something I would

25  have sent.

1705

Direct - Griebel

1    Q.   Okay.  And is this something that you would have sent

2    in June of 2009?

3    A.   Yes.

4    Q.   Okay.  Why would you have been sending this in June of

5    2009?

6    A.   I'm -- if I sent it in June 2009, then that means we

7    would have started selling -- or would have went into

8    Porcelanosa and started selling it at that point.  I

9    thought it was later, but I was wrong.

10   Q.   Okay.  And so here it says, My name is Joey Griebel

11   with RG Construction, and I came across your architecture

12   company as being among the top in the Granby area.

13           Do you see that?

14   A.   Yes, I do.

15   Q.   So why is RG Crew Construction selling Porcelanosa

16   products at this time in June of 2009?

17   A.   I can't really remember when and why we changed from

18   RG Crew Construction.  I thought I remembered that we had

19   already been Crew Tile before I started to try and sell it,

20   so I was wrong.

21   Q.   So does this refresh your recollection, was RG Crew

22   Construction selling or attempting to sell Porcelanosa

23   products in mid-2009?

24   A.   Yes.

25   Q.   Okay.  And then you go on here to say, We are proud to

1706

Direct - Griebel

1   be exclusively offering Porcelanosa tile and stone in the

2   greater Colorado area.

3           Do you see that?

4   A.   Yes, I do.

5   Q.   Why were you putting that in this e-mail in June of

6   2009?

7   A.   That was, to my knowledge, what we were doing is at

8   that time I thought we were the exclusive distributors in

9   Colorado of Porcelanosa.

10  Q.   And why, to your knowledge, were you the exclusive

11  distributors of Porcelanosa in Colorado in June -- or as of

12  June 26th, 2009?

13  A.   That's what Ryan would have informed me.

14  Q.   Okay.  Do you have any recollection of what Mr. Davis

15  informed you in June of 2009?

16  A.   I can't remember the specific conversation.

17  Q.   Okay.  So you have no recollection at all about what

18  Mr. Davis told you?

19  A.   I mean, when we knew the landscaping wasn't taking off

20  and he said we were going to start doing tile, the basis

21  behind it was we were going to be the only people in

22  Colorado selling it, and that was really the big push is

23  nobody else would be selling this product but us.  We had

24  something unique to offer.

25  Q.   And so why did you believe that you were the only one

1707

Direct - Griebel

1    selling this in Colorado?

2    A.    Because that's what I was told by Ryan.

3    Q.    Would that have been approximately the same time as he

4    told you that you would be offering Porcelanosa products

5    exclusively?

6    A.    Yes.

7    Q.    And do you remember any of the specifics of that

8    conversation?

9    A.    I don't.

10   Q.    Okay.  And so at this point in time, being in June of

11   2009, do you recall ever going in to any of those mountain

12   towns and attempting to sell Porcelanosa products?

13   A.    I can't remember if, in June 2009, I was making like

14   actual in-person calls at that point.

15   Q.    Do you remember going into a showroom in Aspen that

16   was called Rocky Mountain Flooring?

17   A.    I remember going into two different showrooms in

18   Aspen, but I can't remember the names of them.

19   Q.    Was one of them called the Balentine Collection?

20   A.    Yes.

21   Q.    Okay.  And so what happened when you went into the

22   Balentine Collection and indicated that you were RG Crew

23   Construction selling Porcelanosa brand products exclusively

24   in Colorado?

25   A.    I can't remember -- I know they informed us that they

Direct - Griebel

 1   offered Porcelanosa as well, but I can't remember if at

 2   that time they told us they had an agreement or not.

 3   Q.   Okay.  Do you remember anything else about what the

 4   Balentine collection told you when they said that they were

 5   carrying Porcelanosa products?

 6   A.   I can't remember.

 7   Q.   Did they tell you to stop saying that you were the

 8   exclusive distributor of Porcelanosa products in Colorado?

 9   A.   I don't think they said that in person.  That came

10   later on.

11   Q.   When did that come?

12   A.   It would have came in an e-mail from Jack and he told

13   us we couldn't use that exclusive -- Colorado exclusive

14   Porcelanosa -- Colorado exclusive Porcelanosa dealer

15   because they were technically allowed to sell as well.

16   Q.   So do you remember when you received that

17   correspondence from Mr. Handley?

18   A.   I don't.  It would have -- it would have gone to Ryan

19   and then he informed us that we had to change the wording.

20   Q.   Okay.  Would that have been in this mid-2009 time

21   frame that this e-mail was sent?

22   A.   I can't remember when that would have been sent.

23   Q.   Okay.  Did anyone else talk to you or, to your

24   recollection, to Mr. Davis, about the use of the word

25   "exclusive"?

1709

Direct - Griebel

1   A.    I think the only person that I heard talk about it was

2   Jack to Ryan.

3   Q.    Okay.  To your knowledge, did Paco Montilla ever

4   contact Mr. Davis or you individually and say that you

5   should not be using the term "exclusive"?

6   A.    I -- I don't recall being contacted directly by Paco,

7   but I can't remember if he contacted Ryan.

8   Q.    Okay.  So following your employment with RG Crew

9   Construction, what happened?  How did you come to work at

10  Crew Tile Distribution?

11  A.    So the -- kind of the first step is we went out and

12  visited Jack at the showroom in Anaheim, California.  And

13  we spent the day with him showing us around the showroom,

14  trying to get us familiar with the different tile that they

15  offer, the different sizing.  And then he showed us some

16  videos of like the production process and tried to help us

17  learn what the unique differentiators were for

18  Porcelanosa.

19  Q.    And in that meeting that you had with Mr. Handley in

20  California, did Ryan Davis ever indicate to you that he had

21  an exclusive distributor agreement with Porcelanosa Los

22  Angeles or any other Porcelanosa company?

23  A.    I can't remember if that was said.

24  Q.    Okay.  And to your knowledge during that meeting, did

25  Jack Handley ever say that Crew Tile Distribution had an

1710

Direct - Griebel

1    exclusive distributor agreement related to Porcelanosa

2    products in Colorado?

3    A.    I can't remember Jack saying that either.

4    Q.    Okay.  Do you have enough of a recollection of that

5    meeting where you would remember if one of those

6    individuals said something?

7              MR. CROUGH:  Objection Your Honor.  Foundation.

8              THE COURT:  Overruled.

9              THE WITNESS:  I -- I really can't remember

10   specific -- that part of it.

11   BY MR. THOMAIDIS:

12   Q.    Okay.  So when you worked at Crew Tile Distribution --

13   well, how did you come to work at Crew Tile Distribution?

14   A.    So if the landscaping wasn't taking off, then we were

15   told, you know, the -- we were going to start selling

16   Porcelanosa.  And me and another guy that was there, Bob,

17   we were each going to be responsible for our own

18   territories.  So we kind of mapped out a territory.  And

19   from there, we just started trying to put together a game

20   plan of how we would get the tile out on the market.

21   Q.    I see.  And so what did you ultimately come up with in

22   terms of a game plan?

23   A.    So the game plan was we would start going after

24   interior designers, architects, and some of the tile stores

25   and like the high-end towns like Breckenridge or Eagle,

Direct - Griebel

1    Avon, Vail, Carbondale.  And we would go in there and try

2    and see if we could do a Lunch and Learn where we would

3    bring the Porcelanosa DVD that has all the different

4    catalogs, and then show them the tile and try to get them

5    to start speccing it.

6    Q.   And so did you consider Lunch and Learns to be an

7    important part of this marketing of Porcelanosa products?

8    A.   I did.

9    Q.   Okay.  Did the other employees the -- let me scratch

10   that.

11        When you worked at Crew Tile Distribution, when it

12   went from RG Crew Construction to Crew Tile Distribution,

13   did you go home one night and then show up the next morning

14   and it was Crew Tile Distribution?  What happened?

15   A.   I mean, it was -- it was pretty quick.  We decided

16   that that -- Ryan decided, it was decided that that was

17   going to be the name of the company, so I started working

18   on a new website that had all the pages from the

19   Porcelanosa catalogs and started building a Yahoo small

20   business for our names at Crew Tile Distribution and

21   setting up all that information so it looks more formal.

22   Q.   And so at that time, did Ryan Davis indicate to you

23   that he had had an exclusive distributor agreement with

24   Porcelanosa Los Angeles or any other Porcelanosa company?

25   A.   Around -- around the time that I set up the e-mails I

Direct - Griebel

1    think is when I had first used that, Your exclusive

2    Colorado Porcelanosa dealer.

3          So around that time is when we were told that --

4    because I had set up our e-mail signatures and that's when

5    we were told that we had to take that part off, and I

6    believe I had put it on the website as well.

7    Q.   Okay.  It appears as far back as June 26th of 2009,

8    were you indicating that Crew -- at that time RG Crew

9    Construction was exclusively offering Porcelanosa tile and

10   stone to the greater Colorado area; is that right?

11   A.   That is.

12   Q.   And so did Mr. Davis indicate to you that you would be

13   offering -- operating and selling those products

14   exclusively in the greater Colorado area?

15   A.   At the start, yes.

16   Q.   Okay.  And what about after?

17   A.   After, Jack said we couldn't have that on there, it

18   was said that we would be doing everything outside of

19   Aspen, so we would be the main Porcelanosa people selling

20   outside of everywhere but Aspen, where that other shop was

21   set up.

22   Q.   And was that before or after you communicated to Mr.

23   Davis that you had had the run-in with the Balentine

24   Collection?

25   A.   That would have been after.

Direct - Griebel

1    Q.   Okay.  How much after, do you have any recollection?

2    A.   I think it was going into -- it would have been

3    late -- late summer, early fall.

4    Q.   Of what year?

5    A.   Of 2009.  Sorry.

6    Q.   Okay.  And so when you worked at Crew Tile

7    Distribution, how many employees did the company have?

8    A.   I think it was just four of us.

9    Q.   Okay.  Can you name those individuals.

10   A.   It was me, Darlyne Davis, Ryan Davis, and then Bob

11   Domingoto.

12   Q.   Okay.  So I'm going to ask you to please turn with

13   me -- actually, we will do it for you -- turn to trial

14   Exhibit A-16, please.  Now, I'm going to ask my colleague

15   to kind of slowly scroll through this document and at least

16   blow it up as best we can.  And then if we could go back to

17   page 1.

18        So, Mr. Griebel, have you ever seen this contract

19   before?

20   A.   I haven't.

21   Q.   You're certain?

22   A.   Yes.

23   Q.   And did you ever see this contract when you were

24   sending e-mails such as the one that has been marked as

25   trial Exhibit Z?  Did you ever see a contract like this or

Direct - Griebel

 1   this contract in the context of drafting and sending those

 2   e-mails?

 3   A.   I didn't.

 4   Q.   Okay.  And when RG Crew Construction changed its name

 5   to Crew Tile Distribution, did you ever see this contract?

 6   A.   I didn't.

 7   Q.   Okay.  And then when you were meeting with Jack

 8   Handley in California and Ryan Davis to do training with

 9   Porcelanosa on selling Porcelanosa products, did you ever

10   see this contract?

11   A.   I didn't.

12   Q.   Okay.  And then as we move forward and you were

13   selling Porcelanosa products, did you ever see or hear of

14   this contract being an exclusive distributor agreement

15   between Crew Tile Distribution and Porcelanosa Los Angeles,

16   or one of other Porcelanosa companies?

17   A.   I heard of the exclusive outside of Aspen part, but I

18   never physically saw agreements or anything.

19   Q.   Okay.  And so do you have any specific instances that

20   you can recollect hearing about being exclusive?

21   A.   I can't think of a specific instance.

22   Q.   Do you remember in what context the word "exclusive"

23   would have been used?

24   A.   When we -- if we were out visiting a customer, letting

25   them know that we were offering Porcelanosa in Colorado, in

1715

Direct - Griebel

1   that context it would have come up, or the exclusive one

2   outside of Aspen to offer it.

3   Q.   Okay.  And so who directed you with respect to the use

4   of the word "exclusive"?

5   A.   Ryan would have.

6   Q.   Okay.  Was there anyone else?

7   A.   No.

8   Q.   Did Darlyne ever indicate to you that you should be

9   representing Crew Tile Distribution as the exclusive

10   distributor, exclusive dealer, of Porcelanosa products in

11   Colorado?

12   A.   No.

13   Q.   To your knowledge, did Glenn Davis ever indicate to

14   you that you should be referring to Crew Tile Distribution

15   as being the exclusive dealer of Porcelanosa products in

16   Colorado?

17   A.   No.

18   Q.   Or distributor, for that matter.

19   A.   I -- I don't believe either one ever specifically told

20   me to refer to us as that.

21   Q.   And so when did you -- Mr. Griebel, when did you

22   ultimately leave Crew Tile Distribution?

23   A.   I left in October 2010.

24   Q.   Okay.  Have you done any work for Crew Tile

25   Distribution since then?

Direct - Griebel

1    A.    Yes.

2    Q.    What work have you done?

3    A.    I built them a new website and -- it was either 2012

4    or -- I think it was 2012, I built them a new website, like

5    updated it with some of the new offerings from Porcelanosa,

6    and made it a little more modern.

7    Q.    And so when you received that information to update

8    the website, who did you receive that information from?

9    A.    From Ryan.

10   Q.    And at that time, did that website -- was it directed

11   to include the word "exclusive"?

12   A.    No, it was just Colorado's Porcelanosa tile and stone

13   distributor, I think was the heading.

14   Q.    Okay.  And then in the context of those interactions

15   about updating the website, did Mr. Davis ever indicate to

16   you that he had an exclusive distributor agreement with

17   Porcelanosa Los Angeles or any of the other Porcelanosa

18   companies in the United States?

19   A.    He didn't reiterate anything further.

20   Q.    Okay.  And you're certain of that?

21   A.    Yeah, it was just updating the website for him.

22   Q.    Okay.  And then as it relates to this litigation, do

23   you know when this litigation started?

24   A.    I don't.

25   Q.    Okay.  Have you ever been contacted by any of

Direct - Griebel

1   plaintiff or counterclaim defendants' attorneys in this

2   case?

3   A.   Yes.

4   Q.   How many times?

5   A.   I want to say five or six times when they were

6   trying -- or -- I don't remember their name -- or that

7   attorney's name.

8   Q.   And I -- I'm not going to give you the information --

9   A.   Okay.  From the plaintiffs' attorneys' side I was

10  contacted probably five or six times when they were trying

11  to figure out recovering e-mails and recovering e-mail

12  server.  And I helped them figure out to the extent that I

13  could.  It was Yahoo Small Business, so there wasn't like a

14  physical server that I had, so I gave them instructions on

15  how they could do it, and then I gave them copies of

16  anything I had related to Crew Tile.  And then just before

17  my deposition, I believe I talked to you on the phone

18  before my deposition as well.

19  Q.   Okay.  And so what about subsequent to the deposition,

20  have there been any subsequent communications with

21  plaintiff or counterclaim defendants' attorneys?

22  A.   Just the -- the e-mail that went out in December

23  saying it was going to trial from your firm and then my

24  subpoena to come here today.

25  Q.   Okay.  All right.

1718

1    MR. THOMAIDIS:  Well, thank you.  I don't have any

2  further questions at this time.

3    THE COURT:  Cross-examination.  Mr. Crough, you

4  have 30 minutes in cross-examination.

5    MR. CROUGH:  Thank you, Your Honor.

6                       CROSS-EXAMINATION

7  BY MR. CROUGH:

8  Q.   Good afternoon, Mr. Griebel.

9  A.   Hi.  How are you?

10  Q.   Good today.  Now, when you worked for -- you worked

11  for both Crew Tile and for Infinite Flooring, that's

12  correct?

13  A.   That's correct.

14  Q.   You understood that those were two separate companies,

15  right?

16  A.   Yes.

17  Q.   Infinite was a flooring installation company:

18  carpets, hardwood, tile, I believe you testified to.

19  A.   Yes.

20  Q.   And Crew Tile was a Porcelanosa tile distributor,

21  correct?

22  A.   Yes.

23  Q.   Two different businesses.

24  A.   Yes.

25  Q.   And you knew, working for Crew Tile, that Crew was

Cross - Griebel

1    responsible for developing the market in Colorado, correct?

2    A.   Yes.

3    Q.   And, in fact, before you started working with Crew

4    Tile, it was your understanding there was no Colorado

5    market for Porcelanosa products, correct?

6    A.   Yes.

7    Q.   Now, Infinite Flooring & Design tapered off for lack

8    of new jobs in 2009; does that sound accurate?

9    A.   Yes.

10   Q.   And that's because the -- now that you mention, the

11   economy was in the pits, right?

12   A.   Yeah.

13   Q.   And that doing flooring installations for new

14   construction, which was what Infinite Flooring & Design's

15   business was, that just -- those jobs weren't -- were not

16   coming in.

17   A.   Yeah.

18   Q.   And when working with Infinite Flooring & Design, you

19   worked with a number of suppliers, you mentioned Dal-Tile,

20   Arizona Tile, Interceramic, correct?

21   A.   Yes.

22   Q.   And in working with Crew, you worked with one

23   supplier, Porcelanosa; is that right?

24   A.   That is.

25   Q.   Now, the decision to get out of any of the landscaping

Cross - Griebel

 1   work with RG Crew was in summer of 2009 because Ryan Davis

 2   was talking with Jack Handley about being a distributor for

 3   Porcelanosa; is that right?

 4   A.   I'm not sure if that -- of that conversation piece,

 5   but Ryan ultimately made the decision to make that move.

 6   Q.   It was your understanding that Crew Tile was beginning

 7   a relationship with Porcelanosa because of conversations

 8   between Ryan Davis and Jack Handley, right?

 9   A.   Yes.

10   Q.   And ultimately you -- you were flown out to California

11   for product training for Porcelanosa, correct?

12   A.   Yes.

13   Q.   And that was also in the fall of 2009, right?

14   A.   Yes, it was.

15   Q.   This is right at the time when Crew Tile was getting

16   started; is that right?

17   A.   That is.

18   Q.   And defendants' counsel had showed you a document that

19   showed that RG Crew was renamed Crew Tile Distribution in

20   September of 2009.  Do you remember seeing that document?

21   A.   The -- just seeing it on the screen?

22   Q.   Seeing it on the screen.

23   A.   Yes.

24   Q.   And in looking at that document, it was -- it was

25   renamed -- the corporation was renamed, it was RG Crew,

Cross - Griebel

1    just renamed Crew Tile Distribution.  Same company, though?

2    A.   Yes.

3    Q.   Still owned by the Davis family, correct?

4    A.   Yes.

5    Q.   And it was around that time is when you flew out to

6    California and actually met Jack Handley, correct?

7    A.   Yes.

8    Q.   And I think you went out with a couple of other people

9    from Crew Tile, including Mr. Ryan Davis, correct?

10   A.   Yes.

11   Q.   And Jack Handley showed you around California?

12   A.   Yeah.

13   Q.   How was the trip?

14   A.   It was -- I don't really remember.

15   Q.   Did you -- did they show you the -- excuse me, did

16   Jack Handley show you the Porcelanosa facility?

17   A.   He did.

18   Q.   Did he show you some of the products?

19   A.   He did.

20   Q.   Did he educated you on what those products were?

21   A.   Yes.

22   Q.   And was it your understanding that that was being done

23   so you would then be able to come back to Colorado and

24   promote Porcelanosa's products?

25   A.   Yes.

1722

Cross - Griebel

1    Q.    Now, you were not part of the formal formation of Crew

2    Tile, any of that paperwork that defendants' counsel showed

3    you, right?

4    A.    Correct, I was not.

5    Q.    You were there working and you were told, I think you

6    said, relatively quickly, That we were going to be moving

7    into a distribution and that's going to be our job, right?

8    A.    Yes.

9    Q.    And at that time, Ryan Davis was excited about

10   flooring and Crew Tile; isn't that right?

11   A.    Yes.

12   Q.    And he was passionate about getting a distributor

13   arrangement set up with Porcelanosa, right?

14   A.    That is correct.

15   Q.    And you were excited about it, too, weren't you?

16   A.    Yes.

17   Q.    You were excited because it was a good opportunity --

18   A.    Yes.

19   Q.    -- right?

20          These -- there are some samples back here.  Do

21   these look similar to some of the samples of Porcelanosa

22   that you saw while you were working there?

23   A.    Yes.

24   Q.    And how would you describe those types of tiles

25   compared to, say, other floor tiles on the market?

1723

Cross - Griebel

1   A.   I think the biggest thing is they're contemporary

2   large floormat tiles, so they're not your standard 12 by 12

3   cookie-cutter tiles.  They're -- they're high-end tile.

4   Q.   You would agree with me that this is not cheap tile?

5   A.   Yes.

6   Q.   Would you say this is luxury tile?

7   A.   Yes.

8   Q.   And you're aware that Porcelanosa markets itself as a

9   luxury brand within the tile industry?

10   A.   Yes.

11   Q.   Now, before you walked into the courtroom, there's

12   been some discussion about Alcalagres, is some tile company

13   that nobody seems to know how to pronounce, including me,

14   you didn't do any work for Alcalagres while you worked for

15   Crew Tile, correct?

16   A.   Correct.

17   Q.   And any of the other suppliers you talked about from

18   Infinite like Dal-Tile, Arizona Tile, Interceramic, you

19   didn't do any work with those when you were working as a

20   distributor for Porcelanosa with Crew, correct?

21   A.   Correct.

22   Q.   But aside from the Porcelanosa brands, there were a

23   couple of other products that Crew Tile sold, like a Flush

24   Drain, Quick Drain; does that sound familiar?

25   A.   Yes.

Cross - Griebel

1   Q.   A product that goes underneath the tile to warm up the

2   bathroom floor before you walk in on a Colorado winter,

3   called Nuheat?

4   A.   Yes.

5   Q.   Now while working at Crew Tile, you were told by Ryan

6   Davis about the existence of a distributor agreement,

7   correct?

8   A.   Yes.

9   Q.   But you don't know the actual workings behind the

10  agreement, right?

11  A.   I do not.

12  Q.   I think in your deposition, it was something like that

13  wasn't information you were privy to.

14  A.   Correct.

15  Q.   You weren't part of the inner workings of the

16  management of the business, correct?

17  A.   No, I was not.

18  Q.   But it was your understanding that there was an

19  agreement in place between Crew Tile and Porcelanosa for

20  the distribution of Porcelanosa's products within Colorado,

21  excluding Aspen and Pitkin County?

22  A.   Yes.

23  Q.   There was some discussions about removing the word

24  "exclusive" from e-mails.  Do you recall that?

25  A.   I do.

1725

Cross - Griebel

1   Q.   And, in fact, the reason why the word "exclusive" was

2   a problem was because Porcelanosa had an existing agreement

3   with Balentine up in Aspen, right?

4   A.   Yes.

5   Q.   So by using the word "exclusive" Colorado distributor,

6   that would run afoul of the territory that already existed

7   in the Aspen Valley, correct?

8   A.   Yes.

9   Q.   And same goes with the website, if you were to put

10  "exclusive" on the website, Crew Tile didn't have all of

11  Colorado, because Aspen was excluded, correct?

12  A.   Yes.

13  Q.   In terms of just written agreements in general for

14  Crew Tile, it just wasn't part of your job to be involved

15  in any written agreements; is that right?

16  A.   That's correct.

17  Q.   So, say, written agreements to obtain display racks

18  with Porcelanosa, you wouldn't have been involved in

19  that?

20  A.   I wouldn't have.

21  Q.   Okay.  Any type of applications made for credit terms

22  with Porcelanosa, you wouldn't have been involved in

23  that?

24  A.   I would not have.

25  Q.   And any agreement in terms of the distribution rights

1726

Cross - Griebel

1   of Crew Tile with Porcelanosa, that's not something you

2   would have been involved in, right?

3   A.   That's correct.

4   Q.   Okay.  Your job was outside sales, I believe the

5   territory north of I-70 and up into the mountains; is that

6   right?

7   A.   That is.

8   Q.   Your primary job was selling the tile as a distributor

9   for Porcelanosa's products?

10  A.   Yes.

11  Q.   Now, in October of 2010, you left Crew Tile, right?

12  A.   Yes, I did.

13  Q.   I think you previously testified you wanted to go back

14  into the tech industry --

15  A.   That's correct.

16  Q.   -- right?

17       And at the time you left, Crew Tile was gaining

18  traction, wasn't it?

19  A.   Yes.

20  Q.   You had gone out and worked to obtain orders and those

21  orders were starting to come in, right?

22  A.   They were.

23  Q.   And business was better in 2010 than it was when you

24  got the project started in 2009, right?

25  A.   It was.

1727

Cross - Griebel

1  Q.   Now, meeting with Jack Handley back in the fall of

2  2009, you understood from that visit that Crew Tile was

3  going to be a distributor for Porcelanosa tile, correct?

4         MR. THOMAIDIS:  Your Honor, asked and answered.

5         THE COURT:  One second.  Sustained.

6  BY MR. CROUGH:

7  Q.   In terms of Crew Tile's business model, selling to

8  dealers, you learned that in speaking with Jack Handley and

9  how Crew Tile was going to go about becoming a distributor;

10 is that right?

11 A.   Can you repeat the question?

12 Q.   Sure.  I'm trying to get a little bit more

13 understanding of what happened there in California when you

14 specifically are interfacing with Jack Handley.  During

15 that meeting, you're in California with Ryan Davis at the

16 Porcelanosa facility, you're talking about becoming a

17 distributor for Porcelanosa, right?

18 A.   Yes.

19 Q.   And those are the words -- when you're talking with

20 Jack Handley, the word "distributor" is used, right?

21 A.   I -- I can't remember if the exact word

22 "distributor" -- I -- I can't say 100 percent it was.

23 Q.   Fair enough.  Your understanding is that a distributor

24 buys from a manufacturer and then sells on to dealers,

25 correct?

1728

Cross - Griebel

1    A.   Yes.

2    Q.   And that's what Crew Tile was doing?

3    A.   Yes.

4         MR. CROUGH:  Your Honor, may I have a moment?

5         THE COURT:  You may.

6  BY MR. CROUGH:

7    Q.   If we could please put up Plaintiffs' Exhibit 2,

8  neither admitted nor stipulated.

9         Now, Mr. Griebel, you had testified that you were

10  involved in the creation of the Crew Tile website, correct?

11    A.   Yes.

12    Q.   Do you recognize -- if we could page through, I

13  believe there's four pages of this document, briefly, for

14  Mr. Griebel.

15         Do you recognize these images?

16    A.   I do.

17    Q.   How do you recognize them?

18    A.   I am the one that put that altogether.

19    Q.   And is this a fair and accurate representation of what

20  you put together?

21    A.   Yes, it is.

22         MR. CROUGH:  Your Honor, I move to admit

23  Plaintiffs' Exhibit 2 into evidence.

24         THE COURT:  Is there an objection?

25         MR. THOMAIDIS:  We have no objection, Your

Cross - Griebel

1  Honor.

2        THE COURT:  All right.  There being no objection,

3  Exhibit 2 is admitted into evidence and may be published to

4  the jury.

5        (Plaintiffs' Exhibit 2 received)

6  BY MR. CROUGH:

7  Q.   Mr. Griebel, this is screenshots from Crew Tile

8  Distribution's website, correct?

9  A.   Yes, it is.

10  Q.   And this is a website that you created for Crew Tile,

11  correct?

12  A.   Yes.

13  Q.   And if we page through the exhibits, I see there's

14  some New with Crew on the first page, tile and stone here

15  on the second, looks like floor tiles, mosaics, wall tiles,

16  and third page, ventilated facades.  Mention of a Butech, I

17  see Porcelanosa's logo down here.  Tile kitchen, bath.  And

18  then I believe the fourth page, bathroom and complete

19  kitchens.

20        So in looking at these, these are all Porcelanosa

21  product, correct?

22  A.   Those are.

23  Q.   And there aren't any other products other than

24  Porcelanosa on Crew's website, right?

25  A.   Correct.

1730

Cross - Griebel

1  Q.   And, in fact, at the bottom of the website, you have

2  Porcelanosa's own logo on Crew Tile's website available for

3  the world to see, right?

4  A.   Yes.

5  Q.   Did anybody at Porcelanosa tell you, You can't use

6  our -- I think -- is that a registered trademark?  It's too

7  small for me to read.  Does it say TM?  Registered --

8  registered mark.  Whatever that little circle thing up

9  there.  That's an intellectual property mark, right?  Did

10  anybody at Porcelanosa tell you to take that down?

11  A.   No.

12  Q.   And when you built the Porcelanosa website, you came

13  back, after you had left Crew Tile and they asked you to

14  come back and create the website -- or update the website;

15  is that fair?

16  A.   Yes.

17  Q.   And when you updated the website, you're updating it

18  with the current Porcelanosa's products, right?

19  A.   Correct.

20  Q.   The purpose of this website is to make sure that if

21  someone's looking in Colorado on their search browser for

22  Porcelanosa, that this is the website that comes up, right?

23  A.   That's correct.

24        MR. CROUGH:  Nothing more for this witness.  Thank

25  you.

1731

Redirect - Griebel

1    THE COURT:  All right.  Redirect.

2    MR. THOMAIDIS:  Thank you, Your Honor.

3              REDIRECT EXAMINATION

4  BY MR. THOMAIDIS:

5  Q.   So, actually, would you mind just leaving that exhibit

6  up, please.

7         So, Mr. Crough had asked you some questions about

8  this website.  Is this the original website that you had

9  done before leaving Crew Tile Distribution or was this

10  something that you had done after you had returned -- maybe

11  while you were freelancing?  Is that an appropriate word?

12  A.   This one was the original.

13  Q.   Okay.  And so when would you have built this website?

14  A.   Actually, I'm trying to look.

15  Q.   We can try to expand something if you need to get a

16  closer look.  It may not be a very high resolution.

17  A.   I was trying to see some -- the original website I

18  built was kind of -- it didn't have flash on it, which

19  makes the -- that home screen kind of click through on its

20  own.  And I'm trying to see.  I can't remember, this might

21  be the second one that I built because looking at the icon

22  where it's hovering over this kitchen, I'm thinking this is

23  actually the second one when I was wanting -- built the

24  second time around.

25  Q.   Okay.  And so when you built this website, did you

Redirect - Griebel

1    understand that Crew Tile Distribution was authorized to

2    use any of these phrases, brands, images?

3    A.    Yes.

4    Q.    And who did you hear that from?

5    A.    From Ryan.

6    Q.    Did you ever do any independent investigation to

7    verify whether that was, in fact, correct?

8    A.    No, I did not.

9    Q.    Okay.  And so how did you get -- if we could please

10   scroll to the page where it has the Porcelanosa logo.

11   There you go.  That will work.

12         You'll notice at the bottom of the page, Mr.

13   Crough asked you about the use of that Porcelanosa logo.

14   Do you see it?  It's very small down there at the bottom of

15   the page.

16   A.    Yes.

17   Q.    So how did you get that logo?

18   A.    I would have gotten that from just like -- I Google

19   image search to find a high resolution version of it.

20   Q.    Okay.  And so did Mr. Davis ever give you any images

21   that were properly authorized by Porcelanosa Los Angeles,

22   for example, to put on the website?

23         MR. CROUGH:  Objection, Your Honor.  Form,

24   "properly authorized."

25         THE COURT:  Rephrase.

1733

Redirect - Griebel

1   BY MR. THOMAIDIS:

2   Q.   Did Mr. Davis ever give you any images from

3   Porcelanosa to put on the website?

4   A.   Yes.  He would send me over their recent catalogs that

5   he'd get from Jack and then that's how I grabbed the

6   pictures to build the website.

7   Q.   Okay.  So those were the actual electronic catalogs

8   that were received typically on a little jump drive,

9   correct?

10  A.   Correct.

11  Q.   Okay.  And it was from that that you then pulled up

12  these pictures; is that right?

13  A.   That's correct.

14  Q.   Okay.  And so I want you to recollect for me, just to

15  the best you can, what were you told about the agreement

16  between Crew Tile Distribution and Porcelanosa Los Angeles,

17  or any other company, what were you told by Ryan Davis

18  about what that agreement said?

19  A.   It was essentially just that we were the Colorado

20  distributor outside of Balentine, and so we were -- you

21  know, they'd supply us samples and catalogs and they were

22  supporting us selling that outside of that existing

23  Balentine Aspen relationship.

24  Q.   So did he ever reference any specific terms of any

25  specific contract or did he simply refer to this as an

Redirect - Griebel

1   agreement?

2   A.   Just as an agreement.

3   Q.   Did he ever mention the word "written contract"?

4   A.   I don't recall a written contract being mentioned.

5   Q.   And you indicated that you were -- that Crew Tile

6   Distribution was quote, unquote, gaining traction.  Do you

7   remember that?

8   A.   Yes, I do.

9   Q.   Approximately when was Crew Tile Distribution gaining

10   traction?

11   A.   I would say spring 2010 is when I started to get more

12   requests for pricing and more requests for samples to be

13   taken out.  Spring into summer.

14   Q.   And so when you indicated that Crew Tile Distribution

15   was gaining traction, would the economy as a whole have

16   been gaining traction as well?

17   A.   I think we were -- I think the economy as a whole

18   would have been starting to come back as well.

19   Q.   Okay.  And Mr. Crough asked you briefly about a couple

20   of products and a couple of companies, one was a company

21   called Quick Drain.  Do you recall ever selling Quick Drain

22   products?

23   A.   I recall -- I don't know if I ever personally sold it,

24   but I recall, you know, taking -- or getting that

25   information when I would talk about the tile, as it would

1735

Redirect - Griebel

1   work well with Porcelanosa tile because it would kind of

2   sit underneath it.  So I can recall bringing it up, but I

3   don't know if I ever sold it.

4   Q.   Do you know what -- would there be a lay terminology

5   for what that product was?

6   A.   I think -- like a recessed floor -- or like a recessed

7   floor drain would be my best kind of layman's term of it.

8   Q.   Is it -- is there such a thing as a shower pan?

9   A.   Yes.

10  Q.   Okay.  Is this the same thing as a shower pan?

11  A.   No.

12  Q.   Okay.  And so this would actually be the drain system?

13  A.   This would be the drain system that would sit in the

14  pan.

15  Q.   Okay.  And did you ever do any inquiry as to whether

16  there was a Porcelanosa brand or Porcelanosa company that

17  was also manufacturing those that Crew Tile could have or

18  perhaps should have been selling?

19  A.   I didn't know of it.

20  Q.   And what about the company, Nuheat?  Tell me what

21  Nuheat manufactures.

22  A.   So Nuheat is under -- under your tile, heating -- you

23  got a thermostat on the wall, so when you get out of the

24  shower, your tile's warm.  So it goes right underneath

25  it.

1736

Redirect - Griebel

1  Q.   Sounds nice.  Did you ever do any inquiry as to

2  whether there was a Porcelanosa brand product or

3  Porcelanosa company that was manufacturing under-floor

4  heating at that time?

5  A.   I didn't.

6  Q.   Were you ever directed by Ryan Davis to do any of

7  those things?

8  A.   I was not.

9  Q.   Okay.  And so tell me just briefly, based on your time

10  in the tile industry, what exactly does it mean to be a

11  dealer?

12  A.   The dealer is responsible for being that regional

13  point of contact, so the people in that region, they come

14  to you for tile samples, they come to you for catalogs and

15  pricing, and you're essentially their focal point of

16  contact to get them what they will need.

17  Q.   And was it your understanding that those people had to

18  fill out any paperwork in order to become a dealer of, for

19  instance, Porcelanosa products?

20  A.   I would think so, but I didn't -- I wasn't part of

21  filling out that information.

22  Q.   Okay.  And what's your definition of a distributor?

23  A.   I guess I would think of it as -- maybe I'm mixing

24  them up in my head.  I think I got a dealer or distributor

25  as one and the same.

1737

Redirect - Griebel

1   Q.   Okay.  So what does it mean to then be an exclusive

2   either dealer or distributor?

3   A.   That would mean that you're the only person in that

4   area that can sell that, so you're not -- you know, you're

5   not selling what the tile store down the road is selling,

6   you're the only person they can get it from.

7   Q.   Okay.  And so to your recollection when you worked

8   with Crew Tile Distribution, did you ever sell any -- any

9   Porcelanosa brand products or any other brands to retail

10  customers, to customers off the street?

11  A.   I know we had -- I can't recall if they went to the

12  actual purchase space, but I know when we had the showroom,

13  we would have people come in off the street looking for

14  tile and wanting pricing information.

15  Q.   And that was the showroom at the Denver Design

16  District?

17  A.   That's correct.

18  Q.   And so would you sell those products to them?

19  A.   Yeah.  If they -- I mean, if they wanted to buy it,

20  yeah.

21  Q.   So to your recollection, while you were Crew Tile

22  Distribution, did you ever install any tile?

23  A.   I remember -- I can't remember -- I'm trying to think

24  of the name of it.  Studio -- I think Studio 2B, or Studio

25  something.  It was an interior designer and we sold -- I

1738

Redirect - Griebel

1    didn't sell her, my counterpart, Bob, had sold her tile,

2    and I think we had people that we used before install it.

3    Q.   And those were people that were employed by Crew Tile

4    Distribution?

5    A.   No, they were existing -- like existing installers we

6    worked with before.

7    Q.   I see.  And so how was Crew Tile Distribution doing

8    from a financial standpoint, at least to the best you can

9    recollect, when you left the company?

10             MR. CROUGH:  Objection.  Foundation.

11             THE COURT:  Sustained.

12   BY MR. THOMAIDIS:

13   Q.   Did you have any reason to believe, when you left the

14   company, that the company was successful?

15   A.   I would say -- I would say it was on the path to

16   success.  I mean, I can't tell you financials, but I knew

17   it was -- they were starting to get more projects coming

18   in.  But I can't tell you financially that.

19   Q.   Did you have similar problems with being paid timely

20   when you were with Crew Tile Distribution as when you were

21   with Infinite Flooring & Design?

22   A.   There were maybe a few times that they were late, but

23   it was a lot more regularly that we were getting paid on

24   time.

25   Q.   Okay.  How many times would you say that Crew Tile

1739

Redirect - Griebel

1    Distribution was late in paying you?

2    A.    Probably -- I -- I would say less than five times.

3    Q.    Okay.

4         MR. THOMAIDIS:  Your Honor, I have no further

5    questions.

6         THE COURT:  All right.  Thank you.  May this

7    witness be excused?

8         MR. THOMAIDIS:  He may, Your Honor.

9         THE COURT:  And for the plaintiff?

10        MR. CROUGH:  Yes, Your Honor.

11        THE COURT:  Mr. Griebel, thank you for joining us.

12   You're excused.  You may step down.

13        THE WITNESS:  Thank you.

14        THE COURT:  Defendant/counterclaimants may call

15   their next witness.

16        MR. THOMAIDIS:  At this time, Your Honor,

17   defendants and counterclaimants call Manuel Prior Diago.

18        THE COURT:  All right.

19      MANUEL PRIOR DIAGO, DEFENDANTS' WITNESS, SWORN

20        COURTROOM DEPUTY:  Please be seated.  State your

21   full name for the record and spell your first and last

22   name.

23        THE WITNESS:  My name is Manuel Prior Diago,

24   M-a-n-u-e-l, P-r-i-o-r, D-i-a-g-o.

25        THE COURT:  Mr. Thomaidis, you have 55 minutes on

Direct - Drago

1    direct examination.

2                          DIRECT EXAMINATION

3    BY MR. THOMAIDIS:

4    Q.    So, Mr. Prior, what is your current place of

5    residence?

6    A.    I live in New York.

7    Q.    Okay.  And how long have you been employed by

8    Porcelanosa SA?

9    A.    I started working for Porcelanosa is in March of

10   2008.

11   Q.    Okay.

12         MR. BURG:  I'm sorry, I didn't hear the year, Your

13   Honor.  I didn't hear that.

14         MR. THOMAIDIS:  March of 2008.

15         MR. BURG:  2008.

16   BY MR. THOMAIDIS:

17   Q.    That is correct, 2008?

18   A.    2008.

19   Q.    And so would you please tell us a little bit and tell

20   the Court and the jury a little bit about who you are

21   outside of Porcelanosa, the Porcelanosa companies in the

22   United States.

23   A.    Well, I grew up in Spain, in the East Coast of Spain,

24   just a few miles away from -- five miles away, you know, a

25   few miles away, I would say, from where the Porcelanosa

Direct - Drago

1    factory's located in a town called Nules, that is about

2    10,000 people.  I went to school there, high school.  And

3    then when I finish high school, I moved to Valencia, which

4    is the biggest town around.  That is about, I would say,

5    30, 40 miles away from my hometown.  And I went and I did

6    there, you know, my business in -- my bachelor degree in

7    business and economics.

8         And afterwards when I got the degree, I came to

9    the United States to learn English and spend here almost

10   one year learning the language, and I applied for

11   scholarships and I got assistanceship in Southern --

12   Southeastern Louisiana University.  And I did earn my MBA

13   for almost two years until I graduated and then I went back

14   to Spain.

15        And I started working in Spain for -- first it was

16   a software firm for a very few months, then I changed my

17   job to consulting.  I was working consulting almost, I

18   would say, about four or five years.

19        And then I moved to another company, and that is

20   called Roca, is the largest sanitary product manufacturer

21   in the world.  And back then it was in the biggest

22   expansion, so I was part of the team that was in charge of

23   acquiring new businesses, building new factories, until the

24   opportunity came up in 2008, I started working for

25   Porcelanosa.

1742

Direct - Drago

1   Q.    Thank you.  Now, what about your life outside of

2   education and Porcelanosa as a job.

3   A.    Well, when I started working for Porcelanosa, instead

4   of coming to the United States, I was put in charge of the

5   business here.  And I met my wife back in 2010, we started

6   going out together, we got married in 2014, and we have a

7   boy that is going to turn one year next week.

8   Q.    And if I understand correctly, you're going to miss

9   his birthday.

10  A.    Yeah.  I'm going to be here, yes.

11  Q.    The demand of the job.  So what is your current

12  position with Porcelanosa in the United States?

13  A.    I'm the director of the -- of -- Porven, P-o-r-v-e-n,

14  Limited, and Porcelanosa New York, Inc., Porcelanosa

15  Maryland, Inc., Porcelanosa Florida Corporation,

16  Porcelanosa Texas Corporation, Porcelanosa Los Angeles, and

17  Porcelanosa San Francisco.  I'm also the director of

18  Porcelanosa East Canada.

19  Q.    Okay.  And so do you consider Porcelanosa the

20  companies that you oversee in the United States, including

21  Porven, and the defendants in this case, which are

22  Porcelanosa Los Angeles, Incorporated, Porcelanosa

23  New York, Incorporated, Porcelanosa Texas Corporation, as

24  well as Porven, Limited, do you consider them to be ethical

25  companies?

1743

Direct - Drago

1    A.    Highly ethical company.  We are a family owned

2    business where I think their standards are the highest.

3    Q.    So give us just a very brief explanation about

4    Porcelanosa's background as a economy.

5    A.    Porcelanosa started 43 years ago and -- in Spain, as I

6    said, in a small town -- well, a small town next to mine

7    called Villarreal.  And it was started by two families that

8    after a few years of very -- they were farmers growing

9    oranges, orange juice.  And after a few years of very bad

10   harvest and they decided that they wanted, you know, to

11   start with a business with a more stable kind of turn over.

12         So they -- there is a long tradition in our area

13   about ceramics, that comes from the middle ages when the

14   Moors were in Spain.  And there is a lot of people that we

15   had knowledge about that, so they flown, you know, a few --

16   a few artisans back then, and they started, you know, with

17   the idea of having -- they wanted to have a higher-end kind

18   of tile.

19         They didn't want to be -- because back then the

20   few factories that were in Spain, they were manufacturing

21   very cheap tile; they wanted to go to a higher quality.

22   Q.    Thank you.

23   A.    So the company started there and has been growing

24   for -- I mean, manufacturing facilities, and they started,

25   you know, having their own distribution centers, first in

Direct - Drago

1    Spain, then becoming international, moving to France, to

2    the UK and Italy.  And finally they come to the United

3    States.

4         First it was the distribution centers and also as

5    part of the distribution center, they start building their

6    own showrooms.

7    Q.   Okay.  Thank you.  So I'm going to start in terms of

8    questioning you with a couple of exhibits.  May we please

9    turn to Plaintiffs' Exhibit 227.

10        So, Mr. Prior, I want to ask you just a couple of

11   questions about this document.  And it's been used

12   periodically through the testimony, so I'm assuming you've

13   at least looked at it, correct.

14   A.   Yes, I've seen it.

15   Q.   So as you review this document, is there anything

16   that's incorrect about it?

17   A.   Well, I find very incorrect the way that the business

18   is set up here in the United States.  We have the

19   manufacturing Porcelanosa, and then we do the territories.

20   In this case it's going to be Porcelanosa Los Angeles,

21   Porcelanosa New York, Porcelanosa Maryland, or any other

22   Porcelanosa here in the United States, we are the

23   distributor here.

24   Q.   And is that a business model that's been established

25   for some time by Porcelanosa in the United States?

1745

Direct - Drago

1   A.   Yes.  Has been for many years.

2   Q.   Okay.  And so when you say a distributor, does that

3   mean that, for instance, Porcelanosa Los Angeles is set up

4   to handle very large quantities of inventory?

5        MR. TeSELLE:  Objection, Your Honor.  Leading his

6   witness.

7        THE COURT:  Sustained.

8   BY MR. THOMAIDIS:

9   Q.   So what makes for a distributor?

10  A.   Distributor is the one that imports the tile, bought

11  the containers from the manufacturer and brings it from the

12  distributor center.  Eventually the materials in this case,

13  the tile, gets distributed.

14  Q.   And so Porcelanosa SA has a fairly broad product line,

15  correct?

16  A.   Yes.

17  Q.   Can you just briefly give an overview of the companies

18  and the types of products they manufacture.

19  A.   We manufacture, I mean, tile, that's the core

20  business.  That's where the company started.  And within

21  the tile, we have floor tile, we have the wall tile, I

22  mean, and we have also -- we have top quality, we just got

23  like first top quality.

24       There are some other factories, they manufacture,

25  they have different levels of quality, we just have the

1746

1    top.  And -- but at the same time, we also have some other

2    factories under Porcelanosa which is factories that my --

3    well, we have another one that is Venice that they

4    manufacture tile, too.  I mean, should be the same quality,

5    it remains the same, the difference is that we have two

6    different teams, design teams and production teams, that

7    they compete with each other.  And even though they are

8    very close located but they compete with each other.

9         We have -- L'antic Colonial, which is not a -- is

10   more focusing on natural products such as stone, natural

11   stone, hybrid mosaics.  We also have Ceranco -- well, we

12   have -- yeah, we have Ceranco, we changed the name later

13   on, that is manufacturing tile, but like a cheaper version

14   of tile.

15        We have Systempool that manufactures showers, and

16   also the distribution to the collection -- -- Systempool

17   manufacturers shower columns, and also Krion, K-r-i-o-n,

18   which is kind of a mineral resin, similar, let's say, you

19   know, just to make a comparison to Corian, although it's

20   not exactly the same.

21        We have also Noken, which is focusing more on

22   behalf of the plumbing products.  We have Cabinetmaker that

23   is the cabinetry maker, that manufactures cabinetry for

24   kitchens and vanities.  And Butech, and Butech is the

25   building solutions, you know, for construction.

Direct - Drago

1    Q.   Thank you very much.  So in the United States, does

2    Porcelanosa Los Angeles, Porcelanosa Texas, any of the

3    other companies that you've described, do any of them

4    distribute or do distribution through third parties?

5    A.   Yeah.  I mean, they have -- we have import all the

6    tile from Spain and we carry the inventory.  We have the

7    inventory here in the United States and the distribution

8    centers that we already have.  And from the distribution

9    center we distribute that to different kind of customers.

10   Q.   And I think maybe you misunderstood my question.

11   Those companies, the companies I described, Porcelanosa Los

12   Angeles, it is technically a distributor of Porcelanosa's

13   products; would you agree?

14   A.   Yes.  Yes.

15   Q.   Okay.  And so my question there was does Porcelanosa

16   distribute products through third parties, so companies

17   that are not those companies?

18   A.   You mean some other import from another factory?

19   Q.   No.  I mean, like, for instance, with a dealer who has

20   filled out the appropriate application; do you distribute

21   product through dealers like that?

22   A.   Yes.  Yes, we sell to dealers and the dealers sell to,

23   you know, to their customers.

24   Q.   Okay.  And so, for example, there's been some

25   discussion in this case about Facings of America.

1748

Direct - Drago

1   A.   Yeah.

2   Q.   Are you familiar with the company Facings of America?

3   A.   Yes, familiar with it.

4   Q.   And so what -- first of all, how long has Facings of

5   America been a dealer of Porcelanosa's products?

6   A.   Well, from what I hear to -- I mean, they have been in

7   business with us for more than 30 years.

8   Q.   Okay.  And in the course of doing their business, do

9   they have multiple locations?

10  A.   Yeah, they have two as far as I know.

11  Q.   Okay.  And those are located in Arizona; is that

12  right?

13  A.   Yeah.

14  Q.   And do you recollect the locations, city-wise?

15  A.   I think it's Phoenix and Scottsdale.

16  Q.   And so for a time, was Facings of America purchasing

17  Porcelanosa brand tile products in bulk, as in a container,

18  which has been mentioned previously in this litigation?

19  A.   Yes.  They were -- they were buying containers.

20  Q.   So for a time, were they permitted to use -- to be on

21  the Porcelanosa website as a distributor of Porcelanosa's

22  product?

23          MR. TeSELLE:  Object.  Leading again.

24          THE COURT:  Overruled.

25          THE WITNESS:  Yes.  Yes.  We put them on the

Direct - Drago

1    website.

2    BY MR. THOMAIDIS:

3    Q.   Okay.  And so was there ultimately a business decision

4    made that Porcelanosa was only going to promote Porcelanosa

5    on Porcelanosa's websites?

6    A.   Yeah, I remember that we put them up in the website

7    because, I mean, they were buying in bulk like a lot of

8    containers, and we put them -- I mean, the thing is

9    afterwards we started, you know, receiving a lot of

10   requests from many other dealers around the country about

11   being up on our website.

12        And at that point, I remember -- I made a decision

13   not to put anybody else.  And eventually I ask, in this

14   case Paco Montilla, to talk to the Facings of America to

15   let them know that after a certain period of time, I mean,

16   they were going to be removed from the website, too.

17   Q.   Okay.  And to your knowledge, did Mr. Montilla -- did

18   he field other requests to be put on the website as either

19   a dealer or a distributor or some other terminology?

20        MR. TeSELLE:  Objection.  Foundation.  Personal

21   knowledge.

22        THE COURT:  Yeah.  Sustained.

23   BY MR. THOMAIDIS:

24   Q.   So to your knowledge, were their dealers that wanted

25   to be on the website?

1750

Direct - Drago

1    A.   Yes, there were many others.   Everybody wanted to --

2    it became an issue to manage that because we were having

3    requests from everywhere.

4    Q.   And so in some cases, did they not make it on the

5    website?

6    A.   No, we didn't put anybody else because once you make

7    an exception, it becomes a problem for us because who --

8    you cannot tell a customer, You are not a good dealer,

9    you're a bad dealer, you're a mediocre dealer, so we

10   decided not to put in anybody else.

11   Q.   And so who manages the Porcelanosa -- I'm going to use

12   the moniker Porcelanosa USA and I want to address it before

13   I'm finished with you, but in the United States, who

14   manages the website domestically?

15   A.   We have an IT department that's in touch with it.

16   Q.   So Mr. Montilla wouldn't be directly responsible, for

17   instance, changing text on a website?

18   A.   Not directly.   I mean, not -- it is has to go through

19   marketing, even though -- I mean, he was -- I mean, his

20   input was very welcome and he was helping out, you know,

21   with whatever was requested from him.

22   Q.   Okay.  And so I would like to please move to

23   Plaintiffs' Exhibit 223.   Excuse me, 233.

24        MR. THOMAIDIS:   And, Your Honor, at this point

25   before we move forward, I do have a -- not a too

1751

Direct - Drago

1    substantial list of exhibits that are stipulated, but not

2    yet admitted.

3            THE COURT:  All right.  Go ahead.

4            MR. THOMAIDIS:  I'm going to try to get to them

5    today.  A-3 --

6            THE COURT:  Well, if they're going to be through

7    this witness, you are going to get to them today.

8            MR. THOMAIDIS:  That's correct.  And --

9            THE COURT:  He's not going to testify tomorrow.

10           MR. THOMAIDIS:  Understood, yes.  A-3, A-6, A-22,

11   A-72.

12           THE COURT:  A what?

13           MR. THOMAIDIS:  A-72.

14           THE COURT:  72.

15           MR. THOMAIDIS:  A-92, B-19, and B-65.

16           THE COURT:  All right.  These are all stipulated?

17           MR. THOMAIDIS:  I -- that's correct, Your Honor.

18           THE COURT:  You think or you know?

19           MR. THOMAIDIS:  According to my records, they are.

20           MR. CROUGH:  They are.

21           MR. TeSELLE:  They are.

22           MR. THOMAIDIS:  According to plaintiffs' records,

23   they are.

24           THE COURT:  Okay.  Given the stipulations, the

25   following exhibits are admitted into evidence and may be

1752

Direct - Drago

1    published to the jury.  A-3, A-6, A-22, A-72, A-92, B-19,

2    and B-65.

3         (Defendants' Exhibits A-3, A-6, A-22, A-72, A-92,

4    B-19, and B-65 received)

5    BY MR. THOMAIDIS:

6    Q.   So, Mr. Prior, I want you to take a quick look at this

7    document that's been used as a demonstrative by plaintiffs

8    in this case.  To the best of your recollection, were

9    Porcelanosa's total brand product sales in Colorado

10   $89,938.26 in 2008?

11   A.   Yes.

12   Q.   And in 2009, were Porcelanosa's total sales of their

13   products in Colorado, $132,334.16?

14   A.   Yes.

15   Q.   And in 2010, were Porcelanosa's total product sales in

16   Colorado, $240,962.21?

17   A.   Yes.

18   Q.   And in 2011, were Porcelanosa's total product sales in

19   the state of Colorado, $267,835.20?

20   A.   Yes.

21   Q.   And in 2012, were Porcelanosa's total product sales in

22   Colorado, $914,700.34?

23   A.   Yes, there was -- those numbers, especially the one

24   in -- I would like to clarify something in 2012.  The 19 --

25             MR. TeSELLE:  Object.  I don't know if there's a

Direct - Drago

1   question pending.  He just asked whether that number was

2   correct; he said yes.

3              THE COURT:  All right.

4              MR. THOMAIDIS:  Sorry.

5              THE COURT:  Ask the next question.

6   BY MR. THOMAIDIS:

7   Q.    So is that number correct?

8   A.    That's correct.  It was invoiced to Colorado, yes.

9   Q.    Okay.  Now, was it invoiced to a Colorado address or

10  was it delivered to a Colorado address?

11  A.    That was on an invoice to Colorado address in 2012.

12  There was a very large project that was shipped to San

13  Diego that was Sheridan Convention Center in San Diego that

14  was shipped to San Diego because the job site was there and

15  the hotel was there, but the order went through a

16  procurement company called Benjamin West that is located

17  here in Colorado.  So they negotiated the prices with us

18  even though they didn't specify anything.  So the input was

19  from the Anaheim warehouse, the goods were shipped to San

20  Diego, but the invoice was coming to Benjamin West here in

21  Colorado.  So that's why you have such a dramatic growth

22  from 2011 to 2012, because it's $455,000.

23  Q.    So to the best of your recollection, that single

24  project for the Sheridan Convention Center in San Diego,

25  that was actually purchased by a procurement company here

Direct - Drago

1   in Colorado.  What was the total value of that project?

2   A.   The total value of the project was a little bit less

3   than 1 million in total.

4   Q.   And so how much Porcelanosa product was sold in there

5   coming through this Benjamin West Company?

6   A.   We sold -- yeah, it was 960, something thousand, if

7   I'm -- we sold the -- it was a sink with a vanity

8   incorporated with a plumbing.  We didn't sell the tile.

9   Q.   And so as it relates to the Benjamin West location in

10  Colorado, how many dollars were sold through that company?

11  A.   We -- well, all the invoices went through that

12  company.

13  Q.   So was that the 455,000 --

14  A.   455,000 in 2012, and the rest of them only add up to

15  almost $1 million in 2013.

16  Q.   Okay.  And so what would have to happen to this bar

17  chart with respect to that sale if it was to be accurate

18  with respect to sales that actually came to and were used

19  in Colorado?

20  A.   Well, it's going to be -- I mean, not even half of

21  this.

22  Q.   Okay.  And so I'd like to talk to you now for just a

23  couple of minutes about Porcelanosa's history over the last

24  decade or decade and a few years.  You obviously are

25  familiar with the Great Recession, correct?

Direct - Drago

1   A.   Yes.   I started working -- I took over the company

2   here in the United States in -- my first year here was in

3   April 2008.

4   Q.   Okay.  And so what was the situation with the company

5   at that time?

6   A.   Well, the company was in a very bad shape for

7   devastation, of course.  Also, I mean, there was like

8   they -- the management -- the management team before my

9   time, I mean, there was a former CEO that took over the

10  company for almost four years, I think that just somebody

11  mentioned him, and they didn't do a very good job

12  organizing the company back then.

13       So one of the owners took over the responsibility

14  of this market and I came with him, and we started working

15  together to reorganize the business in 2008.

16  Q.   Okay.  And so what were some of the effects of the

17  Great Recession on the companies we've discussed, Porven

18  Limited, Porcelanosa Los Angeles, Porcelanosa New York,

19  what were some of the physical effects?

20  A.   Well, back then we had to shut down our showrooms.  I

21  mean, three of them.  We had to let go our employees.  We

22  had to watch for loans for more -- to put mortgages in our

23  properties in order to keep the business running.  Even to

24  sell some real estate that we owned back then.  On top of

25  that, we also have to ask for additional capital literally

Direct - Drago

1    to the parent company in Spain.

2    Q.    And so what were some of the effects on -- let me ask

3    a preliminary question:  How many employees does

4    Porcelanosa employ in the United States presently?

5    A.    Presently in the -- well, the United States we are

6    430.

7    Q.    Okay.  And so what were the effects of the Great

8    Recession on the number of employees that Porcelanosa had

9    in the United States?

10   A.    I mean, we went down to 150.

11   Q.    And so did those people have to be downsized?

12   A.    Yeah.  We had to downsize, I mean, most of the

13   operations.

14   Q.    Okay.  And so what effect did the Great Recession and

15   the housing bust that has been termed, what effects did

16   those have on Porcelanosa -- the Porcelanosa companies in

17   the United States financially?

18   A.    I mean, the sales were going down through 2008, 2009.

19   I mean, and we were losing a lot of money.

20   Q.    Okay.  And so what ended up happening in 2009, to the

21   best of your recollection?

22   A.    We started reorganizing, we started turning all the

23   companies here.  And finally by the last quarter of 2009,

24   we -- I mean, we stopped the bleeding somehow and things

25   started to get better.  The bleeding was like very -- I

Direct - Drago

1    mean, light; signs of recovery; but I mean, we come from

2    the recovery in 2010.

3    Q.    And so did Porcelanosa sales in the United States

4    begin to grow?

5    A.    Yes.   We started growing in from -- I mean, the 2008

6    was a very bad year.   2010 we were growing, and from 2010

7    until today, we have been growing to a very solid double

8    digit.   We have been growing, I mean, during the first

9    period it was like 30 percent and the last couple of years

10   we have been growing, for instance 2016, 50 percent.

11   Q.    And so I'd like to -- I'd like to quickly go back to

12   plaintiffs' trial Exhibit 225.

13            THE COURT:   You know, counsel, before we do that,

14   this is probably a good time for our afternoon break.

15            MR. THOMAIDIS:   Thank you, Your Honor.

16            THE COURT:   All right.   We will be in recess for

17   15 minutes.

18       (Recess 3:13 p.m. to 3:29 p.m.)

19            THE COURT:   Mr. Prior, I remind you that you

20   remain under oath.

21            Mr. Thomaidis, you may resume your examination.

22            MR. THOMAIDIS:   Thank you, Your Honor.

23   BY MR. THOMAIDIS:

24   Q.    So before we went off the record, we were talking

25   about dealers and distributors.   Can we please go to

1758

Direct - Drago

 1    stipulated Exhibit A-3, please.  And could you just blow up

 2    the bottom half of this document.

 3           So, Mr. Prior, could you tell me, do you recognize

 4    what this is?

 5    A.   Yes.

 6    Q.   And what is it?

 7    A.   It's the request that we get from our website.

 8    Q.   Okay.  And so within the companies that you oversee,

 9    approximately how many of these requests do you receive

10    annually?

11           MR. TeSELLE:  Objection.  Foundation.  If he

12    knows.

13           THE COURT:  One second.  I didn't hear the -- let

14    me read the question.

15           MR. TeSELLE:  And which company?

16           THE COURT:  Overruled.  You may answer.

17           THE WITNESS:  Well, we -- the website is for the

18    whole country, covers the whole country.  And we are

19    receiving requests like at a pace -- I think that with the

20    last marketing meeting that we had was an average of 80 per

21    day; that it comes to at the end of the year is going to be

22    close to 20,000.

23    BY MR. THOMAIDIS:

24    Q.   Okay.

25    A.   Per year.

1759

Direct - Drago

1    Q.    And so what happens when one of these is received?  Is

2    it sent to the company in a geographic area?

3    A.    Yes.  It was resent -- it was -- it gets forwarded to

4    the company that -- that is -- well, when you fill that --

5    when you make that request, you have to put your address,

6    your name, and also your state and ZIP code, so according

7    to that information, it gets forwarded, you know, to the

8    right general manager.

9    Q.    And then what happens?

10   A.    And the general manager is the one in charge for

11   providing that, you know, to the sales manager, to the

12   right sales rep.  And occasionally if it is from a region

13   that we don't have any persons, we forward that, you know,

14   to the closest dealer in this case.

15   Q.    Okay.  So can we please look at the top half of this

16   e-mail.

17        And so this would appear to be -- well, what is

18   this doing?  What is the effect of this e-mail?

19   A.    This e-mail is contact by Jack, Paco is forwarding to

20   Jack, please e-mail this person back with a contact

21   information of our best dealer in Colorado.  Copy me in on

22   this, please.

23   Q.    And so I would like to turn now to trial Exhibit D,

24   which is page -- I would just like to limit it to page 4.

25   So -- okay.

Direct - Drago

1        So do you recognize this document?

2   A.   Yes.  This is a customer application.

3   Q.   And is this the first page?

4   A.   Yes.  It is the first page of the customer

5   application.  Must be quite old form because it's got very

6   old logo.

7   Q.   So is there any other document that someone can fill

8   out, aside from this application -- this customer account

9   application?  Is there any other document that can be

10  filled out so someone can then deal or sell Porcelanosa's

11  products?

12  A.   No, that's the standard document that we have.

13  Q.   Okay.  And so now let's go ahead and move forward and

14  take a look at trial Exhibit O.  Now, this appears to be

15  another such document.  Would you agree?

16  A.   Yes.  That's a more recent one.

17  Q.   And so how do you recognize this as being a more

18  recent one?

19  A.   Because of the logo on top of the application.

20  Q.   Okay.  Can we please back up a minute.

21       And so this is a similar account application.

22  A.   Yes.  Yes.

23  Q.   So now I'd like to move forward to Plaintiffs'

24  Exhibit 29, please.

25       And so this is also an account application, this

1761

Direct - Drago

1   one appears to be dated 9-14, 2009; would you agree?

2   A.   Yes.  It is.

3   Q.   Okay.  And then I'd like to move forward to

4   Plaintiffs' Exhibit 115.

5          THE COURT:  Mr. Thomaidis, one second.

6          MR. THOMAIDIS:  Yes, Your Honor.

7          THE COURT:  We won't charge you for this time.

8          MR. THOMAIDIS:  Thank you, Your Honor.

9          THE COURT:  Sorry for the interruption.  You may

10  resume.

11         MR. THOMAIDIS:  Thank you, Your Honor.  May I

12  quickly grab a time check, just so I manage myself

13  accordingly.

14         COURTROOM DEPUTY:  Okay.  So, you have until 4:00.

15         THE COURT:  You have 21 minutes left of your

16  direct, and then you'll have 20 minutes on your redirect.

17         MR. THOMAIDIS:  Okay.  Thank you, Your Honor.

18  BY MR. THOMAIDIS:

19  Q.   So, Mr. Prior, this, like the one before it, is

20  another account application, correct?

21  A.   Yes.

22  Q.   And this is a document that -- well, what does this

23  document have the effect of doing?

24  A.   In order to create -- to have an account created in

25  Porcelanosa, you need to fill out the document, and

Direct - Drago

1    according to -- to the document, we can either give credit

2    to the -- to the customer or we can put him COD.

3    Q.   Okay.  And so if you could just blow up the top third

4    of the page, please.  And so this section here under

5    General Information, that -- it appears that COD account

6    has a dot, and credit account has an X through it.  Do you

7    see that?

8    A.   Yes.

9    Q.   Okay.  So to the best of your understanding, who --

10   what would this particular customer be seeking?

11   A.   It's going to be seeking credit.

12   Q.   Okay.  And then if we can go ahead and span that back

13   and go back to the bottom two sections of the document of

14   the -- of the first page of the document.

15        Now, what do you use this information in these --

16   in the bottom half of section 1 and the top portion of

17   section 2, what do you use that information for?

18   A.   We do credit inquiries about the financial shape of

19   these people or organizations, so we do it through either

20   Experian, we do credit reports, we also ask for references

21   of business.  And, according to that, the financial

22   department makes the final decision.

23   Q.   Okay.  And so section 2, what would be the

24   significance of listing all owners, partners, corporate

25   officers?

Direct - Drago

1    A.   Yes, because we have -- it is important to know who we

2    are dealing with.

3    Q.   Okay.  And so with the -- with respect to this

4    document, would the accounting department have concluded

5    that it was only Darlyne Davis and she was the owner slash

6    partner of this organization?

7    A.   Yes.

8    Q.   Okay.  And what about down there at the bottom?  It

9    says, Has the firm or any of its principals ever been

10   bankrupt.

11        Do you see that?

12   A.   Yes.

13   Q.   So what would the person reviewing this document

14   within, for instance, Porcelanosa Los Angeles, have

15   concluded from that?

16   A.   Well, I mean, you have a customer that has -- has been

17   bankrupt, you know, before, that's a red flag right there.

18   I mean, probably is going to be put COD right away.

19   Q.   Okay.  And so now if we could back up and take the

20   whole page.  And let's go to the second page of this

21   document.  And so if you can just explode the top portion

22   of this page.

23        So, Mr. Prior, what is the intent of having this

24   terms and conditions of the sale portion in this document?

25   A.   The terms and conditions in order to have agreement

1764

Direct - Drago

1  with the customer that we are working with of the terms of

2  Porcelanosa to work with us, the way that we are going to

3  deal with them.

4  Q.   Okay.  And so that's with respect to the sale of tile?

5  A.   Yes, to the sale of tile or any other product that we

6  have.

7  Q.   And also with regard to repayment?

8  A.   Yes, of course on the payment terms.

9  Q.   Okay.  And then the first paragraph there, kind of at

10  the bottom of this section, it says that Porcelanosa can

11  specify the terms of sale and that Porcelanosa may change

12  the terms of sale from time to time without advance notice

13  to the customer.

14       To the best of your understanding, what does that

15  mean?

16  A.   That means that even though we can give some credit

17  terms, we can -- it's up to us to change them any time.

18  Q.   Okay.  And then if we can go ahead and turn to the --

19  well, actually let me stop a second.  I'd like to go back

20  to No. 3 there.  Kind of in the middle of the page.

21       This says that, In the event that the customer

22  fails to pay for invoiced amounts or any interest thereon

23  when due and payable, then in addition to any remedies

24  available for Porcelanosa by law, Porcelanosa shall be

25  entitled to take legal proceedings for the recovery of all

Direct - Drago

1   amounts owed to Porcelanosa and to recover legal and

2   collection costs together with interest.

3          What is the purpose of that provision of this

4   contract?

5   A.   The purpose of this is to protect the company from --

6   in case that we don't get paid.

7   Q.   Okay.  And so then if we could please turn to the

8   third page of this document.  Now, if we could just blow up

9   section 8 there.

10         And this says that, At any time and from time to

11  time Porcelanosa may refuse to sell or deliver to the

12  customer or to extend credit to the customer and, if credit

13  terms are not extended to the customer, Porcelanosa may

14  also cancel all credit arrangements without notice with --

15  without notice or -- of reason.

16         What's the purpose of that provision?

17  A.   The purpose of that provision is to protect the

18  Porcelanosa business, that we don't run the business -- in

19  case there is some customer that doesn't perform according

20  to the standards, we can stop doing business with them any

21  time.

22  Q.   Okay.  And so to your recollection, did Porcelanosa

23  Los Angeles ever make the decision to cease to sell

24  products to Crew Tile Distribution?

25  A.   To?  Can you say that again?  Sorry.

Direct - Drago

1  Q.   Did Porcelanosa Los Angeles ever make the business

2  decision to cease to sell products to --

3  A.   To cease?

4  Q.   Yeah.

5  A.   To cease the -- to stop sending product, you mean?

6  Q.   Yeah.  Whether temporary or permanent.

7  A.   We stop shipping products to them many times when they

8  were put on hold because they were past over due.

9  Q.   Okay.

10 A.   And we put them on hold and they paid some amount, we

11 would release the shipping -- the shipments.  And we would

12 go back and forth with them a lot of times.

13 Q.   Okay.  And so could we please go to paragraph 11 of

14 this contract.  And that says that, This agreement

15 supersedes and takes place of all prior agreements between

16 Porcelanosa and the customer.

17      Do you see that?

18 A.   Yes.

19 Q.   What's the purpose of this provision?

20 A.   The purpose of this provision, if there is any other

21 prior credit application that states something different to

22 the latest one, that this is the one that is prevail.

23 Q.   Okay.  And so let's go ahead and look at the signature

24 block there.

25      Now, what's your understanding of this section of

Direct - Drago

 1   this agreement?  I am talking specifically about the

 2   portion following, This agreement until account is paid by

 3   full -- or paid in full?

 4   A.   In this agreement until they pay all of that.

 5   Q.   So that appears to be signed by Darlyne Davis.  Would

 6   you agree?

 7   A.   Yes.

 8   Q.   And --

 9   A.   It looks like -- I can read Darlyne Davis there.

10   Q.   I don't know who the witness is, but this would appear

11   to bear a date of March 28th, 2012; is that right?

12   A.   Right.

13   Q.   Okay.  And in the course of reviewing these

14   applications in this case, have you reviewed this

15   application, to your recollection?

16   A.   What are you saying?

17   Q.   Did you ever have a chance to review this

18   application --

19   A.   I saw this application during the course of this

20   case.

21   Q.   Okay.  And so at the bottom there, it appears that

22   there is a section called Internal Use Only.  Do you see

23   that?

24   A.   Yes.

25   Q.   So the salesperson there appears to be Jack Handley.

Direct - Drago

1    A.    Yes, it looks like.

2    Q.    When does it mean when it says customer type 200?

3    A.    It is the customer type that we have in the system, in

4    the software system for the dealer.

5    Q.    Okay.  And so the type 200 is a dealer?

6    A.    Yes.

7    Q.    And then it says, price list slash discount, platinum.

8          Do you see that?

9    A.    Yes.

10   Q.    So what does it mean to have a platinum price list

11   slash discount?

12   A.    Is that they were the -- that we had in the price

13   scheme that we had back then, it means, you know, 55

14   percent discount.  I have to say the -- like a percent off,

15   so it's 90 percent of the dealers they have this platinum

16   discount.

17   Q.    And that was because, you know -- was that because

18   everyone wanted to be platinum?

19   A.    Yeah.  I never like it.  I mean, that as a matter of

20   fact, I changed it, you know, years -- I mean, this is

21   2012, probably this is going to be the last year that we

22   had that because I was never like the platinum, gold,

23   silver thing, because you go in front of a customer and you

24   say, no, you thought -- I'm going to silver, and they are

25   going to say, No, I want gold, minimum.

Direct - Drago

1      If they say they know that it's a platinum one,

2   they will want the platinum, of course.  So -- and then it

3   decreases the capacity, you know, to apply the discounts,

4   so we change it.

5   Q.   And so this would appear that internally -- what would

6   the payment terms be?

7   A.   The payment terms is net 30.

8   Q.   Okay.  And would that have been based in part on the

9   first page and the application that was filled out?

10  A.   Yes.

11  Q.   And what about the credit limit there of 10,000?

12  Would that have been dependent on what was filled out in

13  this agreement?

14  A.   Yes.  I mean, this is something that has to be -- even

15  though I see here it's approved, I mean, it's signed by the

16  general manager, has to be submitted to accounting, and the

17  general manager has the last word on that.

18  Q.   Okay.  And so over there, it says, GM signature.  Do

19  you see that?

20  A.   Yes.

21  Q.   Do you recognize that signature?

22  A.   Yes.  I think it's Paco Montilla.

23  Q.   Okay.  So it would appear that Paco Montilla reviewed

24  and approved this document; would you agree?

25  A.   Yes.  That's correct.

Direct - Drago

1    Q.   And so what would happen after Mr. Montilla sign this?

2    Would there be another step --

3    A.   Yes, it goes -- submit it to accounting and accounts

4    receivable checks.  And if it's just a COD account, I mean,

5    they just create an account and that's it.  If there's a

6    credit limit in this case, it goes -- you know, it must be

7    approved by the financial manager.

8    Q.   Okay.  And so now I'd like to please turn to trial

9    Exhibit B-11.

10            I believe this is also admitted, Your Honor.

11            So if I could -- thank you.

12            So this, again, appears to be yet another account

13   application; would you agree?

14   A.   Yes, that's correct.

15   Q.   And this would be the only contract that Porcelanosa

16   Los Angeles would operate under to sell products to anyone,

17   correct?

18   A.   Yes.

19   Q.   And would that be a dealer of Porcelanosa's products?

20   A.   Yes.

21   Q.   What about a distributor of Porcelanosa's products?

22   A.   I mean, we work with dealers.  I mean, the only

23   distributor is Porcelanosa's companies here.

24   Q.   And I understand but, for instance, with Facings of

25   America, would they have had to fill out one of these

Direct - Drago

1    applications --

2    A.    Yeah, yeah.   They are under this application the same

3    way.

4    Q.    Okay.   Thank you.   And so let's go ahead and go to the

5    bottom of this page.   And I mean section 2 there.

6          And so this would, again, appear to list this time

7    Ryan Davis and Glenn Davis.   And then, again, it would

8    appear to show -- what would this tell your account

9    application people?

10   A.    Excuse me?   Sorry.

11   Q.    Just, I mean, based on your experience, what would

12   section 2 tell the person who was reviewing this --

13   A.    Yeah, the officers, the -- the officers and the owners

14   of the company.

15   Q.    Okay.   And this would appear to be Ryan Davis and

16   Glenn Davis as owners of the company; would you agree?

17   A.    Yeah.   That's what puts there.

18   Q.    And then, again, it says, Has the firm or any of its

19   principals ever been bankrupt?   And, again, it's marked

20   "no."

21         So what would that have told the person who was

22   reviewing this application?

23   A.    Well, I mean, this is -- I mean, the person that is

24   reviewing the application, it is very difficult to find out

25   it is a lie when it comes to bankruptcy.

Direct - Drago

1    Q.    And so then if we could please back up and go to

2    the -- I believe it's the third page of this document.    And

3    so if we could just blow up the first section.

4          And this appears to be substantially the same as

5    the document that we reviewed previously; is that right?

6    A.    Yes, should be the same.

7    Q.    Okay.  And then if we could go to the third page of

8    this document.  And so if we could go and take a look at

9    the very bottom section there.

10         So this document would appear to be dated November

11   15th, 2012; is that right?

12   A.    Yes, that's right.

13   Q.    Now, whose signature does that appear to be there?

14   It's not a trick question.

15   A.    Whose signature is that?

16   Q.    Do you recognize that signature?

17   A.    I mean, I see some signatures like that, I -- in this

18   case, it looks like Ryan Davis.

19   Q.    Okay.  And it appears that the witness there would be

20   whom?

21   A.    Darlyne Davis.

22   Q.    And then you have that other section, which is

23   Internal Use Only.  Do you see that?

24   A.    Yes.

25   Q.    And at the bottom there, it says, payment terms:  COD.

Direct - Drago

1    What does that mean?

2    A.   Cash on delivery.  It means, you know, you have to pay

3    before the order goes out.

4    Q.   Understood.  And then underneath that, on the next

5    line down under Comments and Notes, it says a current

6    account is Crew Tile 5938.

7         Do you see that?

8    A.   Yes.

9    Q.   So what does that mean?  What's the significance of

10   that, at least based on your knowledge?

11   A.   Because, I mean, it was the same people, so I think

12   that they -- they submitted the application and when the

13   finance department caught this, they didn't -- the finance

14   manager was -- didn't approve it.

15   Q.   And so do you have any understanding on why they

16   didn't approve them?

17   A.   Because I mean, the -- they have -- the finance

18   department, they have a lot of troubles with them to get

19   them to pay on time, and at that time, you know, there was

20   a debt.

21   Q.   So --

22   A.   Now depending on like when they open another account,

23   would try to open another account with us, the finance

24   department caught that and rechecked the application.

25   Q.   Okay.  And so when you had problems -- when you were

1774

Direct - Drago

1    saying that you were having problems, can you expand on

2    what those problems were?

3    A.    They were put on hold repeatedly.  And they started

4    with us working as a COD and then at some point they asked

5    for terms.  I mean, the Porcelanosa Los Angeles in this

6    case was Paco and Jack, they pushed for -- to give them

7    terms.  Finally the finance, in this case the finance

8    manager, gave to them $10,000.  They, I mean, just ate

9    those $10,000 right away the first month and they would

10   always be behind.

11   Q.    Okay.  And so --

12   A.    So the finance manager had had the bad experience with

13   that and rejected the application.

14   Q.    And so to your understanding as the director of the

15   organizations that you described previously, how much in

16   displays, in samples, in other exhibitor type products did

17   Porcelanosa Los Angeles provide to Crew Tile during the

18   course of the relationship between the parties?

19   A.    During the end of 2009 until 2013, we have fix --

20   spent with them $49,000.

21   Q.    Okay.

22   A.    With samples, displays, and boards.

23   Q.    And so has any of that money, did -- has Porcelanosa

24   Los Angeles recouped any of that money?

25   A.    No.

Direct - Drago

1   Q.   Okay.  And were any of those exhibitors that were

2   provided pursuant to those exhibitor agreements, were any

3   of those ever returned to Porcelanosa Los Angeles?

4   A.   No.

5   Q.   Okay.  And so the grand total of those would be,

6   again, how much?

7   A.   $49,000.

8   Q.   Okay.  So I'd like to please turn to what's been

9   previously marked as plaintiffs' trial Exhibit 160.

10          Now, there's been some testimony given on this

11   letter; do you recollect, Mr. Prior?

12   A.   Yes.

13   Q.   Can you please blow up the first paragraph of this

14   e-mail -- or, excuse me, of this letter.

15          And this appears to be a letter from Kavanaugh

16   Dahl & Knight, LLP; would you agree?

17   A.   Yes.

18   Q.   Who is Kavanaugh Dahl & Knight?

19   A.   Is a law firm that we work with in New York.

20   Q.   Okay.  And this appears to be a letter bearing the

21   date of November 4th, 2013.  Do you have a firsthand

22   recollection of either instructing the attorneys to send

23   this letter or authorizing them to do so?

24   A.   Yes.  It was the letter that was drafted from our

25   attorneys in New York in order to respond to the first Mr.

1776

Direct - Drago

1    Burg letter that was received.

2    Q.    And so I'd like you to read into the record the first

3    line of this e-mail, please.

4    A.    We are responding to your letter of October 22d, 2013.

5    Q.    Okay.

6    A.    In your letter --

7    Q.    I'm sorry, that's fine.  Thank you.  I just wanted --

8    and I did say the whole first line, I should have said the

9    first sentence.

10         So it appears that Mr. Burg, Michael S. Burg,

11   Esquire, of Burg Simpson, had sent a letter on October 22d,

12   2013 -- 2013; would you agree?

13   A.    Yes.

14   Q.    And that was somewhat prior to Halloween of 2013,

15   right?

16   A.    Yes.

17   Q.    And --

18         COURTROOM DEPUTY:  You have two minutes.

19         MR. THOMAIDIS:  Thank you.

20         MR. BURG:  What?

21         MR. THOMAIDIS:  I have two minutes.

22   BY MR. THOMAIDIS:

23   Q.    So, in fact, the trick or treat letter that plaintiff

24   has used and the counterdefendants have used, actually was

25   predated by at least one correspondence from the law firm

Direct - Drago

1    of Burg Simpson; would you agree?

2    A.    Yes.

3    Q.    Is that consistent with your recollection?

4    A.    Yes, it's consistent with my recollection.

5    Q.    And so then subsequently, did you then go out and

6    retain counsel in this matter?

7    A.    Yes.  We -- at the beginning, we respond to the letter

8    from -- with our New York attorneys making clear what our

9    position and our vision in this case was after looking at

10   it and after we realized -- I mean, they were insisting in

11   the matter, we -- I mean, we were advised by our attorneys

12   in New York to get legal advice here in Colorado.

13   Q.    And that would be when I came on the scene, correct?

14   A.    Exactly.

15   Q.    Thank you.

16        MR. THOMAIDIS:   I have no further questions at

17   this time, Your Honor.

18        THE COURT:   Okay.  Cross-examination.

19        MR. TeSELLE:   Thank you Your Honor.

20        THE COURT:   All right, Mr. TeSelle, you have 45

21   minutes on cross.

22        MR. TeSELLE:   Thank you.

23                         CROSS-EXAMINATION

24   BY MR. TeSELLE:

25   Q.    Mr. Prior --

1778

Cross - Prior

1    A.    Yeah.

2    Q.    -- Your Honor, ladies and gentlemen.

3          You and I have met previously, correct?

4    A.    Yes.

5    Q.    Your deposition has been taken, in fact, three times

6    in this case, correct?

7    A.    Correct.

8    Q.    The first time your deposition was taken it was as

9    you, personally; Mr. Burg took that deposition, correct?

10   A.    Correct.

11   Q.    And then you were presented as a corporate

12   representative having the most knowledge on certain topics;

13   do you remember that?

14   A.    Yes.

15   Q.    That was the second deposition that I took, I believe

16   in Denver, correct?

17   A.    Yes.

18   Q.    And then there was a third deposition that I took

19   where you were also a corporate representative, correct?

20   A.    Yes.

21   Q.    And the purpose of that third deposition was

22   specifically to discuss the Colorado -- the sales of

23   Porcelanosa into Colorado during the 2008 to 2013 time

24   frame, correct?

25   A.    Yes.

1779
Cross - Prior

1   Q.   And that was the specific purpose of that entire

2   deposition was the sales -- well, I'll pull out the sales

3   data and what you gave me.   That was -- the specific

4   purpose was for Porcelanosa to provide the actual sales

5   data of all the sales that Porcelanosa was making into

6   Colorado during that time frame, correct?

7   A.   Yes.

8           MR. THOMAIDIS:   Your Honor, I object.   That

9   misstates the evidence.

10          THE COURT:   There's been no evidence about what

11  the purpose of this third deposition was for, so I can't --

12  I can't sustain that objection.

13  BY MR. TeSELLE:

14  Q.   Mr. Prior, you have been here for the entire trial,

15  correct?

16  A.   Yes.

17  Q.   And you were here yesterday, I believe, when Mr. Hazel

18  testified?

19  A.   Yes, I was here.

20  Q.   And he -- he's the CPA who attempted to reconcile all

21  the sales data provided by your company; do you remember

22  that?

23  A.   Yes.

24  Q.   And, in fact, do you remember when he testified here

25  under oath that he had received, in fact, four or five

1780

Cross - Prior

```
 1    different versions of sales data from Porcelanosa?

 2    A.   Yes, I remember that.

 3    Q.   And that he couldn't reconcile any of what was

 4    provided; do you recall that?

 5              MR. THOMAIDIS:  How about beyond the scope of

 6    direct, Your Honor?

 7              MR. TeSELLE:  Your Honor, actually, it goes to the

 8    demonstrative exhibit and the questions about the sales in

 9    the specific years of 2009, 2010, 2011, 2012, and their

10    attempt to undermine that.

11              THE COURT:  You went into those sales.  Overruled.

12    BY MR. TeSELLE:

13    Q.   Isn't that correct?

14    A.   Can you say that again?

15    Q.   Sure.  In fact, I lost my train of thought.  I'll go

16    back to it.

17              So on the -- isn't it true that when Mr. Hazel

18    testified here in court yesterday, that he said he received

19    approximately four or five different versions of sales data

20    from Porcelanosa that he could not reconcile; do you

21    remember that testimony?

22    A.   Yes.

23    Q.   And do you remember the testimony that there were also

24    a number of items of things that he was specifically

25    requesting from Porcelanosa that he never got; do you
```

Cross - Prior

1    remember that testimony?

2    A.   I do remember he said he didn't.

3    Q.   Okay.  And, in fact, we then had -- we then had the

4    deposition on April 6th of -- or April of 2016; do you

5    recall that?

6    A.   What is -- I don't get the point.

7    Q.   I'm sorry, the third deposition --

8    A.   Yes.

9    Q.   -- when we had the deposition talking specifically

10   about the sales data in Colorado, that was in New York in

11   April of 2016, correct?

12   A.   Yes.  That's correct.

13   Q.   And when you answered my questions in that deposition,

14   you answered them honestly, correct?

15   A.   Totally.

16   Q.   And completely.

17   A.   Completely.

18   Q.   Okay.  Remember when -- let's look at demonstrative

19   Exhibit 2- -- is it 227 -- I'm sorry, 233.  This is the

20   demonstrative that Mr. Thomaidis was asking you about on

21   direct.  And remember he was asking you about these

22   different sales numbers, and your response was that this

23   was the invoiced amount into Colorado?

24   A.   Yes, that's correct.

25   Q.   In fact, when I look at this, isn't it accurate to say

Cross - Prior

1    that these are the sales of Porcelanosa defendants into the

2    state of Colorado for the years 2008 through 2014?

3    A.   No, those are sales and invoiced to Colorado.

4    Q.   These are actually the sales into Colorado, not just

5    invoiced, correct?

6    A.   Invoiced to Colorado.

7         MR. TeSELLE:   Okay.   Your Honor, I would like to

8    play Mr. Prior's prior deposition testimony, pages 53, line

9    13 through 54, line 19, please.

10        THE COURT:   All right.   Go ahead.

11        (Video deposition clip played)

12   BY MR. TeSELLE:

13   Q.   Now, Mr. Prior, that was your testimony to me under

14   oath in April of 2016, correct?

15   A.   Yes.   And before giving that testimony, I did ask you

16   it was invoiced to Colorado.

17   Q.   And, in fact, that's an accurate representation of the

18   questions that I asked you and the answers that you gave,

19   correct?

20   A.   Yes.   But I asked you if it was if you meant invoiced

21   to Colorado.

22   Q.   And Mr. Thomaidis will have an opportunity to do

23   whatever he wants with that.   But if we can please look at

24   Exhibit 11C -- or 11, I think.   It's C for confidential.

25        Just so that -- just so that we're clear here,

Cross - Prior

1   you've seen this document before, correct?

2   A.   Yes.

3   Q.   This is the document that you brought with you to

4   New York -- or you were in New York, I had to go there --

5   that reflected the sales data that Porcelanosa -- of the

6   sales that they made into Colorado during the years 2008

7   through 2013, correct?

8   A.   I remember that I asked you because, I mean --

9   Q.   Mr. Prior, can you please just answer my question.

10  A.   Yes --

11  Q.   This is the document you brought --

12  A.   -- invoiced to Colorado.

13  Q.   Mr. Prior, I understand that's your testimony here

14  today --

15  A.   And that they was the same.

16  Q.   Well, now, let me ask you a question.  You -- let's be

17  clear.  You have no firsthand knowledge of any of the

18  actual business dealings between Crew Tile and the

19  principals at the Porcelanosa Los Angeles office in 2008

20  and 2009, 2010, 2011, correct?

21  A.   I wouldn't -- I was not involved in the daily basis of

22  the business.

23  Q.   You -- and we both had had a chance to ask you

24  questions, but you've never met the Davises before this

25  litigation, correct?

Cross - Prior

1    A.   No, I never.

2    Q.   You never dealt with, you, yourself, Crew Tile on any

3    of this prior to 2014, correct?

4         MR. THOMAIDIS:   This -- I have to object to the

5    form of that question, Your Honor.

6         THE COURT:   Overruled.

7         THE WITNESS:   I never heard of them until this

8    case has started.

9    BY MR. TeSELLE:

10   Q.   Okay.  In fact, if we can look at plaintiffs' trial

11   Exhibit 170, please.  This is in evidence.

12        Mr. Prior, this is the first -- and you've been

13   here the entire trial so far, correct?

14   A.   Yes.

15   Q.   I think you have, I just -- my back's been to you so I

16   don't know if you've been, but you've been here the entire

17   time?

18   A.   I have been here the whole time.

19   Q.   You have seen all the documents that have come in?

20   A.   Yes, I did.

21   Q.   In fact, what was interesting, Mr. Thomaidis didn't

22   ask you about any e-mails that you were a sender on,

23   correct?

24   A.   No, he didn't ask me for that.

25   Q.   He didn't ask you about any e-mails that you were a

1785

Cross - Prior

1    recipient on, correct?

2    A.   He asked me about a lot of other things.  In 45

3    minutes, he didn't have time.

4    Q.   Mr. Prior, can you just -- I'm even more limited, so

5    if you could just answer my questions, we'll get through

6    this quicker.

7         There was no e-mails presented where you were

8    either the sender or the recipient or a carbon copy on,

9    correct?

10   A.   Yes.   That's correct.

11   Q.   And, in fact, you're aware that your name doesn't

12   appear on any e-mails or any documents in this entire case

13   until this January 7th, 2014, letter, correct?

14   A.   Yes, that's correct.

15   Q.   Okay.   Is it your testimony here under oath that there

16   are no e-mails out there about you discussing all the

17   things that you were talking about happening in that 2010,

18   2011, 2012 time frame in terms of Crew Tile being slow on

19   payments and things like that.   Is it your testimony here

20   under oath that there are no e-mails with you on them?

21   A.   Yes.   That's true, I'm not involved in the daily basis

22   of the business when it comes to any regular activity.

23   Q.   So you're relying -- just so I'm clear, you're

24   relying, in terms of your testimony here today, on what

25   you've learned from Mr. Paco Montilla, correct?

Cross - Prior

1   A.   Yes.

2   Q.   Mr. Montilla was the one who was in charge of Los

3   Angeles and the western region, correct?

4   A.   That's correct.  And he reported to me.

5   Q.   And you left him -- you let him go because you lost

6   confidence in him, correct?

7   A.   Yes, that's correct.

8   Q.   And you're also reliant here today in terms of what

9   happened in that 2009, 2010, 2011, 2012 time frame on Mr.

10  Jack Handley and his testimony, correct?

11  A.   Yes.

12  Q.   And you -- he also was fired from the company,

13  correct?

14  A.   Yes.  He was fired.

15  Q.   He was fired for dishonesty, correct?

16  A.   Yes.

17  Q.   And, in fact -- we don't have time to look at it

18  today, depending on my time -- but you actually authorized

19  that 2012 Littler letter, correct, that went to Mr. Handley

20  saying that he was terminated, correct?

21  A.   Yes.  I mean, those kind of letters are sent to all

22  employees that leave the company on bad terms.

23  Q.   Okay.  If we look at this Exhibit 170, let's look at

24  your signature block first.  You signed this as Manuel

25  Prior, director of Porcelanosa-USA, correct?

Cross - Prior

1    A.    Yes.

2    Q.    Porcelanosa-USA was a trade name that was used to

3    apply to all of the United States companies of Porcelanosa

4    in a general fashion during that time frame --

5    A.    That's correct.  Porcelanosa-USA is not the entity,

6    it's just a name, as you said.

7    Q.    In fact, if you look at the letter -- because there's

8    been some testimony that Porcelanosa-USA would never be

9    used by the company without specific reference to the

10   individual entity it was tied to, if you look at the first

11   line of the letter, it says, Dear Mr. Davis, correct?

12   A.    Yes.

13   Q.    Do you see that?  Porcelanosa-USA hereinafter

14   Porcelanosa --

15            THE COURT:  Mr. TeSelle.

16            MR. TeSELLE:  Am I going too fast?

17            THE COURT:  No.  You're way too loud.

18            MR. TeSELLE:  I think I'm too close.

19            THE COURT:  I told Mr. Burg two decibels; for you,

20   four decibels --

21            MR. TeSELLE:  How about if I just get rid of the

22   microphone, Your Honor?  I apologize.

23   BY MR. TeSELLE:

24   Q.    Going back to the first line of the letter.  Let me

25   ask you:  There's no reference in this letter to

Cross - Prior

1  Porcelanosa Los Angeles, Inc., correct?

2  A.   Yes.

3  Q.   And am I correct?

4  A.   Yes.  You're correct.

5  Q.   And at the bottom of -- we go to the last full

6  paragraph of this letter, before the, Please do not

7  hesitate to contact me, it says, concurrent with the

8  termination of this agreement, Crew Tile must immediately

9  cease using any trademarks, trade names, patents,

10  copyrights, designs, drawings, photographs, samples,

11  literatures, and sales aid of every kind belonging to

12  Porcelanosa-USA, correct?

13  A.   Yes.

14  Q.   You were aware, and Porcelanosa-USA was aware, that

15  Crew Tile was using that intellectual property during that

16  time frame, correct?

17  A.   Yes.

18  Q.   And this was you telling them no longer to do that,

19  correct?

20  A.   Yes, we didn't want them to use it anymore.

21  Q.   Okay.  And, in fact, is it Porcelanosa's typical

22  practice to allow other companies to use its intellectual

23  property without having an agreement about that?

24  A.   It depends on the -- what they mean to -- intellectual

25  properties are a very broad subject.  But I mean they can

1789

Cross - Prior

1   use, you know, our catalogs to show our product to the

2   customers; they are allowed to do it.

3   Q.   I was using it as shorthand for what you said in your

4   letter.  So I'm not defining it for you.  Is it typical for

5   Porcelanosa, a large international company, to allow other

6   companies to use its trademarks, trade names, patents,

7   copyrights, designs, drawings, et cetera, et cetera, as

8   you've defined it here, is it typical for them to do that

9   without having an agreement?

10  A.   We use -- we let them use our marketing material, if

11  the marketing material we have given to them.

12  Q.   Okay.  And it's your testimony here under oath that

13  you allowed them to do that without an agreement that

14  addressed that?

15  A.   I mean, first of all, they need to have an account

16  application filed and approved.

17  Q.   Okay.  And that account application has nothing to do

18  with what we are talking about now, which is trademarks,

19  trade names, correct?

20  A.   But the relationship we have with the customers are

21  based on that application, so . . .

22  Q.   Okay.  I'm just going to try one more time.  So is it

23  your testimony here under oath that it is usual for

24  others -- or was usual for Porcelanosa-USA during this time

25  frame to allow other companies to use the intellectual

Cross - Prior

1    property without having it addressed in some form in a

2    written contract?  Was that usual?

3    A.    It -- I mean, if it's -- we are talking about the

4    marketing material.  We give the marketing material to

5    them, we are allowing them to do it.  You know, they can

6    use it, of course, they can use it.  It's for that purpose.

7          But when it comes to, I mean, patents and

8    copyrights and, I don't exactly know what you want -- what

9    you mean for that.

10   Q.    Okay.  If we could look at Plaintiffs' Exhibit 26,

11   please.

12         You were shown -- you were actually shown a

13   document about the same time frame August of 2009 -- by

14   Mr. -- I'm sorry, by Mr. Thomaidis talking about at that

15   point in time, who was the best dealer in the area.  Do you

16   remember that?

17   A.    Yes.

18   Q.    And that was actually -- that was in August of 2009,

19   which was approximately four months before December of

20   2009, correct?

21   A.    Yes.

22   Q.    Four months before the purported distributorship

23   agreement that we are all talking about, correct?

24   A.    Yeah.

25   Q.    Now, let's look at the signature block for Mr. Jack

Cross - Prior

1   Handley, if you can, on this -- on the top.

2            COURTROOM DEPUTY:  Mr. TeSelle, I don't have that

3   in evidence.

4            MR. TeSELLE:  Oh, I apologize.

5            COURTROOM DEPUTY:  26?

6            MR. TeSELLE:  It's Plaintiffs' Exhibit 26.

7            MR. CROUGH:  Stipulated.

8            MR. TeSELLE:  We show it as in.  I apologize.

9            THE COURT:  Well, you need to move for --

10           MR. CROUGH:  It's stipulated.

11           MR. TeSELLE:  It's stipulated otherwise, so --

12           THE COURT:  Okay.  Given the stipulation,

13  Exhibit 26 is admitted into evidence and may be published

14  to the jury.

15       (Plaintiffs' Exhibit 26 received)

16  BY MR. TeSELLE:

17  Q.   If you look -- if we can zone in on just the top

18  part -- thank you -- on Mr. Handley's signature block.

19           This is an e-mail from Jack Handley to Paco

20  Montilla at the top; do you see that?

21  A.   Yes.

22  Q.   And do you see what Mr. Handley is showing as his

23  position with the company as of August of 2009?

24  A.   Yes.

25  Q.   Okay.  He's showing as an A&D commercial sales

Cross - Prior

1    manager, correct?

2    A.   Yes.

3    Q.   So at that point in time, he was no longer outside

4    sales, he was actually a manager of the company, correct?

5    A.   No.  He was an outside sales then.  He was promoted as

6    a sales manager in 2011.

7    Q.   Okay.  And your testimony here, as I understand it, is

8    that you're relying upon the testimony of Mr. Montilla and

9    Mr. Handley as to what was happening on a day-by-day basis

10   in that 2009, 2010, 2011 time frame, correct?

11   A.   Can you state that again.

12   Q.   Sure.  Your testimony here today is that as -- you

13   were not -- strike that.

14        We can agree you weren't involved in the

15   day-to-day operations of Porcelanosa Los Angeles during

16   that time frame, correct?

17   A.   Yes.  Paco Montilla got promoted sales manager, with

18   my approval.

19   Q.   You were here when Mr. Handley testified on the stand

20   that he became a sales manager in approximately this time

21   frame and that he remained in a management position until

22   he left.  Do you remember that testimony?

23   A.   I think that he said that he became sales manager in

24   2011.  He became A&D rep -- he was outside sales rep, then

25   he took dealers, and then he got the new position, which

Cross - Prior

1  was the A&D, he put it -- he put this as sales manager, you

2  know, just to give -- to have more importance before the

3  customers.  And --

4  Q.   Would that be a misrepresentation?

5  A.   Yes.  That would be a misrepresentation.

6  Q.   Okay.  If Mr. Handley and Mr. Montilla were

7  representing that Mr. Handley was a manager of the company

8  in 2009, that would be a misrepresentation --

9  A.   At least some sales reps, it happened to us in the

10  past, they like to put them -- you know, something like

11  manager or something just to --

12  Q.   If you could just answer my yes-or-no question.  Would

13  it be a misrepresentation if Mr. Handley and Mr. Montilla

14  were representing that he was a manager of Porcelanosa-USA

15  in this time frame?

16  A.   Well, I just said Mr. Handley.  I don't see -- well, I

17  don't see Mr. Montilla had anything to do with it.

18  Q.   Can you just answer my question, though, sir?

19  A.   Yeah.

20  Q.   Would it be a misrepresentation during the 2009 time

21  frame if Mr. Montilla and Mr. Handley were representing

22  that Mr. Handley was a manager of Porcelanosa-USA?  That

23  would have been a misrepresentation, correct?

24  A.   That would have been not correct, that's not true;

25  misrepresentation if you want to call it like that.

1794

Cross - Prior

1   Q.   Now, anyone who is dealing with Mr. Handley who would

2   be getting e-mails from him that say this, they would

3   believe that he was actually a manager of the company,

4   correct?

5   A.   There was some other employees that were receiving the

6   e-mails and they didn't consider him a manager of the

7   company.

8   Q.   Okay.  You are talking about people interior at

9   Porcelanosa, correct?

10  A.   Interior of Porcelanosa, everybody knew that he was

11  not a manager.

12  Q.   Did you ever see receive any e-mails from Mr.

13  Handley?

14  A.   I don't remember receiving any e-mails from Mr.

15  Handley, to be honest.

16  Q.   Okay.  But you've produced none of your e-mails in

17  this case, correct?

18  A.   I don't recall -- I don't recall any.

19  Q.   Okay.  You have not brought any, correct?

20  A.   You -- you -- you have seen the exhibits more than I

21  did.

22  Q.   Let's look at plaintiffs' trial Exhibit 135.  I know

23  this one's in.

24       We've had testimony in this case, and you've been

25  here the entire time, about Operation Shut Down Denver,

Cross - Prior

1   correct -- do you see that?

2   A.   Yes.

3   Q.   You're aware of Mr. Montilla's testimony and Mr.

4   Davis' testimony that one of the things said on that call

5   was that the decision was above Mr. Montilla's head, that

6   it was already made; do you remember that testimony?

7   A.   Yes.

8   Q.   Was it your decision to instigate Operation Shut Down

9   in Denver in April of 2013?

10  A.   I didn't instigate any Operation Shut Down.  The

11  Operation Shut Down is a military term that Jeff Schnepp,

12  that he used with Paco here to mean that -- I mean, we were

13  transferring the operation itself from Colorado territory

14  to under Porcelanosa Texas.

15  Q.   Okay.  So let's break it down.  You -- as of April of

16  2013, it's you who made the decision, however, to open a

17  showroom in Denver, correct?

18  A.   Ultimately I was the -- with the owners, of course.

19  Q.   And it was you also in that time frame who made the

20  decision to open that showroom to compete directly with

21  Crew Tile Distribution, correct?

22  A.   No, we didn't want to compete with anybody -- with

23  anybody here.  We are doing our own thing.  We have -- we

24  wanted to open a showroom in Denver in the Denver Design

25  District as we did in New York, as we did in the Boston

Cross - Prior

1    Design Center, that we did in the Dallas Design Center.  It

2    was a pattern that we do.

3    Q.   Let's talk about that.  Porcelanosa Texas actually is

4    the name of the Dallas entity, correct?

5    A.   Yes.

6    Q.   And that was created in 2013, correct?

7    A.   I think it was established in 2012, but we started

8    operations in 2013.

9    Q.   Okay.  In terms of its filing here in the state of

10   Colorado.  And just to save time, I'll ask it this way:  We

11   have an exhibit here, but if I had an exhibit that said

12   that you registered to do business, or the trade name --

13   the foreign trade name, in October of 2013, would that

14   refresh your recollection as to when it would have been --

15   A.   Yes.

16   Q.   Okay.  And prior to that time, Porcelanosa Texas was

17   not the distributor for Colorado, correct?

18   A.   No, it was -- we opened the -- I mean, the portion of

19   the Texas branch was established in -- started operations

20   in 2013, and at the beginning we just rent warehouse space.

21   We needed the business, you know, to set up the business

22   there, just all the logistics in Den -- Texas first, and

23   then afterwards -- I mean, in the course of the business we

24   realized that it was -- sorry -- it was more efficient for

25   us to ship things to Colorado area from Texas than doing it

Cross - Prior

1   from Porcelanosa -- from Anaheim.

2   Q.   Okay, Mr. Prior, let's look at Exhibit 159, if we can.

3   The jury's already seen this so I'm going to jump to the

4   questions about it.

5        Did you authorize the sending of the October 31st,

6   2013, letter to the dealers and customers of Crew Tile in

7   this time frame?

8   A.   Yes, I did.

9   Q.   Okay.  And you knew when you authorized this letter

10  that you were going to be basically putting Crew Tile out

11  of business, correct?

12  A.   No.  I didn't know.

13  Q.   Well, Mr. Thomaidis asked you questions on direct

14  about a letter sent by your New York lawyers, Kavanaugh

15  Dahl & Knight.  Do you remember those questions?

16  A.   Yes.

17  Q.   If we could pull up trial Exhibit 160C.  I'm sorry

18  with the C.  The C is a marking for confidential.  The

19  exhibit is actually 160.

20        THE COURT:   Okay.

21  BY MR. TeSELLE:

22  Q.   And do you remember Mr. Thomaidis pointing you to the

23  first line of the November 14th, '04 letter, we are

24  responding to your letter of October 22d, 2013, correct?

25  A.   Yeah.

Cross - Prior

1    Q.   So you were already aware -- and it goes on to talk

2    about what the letter said, that they are alleging in this

3    distribution agreement.  You were aware that Crew Tile was

4    alleging that it had an exclusive distribution agreement at

5    least as of October 22d, 2013, correct?

6    A.   Yes, I found out about that time.

7    Q.   And with that knowledge in hand, you authorized moving

8    forward with sending out this letter and having all of the

9    Colorado dealers report directly to Porcelanosa Texas

10   instead, correct?

11   A.   Yes, of course I did, because, I mean, I knew for sure

12   that the contract didn't exist.

13   Q.   And, in fact, when you authorized this letter, you

14   reviewed it, correct?  Because -- I think your testimony to

15   Mr. Thomaidis was you wanted to make sure that you had your

16   reasoning down and your statement down as to why you

17   believed that you were acting appropriately, correct?

18   A.   Yes, we were -- I'm pretty sure that we did the best

19   thing for the business and for our customers.

20   Q.   Okay.  And if we look at the last paragraph of this

21   letter, it says, In conclusion, should Crew Tile attempt to

22   enforce the alleged agreement, Porcelanosa will vigorously

23   defend, assert appropriate claims and counterclaims, and

24   hold Crew Tile responsible.

25        Do you see that?

Cross - Prior

1   A.   Yes.

2   Q.   And then it finishes, Therefore, the contents of this

3   letter's without prejudice to Porcelanosa's rights and

4   remedies against Crew Tile and Jack Handley, all of which

5   are hereby reserved.

6        Do you see that?

7   A.   Yes.

8   Q.   Is that intended to be a threat?

9   A.   No, it's not intended to be a threat.

10  Q.   What was it intended to be?

11  A.   We just wanted to protect our company.

12  Q.   Why at this point in time are you reserving any rights

13  against Mr. Handley if you were sure there was no contract?

14  A.   Because, I mean, at that time, we -- we haven't met

15  Mr. Handley yet and we want -- and we didn't know if he

16  have signed a contract.

17  Q.   Okay.  Isn't it true that at this point in time, you

18  had your copy of the signed agreement that had Mr.

19  Handley --

20  A.   I never had a copy of the signed agreement.

21  Q.   That's your testimony?

22  A.   I just got the PDF that you guys sent to us.

23  Q.   Okay.  But that wasn't sent -- or referenced in the

24  October 22d letter, was it?

25  A.   I think it was.

1800
Cross - Prior

1   Q.   Now, let's look -- let's turn to the 2008, 2009 time

2   frame.   That was, as I think you testified, it was a bad

3   time in the economy, correct?

4   A.   Yes.

5   Q.   And a bad time specifically for companies like

6   Porcelanosa and Crew Tile --

7   A.   Yeah, I think related to construction --

8   Q.   Anything related to construction.

9   A.   Yeah.

10   Q.   And, in fact, you were pushing hard during that time

11   frame to make sure that the different offices did whatever

12   they could to boost their sales, correct?

13   A.   I mean, we tried to -- of course, to push for sales.

14   Q.   And part of that -- part of what you did is you

15   went -- I believe when we talked about it at the

16   deposition, you went -- you didn't do one big seminar, but

17   you would go to each of the offices and meet with the

18   general managers and talk to them about what they needed to

19   do, correct?

20   A.   I travel -- I spend like more than 50 percent of my

21   time traveling, going to all the companies here in the

22   United States.

23   Q.   Really what I'm talking about now is during that time

24   frame, when the economy was down and you -- you had an

25   extra push because sales were down and you wanted to make

1801

Cross - Prior

1    sure that things got better, correct?

2    A.    Yes, of course.

3    Q.    Okay.  And, in fact, isn't it true that Porcelanosa

4    does do business through distributors?

5    A.    We do business here through -- through dealers,

6    mainly.

7    Q.    But, in fact, you've -- at least one you've already

8    talked about that you agree, at least for a certain period

9    of time, you did do business through Facings as a

10   distributor, correct?

11   A.    Very initially we sent direct containers from Spain to

12   Facings, very initially, but we did.

13   Q.    Mr. Prior, isn't it true that in fact you've done

14   business with distributors in the United States, up to --

15   up to 10 of them?

16   A.    By the way, we --

17   Q.    Isn't that what you said in your deposition?

18   A.    What do you mean we -- we did business with dealers

19   and with distributors.

20   Q.    And with distributors as well, correct?

21   A.    Yeah, that's right.

22   Q.    That's not just internationally, but it's also here in

23   the United States, correct?

24   A.    We sell the -- I mean, our preference -- I mean, right

25   now the way the business is established, we have six

Cross - Prior

1    distribution centers, so we have the ones who carry stock,

2    but if there is a dealer in this case a distributor, if you

3    want to call it like that, that wants to buy in bulk, a

4    large quantity, we facilitate that in order to give to them

5    better price and they -- the way that the operation works

6    is it gets imported from Spain, we import the case, but it

7    gets shipped directly to the customer.

8    Q.   If we look back at Exhibit 227, you were asked some

9    questions about that.  I believe -- I believe I understand

10   your testimony.  You're saying that Porcelanosa Los

11   Angeles, Inc., is a distributor?

12   A.   Yes.

13   Q.   And it would distribute to the dealers here.

14   A.   Yes.

15   Q.   Now I want to make sure that we are on the same page.

16   If we said that -- if we added another line here that the

17   manufacturer ships to Los Angeles, correct?

18   A.   Yes.

19   Q.   And then the Los Angeles ships to Crew Tile

20   Distribution in Denver.

21   A.   Yes.

22   Q.   Do you see that?  You don't dispute that all of these

23   dealers that were being sold to by Crew Tile were actually

24   customers of Crew Tile during that time frame, correct?

25   A.   I don't dispute that.

1803

Cross - Prior

1   Q.   Okay.  You just would add another layer --

2   A.   That's -- I mean, that -- but that's why, I mean, they

3   ended up having like very, very low margins, as we can see.

4   Even though they were doing well, they have a margin of too

5   little money.

6   Q.   If we look at Plaintiffs' Exhibit 51, if we can.

7            And you -- you recall Mr. Montilla and Mr. Handley

8   testifying about this document, correct?

9   A.   Yes.

10  Q.   And you understood this is the document you were

11  talking about earlier, they were just a dealer, and they

12  were platinum level and -- was it 90 -- you said --

13  A.   That represents from that price --

14  Q.   But a large -- you said dealers all have that pricing,

15  correct?

16  A.   90 percent of the dealers, yeah.  And out of LA and

17  other regions wasn't like that, but I mean, out of LA was

18  90 percent; 90 percent of them, they have the platinum.

19  Q.   So -- so we're clear, based on the -- and you've seen

20  it, the Crew Tile was buying at a 55 percent discount, what

21  your testimony is, all of the -- 90 percent of the other

22  dealers would be able to get that same pricing, correct?

23  A.   Exactly.

24  Q.   And then they were marking that product up 20 to 30

25  percent for their margin to make money, correct?

1804

Cross - Prior

1   A.    Yes.

2   Q.    Why would a dealer pay 20 to 30 percent more to buy

3   from Crew Tile unless they were the exclusive dealer and

4   they were required to by Porcelanosa LA?

5          MR. THOMAIDIS:  Your Honor, object.  He has no

6   subject matter knowledge with respect to this.

7          THE COURT:  Overruled.

8          THE WITNESS:  We have the dealers -- I mean, they

9   promote their own market.  I don't know the prices that

10  they put, how they promote their sales.  They do -- they

11  were able, you know, to do it through dealers with very

12  small margins because, at the end, they had to push, I

13  mean, they had to sell to very low margins in order to --

14  to be able to sell to those dealers because, otherwise, if

15  they would have marked it up to the price of Porcelanosa,

16  no way that they were going to be able to sell.

17  BY MR. TeSELLE:

18  Q.    Mr. Prior, you would agree with me, however, that it

19  would make no commercial sense for a dealer, let alone 75

20  dealers, to be buying from Crew Tile Distribution at a 20,

21  30 percent markup, something that they could buy at 55

22  percent discount direct from the --

23  A.    Those were accounts that we were not working with.  I

24  mean, they were promoting the sales the best that they can.

25  I don't know what they did.

Cross - Prior

1    Q.   If you can look at Plaintiffs' Exhibit 231.  Do you

2    remember this exhibit was used in opening?  It was talked

3    about with the different witnesses, including Mr. Handley.

4    Do you see that?

5    A.   Yes, I see it.

6    Q.   Mr. Handley regularly and routinely, after December of

7    2009, referred to Crew Tile as a distributor, correct?

8    A.   Yes.

9    Q.   And you saw that, and it's -- and, in fact, after

10   December of 2009, you heard Mr. Handley's testimony that

11   all of the sales leads that would come into Porcelanosa Los

12   Angeles for Colorado during -- at least for the first 2 1/2

13   years were sent to Crew Tile of Colorado, correct?

14   A.   Yes, he did some of them, at least the ones we have

15   seen a few of them.

16   Q.   So when somebody would contact Porcelanosa Los

17   Angeles -- and I believe Mr. Montilla's specific testimony

18   was he would refer it to Mr. Handley because Mr. Handley

19   was in charge of Colorado, and then Mr. Handley would refer

20   it on.  But, in fact, whenever someone would contact

21   Porcelanosa Los Angeles, they weren't allowed to buy

22   direct, they were forwarded to Crew Tile because of the

23   exclusive distributorship agreement, correct?

24   A.   No.  That's not the case.

25   Q.   Okay.  But you have no personal firsthand knowledge

Cross - Prior

1    about that, correct?

2    A.    No, I know personal -- firsthand knowledge that that

3    was not the case.

4    Q.    Okay.  But you said --

5    A.    We don't work like that.

6    Q.    As you said, you were not involved in the day-to-day

7    operation --

8    A.    I was not involved in the day-to-day operation.

9    Q.    You have to rely on the veracity and the honesty of

10   Mr. Handley, correct?

11   A.    Yes.

12   Q.    And you have to rely on the honesty and the veracity

13   of Mr. Montilla, correct?

14   A.    And I do.

15   Q.    And both of those are people who you fired, correct?

16   A.    No.  I -- I didn't fire Jack Handley, I was not -- it

17   was Paco the one who did.  And Paco Montilla, he was -- he

18   left the company rather than being fired.

19   Q.    Mr. Handley was fired for being dishonest, correct?

20   A.    Yes.

21   Q.    Okay.  And, we talked about in the deposition, so did

22   Mr. Montilla?

23   A.    Yes, we talked about that.

24   Q.    Are you aware -- let's see -- there's been some

25   questions about Colorado Ceramics, and we've looked at some

Cross - Prior

1   exhibits already previously.

2          Are you aware that Mr. Handley would repeatedly

3   require dealers in Colorado to buy through Crew Tile?

4   A.   We saw some examples -- I mean, he brought some

5   information to Crew Tile, I mean, because of this.

6   Q.   And you saw --

7   A.   On the --

8   Q.   And you saw the documents that we've discussed -- or

9   that were discussed previously about getting Colorado

10  Ceramics to get under the umbrella of Crew Tile, correct?

11  A.   That was one of the meetings written by Crew Tile.

12  Q.   If we could look at Plaintiffs' Exhibit 87, please.

13          You saw this -- you saw this document in evidence,

14  correct?

15  A.   Yes.

16  Q.   Okay.  And this is regarding Colorado Ceramics,

17  correct?

18  A.   Yeah.

19  Q.   And this is after we -- you know, time frame:  You

20  also saw some minutes of some meetings when Mr. Montilla

21  and Mr. Handley traveled to Colorado to meet on an annual

22  basis.  You saw those, correct?

23  A.   Those were Crew Tile meetings.

24  Q.   Correct.  But I'm orienting just so we understand --

25  A.   Yeah, those were Crew Tile meeting minutes and it's

1808

Cross - Prior

1    not Porcelanosa minutes.

2    Q.   And in those meetings, a discussion was held with Mr.

3    Montilla about the problem of Colorado Ceramics coming

4    under the umbrella of Crew Tile; do you recall that?

5    A.   Yes.

6    Q.   And you recall that Mr. Montilla said he would do what

7    would need to be done to get that rectified, correct?

8              MR. THOMAIDIS:  Your Honor, that's --

9              THE WITNESS:  That's not --

10             MR. THOMAIDIS:  -- facts --

11             THE WITNESS:  That's not what Mr. Montilla said --

12             THE COURT:  Hold on.  Hold on.  What's the

13   objection?

14             MR. THOMAIDIS:  So it's beyond the scope of

15   direct; it assumes facts not in evidence.  Frankly, it's

16   hearsay.

17             MR. TeSELLE:  I can rephrase it, Your Honor.

18             THE COURT:  All right.  But what about the beyond

19   the scope objection?

20             MR. TeSELLE:  Mr. Thomaidis referred to different

21   dealers in Colorado, Balentine and Colorado Ceramics, as to

22   showing that they were not exclusive, and this is one of

23   them that I would like to be able to confirm that they

24   actually were brought under the umbrella.

25             THE COURT:  All right.  Overruled.

Cross - Prior

1   BY MR. TeSELLE:

2   Q.    First of all, before we turn to the next exhibit, do

3   you see this?  This is a letter, re:  Colorado Ceramics.

4   Do you see that?

5   A.    Yeah.

6   Q.    And it's talking about Crew Tile wants to -- wants to

7   extend our services to our company, and it's talking about

8   the terms of getting them basically under Crew Tile's

9   control, correct?  That's --

10  A.    Let me see.

11  Q.    Go ahead.

12  A.    Yes.

13  Q.    And then there's a handwritten signature at the

14  bottom, Ryan, thanks.  Sandie Venezia, Colorado Ceramic

15  Tile.  Do you see that?

16  A.    Yes.

17  Q.    Okay.  Let's go to Exhibit 88, please.  Now this is an

18  e-mail -- this is an e-mail on May 4th, 2011, from Darlyne

19  Davis to Jack Handley.  And it says, Jack, Colorado

20  Ceramics has agreed to come on board with us.  One of the

21  parts of the agreement is that they close their account

22  with you.  Please check and let me know if they have indeed

23  closed their account.

24        Isn't it true that Colorado Ceramics, after some

25  work and after these meetings that were held, agreed to

Cross - Prior

1   come on board with Crew Tile consistent with the agreement?

2   A.   You have to ask that to Colorado Ceramics.  I have no

3   idea.

4   Q.   Now, if we can look at Exhibit 115.  You were asked

5   questions about this.  I'd like to look at this.  You were

6   shown numerous account applications before.  If you could

7   just look on the first page.  This shows the company name

8   of Crew Tile Distribution.  It's talking about opening a

9   credit account, the application date is March 28th 2011.

10  And can you please read what it says as principal type of

11  business.

12  A.   Crew Tile --

13  Q.   Is this your form --

14  A.   -- distributor.

15  Q.   It says "distributor" on that.

16       And, again, if we go to the second page, I believe

17  it was at the bottom -- I'm sorry, to the first page where

18  they have the approval.  Just a second.  Third page.  I

19  apologize.

20       And, again, so -- so how I understand this works,

21  the application would come in -- and then I think you were

22  asked specifically about this document -- this was -- and

23  you specifically identified Mr. Montilla's signature --

24  this was then approved, Crew Tile credit application as a

25  distributor for the company, correct?

Cross - Prior

1    A.    It was approved.  The account was approved.

2    Q.    Okay.

3    A.    This is not as distributor, they can define

4    themselves, we don't say our customers call -- they have to

5    call them -- theirselves.  They have to -- they can call

6    themselves, you know, whatever they want.

7    Q.    As of October 2012, did you consider Jack Handley to

8    be a liar?

9    A.    When?  Can you say that again.

10   Q.    Yes, absolutely.  As of October 2012, did you consider

11   Jack Handley to be a liar?

12   A.    I don't consider Jack Handley a liar.  I mean, he was

13   fired because something happened --

14   Q.    As --

15   A.    It was never --

16   Q.    As of October 2012, did you consider him to be

17   unreliable?

18   A.    He left -- he was fired by Paco.

19   Q.    Okay.  Can you please play pages 93, 4 through 12.

20         (Video deposition clip played)

21   Q.    And, in fact, if you look at plaintiffs' trial Exhibit

22   127, this is the October 2d, 2012, Littler letter.  Again,

23   is Littler another one of the law firms that Porcelanosa

24   uses?

25   A.    Is a law firm that we work with, yes.  For human

Cross - Prior

1    resource and matters.

2    Q.   Okay.  You authorized the sending of this letter,

3    correct?

4    A.   Yes.  I mean, ultimately I'm the man responsible so I

5    authorized sending this, but it is a matter more with human

6    resources.

7    Q.   You reviewed this letter before it was sent, correct?

8    A.   Yes, I think I did.

9    Q.   You want to make sure it's accurate, you want to make

10   sure --

11   A.   My human resources managers talk to me about like --

12   especially, you know, with employees that they are not

13   leaving the company in good terms, just making sure that

14   it, you know --

15   Q.   Let's look at the third full paragraph of this letter,

16   and just starting with -- it says, During the course of

17   your employment as a manager of the company, you were privy

18   to and had intimate access to company property, et cetera.

19        You would agree that he was a manager of the

20   company.

21   A.   He was a manager in the company in summer, I think it

22   was, August 2011, until he left the company in late summer

23   of 2012.

24   Q.   And, in fact, if we look at the second page, last two

25   paragraphs.  Is this information that you provided to the

Cross - Prior

1    lawyers?

2            COURTROOM DEPUTY:  You have two minutes,  Mr. --

3            MR. TeSELLE:  Thank you.

4            THE WITNESS:  Human resources department, you

5    know, they were the ones who did the research and they

6    provided that information to the lawyers.

7    BY MR. TeSELLE:

8    Q.   Okay.  And this is accurate, to the best of your

9    understanding, correct?

10   A.   Yeah.  I think so.

11   Q.   And then you talk about what you found out.  I don't

12   have the time to read everything, but the last paragraph,

13   Such conduct violated your legal duty of loyalty as well as

14   your contractual obligations to the company.  Moreover,

15   such conduct gives rise to legal claims for tortious

16   interference with contract, tortious interference with

17   prospective economic advantage, breach of fiduciary duty,

18   misappropriation of trade secrets, breach of contract,

19   unfair competition, and related claims.  The company

20   reserves all rights.

21           Do you see that?

22   A.   Yes.

23   Q.   Did you intend to threaten Mr. Handley with this

24   letter when you sent it to him?

25           MR. THOMAIDIS:  Objection --

1814

Cross - Prior

1    THE WITNESS:  No, we didn't try to threaten Mr.

2    Handley at all.

3    BY MR. TeSELLE:

4    Q.    And, in fact, you were here when Mr. Handley testified

5    from the stand, correct?

6    A.    Yes.  I was.

7    Q.    And you recall his testimony was that at some point in

8    time, he was contacted to come and meet regarding the Crew

9    Tile matter, correct?

10   A.    Yes.

11   Q.    You heard him testify that no one told him until he

12   got there that it was going to be a room full of lawyers

13   and Porcelanosa supervisors, correct?

14   A.    Yes, I -- I recall that perfectly.

15   Q.    And you recall that meeting, don't you?

16   A.    Yes, of course.

17   Q.    And it happened at the Hilton by the -- in Los

18   Angeles?

19   A.    No, it was in the Sheridan by -- by the Los Angeles

20   airport, yes, LAX.

21   Q.    And that meeting actually happened, correct?

22   A.    Yes, that happened.

23   Q.    And it was at that meeting that Mr. Handley -- the

24   document was pulled out -- the copy of the agreement, and

25   it was put in front of Mr. Handley and he was asked, Did

Redirect - Prior

1    you sign this document?

2    A.    Yes.

3          MR. TeSELLE:  I have no more questions.

4          THE COURT:  All right.  Redirect.  Mr. Thomaidis,

5    you have 20 minutes on redirect.

6          MR. THOMAIDIS:  Thank you, Your Honor.

7                    REDIRECT EXAMINATION

8    BY MR. THOMAIDIS:

9    Q.    So, Mr. Prior, following up on Mr. TeSelle's last set

10   of questions, do you recall when the meeting happened that

11   he referenced where you, among others, met with Mr. Handley

12   while doing investigation in this case?

13   A.    Yes.  I remember perfectly.  That was in -- I think it

14   was December 12th 2013.

15   Q.    Okay.  And so who was in attendance at that meeting?

16   A.    In attendance at that meeting was you, was your

17   partner, Miles, and it was Paco Montilla, and then -- I

18   mean, it was myself, of course, and Mr. Handley.

19   Q.    Okay.  And my law partner has since passed away,

20   right?

21   A.    Yes.

22   Q.    And aside from those individuals you just described,

23   was there anyone else in the room?

24   A.    No.

25   Q.    Okay.  And as we sit here under oath -- as you sit

Redirect - Prior

1    here under oath, and as I sit here as an officer of the

2    Court, were you investigating this situation to try to

3    understand more about what actually happened with respect

4    to Burg Simpson's allegations?

5    A.   Yes.   I mean, we received that letter from Burg

6    Simpson, we took it very seriously, we started doing

7    research about, I mean, anything that would have helped us

8    understand what the situation was.

9    Q.   Okay.   And with respect to intellectual property,

10   would it be unusual for a dealer of Porcelanosa's products

11   to use logos, trade names, in their advertising?

12   A.   No, I mean, we send the displays to them.   You can see

13   it over there.   You can see the catalogs, in our marketing

14   material.   We have -- of course we need to advertise

15   ourselves and they can use it.   I mean, that's what those

16   materials are for.

17   Q.   And so you wouldn't prohibit a dealer or distributor,

18   or whatever they want to call themselves, from using those

19   materials, correct?

20   A.   Not at all.

21   Q.   Okay.   And so is there any prohibition against what

22   someone applying for an account with Porcelanosa Los

23   Angeles, or any of the other companies you oversee, is

24   there anything prohibiting them from calling themselves

25   something?

Redirect - Prior

1   A.    I mean, every customer, they can call themselves, you

2   know, whatever they want.  I mean, we are not going to be

3   the ones who are going to say to the customer, You have to

4   be call yourself a dealer, you have to be call yourself a

5   distributor.

6   Q.    Okay.

7   A.    That's not our call.

8   Q.    And so once an applicant becomes a authorized

9   purchaser, dealer, of Porcelanosa brand products --

10  A.    They can say what they want to say.

11  Q.    Do you then prohibit them from calling them whatever

12  they want to call themselves?

13  A.    No, not at all.

14  Q.    Okay.  Now, what about that versus the term

15  "exclusive"?

16  A.    Yeah, we don't do exclusivity with anybody.

17  Q.    And so would you prohibit somebody from using the term

18  "exclusive" in their name, marketing, advertising?

19  A.    Yes.  It would be prohibited from the very first

20  minute.

21  Q.    Okay.  And so in the overall scheme of things, Mr.

22  Prior, would you characterize Crew Tile Distribution, or

23  Paradigm Tile & Stone Distributors, or Infinite Flooring &

24  Design, to be a small, medium, or a large dealer of

25  Porcelanosa's products?

1818

Redirect - Prior

1    A.    They were a small dealer.  I mean, they had -- in

2    2011, 2012, they had good years, so it was like a medium at

3    that point.

4    Q.    Okay.  Would a company like that -- I mean this in the

5    nicest possible way -- would a company like that regularly

6    fall to you or end up on your radar in terms of managing

7    the business on a nationwide basis?

8    A.    No.  Usually, I mean, I deal directly with the general

9    managers, with the sales managers, even with the sales rep.

10   We talk about numbers and the specific cases from time to

11   time.  We talk about specific customers during the years

12   that I was working, you know, with Paco, with Jack, or Jeff

13   until this whole situation started, I mean, we never -- I

14   never been aware, you know, the existence of Crew Tile.

15   Q.    And so what about who a dealer, or something with some

16   other name, what about who they can sell to?  Is there any

17   prohibition against who --

18   A.    No, they can sell whoever they want.

19   Q.    Okay.

20   A.    I mean, there is no -- you can see the application

21   there, we don't have a rule, they just can buy from us and

22   they can sell it to retail, to projects, to another

23   dealers.  I mean, it's up to them, it's not our business.

24   Q.    And so as, for instance Porcelanosa Los Angeles, the

25   outside sales representatives would be committed to trying

Redirect - Prior

1    to help them sell product in whatever means or through

2    whatever channels they wanted?

3    A.    Yup.

4    Q.    Is that accurate?

5    A.    Yup.

6    Q.    Okay.  And so do dealers, if they fill out an account

7    application, do sometimes they go dormant and --

8    A.    Yes.  Yeah, it happens.  We have dealers, and some of

9    them they're active, some of them they stop doing business.

10   I mean, as you can see for the space that we have here to

11   maintain a dealer is expensive, they cost a lot of money.

12   And during the years we have been reducing our base of

13   dealers and focusing more in the ones that are really

14   committed to the brand.

15        It happens to us, unfortunately, very often that

16   we put the display -- those ones, or even nicer ones that

17   we have right now, in a dealer and the sales rep -- and we

18   go there, and you see another tile in those racks and in

19   those displays.  And it's something that we get pretty

20   upset.  So when that happens, usually we take and -- the

21   displays with us and we close the dealer.

22   Q.    Okay.  And so Porcelanosa Los Angeles was committed to

23   maintaining relationships with existing dealers; is that

24   right?

25   A.    Yes.

Redirect - Prior

1  Q.   And so providing samples, providing displays, those

2  would be part of that --

3  A.   Yes, we are open to do business with anybody that

4  is -- we are -- is welcome, there is no -- not any

5  boundaries.

6  Q.   Okay.  I'd like to please turn to trial Exhibit 26,

7  please.

8           MR. TeSELLE:  Is it admitted?

9           MR. THOMAIDIS:  It is, actually.  You used it

10  about -- perfect.

11  BY MR. THOMAIDIS:

12  Q.   And so can we just blow up that top signature block.

13  The signature block, whichever you prefer.

14           So there was some discussion about this

15  terminology, A&D commercial sales manager.  Do you see

16  that?

17  A.   Yes.

18  Q.   Was there an official job title within Porcelanosa Los

19  Angeles, for example, of an A&D slash commercial sales

20  manager?

21  A.   We had, I mean, A&D sales reps, and we have regular

22  outside sales rep, and these are mostly with the dealers.

23  Q.   Okay.  And so can we please turn to Defendants'

24  Exhibit M, which I don't believe has been entered into

25  evidence, but I do believe it's been stipulated to.

1821

Redirect - Prior

1     And so if --

2     THE COURT:  Are you moving it into evidence?

3     MR. THOMAIDIS:  I'm sorry, yes.  May I please move

4   this into evidence, Your Honor.

5     THE COURT:  All right.  Given the stipulation,

6   Exhibit M is admitted into evidence and may be published to

7   the jury.

8     (Defendants' Exhibit M received)

9   BY MR. THOMAIDIS:

10  Q.   And so does that appear to be, to the best of your

11  understanding, Mr. Handley's signature in the lower

12  right-hand corner of this document?

13  A.   Yes.

14  Q.   And what about the signature beneath that?

15  A.   That's Paco.

16  Q.   Okay.  Now, can we look in the upper left-hand corner

17  of this document.  So this appears to have a date of

18  November 16, 2009; would you agree?

19  A.   Yes.

20  Q.   What is this document?

21  A.   This is the year-end review.  I mean all the managers,

22  they have to do a yearly review with the people that they

23  manage --

24  Q.   So this would have -- sorry, go ahead.

25  A.   -- at the end of the year.

Redirect - Prior

1     This is done between November and December.

2  Q.   This would appear to be a yearly review for an

3  employee named Jack Handley; would you agree?

4  A.   Yes.

5  Q.   So what is his job title here?

6  A.   Outside sales.

7  Q.   And that would have occurred approximately a month

8  before this contract was allegedly signed, this exclusive

9  distributor agreement of December 14, 2009; is that right?

10 A.   Yes.

11 Q.   Okay.  So does it appear -- well, based on your

12 knowledge of the company, what does it appear Mr. Handley

13 was at that time?

14 A.   He was an outside sales rep.  He became manager in

15 summer of 2011.

16 Q.   Okay.  So last question:  So is there such a thing as

17 an A&D manager?

18 A.   Nowadays we have managers that they manage, you know,

19 A&D reps.

20 Q.   Okay.  And what does A&D stand for?

21 A.   For architectural and design.

22 Q.   And so is that a title that results in additional pay,

23 to your knowledge?

24 A.   It depends.  I mean --

25 Q.   Does it result in additional job responsibilities?

Redirect - Prior

1   A.   Well, I mean, like a regular outside sales rep, as

2   Jack was before, he was just managing dealers, which is a

3   much easier market.

4        When you go for A&D, you have to -- you have to

5   have more knowledge.  So it's a step up from, let's say,

6   from his position, that that's probably why he wanted to be

7   on there.

8   Q.   So with respect to an outside salesperson and an A&D

9   manager, would they have any additional authority?

10  A.   An A&D manager, they have -- yeah, they have a little

11  bit more authority than the sales rep, when it comes, you

12  know, specifically with the discount and the customers.

13  Q.   And what does that authority -- at least to the extent

14  you know, what's that authority consist of?

15  A.   There is a little bit -- a little bit more discount

16  they can give.  And then if there is something depending on

17  the job you have to quote it, and they have to approach the

18  general manager, if they go beyond that range of

19  discounts.

20  Q.   Okay.  And so at least at this point in time, on

21  paper, it would appear that Jack Handley was an outside

22  salesperson --

23       MR. TeSELLE:  Objection.  Asked and answered.

24       THE COURT:  Sustained.

25       MR. THOMAIDIS:  I'll withdraw the question.

1824

                            Redirect - Prior

1   BY MR. THOMAIDIS:

2   Q.   Mr. Prior, so this litigation has now gone on since

3   November of 2013, correct?

4   A.   Yes, that's correct.

5   Q.   So can you give me an estimation of how much

6   altogether the defendants have spent in attempting to

7   defend themselves in this matter?

8            MR. TeSELLE:  Objection.  Beyond the scope of my

9   cross-examination.

10           THE COURT:  Rule 611 has no such limitation.

11  Overruled.

12           THE WITNESS:  I can answer?

13           THE COURT:  Go ahead.

14           THE WITNESS:  Well, we have spent a lot of money,

15  a lot of resources.  And just, I mean my time, my colleague

16  Alicia, many other people involved in the department to

17  pull up these e-mails, and human resources to, you know,

18  dig in papers that were left in the warehouse, you know,

19  like you see records here from 2002, '-3, '-4, so getting

20  all that information has been a lot of time.

21           And I say the IT, I mean, we have to talk -- we

22  talked to a lot of people in Porcelanosa Los Angeles, we

23  talked to people in Porcelanosa Texas, also that was

24  involved in the Colorado area at some point, and it has

25  been hours for our site.  My estimation, based on the rates

Redirect - Prior

1    of the salaries of the people involved on this and that was

2    around, I mean, $460,000.

3    Q.   And now does that include or exclude attorney's fees,

4    costs, expert --

5    A.   No, just including the -- our people.  I mean, I am

6    not including, I mean, the attorney's fees, I'm not

7    including travel expenses, I'm not including here like

8    expert -- I mean, expenses that we had to pay in order to

9    verify the signature and what -- in order to identify the

10   financials of Crew Tile.

11        When we put all that together -- I'm still waiting

12   for your next bill, but I -- my estimation that it's going

13   to be something close to $1.6 million, yeah.

14   Q.   And so -- last question.  So does Porven Limited, or

15   any of the entities that you're responsible for managing in

16   the United States, do any of them allow exclusivity

17   agreements in a given geographic area?

18   A.   No.   There is -- this is rule No. 1 when it comes from

19   a factory, we have our own distribution network.  We have

20   26 showrooms in the United States, we have 430 employees

21   right now, I would say that 60 percent of them are

22   salesperson.  Those are boots on the ground.  So there is

23   no way that we can give, you know, our business model that

24   we started here in 1998, there is no room for exclusivity

25   because, I mean, we have our own presence in this market.

Redirect - Prior

1      So you are not going to find any other -- I mean,

2  you aren't going to find any -- any customer in the United

3  States with an exclusivity agreement.  And this is rule No.

4  1, because we have the presence here and we have -- I mean,

5  the resources and the -- we made the investment.  It

6  wouldn't make any sense not to run the business any other

7  way.

8  Q.   And since I'm an attorney and I'm going to use all the

9  time I have, I have one other question for you, which is

10  historically, when, for instance, Porcelanosa Los Angeles

11  goes and opens a showroom in a given geographic area, does

12  that usually help or hinder the dealers in the area to sell

13  products?

14  A.   They grow with us.  I mean, every time -- like, for

15  instance, I remember in the -- for some reason, I know,

16  the -- the company that has the -- the six companies that

17  we have, the one that has more dealers is Porcelanosa Los

18  Angeles compared to the others.  And when we open our

19  showroom in -- that we came out many times during this

20  trial in West Hollywood, I mean, all the dealers around in

21  the area were scared because we had a very strong presence,

22  but then we only had one showroom in the area, which is in

23  Anaheim, which is very far away from Los Angeles downtown.

24  And all the dealers were kind of afraid of us.

25      The truth of the matter is like after we opened

1827

Redirect - Prior

1    the showroom --

2             MR. TeSELLE:  Your Honor --

3             THE COURT:  Hold on, hold on.

4             MR. TeSELLE:  It's starting to be a narrative

5    beyond the question that was asked.  If we --

6             THE COURT:  Overruled.  You may finish your

7    answer.

8             THE WITNESS:  All dealers where we -- around the

9    showroom, they all grow with us.  We grow the business.

10   And it was a surprise -- very positive surprise for them.

11   And it happen -- not only in LA was the first time that we

12   really experienced that in the firsthand, because I mean we

13   started in 2008, and we opened the showroom in 2011, during

14   all these years we have been expanding the business in the

15   United States and every single time that we open a

16   showroom, all the network of dealers that we had around the

17   area, they grow out their business, too.

18            MR. THOMAIDIS:  Thank you.  I have no other

19   questions.

20            THE COURT:  Thank you.  Mr. Prior, thank you for

21   your testimony.  You may step down.

22            All right.  We're going to call it a day.  Ladies

23   and gentlemen of the jury, you're probably not going to be

24   surprised to hear from me that we will definitely be going

25   into Thursday.

1828

Redirect - Prior

1     Please do not do any independent research or

2  discuss the facts, the law, the lawyers, or issues of this

3  case.  We will be in recess.

4     The lawyers -- I have a couple of things to handle

5  with you, but for the jurors, we will be in recess until

6  8:45.

7     (Jury left the proceedings at 5:01 p.m.)

8     THE COURT:  All right.  My first question, Mr.

9  Thomaidis, is are you still intending to call all of the

10  remaining witnesses on your witness list?

11     MR. THOMAIDIS:  At this time, Your Honor, we are.

12     THE COURT:  Okay.  I was afraid you were going to

13  say that.

14     Well, other than rebuttal -- and I'm going to

15  decide tomorrow how much I'm going to allow -- both sides

16  will get rebuttal, but it's -- you can sit down -- it's

17  going to be very, very limited.  Other than rebuttal, we

18  have to finish tomorrow.  There's just no way about it.  I

19  mean, that would leave Thursday for rebuttal, charging

20  conference, reading instructions to the jury, closing

21  arguments.

22     Even if we finish tomorrow with everything but

23  rebuttal, the jury isn't going to get this case until

24  Thursday afternoon.  And when they find out they're going

25  to be deliberating most likely into Friday they're going to

Redirect - Prior

1     be pissed, all right?  So I have no option but to -- I have

2     been doing the numbers, and everyone that's left on the

3     defendants' witness list, we are -- on both direct and

4     cross, the amount of time will be cut in half.  That's the

5     only way -- we have been averaging around six and three

6     quarters, if we stretched it, seven hours, on the record

7     each day.

8          Right now, excluding Ms. Stransky's deposition,

9     everyone else, McSparren, McFarlen, Venezia, Balentine, and

10    Carlson, they add up to 12 hours.  If Stransky's depo's

11    anything like the ones we've done, that will be an hour.

12    So you take one hour away from seven, that leaves six.

13    If -- I used the numbers that you folks have on this

14    witness list, those five witnesses amount to 12 hours, so

15    if we only have six hours left, that means everybody's

16    going to be cut in half.

17         The -- let me tell you what I'm thinking in terms

18    of rebuttal.  I'm thinking of allowing one witness per side

19    for rebuttal, and I'll have to decide tomorrow how much

20    time I'll be able to give each side for that.  But because

21    there are counterclaims, the defendant will have a rebuttal

22    as well.

23         MR. BURG:  Your Honor --

24         THE COURT:  I -- let me finish.

25         MR. BURG:  I'm sorry.

Redirect - Prior

```
 1          THE COURT:  You should plan on closing arguments
 2    on Thursday.  I'll take input now in terms of how much
 3    counsel want on closings.
 4          MR. BURG:  Your Honor, there are a lot of issues
 5    here.  I would ask for an hour and 15 minutes.
 6          THE COURT:  All right.  What do you --
 7          MR. THOMAIDIS:  And, Your Honor, may I make a
 8    preliminary statement with respect to the remaining
 9    witnesses?  I will confer with my colleagues tonight.  This
10    will mean that, obviously, we've tried to distribute a
11    trial schedule so everybody understands who's going to be
12    called tomorrow --
13          THE COURT:  Right.
14          MR. THOMAIDIS:  -- if I confer with my colleagues
15    and we're able to figure out a way to streamline the
16    remaining witnesses, may I advise everyone of that in the
17    morning without going afoul of your rules?
18          THE COURT:  By streamlining, you mean eliminating
19    a witness?
20          MR. THOMAIDIS:  That's correct, Your Honor.
21          THE COURT:  Yes.  As far as I'm concerned, you
22    have the -- you -- you have the discretion to decide who
23    you're going to put on.  So if you wanted to -- that was
24    why I asked you that question first, because you are under
25    no obligation, as far as I'm concerned, to call everyone on
```

Redirect - Prior

1   your witness list.

2           And almost every trial -- actually this will be

3   the first trial that I've ever had any party call every

4   witness they've listed.  So it was a surprise to me when

5   you said you were intending to call everyone.

6           Now, if you can reduce the list by one, then I'll

7   give you the -- because you are eliminating that witness,

8   I'll give you the option of telling me where you want that

9   time freed up apportioned.  But the time freed up would be

10  the half time that I'm telling you.

11          So, for example, I mean, take a look at your

12  witness list.

13          Mr. Burg, you can sit down.

14          The easiest to pick right now is Sandie Venezia.

15  If you were to tell me that you were no longer going to

16  call her, then you would get an extra half hour.  All

17  right?  And that's what I mean by that.

18          But why don't you do this:  When you first -- when

19  you get in tomorrow, ask Ms. Hansen to tell us back in

20  chambers if you're going to drop a witness and then I can

21  start doing some mental calculations -- and also tell me

22  who you would prefer that time to be apportioned to, and

23  then we'll go from that.

24          Are you -- have you disclosed to the plaintiff

25  when -- or the sequence, rather, of your witnesses for

Redirect - Prior

1    tomorrow?

2         MR. THOMAIDIS:  Your Honor, I have not.  I can do

3    it now or do it off the record.

4         THE COURT:  No, I don't want to be involved.  I

5    didn't --

6         MR. THOMAIDIS:  Understood, Your Honor.

7         THE COURT:  Just let them know.  And obviously if

8    you drop someone after discussions tonight, let them know

9    via e-mail or something, or phone call.  All right.  So

10   does this answer your question?

11        MR. THOMAIDIS:  It does, Your Honor.  Thank you.

12        THE COURT:  Okay.  Now, your input on length of

13   closing argument.

14        MR. THOMAIDIS:  I believe that I could probably

15   limit my closing to 45 minutes.  Well, actually, may I have

16   an hour?

17        THE COURT:  Well, Mr. Burg's asked for 75.

18        MR. THOMAIDIS:  I understand.

19        THE COURT:  What are you asking for?

20        MR. THOMAIDIS:  Well, in the interest of brevity,

21   I would suggest an hour for both of us, but --

22        THE COURT:  I think there's a lot here and I'm

23   going to agree to 75 minutes for closing arguments.  Again,

24   you don't have to take all that time.  If you want to take

25   a half an hour and sit down, that's fine with me.

Redirect - Prior

1    Per my practice standards, since both sides are

2    going to have rebuttal, and per my practice standards you

3    can't reserve more than a third, so that means with 75

4    minutes, you can reserve no more than 25 minutes for your

5    rebuttal.  50 minutes for the opening portion of your -- of

6    your closing arguments and in one way -- and this is

7    important because we've had some confusion in prior trials,

8    and I would like to think that the lawyers were just

9    confused and didn't want to do this intentionally because

10   it causes the sandbagging that my practice standards is

11   meant to avoid.  That being said, let's say, hypothetically

12   one of you takes 40 minutes in your opening segment, that

13   does not mean you get 10 minutes plus 25.  So you can never

14   have more than 25 minutes in rebuttal.  All right?  Is that

15   clear?

16         MR. BURG:  Yes.

17         THE COURT:  Anything else we have to deal with

18   tonight?

19         MR. BURG:  I have two issues.  One is we would

20   waive our rebuttal witnesses if they will.  We would

21   stipulate -- this jury's heard everything.

22         THE COURT:  I think they have.

23         MR. BURG:  I don't --

24         THE COURT:  And I'll make one point, too.  You

25   know, we didn't have the time back in chambers when we were

Redirect - Prior

1    going through the depositions and making the rulings, and

2    there was a lot of that, there was a lot of work that Mr.

3    Foster spent a lot of nighttime here doing that.  We were

4    ruling on objections.

5            I was disappointed how much repetitive testimony

6    was designated on the depositions.  If I -- I was ready to

7    scream if I heard one more time how you put "exclusive" in

8    the signature block, yes, and you were asked to take it

9    off, yes.  That must have been asked seven times and you

10   designated it seven times.

11           I mean, so I agree with you, if you two -- if both

12   sides are willing to waive rebuttal, the jury will thank

13   you immensely, we can get to closings earlier on Thursday.

14   It will just run much more smoothly.

15           You don't have to make that decision right now,

16   Mr. Thomaidis.  You can consult with your client and your

17   colleagues, but if you tell -- if you do both agree, then

18   we will do that.

19           Your second point, Mr. Burg.

20           MR. BURG:  Again, because of the complexity of the

21   case -- even after 41 years I'm a little confused, so I

22   need your help.

23           THE COURT:  All right.  That's all right.  We're

24   all tired.  This is --

25           MR. BURG:  In terms of closing, normally the

Redirect - Prior

1    plaintiff, we would go first and last.  Is that changed by

2    the fact that they have a counterclaim?  Or do they go

3    before me and then I get to go last on our -- the main

4    claim?

5        THE COURT:  No.  You both will have -- you will

6    go -- you both will have an opening segment and a rebuttal

7    segment.  So you -- so you will do your 50 minutes, Mr.

8    Thomaidis will do his 50 minutes, you will do your 25

9    rebuttal, he'll do his 25 rebuttal.

10       MR. BURG:  So in this particular instance, the

11   counterclaimant will get the last word.

12       THE COURT:  Right.  Well, they have -- they

13   have -- they have the same legal burden on their

14   counterclaims as the plaintiff has on its claims.

15       MR. BURG:  Well, I understand that.

16       THE COURT:  You both get to do -- there's no other

17   way to do it.  You each -- you each have, in my view, the

18   right to do a rebuttal portion of your closing argument,

19   and legally there's no way in my mind I can distinguish the

20   burden between the plaintiffs' burden to prove its claims

21   in the suit and the defendants' burden to prove its

22   counterclaims.  And also the defendant has the burden on

23   affirmative defenses.  So, if anything, they have more

24   burden on more different issues and more claims than

25   defenses.

Redirect - Prior

1      MR. BURG:  The last question I have is with regard

2  to the jury instructions.

3      THE COURT:  Right.

4      MR. BURG:  When does the Court -- are we going to

5  have a conference or is the Court just --

6      THE COURT:  Of course.  No, no --

7      MR. BURG:  When are we anticipating the

8  conference?

9      THE COURT:  Okay.  That is exactly why I said we

10  had to finish tomorrow, because I'm looking forward to

11  Thursday.  If you don't both agree to waive rebuttal

12  witnesses, then we'll have to do the rebuttal witnesses

13  first thing in the morning, then we -- do you want to hear

14  my answer, Mr. Burg, or do you want to talk with your

15  counsel --

16      MR. BURG:  No, I apologize.

17      THE COURT:  -- your colleague?

18      All right.  Let me take a positive look -- outlook

19  and say that you both agree no rebuttal.  All right.  So

20  that means Thursday morning, we would have to do the

21  plaintiff -- if the plaintiff wants to make a Rule 50

22  motion against the counterclaims and the defendants'

23  renewal of its Rule 50 motion, we'll have to have argument

24  and ruling on that.

25      And then we will have a charging conference.  Of

Redirect - Prior

1   course, I would never just instruct the jury without giving

2   counsel an opportunity to make the record on the final set

3   of instructions.  You may recall from the trial you had

4   before me a few years ago, Mr. Burg, that my practice is to

5   bring out the Court's set of jury instructions 15 minutes

6   before I come out on the bench and that you'll have the

7   Court's final set, you'll get to review it, collect your

8   thoughts, and then make your record when I come out for the

9   charging conference.

10          Let me just say this:  We have been spending a lot

11  of time and a lot of effort; Mr. Foster and I have been

12  meeting most every meeting -- every evening already on

13  these instructions starting from last week.  So my sense is

14  I'll just let you make your record and I probably will not

15  change too much.  Obviously misspellings or grammatical

16  errors and all that, you bring to our attention, we'll make

17  those corrections.  But the bar is -- I don't want to imply

18  that I will never make a change.  If you -- if you make an

19  objection, especially if you don't have 20 objections, if

20  you have two or three that you want to limit it to and you

21  make a very strong argument and I consider it and discuss

22  it with Mr. Foster, I have been known to make revisions in

23  the final set.  So the final final set will not be

24  completed until we're done with the charging conference.

25          But having said all that, because of the

Redirect - Prior

1   complexity of the claims, the counterclaims, the

2   affirmative defenses, my bar is going to be pretty high for

3   you to convince me to go back to the drawing board on any

4   particular instruction, but you'll have your opportunity to

5   make your record.

6          MR. BURG:  And, again, Your Honor, I do recall how

7   we did it and I -- again, I appreciate your diligence

8   because it makes it a lot easier than going back and

9   arguing the instructions, but doing it the way you're doing

10  it -- and we -- and I appreciate that and that's what I was

11  asking about.

12         THE COURT:  Sure.  If you also recall -- I think

13  it's in my practice standards -- I will read the

14  instructions, the final set first.  After you get the final

15  final set, you will all get a set without the annotated

16  citations on the bottom.  And I instruct first because then

17  you can use an instruction during closing argument if you

18  want.  That's how I found that it has worked best.

19         All right.  Anything further we need to discuss

20  this evening for the plaintiff?

21         MR. BURG:  Nothing for the plaintiff.

22         THE COURT:  All right.  For the defendants?

23         MR. THOMAIDIS:  Not at this time, Your Honor.

24         THE COURT:  All right.  We will be in recess until

25  8:45 tomorrow morning.

1839

Redirect - Prior

| 1 | (Proceedings concluded at 5:16 p.m.) |

**INDEX**

Item     PAGE

### DEFENDANTS' WITNESSES

**WENDY KRAMER**
Direct Examination by Mr. Thomaidis    1626
Cross-examination by Mr. Crough    1659
Redirect Examination by Mr. Thomaidis    1675

**JOSEPH GRIEBEL**
Direct Examination by Mr. Thomaidis    1688
Cross-examination by Mr. Crough    1718
Redirect Examination by Mr. Thomaidis    1731

**MANUEL PRIOR**
Direct Examination by Mr. Thomaidis    1740
Cross-examination by Mr. TeSelle    1777
Redirect Examination by Mr. Thomaidis    1815

### PLAINTIFFS' EXHIBITS

| EXHIBITS: | Offered | Received | Refused | Stipulated |
|---|---|---|---|---|
| 2 | 1728 | 1729 | | |
| 26 | 1791 | 1791 | | |

### DEFENDANTS' EXHIBITS

| EXHIBITS: | Offered | Received | Refused | Stipulated |
|---|---|---|---|---|
| A-3 | 1752 | 1752 | | |
| A-6 | 1752 | 1752 | | |
| A-22 | 1752 | 1752 | | |
| A-72 | 1752 | 1752 | | |
| A-92 | 1752 | 1752 | | |
| B-19 | 1752 | 1752 | | |

1840

Redirect - Prior

1    DEFENDANTS' EXHIBITS

| EXHIBITS: | Offered | Received | Refused | Stipulated |
|-----------|---------|----------|---------|------------|
| B-65 | 1752 | 1752 | | |
| G | 1646 | | 1646 | |
| M | 1821 | 1821 | | |
| Z | 1704 | 1704 | | |

7    *    *    *    *    *

8    REPORTER'S CERTIFICATE

10    I certify that the foregoing is a correct transcript

11  from the record of proceedings in the above-entitled

12  matter.

13    Dated at Denver, Colorado, this 1st day of May, 2017.

MARY J. GEORGE, FCRR, CRR, RMR