```
 1                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLORADO
 2
     Civil Action No. 13-cv-3206-WJM-KMT
 3
     CREW TILE DISTRIBUTION, INC.,
 4
     Plaintiff and Counterclaim Defendant,
 5
     and
 6
     RYAN A. DAVIS,
 7   DARLYNE A. DAVIS,
     GLENN L. DAVIS,
 8   SHANA L. BASTEMEYER,
     PARADIGM TILE & STONE DISTRIBUTORS, LLC, and
 9   G&D DAVIS HOLDINGS, LLC,

10   Counterclaim Defendants,

11   vs.

12   PORCELANOSA LOS ANGELES, INC.,
     PORCELANOSA NEW YORK, INC.,
13   PORCELANOSA TEXAS, CORP., and
     PORVEN, LTD.,
14
     Defendants.
15
     -------------------------------------------------------------
16
                         REPORTER'S TRANSCRIPT
17                        (JURY TRIAL, DAY 8)
                             VOLUME VIII
18   -------------------------------------------------------------

19        Proceedings before the HONORABLE WILLIAM J. MARTINEZ,

20   Judge, United States District Court for the District of

21   Colorado, commencing at 8:53 a.m., on the 22d day of March,

22   2017, in Courtroom A801, United States Courthouse, Denver,

23   Colorado.

24

25
```

1842

1   APPEARANCES

2       MICHAEL S. BURG, DAVID K. TeSELLE, and DAVID J.
    CROUGH, Burg, Simpson, Eldredge, Hersh & Hardine,
3   PC-Englewood, 40 Inverness Drive East, Englewood, Colorado
    80112, appearing for the plaintiffs.
4
        JAMES N. THOMAIDIS, JARED A. BARNARD and JONATHAN T.
5   LIEBER, Gersh & Thomaidis, LLC, 1860 Blake Street, Suite
    400, Denver, Colorado 80202, and
6   D. ELIZABETH WILLS, Wills Law Firm, LLC, 20 South Cherry
    Street, Denver, Colorado 80246, appearing for the
7   defendants.

8

9           MARY J. GEORGE, FCRR, CRR, RMR
          901 19th Street, Denver, Colorado 80294
10        Proceedings Reported by Mechanical Stenography
            Transcription Produced via Computer
11

12              P R O C E E D I N G S

13      (Proceedings in open court outside the presence of the

14  jury at 8:53 a.m.)

15          THE COURT:  All right, a couple of things to

16  cover.  I understand that the parties have agreed to waive

17  rebuttal witnesses; is that right?

18          MR. BURG:  That is correct, Your Honor.

19          THE COURT:  For the defendants?

20          MR. THOMAIDIS:  It is, Your Honor.

21          THE COURT:  Okay.  Excellent.  That helps save

22  some time for tomorrow.  And that you -- the defendants

23  have elected to not call Ms. Venezia today.

24          MR. THOMAIDIS:  That's correct, Your Honor.

25          THE COURT:  All right.  So how do you want to

1    apportion your half hour?

2        MR. THOMAIDIS:  At the moment, I think I'm going

3    to have to apportion it to Ms. Carlson.

4        THE COURT:  Okay.  All right.  So you were going

5    to get an hour, so you will have an hour and a half with

6    Ms. Carlson.  And that means that the 15 minutes that the

7    plaintiff gets from Venezia will be added to the

8    plaintiffs' cross of Wendy Carlson, so that will be an hour

9    and 15 minutes cross-examination for Ms. Carlson.

10       Tell me the order that you're going to call your

11   witnesses.  And as you're doing it, tell me -- just give me

12   a sense of some of these folks, I have no idea who they

13   are, what they're going to be testifying about, just, you

14   know, a sentence about each one.

15       MR. THOMAIDIS:  Understood, Your Honor.  May I

16   take the podium?

17       THE COURT:  Of course.

18       MR. THOMAIDIS:  At this time, we are planning on

19   calling Ms. Carlson this morning, who's a forensic

20   handwriting --

21       THE COURT:  I know who she is.  Is she next?

22       MR. THOMAIDIS:  Yes, she is.

23       THE COURT:  Okay.

24       MR. THOMAIDIS:  That was --

25       THE COURT:  Who's after Ms. Carlson?

1   　　　　MR. THOMAIDIS:  I'm sorry?

2   　　　　THE COURT:  Who's after Ms. Carlson?

3   　　　　MR. THOMAIDIS:  Ms. Carlson is followed by Mr.

4   McSparran and Mr. McFarlen if the Court recalls, is the

5   business practices expert.

6   　　　　THE COURT:  Right.

7   　　　　MR. THOMAIDIS:  Mr. McSparran we anticipate, will

8   be followed by Mr. Rick Balentine, who --

9   　　　　THE COURT:  I know who he is.

10  　　　　MR. THOMAIDIS:  -- the Court is familiar with.

11  And Mr. Balentine will be followed by Mr. McFarlen, who's

12  our forensic accountant.  And Mr. McFarlen will be followed

13  by Ms. Stransky, who we will be hearing from via video.

14  　　　　THE COURT:  And based on my comments yesterday, if

15  you didn't already take my hints, you are free to

16  undesignate portions of Ms. Stransky's deposition that

17  would be repetitive, cumulative, all those other good

18  things that we have been saying and hearing.  So as short

19  as we can make her.  Obviously you cannot add anything

20  because we're only going by what you've designated and only

21  your designations give the opportunity to the plaintiff to

22  make an objection, but obviously if you're dropping

23  testimony that's already in because there's been no

24  objection or the objection's overruled, that's entirely

25  your call and I encourage you to consider that.

1    MR. THOMAIDIS:  Understood, Your Honor.  And the

2    only challenge we've got with that is the editing of the

3    video, so I might -- we're going to try to do that today if

4    possible, and I'll certainly let the Court and counsel

5    know, and I'm not sure we can pull it off at the moment.

6    THE COURT:  She's your last witness, so you will

7    have the lunch time to do that.

8    MR. THOMAIDIS:  Ah, that's a good point.  Okay.

9    Thank you, Your Honor.

10   THE COURT:  Okay.  Mr. Burg, you had a question or

11   issue to raise.

12   MR. BURG:  It's already been taken care of with

13   the other issues you raised, Your Honor.

14   THE COURT:  Okay.  Excellent.  All right.  Let's

15   bring out the jury.

16   Oh, Deb, I'm sorry, I forgot to do this, just hold

17   on.

18   Sit down for a second.

19   At least for the first -- for Ms. -- the first

20   three, so Carlson, McSparran and Balentine, I need to get

21   an apportionment here of how -- and then we know how much

22   to -- okay.  So for Wendy Carlson, the defendants now have

23   90 minutes.  How much do you want for direct and how much

24   do you hold in reserve for your redirect?

25   MR. THOMAIDIS:  I'd like to do 55 minutes on

1    direct and 20 minutes for redirect, please.

2              THE COURT:  Okay.  And how about cross?  You have

3    75 minutes for plaintiff.

4              MR. BURG:  I'm sorry -- what?  She's not cross --

5              THE COURT:  Oh, that's right, she's not

6    cross-endorsed.  I'm getting tired.

7              MR. BURG:  Can I get a 15-minute -- rather than

8    the two-minute, I probably can keep track of it, but I'd

9    like to get a 15-minute call on my time.

10             THE COURT:  Any -- two minutes is our default.  If

11   you wanted a different time, any time you wish.

12             MR. BURG:  If I could get a 15-minute, that would

13   be wonderful.  Thank you.

14             THE COURT:  That's right.  So it's just going to

15   be cross, there's no cross-endorsed -- none of these

16   witnesses are cross-endorsed, right?

17             MR. BURG:  That's correct.

18             THE COURT:  Okay.  So plaintiffs have 75 minutes

19   with Ms. Carlson, and have requested a 15-minute warning.

20             With Mr. McSparran, same thing, you have 90

21   minutes, Mr. Thomaidis.  How much do you want for direct

22   and how much redirect?

23             MR. THOMAIDIS:  I'd like to ask for the exact same

24   if I could, Your Honor.  And obviously we'll try to do

25   these experts more quickly if possible.

1   THE COURT:   Okay.   The plaintiff has -- I'm sorry,

2   wait, wait, wait.   Yeah, we're doing halves.   You don't

3   have an hour and a half for -- you have -- I'm glad we're

4   doing this now.   90 -- you have 45 minutes with Mr.

5   McFarlen.   How do you want --

6   COURTROOM DEPUTY:   McSparran?

7   THE COURT:   I mean McSparran.

8   MR. THOMAIDIS:   At the end of the day, they're

9   both 45 minutes, I think.   So I think -- I think I'm going

10  to do 40 and five, please.   40 minutes and five minutes,

11  please.

12  THE COURT:   Okay.   And with Mr. McSparran, the

13  plaintiff has half an hour.   How much of a warning do you

14  want?

15  MR. TeSELLE:   I mean, I may not even use the whole

16  half hour, but the two minutes is fine.

17  THE COURT:   30 minutes, two-minute warning.   Okay.

18  The last one we'll deal with now is McFarlen, you also have

19  45 minutes.   Do you want to apportion it the same way or

20  something different?

21  MR. THOMAIDIS:   The same way is fine, Your Honor,

22  please.

23  THE COURT:   Same way.   45.   And plaintiff has 30

24  minutes.   How much of a warning do you want of that?

25  MR. CROUGH:   If I could get a five-minute warning

1    with Mr. McFarlen, please.

2         THE COURT:  25 with a -- 30 minutes with a

3    five-minute warning for Mr. McFarlen.  All right.  Now we

4    can bring in the jury.

5         MR. THOMAIDIS:  Your Honor, I'm sorry, there is

6    the matter of Mr. Balentine.  Now, I don't know that --

7         THE COURT:  I just wanted to cover these now.

8    We'll have time --

9         MR. THOMAIDIS:  Oh, I'm sorry, Your Honor.

10        THE COURT:  I suspect that will take us through

11   the morning, and at lunch we can figure out how you're

12   going to apportion the remainders.

13        MR. THOMAIDIS:  Understood.  Thank you.

14        THE COURT:  Yeah.

15      (In open court in the presence of the jury at 9:01

16   a.m.)

17        THE COURT:  Welcome back, ladies and gentlemen of

18   the jury.  Good morning.  Welcome to day 8 of our jury

19   trial.

20        The defendants/counterclaimants may call their

21   next witness.

22        MR. THOMAIDIS:  At this time, defendants and

23   counterclaimants call Ms. Wendy Carlson.

24        COURTROOM DEPUTY:  Right here, ma'am.  Just face

25   me and raise your right hand.

1849

Direct - Carlson

1    WENDY CARLSON, DEFENDANTS' WITNESS, SWORN

2         COURTROOM DEPUTY:  Please be seated.  State your

3    full name for the record and spell your first and last

4    name.

5         THE WITNESS:  Yes, my name is Wendy Carlson.

6    W-e-n-d-y, C-a-r-l-s-o-n.

7                    DIRECT EXAMINATION

8    BY MR. THOMAIDIS:

9    Q.   Ms. Carlson, thank you very much for being here today.

10   A.   Yes.

11   Q.   Would you please -- and as a preliminary matter, we've

12   got kind of a tight time frame, so I'm going to try to

13   expedite my questioning as much as I can.  But to start,

14   what is your profession?

15   A.   I'm a forensic document examiner and handwriting

16   expert.

17   Q.   Okay.  And is that your full-time profession?

18   A.   Yes, it is.

19   Q.   And so what's your professional title?

20   A.   Forensic document examiner.

21   Q.   Okay.  And is there a certification process?

22   A.   There's an apprenticeship process.  It's a two-year

23   apprenticeship, it's a very rigorous course.  And upon

24   completion, we receive a certificate, yes.

25   Q.   Okay.  And so please explain to the Court and the jury

1850

Direct - Carlson

1    what training you've had in forensic document examination.

2    A.   I completed that two-year apprenticeship through the

3    school of -- the International School of Forensic Document

4    Examination.   That's the only nongovernmental school of its

5    kind in the nation.

6         Upon completing that, the last six months of that

7    apprenticeship and the following 3 1/2 years, I officed

8    with anywhere from one to three other document examiners

9    where we regularly peer-reviewed each other's work or gave

10   second opinions.

11        I've also completed a Fundamentals of Forensic

12   Document Examination course through West Virginia

13   University.

14   Q.   And so can you give us an estimation or an

15   approximation of how many documents you've examined or

16   given an opinion on.

17   A.   I've examined about 15,000 documents from about 1400

18   cases.

19   Q.   And so how many times have you testified in a court

20   case like this one?

21   A.   I've testified in -- more than 120 times in courts and

22   hear- -- trials and hearings.

23   Q.   And have you been court -- appointed by a Court like

24   this one to provide a neutral opinion?

25   A.   To provide a neutral opinion?   I don't quite

Direct - Carlson

1  understand your question.

2  Q.   I'm sorry.  Have you -- have you been appointed by any

3  courts to -- I'm not quite sure what the terminology is.

4  Have you been appointed by a Court as a document

5  examiner?

6  A.   Yes.

7  Q.   Okay.  And approximately how many times?

8  A.   I believe about five times in the past eight or --

9  eight, nine years.

10  Q.   Okay.  And in how many states have you been qualified

11  as an expert in this field?

12  A.   I've been qualified as an expert in 15 states, the

13  Bahamas, and in Canada.

14  Q.   And how many states have you rendered an opinion with

15  respect to document examination?

16  A.   The same number.

17  Q.   Okay.  And so what are the various types of cases that

18  you provide forensic document examination for?

19  A.   The cases I receive have to do with wills, deeds, car

20  or boat titles, contract disputes, mortgages.  I've had

21  cases regarding writing on the bathroom wall or anonymous

22  writing.  I've done some work for the Buena Vista Police

23  Department about graffiti on a car.

24  Q.   And so when did you complete your first core

25  qualification?

Direct - Carlson

1   A.    That was in 2008.

2   Q.    And can you give us a sampling of what the courts are

3   and what states where you have been qualified as an expert.

4   A.    I've been qualified as an expert in local, state or

5   federal courts.  Excuse me.  The states I've been qualified

6   that I can recall -- let me go through that list, I'll

7   start from west to east.  Washington, Montana, Nevada,

8   Colorado, Texas, Wyoming, Arizona.  I've been qualified in

9   Philadelphia, New York, Missouri, Georgia, Michigan, and

10  Florida, that I can remember.

11  Q.    Okay.  And does that include with both state and

12  federal courts?

13  A.    Not in each particular state, but I have been

14  qualified in both state and federal courts in Colorado and

15  Texas.

16  Q.    Okay.  And are you a member of any professional

17  organizations?

18  A.    Yes.  I'm a member of the Scientific Association of

19  Forensic Examiners, as well as the American College of

20  Forensic Examiners International.

21  Q.    And I'm going to ask that -- you may have to move a

22  little closer to that microphone.  It's ironic that I'm

23  saying that because usually people are saying that to me.

24  A.    Okay.

25  Q.    And so have you authored any publications?

Direct - Carlson

1   A.    I've authored a type of book -- workbook that I use in

2   conjunction with the class that I teach.  And it's called

3   How to Spot a Forgery.  I've taught that class to the

4   Denver Elections Division about five times or six times

5   during the course of five years.  I've also taught the same

6   class to the Riley Election Divisions in Kansas, as well as

7   gave a short class to the Denver County -- or, I beg your

8   pardon, the Colorado County Clerks Association.

9   Q.    Okay.  Have you ever been retained by any governmental

10  entities aside from some of those you just mentioned?

11  A.    I've been retained by the Department of the Army in

12  Fort Hood, Texas; Sicoe County in Canada; I've been

13  retained by the federal or state Public Defender's Offices

14  in New York, Nevada, and Wyoming; the Buena Vista Police

15  Department, as I stated earlier.  The Office of the General

16  Counsel in Oklahoma.

17        Those are what come to mind immediately.

18  Q.    Okay.  And so with respect to forensic document

19  examination, do you maintain a laboratory where you do this

20  work?

21  A.    Yes, I do.

22  Q.    And so what does that consist of in terms of

23  equipment?

24  A.    I have two stereo microscopes, which are microscopes

25  with a dual eye piece.  One of those also has a tablet that

1854

Direct - Carlson

1    attaches to it so I can view what I am examining actually

2    up on a tablet and take photographs, if necessary.

3              I have a light box to shine to illuminate the

4    documents so I can see through them to overlay them, if

5    necessary.  I have grids, metric rulers.  I have multiple

6    magnifying devices, anywhere from three to 24 times

7    magnification, as well as a MacIntosh computer with about a

8    21-inch screen, so I can enlarge documents on line as well.

9    And printers, copiers, to enlarge documents with.

10   Q.    Okay.  And so what's the methodology that you

11   typically use when examining documents?

12   A.    I use the ACE methodology.  It stands for analyze,

13   compare, evaluate.  Sometimes there's a verification

14   process, which would make it an ACE dash V methodology.

15   That's the same methodology that the FBI uses, and the

16   Secret Service.  And it has been affirmed and approved by

17   the Court of Appeals in the District of Columbia in the

18   *Pettus* matter.

19   Q.    Okay.  And so can you please explain to the Court and

20   to also the jury, what the verification of a component of

21   that methodology is.

22   A.    The verification is not done in every matter.  It is

23   done in -- it's really up to the document examiner to

24   decide.  There are no requirements, so to speak, as far as

25   doing a verification; however, what we do as document

Direct - Carlson

 1   examiners -- or what I do personally is I will send the

 2   documents that I received off to another document examiner

 3   who's been court qualified.  I just give them the documents

 4   themselves, I don't give them my opinion.  That way they

 5   can do an independent examination and evaluation or a blind

 6   verification or a blind evaluation.

 7        And once they do their examination, they get back

 8   with me, we compare notes and, if necessary, go further to

 9   make a better determination of our findings.

10   Q.   And so are there computer programs or software that

11   can be used in examining handwriting?

12   A.   I believe there are.  I don't use them.

13   Q.   Why not?

14   A.   I am just old school.  I like the hands-on method.

15   Q.   Understood.  And so are you familiar with an

16   individual by the name of Bart Baggett?

17   A.   Yes, I am.

18   Q.   Who is Bart Baggett?

19   A.   Bart Baggett is the president of the International

20   School of Forensic Document Examination, and he was also my

21   mentor.

22   Q.   Okay.  Are you affiliated with Mr. Baggett at this

23   point in time?

24   A.   You know, if necessary I will have him do a

25   verification or I might hear from him on occasion, but not

Direct - Carlson

1   generally.

2   Q.   And so how long have you been operating independent --

3   independently of Mr. Baggett or any of his organizations?

4   A.   Since I started my own business.  I believe I opened

5   that business in 2009.

6   Q.   And so have you been compensated by the defendants in

7   this case for your examinations?

8   A.   Yes.

9   Q.   And how much have you been paid to date?

10  A.   To date, I've been paid $5100.

11         MR. THOMAIDIS:  Okay.  So at this time, defendants

12  would offer Ms. Carlson as an expert in the areas of

13  document examination and handwriting identification along

14  with analysis and comparison.

15         THE COURT:  Any objection?

16         MR. BURG:  Your Honor, we would stand on the

17  motion that we filed within the -- with the Court for the

18  record.

19         THE COURT:  All right.  That objection is

20  overruled.  Ms. Carlson is qualified under Rule 702 to

21  provide expert opinion testimony in the fields of document

22  examination, handwriting identification and analysis and

23  comparison.

24         MR. THOMAIDIS:  Thank you, Your Honor.

25  BY MR. THOMAIDIS:

1857

Direct - Carlson

1    Q.   Now, Ms. Carlson, you were asked to conduct an

2    examination and give an opinion on whether the signature of

3    Jack Handley on a signature page of a purported exclusive

4    distributor agreement dated December 8th, 2009, was, in

5    fact, Mr. Handley's signature.  Do you remember that?

6    A.   Yes, sir.

7    Q.   And you were also asked to do an examination and give

8    an opinion on whether the signature of an individual by the

9    name of Josep Domingot on the signature page of a -- what's

10   called an exclusivity agreement dated July 29th, 2004, was,

11   in fact, the signature of Mr. Domingot; is that right?

12   A.   Yes, sir.

13   Q.   Okay.  Did you prepare a written report of your

14   examination and opinions?

15   A.   Yes, I did.

16   Q.   Can you please pull up Exhibit B-38 for

17   identification.  And may I ask -- this is probably going to

18   be easier and more expeditious, may I ask that Ms. Carlson

19   have a hard copy of that exhibit.

20        And so if you will please take a moment to look at

21   Exhibit B-38 and just thumb through the pages and tell me

22   if that's an accurate copy of your report in this matter

23   and its associated exhibits.

24   A.   Yes, sir, it appears to be.  There's also attached to

25   the back of this report an engagement agreement from your

1858

Direct - Carlson

1    office to me, so that was not part of my report.

2    Q.    Understood.  And does Exhibit B-38 contain your

3    curriculum vitae, your resume?

4    A.    Yes, it does.

5    Q.    Okay.  And so to the best of your knowledge at this

6    point and based on your review, does this represent a true

7    and accurate of your report?

8    A.    Yes, sir.

9         MR. THOMAIDIS:  So at this time, defendants

10   request that Defendants' Exhibit B-38 be admitted as an

11   exhibit in this case.

12        MR. BURG:  Your Honor, we object.  It's cumulative

13   to any testimony here; would be improper to have the report

14   in as an exhibit.

15        THE COURT:  I agree.  Sustained.

16   BY MR. THOMAIDIS:

17   Q.    So what I'd like to do is give you the opportunity to

18   reference that exhibit.  And as we proceed to the questions

19   I would like to -- I would like to go ahead and reference a

20   photographic copy of the respective contracts, okay?

21   A.    Okay.

22   Q.    So what I would like to then do is move to -- sorry,

23   Your Honor, may I have just a moment?

24        THE COURT:  You may.

25   BY MR. THOMAIDIS:

1859

Direct - Carlson

1    Q.    Can we please pull up Exhibit B-36.  And I believe

2    this document has been stipulated to.

3            THE COURT:  This says A-33.

4            MR. THOMAIDIS:  I'm sorry?  Oh, well --

5            THE COURT:  I thought you asked for B-36.

6            MR. THOMAIDIS:  Actually, the Exhibit 33 is

7    actually a previous exhibit marking.

8            THE COURT:  Oh, okay.

9            MR. THOMAIDIS:  So trial Exhibit B-36 is the

10   actual photograph of the contract, itself.

11           THE COURT:  Okay.  I understand.

12           MR. THOMAIDIS:  And to expedite this process, I'm

13   going to ask that we please go ahead and look at B-37,

14   which I believe is also stipulated to.

15           THE COURT:  Are you moving for their admission?

16           MR. THOMAIDIS:  Well, I want to verify that

17   they're stipulated, but that's --

18           MR. BURG:  Your Honor, B-36 is stipulated; B-37 is

19   not.  Oh, they both are.  I'm sorry.

20           THE COURT:  They are both stipulated.

21           MR. THOMAIDIS:  So at this time we would move for

22   the admission of both Exhibits B-36 and B-37.

23           THE COURT:  Given the stipulation of the parties,

24   Exhibits B-36 and B-37 are admitted into evidence and may

25   be published to the jury.

1860

Direct - Carlson

1    (Defendants' Exhibits B-36 and B-37 received)

2             MR. THOMAIDIS:  Thank you, Your Honor.

3    BY MR. THOMAIDIS:

4    Q.   And so, Ms. Carlson, you obviously have your report in

5    front of you.  Can you please just briefly explain what

6    documents you reviewed in this case.

7    A.   Yes.  I reviewed the signature page of the distributor

8    agreement that was purportedly signed by Jack Handley and I

9    received the exclusivity agreement that was purportedly

10   signed by Josep Domingot.

11   Q.   Okay.  And did you receive a sampling of known

12   signatures of those two individuals in the process of

13   completing your analysis?

14   A.   Yes, I did.

15   Q.   And can you tell me how many known signatures you

16   received from Mr. Handley.

17   A.   If I can review my notes.

18   Q.   Certainly.  Please do.

19   A.   I received eight documents with Mr. Handley's

20   signature and two other documents that had Mr. Handley's

21   handwriting.

22   Q.   Okay.  And then with respect to the exclusivity

23   agreement, did you also receive a sampling of Mr.

24   Domingot's known signatures?

25   A.   Yes, I did.

Direct - Carlson

1   Q.   And how many of those signatures did you review?

2   A.   I received nine signatures and handwriting of Mr.

3   Domingot's.

4   Q.   Okay.  So I'd like to start -- I'm going to go in

5   chronological order.

6        Your Honor, may I ask one of my colleagues to put

7   our demonstrative back up, just for the jury's edification.

8        THE COURT:  Sure.  Yes.

9        MR. THOMAIDIS:  And would you please put the red

10  overlay.

11  BY MR. THOMAIDIS:

12  Q.   So the first document we're going to look at has been

13  previously marked as Exhibit J in this case and it is --

14  photographically it's identical to -- actually, I'll look

15  at the photographs, please.  Thank you.

16        Can we turn to the last page.  Thank you.  And can

17  you blow up the signatures.

18        So this is a document that's marked by the first X

19  on that demonstrative, it's -- it would have been dated

20  7-29-2004.  So how did you examine the signature of Mr.

21  Domingot on this document?

22  A.   What I had done -- or what my protocol, and what I had

23  done in this case, is to take the known signatures that had

24  been given to me -- provided to me purported to be the

25  signatures, and enlarged those to 200 percent, aligned

Direct - Carlson

1   them, and examined those to determine the patterns of

2   writing and habits within the author's writing.

3        So with knowing that information as far as the

4   patterns of writing, I can then use those to compare to the

5   questioned signature, which I also aligned with the known

6   signatures, enlarged them all to 200 percent, and did a

7   comparison of the different strokes and the different

8   features and the traits within those signatures to see if

9   this questioned signature was authored by the same person

10  who wrote the other signatures.

11  Q.   Okay.  And so how did you determine that the examples

12  of known signatures were by the same person?

13  A.   Again, we're looking for patterns of writing, because

14  handwriting comes from the brain, obviously not the hand,

15  and because it is a feature within our bodies that has been

16  prepared through repetition, we're looking again at the

17  patterns of the writing, we're looking at the various

18  strokes and the little idiosyncracies within specific

19  portions of the writing to determine if those show up from

20  one signature to the next.

21       There will obviously be some variation from one

22  signature to another, as nobody signs their name the same

23  way twice.  But in comparing signatures, a document

24  examiner who's been trained well and skilled well should be

25  able to determine authorship based on those smaller subtle

Direct - Carlson

1   features that most people don't see just looking at the

2   signature.

3   Q.   And so based on your review of those known signatures,

4   would you be confident in determining if a signature was

5   made by Mr. Domingot?

6   A.   Yes, sir.

7   Q.   And so would you please explain to the Court and to

8   the jury what your findings were in review of the signature

9   of the July 29, 2004, exclusivity agreement.

10  A.   My findings of this questioned signature from July 29,

11  2004, that signature of Josep Domingot was not authored by

12  the same person who authored the known signatures of Josep

13  Domingot.

14  Q.   And so I'm going to attempt to pull up a known

15  signature of Mr. Domingot.  And I'm going to ask that we

16  pull up the exhibit -- sorry, Your Honor, may I have just a

17  moment?

18              THE COURT:   Okay.

19  BY MR. THOMAIDIS:

20  Q.   And so I'm going to go ahead and pull up another

21  document.  And I'm going to put the signatures

22  side-by-side.  So if you could, please just expand the

23  signature and the date on Exhibit I and the date and the

24  signature on Exhibit B-37.  Sorry.  This is one of those

25  situations where I should have given her more forewarning.

Direct - Carlson

1    Perfect.  That's fine.  Thank you.

2         And so, Ms. Carlson, would you please walk us

3    through some of the analysis -- some of the point of

4    analysis that you analyzed with respect to Mr. Domingot's

5    known signature and the signature that is questioned.

6    A.   Yes.  Yes, when you look at the top signature, which

7    is the known signature, you can see the beginning stroke,

8    it's -- it looks like a backwards J almost as far as the

9    check mark on the bottom.  But then you can see the

10   upstrokes of the lower case letters, those are all

11   retraced.  And they continue into the D, of which in some

12   signatures, not this signature in particular, sometimes it

13   looks like an S formation because there's a loop at the top

14   of the D, which there is a loop here, this one just doesn't

15   look like an S.  And the T on the end is more right-slanted

16   than any of the other rest of the letters within the

17   signature.  And those are some of the similarities.

18        A couple of other similarities that I found are

19   the bottom of the downstrokes of the P and the connecting

20   stroke that goes to the T, those downstrokes beneath the

21   signature line, those end at a very similar spot in all of

22   his signatures.  They're very equidistant, so to speak,

23   from the signature line.

24        So all of those similarities I find regularly in

25   Mr. Domingot's signature.

Direct - Carlson

1    And do you want me to continue to the questioned

2    signature?

3    Q.    Please, if you would.

4    A.    Okay.  In doing my comparison of the known signatures,

5    which are obviously more than just this one, I'm comparing

6    it to the questioned signature.  There were a multitude of

7    differences.  This questioned signature, I -- really the

8    way that I look at this, whoever wrote this name, they

9    screwed up the first letter and it kind of went downhill

10   from there.

11        So if you would like me to point out some of the

12   specific differences that I found, I can do that.

13   Q.    I would appreciate that, please.

14   A.    Okay.  When you look at the first letter, you can see,

15   rather than the continuation coming from the tall right

16   upstroke into a backwards V, forming a counterclockwise

17   loop and going through the rest of the name like you see on

18   the known signature, the signature in question actually did

19   make a counterclockwise loop, but it's cut short, and then

20   there's a check mark added to the bottom of that A

21   formation.  So those two strokes aren't even connected.

22        Then you start looking at the lower letters

23   between the J and the D, and you'll see tee-pee type

24   formations, or maybe mountain humps might be a way to

25   describe it, but they're certainly not the retraced strokes

1866

Direct - Carlson

1     that you see in the Josep known signature.

2              Going from there, when you look at the D, the

3     letter D, you can see that the questioned signature

4     actually -- I'm trying to think of how to describe this

5     without being able to point it to you -- after it makes the

6     loop at the top --

7     Q.   I can try to be your -- I can try to mark it in green,

8     and I don't have a great track record with this, but if

9     you'll like --

10             THE COURT:  She -- Deb, do we have the stylus that

11    we can give Ms. Carlson?

12             MR. THOMAIDIS:  Your Honor --

13             COURTROOM DEPUTY:  Yes, I have --

14             THE WITNESS:  Thank you, sir.  Thank you.

15             Write just right on the screen?

16             THE COURT:  Yup.

17             THE WITNESS:  Okay.  When you look at the D on the

18    questioned signature, it moves out in a very strong line

19    and curves back down and stops.  And that is unlike any of

20    the known signatures.  You can see the known signatures,

21    the D actually connects to the T.  And then at the end of

22    the name, the T in the known signature is retraced, which

23    means the stroke has been drawn over itself, so it's drawn

24    one direction and then it's drawn again over itself the

25    next direction.

1867

Direct - Carlson

1    When you look at the questioned signature, you can

2    see that that T is actually made as a loop, almost like a

3    letter D with a crossbar going through it.   The crossbar

4    is, again, another formation that is completely unlike the

5    known signatures as the fact that it's going up at a higher

6    angle than any of the known signatures show.   It's a

7    completely looped letter T rather than a retraced letter.

8    The angles in the known signatures, just to give

9    you a better understanding -- I'll just try to draw a quick

10   line -- I also do some angles when I do an examination or

11   I'll draw a line from one letter to another letter, so what

12   I had done was I had drawn an angle from the top of the

13   first letter to the top of the T.   That regularly goes up

14   at a higher angle.   And when you get all of the signatures,

15   the known signatures in a row, those angles are very, very

16   similar from one signature to the next to the next to the

17   next, and almost looks like -- those lines drawn almost

18   look like fenceposts because they're so similar from one

19   signature to the other.

20   When you draw that angle, that same angle from

21   this signature -- and, granted, this little stylus on a TV

22   screen is not the same, but even the angle in the

23   questioned signature is completely different.   It's -- it's

24   a very subconscious trait that people are not aware of when

25   they're signing their names.   People will sign in a similar

1868

Direct - Carlson

1    location, they'll sign similar heights, they'll sign

2    similar ratios -- height ratios from one letter to the

3    next.  Because, again, it's a brain thing, and so a person

4    is not thinking how tall they're drawing their T or how low

5    they're drawing their lower case letters, it's

6    subconscious, and those subconscious features come out on

7    paper, and they did not come out on the questioned

8    signature.

9    Q.   Okay.  So thank you.  Did you form an --

10            THE COURT:  One second.  I just want to point out

11   to Ms. Carlson, as you go on with your testimony,

12   there's -- you can -- when you need to, if you want to, you

13   can erase the lines you've drawn to have a clean screen.

14            THE WITNESS:  That would be great.  And how do I

15   do that?

16            THE COURT:  Deb, can you show her?

17            COURTROOM DEPUTY:  Yeah.

18            MR. THOMAIDIS:  Sorry --

19            THE COURT:  No, just want to make this go

20   smoothly.

21            THE WITNESS:  Oh, thank you.  Those are his.

22   Great.  Thank you.

23   BY MR. THOMAIDIS:

24   Q.   So, Ms. Carlson, did you form an opinion as to the

25   authenticity of the signature of Mr. Domingot on July 29,

Direct - Carlson

1   2004, exclusivity agreement?

2   A.   Yes, I did.

3   Q.   And so what was that opinion?

4   A.   My opinion is that the person who signed the known

5   signatures of Josep Domingot did not sign that questioned

6   signature on that exclusivity agreement.

7   Q.   Okay.  And so what else, if anything, did you find

8   noteworthy in your examination of the July 2004 exclusivity

9   agreement?

10  A.   I noted that the dates were signed by the same person.

11  Whoever wrote the date, they -- the same person wrote the

12  date on both date lines.

13  Q.   Okay.  And so let's go ahead and pull up the same

14  document once again, with the same side-by-side.  And just

15  for the purposes of this analysis, let's stick with the

16  same signature, please.  And then if we can just get the

17  dates side-by-side.  That's fine.  Thank you.

18          So, you had mentioned the dates.

19  A.   Yes.

20  Q.   Could you please expand on your analysis of those

21  dates.

22  A.   Yes.  Did you want me to explain on Mr. Domingot's

23  dates or both of the dates on the exclusivity agreement?

24  Q.   As an expert forensic document examiner, I want you to

25  explain it the way you think is easiest understood by

Direct - Carlson

1       everyone.

2       A.    Okay.  Well, just because this is on the screen, I can

3       let you know that the author of these two dates -- or

4       authors of these two dates are two different people.  There

5       are multiple differences.  Again, we're looking at patterns

6       within the writing.  Numbers generally show quite a bit.

7       As people are doing numbers, they don't necessarily think

8       to change them as they might otherwise in doing

9       handwriting.

10      Q.    Okay.

11      A.    Oh, I beg your pardon.  Go ahead.

12      Q.    I'm sorry, please continue.

13      A.    I was just noting that any differences I see in the

14      dates as far as Josep Domingot's dates, his numbers are --

15      generally his seven's usually have a crossbar.  I think I

16      saw one time that it might not have, generally, as far as

17      the years are signed by Mr. Domingot, he either writes the

18      full year out or he will use an apostrophe for the last two

19      numbers of the year.  And those, again, are -- that's his

20      way of doing it, that's his pattern of writing.

21            The dates in the questioned documents next to the

22      questioned signature are obviously written by a different

23      person and that person has very distinct numbering.  I had

24      looked at other dates and used for comparison.  And the

25      numerals in those -- in the dates that are written, or the

Direct - Carlson

1   numbers that are written are very distinct and -- and tell

2   a completely different authorship.

3   Q.   Okay.  And so in reviewing this July 29, 2004,

4   exclusivity agreement, did you also review the known

5   signatures and dates of Mr. Ryan Davis?

6   A.   Yes, sir.

7   Q.   And so what were your findings with respect to the

8   July 29, 2004, exclusivity agreement after your review of

9   the known signatures and dates of Ryan Davis?

10   A.   The dates on the exclusivity agreement on both

11   signature lines were authored by Mr. Ryan Davis based on

12   examination of his handwriting and his numerals.

13   Q.   And so if we can -- let's use this as an example, this

14   trial Exhibit I.  Can we please expand the date on trial

15   Exhibit I and the date on trial Exhibit B-37.

16        THE COURT:  While we're doing that, I hate to

17   interrupt the flow, but I just want to make a clarification

18   on the time.  You have 90 minutes total with this witness

19   and so I believe you told me at first you wanted 70 minutes

20   for direct and 20 minutes for redirect, correct?

21        MR. THOMAIDIS:  And that's fine, Your Honor,

22   yes.

23        THE COURT:  Okay.  So we'll go with 70 minutes for

24   this portion.

25        MR. THOMAIDIS:  Okay.  And may I have a time check

Direct - Carlson

1    just for my edification at this point?  Sorry.  So can we

2    go ahead and pull up these dates while -- no, I'd like you

3    to pull up Mr. Davis' dates so this and also -- and also

4    this.  Oops.  I made a mess on the screen.

5              COURTROOM DEPUTY:  So you've used 36 minutes.

6              MR. THOMAIDIS:  Thank you.

7    BY MR. THOMAIDIS:

8    Q.   So does this assist in terms of illustrating to the

9    Court and to the jury some of the similarities in these

10   dates?

11   A.   Yes, sir.

12   Q.   Okay.  Can you please describe in more detail the

13   similarities.

14   A.   Yes.  The similarities in these dates, when you look

15   at the -- obviously the fours stand out.  The fours have a

16   very strong tall, long downstroke, and that is a very

17   significant feature within Mr. Davis' writing.  When you

18   look at the zero right before the number four, you can see

19   that it is both shorter in height than the four and it is

20   taller off the baseline, or the line -- the signature line

21   than the number four, so it's essentially shorter in height

22   ratio than the four is.  He does that regularly when he

23   writes zeros, whether it's in the year or whether it's in

24   the date, there's always a shorter smaller zero.

25             When you look at the number nine -- and there are

Direct - Carlson

1    no other nines on this particular exhibit -- but when you

2    look at the number nine, again, the number nine has a very

3    strong long downstroke.  That number nine in the other

4    dates that I examined that were written by Mr. Davis is

5    regularly written longer than the number that it's next to.

6    So, again, it's a very strong long line, you know,

7    downstroke going down.

8         And I was looking at some of the opening points of

9    the numeral zero.  It opens -- you can kind of see on this

10   exhibit, there's an opening and closing point of the zero,

11   right about 12:00 -- right between 11 and 1:00,

12   essentially, is where that opening and closing -- where the

13   zero was started and stopped.  And that's a habit of his.

14   Q.   And so can we please leave the top example of that

15   date and please pull up the date next to Mr. Domingot's

16   signature in the exclusivity agreement.  No, I'd like both

17   dates left on that top one, please.  Perfect.  Thank you.

18        And so can you briefly describe, and in any way

19   that's most understandable for people, why these were

20   authored by the same individual.

21   A.   Yes.  Again, you can see I'm working from right to

22   left, as I was.  The downstroke of the number four, it's a

23   very long, very tall downstroke of that number four.  It

24   stands out more than any of the other numbers in the date.

25        Again, the zero next to the four is shorter in

Direct - Carlson

1    height.  It's shorter -- it's higher up off the baseline or

2    off of the signature line to show that it is a smaller

3    number than the other numbers.  It closes and opens, you

4    know, where it started and stopped right about 11:00.

5         The number nine, again, the long -- the downstroke

6    is very long and longer than the number that's next to it.

7    So those are habits of Mr. Davis' writing.

8         And one other thing that I did not point out in my

9    earlier testimony, is when you look at the slash marks

10   between the numbers that separate the dates, you can see

11   that the slash mark actually curves off to the left until

12   it gets near the bottom, and then it curves back to the

13   right.  You can see that in Mr. Davis' writing.  And I know

14   I'm messing up the screen, but you can see that in Mr.

15   Davis' dates as a regular occurrence.

16   Q.   Okay.  So when you're doing this analysis, did you

17   find inconsistencies in the date in the exclusivity

18   agreement and some of his known dates that would indicate

19   that perhaps he was trying to modify it?

20   A.   Just simply the difference between the slash mark or

21   the hash mark and the dash, but nothing more than that.

22   Q.   Okay.  And so if I understand your testimony

23   correct -- well, would you summarize your testimony with

24   respect to the exclusivity agreement.

25   A.   Yes.  The exclusivity agreement, the dates were both

1875

Direct - Carlson

1    signed -- both dates on that document were signed by Ryan

2    Davis.   The signature in question was not signed by the

3    same person who signed the known Josep Domingot signatures.

4    Q.   Great.   Thank you.

5         So you also, as a component of your engagement to

6    assist defendants, did the review of another document; is

7    that right?

8    A.   Yes, sir.

9    Q.   Okay.   And so what document was that?

10   A.   That was the distributor agreement.   I examined the

11   signature page of the distributor agreement.

12   Q.   Okay.   And so how did you examine the signatures on

13   that document?

14   A.   That document -- a photograph of that document was

15   sent to me to do an examination of the Jack Handley

16   signature.   And I was also sent by your office purported

17   known signatures of Jack Handley to use for comparison.

18   Q.   Okay.   And so can we go ahead and pull up trial

19   Exhibit B-36, please.   And I'm going to ask that we please

20   turn to the eighth page of B-36.   And I'd like to expand

21   the bottom of the two photographs, please, to demonstrate

22   Mr. Handley's signature.   And that's fine.   I think we can

23   go with that.

24        So is this a reasonable representation of what you

25   received of this purported contract?

Direct - Carlson

1   A.   Yes, sir.

2   Q.   Okay.  And so how did you examine the signatures on

3   this document, if you -- if I'm asking you to restate, I

4   apologize.

5   A.   No, that's fine.  I wasn't sure if you were finished

6   with your question.  What I had done was I had taken the

7   known samples that were sent to me and, again, I compared

8   those one to the other to determine the patterns of writing

9   that Mr. Handley shows within his writing and what his

10  habits are.

11       And in doing -- finishing that part of the

12  examination, I then took this questioned signature,

13  included that with the other signatures, aligned them all

14  vertically, enlarged them to 200 percent, and did a

15  comparison of the questioned signature to the known

16  signatures.

17  Q.   Okay.  And so I have a question:  In doing your

18  analysis, did you make any special note of the signature

19  line of Handley being longer than the signature line of

20  Davis and Davis?

21  A.   I did notice that.

22  Q.   And is that -- have you ever seen that before in

23  documents of this type?

24  A.   On occasion.  Not generally speaking, but generally

25  they are -- because they are legal contracts, whoever puts

Direct - Carlson

1    them together usually is very much a perfectionist, but

2    I've seen it.

3    Q.    Okay.  But that does strike you as unusual as a

4    forensic document examiner?

5    A.    It -- I noted it, definitely.  I certainly observed

6    it.

7    Q.    Now, what about these -- these lines being parallel,

8    this one and this one and this one, are they parallel or

9    did you do any analysis on that?

10   A.    I did do an analysis on that.  I laid this on -- under

11   a grid and it appeared visually to be slightly uneven, but

12   when it's laid under a grid, they are even.

13   Q.    Okay.  And so did you follow the same protocol in

14   comparing the questioned signature in this December 8th,

15   2009, document?

16   A.    Yes, I did.

17   Q.    What is your professional opinion on the Jack Handley

18   signature on the purported exclusivity agreement on

19   December 8th, 2009?

20   A.    My professional opinion is that the Jack Handley

21   signature that's in question on that document was not

22   signed by the same person who signed the known Jack Handley

23   signatures.

24   Q.    Okay.  And so if we can pull up a known Jack Handley

25   signature.  And I will -- and this is from trial Exhibit M.

1878

Direct - Carlson

1    And so we have several other examples, but if this

2    is suitable for your -- for your representation purposes,

3    then we can use it.

4    A.    That's fine.

5    Q.    Okay.  So -- so can you just walk us through some of

6    the differences that were noticed between the known

7    signature in this case from this exhibit, this -- that's an

8    exhibit in this case, and the one on the questioned

9    document.

10   A.    Some of the differences?

11   Q.    Yes --

12   A.    Yes.

13   Q.    -- please.

14   A.    One thing that I noted that stood out to me

15   immediately in doing my examination is that Mr. Handley has

16   ink globs within his signature.  You can actually see in

17   the J, at the lower left of that bottom loop, there's an

18   ink glob there, and you can see those -- it's not so clear

19   on this particular exhibit that you pulled up, but there is

20   another -- a similar ink glob in a similar place on the Y.

21        Ink globs are an indicator of identity.  We don't

22   know why they show up.  Certain people have ink globs in

23   their handwriting.  But it shows up very consistently, and

24   a lot of times he'll have ink globs at the top of his D and

25   his L as well.  So those things jumped off the page as soon

Direct - Carlson

1    as I started my examination.

2         As far as the differences in there, I noticed in

3    the questioned signature there are no ink globs, the

4    signature is very clean, the writing is very clean.  I also

5    noticed multiple stops and starts in the questioned

6    signature that I did not see in Jack Handley's signature.

7    The K in Jack is formed incorrectly.  There are stops and

8    starts at the bottom where the little V comes up at the

9    bottom of the K.  Mr. Handley actually, when he signs his

10   name, he continues the K down to the bottom, brings it back

11   up, and makes a slight C to form the right side of the K.

12   That's not seen in this questioned signature.

13        Again, in the letter H, you can see that whoever

14   wrote this, they brought the left leg down and they formed

15   a second line going up; however, those lines aren't

16   actually connected.  There's a stop just -- there's a stop

17   at that top part where you can see there's a slight pen

18   lifting, the lines don't actually align to show that it's a

19   continual line formation.  There's a second stop beneath

20   that crossbar.  And so those stops and starts, you don't

21   regularly see those in Jack Handley's writing, he's very

22   consistent and fluid when he writes his name out.

23        Another thing that I noted is that the D and the L

24   in Handley, those tops of those two letters are very equal

25   in their heights' stopping point.  When you look at the

Direct - Carlson

1    known Jack Handley signatures, he very regularly does one

2    taller than the other.  So to have them so equal, that's

3    not Mr. Handley's habit in his writing, at least with the

4    exhibits that I was given.  Excuse me.

5         Also, again, there's the ink glob I was telling

6    you about on the bottom of the Y.  But in looking at this

7    Y, there's actually no top to the Y.  When you look at --

8    in the questioned signature.  I'm sorry, I wasn't clear.

9    When you look at the L, it comes down and it makes a small

10   loop right here.  And then it -- let me see if I could get

11   that.  Makes a small loop and then it stops.

12   Q.   You can also use your finger.  I don't know if that

13   helps or --

14   A.   It might.  But if you -- if you look at the L, you can

15   see the L comes down and makes just a small loop at the

16   top, right there.  Then if you look closely -- or if an

17   examiner looks under a microscope, you can see that the

18   lower loop of the Y is actually a completely separate

19   stroke, it starts here, comes around -- goodness if I could

20   get this to work -- comes around and forms a full loop.  So

21   it's not connected to that little loop, there's no cup for

22   the Y, there's no top of the Y.

23        So then when you look at the arrow that just came

24   up, that's actually a separate individual stroke that's not

25   connected to anything.  Again, what's that from?  I don't

Direct - Carlson

1   know what that's from, that's just a separate stroke that's

2   in the name.

3         The next thing that I noticed is that this little

4   period at the end of the name, that's much higher in

5   placement than the known signatures of Jack Handley.  He

6   places the period at the end of his name very consistently

7   right approximately even with the lower case letters.

8   This -- this period at the end of the name is much higher.

9         So there are numerous differences in this

10  questioned signature as well.

11  Q.   Now, you noted that there were starts and stops in the

12  questioned signature; is that right?

13  A.   Yes, sir.

14  Q.   And you noted that -- noted that there were ink globs

15  in the known signatures; is that right?

16  A.   Yes, uhm-hum.

17  Q.   So can you help differentiate for the Court and for

18  the jury what the difference between an ink glob would be

19  and what, under a microscope, is a stop and a start?

20  A.   Yes.  What a stop and a start is, a stopping point is

21  when the pen is actually lifted off the page.  So a person

22  will draw a line, stop, lift it off the page, and restart

23  it.  Sometimes the ink may pool a little bit because they

24  left it on there -- the writing instrument on there too

25  long, and so that might form a glob.

1882

Direct - Carlson

1    But as far as the identity issues that I was

2    mentioning earlier, the indicators of identity, as you can

3    see, Mr. Handley has a -- an ink glob over next to his --

4    or on the bottom of his J.  When you look at his

5    signatures, that ink glob shows up almost every single time

6    he writes his name out.  There's an ink glob in his J.

7    There's also an ink glob in his Y that shows up in a very

8    similar spot.  So those aren't places where Mr. Handley

9    actually stopped, he actually just continued his flow of

10   writing because the lines continue and they are aligned

11   with the loop that he's creating, but there's suddenly an

12   ink glob there that just appears.

13        So under the microscope you can see whether a pen

14   or a writing instrument has stopped and bled out or if you

15   can see that it's just a continual formation of a

16   character.

17   Q.   Okay.  So what are some of the similarities -- and

18   just briefly for the Court and the jury, what are some of

19   the similarities between these two signatures?

20   A.   Some of the similarities are that they -- they made

21   the name, whoever -- I say "they," whoever signed this name

22   made it look very similar to Mr. Handley's in the size, in

23   the placement.  They made it similar in the -- some of the

24   appearance of the signature.  However, looking under the

25   microscope, you can find these -- these discrepancies that

1883
Direct - Carlson

1   don't fit with Mr. Handley's patterns of writing.

2   Q.   And so you would -- you had made note of tremors.

3   A.   Yes, I did make note of tremors in the -- in my

4   report.  If you look at the letter Y -- and when you're

5   looking at copies, and like these things that are blown up

6   on the page, everything looks tremulous, the copies are

7   obviously pixelated, so it's going to look like a tremor

8   underneath -- or on this screen, but under the microscope,

9   you can actually see the tremors of the writing in the

10  questioned signature that are not necessarily seen in Mr.

11  Handley's normal signatures.  He tends to be very fluid in

12  his writing.

13  Q.   Okay.  So you were also given samples of Ryan Davis'

14  handwriting with respect to this document; is that right?

15  A.   Yes.

16  Q.   And so what did you do with those samples?

17  A.   I used the comparisons of Ryan Davis' writing -- or I

18  used the samples of Ryan Davis' writing to compare to the

19  Jack Handley signature, and I compared -- again, I'm

20  looking at the height ratio and looking at the placement on

21  the line and looking where the signature begins.  When a

22  person signs their name, they will generally start at a

23  very similar place each time, and so that's one of the

24  things that we're looking at when we're doing a handwriting

25  examination.  I'm looking at the height ratios or the width

Direct - Carlson

1  ratios of the loops within the signature, like the Ryan,

2  the beginning of the R, or the D loop, I'm looking at those

3  various sizes in -- I'm looking at lateral expansion, or

4  the length of the name and the length of the signature.

5       So all of those things are what I'm using for

6  comparison from one signature to the next.

7  Q.   And so how did those things assist you in drawing your

8  conclusions in completing your analysis?

9  A.   When I was looking at the beginning strokes of the

10  name or where the names are placed on the line, they begin

11  at a very similar position in this contract.  Both the Jack

12  and the Ryan.  They come out to about the same position of

13  the bottom of the J and the left side of the R, you can see

14  they are very similar position -- or your -- the -- this

15  part of the R, actually.  Yes.

16       And then when you look at the lateral expansion,

17  they are very similar in where they stop on the line.  So

18  the lateral expansion, that's unusual to have two

19  completely different people sign names that are so similar

20  both the beginning point and the ending point.

21       The next thing that I -- oops, I beg your

22  pardon -- I noticed also the height ratios of the lower

23  case letters.  Again, they're very small from capital --

24  capital letters to the lower case letters.  So those height

25  ratios are very similar.

Direct - Carlson

1    The next thing that I did that I found very

2    significant was doing a comparison of the width of the

3    loops, like the J loop and the loop in the bottom of the H,

4    and the loop that's supposed to be the Y in the signature.

5    I measured those widths and heights to determine their

6    sizes.  In doing a comparison to the size of those loops to

7    the same width and height in the R loop, and in the D loop,

8    they are in millimeters, but the sizes are all within just

9    two millimeters of each other.  The H loop is obviously

10   slightly shorter in length, but the J, the Y, the R, and

11   the D are all within a millimeter of both width and height,

12   so that's highly unusual to have two different people sign

13   so similarly that even those characteristics are so

14   matching.

15   Q.   Okay.  And so what is your opinion as an expert, after

16   reviewing Ryan Davis' signature on this document, and your

17   additional research into the specifics of this document?

18   A.   It was my opinion that, in doing my examination, I

19   believe it's highly probable that Ryan Davis wrote the Jack

20   Handley name.  I feel like the -- I beg your pardon, I feel

21   like that sounds strange, but in doing my examination, the

22   Jack Handley signature is so similar in appearance to the

23   Jack Handley signatures, obviously somebody tried pretty

24   hard to make it look like it was Jack Handley's signature,

25   but in doing the comparison to Ryan Davis' handwriting,

1886

Direct - Carlson

1   there are too many similarities for me to discount that,

2   and I believe it's highly probable that Ryan Davis signed

3   the Jack Handley name.

4   Q.   Okay.  And so in completing your analysis with respect

5   to this document -- and by "this document" I'm referring to

6   the exclusive distributor agreement that was purportedly

7   signed in this case on December 8th, 2009, did you follow

8   the ACE-V methodology in reaching your opinions?

9   A.   Yes, I did.

10  Q.   And did you seek and complete the verification

11  requirement --

12          MR. BURG:  Objection, Your Honor.  May we

13  approach?

14          THE COURT:  Okay.

15      (Side bar proceedings held)

16          MR. BURG:  She did not do the verification.  We

17  took her deposition.  The Court has ruled that she can't

18  get into any verification that she did or who she sent it

19  to in the motion *in limine*.  Absolutely this is improper --

20          MR. THOMAIDIS:  And I believe the Court was very

21  clear in the motion *in limine* ruling that we couldn't use

22  any of the information that was included in those two

23  verification letters, but it wouldn't change the fact that

24  she had sent and completed a verification process as part

25  of the methodology.

Direct - Carlson

1   THE COURT:  It is my recollection that was done

2   after she formed her opinion of the report.

3   MR. THOMAIDIS:  It was done -- we were still

4   seeking additional documentation during the course of the

5   discovery, Your Honor, but it was done -- it was done

6   within discovery, and it was not disclosed as timely as my

7   office clearly should have.  But I don't --

8   MR. BURG:  I --

9   MR. THOMAIDIS:  But I don't think it does change

10  the fact that she, as a component of her analysis of the

11  ACE-V methodology, did the verification.  And we don't

12  intend to go any further than to simply say that she

13  verified.

14  THE COURT:  But if she did it after -- if she had

15  done the verification after she formed her opinions, it --

16  it would be misleading to imply that she did this as part

17  of her analysis such that it predated her conclusion.  I

18  mean --

19  MR. THOMAIDIS:  Pre --

20  THE COURT:  Am I factually incorrect that those

21  verification letters came after the opinion was -- the

22  disclosures were made?

23  MR. THOMAIDIS:  She completed -- we -- she

24  completed and we disclosed her report.

25  THE COURT:  Right.

Direct - Carlson

1    MR. THOMAIDIS:  And then we said as a component --

2    I mean, we would like you to do the V component of this

3    analysis.

4    THE COURT:  Right.  She did the verification

5    afterwards.

6    MR. THOMAIDIS:  Correct.

7    MR. BURG:  After -- I'm sorry, after her --

8    MR. THOMAIDIS:  And, I mean, if the Court rules

9    that it's not appropriate, then that's perfectly fine.  I

10   just think that it would not change the fact that she did

11   seek the verification component.

12   THE COURT:  Well --

13   MR. BURG:  After the report was received and I did

14   her deposition.  I went at length about the verification

15   analysis requirement of the -- the requirement by

16   everything.  At no time did she -- she admitted, she said,

17   I didn't do it because I didn't have time to do it and I

18   can decide not to do what the FBI says.

19   And then later on, much later on, all of a sudden

20   we got this issue that she did some sort of verification.

21   We never were able to inquire into it.  We know who Mr.

22   Baggett is, who I want to go into on my cross-examination

23   did the alleged verification.  This is absolutely highly

24   prejudicial and improper.  Her opinions were formed in her

25   report, finalized, and the Court has ruled that they can't

Direct - Carlson

1    get into any of the verification with Baggett or anybody

2    else she allegedly verified with.

3        THE COURT:  Yeah.  I -- I'll let you get one last

4    response.

5        MR. THOMAIDIS:  The only thing I was going to say

6    is I think within the motion *in limine* -- and it was

7    actually the motion to strike the two letter reports, which

8    is what they referred to them as, is a letter report, the

9    Court's footnote with respect to those letters was very

10   clear, that that information couldn't be brought in, but

11   the verification component, it was my belief that the

12   footnote, and I should have it with me --

13       THE COURT:  Second time you guys come up here to

14   argue over an order that you don't bring me a copy of.

15       MR. THOMAIDIS:  I'm sorry.  I was not aware it was

16   going to be an issue.

17       MR. BURG:  We have a copy.  But nevertheless, her

18   report was finished, her opinions were finished, and she

19   never did the verification.

20       THE COURT:  I mean, what -- what you're going to

21   open the door on this is that it's going to be established

22   that she did the verification after she formed her report.

23       MR. THOMAIDIS:  And I'm happy to clarify that, if

24   it -- and I'm happy to withdraw the question because I

25   don't believe she's answered yet.  It's whatever -- I don't

Direct - Carlson

1   want to go afoul of you.

2           THE COURT:  Let me look at the -- do you know the

3   number of the --

4           MR. BURG:  We have it.

5           MR. THOMAIDIS:  I can grab it.

6           MR. BURG:  Do we want to take our morning break?

7   Because I don't want to be interrupted on my

8   cross-examination, if it makes sense, Your Honor.

9           THE COURT:  No, I want to make this ruling now.

10  Do we have the ECF number?

11          MR. BURG:  I can go get it.

12          MR. THOMAIDIS:  I can grab it.

13          MR. BURG:  Your Honor, here's the ruling that

14  starts on page 17.

15          THE COURT:  Well, after this, I think -- you know,

16  I don't know that it's going to help you if you want to

17  bring out that she did the verification, but it was done

18  after she formed her opinions and was not used in -- was

19  not used in her report.  I think that footnote says that I

20  can -- that was going to -- that he could go into that.

21          MR. BURG:  Your Honor, let me make a quick -- let

22  me make a record.  I think it's highly prejudicial.  This

23  witness is the most crucial witness on their claim that

24  there was a forgery.  She doesn't use the list.  She is

25  required, under the ACE-V standard, which she says she

Direct - Carlson

 1    uses, that she must do verification before she comes up

 2    with her opinion.

 3         MR. THOMAIDIS:  I disagree with that.

 4         MR. BURG:  May I make my record, please?

 5         MR. THOMAIDIS:  Sure.

 6         MR. BURG:  And that this is absolutely improper to

 7    let her, after the fact, after her opinion, after the

 8    report is given, to say that she did some sort of

 9    verification, even if we can't go into -- first of all, it

10    opens the door to the person she had verify, this Mr.

11    Baggett, who we call a charlatan.

12         MR. THOMAIDIS:  Wrong Baggett.

13         MR. BURG:  Who has been called, you know, that he

14    has been -- he -- I'm going to get into it if the Court

15    says -- if the Court -- as the trainer but not as the

16    verifier.  This opens up, really, prejudice.

17         She also told me that she had no opinion of

18    calling anybody a forger in her deposition without any

19    verification -- without verification.  Now they're going to

20    get into verification.  This is an ultimate surprise --

21         MR. THOMAIDIS:  No, it is not.

22         MR. BURG:  -- that there was any verification, and

23    it's extremely prejudicial.  This is the most crucial

24    witness on their claims and as their defense to our case

25    claiming that this is a forgery.  And it's absolutely

Direct - Carlson

1    unfair and improper for them to be able to go beyond the

2    scope of what her opinion was in her report.  That's the

3    final report.  She's limited to that, Your Honor.

4         THE COURT:  Mr. Burg says something that I think I

5    hadn't focused on and I think it's a good point --

6         MR. THOMAIDIS:  Okay.

7         THE COURT:  -- that even if you do -- even if you

8    get verification after the fact, the jury could conclude

9    that because she didn't change her opinion, that the

10   verification confirmed her prior opinion, which would then

11   make it equivalent -- it could make it the equivalent of

12   seeking verification.  In other words, verification

13   before -- we have -- she didn't do it before, but she did

14   it afterwards and didn't change her opinion.  So that

15   confirms her opinion.

16        And it came, as noted or discussed, very late --

17        MR. THOMAIDIS:  Understood, Your Honor.

18        THE COURT:  -- so I -- you caused me to change my

19   mind.  I'm going to sustain the objection, and you're not

20   going to be permitted to inquire into her after-the-fact

21   verification.

22        MR. THOMAIDIS:  So I have to ask the inevitable

23   question, which is:  She has not changed her opinion since

24   her deposition was given, she has not changed her opinion

25   that these are, in fact, forgeries.  And one of the things

Direct - Carlson

1   that Mr. Burg will do is he is going to go into and

2   immediately attack the verification component of this.

3          THE COURT:  That she didn't seek verification.

4          MR. THOMAIDIS:  That's correct.  And so given

5   that, may I treat that as being a similar invitation --

6          THE COURT:  Similar invitation --

7          MR. THOMAIDIS:  -- to address the issue of lack of

8   verification?  Similar -- maybe a similar opening of the

9   door is maybe a better way to describe it.

10          THE COURT:  Well, I --

11          MR. THOMAIDIS:  I'm sorry, I'm sorry.

12          THE COURT:  But the problem still will remain that

13   if you then get on redirect that she did verification

14   afterwards, it's that same problem that I had with that

15   that it could have the effect of, in the minds of the

16   jurors, confirming the correctness of her original opinion.

17   So it's sort of a back door way of getting a verification.

18          Yes, on cross-examination she will say she didn't

19   do it before, but on redirect you will say, well, you did

20   it afterwards, didn't change your opinion, so we end up in

21   the same place.

22          MR. THOMAIDIS:  Understood.

23          THE COURT:  So I'm not going to allow any

24   testimony into the fact that she obtained, after the fact,

25   or after the report verification of her --

1894

Direct - Carlson

1    MR. THOMAIDIS:  There is one other question which

2  is the ACE-V methodology is still similarly -- it's just as

3  valid as the ACE methodology, right?

4    THE COURT:  You can talk about -- you can make

5  whatever argument in closing.  You can ask her questions

6  about ACE without the V, that's fine.

7    MR. THOMAIDIS:  Understand.  That's fine.  So

8  that's what we will do.

9    THE COURT:  How are you doing for time?  Are you

10  going to need --

11    MR. THOMAIDIS:  Probably.  I'll try to wrap it up

12  fairly quickly now.

13    THE COURT:  How much longer do we have -- do you

14  have her to try to finish?

15    MR. THOMAIDIS:  10 minutes.

16    THE COURT:  We'll do 10 minutes, if you could wrap

17  up in 10 minutes, and we'll take a break, that will work.

18    MR. THOMAIDIS:  Thank you, Your Honor.

19    (End of discussion at side bar)

20  BY MR. THOMAIDIS:

21  Q.   And so, Ms. Carlson, members of the jury, thank you

22  for hanging in there with us.

23    MR. BURG:  Your Honor, do you want to make your

24  ruling on the record to my objection that's sustained so we

25  have a record of it?

1895

Direct - Carlson

1    THE COURT:  I made my -- you didn't have an

2    objection when you were --

3        MR. BURG:  Oh, I'm sorry.

4        THE COURT:  -- in front of the jury, so I -- you

5    made one at the side bar and I made my ruling at the side

6    bar.

7    BY MR. THOMAIDIS:

8    Q.   So I'd like to now have you turn to Exhibit B-39 in

9    the exhibit notebook in front of you.  And, actually,

10   before we move too far off of this document, I want to make

11   sure:  Is it your opinion that Mr. Jack Handley authored

12   the signature on the photographic document that you

13   reviewed that's titled Distributor Agreement, dated

14   December 8th, 2009?

15   A.   No.

16   Q.   And do you have an opinion, as it relates to who was,

17   in fact, the author of that signature other than Jack

18   Handley?

19   A.   It's my opinion that it's highly probable Ryan Davis.

20   That's as far as I went with that.

21   Q.   Okay.  Thank you.  So you were asked to do a

22   supplemental report in this case; is that right?

23   A.   Yes, sir.

24   Q.   Okay.  And did you form an opinion as to the three

25   documents that you were asked to compare in that report?

1896

Direct - Carlson

1   A.   Yes, I did.

2   Q.   And so can you please summarize what you did with

3   respect to that supplemental analysis.

4   A.   Yes.  What I was given were three documents that were

5   titled Distributor Agreement, to determine if the three

6   documents were different in any way or if they -- the

7   documents, themselves, were essentially the same document

8   or identical documents.  And so I did a comparison

9   word-for-word, page-for-page, from one to the other.

10  Q.   And what about signature-to-signature?

11  A.   Yes, I did do an examination on the signatures as

12  well.

13  Q.   And one of those documents was from April of 2013,

14  correct?

15  A.   If I could take a look.

16  Q.   Please.

17  A.   These are all dated -- the distributor agreements are

18  dated December 8th, 2009.  One of them was attached to an

19  e-mail dated April 2013.

20  Q.   Okay.  And were you told that that was alleged to be a

21  different copy of the same distributor agreement?

22  A.   I --

23       MR. BURG:  Your Honor, I'm going to object.  This

24  is leading.

25       THE COURT:  Sustained.

1897

Direct - Carlson

1    BY MR. THOMAIDIS:

2    Q.    What were you told with respect to that document?

3    A.    I was asked to examine these documents.  There was a

4    belief that one of them was purportedly -- or one of them

5    was noted to be an original.  Again, I was just examining

6    to determine if they were all the same or if there were any

7    differences in any of them.

8    Q.    And was the second document that you reviewed with

9    respect to that analysis, did it bear a court stamp at the

10   top of the page?

11   A.    One of the documents -- if I could go through this, I

12   can be more clear about my --

13   Q.    That's fine.

14   A.    -- explanation.

15          One of the documents did have a court stamp at the

16   top of the page.

17   Q.    And that court stamp was in case

18   1:13-cv-03206-WJM-KMT?

19   A.    Yes, sir.

20   Q.    Okay.  And so what was your conclusion with respect to

21   those documents?

22   A.    My conclusion was that these documents are all

23   identical in the body, the signatures are identical

24   signatures, the only differences are the copy size, the

25   labels on the documents, and the filing header that you

1898

1  just referred to, as far as the court's filing header.

2       Otherwise, as far as the body of the documents and

3  the signatures, they're -- it's a duplicate document, just

4  printed three different times.

5  Q.   Okay.  And so did you review both of those documents

6  under a microscope?

7  A.   Yes, I did.

8  Q.   Okay.  And they were identical with respect to those

9  signatures?

10  A.   Yes, sir.

11  Q.   Okay.  And so, Your Honor, at this time -- oh,

12  actually, I have one last follow-up question.

13       Do you have anything that you would add with

14  respect to the analysis on either the exclusivity agreement

15  of July 29th, 2004, or the claimed exclusive -- I'm sorry,

16  I think I misspoke.

17       Anything with respect to the exclusivity agreement

18  of July 29th, 2004, or the claimed exclusive distributor

19  agreement of December 8th, 2009, or the signatures on those

20  two documents that I failed to cover with you today?

21  A.   No, sir.

22       MR. THOMAIDIS:  Okay.  Thank you.  I have no

23  further questions at this time.

24       THE COURT:  All right.  We're going to take our

25  morning break at this time.  And we will be in recess for

1899

Direct - Carlson

1    15 minutes.

2          (Jury left the proceedings at 10:18 a.m.)

3          THE COURT:  Mr. Thomaidis, I neglected to ask you,

4    with respect to Mr. Balentine, you have a 30 total minutes.

5    How do you want to divide that between direct and redirect?

6          MR. THOMAIDIS:  May I have 20 and 10, Your Honor?

7          THE COURT:  Okay.  20 and 10.  20 direct, 10

8    redirect for Mr. Balentine.

9          What kind of a warning does the plaintiff want on

10   his 15 minutes?

11         MR. BURG:  We have 15 minutes?

12         THE COURT:  You have 15 minutes total, how much --

13         MR. BURG:  I'll do -- we just decided, I'll do Mr.

14   Balentine.  And how about -- no, we're just doing cross,

15   he's not cross-endorsed --

16         THE COURT:  Yeah.

17         MR. BURG:  15 minutes.

18         THE COURT:  You have 15 minutes.  I'm just asking,

19   how much of a warning do you want?

20         MR. BURG:  Oh, two minutes is fine.

21         THE COURT:  The default two minutes?

22         MR. BURG:  Yes.

23         THE COURT:  Last thing, Ms. Carlson, you're in the

24   middle of your testimony so I direct you not to speak with

25   any of the lawyers during the break.

Direct - Carlson

1     (Recess at 10:19 a.m. to 10:35 a.m. out of the

2  presence of the jury)

3          MR. BURG:  Your Honor, before we do, if I --

4  first of all, Mr. Thomaidis is not here.

5          THE COURT:  Oh.

6          COURTROOM DEPUTY:  Oh, I didn't even see that.

7  I'm sorry, here's --

8          MR. BURG:  And I have one other matter.

9          THE COURT:  Okay.  Wait.

10          MR. BURG:  I'll wait for Mr. Thomaidis.

11          THE COURT:  Is he coming in?  Will you get Mr.

12  Thomaidis, please.

13          COURTROOM DEPUTY:  They are always usually here.

14          THE COURT:  Yes.

15          MR. BURG:  Your Honor, I would hope the witness

16  would be instructed that when I ask her cross-examination,

17  she may not discuss anything about any verification,

18  otherwise it would be in violation of your rule and,

19  obviously we would make a motion, if she violates that

20  rule, for a mistrial.  I just want to make sure the witness

21  knows so that she does not in response talk about

22  verification.

23          THE COURT:  All right.  Your view on it.

24          MR. THOMAIDIS:  Your Honor, I think that the Court

25  was fairly clear in its ruling in its motion -- in the

1901

Direct - Carlson

1   ruling on the motions *in limine* that she can certainly

2   incorporate in third parties' information, she can't act as

3   a conduit for hearsay.  I think that she's been consistent

4   with that.

5         With that said, I definitely understand the

6   Court's perspective and we will abide by that.

7         On the flip side -- if I may, on the flip side, we

8   also have the issue of the stricken letter reports.  If he

9   jumps into the content of the stricken letter reports he's

10  in the exact same boat that he was accusing me of being.

11        THE COURT:  I don't think you're going to do that.

12  You're not going to ask her about the late --

13        MR. BURG:  Absolutely not.  I want to make sure,

14  though, when I ask her numerous questions about not

15  verifying, that she doesn't say that she verified after the

16  fact, which would be in violation of your order.

17        THE COURT:  That could cause some problems.  So do

18  you understand what we're talking about here, Ms. Carlson?

19        THE WITNESS:  When I read your order, my

20  understanding was I could state that it was verified but

21  not testify to what they said, the peers said --

22        THE COURT:  Well, there's been a subsequent

23  objection and significant discussion.  And my view on it

24  now is that we should only stick to what you did or didn't

25  do prior to your preparation of the report and the

1902

Direct - Carlson

1   disclosures.

2        If we go in after -- if you mention -- because we

3   can't put the toothpaste back in the tube, will cause a lot

4   of issues and headaches for everyone.  So it would -- so if

5   you could limit your answers to what you did prior to your

6   issuance of your report and your disclosures.

7        THE WITNESS:  Yes, sir.

8        THE COURT:  All right.

9        MR. THOMAIDIS:  And, Your Honor, may I just

10   clarify, for her edification, so we don't make the

11   toothpaste come out of the tube.  So what you're talking

12   about here is you issued your report?

13        THE WITNESS:  Yes.

14        MR. THOMAIDIS:  Then we subsequently had you do a

15   couple of verifications.  It's those verifications that

16   should not be referenced either in acknowledgment that they

17   occurred or the content of them.

18        I think that's consistent with what the Court has

19   said, right?

20        THE COURT:  Right.  That's my ruling.

21        THE WITNESS:  Thank you.

22        THE COURT:  Okay.  Thank you.  All right.  Bring

23   in the jury.

24     (Jury was present at 10:40 a.m.)

25        THE COURT:  Ms. Carlson, I remind you that you

Cross - Carlson

1  remain under oath.

2      THE WITNESS:  Yes, sir.

3      THE COURT:  Cross-examination.

4      MR. BURG:  Thank you, Your Honor.

5                     CROSS-EXAMINATION

6  BY MR. BURG:

7  Q.   Good morning, Your Honor, ladies and gentlemen of the

8  jury, counsel.

9      We've met before, correct?

10 A.   Yes, sir.

11 Q.   You met at my -- at your deposition where I took your

12 deposition, correct?

13 A.   Yes, sir.

14 Q.   Okay.  I want to deal with one issue right now that

15 you ended on and then I'm going to get through some of the

16 other things.  You were -- you were sent copies of

17 distribution agreements by Mr. Thomaidis, correct?

18 A.   Yes, sir.

19 Q.   All right.  And you looked at those to see if they

20 were identical, correct?

21 A.   Yes.

22 Q.   Okay.  But he failed to send you the distributor

23 agreement dated 18th day of 2012.  You've never seen that

24 one before, correct?

25 A.   Not the original.

1904

Cross - Carlson

1   Q.   You've never seen that one at all.

2   A.   The 18th day of 2012?

3   Q.   Yes.

4   A.   I don't believe so.  If I could refer to my notes, I

5   can tell you what these are dated.

6   Q.   That's fine.  Maybe I could clarify.  What you saw was

7   the exclusive distributor agreement that was dated December

8   8th, '09, and executed on December 14th, '09.  Actually

9   copies of that, correct?

10         MR. THOMAIDIS:  Your Honor, she's not going to

11   have any subject matter knowledge of this other distributor

12   agreement that Mr. Burg is referencing in February.  Nor is

13   she going to have any subject matter knowledge of when the

14   document is allegedly executed.

15         THE COURT:  Well, I think you can establish what

16   document she hasn't reviewed, and you have your report and

17   you can testify as to what you did and didn't review.

18         THE WITNESS:  As far as the distributor agreement?

19   BY MR. BURG:

20   Q.   Yes.  You saw three -- he sent you three different

21   copies of that and you looked at it and said they were all

22   of the same; isn't that true?

23   A.   Yes, sir.

24   Q.   All right.

25         MR. BURG:  May I approach the witness?

1905

Cross - Carlson

1      THE COURT:  Can you hand -- what are you --

2      MR. BURG:  That's fine.

3      MR. THOMAIDIS:  Your Honor --

4      THE COURT:  Do you have something for impeachment?

5      MR. THOMAIDIS:  Your Honor, may we approach,

6  please?

7      THE COURT:  Okay.

8      (Side bar conference held)

9      MR. THOMAIDIS:  So he's going to give her a copy

10  of that purported Sark agreement, which she was -- she's

11  never seen before.  She was never asked to see it and it

12  doesn't have any signature sheet that she analyzed.

13      THE COURT:  What evidence is that?

14      MR. BURG:  It goes to the form.  She's testifying

15  to the form of the distributor agreement that they were all

16  the same.  This is another one that has the same form dated

17  2012.  That's all.  That it was never sent by Mr.

18  Thomaidis --

19      THE COURT:  Okay.  I think that's a -- her

20  testimony wasn't -- I mean, she did mention a form but that

21  wasn't the thrust of her testimony.  That's going to send

22  us off into a tangent that I don't want to go down.  So

23  you're objecting to him using this --

24      MR. THOMAIDIS:  It's irrelevant, and she has no

25  subject matter knowledge of that document.

Cross - Carlson

1    THE COURT:  Okay.  Sustained.

2        MR. BURG:  All right.  Thank you, Your Honor.

3    (End of discussion at side bar)

4    BY MR. BURG:

5    Q.  And just so we're clear, those were only three

6    distributor agreements that you were sent, correct?

7    A.  Yes.

8    Q.  The three copies of the same one?

9    A.  Yes.

10   Q.  All right.  Thank you.  I want to go through your

11   background.  You originally were a cosmetologist, correct?

12   You got a license here in Colorado as a cosmetologist?

13   A.  Yes, sir.

14   Q.  Okay.  And you did that for a number of years,

15   correct?

16   A.  Yes.

17   Q.  Then you actually worked as a receptionist at a law

18   firm, correct?

19   A.  Yes.

20   Q.  And you then worked your way up to a legal secretary,

21   correct?

22   A.  Yes.

23   Q.  And you worked for Parcel Mauro, correct?

24   A.  Yes.

25   Q.  They were a law firm that represented big corporations

Cross - Carlson

1   mostly, correct?

2   A.   They recommended -- yes, and various fields, yes.

3   Q.   Right.   And then at some point in time, you went to

4   school to get your forensic examination certificate,

5   correct?

6   A.   Yes.

7   Q.   All right.   And what was the name of that school?

8   A.   The International School of Forensic Document

9   Examination.

10  Q.   Right.   And who was the founder of that school?

11  A.   Bart Baggett.

12  Q.   Bart Baggett or Curt Baggett?

13  A.   Bart Baggett, to my knowledge.

14  Q.   And his father was Curt Baggett?

15  A.   His father was Curt.

16  Q.   Who also claims to be a forensic examiner, correct?

17  A.   Yes, sir.

18  Q.   And he's been accused -- he's been convicted of

19  multiple felonies, correct?

20          MR. THOMAIDIS:   Your Honor, I object.   That's

21  neither accurate and she --

22          THE COURT:   Sustained.

23          MR. THOMAIDIS:   -- doesn't have subject matter.

24          THE COURT:   Sustained.   Direct the jury to

25  disregard that answer.

1908

Cross - Carlson

1    BY MR. BURG:

2    Q.   You didn't attend any classes at the school, correct?

3    You didn't attend any in Los Angeles where the school was

4    located, correct?

5    A.   No, sir, it wasn't an on-line course, on-line distance

6    learning.

7    Q.   Well, in fact, you said it was an on-line in your

8    deposition, you told me that it was a phone -- that you

9    attended by phoning in; do you recall saying that?

10   A.   Yes, it's a distance learning course, and we attended

11   through telephonic calls, and we submitted our homework

12   online.

13   Q.   Okay.  And you also told me that you pay your money,

14   you get your certificate.  Do you recall telling me that?

15   A.   Would you repeat that?  That what, sir?

16   Q.   Yeah, that if you pay your money, you get your

17   certificate.  Do you recall saying that?

18   A.   No, sir, I don't recall saying that.  I recall --

19   Q.   You don't recall saying that?  Okay.  Well, give me a

20   second here.  Yeah, can we go to line -- thank you.  Can

21   you go to line 46 -- page 46, line 7.

22             COURTROOM DEPUTY:  Exhibit what, I'm sorry?

23             MR. BURG:  I'm sorry, no, this is --

24             COURTROOM DEPUTY:  Exhibit number?

25             MR. BURG:  No, no, this is from her deposition.

Cross - Carlson

1   She said, I never said this.  Impeachment.

2           COURTROOM DEPUTY:  I'm sorry.

3           MR. BURG:  Page 46, line 7.  Play that.

4       (Video deposition clip paid)

5   BY MR. BURG:

6   Q.   Okay.  That's what you told me in your deposition,

7   correct?

8   A.   That's what it shows, yes.

9   Q.   All right.  And you also -- just so we're clear here,

10  that with regard to your -- what you do as a -- for a

11  living, you also do and advertise for personality analysis

12  in which you charge $300, correct?

13          MR. THOMAIDIS:  Your Honor, also not accurate.

14          THE COURT:  Well, she can say that's not accurate.

15          MR. THOMAIDIS:  Well, it's irrelevant, too.

16          THE COURT:  Well, overruled.  It's

17  cross-examination.

18  BY MR. BURG:

19  Q.   Isn't that true?

20  A.   I believe there is a note -- I beg your pardon, there

21  is something about -- ask me your question again and I can

22  answer it again, please.

23  Q.   Okay.  On your LinkedIn --

24  A.   Yes.

25  Q.   -- you state you do personality analysis from

Cross - Carlson

1  handwriting; isn't that true?

2  A.   Yes, I believe that to be true.

3  Q.   Okay.  Can we look at Exhibit -- well, 192, is that --

4  is that admitted?  Okay.  I would like to have her look at

5  the Exhibit 192.  The first page.  Summary.

6       Is this your -- is this your LinkedIn that you use

7  for getting clients?

8  A.   It appears to be.

9  Q.   Okay.  And in -- this absolutely is an accurate copy

10 of that, correct?

11 A.   I don't know that it's an accurate copy.  It appears

12 to be pulled off of the website.

13 Q.   Right.  And in that, you say that -- strike that.

14       THE COURT:  You're not going --

15       MR. BURG:  I'm sorry, I would move for the

16 admission of it.

17       THE COURT:  Is there an objection?

18       MR. THOMAIDIS:  Your Honor, we object.  It's

19 irrelevant and, frankly, prejudicial.

20       THE COURT:  It's --

21       MR. BURG:  May I respond?

22       THE COURT:  Go ahead.

23       MR. BURG:  Yeah, it is relevant.  It goes to her

24 credibility and her credentials, which are very important

25 in terms of determining her opinions in this case as to

1911

Cross - Carlson

1    whether she's credible.

2          THE COURT:  Yeah, but if --

3          MR. BURG:  And in this particular -- this is her

4    LinkedIn advertisement, Your Honor.

5          THE COURT:  Hold on.  This is 192?

6          MR. BURG:  Yes.

7          THE COURT:  I'm going to sustain the objection.

8    There's a lot of completely irrelevant stuff in this

9    document.  I think you can go about your

10   cross-examination --

11         MR. BURG:  Thank you.

12         THE COURT:  -- in a different way.

13   BY MR. BURG:

14   Q.   In your -- you do advertise on there for personality

15   analysis from handwriting, correct?

16   A.   Yes, sir.

17   Q.   And you do charge $300 for these personality analysis,

18   correct?

19   A.   That's incorrect.

20   Q.   Okay.  Well, I have to go back to your -- to the

21   deposition.  I'm surprised that . . .

22         While we're looking for that, you do charge for

23   that, don't you?

24   A.   When I do a -- I beg your pardon.

25         MR. THOMAIDIS:  I'm sorry, Your Honor.  This is

1912

Cross - Carlson

1    still irrelevant.  Documentary --

2              THE COURT:  Go ahead and answer -- no, overruled.

3              THE WITNESS:  When I do personality analysis for a

4    client, it's generally for placement in their company to

5    find out if they will fit the position that the client is

6    seeking to fill, and so when I do a personality assessment

7    for that reason, I regularly charge $200 to do that for a

8    client.

9    BY MR. BURG:

10   Q.   Okay.  Well, let me find -- okay.  Let's go to page --

11   yeah, 41.  Okay, yeah, let's just play it.

12             Isn't it true that what percentage of your

13   practice is doing these personality -- doing these, these

14   personality analysis for $300?  Do you remember me asking

15   you that question?

16   A.   No, I remember us speaking about it.  I don't remember

17   that question specifically.

18   Q.   Okay.  Can you play her question and answer?

19             MR. THOMAIDIS:  And, Your Honor, as we've dealt

20   with before in this case, the attorneys' testimony is not

21   evidence.

22             THE COURT:  Right.

23             MR. THOMAIDIS:  So with respect to this

24   deposition, he is certainly welcome to play the testimony

25   if it means a difference between $100.

Cross - Carlson

1    MR. BURG:  You know what, I'll withdraw it.  I

2    have a limited time.

3    BY MR. BURG:

4    Q.  Okay.  So you charge to do personality assessments,

5    correct?

6    A.  Yes.  When asked to, yes.

7    Q.  Uhm-hum.  And, in fact, you did one of Brad Pitt based

8    on a signature on an aloe vera bottle, correct?

9    A.  No, that's incorrect.

10   Q.  Well, it shows up -- you're cited in a magazine called

11   Cele-bitchy, in which you're quoted in -- that it says,

12   Writing expert Wendy Carlson analyzed Brad's longhand note

13   and signature from the bottle of Kiehl's aloe vera

14   biodegradable liquid body container that he helped create,

15   and it says -- this quotes you -- this writer is a person

16   of emotional reserve, not showing his feelings.

17   Denver-based Carlson says, Although his feelings run deep.

18        Did you do that or didn't you do it?

19   A.  I did an examination of somebody's handwriting, not

20   knowing whose it was.  I was never given a signature, so I

21   never analyzed a signature, it was simply a client who

22   contacted me and asked me to analyze some handwriting,

23   which I did.

24   Q.  Okay.  What's the Handwriting University International

25   that Bart Baggett has?

Cross - Carlson

1   A.    Handwriting University is a separate business where

2   Mr. Baggett teaches graphology or personality analysis

3   through handwriting.

4   Q.    Right.  And, again, he was your -- he was your mentor,

5   Mr. Baggett, correct?

6   A.    Yes.

7   Q.    And he taught you about personality analysis also,

8   didn't he?

9   A.    Yes, separately, prior to taking the forensic

10  examination course.

11  Q.    All right.  And, in fact, you and he both agree that

12  you can look at someone's handwriting and determine their

13  personality better than a psychiatrist who has talked to a

14  patient 50 times, correct?

15  A.    That's a pretty extreme statement.  I don't know that

16  I would agree with that.  I know it's certainly very

17  accurate.  And as far as he and I agreeing to that, that's

18  what I would have to answer speculatively.

19  Q.    You don't remember saying that in your deposition that

20  you agreed with that and that handwriting personality has

21  been around longer than psychiatry?  Do you remember

22  telling me that?

23  A.    I believe I told you it was around longer than

24  psychology.  You asked me a compound question.  I can

25  answer those if you break those down.

Cross - Carlson

1    Q.   Okay.   Mr. Baggett says that you can determine from

2    someone's handwriting their deep dark secrets, fears,

3    esteem, honesty, fetishes, sex drives, and dozens of other

4    hidden personality traits in his brochure for University --

5    University Handwriting International.   Do you agree with

6    that?

7          MR. THOMAIDIS:   Your Honor, I believe that he's

8    objected to this on me before, but he can quote these

9    documents all day and I don't know that it's relevant or

10   any more admissible.

11         THE COURT:   Well, something doesn't have to be in

12   evidence to be able to be used on cross-examination.

13         MR. THOMAIDIS:   Understood, Your Honor.

14         THE COURT:   But all she has to do is deny it.   And

15   it's cross-examination.   She denies or she agrees.

16         Go ahead.   Did you agree with that statement?

17         THE WITNESS:   I agree that there are multiple

18   things you can find.   As far as what you read to me, I

19   would have to read through it again to note specifically

20   what you're asking.

21   BY MR. BURG:

22   Q.   Okay.   So you agree with part of it, but not all of

23   it?

24   A.   I don't remember all of it, sir.

25   Q.   Okay.   He says, esteem, honesty, fetishes, sex drives,

Cross - Carlson

1   and dozens of other hidden personality traits.  Do you

2   agree with part of it, all of it?

3   A.   I agree with part of it.

4   Q.   Okay.  And what part do you agree with?

5   A.   Esteem and honesty.  I don't remember all that you

6   read.

7   Q.   Are you familiar with psychological personality tests

8   that are given by employers throughout this country, for

9   example, the MMPI-2 and the MMPI-2-RF, are you familiar

10  with that?

11  A.   I believe I've heard of those.

12  Q.   Okay.  And do you believe that your handwriting

13  personality is better equipped to determine someone's

14  honesty and esteem than this test that was over many, many

15  years put together by psychologists and scientists?

16  A.   I wouldn't know how to answer that question, sir.  I

17  would have to speculate as to the degree of

18  comparability.

19  Q.   So your answer is it might be that your looking at

20  someone's signature may be more effective and more accurate

21  than that particular test; is that correct?

22  A.   I'm not saying that it might be.  I'm saying that

23  personality from handwriting is used regularly in

24  investigators who are trying to determine, you know, maybe

25  serial killers or types of criminals.  So certainly

Cross - Carlson

1   personality from handwriting can be an accurate science.   I

2   don't know how to compare it to the tests that you're

3   referring to.

4   Q.   And the same thing with the Comprehensive Handwriting

5   for Psychological Assessment by psychologists and doctors

6   Segel and Hilsenroth, you don't know whether or not looking

7   at someone's signature would be more accurate in

8   determining their psychological makeup in this test?

9   A.   Not a signature specifically.   For my -- for my

10   knowledge of handwriting analysis, I would need more

11   writing than simply a signature.

12   Q.   Are you familiar with peer-reviewed papers that have

13   come out, for example, in the -- this one is, I guess,

14   from -- just a couple, published Psychological Bulletin,

15   lack of evidence for assessment of personality traits using

16   handwriting analysis which was done by numerous doctors

17   saying that it's basically quackery.   Are you familiar with

18   that?

19   A.   I'm not familiar with that one specifically.   I know

20   there are a number of reports both ways or studies both

21   ways.

22   Q.   All right.   And what about, Can Graphology Predict

23   Occupational Success?   Are you familiar with that one in

24   which they conclude that it cannot?   Are you familiar with

25   this?

1918

Cross - Carlson

1    A.    No, I am not.

2    Q.    Now, I have been involved in numerous cases in

3    which -- in which there's been an issue of someone's

4    signature.  And I want to ask you a few questions about

5    that.

6              No. 1, you'd agree with me that it's very

7    important to get the original document to review.

8    A.    That's always preferred, it's not always possible.

9    Q.    Okay.  And it's preferred -- it's preferred because

10   there can be -- there can be errors, and there's

11   limitations if you don't have the original; isn't that

12   true?

13   A.    There can be errors in what way that -- I can't answer

14   that question.

15   Q.    I said, isn't it true that if you don't have the

16   original document, there are limitations and there's a more

17   likelihood of errors by not having the original document,

18   correct?

19   A.    Again, I'm -- more likelihood of errors?  What, sir?

20   In --

21   Q.    In what you do, in the forensic examination of a

22   signature.

23   A.    Oh, there are more limitations.  You can't see,

24   obviously, the type of writing instrument that was used or

25   the type of pressure that was put in the writing

Cross - Carlson

1  instrument.  As far as errors, potentially if it's a poor

2  quality copy, there are certainly -- there's certainly that

3  possibility.

4  Q.  Right.  And in this particular case, not only did you

5  not look at the originals, but you looked at a photograph

6  of a copy, so once removed.  You didn't actually get the

7  copy, they sent you a photograph of a copy, correct?

8          MR. THOMAIDIS:  Your Honor, that's incorrect.

9          MR. BURG:  She could answer.

10          MR. THOMAIDIS:  Sorry.

11          THE COURT:  Overruled.  If it's incorrect, she can

12  say it's incorrect.

13          THE WITNESS:  I believe I received a photograph of

14  the original.  I did not look at the original myself.

15  BY MR. BURG:

16  Q.  Okay.  Who told you that there was -- that you

17  received a photograph of the original of, let's say, the

18  exclusive distributor agreement, dated December -- signed,

19  executed, December 14th, '09?

20  A.  Who told me that I received it?

21  Q.  That you received a photograph of the original.

22  A.  I was informed that the photograph was -- that I

23  received was from Mr. Thomaidis.

24  Q.  He told you it was a photograph of the original?

25  A.  I -- I believe so.  I -- that is my remembrance.

Cross - Carlson

1    Q.   So if we have the original copies, you never asked us

2    for the original copies to examine, did you?

3    A.   No, sir.  I don't speak with the opposing counsel on

4    my own.

5    Q.   Right.  And so did -- I want to make sure, so Mr.

6    Thomaidis told you, or you assumed, that what you got was a

7    photograph of the original?

8    A.   No, my remembrance is that Mr. Thomaidis told me that

9    was a photo of the original.

10   Q.   Did he tell you where he got that original copy from?

11   Did he tell you he got it from Porcelanosa?

12   A.   I don't recall where he got the photograph taken.

13   Q.   And I want you to assume from my question that you did

14   not get a photograph of the original.  Would that alter any

15   of your opinions in this case?

16   A.   No.

17   Q.   Okay.  Now, in the other cases I've had, the forensic

18   examiner would actually go and get original signatures --

19   multiple original signatures from the people who signed the

20   document.  You did not do that in this case, correct?

21   A.   No, sir, I did not contact any of your clients.

22   Q.   Right.  And, in fact, not only did you not contact Mr.

23   Handley to get a original signatures of his document, and

24   you never even read his deposition, correct?

25   A.   I did not.

Cross - Carlson

1   Q.   You never heard him say that it looked like his

2   signature?  You never heard that, correct?

3   A.   No, sir, I did not hear him say that.

4   Q.   Mr. Thomaidis never told you that, correct?

5   A.   Told me --

6   Q.   Yeah, that Mr. Handley, under oath, said it looked

7   like his signature?

8   A.   I believe I was told that he thought it looked like

9   his signature; he was uncertain that it was.

10  Q.   Okay.  Again, the reason you didn't contact Mr.

11  Handley was because he didn't retain you.  That's what you

12  told me; isn't that true?

13  A.   Correct.

14  Q.   Okay.  Did you ever ask Mr. Thomaidis if he could get

15  ahold of Mr. Handley so you could get original signatures

16  of his -- of his -- of his signatures?

17  A.   No, sir, I did not get -- no, sir.

18  Q.   People don't sign their signatures the same every

19  time, correct?

20  A.   Correct.

21  Q.   Right.  And if they are in a hurry, they might sign it

22  a certain way, and if they're not in a hurry, they might

23  sign it a different way, correct?

24  A.   Correct.

25  Q.   All right.  And, in fact, you say that may show that

Cross - Carlson

1  he has a change in personality?

2  A.   I --

3  Q.   You don't recall saying that to me?

4  A.   No, sir, I have not said that to you.

5  Q.   Okay.  Can we look for that line.

6        And in terms of -- I mean, I sign hundreds of

7  thousands of documents.  Sometimes my M is high, sometimes

8  my M is low.  Is that -- is that inconsistent with your

9  testimony here?

10  A.   No, sir.

11  Q.   Okay.  Well, you were measuring the -- the -- how high

12  an M, you know, of Mr. Handley's signature would go or how

13  low his certain letters would go; do you remember

14  testifying to that?

15  A.   No, I wasn't testifying how low the letters were.  I

16  measured the width and the height of the loops in them, but

17  not the signature and how long or low they would go.

18  Q.   Right.  But that varies from the -- when the person is

19  signing it, it may go -- I may have a big M or it may have

20  a small M, I may have -- my H may go higher or lower.  Do

21  you -- you agree with that?  That's what happens with

22  signatures.

23  A.   Yes, sir, that's part of natural variation.

24  Q.   Right.  And can we go to 81-29 where you told me that

25  if someone's signature changes, the personality changes.

Cross - Carlson

1   You don't recall telling me that, do you?

2   A.   No, sir.  My -- my knowledge of handwriting for

3   personality is if someone's signature changes, that may

4   have to do with their emotional state at the time, but not

5   their personality.

6   Q.   Okay.  Well, can we show 81.

7        (Video deposition clip played)

8   BY MR. BURG:

9   Q.   Okay.  Now, you also didn't go and request that you

10  get original signatures and handwritings from Mr. Davis,

11  correct?

12  A.   Correct.

13  Q.   From Darlyne Davis, correct?

14  A.   Correct.

15  Q.   From Glenn Davis, correct?

16  A.   Correct.

17  Q.   And from Shana Bastemeyer; you didn't get any original

18  signatures from them, correct?

19  A.   No, sir, I did not.

20  Q.   You could have requested them through discovery that

21  we have them sign so you could take a look at multiple

22  signatures for your evaluation, correct?

23  A.   I could have requested through Mr. Thomaidis to get

24  signatures --

25  Q.   Right.

1924

Cross - Carlson

1   A.   -- through discovery, yes.

2   Q.   You didn't do that.

3   A.   No, sir.  No, sir, I prefer to get signatures that are

4   written prior to the issue at hand.

5   Q.   Okay.  But you also know that original signatures are

6   preferable than looking at copies, correct?

7   A.   Always originals are preferable.

8   Q.   Right.  Now, you also didn't know that there were --

9   you never were told by Mr. Thomaidis, and you didn't read

10   the depositions, that there were eyewitnesses who saw Jack

11   Handley sign the December 14th, '09 agreement, correct?

12   A.   That I was never told, is that your question?

13   Q.   Let's start with:  You were never told that until the

14   deposition, correct?

15   A.   That there were witnesses?

16   Q.   Yeah, eyewitnesses.

17   A.   As far as eyewitnesses, I don't put a lot of stock

18   into what somebody says.  I -- I'm looking at the evidence

19   in front of me to make a decision.

20   Q.   That's not my question.  You were never told for

21   your -- for your -- to do an evaluation, that there were

22   eyewitnesses that saw Mr. Handley sign that document,

23   correct?

24   A.   I don't recall.

25   Q.   You don't recall whether you were told or not?

Cross - Carlson

1   A.   I don't recall whether I was told that.  There were

2   multiple signatures on a same page.  I would imagine in

3   doing a -- or looking at a document, I would think that

4   they might be signed at the same time, but that doesn't

5   mean that they were all witnesses to each other's

6   signatures.

7   Q.   You actually told me, do you recall telling me that

8   that was something that you would have liked to have known?

9   Do you recall saying that?

10  A.   I -- I don't recall saying that.  I may have said

11  that.  I don't recall saying it.

12  Q.   Okay.  But that is something you would have liked to

13  have known before you did your evaluation in this case,

14  correct?

15  A.   I like to know the surrounding circumstances,

16  certainly.

17  Q.   Right.  And one of those surrounding circumstances

18  would be whether or not there were any eyewitnesses,

19  correct?

20  A.   Correct.

21  Q.   All right.  And in this particular case, Mr. Thomaidis

22  never told you that there were eyewitnesses, correct?

23  A.   I don't recall.

24  Q.   You don't recall that?

25  A.   I don't recall whether I was told or not that there

1926

Cross - Carlson

1    were eyewitnesses.

2    Q.   Can we bring up page 21, line 5 through 14.

3        (Video deposition clip played)

4    BY MR. BURG:

5    Q.   Okay.  So does that clear it up now?  You were never

6    told that, and you thought it might be useful, correct?

7    A.   It could be useful.

8    Q.   Right.  And in this case, you never asked to read the

9    deposition nor did Mr. Thomaidis tell you something that

10    might be useful with regard to your examination that you

11    performed in this case, correct?

12    A.   I'm sorry, I feel like I'm trying to line up two

13    questions there.  I do not recall whether he told me and,

14    as I stated in both my deposition and here, I base my

15    examination on the evidence in front of me.

16    Q.   Right.  And -- and you also were not told that Mr.

17    Handley had been fired for being dishonest.  You never were

18    told that either, correct?

19    A.   Yes, I was told that.

20    Q.   Prior to your deposition?

21    A.   I don't recall when it was I was told that.

22    Q.   I think this is -- I think page 24, line 9 through 24.

23    Is that right?  Can we bring that up through -- I think

24    it's through line -- at least through line 17.

25        (Video deposition clip played)

Cross - Carlson

1    BY MR. BURG:

2    Q.   Okay.   That refreshes your recollection that -- and,

3    again, the deposition's taken previously.   You didn't

4    recall him ever telling you that, correct?

5    A.   That's what my deposition -- that's what I said at my

6    deposition.

7    Q.   Right.   And you're sworn to tell the truth under

8    penalty of perjury then, correct?

9    A.   Correct.

10   Q.   Right.   And so when you told me that, you were telling

11   me the truth, correct?

12   A.   Yes.

13   Q.   All right.   Now, with regard to the forensic

14   handwriting, there really are two standards that are

15   approved to be followed, correct?

16   A.   I don't know what standards you're speaking of, if you

17   could clarify.

18   Q.   Well, let's start with the ASTM standard, okay?

19   You're familiar with the ASTM standard?

20   A.   Yes.

21   Q.   Okay.   And are you familiar how the standard for the

22   ASTM gets created?

23   A.   Not specifically.   I believe it's a matter of

24   professionals gathering together to share their knowledge

25   and making a determination what they believe are the best

Cross - Carlson

1   guidelines.

2   Q.    Right.  In fact, isn't it true that you have a

3   standard -- it takes years and years to get a standard for

4   examination of handwritten items and the top professionals

5   in the field come together and they propose and discuss the

6   standard.  And then once they do a proposal, then those

7   people look at it, they modify it, they vote on it, and

8   then ultimately, if it's approved, then the standard gets

9   put into effect; isn't that true?

10  A.    That's my understanding.

11  Q.    Okay.  And just so we're clear here, I want to go

12  through that standard, but you don't use the ASTM standard,

13  correct?

14  A.    No, sir.  The ASTM standards are no longer viable.

15  They've been -- the handwriting section of the ASTM has

16  been discontinued since 2008.  I believe -- I believe it

17  was -- I beg your pardon, 2012 I think is when that

18  happened.  And now it's been relinquished back to the

19  scientific working group for forensic document examiners.

20  Q.    We pulled this up just recently, if we look at Exhibit

21  187, would you look at the standard there.  Are you

22  familiar with this standard?

23          COURTROOM DEPUTY:  I don't show 187 designated.

24          MR. BURG:  It's not.  I'm asking her to take a

25  look at it.

Cross - Carlson

1    BY MR. BURG:

2    Q.   You're familiar with that standard?

3    A.   I remember seeing those, yes.

4    Q.   Okay.  And --

5            MR. THOMAIDIS:  Your Honor, we have to object.  It

6    has no date.

7            MR. BURG:  What?

8            THE COURT:  Well, he hasn't moved -- are you going

9    to --

10           MR. THOMAIDIS:  I don't even know that she can --

11   I don't even think it can refresh her recollection if it

12   doesn't have a date, based on these questions.

13           THE COURT:  Are you using this -- are you going to

14   try to use this as impeachment or to get it into evidence?

15           MR. BURG:  Let me establish the date.

16   BY MR. BURG:

17   Q.   If we'll look, if you look at the bottom of page --

18   it's 187004, where it says, Copyright by ASTM, all rights

19   reserved through --

20           THE COURT:  Mr. Burg, you're reading from a

21   document that's not in evidence.

22           MR. BURG:  I'm sorry.  I apologize.

23           THE COURT:  My question was, you haven't answered

24   it:  Are you trying to use this for impeachment or are you

25   trying to move for its admission?

Cross - Carlson

1    MR. BURG:  I'm probably going to move for its

2    admission.

3    THE COURT:  All right.  Is there an objection?

4    MR. THOMAIDIS:  We object.  She has no subject

5    matter knowledge of the document, and I don't think a

6    copyright date necessarily means when it was produced or

7    when it was obtained by them.

8    THE COURT:  I'm going to sustain the objection.

9    What exhibit is this, Deb?

10    COURTROOM DEPUTY:  We are on 186.  18 --

11    MR. BURG:  I intend to use it for impeachment.

12    COURTROOM DEPUTY:  What number?

13    MR. BURG:  I intend to use it for impeachment

14    also.

15    COURTROOM DEPUTY:  Did I have the number wrong?

16    THE COURT:  What number is this document?

17    MR. BURG:  197.

18    MR. CROUGH:  187.

19    MR. BURG:  187, I'm sorry.

20    THE COURT:  Okay.  187 is -- the objection is

21    sustained.  It's refused.

22    BY MR. BURG:

23    Q.   Okay.  You said you're familiar with this standard,

24    though, correct?

25    A.   I'm familiar with the ASTM guidelines.

Cross - Carlson

1   Q.   Okay.  And this is a standard.  And if you look at

2   the -- that last part we just showed you, the copyright --

3   and this was actually pulled off the ASTM International in

4   2015.  Do you see that?

5   A.   I see there's a date on there, sir, I don't know when

6   it was printed out.  I have nothing to say about the date.

7   I just know that the handwriting sections of the ASTM was

8   disband in 2012, so if these are still on their site, I

9   have no control over what it is that you're showing me --

10  Q.   You're not a member of the ASTM --

11  A.   No, sir, I'm not.

12  Q.   -- correct?

13  A.   Correct.

14  Q.   And, in fact, you didn't go to any of the ASTM

15  meetings, correct?

16  A.   Correct.

17  Q.   Right.  And so you're just coming in here saying the

18  standard doesn't exist, but in 2015, when you look at the

19  ASTM standards, it is still being shown as a standard for

20  handwriting -- for examination of handwriting --

21  handwritten items, correct?

22  A.   Sir, again, I have no authority over the ASTM's

23  website.  I don't know when they put something up or when

24  they take something down.  I can't comment to that.

25  Q.   So you are telling this jury that it was vacated in

                            Cross - Carlson

1    2012, that's what your -- under oath you're saying that?

2    A.    I'm saying that -- I beg your pardon, go ahead.

3              MR. THOMAIDIS:  Your Honor, it's misstating -- if

4    he's trying to get her to lie under oath, then okay, but --

5              THE COURT:  Hold on.  So what's your objection?

6              MR. THOMAIDIS:  Your Honor, at this point he's

7    harassing the witness with respect to something she has no

8    subject matter knowledge on.

9              THE COURT:  Well --

10             MR. BURG:  May I respond, Your Honor?

11             THE COURT:  You may.

12             MR. BURG:  She's telling me that this standard was

13   vacated in 2012 and now he's saying she doesn't have any

14   knowledge of it.

15             THE COURT:  All right.

16             MR. BURG:  You can't have it both ways.

17             THE COURT:  I'll overrule the objection.  You can

18   establish -- or testify as to what you know or don't know

19   about the existence of this standard at the time of

20   questioning.

21             THE WITNESS:  Okay.  Did you want me to give a

22   further answer to that question?

23   BY MR. BURG:

24   Q.    Yeah, let me try it again.  You're coming in here

25   saying it was vacated in 2012.  Isn't that what you're

Cross - Carlson

1    saying?

2    A.    I didn't say that it was vacated.   I said that the

3    handwriting section of the ASTM -- or the document

4    examination section of the ASTM was relinquished or

5    disbanded in 2012.   The guidelines that you're referring to

6    here in this exhibit were given back to the scientific

7    working group for forensic document examiners, so these are

8    simply guidelines.

9         As far as it being a standard, there's no

10   governing body for document examiners, so it's a standard

11   from a group.

12   Q.    Okay.   But let's go back to the first page.   It says,

13   Standard Guide for Examination of Handwritten Items,

14   correct?

15   A.    Correct.

16   Q.    All right.   And if we had to No. 4 -- let's go to No.

17   4.

18        THE COURT:   You're reading from an exhibit that's

19   not in evidence.

20        MR. BURG:   No, I'm going to ask questions about

21   it, Your Honor.   I'm not --

22        THE COURT:   Well, ask her questions.   If she --

23   she has this in front of her, and then she can answer based

24   on her looking at the document and your questions, but your

25   questions can't contain --

Cross - Carlson

1          MR. BURG:   Okay.

2          THE COURT:   -- the text of the document that I've

3    refused to come into evidence.

4    BY MR. BURG:

5    Q.   Isn't it -- would you agree with me that the ASTM

6    standard puts limitations on submissions of nonoriginal

7    documents?   Would you agree with that?

8    A.   It notes that there are limitations that -- thank

9    you -- that limitations can be due to not original

10   documents, or viewing of nonoriginal documents.

11   Q.   All right.  What you said you were trained on -- was

12   it the ACE-V standard, correct?

13   A.   I -- yes, correct.

14   Q.   All right.  And that's what Mr. Bart Baggett trained

15   you on when you took your courses telephonically, correct?

16   A.   Yes.

17   Q.   All right.  And the -- it's really important that --

18   that the V is the verifying.  You understand that?

19   Verification.

20   A.   It's really important to who, sir?

21   Q.   To your opinion that it become verified under that

22   ACE-V standard.

23   A.   It can be, it's not -- verifications are not done for

24   every examination and it's not a requirement.

25   Q.   Well, it's a requirement of the FBI, isn't it?

1935

Cross - Carlson

1    A.    I don't know what the FBI's requirements are, but it

2    is not a requirement for document examiners.

3    Q.    Can we -- let's look at page 66 -- well, let's go

4    through it.  We'll get there -- I'll get there in a second.

5          In this case, you did not do -- you did not have a

6    second expert verify your findings, correct?

7    A.    Correct.

8    Q.    And even though that's part of the verification ACE-V

9    method, correct?

10   A.    Yes.

11   Q.    Okay.  And, in fact, you -- well, I -- it's true that

12   the FBI requires the verification because of the

13   seriousness of an allegation that someone may have

14   committed a forgery.

15         MR. THOMAIDIS:  Asked and answered, Your Honor.

16         THE COURT:  Sustained.  She says she has no

17   knowledge of this.

18   BY MR. BURG:

19   Q.    Well, in fact, you told me that you don't have to

20   comply with that because you weren't trained by the FBI;

21   isn't that what you told me?

22         MR. THOMAIDIS:  Same asked-and-answered

23   objection.

24         THE COURT:  Overruled.  It's a different question.

25         THE WITNESS:  I do not work for the FBI.

1936

Cross - Carlson

1   Verification is not required for -- by document examiners.

2   As I said, there are no governing bodies or regulatory

3   agencies for document examiners, so it's -- it's not a

4   requirement specifically.  We do it as a courtesy for other

5   document examiners.

6   Q.   Okay.  You have on your website the *Pettus* case and in

7   fact you referred to it here this morning, correct?

8   A.   Yes.

9   Q.   And in that case, on page 9, the -- it says that the

10  FBI examiners are testifying [sic] to and employ the

11  national standards recommended by the ASTM International,

12  and that they're trained examiners to employ that, and to

13  apply the ACE-V standard.  Correct?

14  A.   Are you reading something that I can refer to, sir,

15  because --

16  Q.   Well, it's the *Pettus* case that's on your website.

17  A.   Okay.  I haven't committed it to memory, so if it

18  said -- I have to trust that you're reading it correctly.

19  Again, I'm not trained by the FBI, I'm not privy to their

20  requirements or I'm not obligated to their requirements.

21  Q.   Right.  And, in fact, you said you didn't verify the

22  fourth step because it's not a requirement for you.  It may

23  be a requirement for the FBI, but it's not a requirement

24  for you.  Isn't that what you told me?

25  A.   I believe that's the -- that's what I told you, that's

Cross - Carlson

1  what I'm testifying to today.  There are -- again, there's

2  no -- required by who?

3  Q.   No, just answer my question.  Didn't you tell me that

4  it's not a requirement for you, it may be a requirement for

5  the FBI, but you don't have to follow that same

6  requirement?

7  A.   I believe that's what I told you, yes.

8  Q.   Right.  And do you remember telling me that the reason

9  you didn't -- well, in fact, do you remember me saying to

10  you that you do understand that the verification is a

11  crucial step in the ACE-V process, correct?

12  A.   I don't recall saying that it's a crucial step.  I,

13  again, don't remember that.

14  Q.   Okay.  Can we play page 75, line 12 through 23.  I'm

15  sorry.  No, through -- page 76 line 1.

16       (Video deposition clip played)

17  BY MR. BURG:

18  Q.   All right.  So, again, you understand the seriousness

19  of accusing someone of forgery.

20  A.   Yes, sir.

21  Q.   Okay.  And in this particular case, you didn't do the

22  verification, which is to be an independent verification in

23  which the other person has no idea what conclusions you

24  came up to, that they're given a separate group of

25  documents to do the analysis; isn't that true?

1938

Cross - Carlson

1    MR. THOMAIDIS:  Compound, Your Honor.

2    THE COURT:  One second.  Sustained.  Let's break

3  it up and rephrase.

4  BY MR. BURG:

5  Q.    Okay.  All right.  Are you familiar with the etiology

6  of the ACE-V and its proper use and expiration of the

7  relationship between ACE-V and the scientific method of

8  hypothesis testing by Michele Triplett and Lauren Cooney in

9  the Journal of Forensic Identification?

10  A.    No, sir.

11  Q.    Okay.  You don't get the Journal of Forensic

12  Identification?

13  A.    No, sir, I do not.

14  Q.    Okay.  Would you agree that the purpose of the

15  verification is, to have proper peer review, is not about

16  upholding a prior conclusion, even if that happens, the

17  purpose of the peer review verification is to thoroughly

18  attempt to falsify the original examiner's conclusion and

19  how it was arrived?

20  A.    Can you please ask me the question part of that

21  question -- of that statement.

22  Q.    Yeah.  I'm asking if you agree with that.

23  A.    To --

24  Q.    That the proper peer review is not about upholding a

25  prior conclusion -- let's start with that -- for the

1939

Cross - Carlson

1    verification.

2    A.    It is not about upholding a prior conclusion.

3    Q.    Okay.  You agree with that.  Yes?

4    A.    Maybe in some cases peer reviews are done differently

5    for certain industries or for certain peoples or examiners,

6    so some may be done that way, others may not.

7          So as far as not upholding a prior conclusion,

8    that would have to be a speculatory answer based on

9    whatever -- whatever peer review that falls under.

10   Q.    Do you agree that the purpose of the verification of

11   the peer review is to thoroughly attempt to falsify the

12   original examiner's conclusion or how it was arrived?

13   A.    No, sir.

14   Q.    So you disagree with that technical note from the

15   Journal of the Forensic Identification --

16   A.    Yes, sir.

17   Q.    -- correct?

18         All right.  And let's talk about the reason why

19   you didn't do the verification.  The truth is, you didn't

20   do it because it didn't work within your schedule; isn't

21   that true?

22   A.    Yes -- I beg your pardon, go ahead.

23         MR. THOMAIDIS:  I'm sorry -- go ahead.  No

24   objection.

25         THE WITNESS:  At that time, yes, sir.

Cross - Carlson

1    BY MR. BURG:

2    Q.   So your schedule was more important than to get the --

3    a third-party independent person to verify what you -- what

4    you were concluding in your -- in your opinion here; is

5    that true?  That your schedule was more important?

6    A.   If I remember correctly, I believe that I testified

7    that I gave my opinion to the attorney without waiting on a

8    peer review because I didn't know how long a peer review

9    would take to get a return response.

10   Q.   Okay.  Well, I don't think that's what you told me in

11   your deposition.  But just so we're clear, I want to go

12   through it a little more specifically as to what you told

13   me.  You told me you had a short time frame to get Mr.

14   Thomaidis his opinion; isn't that true?

15   A.   I don't remember specifically if that's what I told

16   you.

17   Q.   Okay.  Let's go to -- you decide which ones you want

18   to have verified and which ones you don't want to have

19   verified; isn't that true?

20   A.   I decide whether to get a verification or not, yes.

21   Q.   Right.  It's a matter of you choosing if you're going

22   to have something verified, correct?

23   A.   Yes.  There's nobody else --

24   Q.   And sometimes it's a matter of your time and your

25   schedule; do you recall that?

1941

Cross - Carlson

1    A.    Sometimes that's the case.

2    Q.    Right.  And just so we're clear here, rather than

3    having the verification done, your schedule was more

4    important than doing that verification; is that correct?

5    A.    I don't recall if that's what I testified to, sir.  My

6    deposition was about a year and a half ago.  I don't

7    remember my answers.

8    Q.    All right.  Can we play page 68, line 12 through --

9    through line 22.

10            (Video deposition clip played)

11   BY MR. BURG:

12   Q.    All right.  Does that refresh your recollection that

13   in this case, because of your schedule, you chose not to

14   have the verification done?

15   A.    That's what I testified to, yes.

16            MR. BURG:  Okay.  And how much time do I have

17   left?

18            COURTROOM DEPUTY:  Okay.  Let's see here.  Your 60

19   minutes is up at 11:40.

20            MR. BURG:  At 11:40.  So I have six minutes

21   left.

22            COURTROOM DEPUTY:  Well, no, you have a 15-minute

23   warning.

24            MR. BURG:  So that's the warning.

25            THE COURT:  You are done at 11:55.

Cross - Carlson

1    MR. BURG:  Thank you, Your Honor.

2  BY MR. BURG:

3  Q.   You're accusing this man right here of being a forger;

4  isn't that true?

5  A.   I don't know who that man is, sir.

6  Q.   Mr. Ryan Davis.  Right here, sitting right here.

7  A.   Okay.

8  Q.   You're accusing him of being a forger.

9  A.   I did not accuse him of being a forger.  I said it is

10  highly probable that Mr. Davis authored that signature.

11  Q.   Well, that is -- so you're not saying he's a forger.

12  A.   No --

13  Q.   I want to find out:  Are you saying that Mr. Davis is

14  a forger?

15  A.   I did not say he is a forger.  It was my opinion that

16  whoever wrote the Ryan Davis handwriting and signature was

17  highly probably the author of the Jack Handley signature.

18  Q.   Okay.  Well, actually, you told me in your deposition

19  that I don't -- I don't know that I accused him of being a

20  forger.  I may have said there was some similarities

21  between his signatures and other signatures, but I don't

22  recall accusing him of forging anything.  Do you remember

23  telling me that?

24  A.   No, sir, I don't remember saying that.

25  Q.   Okay.  Well, let's go through line -- let's just play

Cross - Carlson

1   line 12 through line 16 on page 59.

2        (Video deposition clip played)

3   BY MR. BURG:

4   Q.   Okay.  And, in fact, when I asked you the question

5   again, and I said, It's a strong accusation if you're

6   accusing him of forging a signature.

7        I asked you again, just to be sure, I said, Are

8   you accusing him of being a forger?

9        And do you recall telling me that, I believe there

10  were some similarities, there was a high probability that

11  he was the author, but I am not, I did not, accuse him of

12  forging anything?

13       Do you remember saying that also?

14  A.   I don't remember saying that at my deposition.  It's

15  consistent with what I testified to today.

16  Q.   Well, just so we're clear here, that you are -- you

17  didn't look at any original signatures with regard to the

18  December 14th, 2009, agreement, correct?

19  A.   Correct.

20  Q.   That you didn't read any of the depositions that were

21  taken in this case, correct?

22  A.   Correct.

23  Q.   You didn't go out and get exemplars, signatures,

24  from -- well, from Mr. Davis or Mr. Handley or Mr.

25  Domingot, correct?

Cross - Carlson

1   A.   Correct.

2   Q.   Right.  You -- you didn't look at any original

3   comparables of Mr. Davis' signature, correct?

4   A.   Original comparables, no, sir, I -- the documents I

5   received were copies.

6   Q.   Right.  You also didn't follow the ASTM method, which

7   was the standard -- which you say was discontinued in 2012,

8   and obviously we have a copy of it in 2015, you didn't use

9   that method, correct?

10  A.   Those are guidelines.  I did not -- I did not follow

11  those guidelines specifically.

12  Q.   You -- just so we're clear here, you're not in any way

13  accusing Mr. Glenn Davis of anything.  You didn't look at

14  any of his signatures, did you?

15  A.   No, sir.

16  Q.   You didn't -- you're not -- you didn't accuse Darlyne

17  Davis of anything in this case, did you?

18  A.   No, sir.

19  Q.   You didn't look at any of -- you didn't compare any of

20  her signatures, did you?

21  A.   I believe I compared her signature in my examination,

22  but I don't -- I did not have any other signatures to use

23  in that comparison of hers.

24  Q.   And did you -- you say copies on some of the documents

25  that were supplied to you by Mr. Thomaidis, correct?

Cross - Carlson

1    A.    Correct.

2    Q.    All right.  And you didn't -- you didn't look at any

3    signatures of Shana Balentine, correct?  I'm sorry,

4    Bastemeyer.  Balentine is a whole another witness.  I

5    apologize.

6          You never looked at any of her signatures,

7    correct?

8    A.    I don't recall.  I don't believe so.

9    Q.    All right.  Are you aware that they're defendants in

10   this case in terms of this alleged forgery claim?

11   A.    My understanding is they're defendants as a part -- as

12   a part of this case, yes.

13   Q.    All right.  But no one -- Mr. Thomaidis, no one from

14   Porcelanosa, asked you to look at their signatures to

15   compare it, correct?

16   A.    No.  Again, like I said, I believe that I compared

17   what I had in the whole outlook of the documents, but not

18   specifically.

19   Q.    Right.  And you -- and you don't -- you didn't do the

20   verification -- even though the FBI requires the

21   verification, you didn't do that in this case.

22   A.    That's correct.  I testified to that, yes.

23   Q.    Right.  And you also didn't do the verification

24   because you just didn't -- weren't able to fit it in your

25   schedule; is that right?

1946

Cross - Carlson

1    A.   My testimony was that apparently my schedule was an

2    issue at that time.  Specifically -- specific to your

3    answer I don't know what my schedule was, so I would have

4    to go by what is in my deposition.

5    Q.   Right.  You said you couldn't fit it in your schedule

6    and you chose not to do the verification here, correct?

7    A.   I believe it was a matter of determining if I was

8    going to get answers back in time to give them -- the

9    verification answers to my attorney.  So I didn't know how

10   long it was going to take somebody to do a verification.

11   Q.   So Mr. Thomaidis was your attorney, is that what you

12   just told us, that you had to get it to your attorney?

13   A.   I beg your pardon, for the attorney who retained me.

14   Q.   Right.  But you just said it was your attorney.

15   A.   I misspoke.

16   Q.   Right.  But you were on that side of the case, hired,

17   retained, paid by Mr. Thomaidis and Porcelanosa, correct?

18   A.   I beg your pardon, sir.  Mr. Thomaidis retained me for

19   Porcelanosa.  When I was speaking about an attorney, I

20   generally lay it out as the one on my side or the opposing

21   counsel, so, I misspoke when I said that.

22   Q.   All right.  Let's talk about that.  You are supposed

23   to be an independent witness, you're not supposed to have a

24   side; do you understand that?

25   A.   Yes, sir.

1947

Cross - Carlson

1    Q.    So when you told this jury that this is the attorney

2    on your side, do you understand that's -- that's improper

3    for someone giving independent testimony?

4    A.    Yes, sir, that's an improper way to state that and I

5    misspoke and --

6    Q.    But you misspoke twice.  You called him "my attorney"

7    and you said "my side of the case."

8    A.    I understand.

9    Q.    Right.  And -- and witnesses have come on the stand

10   and raised their hand are supposed to be independent; do

11   you understand that?

12   A.    Yes, sir.

13   Q.    Okay.

14           COURTROOM DEPUTY:  You have 15 minutes.

15           MR. BURG:  Thank you.

16   BY MR. BURG:

17   Q.    And there's errors -- there was an error rate for what

18   you do, correct?

19   A.    Correct.

20           MR. BURG:  May I have a moment, Your Honor?

21           THE COURT:  You may.

22   BY MR. BURG:

23   Q.    The reason you want original documents is so you can

24   show -- for example, you are talking about ink globs.  If

25   you had the original document, you would be able to see

Cross - Carlson

1   whether there was an ink glob or not more specifically than

2   on a copy, correct?

3   A.   More specifically, yes.

4   Q.   Right.  And if you're using a fountain pen -- which I

5   don't use anymore -- there's a lot more ink globs from a

6   fountain pen than there would be from a ballpoint, correct?

7   A.   I don't know that answer.

8   Q.   You don't know that answer?

9   A.   I don't know that ink globs if it's more from a

10  fountain pen.  My belief would be that it would be from

11  holding the pen and letting the ink bleed out as a fountain

12  pen rather than a ballpoint pen.

13  Q.   Right.  A ballpoint, generally the ink will not glob

14  out or leak out, correct?

15  A.   Generally, yes.

16  Q.   Right.  And there's lots of different pens.  We can go

17  from this to a Bic, to an expensive pen, all those are

18  different, and all of them -- you may have one that has a

19  little leak in it, there might be an ink glob that comes

20  out of that, correct?

21  A.   Correct.

22  Q.   And when you're using copies, you can't -- you

23  can't -- you have no idea about pressure.

24  A.   Correct.

25  Q.   Right?  And in this particular case, you determined

Cross - Carlson

1    that the signatures were not traced, correct?

2    A.    Correct.

3    Q.    And, again, that would be something without -- by

4    using just photocopies, you would not be able to tell that

5    as opposed to if you had an original, correct?

6    A.    That I would not be able to tell what, sir?

7    Q.    About the pressure.

8    A.    The pressure is correct.

9    Q.    Right.  And you came in here and you told this jury

10   that there's similarities in your opinion based on what you

11   did and how you did it and what the original -- without

12   having the originals, correct?  Without doing -- let's go

13   one step at a time.

14          You came in here and give an opinion without

15   looking at the originals, correct?

16   A.    Correct.

17   Q.    You came in here and told them your opinion without --

18   without following the ASTM standard, correct?

19   A.    Correct.  Excuse me, correct, I -- the -- I didn't use

20   ASTM guidelines, correct.

21   Q.    And you came in here and didn't follow your own

22   standard of ACE-V, you didn't do the verification, correct?

23   A.    The verification was not done.

24   Q.    It was done -- not done because of your schedule; your

25   schedule was more important than having verification done,

1950

Redirect - Carlson

1    correct?

2    A.   That was my schedule.  I obviously had something --

3    another case that needed to be attended to.

4    Q.   Right.  And you needed to get this report to your

5    lawyer, as you stated, Mr. Thomaidis.

6    A.   I needed to get the report to the attorney who

7    retained me, yes.

8    Q.   Right.  And then you told me that you were not

9    accusing Mr. Davis of forgery, correct?  That's not what

10   you're doing here.  You're not accusing him of forgery,

11   which you said twice in your deposition, correct?

12   A.   Correct.

13        MR. BURG:  Thank you.  No more questions.

14        THE COURT:  Redirect.

15        MR. THOMAIDIS:  Thank you, Your Honor.

16                  REDIRECT EXAMINATION

17   BY MR. THOMAIDIS:

18   Q.   Ms. Carlson, I once worked at a store called Mervyn's.

19   I was a sales clerk.  Do you think that makes me less

20   capable of being an attorney here today?

21        MR. BURG:  Your Honor, I'm going to object.  I

22   don't know what's --

23        THE COURT:  You went into her background.

24        MR. BURG:  Okay.

25        THE COURT:  You opened the door.

Redirect - Carlson

1   MR. BURG:  Fine.

2   THE COURT:  Overruled.

3   BY MR. THOMAIDIS:

4   Q.   Would you like me --

5   MR. BURG:  I do not know what Mervyn's has

6   anything to do with it.

7   THE WITNESS:  I'm sorry.  Yes, please.

8   BY MR. THOMAIDIS:

9   Q.   So there was a time when I worked at Mervyn's -- I

10  don't know if it's still open, I don't think it is -- and I

11  was a sales clerk.  Does that make me less capable of being

12  an attorney?

13  A.   No, sir.

14  Q.   Okay.  And so do you take your job seriously?

15  A.   Yes, sir.

16  Q.   And do you take the allegations that are made in the

17  cases that you provide your expert opinions in, do you take

18  those allegations seriously?

19  A.   Yes, sir.

20  Q.   And do you render your opinion objectively?

21  A.   Yes, sir.

22  Q.   At least to the degree you're able?

23  A.   Yes, sir.

24  Q.   Based on the information you're given?

25  A.   Yes.

Redirect - Carlson

1   Q.   So if you go to Harvard and you pay the money, you get

2   a certificate; would you agree?

3   A.   If -- no, I would not agree with that.

4   Q.   Well, so what's different?

5   A.   If you go to Harvard and you pay the money, as long as

6   you are completing your required courses, I would imagine

7   that you would get a certificate but not certainly because

8   you just paid for it.

9   Q.   And so how is that different from what you did with

10  respect to some of your forensic education?

11  A.   It's not different in any way.  I completed my

12  required courses as well as paying for those courses, and

13  upon that completion I received a certificate.

14  Q.   Okay.  And subsequent to that, how many times have you

15  provided forensic examination opinions either in court

16  cases, in litigation, or for some other reason?

17  A.   More than 1400 times.

18  Q.   Okay.  And how many times have you had your

19  credentials attacked?

20  A.   Almost every time I've been in court.

21  Q.   I found it very upsetting.  Did you?

22       MR. BURG:   I'm going to object, Your Honor, as to

23  whether Mr. Thomaidis found it upsetting.

24       THE COURT:   I don't know what you're trying to get

25  out of it, but let's go at it a different way.

Redirect - Carlson

1    BY MR. THOMAIDIS:

2    Q.    Did you find it upsetting?

3    A.    Not necessarily.  I find it a common occurrence in

4    being cross-examined or deposed.

5    Q.    So I want to make sure I get this crystal clear for

6    the record.  Do you remember when you gave your deposition,

7    which was on December 14th, 2015?

8    A.    Yes, sir.

9    Q.    And do you remember that that was taken by Mr. Burg?

10   A.    Yes.

11   Q.    And some of these questions were asked at that time,

12   right?

13   A.    Yes.

14   Q.    And at line -- at page 98, line 17 through 20, do you

15   remember Mr. Burg saying, We're not giving you the original

16   today, and she's not doing her examination on the record

17   here --

18            MR. BURG:  Your Honor, I object.

19            MR. THOMAIDIS:  -- so if you want to go to

20   court --

21            MR. BURG:  Can I approach?

22            THE COURT:  Hold on, please.  We're doing this for

23   eight days.

24            MR. THOMAIDIS:  I'm sorry.

25            MR. BURG:  May I approach, Your Honor?

Redirect - Carlson

1    THE COURT:  No.  Let's do -- I think the

2    objection's sustained to the extent you're trying to do it

3    the way you're doing it.  Because you've not -- you're

4    trying to do impeachment.  It's not proper impeachment so

5    you're reading from a deposition without --

6    MR. THOMAIDIS:  Should I play a video clip, Your

7    Honor?

8    MR. BURG:  No.

9    THE COURT:  Well, you have to lay a foundation for

10   why you --

11   MR. BURG:  Your Honor, I really would like to

12   approach for two seconds to try to clear this up before we

13   go somewhere where we should not go.

14   THE COURT:  All right.

15   MR. BURG:  Thank you.

16   MR. THOMAIDIS:  I would like to preserve our

17   record.

18       (Side bar conference held)

19   MR. BURG:  Your Honor, we're doing the

20   deposition -- at some point in time in the deposition, Mr.

21   Thomaidis says, Let's get the original.  I don't have the

22   original --

23   MR. THOMAIDIS:  Yes, you do.

24   MR. BURG:  I did not have the original.

25   MR. THOMAIDIS:  That's where I took photos.

Redirect - Carlson

1    MR. BURG:  Yeah, but I didn't have it there at the

2  time.  It was in my client's safe at the time.

3    MR. THOMAIDIS:  Whatever.

4    MR. BURG:  And I said, I'm not giving you the

5  originals today.  That's improper for him to go in and get

6  that.  Her opinion was finished.  She had already made her

7  opinion without the originals.  I didn't have it there.

8    For him to try to insinuate that I somehow was not

9  giving them the original when the original was available --

10    THE COURT:  Okay.  Do you have any evidence that

11  Mr. Burg had the original in his possession and he -- let

12  me -- let me ask it this way:  Did you see the original and

13  he refused to give it to you?

14    MR. THOMAIDIS:  Your Honor, that's where I took

15  the photographs.

16    MR. BURG:  That's not --

17    MR. THOMAIDIS:  Now it was predating her

18  deposition.

19    MR. BURG:  Right.

20    MR. THOMAIDIS:  But, yeah, I mean, it's not -- it

21  wasn't -- there were multiple times --

22    THE COURT:  Wait, wait, wait, wait.  At the

23  deposition -- your point is you didn't have it at the

24  deposition?

25    MR. BURG:  We gave it back to the client.  He had

1956

Redirect - Carlson

1   taken it -- the client had given it to us, the client kept

2   the original.  He was able to make copies at the office for

3   it.  I did not have it, he asked for it.  I didn't say, We

4   don't have it here, I said I'm not giving you the original

5   today.  Her opinions are finished.

6           THE COURT:  So did you see the original at the

7   deposition and that is your position that Mr. Burg refused

8   to give it to you?

9           MR. THOMAIDIS:  No, he testified on the record,

10  when I requested that we be given an opportunity to review

11  the original, he said, We're not giving you the original.

12  You can go to court and request it if you want.

13          MR. BURG:  Right.

14          MR. THOMAIDIS:  Now, predating that, I took

15  photographs of the contract and those are the ones that are

16  now an exhibit.

17          THE COURT:  You took the --

18          MR. THOMAIDIS:  Which I'm happy to testify where

19  those photographs came from --

20          THE COURT:  You can't testify.

21          MR. BURG:  He can't be a witness.

22          MR. THOMAIDIS:  Right.

23          THE COURT:  Well, but you see, you're putting him

24  in a difficult -- he can't testify that he did it, but --

25          MR. BURG:  But -- we got the original from our

1957

Redirect - Carlson

1   client.  He wanted to come over and make a copy -- to make

2   photos of it or see it.  We gave it to him, he made his

3   copies, we gave it back to the client.  At the deposition I

4   did not have the originals in the office.

5            THE COURT:  All right.  Well, you're going to have

6   a choice, Mr. Burg.  I can ask you:  Did you provide the

7   originals to Mr. Thomaidis and he took photographs of it?

8   And if you says yes, that's how we get it into the record

9   that those are photographs of the original, or else I'm

10   going to let him go --

11           MR. BURG:  No, I'll stipulate that at one point in

12   time, we had the original from our client, then we brought

13   it to our office for Mr. Thomaidis to make -- to see it and

14   to make photographs of it.

15           THE COURT:  Okay.

16           MR. BURG:  At some point in time.  At the

17   deposition -- and I want to make sure we have a complete

18   record because it appears I'm being called a liar, which I

19   don't really appreciate --

20           MR. THOMAIDIS:  The feeling is mutual.

21           MR. BURG:  -- No. 1, is that at some point in time

22   in the deposition, he said, We want to see the original

23   now.  And I said, No, I'm not going to give you the

24   original now.

25           I didn't tell him we didn't have it at the office,

Redirect - Carlson

1    I didn't -- her opinion was already completed.  I'm taking

2    the deposition.

3         THE COURT:  All right.  Let me say it again.  I'm

4    going to ask you:  Did you provide the original to Mr.

5    Thomaidis for him to take photograph of?

6         MR. BURG:  The answer is yes.

7         THE COURT:  Okay, I want to ask you that in front

8    of the jury.  And then I'm going to ask you:  Did you take

9    a photograph of the originals?  Is that what you used as

10   the exhibits in this case?

11        And then -- so I'm either going to do that or let

12   him --

13        MR. BURG:  We'll do that --

14        MR. THOMAIDIS:  And the dilemma with that is No.

15   1, I was able to take photographs of both the exclusive

16   distributor agreement, which is at the center of this case,

17   and the exclusivity agreement which are the two exhibits

18   that have been admitted.  Now the other problem with this

19   issue is he just spent 20 minutes beating her up about

20   this, but the reality of it is there were -- this was --

21        THE COURT:  Lower your voice.

22        MR. THOMAIDIS:  This is one of the primary reasons

23   why we were unable -- why she was unable to complete

24   components of her report.  And this is not the -- I -- this

25   is not the first time that we're requesting those

Redirect - Carlson

1    documents.

2           MR. BURG:  Yes.

3           MR. THOMAIDIS:  Okay, well --

4           THE COURT:  I tell you what I'm going to do.

5           MR. BURG:  That's fine, that's fine.

6           THE COURT:  And they are going -- then you're not

7    going to go into what -- you're not going to read from the

8    deposition.

9           MR. THOMAIDIS:  Understood, Your Honor.

10          MR. BURG:  Thank you.

11      (End of discussion at side bar)

12          THE COURT:  All right.  I've gotten counsel to

13   agree to a way we can do a work around this dispute.  I'm

14   going to ask them each a question and the jurors can take

15   note of their answers.

16          Mr. Burg, did you provide the original of the two

17   agreements in question in this lawsuit to Mr. Thomaidis for

18   him to be able to take a photograph of them?

19          MR. BURG:  Yes, sir.

20          THE COURT:  Okay.  Mr. Thomaidis, did you take a

21   photograph of the originals and is that what was being used

22   as the exhibits in this case?

23          MR. THOMAIDIS:  I did, Your Honor.  And they are.

24          THE COURT:  All right.  And is that what you

25   provided to Ms. Carlson?

1960

Redirect - Carlson

 1    MR. THOMAIDIS:  That's correct.

 2    THE COURT:  All right.  Let's move on.

 3  BY MR. THOMAIDIS:

 4  Q.   So, you've testified previously -- may I have a time

 5  check?

 6    COURTROOM DEPUTY:  Do you want me to add the time,

 7  the five minutes at the bench?

 8    THE COURT:  I mean, if you need it, I'll give you

 9  the five minutes, because it was Mr. Burg that asked for

10  the side bar.

11    MR. THOMAIDIS:  I think I had 20 --

12    THE COURT:  You have -- I'm asking, if you need

13  it, I will give you the five minutes from the side bar.  If

14  you don't need it, then we'll just stick with our -- we had

15  nine minutes left over from your direct, you had -- plus

16  the 20 Ms. Hansen and I talked about.  So you had 29

17  minutes on the redirect.  You started at 11:44, that would

18  give us to 12:13.  If you want -- if you need the

19  additional five, you can go to 12:18, so it's your

20  decision.

21    MR. THOMAIDIS:  May I, Your Honor, and we'll

22  finish.

23    THE COURT:  We'll go to 12:18 and we'll take our

24  lunch break then and we'll be done with the witness at that

25  point.

1961

Redirect - Carlson

1    BY MR. THOMAIDIS:

2    Q.    Thank you, Your Honor.

3          Ms. Carlson you have testified previously about

4    how long it takes to develop a standard.  Do you remember

5    that testimony?

6    A.    Somewhat, yes.

7    Q.    Did it take years to develop the ACE-V standard?

8    A.    I do not know how long it took to develop that.

9    Q.    Okay.  And so how many -- on a percentage basis, how

10   many forensic document examiners use that standard?

11         MR. BURG:  Objection.  Foundation.

12   BY MR. THOMAIDIS:

13   Q.    To the extent you know.

14         THE COURT:  Overruled.

15         THE WITNESS:  Thank you.  It's -- it's a generally

16   accepted standard, or -- it's a generally accepted standard

17   in the community.  As far as how many, I would have to

18   speculate.  I don't know that answer.

19   BY MR. THOMAIDIS:

20   Q.    Okay.  Would you say it's a majority or would you say

21   it's a minority?

22   A.    I don't have an answer for that, sir.

23   Q.    Okay.  And so based on your experience and number of

24   times you've provided forensic document analysis, do you

25   consider photography of photographs that are disputed,

Redirect - Carlson

1    given technology, to be sufficient for you to complete a

2    comprehensive analysis?

3    A.    Yes, sir.

4    Q.    Okay.  And so let's talk for just a minute about the

5    ACE-V analysis.  First of all, is the V component required?

6    A.    No, sir.

7    Q.    Okay.  And so what does the A component stand for?

8    A.    It stands for analysis, or analyze.

9    Q.    Okay.  And what's the C component stand for?

10   A.    Compare.

11   Q.    And what about the E component?

12   A.    Evaluate.

13   Q.    Okay.  And so can you just briefly explain for the

14   Court and for the jury, what each one of those components

15   is.

16   A.    Yes.  The analysis is a matter of looking at the

17   documents or the signatures or the handwriting that is

18   being both provided as a questioned and as a known to do an

19   analysis to determine what characteristics are found, what

20   are the patterns of writing, if there are multiple samples

21   of writing, what are -- what are the individualistic traits

22   within the writing or within the signatures, and making

23   those determinations, so you can continue on with their

24   examination.

25        The next step is compare.  So that is pretty much

Redirect - Carlson

1    self-explanatory.  It's a comparison of certain writings or

2    signatures to other certain writings or signatures.

3           And evaluation, then, is the third step and that

4    is a matter of once a comparison is done, doing an

5    evaluation to determine what is the most significant or

6    what are the most weighty factors in doing an examination.

7    So it's a matter of evaluating the findings of doing the

8    examination to determine whether something is authentic or

9    whether it's written by a different author or whatever the

10   outcome's possibilities that you would have the options of

11   using.  The evaluation is the part of going through all of

12   the findings of the examination to make a final

13   determination.

14   Q.   Okay.  And so as it relates to the compare component,

15   in what percentage of the cases that you've worked on would

16   you say that you had the opportunity to get an original, as

17   Mr. Burg used, exemplar?  An original of a signature of

18   someone whose signature was disputed.

19   A.   In what percentage of cases?

20   Q.   Yes, ma'am.

21   A.   They are a very small percentage.

22   Q.   Why is that typical?

23   A.   Originals are very hard to come by these days.  Many

24   times originals are either in a court or they are destroyed

25   and copies are made.  For example, bank checks, you -- we

Redirect - Carlson

1    get copies of bank checks because the originals are

2    destroyed.   Sometimes it's a matter of an act of God like a

3    hurricane or fire, so to speak, an act of God.   But

4    originals are hard to come by nowadays.

5    Q.   And so in terms of the individualized analysis you

6    would be doing as a forensic document examiner, it would be

7    comprised of the A, the C, and the E components; is that

8    right?

9    A.   Yes, sir.

10   Q.   Okay.  And then the V component, what exactly is the V

11   component?

12   A.   The V is the verification.  Like I stated, it's a

13   matter of asking another qualified document examiner or

14   court-qualified document examiner to do a peer review.

15   Some document examiners will have the second examiner do a

16   review of their completed report where others, myself

17   included, might have a document examiner do an independent

18   or a blind verification.  They'll do their own independent

19   examination and get back with me regarding their

20   findings.

21   Q.   Okay.  And so do courts typically preclude your

22   analysis if the V component hasn't been completed?

23   A.   No, sir.

24   Q.   Okay.  And why is that?

25            MR. BURG:  Objection, Your Honor.

1965

Redirect - Carlson

1       MR. THOMAIDIS:  To the extent --

2       MR. BURG:  As --

3       THE COURT:  Sustained.  Sustained.  She wouldn't

4  know why a court would rule that way.

5  BY MR. THOMAIDIS:

6  Q.   So when you're engaged to do an analysis of a

7  document, for instance the analysis of a disputed

8  signature, is it you who's making the allegations against

9  the party that you're opposite or the party that the person

10  you're representing or the entity you're representing is

11  opposite?

12  A.   No, sir.

13  Q.   Okay.  And it is, in fact, that party and the

14  attorney; wouldn't you agree?

15  A.   It is the attorney doing what, sir?

16  Q.   That's making the claims, defenses, allegations, in a

17  given dispute.

18  A.   If an attorney is involved, generally yes.

19  Q.   Okay.  And so was it you that was accusing Ryan Davis

20  of being a forger?

21  A.   No, sir.

22  Q.   Okay.  And so when you're investigating the subject

23  matter of a case like this one, does your investigation --

24  is it dictated by the attorney?

25  A.   Generally speaking, yes.

1966

Redirect - Carlson

1    Q.    Okay.  And so if I chose, for example, not to give you

2    a deposition, you wouldn't review that deposition?

3    A.    Correct.

4    Q.    And if I chose not to obtain an exemplar, for example,

5    you wouldn't review that exemplar.

6    A.    Correct.

7    Q.    And if I gave you xeroxed copies of signatures, you

8    would review those xeroxed copies of signatures, correct?

9    A.    I would review those.  I would ask you if originals

10   were available, but yes, I would review those.

11   Q.    And to the best of your recollection, did you ask me

12   if those were available in this case?

13   A.    I believe I asked you.  That's part of my protocol.

14   Q.    And do you recall what I told you?

15   A.    My understanding -- my remembrance is that the

16   original was not made available at that time that I was

17   doing the examination.

18   Q.    Okay.  And so, Ms. Carlson, was I ever your

19   attorney?

20   A.    No, sir.  I misspoke, and I regret saying that.  You

21   are the attorney who retained me, and the attorney who I

22   have been in communication with, so that was a mistake on

23   my part to say it that way.

24   Q.    Okay.  So I'd like to go back and talk about some

25   stuff that we were talking about previously.

Redirect - Carlson

1    With respect to your opinion on the signature of

2    Mr. Domingot, you remember providing that -- providing

3    testimony on that?

4    A.    Yes.

5    Q.    Can I please go ahead and pull up the exhibit that we

6    were talking about previously, which is -- I believe it was

7    Defendants' Exhibit B-38.  Possibly B-37.  Okay.  And if we

8    could please go to the third page of this document, and

9    blow up the signatures.

10    So I would like you to just briefly summarize --

11    and maybe it would be better if we gave you a couple of

12    other examples.  Can you please give me a couple of other

13    known examples from the documents that have been admitted

14    into evidence in this case.

15    Okay.  So given these, can you please tell me,

16    just briefly, again, what the dissimilarities are between

17    the questioned signatures, which is the one in blue at the

18    bottom of the page, and some of these examples of actual

19    signatures of Mr. Domingot.

20    A.    Yes.  The questioned signature at the bottom of the

21    page has a stopping point on the right side of what is the

22    J.  And below that is an unattached misaligned check mark

23    to form the second part of that letter.  The two little

24    mountains that are next to it, those are incomplete -- I

25    beg your pardon, those are incorrectly formed upstrokes.

1968

Redirect - Carlson

1  Mr. Domingot retraces those upstrokes on a regular basis.

2  You can see he has a slight separation in one of them, but

3  otherwise, those are -- those are retraced lines in his

4  signature.  And to have the separation that far apart is

5  not a part of Mr. Domingot's regular handwriting.

6      There is a small -- at the top of that check mark

7  that we were talking about earlier, there's a small line

8  that's coming almost vertical that's a separate line,

9  that's not a part of the end of that signature.  You can

10  see in his regular signatures he forms another check mark

11  style mark at the top near the D, only that line is

12  separate in the questioned signature.

13      On the D, the right side of the D makes a very

14  wide outward formation, unlike his known signatures, which

15  are concave, and some of his signatures are more narrow in

16  that second known signature that's on the screen.

17      Again, there's a stopping point at the bottom of

18  the D, which is below the typed D in Domingot.  And that,

19  again, is a an error within whoever wrote this, because

20  that signature -- I beg your pardon, that line is a

21  connecting stroke to the T in the known signatures.  Again,

22  the T is a wide loop formation, which is unlike Mr.

23  Domingot's Ts, and the crossbar is at a diagonal angle as

24  it leaves the signature where the known signatures, there's

25  a slight angle on that crossbar, but certainly not to that

Redirect - Carlson

1    degree of angle.

2    Q.   Okay.  Thank you.  And so just so we're clear, do you

3    believe that the bottom signature, the one in blue, was

4    authored by someone other than Josep Domingot?

5    A.   Yes, sir.

6    Q.   And based on your analysis of these documents, and

7    your analysis of the known examples of his signature, do

8    you believe that someone else put that signature on this

9    document, not Mr. Domingot?

10   A.   Yes.

11   Q.   And so based on your analysis, do you have an opinion

12   on who that was?

13   A.   No, sir.

14   Q.   Okay.  And then if we move on to the date, just to the

15   far side of the questioned signature, do you have an

16   opinion on who put that date on this document?

17   A.   On the questioned document, it is my opinion that Ryan

18   Davis put the date on that document.

19   Q.   And can you give, in three bullets, why you believe

20   that was Mr. Davis put the date on that document?

21   A.   Because the slash marks are similar to his, have the

22   same patterns of writing as his slash marks do, the numeral

23   four has the same pattern and habits as seen in his

24   writings, and the numeral zero, which is before the four,

25   is very consistently the same in both this document and his

1970

Redirect - Carlson

1    writings.

2    Q.   Thank you.  And now if we could go ahead and move to

3    the exclusive distributor agreement that was dated December

4    8th, 2009.  And if we could please turn to the eighth page

5    of this document.  And if you could blow up the bottom.

6         And so, Ms. Carlson, you completed an analysis on

7    this as well, correct?

8    A.   Yes.

9    Q.   And so were you able to formulate an opinion on

10   whether this was actually Mr. Jack Handley's signature on

11   this document?

12   A.   Yes, I was able to form an opinion.

13   Q.   And would -- I'm going to -- for demonstration

14   purposes, I'm going to put up a couple of other known

15   signatures that are exhibits in this case.  Okay.

16        So now, Ms. Carlson, if you could please summarize

17   for the Court and for the jury why you think that this

18   bottom signature, the questioned signature, was not signed

19   by Jack Handley, himself.

20   A.   Yes, sir.  Again, the ink globs are a very significant

21   part of Mr. Handley's signature and you do not find those

22   in the questioned signature, which is the bottom one.  The

23   Jack -- the K in Jack is formed incorrectly, as Mr. Handley

24   actually continues the K stroke to form the right side

25   with -- it's a continuation stroke.  This K that's in the

1971

Redirect - Carlson

 1   questioned signature is actually two separate individual

 2   strokes, and it doesn't look like Mr. Handley's Ks in his

 3   writing.

 4        The H in Handley regularly connects as a straight

 5   line drawn on the left, connecting at the bottom, and

 6   returns back up diagonal right; however, this H in this

 7   questioned signature has two different stops and starts,

 8   and that check mark on the bottom forming the left side of

 9   the H is actually a separate stroke than the left side of

10   the H.

11        The Y, again, is missing a cup formation.  Mr.

12   Handley doesn't always put a cup, sometimes he puts a

13   little bit of a circle; however the circle, then, is -- I

14   beg your pardon, let me back up a little bit.  The L comes

15   down and forms the circle, and the stroke stops.  Then the

16   loop of the Y is a completely separate and individual loop

17   formation and then there is an additional small stroke on

18   the right upper side of the loop which is not connected to

19   the rest of the name.

20        Again, the period after the end of the name is in

21   a higher placement than on his known signatures.

22   Q.   So based on your expert opinion, do you have an

23   opinion on whether Mr. Jack Handley signed the exclusive

24   distributor agreement that was purportedly executed on

25   December 8th, 2009?

1972

Redirect - Carlson

1    A.    Yes, I have an opinion.

2    Q.    And what is that opinion?

3    A.    It's my opinion that the person who signed the known

4    Jack Handley signatures did not sign that questioned

5    signature on that document.

6    Q.    Okay.  And so based on your review of this document

7    and other documents in this case, were you able to

8    formulate an opinion, or do you have an expert opinion on

9    who signed that signature?

10   A.    Yes.

11   Q.    And what is that?

12   A.    It's my opinion that it's highly probable that Ryan

13   Davis signed that Jack Handley signature on that questioned

14   document.

15         MR. THOMAIDIS:  Okay.  Thank you, Your Honor.  I

16   have no further questions.

17         THE COURT:  All right.  May this witness be

18   excused?

19         MR. THOMAIDIS:  She may, Your Honor.

20         THE COURT:  For the plaintiff?

21         MR. BURG:  Yes.

22         THE COURT:  Ms. Carlson, thank you for joining us.

23   You are excused.  You may step down.

24         All right, ladies and gentlemen of the jury, we're

25   going to take our lunch break at this time.  We will be in

1973

                          Redirect - Carlson

 1   recess until 1:20.

 2        (Jury left the courtroom at 12:13 p.m.)

 3        THE COURT:  I just want to repeat, Mr. Thomaidis,

 4   that given how many witnesses you still have to go through,

 5   if you can reduce the length of the Stransky depo

 6   designations, that would be very much appreciated.

 7        MR. THOMAIDIS:  I will try, Your Honor.  Thank

 8   you.

 9        (Recess at 12:13 p.m.)

10                       AFTERNOON SESSION

11        (Proceedings were held in open court in the presence

12   of the jury at 1:24 p.m.)

13        THE COURT:  The defendants/counterclaimants may

14   call their next witness.

15        MR. THOMAIDIS:  Thank you, Your Honor.  At this

16   time, defendants and counterclaimants call Mr. M. Kent

17   McSparran.

18        THE COURT:  All right.  And, Mr. Thomaidis, per

19   our prior discussion, you have 40 minutes with a two-minute

20   warning on your direct and five minutes on your redirect

21   with a two-minute warning.

22        MR. THOMAIDIS:  Thank you.  At this time, may I

23   request maybe 10 minutes warning?  I talk a lot.

24        THE COURT:  Okay.  So you're going to have -- so

25   you want a 10-minute warning on -- so in 30 minutes, you

Direct - McSparran

1    want a warning on your direct?

2         MR. THOMAIDIS:  Yes, please, Your Honor.

3         THE COURT:  Okay.  We'll do that.

4         M. KENT McSPARRAN, DEFENDANTS' WITNESS, SWORN

5         THE COURTROOM DEPUTY:  Be seated.  And please

6    state your full name for the record and spell your first

7    and last name.

8         THE WITNESS:  Michael Kent McSparran.  I go by

9    Kent, K-e-n-t, M-c-S-p-a-r-r-a-n.

10                   DIRECT EXAMINATION

11   BY MR. THOMAIDIS:

12   Q.   Thank you very much for being here today, Mr.

13   McSparran.  Can you please tell us, and we're working on a

14   fairly condensed time frame once you're settled in, if you

15   could, I'm going to try to go through this fairly quickly.

16   Can you please tell us your current employment and

17   position.

18   A.   I'm a partner at the accounting -- public accounting

19   and consulting firm of EKS&H.

20   Q.   And what is your job title?

21   A.   Partner.

22   Q.   It is partner?  Okay.  And so can you briefly

23   describe -- I think you alluded to this previously, but

24   what does EKS&H do?

25   A.   EKS&H is the public accounting firm in Colorado, one

Direct - McSparran

1   of the top 50 in the country, and it's also a very large

2   consulting practice which I used to lead, and now I'm just

3   a -- now I'm a consultant.

4   Q.   Okay.  And so what did you do prior to EKS&H?

5   A.   I owned and ran a firm -- a consulting firm,

6   management consulting firm, called the Denver Management

7   Group.  Actually I had one stop before -- after that, I

8   spent a couple of years with Keane, which -- and was an

9   executive vice president of Keane Consulting Group.

10  Q.   And what did Keen Consulting Group do?

11  A.   It was a management consulting practice.

12  Q.   And was there any area of emphasis?

13  A.   Keane was very large company.  My area of emphasis was

14  distribution strategy and supply chain strategy.

15  Q.   And is that still an area of emphasis at EKS&H?

16  A.   Not after  -- it's not a complete focus.  I still do a

17  lot of work in distribution strategy, supply chain

18  strategy, but it's not an exclusive focus like it was much

19  of my career.

20  Q.   Okay.  And then prior to Keen Consulting Group, what

21  did you do prior to that?

22  A.   I was managing partner and president of a consulting

23  firm called the Denver Management Group.

24  Q.   And so approximately when were you with the Denver

25  Management Group?

Direct - McSparran

1    A.    From 1982 to 2000.

2    Q.    Okay.  And what happened to the Denver Management

3    Group?

4    A.    We sold that company to Keane and I spent two years

5    with the company that -- which was a public company that

6    bought our firm.

7    Q.    I see.  And so in your professional career, what have

8    been your principal areas of focus?

9    A.    I'm a business strategy consultant, focusing largely

10   on supply chain strategy, logistics, and distribution

11   strategy.

12   Q.    Okay.  And so in a span of years, how long have you

13   been advising business clients with respect to contracts

14   and strategy?

15   A.    More than 30 years.

16   Q.    And so can you give us some examples of business

17   clients that you've consulted with?

18   A.    It's been a very wide range over 30 years.  I've some

19   large public companies, but many small closely held

20   companies, even start-ups.  It's a broad range, across --

21   across multiple industries.

22   Q.    Okay.  And are you in a position where you're

23   comfortable giving the Court and the jury some examples?

24   A.    I can't name names of clients, as those -- that's

25   confidential.

Direct - McSparran

1    Q.    Okay.  And so are these companies small, medium, or

2    large companies, generally?

3    A.    They -- they've been all through the course of my

4    career.  More -- the last 10 years, it's been typically

5    small to medium-sized.  The EKS&H is more of a local

6    firm.

7    Q.    Okay.  And so during your career, have you consulted

8    with manufacturing companies?

9    A.    Yes, I have.

10   Q.    Okay.  Can you give me an approximation of how many.

11   A.    Dozens, maybe -- over a hundred.

12   Q.    Okay.  And then what about distribution companies, or

13   distributors, how many of those would you say you've worked

14   for?

15   A.    Even more.  Over a hundred, maybe.  Maybe a couple

16   hundred over the span of my career.

17   Q.    Okay.  And so in connection with representing -- or,

18   excuse me, working with manufacturers and distributors, did

19   you ever have occasion to review distribution agreements?

20   A.    Yes, often.

21   Q.    Okay.  And can you give me an approximation of how

22   many?

23   A.    I -- I couldn't hazard a guess.  Sorry.

24   Q.    Okay.  And so can you tell me just generally for the

25   purposes of the trial today, what is a distribution

Direct - McSparran

1    agreement?

2    A.   A distribution is -- agreement is a contract or an

3    agreement between typically a supplier, a manufacturer, and

4    a wholesaler or a distributor or a dealer.  There's --

5    there's so many types of channels that they sell through.

6    Q.   Okay.  And so what is the difference, based on your

7    experience, between a distributor and a dealer?

8    A.   Well, the definitions are not precise.  They vary a

9    little bit industry to industry, but in general, I would

10   say distributors tend to carry inventory and have

11   warehousing operations and logistics operations in addition

12   to sales.  Dealers tend to be more sales organizations.

13   Not -- that's not universal, but often this -- that's

14   usually the case.

15   Q.   Okay.  And have you ever had occasion during the

16   course of your career to see a distributor who didn't carry

17   inventory?

18   A.   Not that I can recall.

19   Q.   Okay.  And so then can you tell us for the Court and

20   for the jury's benefit, what's the difference between an

21   exclusive and a nonexclusive contract?

22   A.   An exclusive distribution contract is a -- is really a

23   pretty rare thing in the distribution world.  Most

24   distributors would love to be exclusive distributors, there

25   are -- but they do exist.  Exclusive distribution contract

1979

Direct - McSparran

1  means that if I represent a product in the state of

2  Colorado, I'm the -- everyone has to buy through me, so I'm

3  the only source for that product, so I have an exclusive

4  right to sell all the product in that -- in that given

5  territory.

6          Sometimes it's not a territory, sometimes it's a

7  sales channel, but . . .

8  Q.   Okay.  And so typically what rights does a

9  manufacturer retain where it has entered into a

10  nonexclusive distribution agreement?

11  A.   Nonexclusive?

12  Q.   Yes.

13  A.   Nonexclusive is -- it's a much less significant

14  contract.  Typically that just -- a nonexclusive gives a

15  distributor, a dealer, the right to sell the company's

16  products, but it is not an exclusive right.  In other

17  words, there may be many other dealers or distributors in

18  the market selling the same products.

19          As a result, the partnership is not nearly as

20  tight between a nonexclusive dealer or distributor as it is

21  between an exclusive distributor.

22  Q.   Okay.  And so typically what are the rights of the

23  manufacturer -- manufacturer in an exclusive distribution

24  agreement?

25  A.   The rights of the -- in an exclusive distribution

Direct - McSparran

1    agreement, the manufacturer exercises a significant amount

2    of control --

3            MR. TeSELLE:  Your Honor, I'm just going to

4    object.  He's starting to give testimony without even

5    actually being offered --

6            THE COURT:  I agree.

7            MR. TeSELLE:  I understand your prior ruling, but

8    I would like to at least make our record for --

9            MR. THOMAIDIS:  Still trying to qualify him, Your

10   Honor, but happy to do it now.

11           THE COURT:  Well, you -- go ahead.  Well, either

12   that or continue your foundation for his qualifications

13   without asking for opinions.

14           MR. THOMAIDIS:  Understood.  At this time,

15   defendants would go ahead and offer Mr. McSparran as an

16   expert in the areas of business practices between

17   manufacturing companies and distributors and dealers, and

18   also with respect to operations and agreements between

19   manufacturers, distributors, and dealers.

20           THE COURT:  Any objection?

21           MR. TeSELLE:  Plaintiff will stand on its Rule 702

22   motion.

23           THE COURT:  All right.  The objection is

24   overruled.  The motion is granted.  Mr. McSparran is

25   qualified under Rule 702 to give expert opinion testimony

Direct - McSparran

1   on -- in the areas of business practices between

2   manufacturing companies and distributors and dealers, and

3   also with respect to operations and agreements between the

4   manufacturers, distributors, and dealers.

5          MR. THOMAIDIS:  Thank you, Your Honor.

6   BY MR. THOMAIDIS:

7   Q.   So we were talking previously about what rights a

8   manufacturer typically retains in an exclusive distributor

9   agreement.  So can you kind of pick up where you left

10  off?

11  A.   Yes, an exclusive -- if there's an exclusive

12  arrangement between a manufacturer and a distributor, the

13  manufacturer tends to -- tends to have some fairly onerous

14  requirements, significant reporting, sometimes financial

15  investment, always performance criteria, annual sales goals

16  and sales targets.  Sometimes they would dictate number of

17  locations or other things that a distributor would need to

18  have to -- to earn the right to -- for exclusive

19  representation.

20  Q.   Okay.  And in your experience, who typically makes the

21  decision to award a dealer or a distributor with an

22  exclusive distribution type arrangement?

23  A.   An exclusive distribution arrangement is -- as I

24  mentioned before, is a pretty rare thing, so it's typically

25  not -- not done -- it's done by high level executives in

Direct - McSparran

1    the company.  And typically it's a strategy across markets.

2    Most companies don't pick and choose some markets where

3    they are going to be exclusive and other markets where they

4    are going to be nonexclusive.  Most companies have a

5    strategy for going to market and distributing the products

6    and it's either an exclusive or nonexclusive.

7    Q.   Okay.  And so if I understand -- maybe -- within a

8    given geography, like, let's use the United States as an

9    example, when you say that there's a part -- it's part of a

10   bigger strategy, can you just tell -- maybe elaborate on

11   that a little bit.

12   A.   Well, it -- a manufacturer essentially has a -- what I

13   call a go-to market strategy or distribution strategy,

14   which is how are you going to get our products to our

15   potential customers.  Distribution is a link in that

16   process, sometimes a distributor is the link between the

17   manufacturing plant and the retail outlets, sometimes

18   it's -- the distributor is selling -- occasionally they're

19   selling directly to consumers.  It's pretty rare but

20   they're also selling to designers and contractors and

21   people like that as well.

22   Q.   Okay.  And so have you been retained by my law firm

23   and the defendants in this case, Porcelanosa Los Angeles,

24   Incorporated, Porcelanosa New York, Porcelanosa Texas, and

25   Porven Limited, to review and evaluate a distributor

1983

Direct - McSparran

1    agreement -- and, actually, it's an exclusive distributor

2    agreement dated December 8th, 2009?

3    A.    Yes.

4    Q.    And that's between Crew Tile Distribution,

5    Incorporated, and an entity called Porcelanosa-USA; is that

6    right?

7    A.    Yes.

8    Q.    And in the course of your analysis, did you also

9    review certain other documents, including exhibitor

10   agreements and account applications between the parties?

11   A.    Yes, I reviewed a number of documents that looked like

12   common business documents between Porcelanosa and its

13   dealers.

14   Q.    Okay.  And so I'd like to go ahead and start by

15   referencing your expert report in this matter, which is

16   actually -- I don't think you have it in paper form in

17   front of you, but I'd like to ask if we do, it's trial

18   Exhibit B-40.

19   A.    Okay.

20   Q.    So, Mr. McSparran, I'm going to ask you to please turn

21   to Exhibit A of your report, please.

22            THE COURT:  Counsel, let me -- maybe we can

23   short-circuit this a little bit and save some time.  As you

24   know from my -- you may infer from my prior ruling, unless

25   there's a stipulation, I do not allow expert reports into

1984
Direct - McSparran

1    evidence.

2              MR. THOMAIDIS:  And I understand.

3              THE COURT:  So don't waste any time setting a

4    foundation, if you do that.  So knowing that, you can go

5    ahead and continue whatever examination you think is

6    appropriate.

7              MR. THOMAIDIS:  Understood.  Thank you, Your

8    Honor.

9    BY MR. THOMAIDIS:

10   Q.    So would you please take a moment to take -- just look

11   at Exhibit A.

12   A.    Yes.

13   Q.    And can you tell me what this document is.

14   A.    This is a report I drafted on July 1st of 2015, to the

15   law firm Gersh & Thomaidis, outlining my findings --

16   Q.    Okay.

17   A.    -- in reviewing these contracts.

18   Q.    And so I'm going to go ahead and ask we please turn to

19   another exhibit, this is plaintiffs' trial Exhibit 196, and

20   it has been stipulated to.  And if you'd please go to the

21   second page of this document.  And if you'll please blow up

22   the top -- let's say dozen lines.

23   A.    The top dozen -- you want me to read them or --

24   Q.    No, I'm sorry, I have a couple of questions.  I just

25   want to make sure we're tee'd up for this.

1985

Direct - McSparran

1    A.    Okay, yes.

2    Q.    So if you'd reference your paper report and tell me,

3    please, where this distributor agreement -- oh, and I'm

4    sorry, Your Honor, may I please move for the admission of

5    plaintiffs' trial Exhibit 196.

6           THE COURT:    All right.   Given the stipulation of

7    the parties, Exhibit 196 is admitted into evidence and may

8    be published to the jury.

9           MR. THOMAIDIS:    Thank you, Your Honor.

10          (Plaintiffs' Exhibit 196 received)

11          THE COURT:    And, sir, I'll point out to you that

12   the exhibit's also on the screen to your left.

13          THE WITNESS:    Oh, thank you.

14   BY MR. THOMAIDIS:

15   Q.    I don't want to make this too complicated so I'll ask

16   that you kindly reference your paper exhibit for -- or your

17   paper report for the moment.

18   A.    Okay.

19   Q.    So we were talking about Exhibit A, which is a

20   distributor agreement.   Can you please explain for the

21   Court and the jury where you found this distributor

22   agreement.

23   A.    Well, the writ -- the distributor agreement between

24   Crew Tile and Porcelanosa was provided to me as part of

25   this case.

1986

Direct - McSparran

1   Q.   Understood.  And perhaps I should -- maybe if you

2   would explain more clearly than I would.

3   A.   Let me explain what happened.  As I was reviewing this

4   agreement, it was -- it was -- it just had -- it was so

5   illogical to me in terms of what you typically see a

6   distributor agreement look like.  It became pretty apparent

7   to me that this wasn't drafted for Porcelanosa.  It -- the

8   product -- the product lines don't even make any sense,

9   there's -- there's lots of references to things that really

10  don't fit the product -- the type of product that

11  Porcelanosa sells and the type of product that I think Crew

12  Tile distributes.

13       So I just did an Internet search for -- for

14  template agreements, which anybody can do, you can go out

15  and look, and there's all kinds of template legal

16  agreements out there.  And I found this one at the -- I

17  used a -- sort of an archaic search engine, I found this

18  one from a tannedfeet.com.  I don't know what

19  tannedfeet.com is, but it's a distributor agreement.

20       And instantly when I looked at that document,

21  it -- I could see it was -- it was the document from which

22  this Porcelanosa/Crew Tile was taken from.

23  Q.   Okay.  And so just so I'm clear, that's

24  www.tannedfeet, T-a-n-n-e-d-f-e-e-t dot com; is that right?

25  A.   Yes.

1987

Direct - McSparran

1    Q.   So what I've put up there is actually the plaintiffs'

2    exhibit, Plaintiffs' Exhibit 196.  Can you please take a

3    look at that and tell me if that website and that

4    distributor agreement is consistent with what you found on

5    the Internet at least based on the little brief summary

6    there?

7    A.   It appears to be.

8    Q.   And so subsequently, once you found this agreement on

9    the Internet, what did you do with it?  Did you conduct a

10   comparison?

11   A.    Yeah.  I started comparing them and I actually went

12   through a little manual process of reconstructing the --

13   the Porcelanosa/Crew Tile agreement from this original

14   agreement and I -- I created a little manual redline copy

15   of that where I -- where I indicated so I could follow what

16   changes were made to the agreement and what things were

17   kept in -- kept in the agreement.

18   Q.   Okay.  And so I don't want you to give an

19   all-inclusive summary, but would you mind giving a couple

20   of the high points of what you found in that comparison.

21   A.    Well, the places where the -- where the original

22   document -- the original template document was changed were

23   clearly trying to make it apply.  They changed the word

24   "equipment" to "product"; they -- because the original

25   document all referred, it was clearly written for some sort

1988

Direct - McSparran

1    of technical equipment distribution agreement.

2         And I have a number of clients in those kind of

3    distribution organization -- distribution agreements.  And

4    it makes references to software in the middle where --

5    which requires system integration, things that just don't

6    apply at all to Crew Tile.

7         Some of those things actually I think accidentally

8    got left in, would be my guess, but others were -- other

9    things that didn't apply were stricken from the agreement

10   and, of course, names of companies and -- were inserted.

11   There were a fair amount of changes made to the template.

12   Q.   Okay.  And so what I'd like to go ahead and do now is

13   go to -- it's actually Defendants' Exhibit A-16.  And so

14   I'm going to ask that we just briefly scroll through this.

15   And it actually is also in the paper copy in front of you.

16   If it's more convenient to reference it in paper form,

17   please feel free.  We'll just briefly flip through this

18   document.

19   A.   Yes, I see it.

20   Q.   Now, is that consistent with the distributor --

21   exclusive distributor agreement that you reviewed at

22   defendants' request in this case?

23   A.   Yes, I believe this is it.  Appears to be.

24   Q.   Okay.  And so we've already kind of delineated some of

25   the things that you found from the www.tannedfeet template,

1989

Direct - McSparran

1   but can you please walk through this document and just

2   briefly give some of the points that you found to be

3   inconsistent given the relationship between the parties in

4   the industry that we're discussing here.

5   A.    A number of things.  First, it starts out by saying

6   the company hereby appoints and grants distributor the

7   exclusive and nonassignable right to sell products, which

8   is -- caught my attention because none of the other

9   Porcelanosa contracts I saw had any reference to

10  exclusivity.

11        When you get down into -- into Title to

12  Products --

13  Q.    I'm sorry, we'll try to -- if you need to reference

14  your report, please do.  And we'll try to follow along --

15  A.    Maybe that will be easier.  It looks like in article

16  1.4, there's reference to leasing.

17  Q.    Sorry, let me get us caught up to you here.  So

18  section 1.4.  Oh, I'm sorry, you're in 1.4.  I'm sorry,

19  please continue.

20  A.    Yeah.  1.4, and -- I'm trying to find it, but -- oh, I

21  see, it's in the -- it's in the end of the second line.  It

22  says, If distributor shall have sold or leased units to

23  another party prior to the distributor paying the company

24  leased -- I'm not aware of any situation where you could

25  lease tile to install in your bathroom, but . . .

Direct - McSparran

1   Q.   Okay.   And so that provision that you're referencing

2   is, The distributor shall have sold or leased a unit(s) to

3   another party prior to distributor paying company the

4   purchase price of such unit as set forth herein?

5   A.   Uhm-hum.   Yes.

6   Q.   Okay.   All right.   Thank you.   Are there any others?

7   A.   Article 5 under -- article 1 under point 5 talks about

8   competitive products.   And my observation on this one, it's

9   just surprisingly vague and short, considering the fact

10  that it's an exclusive dealer agreement.   If this were

11  nonexclusive, there would probably be no reference to

12  competitive products, but in the fact that it's an

13  exclusive distribution agreement, they make a quick

14  reference to a distributor agrees not to represent or sell

15  other products which are deemed to be competitive with the

16  company's products, unless agreed on by the company in

17  advance.

18          Typically, if you're going to have that kind of

19  clause in this kind of agreement, it's going to be spelled

20  out what exceptions might be to that, what a competitive --

21  how are we even defining a competitive product.

22  Q.   Okay.

23  A.   And there's no definitions or specifics at all in

24  this.

25  Q.   And so your experience with provisions of this type,

Direct - McSparran

1    how much information would they give about what constitutes

2    a competitive product?

3    A.    Typically it's going to be fairly detailed regarding

4    competitive products, even the fact they even allow it.

5    Some exclusive distribution agreements allow -- you know,

6    allow no competitive product, but they have to define what

7    a competitive product is, because there's -- they're

8    selling flooring.  It's, you know, what's competitive and

9    what's -- with Porcelanosa's products and what's not?

10   There's no -- there's no clarity at all there.

11   Q.    Understood.  And, okay, so are there any others that

12   you would like to point out?  And we'll just try to go

13   through them page by page if that's easiest --

14   A.    Yes, article 4, point No. 1, was the -- the next one.

15   Oh, this is the one where the company -- the products are

16   misspelled.  If you go to the -- let's see, the next page,

17   where the products are listed at the top of that page --

18   Q.    Let's go back one more page, please.

19        Is this the one you're going to reference?

20   A.    Yes.  Yeah, that's it.  I noticed that several of the

21   product names are misspelled.  I can't imagine, if this

22   would be drafted by Porcelanosa or their attorneys, that

23   they couldn't spell the names of the products that -- there

24   are several of them that are misspelled relative to what I

25   found them spelled in other documents I was provided, as

Direct - McSparran

1   well as looking at the website.

2   Q.   Okay.  And so let me ask you another question.  In a

3   contract of this type, would it be typical for the parties

4   to utilize counsel or utilize attorneys to advise them with

5   respect to the provisions of the contract?

6   A.   Yes.  A contract of this significance, absolutely.

7   Q.   And have you ever seen a situation, at least based on

8   your experience, where two similarly situated companies as

9   these, failed to or didn't seek counsel with respect to --

10   either internal or external, with respect to the

11   negotiation of the contract?

12   A.   Not if it's a custom-negotiated contract.  If they're

13   signing a boilerplate contract, that might be different,

14   but . . .

15   Q.   Okay.  So are there any others?

16   A.   Let's see.  Yes.  Article 4, No. 2, under the title

17   Patent Indemnity.  There's some strange language here that

18   just -- that just really jumps out.  Let's see if I can

19   find it.  I have to look at the report to remember what I

20   was -- oh, yeah.  This is where there's reference to

21   software and firmware.

22        And in changing internal -- I'm trying to find it

23   here --

24   Q.   And, actually, if you look at the bottom two lines.

25   A.   There you go.  It's up on the screen here.  Yes.  And

1993

Direct - McSparran

1   so it says, Product or part or replace or modify the same

2   with nonconfirming capacity or affect its compatibility

3   with hardware or firmware compromising the product.

4        I mean, to me that's clearly draft -- this

5   document's clearly drafted for some sort of technical

6   product, maybe systems or controls kind of products that

7   have firmware that integrate this product with different

8   software applications.

9   Q.   And so based on your experience, when this provision

10  says with the hardware or firmware comprising the product

11  or the software utilized thereon, that -- what type of

12  product would that typically be?

13  A.   It would be -- it would be some sort of potentially

14  electronic or technical product that has internal

15  capability and also connects to software.  Because what

16  firmware does is essentially connect components together.

17  And so unless we're selling lighted tile, somehow kind of

18  connects to a music machine, I don't -- I don't -- I'm

19  struggling to figure out how that would apply to

20  Porcelanosa's products.

21  Q.   Understood.  Are there any others?

22  A.   Yes.  Article 4.3.  Article 4.3, says, Company retains

23  all proprietary rights in and to all designs, engineering

24  details, and other data pertaining to product specified in

25  the contract and to all discoveries, inventions, patent

1994

Direct - McSparran

1   rights, arising out of the work done in connection with the

2   contract.

3        That -- that's exactly the kind of clause you

4   would see in a -- in a technical product where -- where

5   engineers are connecting products, maybe systems or control

6   products, to other things.  And they're saying if you -- if

7   you create something with this product through your

8   engineering process, we -- we own the product, it's

9   essentially is what this -- what this says.

10       So, to me, it's one of the -- one of the many

11  phrases in this contract that led me to believe this

12  contract was not drafted for Porcelanosa or for their

13  products.

14  Q.   Okay.  Are there any others in this contract that

15  you'd like to point out?

16  A.   Well, article 4.4 makes reference to the document that

17  didn't exist, as I recall.  Let's see.  Title to Products.

18  Oh, first refers to the confidential relationship with the

19  company and the distributor agrees not to print, copy or

20  provide otherwise the product documentation.

21       Again, sounds like a technical product, and the

22  whole idea of the relationship between the company being

23  confidential just didn't hold water to me in terms of the

24  relationship between Crew Tile and Porcelanosa.

25  Q.   Okay.  And then as it relates to the reference to the

Direct - McSparran

1    other document, can I draw your attention to the first two

2    lines of that section 4.

3    A.    Title to Products.  Is that what I'm looking at?

4    Q.    Well, no, just from, Distributor acknowledges that

5    products and documentation listed --

6    A.    Oh, listed -- yes.

7    Q.    -- are the --

8    A.    Are the property of the company.  Schedule 1 I could

9    not find.  I specific -- when I read this I specifically

10   asked for it and was told that no one could produce a

11   schedule 1.

12   Q.    And so who did you ask for that?

13   A.    I asked your office and apparently you must have asked

14   the Crew Tile's attorneys.

15   Q.    Okay.

16          COURTROOM DEPUTY:  10 minutes, counsel.

17          MR. THOMAIDIS:  Thank you.

18   BY MR. THOMAIDIS:

19   Q.    So are there any other provisions that you'd like to

20   point out in this contract?

21   A.    Then the article 6.1C, is the most unusual.

22   Q.    Okay.

23   A.    And that's where it says -- this talks about the term

24   of the agreement being five years.  And it says, The

25   termination -- termination shall not relieve either party

Direct - McSparran

1    of obligations incurred prior to, and then down here it

2    says, The company at the end of the fifth year of this

3    agreement, upon paying the distributor a sum of 2 and half

4    million, or present company value, whichever is greater,

5    and having given to distributor 120 days advance notice of

6    the intention to terminate.

7         This was, to me, the most unbelievable element in

8    this whole contract.  At the termination -- this is at the

9    end of the agreement.  Typically the whole point of having

10   a term to a contract like this is to say you got five years

11   to perform, if you perform for five years, then we'll

12   decide at the end of five years whether we want to renew or

13   go our separate ways and do something different.

14        The idea of putting a $2.5 million termination at

15   the end of a contract, just kind of pulled that -- pulled

16   out of the blue.  It didn't seem -- it seemed irrational to

17   me.

18   Q.   Okay.  And so may I ask you just quickly as it relates

19   to distribution agreements that you've looked at, and to

20   the extent you have seen exclusive distribution agreements,

21   what obligations are typically in existence between the

22   manufacturer and the distributor respectively?

23   A.   Well, in exchange for exclusivity, typically the

24   manufacturer requires -- has specific requirements of the

25   distributor.  Sometimes they're financial, sometimes --

1997

Direct - McSparran

1   sometimes they actually pay for the distribution rights,

2   sometimes they make financial commitments, such as

3   advertising funds or marketing funds that are going to be

4   committed.  Sometimes they will commit to the number of

5   locations they're going to open to represent the product

6   properly, or number of salespeople they'll employ to

7   represent the product properly.

8         But typically that -- the agreement -- exclusive

9   agreement like this would have those sorts of things.

10  But -- and also there would be typically requirements

11  regarding inventory, how much inventory would be carried

12  and in what form and how many locations they carry

13  inventory.

14        And if at the end of the contract there is some

15  form of termination amount paid to the distributor, most

16  typically what I've seen is the manufacturer agrees to buy

17  back the inventory that they -- that they own, or something

18  like that.  But that -- but just a stipulated advance to a

19  $2.5 million number makes no business sense to me at all.

20  Q.   Okay.  One last quick question for you.  If we can go

21  to the very last paragraph of that same section, which is

22  article 6.  I believe it's subsection G.  I'm sorry,

23  subsection E.

24  A.   6.E, okay.

25  Q.   So is this something that you would typically see in

1998

Cross - McSparran

1    a -- in a distribution agreement of the type that you've

2    seen in the course of your career?

3    A.    No.   This is -- this is highly unusual in that

4    typically, especially an exclusive agreement, it's going to

5    be -- it is typically not going to be transferable to

6    another party.   And this sentence -- this sort of implies

7    it's transferable in terms of ownership, shareholder

8    agreements, change in company name.   It's pretty -- it's

9    vague but it's not -- it's not typical.

10   Q.    Okay.   And so -- actually, Your Honor, I have no

11   further questions at the moment.

12             THE COURT:   All right.   Cross-examination.

13             MR. TeSELLE:   Thank you, Your Honor.

14             THE COURT:   Mr. TeSelle, if you need it, you have

15   30 minutes on cross.

16             MR. TeSELLE:   Thank you.   I don't think I will.

17             THE COURT:   Okay.

18                       CROSS-EXAMINATION

19   BY MR. TeSELLE:

20   Q.    Mr. McSparran, how are you?

21   A.    Fine, thank you.

22   Q.    You and I have not met previously?

23   A.    We have not.

24   Q.    We did not take your deposition in this case.

25   A.    Right.

Cross - McSparran

1    Q.   Let me start, for the jury's benefit, to make sure

2    they understand.  They don't get a copy of your report and

3    they don't know what you reviewed and didn't review here

4    before coming in today and I want to make sure it's clear.

5         You've listed on the last page of your report, if

6    we can put that up just for the witness.  Exhibit -- what

7    was that?  B-40.  Thank you,  Mr. -- there's a section in

8    your report that you list the information considered in

9    formulating the above opinion.  Do you see that section?

10   A.   Yes, I remember that.  That's not shown on the screen,

11   but I do remember that.

12   Q.   Okay.

13        THE COURT:  Which page do you want on the screen?

14        MR. TeSELLE:  I believe it's the last -- the last

15   page.  Oh, I'm sorry, the whole thing is -- it's the last

16   page.

17        THE WITNESS:  Page 7 of Exhibit --

18        MR. TeSELLE:  Thank you.

19        THE COURT:  I think he located it in the hard

20   copy.

21   BY MR. TeSELLE:

22   Q.   Thank you, I appreciate it.

23        This is a complete list of the things that you

24   reviewed and considered before formulating the opinions

25   that you're testifying here today about, correct?

Cross - McSparran

1    A.    I believe it's complete, yes.

2    Q.    Okay.  And just for the record, you already testified

3    about the template that you found on the Internet, on

4    tannedfeet.com, correct?

5    A.    Correct.

6    Q.    You have no idea whether that was downloaded by Paco

7    Montilla or Jack Handley or Ryan Davis or anyone else, do

8    you?

9    A.    No, I have no idea.

10   Q.    You're not here giving any opinions about that,

11   correct?

12   A.    No.

13   Q.    You also had talked about the redline changes,

14   that's -- that was a document that you prepared.  I'm

15   looking at your list here.

16   A.    Correct.

17   Q.    And then you looked at one distributorship agreement

18   dated December 8th, 2009.  That's the agreement that you're

19   here testifying about, correct?

20   A.    Correct.

21   Q.    And then just a couple of -- or five other documents,

22   two exhibitor agreements, one dated March 29th, 2010, and

23   one with Infinite Flooring & Design dated October 1st,

24   2008, correct?

25   A.    Correct.

2001

Cross - McSparran

1    Q.    And three customer applications; do you see that?

2    A.    Yes.

3    Q.    And then, finally, it has a listing, you looked at

4    financial and tax return information for Crew Tile

5    Distribution, correct?

6    A.    Correct.

7    Q.    In terms of documents that you reviewed, exhibits that

8    you reviewed before forming your opinions in this case,

9    that's a complete and accurate summary of the documents you

10   reviewed, correct?

11              MR. THOMAIDIS:   Your Honor, defendants are happy

12   to stipulate to the entry of the exhibit, if you'd like.

13              THE COURT:   I don't think he wants to do that.

14              MR. TeSELLE:   I'm not going to offer that, Your

15   Honor.

16   BY MR. TeSELLE:

17   Q.    Is that a correct statement?

18   A.    I believe it is.  I can't guarantee you put everything

19   on this list that I looked at while I was doing my

20   research, but . . .

21   Q.    You -- do you recall anything else you reviewed that

22   you did not include on this list that says information

23   considered in formulating your opinions?

24   A.    Not that I recall, no.

25   Q.    You're not -- strike that.

Cross - McSparran

1    A.    Yeah.

2    Q.    You didn't review any of the depositions in this case

3    prior to rendering your opinions, correct?

4    A.    No.

5    Q.    You have not looked at the deposition of Mr. Manuel

6    Prior -- there are actually three of those depositions --

7    correct?

8    A.    No.

9    Q.    You didn't look at the depositions of Mr. Montilla or

10   Mr. Handley, correct?

11   A.    No, that's correct.

12   Q.    You have not looked at or read the depositions of any

13   of my clients, correct?

14   A.    That's correct.

15   Q.    Okay.  You didn't speak to any of Porcelanosa's

16   principals prior to rendering your opinions here, correct?

17   A.    That's correct.

18   Q.    You didn't go to Mr. Prior or anyone else at

19   Porcelanosa and ask them for copies of whatever

20   distributorship agreements they typically enter into,

21   correct?

22   A.    No, I did not.

23   Q.    And it is your testimony, I believe, on direct, that

24   it's -- distributorship agreements are typical in the

25   industry, correct?

Cross - McSparran

1  A.   Yes.

2  Q.   And, in fact, exclusive distributorship agreements

3  are -- I think you used the word they're either atypical or

4  not as usual --

5  A.   I think this -- yeah, they're more unusual, yes.

6  Q.   And you would expect that if a company such as

7  Porcelanosa were entering into an exclusive distributorship

8  arrangement, that that would be done in writing, wouldn't

9  you?

10  A.   Yes.  Oh, absolutely.

11  Q.   Have you ever seen it where a company the size and

12  international scope of Porcelanosa would enter into an

13  exclusive distributorship arrangement without making sure

14  that's in writing, in your experience?

15  A.   Arrange -- well, there were -- the word "arrangement"

16  could be a little different than agreement, but --

17  Q.   I may have misspoke and that was unintentional.  As to

18  an exclusive agreement, you would expect that to be in

19  writing, correct?

20  A.   Correct.

21  Q.   Yes?

22  A.   Yes.

23  Q.   You didn't speak to any of the accountants of

24  Porcelanosa before rendering your opinions in this case,

25  correct?

Cross - McSparran

1    A.    No, I did not.

2    Q.    You did not ask anyone at Porcelanosa to provide you

3    with any of their policies and procedures regarding

4    entering into distribution agreements, correct?

5    A.    Correct.

6    Q.    You didn't speak to any of their -- you didn't speak

7    to any of their corporate lawyers?

8    A.    No.

9    Q.    Aside from speaking to Mr. Thomaidis, correct?

10   A.    To Mr. Thomaidis, yes.

11   Q.    And, in fact, not just the exclusive distributorship

12   agreement that you expect in writing, but you also

13   referenced a section in this distribution agreement that

14   talked about intellectual property issues, correct?

15   A.    Yes.

16   Q.    You would expect that before a company the size and

17   scope of Porcelanosa would allow someone to use their

18   intellectual property, their copyrights, their trade names,

19   and those types of things, you would expect there to be

20   some written agreement on that, wouldn't you?

21   A.    I guess it would depend on what they were and how

22   publicly available that information is.

23   Q.    If, in fact, a company such as Porcelanosa were

24   entering into an exclusive distributorship agreement that

25   would be allowing that other party to use the intellectual

2005

Cross - McSparran

1    property, under those circumstances typically you would see

2    a written agreement covering the terms of what can and

3    can't be done with that intellectual property, correct?  Is

4    that fair?

5    A.    I'm having trouble connecting that to tile, but maybe

6    I'm just missing something.

7    Q.    Okay.  If you just answer my question.  I'm really

8    limited on time today.

9    A.    Yes.

10   Q.    But whether tied to tile or not, in terms of the use

11   of intellectual property, you would agree that's something

12   that there would be a written agreement for that the

13   lawyers would get involved in, that -- for a company the

14   size of Porcelanosa, correct?

15   A.    Not always.  Not always.

16   Q.    But you --

17   A.    Depend -- I think it depends on the nature of the

18   product, really.

19   Q.    Okay.  You've seen where -- strike that.

20           In fact, you didn't ask to look at any of

21   Porcelanosa's internal contractual documents to see what

22   they -- what they typically do in terms of dealing with

23   distributors and dealers and other parties, correct?

24   A.    That -- what I was provided were the -- were the

25   exhibitor agreements and the dealer agreements --

Cross - McSparran

1   Q.    Okay.  And those were documents --

2   A.    -- that's what I saw.

3   Q.    And those were documents that were provided by Mr.

4   Thomaidis, the defendants' lawyer in this case, correct?

5   A.    Correct.

6   Q.    And but you did not see any distributor agreements

7   that Porcelanosa ever entered into before, correct?

8   A.    No.  No, I did not.

9   Q.    You are not giving any opinions here today as to what

10  would be typical for Porcelanosa to do when entering into a

11  distributorship agreement or an exclusive distribution

12  agreement, correct?

13  A.    No, I have no knowledge about that, what they

14  typically do.

15  Q.    I mean, you kind of -- is it fair -- is it a fair

16  characterization to say that you were given this

17  document -- this distribution agreement pretty much in a

18  vacuum and asked that, based on your experience, is this

19  what you would typically see happen between two parties in

20  a tile business?

21  A.    Vacuum might be overstating that, but no, I didn't

22  interview anybody from the company.

23  Q.    A vacuum plus a couple of documents that we talked

24  about; is that better?

25  A.    Yes.

2007

Cross - McSparran

1    Q.   Okay.  Were you told that my clients -- well, let me

2    strike that because I would rather do it -- you testified a

3    couple of times about what you would expect to see if there

4    was going to be an exclusive arrangement or exclusive

5    distribution, and the first thing you said is that you

6    would expect that there would be some kind of an investment

7    was the word that would be put in by the party who would be

8    getting the benefit of the exclusive --

9    A.   Often there's some requirements, sometimes financial

10   investments, sometimes other types of requirements.

11   Q.   Did -- were you told what the status of Porcelanosa's

12   presence in Colorado was before December of 2009?

13   A.   No.

14   Q.   Did you know whether Porcelanosa had any employees

15   or -- I think it's been said for eight days, boots on the

16   ground here in Colorado at that point in time?

17   A.   I wasn't aware of any.

18   Q.   Okay.  Were you aware as to whether Porcelanosa had

19   any offices here in Colorado?

20   A.   Not that I'm aware of.

21   Q.   Were you aware of whether Porcelanosa had a showroom

22   here in Colorado?

23   A.   I don't know the answer to that.

24   Q.   Okay.  When you talk about -- one of the things that

25   you expect to see, if you -- you thought there would be an

Cross - McSparran

1  exclusive, were you ever told that my clients actually

2  built Porcelanosa a showroom in the Denver Design Center

3  based upon the exclusive distribution agreement?

4  A.   I heard that they had a showroom at the design center,

5  yes.

6  Q.   Did you hear they had one or that my clients actually

7  built it for Porcelanosa?

8  A.   I just heard that Crew Tile had a showroom, I

9  believe.

10  Q.   Okay.  Did anyone tell you that my clients -- well,

11  let me pull the exhibit up.  That my clients collectively

12  put in over a half a million dollars in terms of building

13  the showroom and developing the dealers here in Colorado to

14  sell Porcelanosa product?

15  A.   No, I was not told that.

16  Q.   Okay.  You were then asked -- you also said the next

17  thing is that you would expect to see sales goals.  Do you

18  remember that?

19  A.   Yes.

20  Q.   Okay.  If we can look at -- are -- strike that.

21      Are you aware or did anyone ever tell you that

22  Porcelanosa set sales goals for Crew Tile on an annual

23  basis?

24  A.   I wouldn't be surprised, but no, I wasn't told that.

25  Q.   That -- in fact, that if we look at Exhibit 77,

Cross - McSparran

1    briefly.  If we can look at this document.  On here it says

2    Crew -- this is a -- okay, this has been referred to a

3    couple of times with different witnesses, this is a minutes

4    of meetings that were held between Crew Tile and

5    Porcelanosa.  And if you look on this document where it

6    says, Crew is targeting.

7         MR. THOMAIDIS:  Your Honor, it's a compound

8    question and this witness has no subject matter knowledge

9    of this document whatsoever.

10        MR. TeSELLE:  I'm asking if he was told about

11   the --

12        THE COURT:  I'm sustaining the compound and

13   overruling the other part, so rephrase.

14   BY MR. TeSELLE:

15   Q.   Page 4.  We can turn to page 4 of this.  You did not

16   review this document before providing your opinions in this

17   case, correct?

18   A.   It does not look familiar, no.

19   Q.   And, in fact, were you -- if we look here at the

20   bottom of page 4, benefit to Porcelanosa, and it says, Crew

21   will be purchasing more stock to have on-hand inventory; do

22   you see that?

23   A.   Yes.

24   Q.   Did anyone ever tell you they were going to be doing

25   that?

Cross - McSparran

1   A.   No.

2   Q.   Next it says, Crew is targeting $300,000 in sales for

3   2011; do you see that?

4   A.   Yes.

5   Q.   Okay.  And what I want to go back to, go to the top --

6   let's go back to the top of the first page of this exhibit,

7   just so that I can orient him.

8        If you look at the top, in the signature line, you

9   noticed that Mr. Handley is included on these minute notes,

10  correct?

11  A.   Looks like he's copied on an e-mail.

12  Q.   Okay.  You -- if you could quick look also at

13  Exhibit 98.

14       These are the Crew Tile meeting minutes from

15  January of 2012.  Again, Jack Handley is listed along with

16  a Daniel Leon from Porcelanosa and, of course, it's to Paco

17  Montilla.  And it says -- this is from Ryan Davis and it

18  says, Good morning, gentlemen.  Wanted to follow up with

19  our understanding from Friday's meeting, Crew has agreed to

20  500,000 in sales for the 2012 year.

21       Did anyone ever tell you before you provided your

22  opinions in this case that these parties were meeting on an

23  annual basis where Porcelanosa was setting sales goals for

24  my client?

25  A.   No one told me that, but that wouldn't be unusual for

2011

Cross - McSparran

1   a dealer arrangement.

2   Q.   Now, you were aware, did they ever tell you that Mr.

3   Handley repeatedly referred to my client not as a dealer,

4   but as a distributor after the December 2009 agreement; did

5   anyone ever tell you that?

6   A.   No.   Whether they did or not, those terms are often

7   used by people interchangeably.

8   Q.   No one ever told you that, correct?

9   A.   Correct.

10  Q.   Let me get this straight, because I read your report.

11  Are you actually giving an opinion here today based upon

12  the limited documents that you've seen as to whether my

13  client was actually a dealer or a distributor?   Am I

14  hearing you correctly?

15  A.   No -- I -- no, my opinion is regarding the contract,

16  itself.

17  Q.   Okay.   Don't have an opinion one way or another based

18  on the facts and based upon what was actually happening, my

19  client was a dealer or a distributor, correct?

20  A.   No, I did see -- I did see some dealer agreements that

21  were signed by Crew Tile, I believe.

22  Q.   Okay.   And those are the exhibits that we referenced

23  before, correct?

24  A.   Yes, that's correct.

25  Q.   Which are in evidence and the jury can look for

Cross - McSparran

1   themselves.  Do you -- did anyone ever tell you that Crew

2   Tile had a network of approximately 75 dealers that they

3   were supplying and distributing Porcelanosa's tile to?

4   A.   No, I don't recall hearing that.

5   Q.   Okay.  Did anyone ever tell you -- if we can look at

6   Plaintiffs' Exhibit -- what is the exhibit number?  225.

7           Did anyone ever tell you that after the date of

8   the distribution agreement in December of 2009, that all or

9   substantially all of the sales in Colorado were directed

10   outside of Pitkin County and Aspen, and that's why we have

11   the difference between a hundred percent and where we're

12   at, that's all or substantially all of the Colorado sales

13   were directed through my client by Porcelanosa?

14   A.   I -- I do recall hearing that they were -- they were a

15   significant portion of the business.

16   Q.   And, in fact, in your experience, they were actually

17   being treated as an exclusive distributor based upon all

18   the -- with sales going through them; isn't that correct?

19   A.   No, that's -- that's a misleading question.  Being

20   treated as -- it is not unusual for a nonexclusive dealer

21   or distributor to be the only one in the market.

22   Q.   Okay.  Let's look at Plaintiffs' Exhibit 51.  Did

23   anyone ever show you this exhibit -- or this document

24   before, sir?  And we don't need the -- just from Jack --

25   thank you.  Somebody printed it out when they found it was

Cross - McSparran

1    a discovery issue.

2              Anyone show you this document before, sir?

3    A.   No, I've not seen that.

4    Q.   Okay.  I'll represent to you that there's been a lot

5    of testimony over the prior seven days:  Mr. Montilla,

6    everybody -- the people that are on here, have actually

7    testified to it.  And there was a discussion about, if you

8    look down at the bottom, just so -- because I know this is

9    new to you.  The e-mail's from Paco Montilla to Jack

10   Handley, re:  Crew Tile.  It is in March of 2010, okay?  Is

11   that fair?  Do you see that?

12   A.   Yes, I see that.

13   Q.   Okay.  If you look at the bottom, it says a display --

14   what discount off retail is Crew Tile going to offer to

15   dealers in Colorado on Porcelanosa products?

16              Do you see that?

17   A.   Yes.

18              MR. THOMAIDIS:  Your Honor, at this point I'm sure

19   it's a compound question and I'm not sure whether he's

20   asking a question.

21              THE COURT:  He's already answered it.  Let's move

22   on.

23   BY MR. TeSELLE:

24   Q.   All right.  Now so the question here is Crew Tile --

25   is Crew Tile going to be competitive if he buys at 55

Cross - McSparran

1    percent off of us, what discount is he going to offer?

2          Do you see him asking that question?

3    A.   This is -- I'm not even sure who this is from.  This

4    is from Paco Montilla to Jack Handley --

5    Q.   Do you know who Paco Montilla is?

6    A.   No.  I've seen the name in documents but --

7    Q.   Do you know whether he's just a salesperson or, in

8    fact, was in charge of the entire western United States for

9    the defendants?

10    A.   I don't specifically recall.  I think I saw some

11    documents referring to --

12    Q.   But you don't know one way or the other, correct?

13    A.   I don't.

14    Q.   And do you know who Mr. Handley is?

15    A.   I saw his signature on a couple of the documents I

16    reviewed, yes.

17    Q.   Okay.  You saw it on the distribution agreement or the

18    purported signature that we're fighting about here?

19    A.   And I think on the dealers agreements as well, but I'm

20    not positive to them.

21    Q.   You think Mr. Handley signed the dealer agreements?

22    A.   I don't know.  I thought -- I know I saw it on the

23    distribution agreement.

24    Q.   Okay.  Other than on the distribution agreement --

25    this becomes an important question --

Cross - McSparran

1   A.   Okay.

2   Q.   -- other than on the distribution agreement, have you

3   ever seen Mr. Handley's signature on any of the other

4   documents that you reviewed?

5   A.   I don't recall.

6        MR. THOMAIDIS:  Asked and answered, Your Honor.

7        THE COURT:  Overruled.

8   BY MR. TeSELLE:

9   Q.   Let's go back to Exhibit 51.  Then at the top is the

10  response from Mr. Handley to Mr. Montilla.  He says, Paco,

11  my understanding is that he will add a 20 to 30 percent

12  margin based on customer and/or project.

13       Do you see that?

14  A.   Yes.

15  Q.   My question for you:  And based upon your experience

16  in the industry, why would a dealer pay a 20 or 30 percent

17  markup to my client instead of buying direct from

18  Porcelanosa unless my client was exclusive?

19       MR. THOMAIDIS:  Your Honor, that's a compound

20  question again.

21       THE COURT:  It's not compound.  Overruled.

22       THE WITNESS:  I'm not sure I understand the

23  question.  Why would he pay a margin?

24  BY MR. TeSELLE:

25  Q.   Why would a dealer -- why would another dealer, why

2016

Cross - McSparran

1   would any of the 75 dealers that my client worked with, pay

2   a 20 or 30 percent markup to my client to buy Porcelanosa

3   product instead of buying directly from Porcelanosa unless

4   my client were the exclusive?

5   A.   Your client might have a better price than the other

6   dealers.

7   Q.   Okay.  And if the testimony --

8   A.   That doesn't make it exclusive.

9   Q.   If the testimony here in this -- in this Court is that

10   I believe 90 percent plus of the dealers in Colorado were

11   getting the same 55 percent on pricing, would that change

12   your opinion?

13       MR. THOMAIDIS:  Calls for speculation, Your Honor.

14       THE COURT:  He's asking if it changes his opinion.

15   Overruled.

16       THE WITNESS:  Not necessarily, I have seen it

17   before.

18   BY MR. TeSELLE:

19   Q.   In fact, did anyone ever tell you -- Plaintiffs'

20   Exhibit 233, Your Honor.

21       Did anyone ever tell you about how Porcelanosa's

22   total Colorado sales progressed while the parties were

23   operating under the distribution agreement?

24   A.   I did hear the revenue went up, yes.

25   Q.   And do you have any knowledge about that or --

2017

Cross - McSparran

1    A.    No detailed knowledge, no.

2    Q.    You were asked some questions about -- Exhibit 78,

3    please.

4          You were asked some questions about the template

5    of the distribution agreement.  Do you remember those

6    questions?

7    A.    Yes.

8    Q.    Okay.  And you don't know where, who -- where that

9    came from, correct?

10   A.    That's correct.

11   Q.    You understand, or have you been told, that there's an

12   allegation that in the spring of 2013, that my clients came

13   up with this -- with the document that you reviewed and are

14   giving opinions on today?

15   A.    No, I wasn't told that.

16   Q.    Okay.  If you look at Exhibit 7 -- I'm sorry, A-78,

17   correct?  A-78.  Is this stipulated?

18           MR. CROUGH:  It's admitted.

19           MR. TeSELLE:  This one's in, Your Honor.

20           THE COURT:  All right.  Ms. Buchanan.

21           COURTROOM DEPUTY:  Yes, Your Honor.

22   BY MR. TeSELLE:

23   Q.    Let me show you this.  Were you shown -- just look at

24   the first page.  Does this appear to be the same template

25   that you found on the Internet and that you concluded was

2018

Cross - McSparran

1  the same template that was ultimately used for the 2009

2  agreement?

3        MR. THOMAIDIS:  Your Honor, there's no way he

4  could do a detailed analysis of this document here on the

5  stand in the remaining time.

6        MR. TeSELLE:  It's cross-examination.

7        THE COURT:  Well, if you believe you can answer

8  the question, go ahead.

9        THE WITNESS:  You know, I'd have to -- I can't

10  even read it, the outline.  The outline I can't --

11  BY MR. TeSELLE:

12  Q.   First of all, you gave testimony that -- and I know

13  it's your opinion, that no tile dealer would enter into an

14  agreement like -- like the one that you reviewed for

15  December of --

16  A.   No tile manufacturer I said.  I didn't say dealers --

17  Q.   If you look at this document, there's testimony in

18  this case -- if you look at the last page, there's been

19  testimony, in fact, that Sark Tile entered into this

20  agreement with Crew Tile in 2012.  Are you aware of that?

21  A.   No.

22  Q.   Did Mr. Thomaidis give you this document to review

23  with the other documents, the other agreements --

24  A.   No, I haven't seen this document.

25  Q.   Okay.  If you look at the bottom, can you tell me if

Cross - McSparran

1   you see this, there's a fax date on it.  See where it says

2   December 26th, 2012?

3   A.    2012, yes, I see that.

4   Q.    This appears to have been faxed between the parties on

5   December 26th, 2012, doesn't it?

6   A.    Yes.

7   Q.    And if you look in the body of the document, and there

8   are -- there's kind of black lines on the left-hand side

9   where there's red lining going on.  You're familiar with

10  that, correct?

11  A.    Yes.

12  Q.    That's kind of a typical practice when two parties are

13  going back and forth and they're making red lines.  If you

14  could just briefly look at page 4 of this exhibit.  And I'm

15  going to -- article 7, Section 6, Applicable Law.  Do you

16  see that?

17  A.    I can't read it.  There we go.  Now I can.

18  Q.    You see that section?

19  A.    Yes.

20  Q.    It says, This agreement shall be governed by the laws

21  of the state.  And then they redline out name of the state

22  because that was kind of where you filled that in, right?

23  A.    Correct.

24  Q.    And is accepted by company at its corporate offices

25  in, address of the company.  You see that?

2020

Cross - McSparran

1    A.    Yes.

2    Q.    And it has an address of 1901 West O Street, Lincoln,

3    Nebraska.   Do you see that?

4    A.    Yes.

5    Q.    I'll represent to you that that is the actual address

6    of the Sark Tile that I was -- entity I was referring to.

7    A.    Okay.

8    Q.    And then all payments hereunder shall be made at

9    company's offices at.

10          And can you read into the record what is stricken

11   out on this document?

12   A.    1301 South State College Boulevard, Anaheim,

13   California.

14   Q.    Do you know whose address that is?

15   A.    No, I don't.

16   Q.    You reviewed the distribution agreement in this case,

17   the 2009 agreement, correct?

18   A.    Yes.

19   Q.    Would it surprise you that 1301 South State College

20   Boulevard, Anaheim, California 92806, is the address for

21   Porcelanosa Los Angeles?

22   A.    No, that wouldn't surprise me.

23   Q.    Okay.  So it appears that in 2012, the document that

24   Crew Tile and Sark Tile were using as their template was a

25   document that previously had Porcelanosa's home address in

Cross - McSparran

1    it, correct?

2    A.   I -- I can't -- I don't have a detail to say that's

3    correct, but it appears to be the case.

4    Q.   Does that appear to be what's --

5    A.   Yes.

6    Q.   -- happening here?

7    A.   Yes.

8    Q.   Okay.  And so, therefore, does it appear that the

9    template that's being used is a Porcelanosa Los Angeles

10   template that have been provided by Mr. Handley?

11        MR. THOMAIDIS:  Your Honor, this calls for

12   speculation.

13        THE COURT:  Sustained.  He's not seen it.

14        MR. TESELLE:  I'll withdraw it.

15        THE COURT:  He's never seen this document before.

16        THE WITNESS:  What was the question?

17   BY MR. TeSELLE:

18   Q.   I --

19        THE COURT:  The objection's sustained.

20   BY MR. TeSELLE:

21   Q.   You also could have looked at any of the

22   distribution -- distributor agreements that Porcelanosa

23   enters into with distributors around the world, correct?

24   A.   Those weren't -- those weren't provided for me, no.

25   Q.   Okay.  Did you do any -- you didn't ask for it either,

Cross - McSparran

1    correct?

2    A.   I asked for agreements, broad -- any kind of

3    agreements that they have, yeah.

4    Q.   Okay.  So --

5              MR. THOMAIDIS:  Your Honor, at this point,

6    we're -- irrelevant.

7              THE COURT:  Hold on.  Overruled.

8    BY MR. TeSELLE:

9    Q.   Did you do any independent investigation on your own

10   on the Internet to see whether Porcelanosa enters into

11   exclusive distributorship agreements?

12   A.   No, I did not.

13             COURTROOM DEPUTY:  Two minutes, counsel.  Two

14   minutes.

15   BY MR. TeSELLE:

16   Q.   Two minutes, thank you.

17             If you could look at Exhibit 206 -- no, these are

18   not in, correct?  This is cross-examination of the witness,

19   but -- for the expert.

20             But if you -- can you see that -- I'll represent

21   this is a Porcelanosa What's New products.  Do you see

22   this?  Exhibit 206?

23   A.   Yes.

24   Q.   And if you look under Who We Are, it says, Fontile has

25   been a family run business in the same Vancouver location.

Cross - McSparran

1    Honored to be the exclusive distributor of Porcelanosa's

2    full range of products in Western Canada.

3            Do you see that?

4    A.   Yes, I do.

5            MR. THOMAIDIS:  Your Honor, this has no subject

6    matter of this witness.  It hasn't --

7            THE COURT:  You're reading from an exhibit that's

8    not in evidence.

9            MR. THOMAIDIS:  -- reading from an exhibit.

10           MR. TeSELLE:  For the -- I'm asking him if he's

11   aware and did --

12           THE COURT:  From a document that's not in

13   evidence.

14           MR. TeSELLE:  Okay, I'm not asking for it to be in

15   evidence.

16   BY MR. TeSELLE:

17   Q.   But let me ask you, then, directly.  Did you go on the

18   Internet and look to see if there were other exclusive

19   distributors around the world that Porcelanosa worked with?

20   A.   I did not, but I wouldn't -- I wouldn't be surprised

21   if there's exclusivity in some countries.  It's actually

22   fairly common to have a different channel strategy and a

23   different distribution strategy in different markets.

24   Q.   Okay.

25           MR. TeSELLE:  I think I'm out of time, Your Honor.

Redirect - McSparran

1    Thank you very much.

2            THE COURT:  All right.  Redirect.  Mr. Thomaidis,

3    per my calculation I believe you have 10 minutes left.

4            MR. THOMAIDIS:  Thank you, Your Honor.

5            THE COURT:  With a two-minute warning.

6                    REDIRECT EXAMINATION

7    BY MR. THOMAIDIS:

8    Q.   So, Mr. McSparran, your objective was to conduct a

9    neutral and objective analysis on this contract that's been

10   disputed in this case, correct?

11   A.   That's correct.

12   Q.   And that's the exclusive distributor agreement dated

13   December 8th of 2009; is that right?

14   A.   That's correct.

15   Q.   And so in your experience, you worked with

16   multi-national companies?

17   A.   Yes.

18   Q.   And when you worked with a multi-national companies --

19   or company, do you find that they sometimes use

20   distributors that are geographically remote from the

21   corporate offices?

22   A.   That's often the purpose of a distributor.

23   Q.   And so why is that often the purpose of a distributor

24   agreement?

25   A.   Typically -- often a company uses the distributors to

Redirect - McSparran

1   reach markets where they don't have -- they don't have

2   presence.

3   Q.   Okay.  And so in the event that there was a market

4   where they didn't have a presence, what would be some of

5   the provisions that would be drafted in that contract to

6   reflect the relationship between the parties in that case,

7   if you know?

8   A.   I am not sure I understand your question.

9   Q.   Well, would there be anything special if it was a

10  geographically remote location -- in your experience, for

11  example, would there be minimum sales goals that had to be

12  met, for example?

13  A.   Dealers, distributors, are often geographically

14  remote.  I don't see -- I'm not quite following the

15  distinction.

16  Q.   I'm sorry, maybe I should rephrase the question.

17       As far as the requirements of this contract, were

18  there any provisions about, for example, having a certain

19  number of on-hand inventory so they could handle the demand

20  of --

21  A.   No.

22  Q.   -- this geographically remote location?

23  A.   There was no references to carrying inventory.

24  Q.   And what about with respect to developing and opening

25  a showroom, was there any dollar figure associated with a

2026

Redirect - McSparran

1    minimum that the distributor would have to pay to maintain

2    and operate a showroom?

3    A.    No, there were no requirements regarding -- not just

4    dollars but even requiring a showroom that I -- there was

5    no reference to showroom in there.

6    Q.    Okay.  And what about Mr. TeSelle talked about

7    entering into other contracts, and you saw an example of

8    one from a company called Sark Tile, Defendants' A-78.

9    Were there any provisions in the contract -- the

10   distributor agreement that you reviewed that would prohibit

11   that kind of conduct?

12   A.    I'm sorry, I didn't follow the question.

13   Q.    Let me take a different angle.  Can we please pull up

14   A-78.

15        So based on your recollection of the provisions

16   regarding competition in the contract that you were

17   actually asked to review, would there be a problem with

18   entering into this type of a contract on what appears to be

19   February 18th, 2012?

20        MR. TeSELLE:  Objection.  Foundation as to his

21   knowledge of what a competitor -- competitive product would

22   be.

23        THE COURT:  Sustained.

24   BY MR. THOMAIDIS:

25   Q.    Let's turn to paragraph -- let's turn to Defendants'

Redirect - McSparran

1   A-16 for a minute.  And let's blow up paragraph 5 on the

2   bottom of that page.

3          Now, that provision says, The distributor agrees

4   not to represent or sell other products which are deemed to

5   be competitive with the company's product unless agreed to

6   by the company by written notice.

7          Do you see that?

8   A.   Yes.

9   Q.   Now you testified previously that that was vague and

10  fairly ambiguous as far as what a company would negotiate

11  under these circumstances relating to competition; is that

12  right?

13  A.   Yes.  Yes.

14  Q.   Okay.  And so now let's go ahead and go back to A-78.

15  Okay.  So this document appears, if you look past the red

16  lines, to be dated February 18th, 2012, would you agree?

17  A.   Yes.

18  Q.   And that would have fallen within the period of the

19  contract you just looked at and that you indeed issued a

20  report on; is that right?

21  A.   That's correct.

22  Q.   So based on your review of that contract, would this

23  be competition with Porcelanosa-USA?

24          MR. TeSELLE:  Objection.  Same -- same objection.

25  Foundation --

2028

Redirect - McSparran

1          THE WITNESS:  No --

2          MR. TeSELLE:  -- as to what is competitive product

3    to Porcelanosa.

4          THE COURT:  I think there's an issue here about

5    whether he knows what would be a competitive product.

6          MR. THOMAIDIS:  I think we're all wondering what

7    would be a competitive product.

8          THE COURT:  But you're asking him to opine on

9    that.

10          MR. THOMAIDIS:  Understood, Your Honor.

11   BY MR. THOMAIDIS:

12   Q.   So would you be able to opine on what's a competitive

13   product based on the provisions of the exclusive

14   distributor agreement dated December 8th of 2009?

15          MR. TeSELLE:  Same objection.  It goes beyond the

16   scope of his report as well.  He did not give his opinion.

17          MR. THOMAIDIS:  He did address the issue of

18   competition, Your Honor.

19          THE COURT:  But -- sustained.  He doesn't have the

20   subject matter knowledge to opine as to what is competitive

21   to the -- your client's products.

22          MR. THOMAIDIS:  All right.

23   BY MR. THOMAIDIS:

24   Q.   So, Mr. McSparran, based on the fact that you're an

25   expert sitting here today, based on your review of the

Redirect - McSparran

1    exclusive distributor agreement of December 8th of 2009,

2    what tile products would be competitive, just based solely

3    on your review of that document?

4              MR. TeSELLE:  Same objection, Your Honor.

5              THE COURT:  Sustained.

6              MR. THOMAIDIS:  All right.  I give up.

7    BY MR. THOMAIDIS:

8    Q.   Can we please go to Exhibit A -- the last page of

9    Exhibit A-78, please.

10             So now you reviewed this document, correct?

11   A.   Yes.

12   Q.   Do you know whose signatures those are?

13   A.   I can't read them.

14   Q.   And I -- if you don't know, it's --

15   A.   They're names -- no, I would be guessing.

16   Q.   Is this a forgery?

17   A.   I have no idea.

18   Q.   Can you -- do you have any idea whatsoever if this a

19   forgery?

20             MR. TeSELLE:  Objection, Your Honor --

21             THE WITNESS:  No.

22             MR. TeSELLE:  He's not qualified and he actually

23   says he doesn't know the signatures.

24             THE COURT:  Sustained.

25   BY MR. THOMAIDIS:

Redirect - McSparran

1    Q.   Let's go ahead and turn to the page previous.  And

2    let's go ahead and blow up that section, paragraph 6,

3    Applicable Law.

4         So here it says, By the company at its corporate

5    office in, and brackets, address of company.

6         Does that look to be a form to you?

7    A.   Yes.

8    Q.   And then appears after that, 1901 West O Street,

9    Lincoln, Nebraska, 86 -- or, excuse me, 68528.

10        Do you see that?

11   A.   Yes.

12   Q.   And then it appears that there's some red lines in

13   that.  Would this appear to be -- make this contract

14   binding under the laws of the state of Nebraska?  And I'm

15   not asking you to be a lawyer.

16        MR. TeSELLE:  Objection.  Foundation.  Asking for

17   a legal conclusion --

18        THE WITNESS:  Yes.

19        THE COURT:  Sustained.

20   BY MR. THOMAIDIS:

21   Q.   Under what law based on your qualification as an

22   expert, what is your opinion as to the law of this

23   contract?

24        MR. TeSELLE:  Same objection, Your Honor.

25        THE COURT:  Sustained.

2031

Redirect - McSparran

1          MR. THOMAIDIS:  Okay.

2     BY MR. THOMAIDIS:

3     Q.   Were you ever aware -- were you ever made aware in

4     this case that Crew Tile Distribution was sued by Sark

5     Tile?

6     A.   No.

7     Q.   Were you ever aware that they were sued by Sark Tile

8     in Nebraska?

9     A.   No.

10    Q.   Based on those factors, is it possible that someone

11    would have changed a subsequent contract --

12         MR. TeSELLE:  Objection, Your Honor.  No

13    foundation.  He says he doesn't know anything about Sark

14    Tile.  Now he's just testifying through this witness --

15         THE COURT:  Sustained.  Sustained.  Go ahead, Ms.

16    Buchanan.

17         COURTROOM DEPUTY:  Two minutes.

18         MR. THOMAIDIS:  Thank you.  All right.

19    BY MR. THOMAIDIS:

20    Q.   Mr. McSparran, is it your expert opinion, as you sit

21    here today, that the document that we were asked -- that

22    you were asked to review, the exclusive distributor

23    agreement of December 8th, 2009, is it your opinion that it

24    is not a contract that Porcelanosa Los Angeles or one of

25    the other entities would have entered into?

2032

Redirect - McSparran

1   A.   It's -- yeah, there's no business logic in my mind why

2   Porcelanosa would enter into a contract like the one I

3   reviewed.

4   Q.   Okay.  And the reason that there's no business logic,

5   as you've described, is because there's multiple provisions

6   that are not reconcilable with respect to the sale of tile;

7   is that right?

8           MR. TeSELLE:  Objection.  Leading.

9           THE WITNESS:  That's part of it.

10          MR. TeSELLE:  Objection, leading.

11          THE COURT:  You would be much more effective if

12   you asked it in a nonleading fashion.

13          MR. THOMAIDIS:  Thank you, Your Honor.

14          THE COURT:  Let the witness testify.

15   BY MR. THOMAIDIS:

16   Q.   So what are some of the reasons why this contract is

17   irreconcilable, in your mind?

18   A.   It's -- it clearly doesn't apply to the product lines.

19   It -- it's clearly -- it grants exclusive distribution

20   rights without any expectations on behalf of the other

21   side.  It is completely irrational from a business

22   perspective, the payout at the end of the term.  Those are

23   the three things that jump to mind at first.

24          It all -- you know, it also -- well, it's just --

25   it -- it's very slanted toward -- essentially toward the

2033
Redirect - McSparran

1   distributor.  Which is unusual because typically, if

2   anything, a contract slants the other way because they're

3   typically drafted by the manufacturer.

4   Q.   Understood.

5        MR. THOMAIDIS:  Your Honor, at this time I have no

6   further questions.

7        THE COURT:  All right.  May this witness be

8   excused?

9        MR. THOMAIDIS:  He may, Your Honor.

10       THE COURT:  Hold on a second.  For the plaintiffs?

11       MR. TeSELLE:  Yes, he may.

12       THE COURT:  All right.  Mr. McSparran, thank you

13   so much for joining us.  You may be excused and you may

14   step down.

15       All right.  Defendants/counterclaimants may call

16   their next witness.

17       MR. THOMAIDIS:  At this time, Your Honor,

18   defendants and counterclaimants will call Mr. Rick

19   Balentine.

20       THE COURT:  All right.  Mr. Thomaidis, just to

21   repeat, you have 20 minutes on direct and 10 minutes on

22   redirect with a two-minute warning on both.

23       MR. THOMAIDIS:  Thank you, Your Honor.

24       THE COURT:  All right.

25       COURTROOM DEPUTY:  Stand up here, please.

Direct - Balentine

1      THE WITNESS:  Stand?

2           RICKEY BALENTINE, DEFENDANTS' WITNESS, SWORN

3      COURTROOM DEPUTY:  Please be seated.  Please state

4    your full name for the record and spell your first and last

5    name.

6      THE WITNESS:  Rickey Balentine.  R-i-c-k-e-y,

7    B-a-l-e-n-t-i-n-e.

8                       DIRECT EXAMINATION

9    BY MR. THOMAIDIS:

10   Q.   So Mr. Balentine, thank you very much for being with

11   us here today.  I appreciate it.  Can you please just tell

12   us, for the benefit of the Court and the jury, what your

13   present employment is?

14   A.   I own a company in Aspen, a flooring company.  Okay.

15   Q.   What's the name of that company?

16   A.   It's Rocky Mountain Floor Systems Balentine

17   Collection.

18   Q.   Okay.  And so what does that company do?

19   A.   The company does carpet, tile, it's stone countertops,

20   wood floors.

21   Q.   Okay.  And so how long have you, I guess, owned and

22   operated Balentine Collection and Rocky Mountain Flooring?

23   A.   Over 20 years.

24   Q.   Okay.  And my understanding is you have another

25   occupation in addition to your proprietorship of those

2035

Direct - Balentine

1    companies; is that right?

2    A.    That's correct.

3    Q.    And what is that?

4    A.    I'm on the fire department.

5    Q.    Okay.  And are you the fire chief for the city of

6    Aspen?

7    A.    Yes, sir.

8    Q.    I feel like I should say thank you, but thank you.

9          And so at some time was Balentine Collection a

10   dealer of Porcelanosa brand products?

11   A.    They still are.

12   Q.    Okay.  And so how did Balentine Collection or Rocky

13   Mountain Flooring become a dealer of Porcelanosa brand

14   products?

15   A.    When I ran across their line, when I went to a tile

16   and carpet show in Las Vegas, called Services, and I don't

17   remember what year that was.

18   Q.    Okay.

19   A.    I liked the line and picked it up.

20   Q.    Okay.  And so when you picked it up, did you fill out

21   an account application to begin to sell their product?

22   A.    I don't recall.

23   Q.    Okay.  Was there some paperwork that you had filled

24   out in order to be able to sell their product and buy their

25   product?

2036

Direct - Balentine

1   A.   I'm assuming there would have had to have been for us

2   to get credit.  I just don't know that -- what that was.

3   That was in the accounting department.

4   Q.   Understood.  And so how long would you say you have

5   been selling Porcelanosa products in Aspen?

6   A.   Probably 10 years.  Eight or 10 years.

7   Q.   Okay.  And so --

8   A.   Sorry, I don't know the exact date.

9   Q.   That's all right.  And so have you always valued the

10   relationship that you had with Porcelanosa Los Angeles?

11   A.   I have a great relationship with them.

12   Q.   Okay.  And there's been some testimony here about you

13   being an exclusive distributor, or exclusive dealer in the

14   Aspen and Pitkin County.  Were you ever aware of being an

15   exclusive per-contract dealer in Pitkin County?

16   A.   As far as I know we don't have any sort of contract

17   that says that we are.

18   Q.   All right.  So what was your understanding why you are

19   the primary dealer -- dealer of Porcelanosa products in

20   Pitkin County and Aspen?

21   A.   Because I believe we were the -- one of the first --

22   we were definitely the first in our area to carry the line,

23   and it was a very popular line, so that's why we had the

24   line in Aspen.

25   Q.   And so did Porcelanosa Los Angeles ever indicate to

2037

Direct - Balentine

1   you that they desired to maintain your relationship and

2   foster your relationship?

3           MR. BURG:  Your Honor, leading.

4           THE COURT:  Sustained.

5           THE WITNESS:  I'm sorry, would you say --

6   BY MR. THOMAIDIS:

7   Q.   How would you characterize the relationship between

8   you and Porcelanosa Los Angeles?

9   A.   Our relationship was if we sell their product, they'll

10  continue to sell to us.

11  Q.   Okay.  And have they ever violated that understanding?

12  A.   No.

13  Q.   Okay.  So I'm going to ask you to recollect back a

14  little bit for me.  Do you recall -- and I'm going to

15  actually pull up an exhibit.  May I please pull up trial

16  Exhibit Z.  And if you can just -- for Mr. Balentine's

17  clarity, can you try to explode the top half of the page.

18  Thank you.

19          So are you familiar with the company called Crew

20  Tile Distribution?

21  A.   I've heard of them.

22  Q.   Okay.  And how have you heard of them?

23  A.   At some point I became aware of Crew Tile.  I believe

24  one of our designers had actually found them online and

25  they called us to say if they should be buying tile from

2038

Direct - Balentine

1   Crew Tile or through us in Aspen.  And I said they should

2   be buying from us.

3   Q.   Okay.  And so let me go ahead and call your attention

4   to this exhibit, which is trial Exhibit Z.  Do you remember

5   an individual with a company called RG Crew Construction?

6   Do you remember an individual approaching you in June of

7   2009?

8   A.   I remember, I believe two gentlemen came to our

9   showroom in Aspen, but I don't know when it was.  And I

10  don't remember their names.

11  Q.   Okay.  And what did they say, to the best of your

12  recollection?

13  A.   They told me that they were going to be my new rep, I

14  believe was what they said, or new representative of

15  Porcelanosa, and I would be purchasing through them.  And I

16  told them that I probably wouldn't be doing that.

17  Q.   And so why did you tell them you probably wouldn't be

18  doing that?

19  A.   Because I felt we had a good relationship with

20  Porcelanosa in LA and the salespeople that I met there and

21  that's where I would continue to do business with.

22  Q.   Okay.  And so did you do anything from a remedial

23  standpoint after these two individuals came into your

24  store?

25  A.   I called Porcelanosa and gave them a little bit of

2039

Direct - Balentine

1   hell.

2   Q.   And I'm sorry, say that again.

3   A.   Gave them a little bit of hell.

4   Q.   Okay.  What kind of hell did you give them?

5   A.   That I was very -- I felt disappointed because we had

6   been a good client and now they're telling me I had to buy

7   from somebody in Denver and I told them I wouldn't do

8   that.

9   Q.   Okay.  And so can I please pull up trial Exhibit A-10.

10  And this is not stipulated to and not admitted, so I'm just

11  going to ask that -- and the text is -- we're going to try

12  to blow it up for you a little bit because otherwise -- so

13  and it probably will be easier on the screen, if I may.

14         Would you please just take a moment to review this

15  correspondence.

16  A.   Okay.

17  Q.   So do you recollect this correspondence, Mr.

18  Balentine?

19  A.   Yes.

20  Q.   And what is it?  I'm sorry, let me rephrase the

21  question.  Do you remember this time period in October of

22  2009 being roughly the time that you contacted Porcelanosa

23  Los Angeles?

24  A.   Sounds about right.

25  Q.   Okay.  And so do you recall Porcelanosa Los Angeles

Direct - Balentine

1    responding to you?

2    A.   I do.   They said they valued my business and that we

3    could continue to buy material from them in LA.

4    Q.   Okay.   And so what did they tell you specifically as

5    it relates to Crew Tile Distribution?

6    A.   I believe they said they were a dealer like we were,

7    but I don't remember exactly what they said.

8    Q.   Okay.   Did they tell you anything else with respect to

9    Crew Tile Distribution?

10            MR. BURG:   Your Honor, hearsay.   Objection.

11            THE WITNESS:   I'm sorry, what was the question?

12            THE COURT:   Hold on.   What's your response?

13            MR. THOMAIDIS:   I think I'm asking for his

14   recollection on a telephone call that he had with one of

15   the parties to this case.

16            THE COURT:   Yeah, but it's your -- sustained.

17            MR. THOMAIDIS:   I can rephrase the question.

18   BY MR. THOMAIDIS:

19   Q.   So what do you recollect from that conversation that

20   you had with Porcelanosa Los Angeles?

21            MR. BURG:   Objection.   Calls for hearsay.

22            THE COURT:   Is there an exception to the hearsay

23   rule that you think applies?

24            MR. THOMAIDIS:   I mean, the only -- Your Honor,

25   the only thing I can really put my finger on with this is

2041

Direct - Balentine

1    that this would be a business record.  Actually the -- you

2    know what, no, you know, they're --

3              THE COURT:  Hold on.  One at a time.

4              MR. THOMAIDIS:  They're -- the two individuals

5    would be -- and the person who drafted this e-mail, would

6    be agents of one of the companies in this case.

7              THE COURT:  Your client.

8              MR. BURG:  I'm going to withdraw.  He can move on.

9    I don't want to keep -- we're behind --

10             THE COURT:  Thank you.  Keep going.

11   BY MR. THOMAIDIS:

12   Q.   So --

13   A.   I can tell you what I remember about it.  And one

14   thing that I was very upset about at the time is my -- in

15   terms of my coming to work for architects, when they

16   were -- they were going online for Porcelanosa and they

17   were getting Crew Tile.  And I remember being upset about

18   that because I told them I was their dealer in Aspen and

19   not to be buying from somebody in Denver.

20   Q.   Okay.

21   A.   That's about what I remember about that.

22   Q.   And so do you recollect anything else?

23   A.   Not really.

24   Q.   Okay.  And do you remember who that individual was?

25   A.   It was either Letisha, who was my sales rep at the

Direct - Balentine

1   time, or Paco --

2   Q.   Okay.

3   A.   -- I think his name was.  Yeah.

4   Q.   And so do you recall Mr. Montilla ever indicating that

5   the statements that these individuals, when they came to

6   see you, those statements were untrue?

7          MR. BURG:  Your Honor, that is hearsay, as to what

8   Mr. Montilla told him.

9          MR. THOMAIDIS:  That's not what I asked.

10          THE WITNESS:  Well, I think --

11          THE COURT:  Hold on, sir.  Hold on a second.  Is

12   there an exception to the hearsay rule you want to --

13          MR. THOMAIDIS:  I guess, Your Honor, that the only

14   thing I can -- I mean, this is a recorded recollection,

15   certainly.  I can go through -- I can go through the whole

16   list.  I --

17          THE COURT:  I'm going to sustain it.  It's -- go

18   ahead.

19   BY MR. THOMAIDIS:

20   Q.   Clearly I'm missing something here in terms of this

21   document.  Anything else?  Do you remember anything else?

22   A.   No.

23   Q.   Okay.  So, Mr. Balentine -- so, Mr. Balentine, let's

24   go ahead and move forward.  So what exactly are -- is your

25   understanding of your relationship with Porcelanosa Los

2043

Direct - Balentine

1   Angeles now?

2   A.    As far as I know, we are still the only company in my

3   area that sells and reps Porcelanosa tile in my immediate

4   Aspen area.

5   Q.    And now is that pursuant to --

6   A.    A verbal agreement we had back in that they would

7   protect our area if we could sell their product.  And we

8   still have quite a bit of real estate in our showroom

9   devoted to Porcelanosa.

10  Q.    Okay.  And did you have any other interactions with

11  Crew Tile Distribution subsequent to this that you

12  recollect in 2009 in October?

13  A.    Not that I recall.

14  Q.    Okay.  And so I'm going to ask that we please turn to

15  trial Exhibit A-16.

16        So, Mr. Balentine, would you please take a moment,

17  and I'm going to -- you can look at this in paper copy in

18  front of you or alternatively on the screen.  And actually,

19  why don't you take that down, please.  Nope, take it down.

20  Now, please scroll up through the pages.

21        So, Mr. Balentine, let's go back to page 1.  So

22  have you ever seen this contract before?

23  A.    No.

24  Q.    Have you ever seen a contract like this one before?

25  A.    No.

2044

Direct - Balentine

1   Q.   To your knowledge, does Porcelanosa Los Angeles, or

2   any other Porcelanosa entity, enter into contracts of this

3   type, given that you're a dealer of Porcelanosa's products?

4           MR. BURG:  Your Honor, total speculation.  No

5   foundation.

6           THE COURT:  Sustained.  I mean, he can testify if

7   he has such a contract.

8           MR. THOMAIDIS:  Understood.

9   BY MR. THOMAIDIS:

10  Q.   So, Mr. Balentine, have you ever entered into a

11  contract like this one?

12  A.   No.

13  Q.   Okay.  You're certain?

14  A.   Yes.

15  Q.   Okay.  And so with respect to the relationship that

16  you had had with Porcelanosa Los Angeles in Aspen and

17  Pitkin County, that was subject to a verbal agreement that

18  Porcelanosa has to honor; is that right?

19  A.   That's correct.

20          MR. THOMAIDIS:  I have no further questions.

21          THE COURT:  All right.  Cross-examination.

22          MR. BURG:  Thank you.  It may be quick.

23          THE COURT:  All right.  If you need it, you have

24  15 minutes.

25          MR. BURG:  15.

Cross - Balentine

1              CROSS-EXAMINATION

2    BY MR. BURG:

3    Q.   Good afternoon, Your Honor, ladies and gentlemen of

4    the jury, counsel.

5              Did you come voluntarily down from Aspen for this

6    or were you subpoenaed?

7    A.   I wouldn't be here voluntarily.

8    Q.   Okay.  So just so we know.  You were subpoenaed by the

9    defendants in this case to come here, correct?

10   A.   I was subpoenaed, yes.

11   Q.   Right.  So when he thanked you for being here, that

12   was not voluntarily, right?

13   A.   That's correct.

14   Q.   All right.  And when Mr. Griebel came into your Aspen

15   place and tried to tell you that he wanted to sell you

16   Porcelanosa product through Crew Tile, that upset you,

17   correct?

18   A.   I laughed at him.

19   Q.   You told him, Hey, what are you talking about,

20   right?

21   A.   More or less.

22   Q.   Okay.  Yeah.  You had been doing business with them,

23   and, in fact, you turned -- you have been doing business

24   with them for some time, at least a few years prior to

25   this, correct?

2046

Cross - Balentine

1    A.    Yeah.

2    Q.    All right.  And you talked to Porcelanosa because you

3    wanted to protect your territory, correct?

4    A.    Correct.

5    Q.    Right.  And you had the exclusive with Porcelanosa in

6    the Aspen and Pitkin County -- in Aspen and Pitkin County,

7    correct?

8    A.    Correct.  We have three showrooms.

9    Q.    Right.  And you -- and your -- it's a very high-end

10   tile, correct?  Luxurious tile?

11   A.    I wouldn't call it high-end.

12   Q.    Okay.  And to the best of your knowledge, after you

13   talked to them, Crew Tile has not sold into your territory

14   in either Pitkin County or Aspen, correct?

15   A.    I don't know.

16   Q.    Well, to the best of your knowledge.  You -- you're --

17   you do not know of any instance where they have done that,

18   correct?

19   A.    That's correct.

20   Q.    Right.  And when Mr. Griebel came in, he -- he told

21   you that they were going to have the  -- this is in

22   October, the exclusive distributorship for the state of

23   Colorado; do you recall that?

24   A.    Yes.

25   Q.    That's when you laughed at him, right?

2047

Cross - Balentine

1  A.   Maybe not to his face.

2  Q.   All right.  And after -- after that, are you aware

3  that in the contract that was entered into in December 14,

4  2009, your territory, Aspen and Pitkin County, was excluded

5  from their contract.

6  A.   I don't know anything about their contract.

7  Q.   But you do know that they have not gone, to the best

8  of your knowledge, anyway, they've not gone into your

9  territory since that time.

10  A.   I don't know.

11  Q.   Well, you don't have any instances in which that

12  occurred, to the best of your knowledge.

13  A.   Correct.

14  Q.   And you want to keep your exclusive territory to Aspen

15  and Pitkin County with regard to carrying Porcelanosa tile,

16  correct?

17  A.   Correct.

18        MR. BURG:  Thank you.  No more questions.

19        THE COURT:  All right.  Redirect?

20        MR. THOMAIDIS:  Thank you, Your Honor.

21                   REDIRECT EXAMINATION

22  BY MR. THOMAIDIS:

23  Q.   Mr. Balentine, I'm going to make this very quick.  Can

24  we please turn to trial Exhibit B-32.

25  A.   Do you want me to do that?

2048

Redirect - Balentine

1   Q.   I'm sorry?

2   A.   Here?

3   Q.   It should be on the screen momentarily.   Is --

4   A.   It's not up.

5   Q.   Is it not admitted?

6          THE COURT:   Which exhibit?

7          MR. THOMAIDIS:   Wow, this is --

8          THE COURT:   B-32.   It's stipulated.   Do you want

9   to move for its admission?

10          MR. THOMAIDIS:   If I may, Your Honor.   I thought

11   it was in.

12          MR. TeSELLE:   We show it's in.

13          THE COURT:   Okay.   All right.

14          MR. THOMAIDIS:   All right?

15          THE COURT:   Go ahead.

16   BY MR. THOMAIDIS:

17   Q.   Please put this up on the screen.   So please expand

18   that bottom e-mail.

19          So, Mr. Balentine, would you just take a moment to

20   review this document.

21   A.   Okay.

22   Q.   Were you aware that this litigation had been initiated

23   by Crew Tile Distribution?

24          MR. BURG:   Objection, Your Honor.   Foundation.

25          THE COURT:   Sustained.

2049

Redirect - Balentine

1    THE WITNESS:  No.

2    THE COURT:  Let's keep going.

3    MR. THOMAIDIS:  I'm -- all right.

4    BY MR. THOMAIDIS:

5    Q.   So were you aware that Crew Tile Distribution was

6    claiming to be the exclusive distributor of Porcelanosa

7    products in the state of Colorado?

8    A.   Yes, I was aware of that.

9    MR. BURG:  Object --

10   BY MR. THOMAIDIS:

11   Q.   And how did you become aware of that?

12   A.   I became aware of that when Crew Tile contacted me and

13   said they were a dealer, and had another client who

14   contacted me that they were told they needed to buy

15   material through Crew Tile in Denver.

16   Q.   Okay.  And do you recall that that -- strike that.

17   So let's go ahead and go back to trial Exhibit

18   A-10, please.  So, I want to put this one back up on the

19   screen and just ask you to take a moment to review this.

20   A.   Okay.

21   Q.   Okay.  So do you recall when you were -- when you

22   expressed your dissatisfaction what had happened in October

23   of 2009, do you recollect who called you?

24   MR. BURG:  Your Honor, this is cumulative.

25   MR. THOMAIDIS:  We can --

2050

Redirect - Balentine

1          MR. BURG:  We went over it prior to this.

2          THE COURT:  Let's move on to something new.

3          MR. THOMAIDIS:  Your Honor, can I move for its

4    admission either as a present sense impression or mental

5    state at the time under 801 -- or under 803(1), 803(3) --

6          THE COURT:  Which are we talking about?

7          MR. THOMAIDIS:  We're talking about the Balentine

8    correspondence, which is actually trial Exhibit A-10.

9          THE COURT:  One second.

10          MR. THOMAIDIS:  And I guess alternatively under

11    803(5) as a recorded recollection.

12          THE COURT:  Is there an objection?

13          MR. BURG:  Yeah, it doesn't meet any -- either of

14    those requirements, Your Honor.  It's not a recorded

15    recollection.

16          THE COURT:  All right.  It's not that, but what

17    was the other --

18          MR. THOMAIDIS:  I'm feeling this is like a raffle.

19    Present sense --

20          THE COURT:  That's good to know the acceptance of

21    the hearsay --

22          MR. THOMAIDIS:  I understand, and maybe I'm

23    missing --

24          THE COURT:  Go ahead.

25          MR. THOMAIDIS:  Present sense impression under

2051

Redirect - Balentine

1    803(1), or a mental state under 803(3).

2         THE COURT:  I'm going to let it in.

3         MR. THOMAIDIS:  Thank you, Your Honor.

4         THE COURT:  A-10 is admitted into evidence.

5    Objection overruled.  May be published to the jury.

6       (Defendants' Exhibit A-10 received)

7    BY MR. THOMAIDIS:

8    Q.  All right.  So let's take a look at this document, Mr.

9    Balentine.  I'll just walk you through it.  So do you

10   recall speaking with Mr. Paco Montilla on October 29th or

11   slightly before in 2009?

12   A.  I do.

13   Q.  Okay.  And do you recall him sending you this e-mail?

14   A.  I do, yes.

15   Q.  Okay.  And did he indicate to you at that time that

16   Crew Tile Distribution was not authorized to use the logos

17   and links of Porcelanosa and their website?

18        MR. BURG:  Your Honor, that would be hearsay.

19        THE COURT:  Well, this exhibit is -- is that

20   something that's in here?

21        MR. THOMAIDIS:  It is, Your Honor.

22        THE COURT:  Okay.  Yeah, the exhibit's admitted.

23   Go ahead.  Overruled.

24   BY MR. THOMAIDIS:

25   Q.  So did Mr. Montilla indicate to you that Crew Tile

2052

Redirect - Balentine

1   Distribution was not authorized to use logos and links in

2   their website in October of 2009?

3   A.   I can tell you what I recall.  I recall --

4   Q.   Please.

5   A.   -- being upset that I was told by some gentleman that

6   they would be my new go-to person for Porcelanosa and I was

7   very upset about that.

8        After talking to Paco, and Letisha, who was my

9   sales rep at the time, they assured me that wasn't the

10  case, I would continue to still buy through them.

11  Q.   So did he indicate to you at that time that the

12  statement that Crew Tile Distribution was making about

13  being distributors in the state of Colorado was mistaken?

14  A.   Correct.

15       MR. BURG:  Your Honor, I -- again, I'm not trying

16  to delay things here, but --

17       MR. THOMAIDIS:  I'm not either.

18       MR. BURG:  I don't know if it's the conversation

19  he's talking about, which is hearsay; this document is

20  clear what it says and he's --

21       THE COURT:  Right, I agree.  Sustained.

22       MR. BURG:  Thank you.

23  BY MR. THOMAIDIS:

24  Q.   Did Mr. Montilla ever indicate to you that he had any

25  other remedial measures planned related to Crew Tile

2053

Redirect - Balentine

1    Distribution?

2              MR. BURG:  Again, Your Honor --

3    BY MR. THOMAIDIS:

4    Q.   To the extent you can recollect?

5              MR. BURG:  It's hearsay.

6              THE COURT:  Sustained.

7              MR. BURG:  It's not -- thank you.

8              THE COURT:  Sustained.

9    BY MR. THOMAIDIS:

10   Q.   To the best of your recollection, did Crew Tile

11   Distribution do anything to correct the issues that you

12   brought to Porcelanosa Los Angeles' attention?

13             MR. BURG:  Objection.  Foundation.

14             THE COURT:  Overruled.

15             MR. BURG:  Speculation.

16             THE COURT:  Overruled.  You may answer.

17             THE WITNESS:  I'm sorry, what was the question

18   again?

19   BY MR. THOMAIDIS:

20   Q.   To the best of your recollection, did Crew Tile

21   Distribution do anything to remedy any remedial measures

22   related to your concerns that you expressed in October of

23   2009?

24   A.   Not to me, no.

25   Q.   Okay.  And were -- was anything ever -- you know what,

2054

Redirect - Balentine

1    I have no further questions, Your Honor.

2            THE COURT:  All right.  May this witness be

3    excused?

4            MR. THOMAIDIS:  They may, Your Honor.

5            THE COURT:  For the plaintiff?

6            MR. BURG:  Absolutely.

7            THE COURT:  All right.  Sir, thank you for joining

8    us.  You may step down.  You're excused.

9            All right, we're going to take our afternoon

10   break.  We will be in recess for 15 minutes.

11       (Recess at 3:08 p.m. to 3:26 p.m.)

12           THE COURT:  Defendants/counterclaimants may call

13   their next witness.

14           MR. THOMAIDIS:  Thank you, Your Honor.  At this

15   time, defendants and counterclaimants will call Mr. Patrick

16   McFarlen.

17           THE COURT:  Okay.  And as we discussed, Mr.

18   Thomaidis, you have 40 minutes on direct and five minutes

19   on redirect with a two-minute warning for both.

20           MR. THOMAIDIS:  Thank you, Your Honor.

21           THE COURT:  All right.

22           COURTROOM DEPUTY:  Stand up here for me.

23         PATRICK McFARLEN, DEFENDANTS' WITNESS, SWORN

24           COURTROOM DEPUTY:  Please be seated.  Please state

25   your full name for the record and spell your first and last

Direct - McFarlen

1    name.

2              THE WITNESS:  Patrick Wayne McFarlen.

3    P-a-t-r-i-c-k.  M-c-F-a-r-l-e-n.

4                        DIRECT EXAMINATION

5    BY MR. THOMAIDIS:

6    Q.   Mr. McFarlen, thank you very much for being with us

7    today.  I'm going to preliminarily ask you to move yourself

8    forward a little bit because the microphones are not as

9    sensitive as maybe I would like.

10   A.   All right.  No problem.

11   Q.   Thank you.  So can you please tell the Court and the

12   jury where you're presently employed.

13   A.   EKS&H, LLLP.

14   Q.   And so what is your present position there?

15   A.   I'm the valuation lead partner.

16   Q.   Okay.  And how long have you been a partner at EKS&H?

17   A.   Since 2011.

18   Q.   Okay.  And so can you briefly explain what EKS&H does.

19   A.   We're a Denver based CPA firm, so we do audit, tax and

20   consulting.

21   Q.   Okay.  And can you please tell the jury and the Court

22   a bit about your educational background.

23   A.   I have a bachelors from Metro State College here in

24   Denver.

25   Q.   Okay.  And what year did you obtain that degree?

Direct - McFarlen

1   A.   1999.

2   Q.   Okay.  And I will go ahead and tell you I'm going to

3   try to proceed through this fairly quickly because our

4   timelines are getting shorter and shorter, so --

5   A.   No problem at all.

6   Q.   Okay.  Thank you.  So what are your professional

7   credentials?

8   A.   I'm currently a CFA charter holder, a CPA, an ABV,

9   which is accredited in business valuation, and ASA, which

10  is accredited senior appraiser.

11  Q.   So if you were to go in order of what you just

12  described, would you just give everyone a brief description

13  of what those are.

14  A.   Yeah, CFA charter holder is -- that's a premier

15  financial designation that a lot of equity valuation

16  analysts use to, you know, value equity basically.

17          The ABV is something put on by the AICPA, which is

18  a test that you take and say you're accredited to do

19  business valuations.  Then the accredited senior appraiser

20  is the same thing, it's a multitude of tests, and then five

21  years of experience doing appraisal work full-time.

22  Q.   Okay.  And so when you say appraisal work full-time,

23  did you go through multiple positions or transitions?

24  A.   Yes.

25  Q.   Okay.  And so what were those transitions?

2057

Direct - McFarlen

1    A.    When I first started at EKS&H I was a staff valuation

2    analyst.  And then you move your way up to eventually being

3    partner.

4    Q.    Okay.  And so approximately when did you sign as the

5    primary signer of your first valuation report?

6    A.    As a primary signer, probably 2011, 2012.  Shortly

7    after I made partner.

8    Q.    And so how many valuations do you work on on an annual

9    basis at this point?

10   A.    It ranges, it's somewhere between 120 and 150.

11   Q.    Okay.  And so how many business valuation engagements

12   have you done since you've been at EKS&H?

13   A.    Well over 700.

14   Q.    Okay.  And so can you just explain briefly what the

15   types of companies are that you typically value.

16   A.    There's a lot of types of industries.  A lot of

17   manufacturing, a lot of distribution, is primarily the

18   primary highest percentage of valuations that I work on.

19   Q.    Okay.  And so what are some of the circumstances where

20   you end up doing a valuation for a company?

21   A.    There's a lot of different reasons but usually it's

22   around a transaction, so around a merger or acquisition.

23   And it's -- so it's trying to figure out how much they

24   should buy or how much they should sell for.

25   Q.    Okay.  And so have you ever done evaluation of -- with

Direct - McFarlen

1   respect to businesses with exclusive distribution

2   arrangements?

3   A.   I've done a couple.

4   Q.   Okay.  And when you say a couple, approximately how

5   many?

6   A.   Probably two or three.  Not too many.

7   Q.   Okay.  And so what are the circumstances involved in

8   exclusive distribution arrangements that you've previously

9   seen?

10  A.   Usually it's a spin-off of a bigger company or so the

11  holding company or the manufacturer will spin off their

12  distribution arm.  At some point operationally it didn't

13  make sense to them, so they would spin it off.

14  Q.   And so what, if any, under those circumstances, would

15  the relationship of the company be to the distributor?

16  A.   Usually related party.

17  Q.   Okay.  And is that the case with Crew Tile

18  Distribution and Porcelanosa -- the Porcelanosa defendants

19  here?

20  A.   No.

21  Q.   Okay.  Now, Mr. McFarlen, have you ever provided your

22  testimony in court before?

23  A.   One other time.

24  Q.   Okay.  And so what is your primary business emphasis?

25  A.   To actually advise companies on whether they should

2059
Direct - McFarlen

1   sell and how much they should sell for.

2   Q.   So would you say your area of emphasis and your

3   specialty is valuing businesses?

4   A.   Correct.

5   Q.   And it's not providing testimony in litigation?

6   A.   No.

7   Q.   After today, you may not want it to be ever again.

8        So I'm going to go ahead and ask you, in the paper

9   copies which I'm going to ask the clerk to maybe help me

10  with, in that -- in one of those binders is an

11  Exhibit B-41.  I'd like you to look at that.  That's

12  actually your expert report.

13  A.   Yes, this looks like it.

14  Q.   Okay.  And then following that is Exhibit B-42, which

15  is actually your rebuttal report to the expert report of

16  Mr. Hazel.  Do you remember doing that?

17  A.   Yes, I do.

18  Q.   Okay.  So if you need to reference those two reports,

19  they're going to be in front of you.  Okay?

20  A.   Thanks.

21  Q.   So, in general, what types of information do you look

22  at when you value a company?

23  A.   I usually start with the financial information, so tax

24  returns, financial statements and so forth.

25  Q.   Okay.  And so what, if anything, are you looking at

Direct - McFarlen

1  when you're looking at those documents?

2  A.  Financial statements you're looking for trending of

3  historical, where they have been, and hopefully eventually

4  that will give you a clue of where they're going.

5  Q.  Okay.  And so what else do you look at typically?

6  A.  So I look at that trending, you're looking at

7  liquidity of the company, so the ability for them to pay

8  their bills.  You're also looking at leverage.  So when you

9  look at the balance, sheet you're trying to figure out what

10  other risk factors, so if they can pay their bills on time;

11  and then if they start to accumulate too much debt, can

12  they pay off that debt in order to continue to grow, and

13  so -- and then we move over to the income statement,

14  similarly, you're looking for is the revenue growing over

15  time, are they a profitable company?  Are their expenses

16  growing faster than their revenue and so forth?  So

17  eventually for them to be a going concern you need cash

18  flow to pay the bills.

19  Q.  Okay.  And would you please define for everyone here

20  today what a "going concern" is.

21  A.  Going concern is basically the ability to continue to

22  operate as a business.

23  Q.  Okay.  And now in this case, you were asked to provide

24  a valuation opinion as it relates to two businesses,

25  correct?

2061
Direct - McFarlen

1  A.    Correct.

2  Q.    And what were those two businesses?

3  A.    Crew Tile Distribution, LLC, and Paradigm Tile & Stone

4  Distributors, LLC.

5         THE COURT:  Hold on.

6         MR. CROUGH:  Your Honor, he hasn't been offered as

7  an expert.  We're starting to get into expert opinion.

8         MR. THOMAIDIS:  I'll offer him as an expert, Your

9  Honor.

10        THE COURT:  He hasn't been asked for an opinion

11 yet, so overruled.

12 BY MR. THOMAIDIS:

13 Q.    So what types of market research do you look at in

14 addition to the previous documents when you're doing a

15 valuation?

16 A.    So market research is really looking at economic

17 factors, and then also industry.  So is the industry

18 growing, is there additional competition in the industry?

19 Would it bear entry in the industry and so forth?  So if it

20 advances the market, then the economic industry.

21 Q.    And what other factors do you look at when you're

22 doing a valuation of the business?

23 A.    And the last thing, just the overall company, itself.

24 So you're looking at the management team of the company.

25 Who is that management team, what's that management

2062

Direct - McFarlen

1   strength.  What kind of experience do they have.  Have they

2   ran the company similar to this before?  Yeah, so forth.

3           So the products they distribute, where did they

4   distribute them, so forth.

5   Q.    And so what was your understanding in reviewing the

6   documentation you did and providing your report -- strike

7   that.

8           So were you able to come to an opinion on the fair

9   market value of Crew Tile Distribution and Paradigm Tile &

10  Stone Distributors in this case?

11  A.    Yes, I was.

12  Q.    Okay.

13          THE COURT:  I think -- now --

14          MR. CROUGH:  Now we're there.

15          THE COURT:  We're at that point.

16          MR. THOMAIDIS:  And that's where I was going, Your

17  Honor.

18          At this time, we would offer Mr. McFarlen as an

19  expert in -- let me make sure I'm quoting -- in the fields

20  of business valuation and business valuation analysis.

21          THE COURT:  Any objection?

22          MR. CROUGH:  Your Honor, may I briefly voir dire

23  the witness?

24          THE COURT:  You may.

25                      VOIR DIRE EXAMINATION

Voir Dire - McFarlen

1   BY MR. CROUGH:

2   Q.   Mr. McFarlen, you testified that you evaluated two

3   exclusive distributorships businesses?

4   A.   Two or three, but yes.

5   Q.   Two or three?

6   A.   That's true.

7   Q.   Were any of those in the tile industry?

8   A.   No, they were not.

9   Q.   What was the first business, exclusive distributorship

10   that you evaluated?

11   A.   The most recent one, they're water treatment

12   products.

13   Q.   Water treatment products like chemicals?

14   A.   No, they actually are little devices that they put in

15   the water to sensor what kind of chemicals are in the

16   water, is there enough air in the water, so forth.

17   Q.   What about the second business, the exclusive

18   distributor business that you evaluated?

19   A.   It was clothing, retail.

20   Q.   Retail clothing.  And the third.

21   A.   The third was beverage, so . . .

22   Q.   What type of beverage?

23   A.   So sodas, waters, and a little bit of distilled

24   spirits.

25   Q.   So my understanding that you've never done a business

Voir Dire - McFarlen

1    valuation for a flooring business of any kind that has an

2    exclusive distributor arrangement.

3    A.    That would be true.

4    Q.    And do you have any experience in the flooring or tile

5    market place, professional?

6    A.    I do.

7    Q.    What experience is that?

8    A.    So I'm actually part of the construction niche.  Under

9    the construction niche includes everything from, you know,

10   commercial and residential real estate all the way down to

11   installing tile, dealers of tile, dealers of lumber,

12   dealers of doorways, so forth.

13   Q.    And in your experience there, have you ever done any

14   form of valuation of any of those businesses with relation

15   to an exclusive distributorship arrangement with a

16   manufacturer?

17   A.    No.

18   Q.    When you have been qualified once previously as an

19   expert to testify in court, what type of case was that?

20   A.    It was a marital dissolution.

21   Q.    Marital dissolution.  So nothing to do with a dispute

22   between a distributor of tile and manufacturer of tile; is

23   that fair?

24   A.    That's true.

25   Q.    And in that case, you were stipulated as an -- as an

Voir Dire - McFarlen

1    expert witness in that case, right?

2    A.    Yeah, I was approved by the Court, both sides.

3    Q.    Okay.  So you weren't actually offered and accepted as

4    an expert, but the parties agreed to have you testify?

5    A.    That is correct.

6              MR. CROUGH:  Your Honor, on that we object to Mr.

7    McFarlen in the areas that he's been designated for

8    expertise in this case.

9              THE COURT:  All right.  The objection's overruled.

10   Mr. McFarlen is qualified under Rule 702 to provide expert

11   opinion testimony on -- give me the areas again, Mr.

12   Thomaidis.

13             MR. THOMAIDIS:  I've -- maybe slightly different,

14   Your Honor, but as an expert in the areas of accounting,

15   business consulting, business valuation, and business

16   valuation analysis.

17             THE COURT:  All right.  In the areas of

18   accounting, business consulting, business valuation, and

19   business valuation analysis.

20                  DIRECT EXAMINATION (Continued)

21   BY MR. THOMAIDIS:

22   Q.    So, Mr. McFarlen, you reviewed Mr. Hazel's expert

23   report in this case, correct?

24   A.    I did.

25   Q.    And you, in fact, reviewed several, correct?

Direct - McFarlen

1   A.   There's multiple, yes.

2   Q.   Okay.  And did you have an opportunity to see Mr.

3   Hazel's CV, curriculum vitae, in this case?

4   A.   Yes, I did.

5   Q.   And did you have a chance to recollect how many times

6   he had provided litigation services with respect to

7   valuation?

8   A.   More than me.  I didn't count, but there's multiple

9   pages.

10  Q.   Was it hundreds?

11  A.   Again, I didn't count, but there's a lot.

12  Q.   Was it thousands?

13  A.   I do not know.

14  Q.   Okay.  So have you ever been disqualified as an expert

15  before?

16  A.   I have not.

17  Q.   Okay.  And so I'd like you to briefly walk through,

18  for the purposes of brevity today, what the results of your

19  analysis were and how you arrived at the results.

20  A.   Sure.  Going back to, you know, looking at financial

21  statements, looking at management team, looking at the

22  overall industry, the company was never able to have

23  profitable -- a profitable year at any year, to the point

24  where they weren't even paying salaries by the end of the

25  time.

Direct - McFarlen

1      So when you start with the income approach, start

2   looking at do they have the ability to actually have cash

3   flow, so from the end approach to the value of zero,

4   looking at the assets.  So you also look at the assets.  If

5   you think about it, if you buy a house, you mortgage that

6   house, if the house goes up, and the value of the -- the

7   assets is greater than the liabilities.

8      In this situation, from the first year they had a

9   loss, they continued to go into debt instead of being able

10  to have cash flow.  So at that point, if you look at the

11  net equity of the company, it was always negative.

12     Same situation, at that point, you say the value

13  is zero.  As soon as you have zero equity and zero cash

14  flow, you look at the market approach.  There were no

15  transactions that would actually indicate anybody would pay

16  anything for this company.  So the market approach, again,

17  was zero.

18     So my opinion across the board was zero or de

19  minimis.

20  Q.   Okay.  And so what exactly does the term "de minimis"

21  mean?

22  A.   It's really hard to say anything that's worth zero, so

23  I always say zero or de minimis, so somebody might pay them

24  a dollar to take something on, buy something from them.

25  Q.   And so we would then -- we had begun talking about the

2068

Direct - McFarlen

1    differences between Crew Tile Distribution and Paradigm

2    Tile & Stone Distributors before I qualified you as a

3    witness, or attempted to.

4         Can you go ahead and elaborate what your

5    understanding was of the two companies.

6    A.   So my understanding of the two different companies, is

7    that they're -- what I would call brother and sister

8    company, so they're similar, with similar ownership, but

9    yet Crew Tile was started in 2009, operated for a few

10   years, and then eventually wound down operations.  And then

11   at that point, Paradigm, with similar ownership, started

12   operations, and -- but basically doing similar things:

13   dealing tile.

14   Q.   Okay.  And so why were you directed to do an analysis

15   with both of those companies?

16   A.   My understanding is they -- the alleged contract was

17   going to be transferred from one entity to the other, so

18   they're alleging they went from one entity to the other.

19   So at that point we wanted to show what the value would be

20   for both.

21        MR. CROUGH:  Objection, Your Honor.  Outside the

22   scope of his report.  The allegation of transfer of the

23   company?

24        THE COURT:  I haven't reviewed his report recently

25   so I don't recall.

Direct - McFarlen

1       MR. THOMAIDIS:  And, Your Honor, it's on page 6 of

2   the report; however, I'll withdraw the question.

3       THE COURT:  All right.

4   BY MR. THOMAIDIS:

5   Q.   So you conducted your analysis on two separate legal

6   entities; is that right?

7   A.   Correct.

8   Q.   And you did that at my law firm's direction, correct?

9   A.   Correct.

10  Q.   Okay.  So did you review the purported exclusive

11  distributor agreement dated December 8th, 2009, as a

12  component of your analysis?

13  A.   I did.

14  Q.   Okay.  And did you consider the five-year term of the

15  purported distributor agreement when you did your analysis?

16  A.   I did.

17  Q.   And would this winding down that you described for

18  Crew Tile, would that have occurred during the term of the

19  distributor agreement?

20  A.   It would have.

21  Q.   Okay.  And would the winding up of Paradigm Tile &

22  Stone Distributors, LLC, also have occurred within the term

23  of that agreement?

24  A.   Again, yes.

25  Q.   Okay.  And so to your recollection, was Paradigm Tile

Direct - McFarlen

1    & Stone Distributors mentioned in the exclusive distributor

2    agreement in the course of your review?

3    A.    I did not see it.

4    Q.    Okay.  And so would you just explain briefly for

5    everyone what the methodologies were in coming and doing

6    your analysis, what -- the methodologies that you typically

7    employed.

8    A.    Sure.  So as I mentioned a little earlier,

9    asset-based, you're looking at the balance sheet,

10   understanding what the net assets were worth, how much debt

11   does the company hold at the time and if there's any

12   different between the two.

13         In this situation, again, we had zero equity or

14   negative equity every year.  If you go over the income

15   approach you're looking at cash flow, so you're looking at

16   normalized earnings.

17         Does this company have the ability to generate

18   profit, generate cash flow?  And in order for any company

19   to continue to grow, that cash flow has to continue to grow

20   to fund operations.

21         And then you look at the market approach and you

22   look at transactions that have eventually taken place and

23   to see how they were contemplated, how they were bought.

24   Q.    And so which of those analysis -- based on your

25   experience valuing businesses, which of those analyses is

Direct - McFarlen

1    most viable in this situation?

2    A.    Usually it will be the income approach.

3    Q.    Okay.  And so what approach did you ultimately employ?

4    A.    I actually employed all three, but in the -- they all

5    have the same indication of zero, so you could argue I did

6    all three.

7    Q.    Okay.  And so in the asset-based approach, what, if

8    any, importance is placed on the initial capitalization of

9    the company?

10   A.    Just a little bit to see the initial investment by the

11   owners of the company.

12   Q.    And so what information or financial statements do you

13   look at to determine the capitalization of the company?

14   A.    Usually you can look at the balance sheet and look at

15   the equity.  The equity line usually has a line that says

16   paid in capital, or something similar to that that shows

17   how much capital was put in.

18   Q.    And in this case, the plaintiffs and counter

19   defendants have said that they contributed $557,991 to Crew

20   Tile Distribution.  As a result of your analysis, do you

21   have an opinion as to how much money or assets were

22   contributed to Crew Tile?

23   A.    By the tax returns that I looked at, it would be less

24   than 50,000, as far as I can tell.  The tax returns are

25   missing information, so I'm sort of backing into that based

Direct - McFarlen

1    on the net income, the net loss for the year, and the

2    equity at the end of the year.  So I have to back into it,

3    but it's approximately 50,000 of true capital.

4    Q.   Okay.  Now what do you mean by "true capital"?

5    A.   Well, the company didn't continue to incur debt.

6    When I was looking at the schedules, you can see that some

7    of that debt might be related party debt.  I saw a HELOC

8    mentioned, so stuff like that.  But it's not true cash, not

9    true capital.  It's debt.

10   Q.   Okay.  And so if I understand correctly, loans to the

11   company would not be considered true capital.

12   A.   Absolutely not.

13   Q.   Okay.  And so can you speak generally about what --

14   some of the things that you found in the tax returns as you

15   were reviewing them, to the extent you can recollect, or

16   you can reference your report.

17   A.   Well, and so, I mean, just year over year you saw very

18   flat growth.  And that overall, the company didn't make a

19   profit.

20          And then the other thing that I noticed is, if you

21   looked at the compensation in 2010 and you can see it go

22   down to zero by 2012.  So I think those are the three major

23   points I saw on the tax return.

24          The only other thing I would say is the 2010 tax

25   return, the balance sheet wasn't even included.

2073

Direct - McFarlen

1   Q.   Okay.  And so when you say the compensation, what are

2   you referring to?

3   A.   The salary of every employee of the company.

4   Q.   Okay.  And those went to zero by 2012?

5   A.   Correct.

6   Q.   Okay.  And what about the years prior to 2012?

7   A.   I don't recollect, but they were under 20,000 and then

8   they basically, if I remember right, 20,000 down to 10,

9   down to zero, approximately.

10  Q.   So what happened in your analysis -- just a general

11  level, with your analysis of Paradigm Tile & Stone

12  Distributors, LLC?

13  A.   Very similar to Crew Tile.  You saw the startup of the

14  company; again, was not able to show a profit; continued to

15  take on more leverage in order to fund the net loss.  So

16  very similar to Crew Tile.

17  Q.   Okay.  And so what about -- what about staffing,

18  management and employees?  Were you able to come to any

19  conclusions with respect to the analysis of these documents

20  about how many employees there were and how it would ramp

21  up over time and if it grew or ramped down over time if it

22  got smaller?

23  A.   Not necessarily on how many people, but I can tell you

24  that they weren't paying them a lot.  Again, the salary was

25  very low for every year that we saw.

Direct - McFarlen

1    Q.   Okay.  And so were you able to ever ascertain whether

2    Crew Tile Distribution or Paradigm Tile & Stone

3    Distributors were ever able to generate positive cash flow?

4    A.   Yes, and they were not.

5    Q.   And so given some of these circumstances, what, in

6    your opinion -- in your expert opinion, was the fair market

7    value of Crew Tile Distribution as of December 31st, 2012?

8    A.   Zero.

9    Q.   Okay.  And under the similar income approach, in your

10   opinion what was the fair market value of Paradigm Tile &

11   Stone Distributors as of 12-31, 2013?

12   A.   Same, zero.

13   Q.   Okay.  And in your opinion under the same income

14   approach, what was the fair market value of the combined

15   companies as of December 31st, 2013?

16   A.   Same, zero.

17   Q.   Okay.  And so can you please tell everyone in the

18   courtroom a little bit about what a Monte Carlo analysis

19   is.

20   A.   Monte Carlo allows the analyst to basically create a

21   range of values for any scenario.  And so if you think

22   about it, when you have an unknown -- so if you are trying

23   to guess what tomorrow's weather will be like, nobody can

24   really guess what tomorrow's weather will be like, but what

25   you can say is you can range it from, you know, based on

2075

Direct - McFarlen

1    the clouds, based on the wind, it will be somewhere between

2    70 and 80 degrees.  So Monte Carlo lets you put in that

3    range for any assumption that you really want.  Simple

4    understanding of what Monte Carlo is.

5    Q.    So do you put value as an expert in a Monte Carlo

6    analysis in a situation like this?

7    A.    Absolutely do, especially when I'm advising my

8    clients, because you don't always know exactly what the

9    value of the company is that they will buy or sell, and so

10   you try to give them a range, and so you try to give them,

11   what does it look like if they only grow 2 percent, what

12   does it look like if they grow 7 percent.  So those types

13   of analyses is extremely important in my world.

14   Q.    And so what was your -- can you give an overview of

15   your findings when you did a Monte Carlo analysis in this

16   case?

17   A.    Yeah, so what I did is I went over all the major

18   assumptions, so there was seven different assumptions that

19   I indicated as the major assumptions, both out of my report

20   and Mr. Hazel's report, and so I Monte Carloed on those

21   seven reports -- seven assumptions that meeting of -- the

22   indications was still zero, and then the average was about

23   150,000.

24   Q.    Okay.  Now, to your knowledge, when you were looking

25   at Mr. Hazel's report, did he account for any of the

Direct - McFarlen

1    litigation that was occurring or had occurred with respect

2    to Crew Tile Distribution?

3    A.   Not that I saw on the financial statements.

4    Q.   So, for example, there was a $104,000 judgment entered

5    against Crew Tile Distribution in the latter half of 2012.

6    Was any of Mr. Hazel's reporting accounting for that when

7    he was doing his analyses?

8    A.   Not that I noted.

9    Q.   Okay.  When Mr. Hazel was ramping up and indicating

10   that Crew Tile was having increased value over time using

11   Porcelanosa Los Angeles' sales numbers, was he accounting

12   for additional management or employee personnel when he did

13   so?

14   A.   In his rebuttal of mine, I believe he used it on the

15   valuation side, but he did a lost-profit analysis that he

16   did not include it on there.

17   Q.   Okay.  And so would you say that that rendered those

18   fundamentally inaccurate?

19   A.   My opinion, it would be to say yes.

20   Q.   So last week Mr. Hazel testified as to Crew Tile's

21   negative inventory value in 2009, 2010, and 2011.  As an

22   accountant, and as a business valuation person, what does

23   it mean to you to have a negative inventory value?

24   A.   I -- that's not a standard.  It doesn't exist.  You

25   can't have negative inventory.  You either have brought an

Direct - McFarlen

1   asset and you own the inventory or you don't.  So once you

2   buy it, you add the asset and then you sell it and you

3   reduce the asset, so you never have negative inventory.

4   Q.   Okay.

5   A.   I'm unclear what he was referring to.

6   Q.   Okay.  And so Mr. Hazel also opined that a company

7   could be losing money year over year, but still have

8   inherent value.  And in doing so, he referenced a couple of

9   companies, one of them was Uber.  Would you consider the

10  inherent value in a company like Uber to be similar to a

11  company like Crew Tile Distribution?

12  A.   Absolutely not.

13  Q.   How so?

14  A.   Uber is a -- it's different.  You're comparing apples

15  to oranges in that situation.  And, No. 1, Uber does have a

16  net loss, but they're a public company, so you get the

17  behavior of every investor out there.  Also if you look at

18  Uber, there's intellectual property.  Crew Tile doesn't

19  have intellectual property.  Intellectual is the program,

20  the system, that app that you use for Uber.  Stuff like

21  that gives companies that are technology based more value

22  whether they're profitable or not.

23  Q.   And so what about Paradigm Tile & Stone, would there

24  be any different analysis that would apply to it?

25  A.   No.  They're the same.

Direct - McFarlen

1   Q.   So do you agree with Mr. Hazel's findings regarding

2   the fair market value of Crew Tile Distribution and

3   Paradigm Tile & Stone Distributors are companies being

4   calculated on a combined basis?

5   A.   My opinion, it would be no; but -- I would say no, I

6   would separate them out.

7   Q.   And why is that?

8   A.   Again, going back to the contract, it's for Crew Tile

9   Distribution, so I -- I make my analysis to Crew Tile.

10  Q.   Okay.  In your opinion, was the fair market value of

11  Crew Tile Distribution, Paradigm Tile & Stone Distributors,

12  or the two companies on some kind of a combined basis, was

13  that greater than $2.5 million dollars?

14  A.   Absolutely not.

15  Q.   Okay.  And just so we're clear on your testimony, what

16  exactly was your opinion of the value of Crew Tile

17  Distribution, Incorporated?

18          MR. CROUGH:  Objection, Your Honor.  Asked and

19  answered.

20          THE COURT:  It depends as of what day.

21  BY MR. THOMAIDIS:

22  Q.   As of -- as of today's date -- no, actually, let me

23  rephrase.  As of December 31st, 2012, what was the value of

24  Crew Tile Distribution, Incorporated?

25          MR. CROUGH:  Objection, Your Honor.

2079

Direct - McFarlen

1    THE COURT:  Sustained.  He's already testified as

2    to December 31, 2012 and 2013 as to both companies.

3    MR. THOMAIDIS:  I'm sorry, Your Honor.

4    BY MR. THOMAIDIS:

5    Q.    So as of today's date, does Crew Tile Distribution,

6    Incorporated, have any inherent value?

7    A.    They have no value.

8    MR. CROUGH:  Objection, Your Honor.  Beyond the

9    scope of his report.

10   MR. THOMAIDIS:  All right.

11   THE COURT:  Sustained.

12   MR. THOMAIDIS:  Bear with me one second, please.

13   BY MR. THOMAIDIS:

14   Q.    As of July 7th, 2015, did Crew Tile Distribution,

15   Incorporated, have any inherent value?

16   A.    No.

17   Q.    And as of July 7th, 2015, when you completed your

18   report in this matter, what about Paradigm Tile & Stone

19   Distributors?

20   A.    No.

21   Q.    And in terms of completing your expert reporting as of

22   July 7th, 2015, did the two companies, combined, have any

23   inherent value?

24   A.    No.

25   MR. THOMAIDIS:  Okay.  Your Honor, I have no

Cross - McFarlen

1    further questions at this time.

2         THE COURT:  All right.  Cross-examination.

3         Mr. Crough, just to confirm, because we have a

4    different courtroom deputy, you have a 30-minute limit and

5    I believe you asked for a five-minute warning.

6         MR. CROUGH:  That's correct, Your Honor.

7         THE COURT:  All right.

8                   CROSS-EXAMINATION

9    BY MR. CROUGH:

10   Q.   Good afternoon, Mr. McFarlen.

11   A.   Good afternoon.

12   Q.   We've met once before; is that correct?

13   A.   That is.

14   Q.   It was at your deposition.  I didn't take it, but I

15   was in the room attending; do you remember that?

16   A.   I think you took some of it, but yes.  I do remember

17   you being there.

18   Q.   Now, you were hired by Porcelanosa to give testimony

19   in this case; is that right?

20   A.   That is true.

21   Q.   And they're paying -- they are here paying you for

22   your testimony here today, correct?

23   A.   They are.

24   Q.   Now you work with EKS&H, that's the same company that

25   employs Kent McSparran, another expert who preceded you on

2081

Cross - McFarlen

1    the stand here today; are you aware of that?

2    A.    That is true.

3    Q.    And, in fact, defendants and their lawyer came to

4    EKS&H and I believe they retained Mr. McSparran, and he

5    brought you on board to work on the project; is that right?

6         MR. THOMAIDIS:   Your Honor, he has no subject

7    matter of this.

8         THE COURT:   Well, he might have.   They work in the

9    same firm.   You may answer.   Overruled.

10        THE WITNESS:   That is correct.

11   BY MR. CROUGH:

12   Q.    Okay.   How much does EKS&H, as a firm, charge for its

13   services to date for opinions in this matter?

14   A.    I don't -- I don't have that in front of me.   I do not

15   know.

16   Q.    You're a forensic accountant and you don't know how

17   much you've charged to date for your services?

18   A.    No.   Not as a firm.

19   Q.    When we took your deposition back in December of 2015,

20   which was about a year and four months ago, do you remember

21   how much you had been paid at that point?

22   A.    I remember it was probably on the 15,000 mark.

23   Q.    15,000 or 40,000?

24   A.    Well, it depends, are you talking about the valuation

25   or the firm?

2082

Cross - McFarlen

1    Q.   Let's say your portion.  For your portion of your

2    testimony, as of December 2015, isn't it true that you

3    charged approximately 15- to $20,000 back then?

4    A.   Correct.

5         MR. THOMAIDIS:  Your Honor, he's ambiguous as to

6    "you."

7         THE COURT:  I think he's trying to distinguish

8    between the firm and the witness.  But let's make that

9    clear in the questions.

10   BY MR. CROUGH:

11   Q.   Okay.  You, Mr. McFarlen, your valuation of Crew Tile,

12   you incurred approximately 15- to $20,000 worth of fees as

13   of December 2015; isn't that correct?

14   A.   Approximately, that's true.

15   Q.   Okay.  And at the -- as of 2015, your firm had billed

16   at least $40,000 between you and Mr. McSparran, correct?

17   A.   I -- that sounds about right.  I would have to

18   confirm.

19   Q.   And how much more have you spent or incurred since

20   that point, a year and three months?

21   A.   If I'm throwing out a number, 10- to 15,000.

22   Q.   10- to 15,000 more.

23   A.   Correct.

24   Q.   For you or for Mr. McFarlen, or combined?

25   A.   I would say combined.

Cross - McFarlen

1   Q.   Combined.  So we're somewhere around $60,000; is that

2   accurate?

3   A.   I'm guessing, but I wouldn't doubt it.

4   Q.   And in your opinions, for $60,000, a portion which is

5   yours, your opinion here is Crew is worth nothing?

6   A.   What do you mean by a portion of it is mine?

7   Q.   Well, let's assume that your number's 30,000 that you

8   charge so far.  So for 30,000, the opinions that you're

9   giving of the defendants here is zero -- or a dollar, I

10   think is what you said.

11   A.   That is true.

12   Q.   Now, you claim to be neutral in your analysis in this

13   case; is that right?

14   A.   Absolutely.

15   Q.   You met with Mr. James Thomaidis and members of his

16   firm, correct?

17   A.   That is true.

18   Q.   And he gave you information and documents to review,

19   correct?

20   A.   That is true.

21   Q.   And he told you about the parties and the facts of the

22   case; isn't that right?

23   A.   That is true.

24   Q.   And, in fact, you advocate for the position that Crew

25   Tile was a dealer; isn't that true?

2084

Cross - McFarlen

1    A.    Yes.

2    Q.    Now, in your opinions in this case that Crew has no

3    value, you say that that opinion does not change whether or

4    whatever conduct the defendants may have engaged in; is

5    that right?

6    A.    That is true.

7    Q.    Okay.  And, in fact, you're not here to give opinions

8    about damages because you don't know what damages were or

9    were not caused by the alleged breach of contract by

10   defendants, correct?

11   A.    That is correct.

12   Q.    So when Mr. Hazel opines about damages, you're not

13   here to say that his damages calculations are wrong because

14   you weren't retained to opine on damages, correct?

15   A.    That is correct.

16   Q.    Now, you mentioned three approaches in doing an

17   analysis:  asset, market, income.  The jury's heard a fair

18   amount of that economic analysis already.

19   A.    Sure.

20   Q.    So you would agree that the asset approach in this

21   case is not optimal because Crew simply didn't have

22   significant tangible assets as parts of its business model,

23   correct?

24   A.    Correct.

25   Q.    And in looking at the market approach, what you're

Cross - McFarlen

1   doing is looking for comparable companies and what those

2   have sold for in an effort to draw an analogy of Crew Tile;

3   is that right?

4   A.   That's correct.

5   Q.   And, in fact, to your knowledge, none of the companies

6   that you looked at in the market approach were exclusive

7   distributors, correct?

8   A.   That is correct.

9   Q.   And in doing your market analysis, you didn't look at

10  any other Porcelanosa distributors, correct?

11  A.   I did not.

12  Q.   In fact, you didn't even look at any other Porcelanosa

13  dealers, correct?

14  A.   Correct.

15  Q.   In fact, that information wasn't even given to you by

16  Porcelanosa or its lawyers, correct?

17  A.   That is correct.  I did not ask for it.

18  Q.   Now, in the primary background market research, in

19  fact you didn't look at anything about Porcelanosa.  You

20  only looked at companies that you considered to be

21  competitors, correct?

22  A.   I looked at Porcelanosa's products and similar

23  products in order to get that competition, but you're

24  right, I looked at competition.

25  Q.   In other -- you didn't even look at Porcelanosa,

Cross - McFarlen

1    itself, correct?

2    A.   Well, I -- I guess clarify.

3    Q.   Let me clarify.  In doing the market analysis, you

4    didn't look at Porcelanosa, as a company, as a comparable,

5    rather, you looked at other companies that you considered

6    to be competitors, right?

7    A.   Correct.

8    Q.   All right.  And when we asked you in deposition, you

9    couldn't name even one single competitor; isn't that

10   correct?

11        MR. THOMAIDIS:  Object, Your Honor.  It misstates

12   the evidence.

13        THE COURT:  Well, we don't know what the -- we

14   don't know what he said in the deposition.  Competitor to

15   whom?

16        MR. CROUGH:  Competitor of Porcelanosa.

17        THE WITNESS:  If I remember right, I said there's

18   multiple competitors to Porcelanosa.

19   BY MR. CROUGH:

20   Q.   Let me rephrase the question.  Can you name one

21   competitor of Porcelanosa that sells comparable tile to

22   what Porcelanosa sells in the United States?

23   A.   No.

24   Q.   Now, part of competition in business is the ability to

25   buy other products; isn't that right?

2087

Cross - McFarlen

1   A.   Again, you have to clarify.

2   Q.   Let me rephrase it.  Part of your opinions in this

3   case is that the exclusivity that Crew has is not

4   necessarily something of value; is that fair?

5   A.   That is true.

6   Q.   And in order to be competitive in business, the

7   ability to buy another product and supply customers is

8   helpful so, in your opinion, exclusivity could have less

9   value; isn't that right?

10   A.   That's true, especially for a small company.

11   Q.   Okay.  And in your deposition, you said that there are

12   lots of substitute products to Porcelanosa; isn't that

13   right?

14   A.   That is true.

15   Q.   And you haven't been here in court listening to the

16   testimony of Porcelanosa's own witnesses when they're

17   talking about what are substitute products for Porcelanosa,

18   correct?

19   A.   Correct.

20   Q.   You're aware that Porcelanosa is a luxury tile,

21   correct?

22   A.   I do know that.

23   Q.   And, in fact, the luxury tile used at the Denver

24   International Airport, you're aware of that, correct?

25   A.   Correct.

Cross - McFarlen

1          MR. THOMAIDIS:  Your Honor, he has no subject

2     matter knowledge about this.

3          THE COURT:  He's already answered it, so let's go

4     forward.

5     BY MR. CROUGH:

6     Q.   Now, Mr. McFarlen, you primarily relied on the income

7     approach in reaching your opinions in this case, would you

8     agree?

9     A.   As I stated earlier, I looked at all three.  All three

10    came up to zero.

11    Q.   Yeah, but between the market and the income approach,

12    the income approach is most appropriate here, correct?

13    A.   Correct.

14    Q.   And now in doing your analysis, you did not look at

15    any of the Porcelanosa sales in Colorado between 2009 and

16    2014, correct?

17    A.   Outside of Crew Tile sales, correct.

18    Q.   Correct, you did not look at Porcelanosa's own sales

19    data --

20    A.   That's correct.

21    Q.   -- in reaching your analysis?

22    A.   Correct.

23    Q.   In fact, you didn't even see the importance of

24    Porcelanosa's sales over the five years when Crew had the

25    exclusive, to see what value that right would have had,

2089

Cross - McFarlen

1   correct?

2   A.   Correct.

3   Q.   And in your experience, would it be unusual for a

4   multi-national corporation like Porcelanosa to produce five

5   different sets of sales data?

6   A.   I don't know if I can answer that.  I don't know.

7   Q.   You don't know?

8   A.   No.

9   Q.   In working with other companies doing business

10  valuations and you ask for their sales data, is it common

11  for you in your profession to receive multiple different

12  sets?

13  A.   Yes, it is common.

14  Q.   Is it common that those sets cannot be reconciled?

15  A.   Usually it takes a little massaging to reconcile them,

16  but you can get there.

17  Q.   You can get there.  What if you can't get there?

18  A.   You have to do some more digging.  I don't know --

19  Q.   Is that a red flag for you?

20  A.   Bad systems, maybe, but not necessarily a red flag for

21  the overall company, itself.

22  Q.   It would be something that you would be concerned

23  about and ask the client about, certainly?

24  A.   It would be a risk factor if I was valuing

25  Porcelanosa.

Cross - McFarlen

1    Q.   Risk factor.  So something that you would take into

2    account when you're seeking the value of their business.

3    If you can't reconcile their own sales data, that's a

4    potential risk in valuing the company, then.

5    A.   I was referring to systems, but obviously the sales

6    data's coming out of systems.

7    Q.   Fair enough.  Now, in doing your analysis of Crew

8    Tile, you did not look at the pipeline of Crew Tile's

9    project when doing an income analysis, correct?

10   A.   What do you mean "pipeline"?

11   Q.   Sales going forward from the end of the exclusivity

12   agreement, or potential sales, isn't that a term --

13   pipeline is not a term you use in your business?

14   A.   Backlog.  It's usually called backlog.

15   Q.   Backlog.  You didn't look at Crew Tile's backlog from

16   projects when doing your income analysis, correct?

17   A.   I was unaware that they had any sales at that time.

18   Q.   Okay.  But -- and you didn't even ask to look at that

19   info, correct?

20   A.   Correct.

21   Q.   And what you did find significant in doing your income

22   analysis is there was a drop off in sales from 2012 into

23   2013 showing a downward trend; would you agree?

24   A.   Correct.

25   Q.   Now -- now at the same time that that downward trend

Cross - McFarlen

1    began occurring, there was hundreds of thousands of dollars

2    of sales into Colorado done by Porcelanosa, correct --

3    direct; isn't that true?

4    A.   I'm unaware of that.  Again, I didn't look at the

5    sales data.

6    Q.   So you just don't even know --

7    A.   I don't --

8    Q.   -- what Porcelanosa was selling direct in --

9    A.   No.

10   Q.   -- 2012 and into 2013, you were only looking at

11   Crew?

12   A.   Exactly.

13   Q.   So around the time of Operation Shut Down in April of

14   2013 -- let me rephrase.

15           Have you ever heard of the term Operation Shut

16   Down?

17   A.   Well, I think I know what you're talking about, but is

18   that a code term for something?

19   Q.   It's a document that's been used significantly in this

20   case.  Are you aware of what Operation Shut Down means in

21   this case?

22   A.   No.

23   Q.   No.  So just so I'm -- so you're not aware that

24   Porcelanosa instituted Operation Shut Down in April of 2013

25   in a conference call to Crew Tile?

Cross - McFarlen

1   A.   No.

2   Q.   Now, since you didn't have any of the Porcelanosa

3   sales data, necessarily, you didn't and could not have

4   considered any of the direct sales being made into Colorado

5   by Porcelanosa from 2012 on in your valuation of Crew Tile;

6   isn't that true?

7   A.   That is true.

8   Q.   And you have been critical of the viability of Crew

9   Tile based on the fact that they were losing money, true?

10  A.   Correct.

11  Q.   Now, you're aware Crew Tile was a start-up company.

12  A.   Yes.

13  Q.   And you know it's not uncommon for start-up companies

14  to lose money initially for the first few years, correct?

15  A.   In this situation, this industry, I would say

16  absolutely not correct.

17  Q.   Not correct.  Let's talk about start-up companies in

18  general.

19  A.   Depends on how much you have to invest in order to get

20  in the market.

21  Q.   Okay.  So you would agree that it takes some money to

22  invest in order to get into the market initially?  Right?

23  A.   Sure.  Yes.

24  Q.   Were you aware of who was funding the initial

25  investment on how to get into that market, whether it was

Cross - McFarlen

1  Porcelanosa or whether it was Crew Tile?

2  A.   No.

3  Q.   You don't know that information?

4  A.   If they're a dealer, then they -- if they're well

5  capitalized, once they put their initial capitalization in

6  there, Day 1, because of the infrastructure they should be

7  able to fund it at a reasonable rate, even year one, based

8  on my experience.

9  Q.   Year one -- your expectation is that a business like

10  Crew Tile, starting from year one making an initial capital

11  investment, and then it's all roses and profit from there;

12  is that what I'm hearing?

13  A.   I'm not saying roses and profit.  I said they should

14  be at least break-even.

15  Q.   At least break-even, okay.  So turning profitable by

16  year one?

17  A.   Hopefully.

18  Q.   And that's your opinion in this case, that's the

19  analysis of Crew Tile without looking at anything that

20  Porcelanosa --

21  A.   Right.  If they're well capitalized.

22  Q.   In terms of capital, you have no idea how much

23  additional capital was available to Crew Tile to fund

24  ongoing operations, correct?

25  A.   Outside of Crew Tile?

Cross - McFarlen

1    Q.    Outside of Crew Tile.

2    A.    I do not.

3    Q.    Other than what's in their books, you have no idea

4    what access to capital they had.

5    A.    Correct.

6    Q.    Now, let's talk briefly about the 2009 distribution

7    contract.  And in your opinion, the five-year exclusive

8    agreement doesn't really pertain to the value of Crew Tile,

9    correct?

10   A.    Correct.

11   Q.    And it's your opinion that the existence of the

12   five-year exclusive agreement has no impact on the fair

13   market value of Crew Tile, right?

14   A.    As I stated earlier, if anything it's a detriment.

15   Q.    Okay.  And you've already gotten it here, so, in fact,

16   in your opinion, the existence of the agreement, itself,

17   not only has no value, but it's potentially a detriment to

18   the owner of that, right?

19   A.    Correct.

20   Q.    Because in your opinion, exclusivity would have less

21   value because in order to successfully compete, you would

22   need the ability to buy other products, right?

23   A.    It allows -- there's -- you're stuck with Porcelanosa.

24   So if Porcelanosa does great, you do well.  If they do bad,

25   you do bad.

2095

Cross - McFarlen

1   Q.   Okay.  So you're stuck with one manufacturer.  I

2   believe you referred to it in your report as credit risk.

3   A.   Yes.

4   Q.   Is that right?

5   A.   Absolutely.

6   Q.   Okay.  And in the way you refer to it, is as a

7   concentration of credit risk.

8   A.   Absolutely.

9   Q.   Okay.  So in this case, the credit risk is, in fact,

10  having Porcelanosa as Crew Tile's only supplier.  And if

11  Porcelanosa is unwilling to supply, it would have a

12  negative impact on operations.

13          MR. THOMAIDIS:  Your Honor, compound, and calls

14  for speculation.

15          THE COURT:  Overruled.  You may answer.

16          THE WITNESS:  Can you restate the question?

17  BY MR. CROUGH:

18  Q.   Sure.  So in this case, the credit risk is having

19  Porcelanosa as Crew Tile's supplier.  And if Porcelanosa is

20  unwilling to supply product, it would have a negative

21  impact on Crew Tile's operations, correct?

22  A.   That is correct.

23  Q.   So you would agree that if Porcelanosa decided that

24  they weren't going to supply products to Crew Tile as the

25  exclusive distributor, Crew Tile would suffer a negative

Cross - McFarlen

1  impact, correct?

2  A.   Correct.

3  Q.   Because of the exclusivity, right?

4  A.   Correct.

5  Q.   So if Porcelanosa decided to slow-play orders in 2013

6  and not supply product, that would have a negative impact

7  on the overall valuation of Crew Tile down the road, right?

8  A.   Yes.

9  Q.   And, in fact, if Porcelanosa began directing Crew

10  Tile's customers to buy directly from Porcelanosa in

11  October of 2013, that would have a negative overall impact

12  on the Crew Tile valuation, correct?

13  A.   Correct.

14  Q.   And, finally, if Porcelanosa decided to cut off all

15  products to Crew Tile in January of 2014, that would have a

16  really big negative effect on the valuation of Crew Tile.

17  A.   Correct.

18  Q.   And you'd mentioned that you looked at some records

19  and you think that the only money invested was $50,000.  Do

20  you remember that testimony?

21  A.   Based on the tax returns.

22  Q.   Based on the tax returns.  You didn't look at any of

23  the bank records, right?

24  A.   I did not.

25  Q.   No.  There's been bank records shown in this case,

Cross - McFarlen

1    we've gone through a number of them line by line.  You

2    didn't look at any of that, correct?

3    A.    No, I relied on the U.S. federal income tax returns.

4    Q.    Income tax returns, okay.

5    A.    Yes.

6    Q.    You didn't look at Glenn and Darlyne Davis' retirement

7    accounts, right?

8    A.    I did not.

9    Q.    No statements there.  So you wouldn't have any

10   knowledge that they had liquidated retirement accounts in

11   order to fund Crew Tile, right?

12   A.    Correct.

13   Q.    Now, in terms of exclusivity, depending on the demand

14   for the product at issue, the existence of an exclusive

15   right to distribute that product may have significant value

16   under the right circumstances.  You'd agree with that,

17   right?

18   A.    I agree.

19   Q.    But in this case, you're here to say that the

20   existence of the exclusive right to sell the luxury product

21   of Porcelanosa in Colorado has no impact on your valuation

22   of Crew Tile?

23   A.    Everything I've looked at, absolutely, I agree.

24   Q.    Let's look at the "2.5 million or value of the

25   company" clause in the contract.  There's been some

2098
Cross - McFarlen

1    discussion of that.

2    A.    Yeah.

3    Q.    Are you aware that Mr. McSparran, in his retention in

4    this case, was brought in this courtroom to express

5    opinions about the reasonableness of that clause?

6    A.    I do not.  I'm not aware of any of his testimony.

7    Q.    Are you aware of any of his reports?

8    A.    I didn't review his reports, no.

9    Q.    You -- you're a partner in this case, in the same

10   firm --

11   A.    No.

12   Q.    -- to dovetail testimony, you haven't looked at any of

13   his opinions?

14   A.    I have not.

15   Q.    Well, let me ask you, then:  Do you find it

16   unreasonable that if a company -- a distributor like Crew

17   Tile is going into what they believe to be an exclusive

18   distributorship arrangement where they're going to have

19   this concentration of credit risk, would you agree that it

20   would be reasonable for them to want some form of assurance

21   that they aren't going to have their legs cut out from

22   under them by the manufacturer at any given time?

23             MR. THOMAIDIS:  Your Honor, there's -- this is

24   so --

25             THE COURT:  Sustained.

Cross - McFarlen

1          MR. THOMAIDIS:  Thank you.

2     BY MR. CROUGH:

3     Q.   Mr. McFarlen, would you agree that it would be

4     reasonable for Crew Tile to ask for a termination clause so

5     Porcelanosa couldn't walk away from the contract?

6          MR. THOMAIDIS:  Calls for speculation.

7          THE COURT:  That's not what he's testifying about.

8     Sustained.

9          MR. CROUGH:  Well, he's being offered for business

10    management service as well, correct?  Business consulting?

11         THE COURT:  Don't argue with me, counsel.  I

12    ruled.  Sustained.

13         MR. CROUGH:  Okay.

14    BY MR. CROUGH:

15    Q.   Would it be a reasonable business position for Crew

16    Tile to request a contract termination fee?

17    A.   Please restate the question.

18    Q.   Would it be a reasonable business position for Crew

19    Tile to request a contract termination fee?

20    A.   In my opinion, sure.

21    Q.   And, in fact --

22    A.   Or --

23    Q.   And, in fact, if you personally were the owner of a

24    start-up company, you would absolutely try to request it;

25    isn't that true?

Cross - McFarlen

1  A.    Would I request it?  Absolutely.

2  Q.    Now, from an income standpoint, you determined that

3  sales were dropping off in 2012 and 2013, correct?

4  A.    Correct.

5  Q.    And that Crew Tile was losing money, correct?

6  A.    Correct.

7  Q.    And so, in essence, from an income generation

8  standpoint, you believe that the company was worthless --

9  A.    Correct.

10 Q.    -- correct?

11        COURTROOM DEPUTY:  Five minutes, counsel.

12        MR. CROUGH:  Thank you.

13 BY MR. CROUGH:

14 Q.    Now you did not analyze at all what impact on Crew's

15 profitability occurred when Porcelanosa began to sell

16 direct and compete in 2012 and 2013, correct?

17 A.    Correct.

18 Q.    In fact, you weren't even asked to look at that,

19 correct?

20 A.    That's correct.

21 Q.    So, in your opinion, all the hard work Crew Tile put

22 in, the network of dealers that they established, the

23 creation of the Denver market place over many years, you

24 think that is worthless, correct?

25 A.    Based on the operations I see, I don't see any benefit

Redirect - McFarlen

1    for what they did, right.

2    Q.   So just so the jury understands, the way you've done

3    your evaluation, you did not look at anything that

4    Porcelanosa did that may have affected Crew Tile's

5    profitability?  You looked only at Crew Tile and their

6    documents, correct?

7    A.   That is correct.

8         MR. CROUGH:  Thank you, Your Honor.  Nothing

9    further.

10        THE COURT:  All right.  Redirect.

11        MR. THOMAIDIS:  Thank you, Your Honor.

12        THE COURT:  Mr. Thomaidis, per my calculations,

13   you have eight minutes left over from your direct, you have

14   five, so you have 13, minutes if you need it.

15        MR. THOMAIDIS:  Thank you, Your Honor.

16        THE COURT:  With a two-minute warning.

17                    REDIRECT EXAMINATION

18   BY MR. THOMAIDIS:

19   Q.   So, Mr. McFarlen, Mr. Crough just asked you about what

20   the impact of selling direct would have been on Crew Tile's

21   profitability.  Do you remember that?

22   A.   Yup.

23   Q.   Was Crew Tile Distribution ever profitable?

24   A.   No.

25   Q.   Was Paradigm Tile & Stone Distributors ever

2102

Redirect - McFarlen

1    profitable?

2    A.    No.

3    Q.    Okay.  And so there are several references made about

4    Crew Tile Distribution being a quote, unquote, start-up.

5    Do you remember that?

6    A.    Yes.

7    Q.    If Crew Tile Distribution was originally formed to do

8    landscaping as another company called RG Construction

9    Services, would that have impacted your -- the valuation

10   method that you applied to Crew Tile Distribution?

11   A.    No.

12   Q.    Okay.  What about if, before that, Infinite Flooring &

13   Design, another company owned by the same managers and same

14   owners of this company, what if that company would have

15   failed, would that have impacted your analysis of the

16   valuation of Crew Tile Distribution?

17            MR. CROUGH:  Objection, Your Honor.  Well outside

18   of the scope of his opinions.

19            THE COURT:  Overruled.

20            THE WITNESS:  It would be a reference to the

21   management team.  When I talked about the company, nature

22   and history you look at the management team, their ability

23   to have a successful company and operations.

24   BY MR. THOMAIDIS:

25   Q.    So would it have affected your valuation?

2103

Redirect - McFarlen

1    A.    Yes.

2    Q.    Okay.  And what about if that company -- that prior

3    company had discharged $204,000 in bankruptcy, would that

4    have impacted your valuation of Crew Tile Distribution?

5    A.    Again, it goes to the managers and their ability to

6    have good operations.

7    Q.    Okay.  So let's go ahead and talk briefly about the

8    fundamental difference between your analysis and the

9    analysis of plaintiffs' expert, Steve Hazel.  Okay?

10   A.    Okay.

11   Q.    In your opinion, what's the most fundamental

12   difference between your analysis and the analysis of

13   plaintiffs' expert?

14   A.    I think it would be the inclusion of his lost

15   profit.

16   Q.    And why is that so significant?

17   A.    It's not part of the contract, so it's fair market

18   value of the company or 2.5.  There's nothing about lost

19   profit as part of that calculation.

20         MR. CROUGH:  Your Honor, I object.  He's

21   interpreting the contract --

22         THE COURT:  And he asked what he believes is the

23   single greatest deficiency in the report, so overruled.

24   BY MR. THOMAIDIS:

25   Q.    So in talking about the deficiency of Mr. Hazel's

2104

Redirect - McFarlen

1    report, how is Mr. Hazel able to arrive at the lost-profit

2    figures that he was able to arrive at?

3    A.    He's included all the sales for Porcelanosa in the

4    Colorado region, I believe.

5    Q.    Okay.  And so had the contract not existed, would

6    there be any rational basis for including those Porcelanosa

7    sales numbers as a component of the lost-profits analysis

8    for Crew Tile Distribution?

9    A.    No.

10   Q.    What about for Paradigm Tile & Stone Distributors?

11   A.    Same, no.

12   Q.    Okay.  And so in conducting your analysis of Crew Tile

13   Distribution and Paradigm Tile & Stone Distributors' value,

14   did you reference any outside industry publications or data

15   to help validate what you were doing?

16   A.    Yes.

17   Q.    And what were they?

18   A.    One was a BB Economic Outlook, and the other was a --

19   IBIS World, I-B-I-S World.  And those are two databases we

20   get economic industry information from.

21   Q.    When you're doing a business valuation, are those

22   standard reference publications for doing your valuation

23   based on the type of industry the company's in?

24   A.    Absolutely.

25   Q.    Okay.  So why would there be any reason for you to

Redirect - McFarlen

1   have any information about any other dealers of Porcelanosa

2   brand products in the state of Colorado?

3   A.   I don't believe there is.

4   Q.   Okay.  And so given your assumption, if we're working

5   with the exclusive distributor agreement of December 8th,

6   2009, was not, in fact, real, why would you have to

7   consider Porcelanosa, or Porcelanosa Los Angeles, or any of

8   these entities, as competition for Crew Tile Distribution?

9   A.   Sorry, restate that question.

10  Q.   Well, you had answered a couple of questions for Mr.

11  Crough about why didn't you consider Porcelanosa Los

12  Angeles, for example, as competition with Crew Tile

13  Distribution.  Do you remember that?

14  A.   Right.

15  Q.   Why would you do that at all?

16  A.   They would be part of the overall market.

17  Q.   And they would supposedly be a business partner of

18  Crew Tile Distribution, correct?

19  A.   Correct.  Correct.

20  Q.   And so if the contract didn't exist, would there still

21  be any rational basis for including Porcelanosa Los Angeles

22  is a relevant competition?

23  A.   No, against the market.

24  Q.   And so let's talk just briefly about how exclusivity

25  for a company like Crew Tile Distribution would have been a

Redirect - McFarlen

1    risk.  Why is that exclusivity have been a risk in this

2    case?

3    A.    Because, again, they're -- they're hooked to

4    Porcelanosa.  So if Porcelanosa does well, they do well; if

5    they don't, then they don't.  I think a perfect example is

6    the Nike Golf.  So if you're an exclusive distributor of

7    Nike Golf.  Last year they decided to cancel their Nike

8    Golf line, so if you're an exclusive dealer, you're done,

9    your operations are gone.

10        So that's where the risk comes in, is you have one

11   product and that one product's tied to that one

12   manufacturer.

13        In addition, in the market, if somebody wants

14   something other than Porcelanosa product, they can't go to

15   you, they have to go to somebody else because Crew Tile can

16   only distribute Porcelanosa product at that time.

17   Q.    So if one were to fail, all would fail?

18   A.    Correct.

19   Q.    Now, Mr. Crough asked you previously about your

20   testimony dovetailing into Mr. McSparran's testimony.  Do

21   you remember that?

22   A.    Yes.

23   Q.    Now, do you -- were you ever directed to interface

24   with Mr. McSparran with respect to your testimony in this

25   case?

Redirect - McFarlen

1    A.    No.

2    Q.    And I -- did I ask you that I wanted you to give me a

3    business valuation based on Crew Tile Distribution and

4    Paradigm Tile & Stone Distributors, correct?

5    A.    Yes, you were very direct.

6    Q.    And did I ever direct you to interface with Mr.

7    McSparran?

8    A.    No.

9    Q.    And did Mr. McSparran ever interface with you

10   regarding your valuation?

11   A.    No.

12   Q.    Okay.  And so the plaintiff in this case is

13   maintaining that the switch in Porcelanosa's sales in 2009

14   and 2010 was the result of Crew Tile Distribution getting

15   more sales, getting a larger percentage of overall sales in

16   Colorado.  Is that accurate, with your -- with your

17   understanding of their analysis?

18   A.    I'm not seeing it in the financial statements.

19   Q.    Okay.

20   A.    I would expect Crew Tile to show those sales in the

21   condition that Porcelanosa sales --

22   Q.    And you forecast another question:  What would you

23   expect to see in Crew Tile's financial statements and

24   financial documents if that were the case?

25   A.    Exactly that.  I would have expected greater revenue,

1   again, and hopefully profitability.

2   Q.   Okay.  And so, once again, taking either Crew Tile

3   Distribution, Incorporated, individually or coupling it

4   with Paradigm Tile & Stone Distributors, LLC, the value is

5   still de minimis, correct?

6   A.   Correct.

7   Q.   And that means basically nothing?

8   A.   Zero.

9        MR. THOMAIDIS:  I have no other questions.

10        THE COURT:  May this witness be excused?

11        MR. THOMAIDIS:  He may, Your Honor.

12        THE COURT:  For plaintiffs?

13        MR. CROUGH:  Yes, Your Honor.

14        THE COURT:  Thank you for joining us.  You may

15   step down.  You're excused.

16        Defendants/counterclaimants may call their next

17   witness.

18        MR. THOMAIDIS:  And, Your Honor, may I make -- you

19   know what, I'll do this -- so at this time, Your Honor,

20   we'd like to go ahead and tee up the videotape deposition

21   of Mrs. Adela Stransky.

22        THE COURT:  Do you have a sense of how long it is

23   currently, if you've done any editing on it?

24        MR. THOMAIDIS:  Unfortunately, due to the

25   logistics today, I wasn't able to edit down anything

1    there.

2            THE COURT:  So without the editing, how long is

3    it?

4            MR. THOMAIDIS:  I would say just a bit over an

5    hour, maybe an hour and 10 minutes.

6            THE COURT:  All right.  Why don't we -- we'll go

7    till -- we'll do half an hour, we'll go to five after 5:00

8    and conclude it first thing in the morning.

9            MR. THOMAIDIS:  Thank you, Your Honor.

10           (Video deposition played)

11           THE COURT:  It's getting in an area, why don't we

12   stop there for the day.  All right.  It sounded like the

13   questioning was going in a different direction, so --

14           MR. THOMAIDIS:  Your Honor -- Your Honor, I'm

15   certainly happy to try to change the -- may I have a

16   moment?

17           THE COURT:  What?

18           MR. THOMAIDIS:  Oh, are we stopping --

19           THE COURT:  Yeah, I'm saying we're going -- it

20   sounded like the examination was going in a different -- in

21   a different direction, so I wanted to stop it there for the

22   day.  All right.

23           MR. THOMAIDIS:  Thank you, Your Honor.

24           THE COURT:  All right.  Ladies and gentlemen of

25   the jury, let me tell you some things about tomorrow.  It's

1    going to be different than we've been doing.

2         The remainder of this deposition is -- will be the

3    conclusion of the testimony in this trial.  So we will

4    bring you back here at the regular time, we'll hear the

5    remaining half hour, then there's going to be several,

6    unfortunately, lengthy periods of time, it might be upwards

7    of about an hour, where I have to deal -- hour, maybe

8    longer, where I have to deal with matters that the law

9    requires be discussed outside your presence.

10        So we'll have that break.  Then we'll come back

11   and then I will read you the jury instructions.  You'll

12   each get a copy of it in written form, but I'm required to

13   read it to you orally first.

14        Then we'll have the closing arguments of the

15   lawyers and then you will be able to begin your

16   deliberations.

17        I should point out that you probably -- we

18   probably won't finish closing arguments and you won't get

19   the case to start deliberating until around lunchtime, late

20   lunchtime tomorrow, which means if you, in addition -- you

21   need to be prepared for the possibility if you don't return

22   a verdict tomorrow afternoon, that you would have to return

23   on Friday to continue your deliberations.

24        All right.  I have some matters to discuss with

25   the lawyers, but for the jury, we're in recess until

1    8:45.

2         (Jury left the proceedings 5:04 p.m.)

3         THE COURT:  So we discussed this yesterday, but I

4    just want to repeat so everybody knows exactly what we're

5    doing.  I've been informed that -- and you've confirmed,

6    that both sides are waiving rebuttal.  We'll just get that

7    on the record.  I'll ask each side if you have any rebuttal

8    witness.  You'll say no for the record in front of the

9    jury.  And then the jury will be excused and then we'll go

10   into the Rule 50 arguments.

11        I'll hear the renewal of the defendants' motion

12   first.  And I was informed earlier that the plaintiff was

13   going to have a motion, so then we'll hear argument on the

14   plaintiffs' motion at that time, and I will rule on both

15   motions at that time, then take a break.

16        We'll bring out the Court's final set of jury

17   instructions and verdict form.  You'll have 15 minutes to

18   review it.  I'll come out, we'll have our charging

19   conference.  We'll deal with whatever comes up in the

20   charging conference.  After that, as you just heard me tell

21   the jurors, I'll read the instructions and then the closing

22   arguments will be made.

23        First, let me ask you, Mr. Burg, have you decided

24   how much time you want to reserve in your -- for your

25   closing argument?

1      MR. BURG:  Yes, Your Honor.  25 minutes.

2      THE COURT:  25.

3      MR. BURG:  No, 25 for my rebuttal closing.

4      THE COURT:  And that's what I meant.

5      MR. BURG:  And also, the motion will be made by

6  the -- I think you said plaintiffs, but it will be the

7  counterclaimant defendants who will be making the Rule 50

8  motion.

9      THE COURT:  You're correct.  You're correct.  I'm

10 sorry.

11     25.  Okay.  So the opening portion of plaintiff/

12 counterclaim defendants' closing will be 50 minutes and 25

13 minutes for rebuttal.

14     Mr. Thomaidis, have you made a decision as to how

15 much you want to reserve for the rebuttal portion of your

16 closing argument?

17     MR. THOMAIDIS:  Your Honor, may I please reserve

18 15 minutes.

19     THE COURT:  It's entirely up to you.  You want 15?

20     MR. THOMAIDIS:  Yes, please, Your Honor.

21     THE COURT:  Okay.  So it will be 60 minutes

22 opening, so -- and then 15-minute rebuttal.

23     All right.  Something I think we should deal with

24 tonight so we have one less thing to worry about tomorrow.

25 The deposition excerpt exhibits.  Let's have you -- have

1     you exchanged with each other, so that you're in a position

2     to know whether you're objecting to them?

3          MR. CROUGH:  Your Honor, we've gotten -- not quite

4     to date.  We haven't gotten through Wendy Carlson or

5     Patrick McFarlen -- sorry I didn't -- we have Joseph

6     Domingot, Paco Montilla, Jack Handley, Manuel Prior.  We've

7     already conferred with opposing counsel that these are

8     accurate, so we have these ready to admit and we'll have

9     two more sets tomorrow.

10          THE COURT:  I'm confused, I'm talking about the --

11    as I discussed a couple of days ago and as you can readily

12    see, Mary is not transcribing the depositions, so that what

13    I informed everybody was that you had to prepare an exhibit

14    which contained the transcript of the deposition testimony,

15    label it as an exhibit, exchange it with each other to make

16    sure that it's accurate, that it contains everything that's

17    been designated, and doesn't include anything that's been

18    objected to or was undesignated, and then we would move for

19    their admission.

20          You just named several deponents who testified

21    live, so that couldn't possibly --

22          MR. CROUGH:  I'm sorry, Your Honor, I was

23    confused.  We didn't call any witnesses by deposition, but

24    we have impeachment clips that we were asked also to

25    prepare exhibits for.

1          THE COURT:  Correct.

2          MR. CROUGH:  And I'm sorry, I was addressing the

3    impeachment clips, not the deposition.  Sorry.

4          THE COURT:  Okay.  So have you organized it so

5    like all of your impeachment for Mr. Domingot is in one

6    exhibit?  All your impeachment is by witness?

7          MR. CROUGH:  We have, Your Honor.

8          THE COURT:  But you're not quite ready to exchange

9    it yet.

10         MR. CROUGH:  We've done it with four of the

11   witnesses.  We still have two to go that testified today.

12   We just haven't prepared those impeachment clips as an

13   exhibit -- these are agreed.

14         THE COURT:  Okay.  Well, if you try to get here a

15   little bit earlier tomorrow and then we can do this

16   exchange and we can admit them and make them part of the

17   record and then we don't delay the jury coming -- the jury

18   coming out too much beyond 8:45.

19         And I remind counsel that these exhibits are for

20   review purposes only, for record purposes.  They will not

21   be going back to the deliberation room with the jury.

22         What's the status of the defendants' deposition

23   excerpt exhibits?

24         MR. THOMAIDIS:  And, Your Honor, we have -- we

25   similarly have the impeachment -- I digress, we have that

1    completed and then we also have the designations of the

2    deposition testimony.  And what we did is we took -- took

3    the blue and the yellow and the red that was stricken,

4    or -- or sustained -- objection sustained by the Court, and

5    so basically what we have left is everything that was

6    agreed upon.

7             THE COURT:  That's what -- that's where you should

8    end.

9             MR. BURG:  And that's on Sudovich, right?  That's

10   the only one that was read.

11            MR. THOMAIDIS:  I'm sorry?

12            MR. BURG:  That's on Michelle Sudovich.

13            MR. THOMAIDIS:  No, Sudovich, Stransky, and

14   Schnepp.

15            MR. BURG:  Oh, okay.  Thank you.

16            THE COURT:  Yeah, so you're going to have three,

17   the deposition excerpt exhibits for witnesses who testified

18   substantively via their deposition, and then you're also

19   going to have impeachment exhibits.

20            MR. THOMAIDIS:  That's correct, Your Honor.

21            THE COURT:  All right.  And so I'd like you to

22   organize it the same way as I just had the colloquy with

23   Mr. Crough, by witness.

24            All right.  So let's see if we can get here early

25   enough -- you folks can get here early enough tomorrow to

2116

1      exchange that with each other so you're ready to go,

2      because when you make the -- when you move to admit it, I

3      don't want to hear an objection, I want to hear that

4      there's not an objection, because you've reviewed each

5      other's exhibits, and there should be no surprises left.

6            Let me see here before -- after the jury leaves to

7      start their deliberation, we will go through the exhibits,

8      so whoever has been keeping track of the exhibits that --

9      as they've come in, we will go through it and compare and

10     contrast with the list that the Court has and make sure

11     everybody's on the same page, that the same -- that we all

12     agree that -- which exhibits have been admitted and will be

13     going back to the jury.  And obviously those that have not,

14     will not.  And I think we have that one exhibit that pages

15     1 and 2 and 4 and 5 of the exhibit were -- were admitted,

16     but not 3.  So we've got to make sure that page 3 doesn't

17     go back to the deliberation.

18            What have you decided about the demonstratives?

19     Are you going to make those exhibits that go back to the

20     jury?

21            MR. BURG:  They are exhibits in the case, which is

22     unusual for demonstratives.  And at that point in time, we

23     believe, yes, they're now exhibits in the case and should

24     go back.

25            THE COURT:  Okay.  That probably makes sense.  I

1    mean, you stipulated to their admission and they were

2    labeled and admitted into evidence.  Do you agree?

3            MR. THOMAIDIS:  Your Honor, I -- I think we've

4    stipulated to the demonstratives going back with the jury,

5    except I am not certain that our demonstratives, which are

6    B-78, B-79, B-80, and B-81 have been admitted as exhibits

7    to the evidence in the case.

8            MR. BURG:  I just want to make sure, those are the

9    boards?

10           MR. THOMAIDIS:  That's correct.

11           MR. BURG:  Yeah, we -- that's fine.  We don't have

12   a problem --

13           THE COURT:  All right.

14           MR. BURG:  As long as ours are going back, those

15   can go back.

16           THE COURT:  I think that's fair.  Let's -- so

17   let's deal with that right now.  You're moving for the

18   admission of which exhibits?

19           MR. THOMAIDIS:  At this time, defendants would

20   move for the admission of Exhibit B-78, B-79 --

21           THE COURT:  Slow down.

22           MR. THOMAIDIS:  Sorry, Your Honor.

23           THE COURT:  B-78, B-79.

24           MR. THOMAIDIS:  B-80 and B-81.

25           THE COURT:  B-80 and B-81.  All right.  And

2118

1    there's no objection from the plaintiffs; is that correct?

2            MR. BURG:  No, it's fair.  Ours are going back,

3    theirs should go back.

4            THE COURT:  All right.  Given that there's no

5    objection, Exhibits B-78, B-79, B-80, B-81 are admitted

6    into evidence and will go back to the deliberation room

7    with the jury.

8        (Defendants' Exhibits B-78, B-79, B-80, and B-81

9    received)

10           THE COURT:  All right.  Anything else we need to

11   deal with today --

12           MR. BURG:  We have one more matter, which we

13   talked to your law clerk about.  We do have the original

14   signed -- the exclusive distributor agreement and the also

15   exclusive -- whatever that was, the one in 2004 --

16           THE COURT:  Yeah, the two agreements --

17           MR. BURG:  Right.  And we talked about it and I

18   guess we haven't agreed on it, but whether or not the

19   Court -- we think we should substitute those in so the jury

20   would have originals that they would be able to look at.

21   Obviously this is a case that is very contentious about

22   what those documents are.

23           THE COURT:  Right.  Is there an objection?

24           MR. THOMAIDIS:  There is, Your Honor.

25           THE COURT:  What is that?

1          MR. THOMAIDIS:  It's defendants' perspective that

2     we tried for some time to get ahold of these documents in

3     their original form, including with respect to Ms. Carlson.

4     We were never able to get our hands on them.  And --

5          THE COURT:  You're able to take a photo of them.

6     You put that on the record in front of the jury.

7          MR. THOMAIDIS:  That's true.  At this point in

8     time, the jury should be able to consider what defendants

9     were able to consider.

10          THE COURT:  Well, but -- let me tell you, I have

11     all along thought that the originals were in the Court set

12     that were going to go back to the deliberation room, so

13     this is news to me that they're not.  So the objection is

14     overruled and the originals will go back.

15          Do you have them already labeled as separate

16     exhibits?

17          MR. BURG:  We have not labeled them, but we

18     will --

19          THE COURT:  Well, why don't we just take the next

20     two -- let's see.

21          MR. CROUGH:  Okay.

22          THE COURT:  I think B-81 was your last labeled

23     exhibit.

24          MR. BURG:  That would be the B is the

25     defendants' --

1              THE COURT:  I'm sorry.

2              MR. TeSELLE:  It's 231 and 232, I believe.

3              THE COURT:  All right.  I've still got to go

4    through jury instructions tonight.  All right.

5              MR. BURG:  Those are impeachment -- 243 and 244?

6              THE COURT:  So let's do it chronologically.  Let's

7    label the original -- is everybody listening to me?

8              MR. BURG:  Yes, I am, Your Honor.

9              THE COURT:  Okay.

10             MR. TeSELLE:  Trying to get the numbering.

11             THE COURT:  Let's label the original 2004

12   agreement as Exhibit -- Plaintiffs' Exhibit 243, and the

13   original 2009 exhibit as Plaintiffs' Exhibit 244.

14             Given that I've overruled the objection, Exhibits

15   243 and 244 will go back to the jury and are -- I've

16   admitted into evidence.  And the way we will effect that is

17   we will put it in the original Court's binders and that is

18   the set that will go back to the deliberation room.

19             MR. BURG:  Can we mark them tonight and do that

20   first thing in the morning?

21             THE COURT:  Well, I've already admitted it.  Can

22   you mark them now and either give it to Ms. Buchanan, or

23   Ms. Hansen if she rejoins us in the morning.  And we'll

24   just -- it's just a matter of three-hole punching them and

25   putting them in the binders.

2121

1    MR. BURG:  Thank you.  We will do that.

2    MR. THOMAIDIS:  Your Honor, may I make one small

3 request before we proceed with this?  May defendants have

4 the opportunity to inspect those documents before they end

5 up in the binders?  Please.

6    THE COURT:  So you're -- you think that they're

7 not the original -- you have reason to believe that they're

8 not the original?

9    MR. THOMAIDIS:  I would just like the opportunity

10 to inspect them.

11    THE COURT:  Why don't we do that now while we're

12 still on the record.

13    MR. THOMAIDIS:  Okay.

14    THE COURT:  And I'll ask Mr. Burg as an officer of

15 the Court, is it your representation that these are the

16 original documents?

17    MR. BURG:  Yes, it is -- yes, they are.

18    MR. GREENLEE:  May I approach?

19    THE COURT:  You don't have to approach, because --

20    MR. THOMAIDIS:  Well, Your Honor, it appears that

21 the -- with -- at least with respect to the exclusivity

22 agreement, that the signature page now has a Bates number

23 on it.

24    THE COURT:  Is that the only difference you're

25 seeing from the copies?

2122

```
 1          MR. THOMAIDIS:  Well, it's clearly not an
 2   original.
 3          THE COURT:  Sorry, what?
 4          MR. THOMAIDIS:  I said it's clearly not an
 5   original, Your Honor.
 6          MR. BURG:  No, it -- the only -- it has a
 7   Bates-stamp on it --
 8          MR. THOMAIDIS:  Okay, so you're -- so you have a
 9   duplicate page.
10          MR. TeSELLE:  That's the original that he's
11   showing.
12          MR. BURG:  That's just the Bates stamp -- there it
13   is.  There's the original signature.
14          MR. THOMAIDIS:  Is there any reason to include
15   another page of the Bates stamp?
16          MR. BURG:  No.  No.
17          THE COURT:  So what's the issue?
18          MR. THOMAIDIS:  There is no issue now.
19          THE COURT:  Okay.  So --
20          MR. THOMAIDIS:  The page is missing -- or is gone.
21          THE COURT:  What do you mean -- what page is
22   missing?
23          MR. BURG:  We Bates-stamped the signature page, so
24   it has an additional copy of the signature page.  That's --
25   that was --
```

1            THE COURT:  Oh, it was an additional page.

2            MR. BURG:  Yes.  Yes.

3            THE COURT:  There's still the original signature

4    page.

5            MR. BURG:  Yes.

6            THE COURT:  Okay.

7            MR. THOMAIDIS:  And these are -- I'm sorry.  Thank

8    you, Your Honor.

9            THE COURT:  All right.  All right.  So that's

10   taken care of.

11           243 and 244, the originals are admitted and will

12   go back with the Court's binder of exhibits to the

13   deliberation room.

14       (Plaintiffs' Exhibits 243 and 244 received)

15           THE COURT:  Anything else we need to deal with

16   tonight?

17           MR. BURG:  We have nothing more.

18           THE COURT:  For the defendants?

19           MR. THOMAIDIS:  Not at this time, Your Honor.

20           THE COURT:  All right.  We will be in recess until

21   tomorrow at 8:45.

22       (Proceedings concluded at 5:22 p.m.)

23

24

25

2124

1                                  **INDEX**

2    Item                                                    PAGE

3                        PLAINTIFFS' WITNESSES

4        **WENDY CARLSON**
         Direct Examination by Mr. Thomaidis            1849
5        Cross-examination by Mr. Burg                  1903
         Redirect Examination by Mr. Thomaidis          1950
6
         **M. KENT McSPARRAN.**
7        Direct Examination by Mr. Thomaidis            1974
         Cross-examination by Mr. TeSelle               1998
8        Redirect Examination by Mr. Thomaidis          2024

9        **RICKEY BALENTINE**
         Direct Examination by Mr. Thomaidis            2034
10       Cross-examination by Mr. Burg                  2045
         Redirect Examination by Mr. Thomaidis          2047
11
         **PATRICK McFARLEN**
12       Direct Examination by Mr. Thomaidis            2055
         Voir Dire Examination by Mr. Crough            2063
13       Direct Examination by Mr. Thomaidis (Cont)     2065
         Cross-examination by Mr. Crough                2080
14       Redirect Examination by Mr. Thomaidis          2101

15

16

17                     PLAINTIFFS' EXHIBITS

18   EXHIBITS:      Offered    Received   Refused    Stipulated

19   187            1930                  1930

20   192            1930                  1930

21   196            1985       1985

22   243            2123       2123

23   244            2123       2123

24

25

DEFENDANTS' EXHIBITS

| EXHIBITS: | Offered | Received | Refused | Stipulated |
|-----------|---------|----------|---------|------------|
| A-10 | 2050 | 2051 | | |
| B-36 | 1859 | 1860 | | |
| B-37 | 1859 | 1860 | | |
| B-38 | 1858 | | 1858 | |
| B-78 | 2117 | 2118 | | |
| B-79 | 2117 | 2118 | | |
| B-80 | 2117 | 2118 | | |
| B-81 | 2117 | 2118 | | |

\*     \*     \*     \*     \*

REPORTER'S CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Dated at Denver, Colorado, this 1st day of May, 2017.

_Mary J. George_

MARY J. GEORGE, FCRR, CRR, RMR