**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.13-cv-03206-WJM-KMT

**CREW TILE DISTRIBUTION, INC.**,

      Plaintiff and Counterclaim Defendant,

and

**RYAN A. DAVIS**,
**DARLYNE A. DAVIS**,
**GLENN L. DAVIS**,
**SHANA L. BASTEMEYER**,
**PARADIGM TILE & STONE DISTRIBUTORS, LLC**, and
**G&D DAVIS HOLDINGS, LLC**,

      Counterclaim Defendants.

v.

**PORCELANOSA LOS ANGELES, INC**.,
**PORCELANOSA NEW YORK, INC**.,
**PORCELANOSA TEXAS, CORP**., and
**PORVEN, LTD.**,

      Defendants and Counterclaimants.

---

**PLAINTIFF CREW TILE'S AND COUNTERCLAIM DEFENDANTS' EQUITABLE**
**CLAIMS OPENING BRIEF**

---

Plaintiff and Counterclaim Defendant Crew Tile Distribution, Inc. and Counterclaim Defendants Ryan Davis, Darlyne Davis, Glenn Davis, Shana Bastemeyer, Paradigm Tile & Stone Distributors, LLC, and G&D Davis Holdings, LLC (hereinafter "Crew Tile Parties"), through their counsel, Burg Simpson Eldredge Hersh & Jardine, P.C., submit their opening brief on equitable claims, pursuant to ECF No. 357:

I.      **STATEMENT OF CREW TILE DISTRIBUTION, INC.'S EQUITABLE CLAIM**

Plaintiff Crew Tile Distribution, Inc. ("Crew Tile") believed that it had a valid,

enforceable contract with Porcelanosa Los Angeles, Inc. (acting on behalf of all of the United

States Porcelanosa entities through the use of the unlawful and unregistered trade name of

"Porcelanosa USA") to act as its exclusive distributor in Colorado (outside of Aspen/Pitkin

County).  Porcelanosa argued at trial that no contract was ever agreed to or executed regarding

this special relationship.  After an eight-day jury trial, the jury found that Crew Tile failed to

prove the existence of a valid and enforceable agreement between the parties.

Crew Tile, of course, vehemently disagrees with the jury's findings and conclusion that

there was no valid, binding and enforceable contract between the parties. But even, for the

purposes of this briefing, accepting the jury's findings as correct, Plaintiff Crew Tile is still

entitled to recover damages based on its equitable quasi-contractual claims, as follows.

As a threshold matter, it is the Defendants' position and the jury's finding of no valid,

enforceable contract that triggers the court's consideration and determination of quasi-contract in

equity. This court has broad equitable power to enforce promises, even those that did not rise to

enforceable contracts, where not doing so would lead to an unjust and/or inequitable result:

> The scope of the equitable remedy of unjust enrichment is broad, "cutting across both
> contract and tort law, with its application guided by the underlying principal of avoiding
> the unjust enrichment of one party at the expense of another." *Robinson v. Colo. State
> Lottery Div*., 179 P.3d 998, 1007 (Colo.2008).

*Walshe v. Zabors*, Civil Action No. 15-cv-01218-MEH, 2017 U.S. Dist. LEXIS 39581, *18

(D.Colo. Mar. 20, 2017).

At trial, the evidence showed that Crew Tile believed it had a contract with Porcelanosa

Los Angeles, Inc. Moreover, the principals who actually ran Porcelanosa Los Angeles, Inc. at the

time either confirmed (Handley) or had little recollection to credibly dispute (Montilla) what the

contemporaneous emails and other written communications entered into evidence at trial, that Porcelanosa had promised to send all Colorado sales to Crew Tile as its distributor, knowing that in exchange Crew Tile was devoting its time, money and resources into building a market for Porcelanosa product in Colorado.  Even though Mr. Montilla's recollection of the discussions and meetings he had with Crew Tile was fleeting at trial, his emails and written communications, and those of Mr. Handley, from the time period in question clearly showed that Porcelanosa was directing the Colorado customers and dealers to Crew Tile, and clearly referred to them as their "distributor" in Colorado.  While the evidence of the written contract was hotly disputed, the Defendants had no answer – other than the argument of counsel - for the evidence of these promises and Crew Tile's reasonable reliance upon them during that time period.

In fact, perhaps the most potent evidence may be what the parties actually did – how they actually performed – during the relevant time frame, rather than what they are saying today.  The trial evidence shows that for approximately two full years (year end 2009 through year end 2011) both Crew Tile and Porcelanosa Los Angeles, Inc. performed consistent with the purported contract Crew Tile thought it had, and the promises Porcelanosa had made.  The evidence showed that Crew Tile and its investors justifiably relied upon these promises to their detriment. Investors such as Glenn Davis contributed his 401K to the business, and Ray Perry, an outside investor, also put in significant amounts to build the business based upon these promises.

For example, investor Ray Perry testified to a meeting he had with Mr. Montilla at Elway's in 2010 (a meeting that is undisputed), when it had come to his attention that Handley had been caught selling Porcelanosa product directly to Colorado dealers and customers. According to Mr. Perry's testimony under oath, Mr. Montilla was deeply apologetic as "he apologized a number of times that Jack had done this, said that he was sorry and that it would

discontinue." *See Trial Transcript* 234:3-234:14.  Mr. Perry testified that "Mr. Montilla was apologizing that Jack had sold product and had been in contact with dealers that we sold to, as well as clients that were spec'ing deals for" and Mr. Montilla assured him that "he was going to stop it." *Id.* at 234:21-235:4. Ray Perry testified that he believed Montilla when he re-affirmed that promise. *Id.* at 235:5-6. Therefore, it was not only the initial promise but the subsequent assurances and re-assurances that Porcelanosa was committed to those promises, i.e. not selling around Crew Tile, that Crew Tile reasonably relied upon in spending money, time and effort to build Porcelanosa a marketplace.[1]

The trial evidence also showed that Crew Tile's performance, based upon those promises, successfully promoted and built out a marketplace and dealer network for the sale of Porcelanosa product in Colorado.  Porcelanosa financially benefitted immensely as a result of Crew Tile's work, and today is enjoying a windfall for themselves at the expense of Crew Tile.

The trial evidence shows that beginning in 2012, contrary to the promises Porcelanosa had made earlier to induce Crew Tile to help build out its Colorado market -- and without Crew Tile's knowledge -- Porcelanosa began to sell around Crew Tile and directly to the Colorado marketplace and directly to the same network of dealers that had previously been directed to Crew Tile consistent with their prior promises.  In fact, the evidence at trial showed that Porcelanosa concealed this misconduct, and instead assured Crew Tile they were still honoring their promises to ensure that Crew Tile would continue to do the groundwork that would benefit Porcelanosa in the end.  The trial evidence was also clear that by denying Crew Tile the cash flow of the Colorado sales Porcelanosa should have routed through Crew Tile if they had

---

[1] See also Plaintiff's Trial Exhibit 87, dated May 3, 2011 which shows Colorado Ceramics, a hold-out Colorado dealer who had still been buying direct from Porcelanosa being brought in line to buy only through Crew Tile, as Porcelanosa had promised and continued to re-affirm.

honored their promises, Crew Tile suffered significant and substantial financial difficulties. Ironically, Defendants then used the very financial difficulties that Defendants' wrongful conduct created, to argue to the jury as a basis to reject the contract claim.  By saying one thing and doing another – promising to send Crew Tile its Colorado business, but instead keeping it for themselves, Porcelanosa wrongfully enriched themselves at Crew Tile and its investors' expense.

As the trial evidence showed, it was not until April 2013, when Porcelanosa executed "Operation Shut Down Denver", that Porcelanosa finally disclosed that they were no longer going to honor their promises (promises they had already secretly broken) to Crew Tile.  It was not until April 2013 that Porcelanosa disclosed their intent to open their own showroom, and to compete directly with Crew Tile in Colorado. In April 2013, the illusion Porcelanosa had created for Crew Tile through their false promises was over.  Crew Tile objected, but, ultimately, at the end of 2013, Porcelanosa opened their own showroom and began competing directly with Crew Tile.

Crew Tile thought they had a written contract to protect them. The jury determined they didn't.  Porcelanosa believes that finding on the contract ends the inquiry and now asks this Court to allow them to run "scot free" from their own bad conduct, from the promises they broken in secret, and the harm they caused to Crew Tile and its investors as a result.

The evidence at trial established that beginning around the beginning of 2012 through the opening of their own showroom in Colorado in late 2013, Porcelanosa made almost a million dollars of direct sales into Colorado. All during the time period when they had Crew Tile operating based upon the promise and the premise that all Colorado sales would be directed to them.  It is unjust and inequitable to allow Porcelanosa to retain those monies - which they enjoy as a windfall - to Crew Tile's and its investors' detriment.

Crew Tile anticipates that the Defendants will attempt to argue "unclean hands" as a defense, continuing the character assassination of the Davis family which was the repeated thrust of Defendants' attacks at trial.  However, this argument misses the mark as to the equitable claims belonging to Crew Tile vis-à-vis the promises made by Porcelanosa Los Angeles and the three-plus years of service Crew Tile gave Porcelanosa in reasonable reliance upon those promises. As the Colorado Supreme Court has held:

> Generally, "one who comes into equity must come with clean hands." Dan B. Dobbs, Law of Remedies § 2.4(2) (2d ed. 1993). The principal derives from the concept that one who seeks equity must do equity. See id. Many different forms of improper conduct may bar a plaintiff's equitable claim, and the conduct need not be illegal. See id. **Generally, courts apply this doctrine only when a plaintiff's improper conduct relates in some significant way to the claim he now asserts. See id. Otherwise, only those leading pristine and blameless lives would ever be entitled to equitable relief. See id.**

*Salzman v. Bachrach*, 996 P.2d 1263, 1269 (Colo. 2000). (Emphasis Added).

Here, as to the quasi-contractual relationship being asserted, the claim concerns the specific relationship between the parties during a specific period of time that pre-dates the alleged conduct found by the jury against Ryan and Darlyne Davis. The trial evidence shows that at all times during the pendency of that relationship (2009-2013), Crew Tile was acting equitably and in good faith with Porcelanosa. It was Porcelanosa who was not.

The jury's findings implying potential wrongful conduct by individual counter-claim defendants Ryan Davis and Darlyne Davis occurred, based upon the evidence and argument of Defense Counsel, only AFTER the quasi-contractual relationship between the parties ended in April 2013.  And in fact, to the extent of what impact that subsequent alleged bad conduct had, the jury resolved that issue and that claim related thereto in its verdict.  Plaintiff Crew Tile - which is a separate corporate entity with investors, creditors and other interested parties who were never implicated with any bad conduct - should not be punished based upon the conduct of

individuals occurring outside the time period of the quasi-contractual relationship, after that relationship had ended, and having no bearing on the quasi-contractual relationship during its pendency.

It would be inequitable and unjust to allow Porcelanosa Los Angeles, Inc. to have induced Crew Tile and its investors to commit monies (including Glenn Davis's retirement savings), time, and resources to build a market platform in Colorado for so Porcelanosa could step in to Colorado as a "turn-key" marketplace instead of one they needed to build from the ground up – based upon broken promises that Porcelanosa was directing all of its sales to Crew Tile in Colorado when it turns out they were not.  It would be inequitable and unjust for Porcelanosa to capitalize upon the platform that Crew Tile built for them, where the facts at trial showed that, unbeknownst to Crew Tile, Porcelanosa had instead been selling around Crew Tile and direct to Colorado dealers and concealed that fact from Crew Tile until they were ready to come in and reap the benefit of Crew Tile's and its investors' efforts.

Porcelanosa is now celebrating "victory" over having duped Crew Tile into building them a Colorado platform and marketplace that now generates millions of dollars in revenue for them, without having to pay for it.  Justice and equity abhor a windfall, especially for deceptive and wrongful conduct. For these reasons, Crew Tile respectfully requests that the Court consider exercising its equitable powers to correct this injustice and hold Porcelanosa Los Angeles, Inc. accountable for its wrongful conduct, as shown through the evidence at trial.

## II.   THE CREW TILE PARTIES' PROPOSED FINDINGS OF FACT

Testimony from Shana Bastemeyer

1.      Crew Tile was a tile distributor for Porcelanosa, responsible for creating the Colorado marketplace and working with flooring dealers.  *See* Trial Trans. 43:12 – 25.

2.      When Shana Bastemeyer joined Crew Tile in 2012, there was a lot of sales momentum being built with Porcelanosa.  *Id*. at 47:7 – 13.

3.      Crew Tile was responsible for providing local dealers with samples and pricing for Porcelanosa's products, and brokering the resulting tile transactions with Porcelanosa.  *Id*. at 50:23 – 51:18, 52:19 – 53:8; *see* Pltf. Ex. 227.

4.      Crew Tile was responsible for providing dealers with Porcelanosa's displays, obtaining current product samples for the displays, and ensuring that dealers had product knowledge.  *See* Trial Trans. 53:16 – 23, 54:20 – 56:13.

5.      Porcelanosa did not have an office in Colorado or any sales; therefore, Crew Tile believed they had an agreement to be responsible for getting the product into the marketplace to grow sales and increase Porcelanosa's market share.  *Id*. at 53:24 – 54:6, 56:14 – 24.

6.      Crew Tile was responsible for all of the expenses associated with growing the market share for Porcelanosa's product in Colorado.  *Id*. at 56:24 – 25.

7.       Crew Tile had a dealer network of approximately 75 to 100 dealers in Colorado.  *Id*. at 57:6 – 8; see Pltf. Ex. 227.

8.      Porcelanosa made money on every sale that Crew Tile made because Crew Tile was absorbing the expense of the sales staff, the samples, the displays, and the showroom.  *See* Trial Trans. 62:15 – 63:4.

9.      Porcelanosa was actively supporting and encouraging Crew Tile's efforts in order to gain additional market exposure and to grow the Colorado sales market.  *Id*. at 65:4 – 17.

10.     As of 2012, the business relationship between Crew Tile and Porcelanosa was going well, with sales coming in and new projects being registered for future sales.  *Id*. at 66:17 – 68:3; 70:10 – 14.

11.     On April 10, 2013, Porcelanosa's General Manager Francisco "Paco" Montilla announced to Crew Tile that Porcelanosa would be taking over the Colorado territory, nicknamed by Porcelanosa as "operation shutdown."  *Id.* at 82:11 – 23; *see* Pltf. Ex. 135.

12.     In April 2013, Crew Tile's sales were still increasing, job registrations were continuing to be sent to Porcelanosa, and lot of momentum was going.  *See* Trial Trans. 85:14 – 22.

13.     During the summer of 2013, Porcelanosa stopped providing samples, product, and pricing to Crew Tile, and kept the job registrations that Crew Tile had worked to obtain, including the Denver International Airport project.  *Id.* at 96:5 – 97:12; *see* Pltf. Exhibits 172 & 174.

Testimony from Ray Perry

14.     A lunch meeting took place on December 14, 2009, in Denver, attended by Ryan Davis (of Crew Tile), Paco Montilla and Jack Handley (of Porcelanosa), and potential investor Ray Perry.  *See* Trial Trans. 227:23 – 228:5.

15.     At that meeting, Mr. Montilla referred to Mr. Davis as "our guy" numerous times, and expressed enthusiasm about the opportunity to grow Porcelanosa's business in Colorado.  *Id.* at 228:6 – 23; 274:16 – 19.

16.     At a lunch meeting in 2010, Mr. Montilla apologized that they had been selling around Crew Tile to its dealers direct, and promised it would stop and that it wouldn't happen again. *Id.* at 234:3 – 235:6.

Testimony from Ryan Davis

17.     In August 2009, Crew Tile began promoting Porcelanosa's products in Colorado and asked permission to use Porcelanosa's branding in Crew Tile's advertising materials.  *Id.* at 314:10 – 315:9; *see* Pltf. Ex. 23.

18.     By September 2009, Crew Tile provided Porcelanosa with a status update explaining the progress that had already been made in growing market share.  *See* Trial Trans. 318:6 – 24; *see* Pltf. Ex. 28.

19.     In October 2009, Crew Tile provided Porcelanosa with a list of 142 of Crew Tile's customers that had already been contacted to promote Porcelanosa's product.  *See* Trial Trans. 322:9 – 323:1; *see* Pltf. Ex. 31.

20.     In October 2009, Crew believed Porcelanosa had agreed to refer business that came from the Colorado territory to Crew Tile.  *See* Trial Trans. 325:6 – 24.

21.     As of October 2009, Crew Tile was Porcelanosa's "local distributor covering the Denver market."  *See* Pltf. Ex. 38.

22.     Crew Tile believed that part of the agreement between Crew Tile and Porcelanosa was that Crew Tile would not do business in the Aspen/Pitkin County area.  *See* Trial Trans. 327:22 – 25; *see* Pltf. Ex. 39.

23.     From 2009 through 2011, the housing market was rebounding and Crew Tile's sales of Porcelanosa products was picking up.  *See* Trial Trans. 387:15 – 388:3; *see* Pltf. Ex. 233.

24.     By year 2012, Porcelanosa's sales into Colorado were over $900k, as compared to $132k in 2009.  *See* Pltf. Exhibits 11 & 233.

25.     The large increase in sales in 2012 is attributed to the hard work of Crew Tile.  *See* Trial Trans. 391:9 – 16.

26.     In late 2009, prior to agreement Crew Tile believed it had with Porcelanosa, the majority of the sales of Porcelanosa products in Colorado were not made through Crew Tile.  *See* Pltf. Exhibits 11 & 225; Trial Trans. 391:18 – 392:5.

27.     In late 2009 after Crew believed an agreement had been reached, the vast majority of the sales in Colorado were made through Crew Tile.  *See* Pltf. Exhibits 11 & 225; Trial Trans. 392:7 – 25.

28.     As of December 2010, Crew Tile had "shown excellent results in a short amount of time," with "$130k in sales since May 2010."  *See* Pltf. Ex. 77, p. 4.

29.     As of December 2010, Crew Tile and Porcelanosa targeted "a great 2011 expansion and sales year."  *Id*. at 6.

30.     As of September 2011, Porcelanosa was continuing to support Crew Tile's "efforts there in Denver as we have agreed."  *See* Pltf. Ex. 94, p. 1.

31.     By early 2012, Crew Tile believed they had agreed to a sales goal of $500k of Porcelanosa products because the market was growing and sales were improving.  *See* Trial Trans. 395:11 – 24; Pltf. Ex. 98.

32.     In 2012, Porcelanosa protected Crew Tile's existing project specifications.  *See* Pltf. Exhibits 110 & 118.

33.     In 2012, Porcelanosa continued to refer customer inquiries to Crew Tile, consistent with the agreement Crew believed it had.  *See* Trial Trans. 401:16 – 402:5; Pltf. Ex. 229.

34.     The expansion project at Denver International airport was specified by Crew Tile, through Gensler Architects.  *See* Pltf. Ex. 118; Trial Trans. 406:6 – 13, 408:1 – 3, 409:15 – 24.

35.     As of June 2013, Porcelanosa had already informed Crew Tile that Porcelanosa would be taking over the Colorado market, yet was "still trying to keep [Crew Tile] selling until we get there."  *See* Pltf. Ex. 150; *see* Trial Trans. 436:16 – 438:17.

36.     On October 31, 2013, Porcelanosa sent a letter to all of Crew Tile's customers informing them to buy product directly from Porcelanosa.  *See* Pltf. Ex. 159.

37.     Eventually, Porcelanosa took all of Crew Tile's customers.  *See* Trial Trans. 443:10 – 16, 444:12 – 14.

38.     On January 7, 2014, Porcelanosa informed Crew Tile that Porcelanosa would no longer be providing any product to Crew Tile, and denied any responsibility for future losses that Crew Tile would incur for loss of pending sales, and loss of the market share.  *Id*. at 445:1 – 6; 446:18 – 448:8; *see* Pltf. Ex. 170.

39.     After cutting off Crew Tile, Porcelanosa opened a showroom in Denver and began calling on all of Crew Tile's former customers.  *See* Trial Trans. 450:8 – 14.

40.     On January 27, 2017, Crew Tile was informed by one of its customers that Porcelanosa was instructing him to order directly for the Denver International Airport project, despite the fact that Crew Tile had registered the specification.  *Id*. at 453:3 – 455:13; *see* Pltf. Ex. 174.

Testimony from Jack Handley

41.     In the fall of 2009, Porcelanosa did not have any offices or its own employees in Colorado.  *See* Trial Trans. 695:24 – 696:10.

42.     Porcelanosa wanted Crew Tile to promote Porcelanosa product and develop a strong presence in Colorado.  *Id*. at 696:11 – 18.

43.     During an in-person meeting on December 14, 2009, Porcelanosa promised it would provide sales leads to Crew Tile for the Colorado area excluding Aspen/Pitkin County.  *Id*. at 698:22 – 25, 700:18 – 701:20, 712:1 – 4.

44.     There was a benefit to Porcelanosa in having Crew Tile build a showroom and provide employees to develop the market for Porcelanosa products in Colorado, especially during a time period of economic downturn.  *Id*. at 704:19 – 705:11.

45.     Porcelanosa knew that Crew Tile was paying for the showroom, and the purpose of the showroom was to showcase Porcelanosa products.  *Id*. at 716:13 – 17.

46.     Porcelanosa knew that Crew Tile was selling to dealers in Colorado.  *Id*. at 717:16 – 18.

47.     Porcelanosa knew that Crew Tile's markup to dealers was 20% - 30%.  *See* Pltf. Ex. 51.

48.     Porcelanosa felt the Crew Tile was moving in the right direction and meeting performance expectations.  *See* Trial Trans. 722:12 – 723:3.

49.     Porcelanosa product is high quality luxury tile with few, if any, peers.  *Id*. at 724:2 – 9.

50.     Whenever Crew Tile was able to find a customer, it was good for Porcelanosa because it would make money.  *Id*. at 730:9 – 19.

51.     Porcelanosa knew that Crew Tile was buying displays and buying product to put into dealers' showrooms to help sell and promote Porcelanosa's products so Porcelanosa could make money.  *Id*. at 730:24 – 731:3.

52.     Porcelanosa wanted to have personal contact with the customers.  *Id*. at 856:11 – 19.

53.     A project registration exists to protect the specifier so when the job goes through, the manufacturer knows whose efforts are to be rewarded.  *Id*. at 886:13 – 23, 887:2 – 10.

Testimony of Darlyne Davis

54.     Crew Tile spent approximately $80k - $100k to build a showroom for Porcelanosa.  *Id*. at 944:17 – 945:1.

55.     Crew Tile specified the Denver International Airport ("DIA") expansion project, but did not get paid anything by Porcelanosa for it.  *Id*. at 968:2 – 7.

56.     The October 31, 2013, letter from Porcelanosa instructing Crew Tile's customers to buy direct was sent to the dealers that Crew Tile has spent 2.5 to 3 years establishing, and that reduced Crew Tile's business to zero.  *Id*. at 969:13 – 970:4.

57.     After October 2013, Porcelanosa did not honor Crew Tile's registrations on existing projects. *Id*. at 970:6 – 12.

Testimony of Francisco Montilla Soto

58.     Porcelanosa was happy with the buildup in sales in Colorado through 2012 because the more that was sold, the better it was for Porcelanosa. *Id*. at 1155:20 – 1156:3.

59.     It was the policy of Porcelanosa that if Crew Tile was the specifier of a project, then Crew Tile would be paid on that project. *Id*. at 1160:7 – 18; *see* Pltf. Ex. 118.

Testimony from Steven Hazel

60.     Lost profits are the lost sales over and above the actual sales, less saved expenses. *See* Trial Trans. 1273:7 – 18.

61.     Crew Tile's owners invested approximately $500k into the business. *Id*. at 1275:19 – 1276:10; *see* Pltf. Ex. 226.

62.     Product sales to Crew Tile effectively ceased in 2014. *Id*. at 1281:11 – 14.

63.     Based on Porcelanosa's sales data, there was an active decision by Porcelanosa to cut Crew Tile out in late 2013 and early 2014. *Id*. at 1281:24 – 1282:8.

64.     In calculating lost profits for Crew Tile, the sales data from Porcelanosa was compared with the sales data from Crew Tile, since Crew Tile does not get the benefit of sales they already did in the lost profit calculation. *Id*. at 1286:3 – 24.

65.     If there had been no interference with Crew Tile's sales by Porcelanosa, Crew Tile would have turned a profit. *Id*. at 1288:8 – 10.

66.     The lost profits of Crew Tile range from $400k to $800k. *Id*. at 1298:21 – 1299:3.

67.     The business valuation of Crew Tile ranged from $274k to $1M. *Id*. at 1299:4 – 5.

68.     The calculations performed by Mr. Hazel would not necessarily change if the Distributor Agreement Crew Tile believed it had was not in effect because the facts would not change. *Id*. at 1301:11 – 1302:2.

69.     Crew Tile has intangible value. *Id*. at 1318:25 – 1319:3.

Testimony of Glenn Davis

70.     During the first few year of Crew Tile, business was growing, and then in 2012 it took a huge jump. *Id*. at 1376:22 – 1377:4.

71.     After being informed that Porcelanosa would be opening its own Colorado showroom, Crew Tile looked into potentially selling another product, but it would be a big change. *Id*. at 1380:7 – 21.

72.     Because Porcelanosa product did not have competitors, that led to the big jump in sales. *Id*. at 1381:1 – 6.

73.     After the October 2013 letter from Porcelanosa to Crew Tile's customers telling them to buy direct, Crew Tile could not get product to fill orders. *Id*. at 1381:9 – 14, 1382:1 – 4.

74.     Porcelanosa built a showroom in the Denver Design Center where Crew Tile had been previously. *Id*. at 1442:4 – 10.

Testimony from Barbara Mabary

75.     Porcelanosa still has a showroom open in the Denver Design Center. *Id*. at 1599:8 – 10.

Testimony from Manuel Prior

76.     Porcelanosa's sales in the United States were going down through 2008 and 2009, and the company was losing a lot of money. *Id*. at 1756:14 – 19.

77.     Sales have been growing at "very solid double digit" growth from 2010 through the present day. *Id*. at 1757:3 – 10.

78.     When Porcelanosa opened its showroom at the Denver Design Center, it did not want to compete with anyone. *Id*. at 1795:19 – 23.

79.     Porcelanosa does not dispute that the list of dealers on Exhibit 227 are customers of Crew Tile. *Id*. at 1802:22 – 25; *see* Pltf. Ex. 227.

Testimony from Patrick McFarlen

80.     Mr. McFarlen was not retained by Porcelanosa to provide any opinions about Crew Tile's damages, so he cannot refute any opinions about damages offered by Steven Hazel. *Id*. at 2084:7 – 15.

81.     Porcelanosa is luxury tile that was used at the Denver International Airport ("DIA"). *Id*. at 2087:20 – 25.

82.     Mr. McFarlen did not have any of Porcelanosa's sales data, so he could not have considered any of the direct sales being made by Porcelanosa from 2012 when evaluating Crew Tile. *Id*. at 2092:2 – 7.

83.     If Porcelanosa was unwilling to supply product to Crew Tile, it would have a negative effect on Crew Tile's operations. *Id*. at 2095:18 – 22.

84.     If Porcelanosa began directing Crew Tile's customers to buy directly from Porcelanosa in 2013, it would have a negative overall impact on the valuation of Crew Tile. *Id*. at 2096:9 – 13.

85.     If Porcelanosa decided to cut off all products to Crew Tile in January 2014, it would have a really big negative impact on the valuation of Crew Tile. *Id*. at 2096:14 – 17.

86.     Mr. McFarlen did not analyze at all what impact on Crew Tile's profitability occurred when Porcelanosa began to sell direct and compete in 2012 and 2013. *Id*. at 2100:14 – 20.

III.   <u>A</u>RGUMENT

**A.     This Court Should Balance the Equities, Divest the Defendants of the Windfall they Enjoy from their Wrongful Conduct, and Provide Some Reasonable Compensation to Crew Tile.**

To recover for unjust enrichment or *quantum meruit*, a plaintiff must demonstrate that: (1) at plaintiff's expense; (2) defendant received a benefit; (3) under circumstances that would make it unjust for defendant to retain the benefit without paying. *See Dudding v. Norton Frickey & Assocs.*, 11 P.3d 441, 445 (Colo. 2000) (*quantum meruit*); *See Martinez v. Colo. Dep't of Human Servs.*, 97 P.3d 152, 159 (Colo. App. 2003) (unjust enrichment).   Unjust enrichment is a "legal claim in quasi-contract for money damages based upon principles of restitution." *DCB Constr. Co. v. Central City Dev. Co.*, 965 P.2d 115, 118 (Colo. 1998). "If the elements of unjust enrichment are established, the party who has received the benefit is ordinarily required to make restitution in the amount of enrichment received." *Redd Iron, Inc. v. Int'l Sales & Servs. Corp.*, 200 P.3d 1133, 1136 (Colo. App. 2008).   "The scope of the remedy for unjust enrichment is broad, cutting across both contract and tort law, with its application guided by the underlying principle of avoiding the unjust enrichment of one party at the expense of another." *Univ. of Colo. Found., Inc. v. Am. Cyanamid Co.*, 974 F. Supp. 1339, 1358 (D. Colo. 1997).

**B.     Crew Tile Has Met its Burden on its Equitable Claims.**

Crew Tile is entitled to recover under a theory of unjust enrichment because Porcelanosa received a benefit at Crew Tile's expense under circumstances that would make it unjust for Porcelanosa to retain the benefit without paying. *See DCB Constr. Co.*, 965 P.2d at 119.  Here, the benefit that Porcelanosa received was establishment of a platform for sales of its product in Colorado and significant growth in the market for its products in Colorado during the four years period when Crew Tile worked to create the market from scratch.

Here, Crew Tile spent approximately $500k of its own money to establish and run the business for a period of over four years.  Crew Tile's business was to promote Porcelanosa's product in the Colorado market.  Prior to 2009, Porcelanosa had no direct sales presence in Colorado.  Until Crew Tile came along in 2009, Porcelanosa had no showroom, no local employees, and no local sales force.  At its own expense, Crew Tile built a showroom to display Porcelanosa's products at the Denver Design Center.  Crew Tile paid the rent, and also purchased products from Porcelanosa in order to fill the showroom displays.

There was also a benefit to Porcelanosa in having Crew Tile build a showroom and provide employees to develop the market for Porcelanosa products in Colorado, especially during a time period of economic downturn in 2009.  In addition to the showroom, Crew Tile paid for dozens of display racks that Porcelanosa knew were being placed in tile dealer stores around Colorado.  Crew Tile provided its own employees, at its expense, to market Porcelanosa's products, educate dealers about the products, build a dealer network, promote sales, and service the display racks.   There is no dispute that Plaintiff Crew Tile bore the financial burden of the expenses associated with its business operations.

C.     **Appropriate Considerations for Equitable Damages Include 1) the Amount Crew Tile Spent to Create the Market, 2) the Lost Profits that Crew Tile would have Otherwise Received, and 3) Crew Tile's Standard Markup.**

As damages, Crew Tile does not seek anything for the sales in which Crew Tile already participated in between 2009 and 2013.    However, Crew Tile should be compensated for the sales that Crew Tile did not participate in, both before Crew Tile was put out of business and the prospective sales that it lost afterwards.

It is undisputed that Crew Tile spent approximately $500k of its own money to establish the Colorado marketplace for Porcelanosa products.  These monies were primarily contributed

by investments of Glenn Davis's retirement account, and a $50,000 investment from Ray Perry, individuals whose conduct, based upon the trial record, is not in question. Crew Tile used this money to rent showroom space, pay sales staff, buy display racks, and distribute the product to customers. Had Crew Tile not spent its own money to provide these services, Porcelanosa would have needed to do so at its own expense. Since the end result was Porcelanosa taking over the entire market, a fair way to evaluate the financial benefit of that market is to equate it to the amount of money Crew Tile was required to spend to create it. Accordingly, the value of the Colorado market for Porcelanosa products can be fairly evaluated at $500k.

Another method for evaluation of damages is the loss of prospective customers to another company that put in "virtually no expenditure of time, effort or expense" to obtain the customers' information can result in unjust enrichment. *See Rain Bird Corp. v. Nat'l Pump Co.*, 2003 U.S. Dist. LEXIS 26792, *60-61 (N.D. Miss. Dec. 23, 2003). Here, the prospective customers are those that Crew Tile developed over several years while acting as the sales force for Porcelanosa in Colorado between 2009 and 2014. Porcelanosa promised Crew Tile it would direct its Colorado business (outside Aspen/Pitkin County) to Crew Tile and from email evidence at trial knew that Crew Tile's profit margin was based upon a 20% - 30% markup on the products. After Crew Tile's customers were directed to buy product from Porcelanosa in October 2013, Crew Tile no longer was able to receive its markup since its customers were now buying direct.

Through its expert Steve Hazel, Crew Tile provided evidence at trial that its lost profits for direct sales taken by Porcelanosa were between $400k and $800k. This calculation was irrespective of the existence of a written contract, and was merely a calculation of the profits that Crew Tile would have received if the Colorado sales had through Crew Tile as they had in 2009, 2010, and 2011. Defendant's financial expert Patrick McFarlen did not compute lost profits, so

Mr. Hazel's figures are unrefuted.  In essence, through its wrongful conduct, Porcelanosa cut out its middle man, so Porcelanosa was able to reap both the profit that it would have otherwise made, and also keep the profit that Crew Tile should have made.

The lost profit calculation provided by Mr. Hazel was based on a time period through December 2014.  This time period is appropriate for Crew Tile's claim of unjust enrichment, as Crew Tile was cut out in January 2014, so the calculation extends for another eleven months.  It is undisputed that Porcelanosa's product was luxury, with few if any competitors in Colorado.  If Crew Tile was to shift to a different luxury product line, it would have taken at least a year to build a sales market from scratch for that new product, much like it had already done for Porcelanosa.  In fact, it took Crew Tile approximately three years to build the market for Porcelanosa product in Colorado, so consideration of only eleven months of profits after Crew Tile was cut out is a very conservative approach.

Another valuation method is to look at the benefit Porcelanosa received is the markup that it was no longer paying Crew Tile for Colorado sales.  By cutting out the middle man, Porcelanosa was able to keep all of the profit margin for itself.  The evidence shows that Porcelanosa achieved sales of $971k in Colorado in 2014.  *See* Pltf. Ex. 11, p. 2.  Based on the 20% - 30% markup that Crew Tile should have received on these sales, but instead was retained by Porcelanosa, the benefit was in the range of $194k to $291k.  Since Crew Tile was no longer there to take its 20% - 30% markup, Porcelanosa kept it on each sale that was taken from Crew Tile.  An award of this nature would be consistent with the evidence that Crew Tile's customers felt that Crew Tile should receive some benefit from the work it put in, but would not receive after Porcelanosa took all of the business.  *See* Pltf. Ex. 174 ("maybe they can pay you a fee or something???").

IV.     **CONCLUSION**

Under the circumstances of this case, an equitable award of damage to Crew Tile is appropriate.  Porcelanosa should not be allowed to reap the ongoing benefits of the Colorado market that Crew Tile built without some compensation to Crew Tile.

**WHEREFORE**, Plaintiff respectfully requests that the Court find in favor of Crew Tile on its equitable claims for unjust enrichment and *quantum meruit*, and that the Court award damages as it finds appropriate.

**DATED** this the 26th day of May, 2017.

/s/ David J. Crough_____
Michael S. Burg
David K. TeSelle
David J. Crough
**BURG SIMPSON**
**ELDREDGE HERSH & JARDINE, P.C.**
40 Inverness Drive East
Englewood, CO 80112
Telephone (303) 792-5595
Facsimile (303) 708-0527

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 26th day of May 2017, a true copy of the foregoing **PLAINTIFF'S AND COUNTERCLAIM DEFENDANTS' EQUITABLE CLAIMS OPENING BRIEF** has been served on the following by electronic mail:

James N. Thomaidis, Esq.
Gersh & Thomaidis, LLC
1860 Blake Street, Suite 400
Denver CO 80202
Email:  jt@gtattorneys.com,

*/s/ Amy Florendo*