**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.13-cv-03206-WJM-KMT

**CREW TILE DISTRIBUTION, INC.**;

       Plaintiff and Counter-Defendant,

and

**RYAN A. DAVIS**,
**DARLYNE A. DAVIS**,
**GLENN L. DAVIS**,
**SHANA L. BASTEMEYER**,
**PARADIGM TILE & STONE DISTRIBUTORS, LLC**, and
**G&D DAVIS HOLDINGS, LLC**,

       Counter-Defendants,

v.

**PORCELANOSA LOS ANGELES, INC.**,
**PORCELANOSA NEW YORK, INC.**,
**PORCELANOSA TEXAS, CORP.**, and
**PORVEN, LTD.**,

       Defendants and Counterclaimants

---

## DEFENDANTS' POST-TRIAL BRIEF ON EQUITABLE CLAIMS AND DEFENSES

---

       Pursuant to this Court's Order Directing Post-Trial Briefing on Equitable Claims and Defenses [Dkt. No. 357], dated March 28, 2017, Defendants and Counterclaimants, Porcelanosa Los Angeles, Inc. ("Porcelanosa Los Angeles"), Porcelanosa New York, Inc., Porcelanosa Texas Corp., and Porven, Ltd. (collectively the "Porcelanosa Parties"), by and through undersigned counsel, GERSH & THOMAIDIS, LLC, hereby submit their opening brief on equitable claims and defenses.  In support of their position on equitable claims and defenses, the Porcelanosa Parties state as follows:

1

TABLE OF CONTENTS

**Section/Subsection**                                                                                      **Page**

I.      INTRODUCTION ........................................................................................... 1

II.     ARGUMENT AND AUTHORITY .................................................................. 2

        A.  The Court Should Deny Plaintiff's Equitable Claims Because of the Crew Tile
            Parties' Own Conduct ...................................................................................... 2

        B.  The Court Should Deny Plaintiff's Equitable Claims Because the Crew Tile
            Parties Have Unclean Hands............................................................................. 2

        C.  The Court Should Deny Plaintiff's Equitable Claims Because the Doctrine of
            *In Pari Delicto* Mandates the Court Leave the Parties as It Finds Them. ................... 4

        D.  Plaintiff is Precluded from Any Recovery for Damages on Any Equitable
            Claims Due to Crew Tile's Failure to Mitigate Damages........................................... 5

        E.  Piercing the Corporate Veil Advances the Public Interest, and Properly
            Punishes Frauds and Other Abuses by the Crew Tile Parties ..................................... 6

            I.    The Court Should Pierce the Corporate Veil Because Subject
                  Entities Were Merely Alter Egos of Individual Crew Tile Parties ............ 6

            ii.   The Court Should Similarly Allow for Reverse Veil Piercing
                  Because Individual Crew Tile Parties Utilized Entities as Façades .......... 8

        F.  The Court Should Apply a Bad-Faith Fee-Shifting Analysis and Award
            Defendants Attorneys' Fees and Costs for the Crew Tile Parties' Misconduct. ...... 10

III.    THE PORCELANOSA PARTIES' STATEMENT OF MATERIAL FACTS ............... 11

IV.     CONCLUSION ........................................................................................... 22

## TABLE OF AUTHORITIES

**Cases/Citations**                                                              **Page(s)**

*Abernethy v. Wright*, 27 Colo. App. 239, 148 P. 277 (1915). ....................................... 4

*Bushner v. Bushner*, 134 Colo. 509, 307 P.2d 204 (1957). .......................................... 4

*Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991). ...................................................... 10

*City of Westminster v. Centric-Jones Constructors*, 100 P.3d 472 (Colo. App. 2003). ............... 6

*Conestoga Pines Homeowners' Ass'n v. Black*, 689 P.2d 1176 (Colo. App. 1984). .................... 3

*Dudding v. Norton Frickey & Assocs., 11 P.3d 441, 445 (Colo. 2000)* ...................................... 3

*Fish v. East*, 114 F.2d 177 (10th Cir. 1940). ......................................................... 8

*Fox v. Vice*, 563 U.S. 826 (2011). .................................................................. 9

*Francis Ex Rel. Goodridge v. Dahl*, 107 P.3d 1171 (Colo. App. 2005). ................................ 6

*Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. ____ (2017). ...................................... 10

*Great Neck Plaza, L.P. v. Le Peep Restaurants, LLC*, 37 P.3d 485 (Colo. App. 2001). .......... 7, 8

*Harsh v. Cure Feeders, LLC*, 116 P.3d 1286 (Colo. App. 2005). ..................................... 6

*Hottinger Excavating & Ready Mix, LLC v. R.E. Crawford Constr., LLC, 2014 WL 6461350, at
   *6 (D. Colo. Nov. 18, 2014)* . ................................................................. 2

*In re Marriage of Lodeski*, 107 P.3d 1097 (Colo. App. 2004). ...................................... 2

*In re Phillips*, 139 P.3d 639 (Colo. 2006). ...................................................... 7, 8, 9

*Link v. Wabash R. Co.*, 370 U.S. 626 (1962). ..................................................... 10

*McCallum Family L.L.C. v. Winger*, 221 P.3d 69 (Colo. 2009). ...................................... 7

*Merrill v. Abbott*, 7 B.R. 843 (D. Utah 1987). ..................................................... 5

*Micciche v. Billings*, 727 P.2d 367 (Colo. 1986). .................................................. 7

*Morganroth & Morganroth v. DeLorean*, 213 F.3d 1301 (10th Cir. 2000). ........................... 10

*Pac. Dev., Inc. v. United States*, 1979 WL 1283 (D.D.C. Jan. 3, 1979). ............................. 9

*Potter v. Swinehart*, 184 P.2d 149 (Colo. 1947). ................................................... 5

*Rhine v. Terry*, 143 P.2d 684 (Colo. 1943). ................................................................................ 4

*Salzman v. Bachrach*, 996 P.2d 1263 (Colo. 2000). ..................................................................... 3

*Sender v. Simon*, 84 F.3d 1299 (10th Cir. 1996). ......................................................................... 5

*Shamrock Oil & Gas Co. v. Ethridge*, 159 F. Supp. 693 (D. Colo. 1958). .............................. 8, 9

*Walk-In Med. Ctrs., Inc. v. Breuer Capital Corp.*, 778 F. Supp. 1116 (D. Colo. 1993). ............. 8

*Walshe v. Zabors*, 2016 WL 1572375, at *11 (D. Colo. Apr. 18, 2016) . ................................... 3

*Ward v. Cooper*, 685 P.2d 1382 (Colo. App. 1984). ................................................................... 8

*Wilson v. Prentiss*, 140 P.3d 288 (Colo. App. 2006)…………................................................... 3

*Van Zanen v. Qwest Wireless, LLC*, 522 F.3d 1127 (10th Cir. 2008). ........................................ 5

OTHER AUTHORITIES

Dobbs, Law of Remedies § 2.4(2) (2d ed. 1993)……...……………………………….………3

# I.  INTRODUCTION

The Court noted in its Summary Judgment Order of September 9, 2016, regarding the December 8, 2009, Distributor Agreement [Dkt. No. 166-1]-- "[t]here is no apparent way to reconcile the factual disputes without raising the suspicion that one or more parties is being dishonest." (*See* Summary Judgment Order [Dkt. No. 236], dated Sept. 9, 2016, at p. 15, ¶ 3).  The Court then noted it must "…switch back and forth between two totally different views of reality, one in which the Agreement was signed and one in which it was forged." (*Id.* at p. 15, ¶ 4).

The jury found against Crew Tile Distribution, Inc. ("Crew Tile" or Plaintiff") "…on Counterclaimants' Abuse of Process Claim," and also concluded that the Porcelanosa Parties "…proved their claims for abuse of process…" against Ryan A. Davis and Darlyne A. Davis. (*See* Jury Verdict Form [Dkt. No. 355], dated March 24, 2017, at p. 3, Part B).  Analogously, the jury found that "[Crew Tile Ryan A. Davis and Darlyne A. Davis] intentionally filed the claims constituting this lawsuit"; and "[t]he principal reason for [Crew Tile's Ryan A. Davis's and Darlyne A. Davis's] filing of [their] claim was not for the proper legal purpose for which such process is used, in that Crew Tile's claim was devoid of reasonable factual support"; and "[Crew Tile's, Ryan A. Davis's and Darlyne A. Davis's actions caused Porcelanosa injuries, damages, and/or losses." (*See* Final Jury Instructions [Dkt. No. 343], dated March 24, 2017, at p. 45).

The net effect of the foregoing resolution is that Crew Tile and Counterclaim Defendants, Ryan A. Davis, Darlyne A. Davis, Glenn L. Davis, Shana L. Bastemeyer, Paradigm Tile & Stone Distributors, LLC, and G&D Davis Holdings, LLC (collectively the "Crew Tile Parties") *were dishonest* and one view of reality is proper-- that in which that *Distributor Agreement was forged*.

On these bases alone, any equitable claims remaining, at least with respect to the Crew Tile Parties, should be extinguished.  However, the Crew Tile Parties also received the benefit of their bargains related to the actual contracts (for example the Dealer Account Applications and

Exhibitor Agreements) between the Crew Tile Parties and the Porcelanosa Parties, which governed the actual relationship and the conduct of the parties. Despite this, the Crew Tile Parties had no qualms with dishonesty in their business dealings and attendant conduct.[1]

The Porcelanosa Parties now set forth arguments in support of the affirmative defenses of: (a) the Doctrine of Unclean Hands, (2) the Doctrine of *In Pari Delicto*, and (3) the Doctrine of Failure to Mitigate Damages. The Porcelanosa Parties further argue that equity directs that the Court should pierce the corporate veil in order to avoid the inequitable result of protecting certain of the Crew Tile Parties' frauds. The Porcelanosa Parties also assert that the Court should employ its inherent authority to impose the Porcelanosa Parties' costs and attorneys' fees upon Crew Tile, Ryan A. Davis and Darlyne A. Davis, as a sanction and to deter future abusive litigation.

## II.    ARGUMENT AND AUTHORITY

Any argument the Crew Tile Parties may now assert based on their equitable claims must fail because of the doctrines of Unclean Hands, *In Pari Delicto*, and Failure to Mitigate Damages.

### A.    *The Court Should Deny Plaintiff's Equitable Claims Because of the Crew Tile Parties' Own Conduct*

While a plaintiff cannot ultimately recover on both contract and quasi-contract claims, "[a] party pursuing contract claims may also pursue [equitable] claims in the alternative." *See Hottinger Excavating & Ready Mix, LLC v. R.E. Crawford Constr., LLC*, 2014 WL 6461350, at *6 (D. Colo. Nov. 18, 2014). "To recover in *quantum meruit*, a plaintiff must demonstrate that: (1) at plaintiff's expense; (2) defendant received a benefit; (3) under circumstances that would make it unjust for

---

[1] A brazen example of this dishonesty was the Crew Tile Parties disregard for their obligations regarding the return of the tile exhibitors owned by the Porcelanosa Parties. On January 7, 2014, Porcelanosa Los Angeles terminated the Exhibitor Agreement, dated March 29, 2010. (*See* Pl.'s Tr. Ex. 170). Porcelanosa Los Angeles required that the Crew Tile Parties, "within ten (10) days following receipt of the notice of termination, return to Porcelanosa Los Angeles all exhibitors (as defined by contract) to Porcelanosa Los Angeles's warehouse." (Pl.'s Trial Ex. 170). Not only did the Crew Tile Parties not return the exhibitors, but they kept certain exhibitors from January 7, 2014 through the date of this filing, using multiple exhibitors at trial, displaying them prominently behind the Crew Tile Parties' table.

defendant to retain the benefit without paying." *Dudding v. Norton Frickey & Assocs.*, 11 P.3d 441, 445 (Colo. 2000). Essentially the same elements define unjust enrichment. *Lewis v. Lewis*, 189 P.3d 1134, 1141 (Colo. 2008). Unjust enrichment is "designed to restore the plaintiff to his or her prior status." *Walshe v. Zabors*, 2016 WL 1572375, at *11 (D. Colo. Apr. 18, 2016) (citing *Robinson v. Colo. State Lottery Div.*, 179 P.3d 998, 1007 (Colo.2008) and Restatement (First) of Restitution § 1 (1937)). Determining whether a party is entitled to this relief "requires a trial court to 'engage in a highly fact-intensive inquiry.'" *Id.* (quoting *Dudding*, 11 P.3d at 445). Crew Tile failed to demonstrate that the Porcelanosa Parties received any benefit at its expense. Further, Crew Tile and its principals are guilty of conduct involving fraud, deceit, unconscionability, and bad faith, which injured the Porcelanosa Parties and affect the balance of equities between parties.

**B.    The Court Should Deny Plaintiff's Equitable Claims Because the Crew Tile Parties Have Unclean Hands**

The "unclean hands" doctrine provides an equitable defense enabling a defendant to defeat equitable remedies. *Wilson v. Prentiss*, 140 P.3d 288, 293 (Colo. App. 2006). Under this doctrine, a court considering equitable claims may exercise its discretion to deny the remedy sought. *Id.* (citing Dobbs, Law of Remedies § 2.4(2) (2d ed. 1993)). Whether the doctrine applies is a question of fact and law that involves an exercise of judicial discretion. *Conestoga Pines Homeowners' Ass'n v. Black*, 689 P.2d 1176 (Colo. App. 1984). "One who has engaged in improper conduct regarding the subject matter of the cause of action may, as a result, lose entitlement to an equitable remedy." *In re Marriage of Lodeski*, 107 P.3d 1097, 1103 (Colo. App. 2004).

Elements demonstrating the doctrine of unclean hands involve a showing that the party seeking equitable relief is "(1) guilty of conduct involving fraud, deceit, unconscionability, or bad faith, (2) directly related to the matter at issue, (3) that injures the other party, and (4) affects the balance of equities between the litigants." *Cartel Asset Mgmt. v. Ocwen Fin. Corp.*, No. 01-cv-01644-REB-CBS, 2010 WL 3522409, at *3 (D. Colo. Aug. 11, 2010) (citing *In re New Valley*

*Corp.*, 181 F.3d 517, 523 (3d Cir. 1999)).

Here, the jury found in the Porcelanosa Parties' favor on Crew Tile's breach of contract claims and on the Porcelanosa Parties' abuse of process counterclaim against Crew Tile. There can be no question that the inequitable conduct by Crew Tile is sufficiently related to the substance of its breach of contract claim, and therefore to Crew Tile's quasi-contract equitable claims, to permit the Porcelanosa Parties to successfully assert that Crew Tile had unclean hands, directly related to the matter at issue, and is now precluded from the equitable relief it seeks.

The jury found that Crew Tile had failed to prove the existence of a valid and enforceable contract between Crew Tile and Porcelanosa Los Angeles. However, critical to this analysis, the lack of a valid and enforceable contract is not where the jury's scrutiny ended. The jury also found that Crew Tile, Ryan A. Davis, and Darlyne A. Davis had abused the judicial process by fraudulently creating a contract and subsequently bringing and maintaining the instant lawsuit based on that contract. This unconscionable conduct epitomizes what the doctrine of unclean hands developed to protect against.[2] The doctrines of "clean hands" and of "unclean hands" are instrumental to public policy, devised to protect the integrity of the court. *Salzman v. Bachrach*, 996 P.2d 1263, 1269 (Colo. 2000) (citing *Rhine v. Terry*, 143 P.2d 684, 685 (Colo. 1943)).

That the Crew Tile Parties steadfastly maintained that the Distributor Agreement existed, from November 22, 2013, when the initial Complaint [Dkt. No. 1] was filed, and during the entire pendency of this lawsuit, further renders their hands unclean. The record from trial shows that Crew Tile negotiated another exclusive agreement with Alcalagres Tile (Defs. Trial Ex. A37), pursued the sale of competitive tile products (Defs. Trial Ex. A37, A39, and A42), and inexplicably

---

[2] In *Rhine v. Terry*, 143 P.2d 684, 684-85 (Colo. 1943) the Colorado Supreme Court explained that the "cardinal maxim that 'he who comes into a court of equity must come with clean hands,' simply means that equity refuses to lend its aid in any manner to one seeking its active interposition who has been guilty of fraudulent or unconscionable conduct in the matter with relation to which he seeks relief."

abandoned Porcelanosa Los Angeles's property following the eviction from its showroom (Trial Trans. 1574:6-25), among other things.  This conduct not only reveals the non-existence of the Distributor Agreement, but provides a road map of misrepresentations by which third parties can identify Crew Tile's and its principals' fraud, deceit and bad faith.

The reality of this entire proceeding is that Crew Tile, Ryan A. Davis, and Darlyne A. Davis, and likely others, fraudulently created the Distributor Agreement with the intent to extort a monetary settlement from the Porcelanosa Parties, through the misuse and abuse of the judicial system.  Crew Tile should not be permitted to recover for such egregious and inequitable conduct, particularly when a jury has found that its claims at law were devoid of any factual support.

**C.    The Court Should Deny Plaintiff's Equitable Claims Because the Doctrine of In Pari Delicto Mandates the Court Leave the Parties as It Finds Them**

In the unlikely event that the Porcelanosa Parties are seen to have any culpable conduct in these proceedings, the doctrine of *in pari delicto* should then apply.  This doctrine is rooted in the principle that the court will leave equally culpable parties where they stand. *Van Zanen v. Qwest Wireless, L.L.C.*, 522 F.3d 1127, 1132-33 (10th Cir. 2008).  The general rule is that when parties to an illegal [fraudulent, or inequitable] bargain are *in pari delicto*, a court will not "aid either to enforce, revoke, or rescind." *Id.* at 1133 (citing *Potter v. Swinehart*,184 P.2d 149, 151 (Colo. 1947).  The Tenth Circuit has described the doctrine of *in pari delicto* as: "one who has himself participated in a violation of law cannot be permitted to assert in a court of justice any right founded upon or growing out of the illegal transaction." *Sender v. Simon*, 84 F.3d 1299 (10th Cir. 1996) (citing *Merrill v. Abbott*, 7 B.R. 843, 857 (D. Utah 1987) (internal quotation marks omitted)).

Once again, Crew Tile cannot now recover in equity because Crew Tile, Ryan A. Davis, and Darlyne A. Davis were found by a jury to have abused the judicial process by maintaining a lawsuit based on a fraudulent contract.  To allow Crew Tile to recover in equity for inequitable actions that it took of its own accord, and not undertaken for the Porcelanosa Parties' benefit,

would permit Crew Tile to perpetuate the very fraud, deceit and bad faith identified by the jury.

**D.**    ***The Plaintiff is Precluded from Any Recovery for Damages on Any Equitable Claims Due to Crew Tile's Failure to Mitigate Damages***

Even if Crew Tile had been able to prove that it incurred expenses associated with acting as a distributor of Porcelanosa products, contrary to the evidence presented during trial, it had a duty to take reasonable steps under the circumstances to mitigate any potential damages. Damages may not be recovered for any injuries that might reasonably have been avoided by the plaintiff. *Harsh v. Cure Feeders, LLC*, 116 P.3d 1286, 1288 (Colo. App. 2005); *see also City of Westminster v. Centric-Jones Constructors*, 100 P.3d 472, 480 (Colo. App. 2003). Failure to mitigate damages refers to a party's "failure to take such steps as are reasonable under the circumstances to minimize resulting damages." *Francis Ex Rel. Goodridge v. Dahl*, 107 P.3d 1171, 1173 (Colo. App. 2005).

Crew Tile did not take any steps to mitigate its damages. Rather, Crew Tile vacated its showroom  providing no notice to Porcelanosa Los Angeles (Trial Trans. 1027:20-23); did not return exhibitors, displays or samples (Trial Trans. 834:8-10; 1775:1-4); allowed those exhibitors, displays or samples to be thrown away by its former landlord (Trial Trans. 1574:6-13); did not timely pay Porcelanosa Los Angeles for products; and invented "Operation Shutdown Denver" to advance its ostensible damages (Pl. Trial Ex. 135), to name only a few failures to mitigate its damages. Unaware of the foregoing, Porcelanosa continued to sell products to Crew Tile until January of 2014, several months after the initiation of this litigation (Defs. Trial Ex. B30 at 1).

**E.**    ***Piercing the Corporate Veil Advances the Public Interest, and Properly Punishes Frauds and Other Abuses by the Crew Tile Parties***

 i.    <u>The Court Should Pierce the Corporate Veil Because Subject Entities Were Merely Alter Egos of Individual Crew Tile Parties</u>

Members of a corporation or a limited liability company can be held liable for their own torts, even if they purportedly were acting on behalf of the company, "so long as they personally participated in the act constituting the tort." *See e.g. Sedoy v. JW Ventures, LLC*, No. 15-cv-02168-

6

RBJ, 2016 WL 3522110, at *2 (D. Colo. Dec. 23, 2016), citing C.R.S. § 7-80-107(1) and *Sheffield Services Co. v. Trowbridge*, 211 P.3d 714, 719-20 (Colo. App. 2009) (applying the section to a manager of an LLC).   The doctrine of piercing the corporate veil allows a court to impose individual liability on corporate shareholders and limited liability company members stemming from the company's debts.   Here, the Porcelanosa Parties' piercing the corporate veil claim argues that the Alter Ego Defendants (i.e. G&D Davis Holdings, LLC, the Radicchio Domestic Trust, and the Stardust Domestic Trust) are the alter egos of Crew Tile, Ryan A. Davis and Darlyne A. Davis.

A corporation is generally treated as a legal entity separate from its shareholders, officers, and directors, and permits shareholders to invest with the assurance that they will not be held personally liable for the corporation's debts. *See e.g. McCallum Family L.L.C. v. Winger*, 221 P.3d 69, 73-74 (Colo. 2009); *In re Phillips*, 139 P.3d 639, 643-44 (Colo. 2006); *Micciche v. Billings*, 727 P.2d 367, 372-73 (Colo. 1986).   In Colorado, *Sheffield Services* applied the veil piercing theory to limited liability companies. *Sheffield Services supra*.   A corporate veil may be pierced, "if not doing so would defeat public convenience, justify wrong, or protect fraud." *Great Neck Plaza, L.P. v. Le Peep Restaurants, LLC*, 37 P.3d 485, 490 (Colo. App. 2001).

To determine whether it is appropriate to pierce the corporate veil, a court must make a three-part inquiry. *Phillips*, 139 P.3d at 644; *Micciche*, 727 P.2d at 372-73.   First, the court must determine whether the corporate entity is the "alter ego" of the person or entity in issue. *Phillips*, 139 P.3d at 644.   Courts consider a variety of factors in determining status as an alter ego, including whether (1) the corporation is operated as a distinct business entity; (2) funds and assets are commingled; (3) adequate corporate records are maintained; (4) the nature and form of the entity's ownership and control facilitate misuse by an insider; (5) the business is thinly capitalized; (6) the corporation is used as a "mere shell"; (7) legal formalities are disregarded; and (8) corporate assets are used for noncorporate purposes. *Winger*, 221 P.3d at 74 (citing *Phillips*, 139 P.3d at 644.)

Piercing the corporate veil may be determined when, as here, the owners use the corporate form to further their own personal goals, as enumerated.  The court must then determine whether justice requires recognizing the substance of the relationship over the form because the corporate fiction was "used to perpetrate a fraud or defeat a rightful claim." *See Phillips*, 139 P.3d at 644. This does not require actual fraud, complete with a showing of intent. *See Shamrock Oil & Gas Co. v. Ethridge*, 159 F. Supp. 693, 696 (D. Colo. 1958).  Rather, a party only must show that retention of the corporate form would produce inequitable consequences. *Id.* Inequitable consequences include the "manifest abuse of the corporate form," including "intent to use the corporation as a shield for fraud."  *Walk-In Med. Ctrs., Inc. v. Breuer Capital Corp.*, 778 F. Supp. 1116, 1123 (D. Colo. 1993) (citing *Ward v. Cooper*, 685 P.2d 1382, 1383 (Colo. App. 1984)).

In analyzing whether to pierce the corporate veil, the most important consideration is whether an equitable result will be achieved by disregarding the corporate form and holding an individual personally liable for the acts of the business entity. *Phillips*, 139 P.3d at 644.  This determination is essential as "[p]iercing the corporate veil is an equitable remedy, requiring balancing of the equities in each particular case." *Great Neck Plaza*, 37 P.3d at 490.

    ii.    <u>The Court Should Similarly Allow for Reverse Veil Piercing Because Individual Crew Tile Parties Utilized Entities as Façades</u>

For Paradigm Tile & Stone Distributors, LLC ("Paradigm Tile"), G&D Davis Holdings, LLC, the G&D Davis Holdings Trust, the Radicchio Domestic Trust, and the Stardust Domestic Trust (collectively the "Alter Ego Defendants"), each are entities created and owned by Ryan A. Davis, Glenn L. Davis, and Darlyne A. Davis and reverse veil piercing must be considered.

Reverse veil piercing imposes liability on a corporation or limited liability company for the obligations of an individual shareholder. *See In re Phillips*, 139 P.3d at 644.  In an "outside reverse piercing" claim, an outside third-party seeks to impose liability on the corporation so as to recover debts owed by an individual shareholder. *See In re Phillips*, 139 P.3d at 645.

In *Shamrock Oil & Gas v. Ethridge*, a Federal district court adopted a broad definition of reverse veil piercing in a case with similar facts to the one at hand. *Shamrock Oil & Gas v. Ethridge* 159 F. Supp. 693 (D. Colo. 1958). In applying reverse veil piercing, the *Shamrock* court stressed that "[t]he abstraction of the corporate entity should never be allowed to bar out and pervert the real and obvious truth." *Id.* at 696. Here, the Porcelanosa Parties now seek to reverse pierce the corporate veil in order to reach the individual parties' assets, which have been inequitably transferred to the Alter Ego Defendants.

In Colorado, the same three-pronged test is applied in veil piercing and reverse veil piercing cases. *See In re Phillips*, 139 P.3d at 646. However, certain factors must be considered differently due to the inverse nature of the claim. In reverse veil piercing, a plaintiff alleges that an individual member or shareholder is incapable of satisfying a debt because the individual has divested all of their assets into a corporate alter ego. Hence, overcapitalization of a corporate alter ego can be evidence of fraud and serve as a basis for reverse veil piercing. *See Pac. Dev., Inc. v. United States*, 1979 WL 1283, at *2 (D.D.C. Jan. 3, 1979).

By divesting their assets to the Alter Ego Defendants, Ryan A. Davis and Darlyne A. Davis intentionally sheltered their individual assets. As a result, Ryan A. Davis and Darlyne A. Davis are likely incapable of satisfying debts owed by each individually and by Crew Tile, their "family business." (*See e.g.* Trial Trans. 504:3-5). In addition to the jury verdict rendered in this case, such debts include the judgment against Crew Tile and Darlyne Davis in favor of CFPM, LLC. (*See e.g.* Defs. Trial Ex. B8). In fact, the testimony of Glenn L. Davis demonstrates that the sole purpose in forming G&D Davis Holdings, LLC, the Stardust Domestic Trust, and the Radicchio Domestic Trust was to consolidate assets after Crew Tile and Darlyne A. Davis were sued by CFPM, LLC. (*See e.g.* Trial Tr. 1451:11-17; 1453:13-21). A veil may be pierced where the corporate shield is being used to defraud creditors. *See Fish v. East*, 114 F.2d 177 (10th Cir. 1940).

9

In "consolidating assets," the Alter Ego Defendants became overcapitalized with respect to Ryan A. Davis's and Darlyne A. Davis's individual assets. For example, Glenn Davis testified that certain Alter Ego Defendants holds he and Darlyne A. Davis's primary residence at 14860 Pecos Street, Broomfield, Colorado 80023. (*See* Trial Tr. 1452:10-16).

**F.      *The Court Should Apply a Bad-Faith Fee-Shifting Analysis and Award Defendants Attorneys' Fees and Costs for the Crew Tile Parties' Misconduct***

As noted above, Crew Tile has engaged in unusually egregious conduct in bringing and maintaining this lawsuit, predicated solely on the fraudulent Distributor Agreement. As such, this Court should use its inherent equitable power to sanction Crew Tile's, Ryan A. Davis's and Darlyne A. Davis's conduct by placing the burden of all of the Porcelanosa Parties' attorneys' fees and costs on each, jointly and severally. Federal courts possess inherent powers that are not conferred by rule or statute, "to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. ____, p. 5 (2017) (quoting *Link v. Wabash R. Co*., 370 U.S. 626, 630-631 (1962). These powers include "the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45 (1991).

A court may shift only those attorneys' fees incurred because of the misconduct at issue in the case. *Goodyear Tire & Rubber Co.*, 581 U.S. at p. 6. And, when using its inherent power to shift attorney's fees, a court must establish a causal link between the litigant's misbehavior and the legal fees paid by the opposing party. *Id.* Thus, the party seeking reimbursement for fees may recover only the portion of fees that he would not have paid but for the misconduct. *Fox v. Vice*, 563 U.S. 826, 836 (2011). In the Tenth Circuit, the bad faith fee-shifting exception allows attorneys' fee awards only for litigation conduct and not for the underlying previous conduct which gave rise to the cause of action. *See Morganroth & Morganroth v. DeLorean*, 213 F.3d 1301, 1317 (10th Cir. 2000). However, in this instance, Crew Tile's, Ryan A. Davis's and Darlyne A. Davis's

10

litigation conduct, as well as the conduct which gave rise to the cause of action, are inextricably linked as they created the fraudulent contract, which precipitated and facilitated the cause of action.

## III.   DEFENDANTS' STATEMENT OF MATERIAL FACTS

1.      The Parties to this litigation submitted Stipulations for this case which are incorporated in their entirety herein, by reference. (*See* [Dkt. No. 343] at p. 7-8).

2.      Shana Bastemeyer testified that she was aware and had knowledge that Porcelanosa was selling its products through companies like Home Depot, Great Indoors, and Prosouce, during the relevant time period from 2009 to 2013. (Trial Trans. 218:11-24).

3.      In exchange for a $50,000.00 contribution, Ray Perry received a 15 percent ownership in Crew Tile. (Trial Trans. 269:13).

4.      Ray Perry furnished a check dated June 28, 2010 to "Crew Tile" in the amount of $5,000 and Contemporaneously, Ryan Davis and Ray Perry agreed that Ryan Davis owned 85% of Crew Tile Distribution, Inc. and that Ray Perry owned the remaining 15% of Crew Tile. (Def. Trial Ex. A33 at 1-2).

5.      Ray Perry testified that his attorney filed Articles of Amendment with the Colorado Secretary of State to change the name of "Crew Tile Distribution" to "Crew Tile Distribution, Inc."  (Trial Trans. 269:17-20; Defs. Trial Ex. X at 8-9).

6.      Ray Perry testified that he received an e-mail on or around August 25, 2010, wherein Ryan Davis informed him that Crew Tile was carrying Alcalagres Tile and that Crew Tile had started negotiations with Alacalagres regarding an exclusivity agreement. (Trial Trans. 278:2-4; *see* Defs. Trial Ex. A37).

7.      Ryan Davis testified that he was previously employed by Porcelanosa Los Angeles from sometime in 2003 until July 20, 2004, at which point Porcelanosa Los Angeles fired Ryan Davis due to the "conflict of interest that [Ryan Davis] was starting his own flooring company."

(Trial Trans. 303:5-8).

8.      Ryan Davis did not disclose "his involvement to [Porcelanosa Los Angeles] as required by [Porcelanosa Los Angeles's] policy on conflict of interest."  (Defs. Trial Ex. I; *see* Trial Trans. 303:9-13).

9.      Ryan Davis testified that Crew Tile "never wound up doing anything with Alcalagres." (Trial Trans. at 354:19-20).

10.     On September 2, 2008, Infinite Flooring & Design ("Infinite Flooring") submitted a second Account Application for a credit account to Porcelanosa Los Angeles, which listed Ryan Davis, Glenn Davis, and Darlyne Davis as individuals authorized to charge to the account, became the operative agreement between the parties. (Trial Trans. 485:9; Defs. Trial Ex. O).

11.     In filling out the "Customer Application (C.O.D.)" form to establish an account with Porcelanosa on behalf of Infinite Flooring, dated March 25, 2004, Darlyne Davis signed the form as "Darlyne Johnson" and listed only herself as the "Owner." (Trial Trans. 492:15-17; Defs. Trial Ex. D at 4).

12.     Ryan Davis, Darlyne Davis, and Glenn Davis, individually, each owned shares of Infinite Flooring because it was a family entity.  (Tr. Trans. 500:4-10).

13.     On July 20, 2010, Ryan Davis executed the "Minutes of Action by Consent of The Special Combined Meeting of the Directors and Shareholders of Crew Tile Distribution, Inc." in which he represented that he was the "Sole Shareholder and Director" of Crew Tile. (Trial Trans. 503:1 – 504:5. Defs. Trial Ex. A32 at 2).[3]

14.     On March 28, 2011, in furtherance of the dealer relationship between Crew Tile and Porcelanosa Los Angeles, Crew Tile submitted a new Dealer Account Application to

---

[3] Additionally, Ryan Davis, by and through execution of this "Consent," issued 315 shares of Class B Common stock to Ray Perry in exchange for a $50,000.00 contribution to Crew Tile Distribution, Inc.

Porcelanosa Los Angeles, which, upon submission, became the operative agreement between the parties.  (Trial Trans. 509:4 – 512:22; Pl. Trial Ex. 115).

15.     At trial, contrary to the written record, Ryan Davis testified that he was the owner of Infinite Flooring.  (Trial Trans. 587:11-19).

16.     Ryan Davis acted as the incorporator and incorporated Infinite Flooring, as a Colorado corporation on September 27, 2005, and in doing so, authorized the corporation to issue 10,000 shares. (Trial Trans. 607:24 – 609:18; Defs. Trial Ex. L at 2-3).

17.     On December 14, 2009, Francisco "Paco" Montilla, the General Manager of Porcelanosa Los Angeles, and Jack Handley, the Outside Sales Representative for Porcelanosa Los Angeles, flew to Denver, at the request of Ryan Davis, in an attempt to support Crew Tile and to and view Crew Tile's showroom at the Denver Design Center.  *See*, Jack Handley Trial (Tr. 687:1-7; 694:21-24; 758:18-22; 823:23-25).

18.     At trial, Jack Handley testified sales from Colorado compared with Porcelanosa Los Angeles's total sales volume was relatively small, including as compared to other regions. (Trial Trans. 758:7-11).

19.     As a matter of policy, Porcelanosa entities do not enter into exclusive agreements with any dealer or re-seller of tile in any geographic region in the United States.  (Trial Trans. 759:19-22).  During the 2009 timeframe, Porcelanosa LA did not grant exclusivity to any dealer or distributor within its territory.  (*See* Trial Tr. 759:12-15).

20.     On June 15, 2009, Ryan Davis informed Jack Handley during a telephone call that he had secured investors who were willing to invest $500,000 with "RG Crew" in order to promote Porcelanosa's products.  (Trial Trans. 769:4-18; 770:5-25; *see also* Defs. Trial Ex. Y).

21.     Jack Handley testified that it was his understanding that "RG Crew" was going to be Infinite Flooring with a different name.  (Trial Trans. 770:23-25; 776:8-10).

22.     Jack Handley stated that when he took over the territory that included Colorado, Infinite Flooring was already a customer, and that there were probably 50 or 60 other different accounts ranging from dealers to architects and designers. (Trial Trans. 771:22 – 773:4).

23.     Porcelanosa entities executed standard written exhibitor agreements with customers, including Crew Tile, which required a security deposit to be sent to the Porcelanosa entity and in return the Porcelanosa entity would provide the customer the ability to use to displays and exhibit Porcelanosa products.  (*See* Trial Trans. 777:21 – 779:24).

24.     Jack Handley testified that he did not sign the Distributor Agreement during his employment or after his employment with Porcelanosa Los Angeles.  (Trial Trans. 783:11-13).

25.     Occasionally, Porcelanosa Los Angeles provided Crew Tile, at no charge, with various products and materials to assist in the building of Crew Tile's showroom.  (*See* Trial Trans. 829:9-17; Trial Trans. 1774:14-25).

26.     Porcelanosa Los Angeles entered into several Exhibitor Agreements with Crew Tile, under which Porcelanosa Los Angeles loaned to Crew Tile a display or "exhibitor" to showcase Porcelanosa brand products.  (Trial Trans. 830:2-17; *see, e.g.* Pl. Trial Ex. 48; Pl. Trial Ex. 56; Pl. Trial Ex. 60).

27.     Between 2009 and 2013, Porcelanosa Los Angeles lent to Crew Tile approximately 30 exhibitors or displays, subject to the terms and conditions of the Exhibitor Agreements.  (Trial Trans. 834:2-7).

28.     Despite the fact that exhibitors belonged to Porcelanosa Los Angeles, Crew Tile never returned those exhibitors.  (Trial Trans. 834:8-10; Trial Trans. 1775:1-4).

29.     Darlyne Davis admitted that she definitely made some mistakes with regard to the corporate formalities. (Trial Trans. 915:6-8).

30.     When Paradigm Tile was created in the fall of 2012, Darlyne Davis combined

14

Crew Tile's accounting with Paradigm Tile's accounting, and only maintained one set of books for the two separate companies.  (Trial Trans. 950:5-20; 951:13-15).

31.     Darlyne Davis admitted that she knowingly combined accounts "more out of convenience for myself to keep track of everything than what probably was – I don't want to say legally incorrect."  (Trial Trans. 951:1-4).

32.     One of the stated reasons for using Paradigm Tile to keep Crew Tile's books was that CFPM, LLC, had begun to garnish Crew Tile's account following the entry of judgment. (Trial Trans. 951:13-24; 1034:11-18).

33.     Crew Tile used credit cards from Infinite Flooring to pay for tile and other supplies because Crew Tile did not have sufficient credit on its credit cards. (Trial Trans. 997:6-13).

34.     In addition to keeping only one set of books for the two companies, Crew Tile began directing payments only to Paradigm Tile accounts because Crew Tile had closed its bank account.  (Trial Trans. 1034:1-9).

35.     Darlyne Davis filed Articles of Incorporation for RG Crew with the Colorado Secretary of State, on June 2, 2009. (Defs. Trial Ex. X at 1-3).

36.     On September 14, 2009, Darlyne Davis filed Articles of Amendment with the Colorado Secretary of State to change the name of "RG Crew" to "Crew Tile Distribution."  (Defs. Trial Ex. Y at 4-5).

37.     On September 14, 2009, Darlyne Davis, on behalf of Crew Tile, prepared and submitted an Account Application for a Credit Account with Porcelanosa Los Angeles, which listed Darlyne Davis and Ryan Davis as individuals authorized to charge to the account, but listed Darlyne Davis as the only owner, partner, or corporate officer. (Trial Trans. 1008:23 – Trial Trans. 1009-6; Pl. Trial Ex. 29).

38.     Darlyne Davis testified at trial that Sark Tile sued "Bryan Davis, not Ryan, Bryan,

B-r-y-a-n," and that this lawsuit was related to a dispute that occurred in Nebraska. (Trial Trans. 1013:10-22).

39.     Crew Tile and Darlyne Davis never informed Porcelanosa Los Angeles that they had been evicted from the Denver Design Center because "[they] didn't think it was their business. They didn't own us." (Trial Trans. 1027:20-23).

40.     On December 8, 2009, Crew Tile and CFPM, LLC, the landlord of the Denver Design Center, entered into a Standard Lease for the showroom at the Denver Design Center. (Trial Trans. 1030:13-16; *see* Defs. Trial Ex. A15).

41.     On December 28, 2012, Darlyne Davis, as agent for Crew Tile, responded to a Complaint by Sark Tile in the County Court of Lancaster County Nebraska, and stated that Crew Tile "has closed as of November 1, 2012 and no longer is doing business in the State of Colorado." (Trial Trans. 1031:19 – 1033:23; Defs. Trial Ex. B12; Def. Trial Ex. B13).

42.     Darlyne Davis testified that she was the sole shareholder of Crew Tile on paper seven months in but she was doing it on behalf of herself, Ryan Davis, and Glenn Davis because they "[w]e're kind of all in one." (Trial Trans. 1043:13-16).

43.     Darlyne Davis testified that she knew that they "would ultimately be responsible for it." (Trial Trans. 1044:18).

44.     On September 14, 2010, Darlyne Davis e-mailed Ryan Davis to communicate the items and costs of an order to be placed with Alcalagres. (Trial Trans. 1097:25—1098:16; Defs. Trial Ex. A39).

45.     Darlyne Davis testified that an account titled in the name of Crew Tile Distribution was used to pay the attorney who assisted Ryan Davis with his bankruptcy. (Trial Trans. 1109:6–1110:5).

46.     Crew Tile was a "platinum" dealer which entitled it to a 55% discount; Manuel

Prior testified that during the relevant time period most of the dealers that they had in Porcelanosa LA were "platinum" dealers. (Trial Trans. 1142:16-17).

47.     Paradigm Tile was formed with the Colorado Secretary of State on September 17, 2012.  (Trial Tr. 1449:6-10; *see also* Def. Trial Ex. B4).

48.     The stated owners, partners, and corporate officers of Paradigm Tile were Glenn Davis and Ryan Davis.  (Trial Trans. 1457:15-25; Defs. Trial Ex. B11).

49.     Michelle Sudovich testified that her job responsibilities at Crew Tile included "getting in there and trying to sell Porcelanosa tile and Alcalagres." (Michelle Sudovich Dep. Trans. at 15:12-13).

50.     Crew Tile made an offer of employment to Adela Stransky on November 8, 2010, which made no mention of Crew Tile selling only Porcelanosa brand products, but rather stated that the employee could not "use any of Crew Tile Distribution pricing practices and customers or vendors base to profit personally." (Defs. Trial Ex. A42 at 1).

51.     CFPM, LLC had to "chase [Crew Tile] for the security deposit for the showroom and the Denver Design Center" and Crew Tile immediately was behind on its rent payment obligations, even though it was given five months of free rent. (Trial Trans. 1561:17-19; 1562:11; 1564:13-19).

52.     On or around March 29, 2012, Crew Tile was evicted from the showroom at the Denver Design Center because they were in default of their lease agreement and owed CFPM, LLC "a lot of money."  (Trial Trans. 1572:7-21).

53.     Upon vacating the showroom at the Denver Design Center, Crew Tile and the Davises abandoned various tile products and displays belonging to Porcelanosa Los Angeles, did not leave the showroom in the condition that Crew Tile had received it in, and eventually the landlord had to bear the cost in removing the entire floor.  (Trial Trans. 1573:2-23).

17

54.     Porcelanosa Los Angeles did not recover any of the tile products or displays that were abandoned by Crew Tile as the items were ultimately discarded by CFPM, LLC in connection with the restoration of the showroom.  (Trial Trans. 1574:6-13).

55.     While Crew Tile and the Davises abandoned the various tile products and displays belonging to Porcelanosa Los Angeles, they did remove and take with them the light fixtures owned by the landlord of the Denver Design Center.  (Trial Trans. 1574:14-25).

56.     In addition to abandoning Porcelanosa Los Angeles's tile products and displays, when Crew Tile and the Davises vacated the showroom, they also caused significant damage to the space, for which CFPM, LLC ultimately had to pay to restore to a rentable condition.  (Trial Trans. 1576:14-25).

57.     Following Crew Tile's eviction from the showroom, CFPM, LLC, the landlord of the Denver Design Center, initiated a lawsuit against Crew Tile and Darlyne Davis to recover both back rent owed by Crew Tile and damages caused in vacating the showroom.  (Trial Trans. 1577:1-4; 1583:21-24).

58.     On October 29, 2012, Crew Tile and Darlyne Davis entered into a Confession to Judgment, whereby both Crew Tile and Darlyne Davis confessed to a judgment in favor of CFPM, LLC, in the amount of $100,000, plus prejudgment interest of $1,000 and attorney fees and costs in the amount of $3,608.72.  (Defs. Trial Ex. B8).

59.     On October 30, 2012, a judgment in the amount of $104,608.72 was entered against Crew Tile and Darlyne Davis and in favor of CFPM, LLC, the landlord of the Denver Design Center.  (Defs. Trial Ex. B9).

60.     Ryan Davis filed a Voluntary Petition for Individual, Chapter 7 bankruptcy with the United States Bankruptcy Court for the District of Colorado on March 22, 2011. (Defs. Trial Ex. A54 at 1).  In filing the Voluntary Petition for Bankruptcy, Ryan Davis stated that the "debts

18

[were] primarily business debts." (Defs. Trial Ex. A54 at 1).  On the Voluntary Petition for Bankruptcy, Ryan Davis represented that "Infinite Flooring & Design" was another name used by the Debtor in the last 8 years. (*Id.*).

61.     Ryan Davis represented that he owned 5 percent or more of the voting or equity securities of Infinite Flooring, within six years immediately preceding the commencement of his Voluntary Petition for Bankruptcy. (*Id.* at 11).

62.     On the Bankruptcy Petition, Ryan Davis further represented that Glenn L. Davis owned 49% of Infinite Flooring. (*Id.* at 12).

63.     In the Bankruptcy Petition, inclusive of Schedule B, Ryan Davis did not list his interest in Crew Tile, which would have included the purported "Distribution Agreement" with Porcelanosa Los Angeles. (Defs. Trial Ex. A54 at 17-19).

64.     G&D Davis Holdings, LLC is a Nevada limited liability company.  (Trial Trans. 1449:22-1450:2).

65.     The Operating Agreement for G&D Davis Holdings, LLC was executed on August 24, 2012.  (Trial Trans. 1450:3-6).

66.     The G&D Davis Holdings Trust is a trust that was created at or around the same time as G&D Davis Holdings, LLC.  (Trial Trans. 1450:17-25).

67.     Glenn Davis is the Managing Trustee of the G&D Davis Holdings Trust.  Glenn Davis Trial Trans. 1451:1-4.  Ryan Davis is the Manager of both the G&D Davis Holdings Trust and G&D Davis Holdings, LLC.  (Trial Trans. 1451:5-10).

68.     Glenn Davis, Darlyne Davis, and Ryan Davis created the G&D Davis Holdings Trust and G&D Davis Holdings, LLC, with the assistance of Attorney Stephen Berken, for the purpose of consolidating and holding certain assets of the Davises.  (Trial Trans. 1451:11-17).

69.     Attorney Stephen Berken assisted Crew Tile and Darlyne Davis in the negotiation

of the Confession to Judgment with CFPM, LLC, which eventually resulted in the $104,608.72 judgment entered in favor of CFPM, LLC.  (Trial Tr. 1451:18-21; Defs. Trial Ex. B8).

70.     The Stardust Domestic Trust is a trust that was formed on or around August 24, 2012, approximately two months prior to the judgment entered against Crew Tile and in favor of CFPM, LLC.  (Trial Trans. 1452:22-1453:2).

71.     As with the G&D Davis Holdings Trust, G&D Davis Holdings, LLC, and the Radicchio Domestic Trust, the Stardust Domestic Trust was created by the Davises with the assistance of Attorney Stephen Berken.  (Trial Trans. 1452:22-1453:4).

72.     The Stardust Domestic Trust holds a number of the Davis' assets, including a one percent ownership interest in Paradigm Tile.  (Trial Trans. 1452:10-16).

73.     The Stardust Domestic Trust also holds the primary residence of Glenn Davis and Darlyne Davis at 14860 Pecos Street, Broomfield, Colorado 80023.  (Trial Trans. 1452:10-16).

74.     The Radicchio Domestic Trust is a trust that was formed on or around August 24, 2012, approximately two months prior to the judgment entered against Crew Tile and in favor of CFPM, LLC.  (Trial Trans. 1453:13-21).

75.     As with the G&D Davis Holdings Trust, G&D Davis Holdings, LLC, and the Stardust Domestic Trust, the Radicchio Domestic Trust was created by the Davises with the assistance of Attorney Stephen Berken.  (Trial Trans. 1453:13-21).

76.     The Radicchio Domestic Trust was created by the Davises in direct response to CFPM, LLC's lawsuit against Crew Tile and Darlyne Davis.  (Trial Trans. 1453:13-21).

77.     As of September 17, 2012, the Radicchio Domestic Trust was the registered agent of Paradigm Tile.  (Trial Trans. 1454:21-25; Defs. Trial Ex. B4).

78.     As of September 17, 2012, Paradigm Tile's registered address was 14860 Pecos Street, Broomfield, Colorado 80023.  (Trial Trans. 1454:5-17; Defs. Trial Ex. B4).

79.     The address of 14860 Pecos Street, Broomfield, Colorado 80023 is also the address belonging to the primary residence of Glenn Davis and Darlyne Davis.  (Trial Trans. 1454:15-20).

80.     As of September 17, 2012, the Radicchio Domestic Trust's registered address was 14860 Pecos Street, Broomfield, Colorado 80023, which is the same address as that belonging to Paradigm Tile, as well as Glenn Davis and Darlyne Davis.  (Trial Trans. 1455:1-7; Defs. Trial Ex. B4).

81.     Jeff Schnepp testified that Crew Tile received that same price group as any dealer. (Schnepp Depo. Trans. 114:18-19).

82.     Jeff Schnepp further testified that "a distributor is someone that sold multiple lines at a bigger discount in order to make the profit margin for him to sell that line and sell it to other dealers. (*Id.* 114:23 – 115:1).

83.     Jeff Schnepp asked Ryan Davis to send him the purported Distributor Agreement so he could help Ryan Davis; however, Ryan Davis never sent the purported agreement. (*Id.* 115:17-22).

84.     Porcelanosa Los Angeles's total sales in the state of Colorado for the year 2008 were $89,938.26.  (Trial Trans. 1752:10-11).

85.     Porcelanosa Los Angeles's total sales in the State of Colorado for the year 2009 were $132,334.16. (Trial Trans. 1752:12-14).

86.     Porcelanosa Los Angeles's total sales in the State of Colorado for the year 2010 were $240,962.21. (Trial Trans. 1752:15-17).

87.     Porcelanosa Los Angeles's total sales in the State of Colorado for the year 2011 were $267,835.20. (Trial Trans. 1752:18-20).

88.     Porcelanosa Los Angeles's total sales in the State of Colorado for the year 2012

were $914,700.34. (Trial Trans. 1752:21-23).

89.     Porcelanosa Los Angeles had total sales of $914,700.34 in Colorado for the year 2012; $455,000 of the total was accounted for product that was shipped to San Diego, California, but that was invoiced to Colorado due to the location of the architectural firm, HST San Diego HH LP c/o Benjamin West, which was the company that registered the project. (Trial Trans. 1753:7-22; *see also* Defs. Trial Ex. B78).

90.     On November 15, 2012, Paradigm Tile submitted a Dealer Account Application to Porcelanosa LA, which, upon submission, was rejected by Porcelanosa Los Angeles. (*See* Trial Trans. 1773:15-1774:13; Defs. Trial Ex. B11).

91.     Crew Tile received displays and samples from Porcelanosa Los Angeles amounting to roughly $49,000. (Trial Transcript 1774:14-22).

92.     Neither Porcelanosa Los Angeles, nor any other Porcelanosa company, have recouped any portion of the $49,000 worth of displays and samples. (Trial Trans. 1774:23-25).

93.     Defendants' Expert, Patrick McFarlen testified that Crew Tile had less than $50,000 invested into it. (Trial Trans. 2071:23-24).

94.     Further, Patrick McFarlen testified that year-over-year there was no growth at Crew Tile, that the company did not make a profit, and that for the 2010 tax return, the balance sheet was not included. (Trial Trans. 2072:17-25).

## IV.  CONCLUSION

Once again, the net effect of the jury's verdict is that the Crew Tile Parties were dishonest and the Distributor Agreement was forged.

The Porcelanosa Parties have set forth arguments in support of the affirmative defenses of: (a) the Doctrine of Unclean Hands, (2) the Doctrine of *In Pari Delicto*, and (3) the Doctrine of Failure to Mitigate Damages. The Porcelanosa Parties further argue that equity directs that the

Court should pierce the corporate veil in order to avoid the inequitable result of protecting certain of the Crew Tile Parties' frauds.  The Porcelanosa Parties also assert that the Court should employ its inherent authority to impose the Porcelanosa Parties' costs and attorneys' fees upon Crew Tile, Ryan A. Davis and Darlyne A. Davis, as a sanction and to deter future abusive litigation.

The Court should deny Crew Tile's equitable claims.  The Court should pierce the corporate veil in order to avoid the inequitable result of protecting certain of the Crew Tile Parties' frauds.  And the Court should employ its inherent authority to impose the Porcelanosa Parties' costs and attorneys' fees upon Crew Tile, Ryan A. Davis and Darlyne A. Davis, jointly and severally, as a sanction and to deter future abusive litigation.

WHEREFORE, the Porcelanosa Parties respectfully request this Court: (a) deny all equitable claims made by Plaintiff; (b) pierce the corporate veil that the Crew Tile Parties sought to establish by and through their alter ego corporations, limited liability companies, and trusts; and (c) require Crew Tile, Ryan A. Davis and Darlyne A. Davis, jointly and severally, to pay all reasonable and attendant attorneys' fees and costs the Porcelanosa Parties have incurred in litigating this matter, along with interest as allowed by Colorado law.

DATED this the 30th day of May, 2017.

Respectfully submitted,

*/s/ James N. Thomaidis*                              .
James N. Thomaidis, Esq.
Jared A. Barnard, Esq.
GERSH & THOMAIDIS, LLC
1860 Blake Street, Suite 400
Denver, CO 80202
Telephone (303) 293-2333
Facsimile (303) 293-2433

*Attorneys for Defendants/Counterclaimants*

23

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 30th day of May, 2017, and true and correct copy of the foregoing was filed via ECF filing system and notice was sent electronically to the following:

David Crough, Esq.
David TeSelle, Esq.
Michael Burg, Esq.
Burg, Simpson, Eldredge, Hersh & Jardine, PC
40 Inverness Drive East
Englewood, CO 80112
(303) 792-5595
(303) 708-0527 – Fax
dcrough@burgsimpson.com
dteselle@burgsimpson.com
mburg@burgsimpson.com

*Attorneys for Plaintiff/Counterclaim Defendant, and Counter Defendants*

By: *<u>/s/ Jared Barnard                        </u>*
              Attorney