**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge William J. Martínez**

Civil Action No.13-cv-3206-WJM-KMT

CREW TILE DISTRIBUTION, INC.,

Plaintiff and CounterDefendant,

and

RYAN A. DAVIS,
DARLYNE A. DAVIS,
GLENN L. DAVIS,
SHANA L. BASTEMEYER,
PARADIGM TILE & STONE DISTRIBUTORS, LLC, and
G&D DAVIS HOLDINGS, LLC,

CounterDefendants,

v.

PORCELANOSA LOS ANGELES, INC.,
PORCELANOSA NEW YORK, INC.,
PORCELANOSA TEXAS, CORP., and
PORVEN, LTD.,

Defendants and CounterClaimants.

---

**AMENDED ORDER ENTERING FINDINGS OF FACT AND RULING ON EQUITABLE CLAIMS AND DEFENSES**

---

This business dispute pending under 28 U.S.C. § 1332 proceeded to a jury trial from March 13–24, 2017, and a jury verdict entered on the parties' legal claims. (*See* ECF No. 355.)[1] At the Court's direction, the parties submitted proposed findings of fact and post-trial briefs on their equitable claims. (ECF Nos. 357, 370–82.) The

[1] The Court granted Summary Judgment and Judgment as a Matter of Law against certain claims pursuant to Fed. R. Civ. P. 56 & 50(a), respectively. (*See* ECF Nos. 236, 341.)

Court now enters this Order setting out its findings of fact and rulings on the parties' equitable claims and defenses.

## I. PROCEDURAL BACKGROUND

Plaintiff, Crew Tile Distribution, Inc. ("Crew Tile"), initiated this action on November 22, 2013, bringing a claim for breach of contract and related claims against Defendants Porcelanosa Los Angeles, Inc., Porcelanosa New York, Inc., Porcelanosa Texas, Corp., and Porven, Ltd. (together, "Porcelanosa" or "Defendants"). (ECF No. 1.)

Porcelanosa in turn asserted counterclaims against Crew Tile and certain of its principals and employees, including Ryan A. Davis, Darlyne A. Davis, Glenn L. Davis, and Shana L. Bastemeyer, as well as against two related business entities, Paradigm Tile & Stone Distributors, LLC ("Paradigm"), and G&D Davis Holdings, LLC. (ECF No. 132 at 19–51.)[2] In addition, in asserting counterclaims for declaratory judgment and for piercing the corporate veil, Porcelanosa described CounterDefendant G&D Davis Holdings, LLC and two additional entities, the Radicchio Domestic Trust and the Stardust Domestic Trust, as "Alter Ego Defendants." (*Id.* at 48–51.)

Following the Court's rulings on the parties' motions for summary judgment (ECF No. 236) and mid-trial motions for judgment as a matter of law, only Crew Tile's claim for breach of contract and Porcelanosa's counterclaim for abuse of process were submitted to the jury, which returned a verdict in Porcelanosa's favor on both claims. The Court reserved ruling post-trial on the parties' equitable claims and defenses.

---

[2] Defendants originally named the CounterDefendants other than Crew Tile as "Third Party Defendants," but the Court concluded they were more properly captioned as Counterclaim Defendants (*i.e.*, CounterDefendants). (*See* ECF No. 225.)

These include Crew Tile's claim for unjust enrichment/*quantum meruit*, and Porcelanosa's counterclaims for declaratory judgment and piercing the corporate veil/alter ego liability. Porcelanosa also now seeks an award of attorneys' fees as a sanction under the Court's inherent powers. (*See* ECF No. 375 at 10–11.)

## II. BACKGROUND AND FINDINGS OF FACT

The Court has previously described in detail the underlying facts and the nature of this case, including in the Court's Summary Judgment Order. (ECF No. 236.) Only a brief summary is set out below to provide context for the present rulings. More detailed facts are not repeated, and familiarity with the case and the parties and witnesses is presumed. The Court sets out below those findings of disputed facts that are directly material to the present rulings.

### A. Summary of Dispute

Porcelanosa is a family of companies based in Spain that manufactures and distributes tile products. Crew Tile was a Denver-area company that sold Porcelanosa's products from approximately 2009 through 2013, although the nature of that business relationship is centrally disputed here.

Crew Tile initiated this lawsuit for breach of contract and related claims on November 22, 2013, alleging that the parties had entered into a contract in December 2009 (the "Distributor Agreement"), making Crew Tile the exclusive distributor of Porcelanosa products in most of Colorado (excluding Pitkin County) for at least five years. (*See* ECF No. 85 ¶¶ 12–14; ECF No. 250 at 2–3.) Crew Tile alleged that Porcelanosa purposefully breached that Distributor Agreement beginning in 2012 by

selling products through other dealers, and later by directly taking over distribution of its products into Colorado (through a Texas subsidiary), beginning in 2013. In particular, Crew Tile claimed it was owed a $2.5 million termination or buyout payment under the terms of the Distributor Agreement. (ECF No. 250 at 3–4.)

Porcelanosa acknowledged that Crew Tile had been one of many dealers of its products in Colorado, but denied that Crew Tile had ever been a distributor, or that Crew Tile ever held any exclusive rights regarding sale or distribution of Porcelanosa products. Further, Porcelanosa alleged that it never signed or entered into the 2009 Distributor Agreement, had never seen the document prior to this litigation, and that the document "is fraudulent" representing "a conspiracy to create a falsified agreement and seek payment under it." (ECF No. 250 at 5.) Porcelanosa therefore brought a counterclaim for abuse of process and related counterclaims. (*Id.* at 6–7.)

As set out above, after a lengthy trial, the jury returned a general verdict in Porcelanosa's favor, finding Crew Tile had not proved its breach of contract claim, and finding in favor of Porcelanosa on its abuse of process claim against Crew Tile, Ryan Davis, and Darlyne Davis, and awarding Porcelanosa damages of $460,000.[3] (ECF No. 355.)

**B. Findings of Fact**

The Court finds the following facts were proven by a preponderance of the

[3] The jury found CounterDefendant Shana Bastemeyer was not liable on Defendants' abuse of process claim.

evidence admitted at trial.[4]

1. Falsification of Distribution Agreement

1. A preponderance of the evidence shows that the alleged Distribution Agreement was not a legitimate or enforceable contract entered into by Porcelanosa.

2. A preponderance of the evidence shows that Crew Tile, acting through its principals, including Ryan Davis and Darlyne Davis, falsified the Distribution Agreement or participated in doing so.

3. As a corollary, a preponderance of the evidence shows that at the time Crew Tile filed this lawsuit, Crew Tile, Ryan Davis, and Darlyne Davis knew or should have known that the Distributor Agreement was not a valid or enforceable contract.

4. A non-exhaustive summary of evidence supporting the above findings includes:

   a. Although Crew Tile alleged the Distributor Agreement was prepared by Porcelanosa, it includes terms that are nonsensical in the context of Porcelanosa's tile products. For example, the Distributor Agreement contemplates return of tiles for repair at Porcelanosa's factory (Ex. 46, ECF No. 85-1 at 4, ¶ V.1), seeks to void warranty terms "if . . . [Crew Tile] attempts to make any internal changes to" the tiles, or if "the serial

---

[4] Where specific testimony or evidence is cited, the Court finds that evidence was credible and probative as to the Court's findings. In many instances, contrary evidence was also introduced, as many of the relevant facts were contested at trial. This Order in no way attempts to address all of the voluminous evidence admitted at trial. Neither all of evidence which supported the Court's findings is cited, nor does the Court attempt to explain or distinguish every piece of contrary evidence. The facts set out here were, in the Court's view, proven by a preponderance of the evidence after weighing and considering *all* of the voluminous and competing evidence, and the Court's findings also reflect its evaluation of the witnesses' credibility. Facts that are not enumerated here but are discussed in Part III below also reflect the Court's findings by a preponderance of the evidence.

number plate is removed" (*id.* at 6, ¶ V.2). It includes a clause covering "Patent indemnity," although no patents were at issue. (*Id.* at 4, ¶ IV.2.) This clause addressed remedies related to altering the "compatibility with the hardware or firmware comprising the Product or the software utilized thereon," although Porcelanosa's tiles do use or comprise firmware or software. (*Id. at 4,* ¶ IV.2.)[5]

b. Given such obviously irrelevant terms, the Court agrees with Porcelanosa's business practices expert, Mr. M. Kent McSparran (*see generally* Tr. at 1980–81), who testified that the Distributor Agreement was "clearly drafted for some sort of technical product," not for Porcelanosa's tile products (Tr. at 1993).

c. The Distributor Agreement also included spelling, typographical, and similar errors inconsistent with Crew Tile's claim that it had been prepared by Porcelanosa. For instance, the agreement purports to be entered on behalf of "Porcelanosa USA," which is a trade name but not the name of any legal entity. (Ex. 46 at 1.) The agreement mis-spelled the names of product lines it supposedly covered and included at least one product line

[5] All citations to materials filed in the docket are to the page number indicated in the CM/ECF header, which sometimes differs from the documents' internal pagination.

Citations using the abbreviation "Ex." are to exhibits admitted into evidence at trial. (*See generally* ECF Nos. 345, 347.) Where possible, the Court includes parallel citations to copies of those trial exhibits as filed in the Court's docket (*i.e.,* to the "ECF No."), although not all exhibits admitted at trial have been filed in the docket. (*See* ECF No. 356.)

that did not exist in December 2009. (*Id.*; Tr. 781–83.)[6] Mr. Francisco "Paco" Montilla Soto ("Mr. Montilla"), then General Manager of Porcelanosa-Los Angeles, testified there was no way he would have signed the agreement, or authorized any one else to do so, given such errors. (Tr. at 1216.)

d. These errors make Crew Tile's claim that the document was prepared and executed by Porcelanosa's employees in 2009 not credible.

e. Likewise, given Ryan Davis's previous employment for Porcelanosa and knowledge of their products, it is not credible that he would have executed the Distributor Agreement while believing in good faith that it had been prepared by Porcelanosa or represented a valid contract.

f. The fact that the Distributor Agreement contains a $2.5 million minimum buyout or termination clause in favor of Crew Tile (Ex. 46. at 5, ¶ VI(2.)(c)) underscores the non-credibility of Crew Tile's claim that it was negotiated, prepared, and executed by Porcelanosa. More likely than not, business parties would not enter such a high stakes agreement without carefully negotiating and reviewing its terms and removing obvious errors. This finding is supported by Mr. McSparran's testimony (*see, e.g.*, Tr. at 1981, 1992 (an "exclusive distribution arrangement is . . . a pretty rare thing," typically negotiated with advice of counsel)), by evidence that neither Mr. Montilla nor Mr. Handley was authorized to bind Porcelanosa on a

[6] Citations to trial testimony ("Tr.") are to the respective pages in the Court Reporter's trial transcript, docketed at ECF Nos. 359–69.

contract of such magnitude (*see* Tr. at 1217), and by common sense and experience.

g. Mr. McSparran explained that using an Internet search he found a template agreement reflecting that the Distributor Agreement had been obviously but clumsily derived from the online template. (Tr. at 1986–88.)

h. Mr. McSparran testified that many substantive terms of the Distributor Agreement were highly unusual or made no sense in the context of the commercial relationship between Crew Tile and Porcelanosa. (*See* Tr. at 1990–96.) In particular, he characterized the $2.5 million termination clause payable to Crew Tile as "unbelievable" and "completely irrational from a business perspective," given the "very slanted" benefits conferred on Crew Tile without corresponding value conveyed to Porcelanosa, and that this is "[u]nusual because typically, if anything, a contract slants the other way because they're typically drafted by the manufacturer." (Tr. at 1993, 2032–33.)

i. Mr. McSparran's testimony regarding the highly unusual terms of the Distributor Agreement was credible and consistent with common sense and the evidentiary record as a whole.

j. Given the evidence summarized above, it is more likely than not that the person or persons who drafted the Distributor Agreement did so with the purpose of attempting to confer unusual benefits upon Crew Tile.

k. Jack Handley, who Crew Tile alleges signed the Distributor Agreement, testified unequivocally that he did not do so, and that had never seen it

before 2013. (Tr. at 783:11–13.)

l. No persuasive explanation was offered for why Mr. Handley allegedly signed the Distributor Agreement, rather than Mr. Montilla, who was the general manager of Porcelanosa-Los Angles and Mr. Handley's superior, given the Davises' allegation that although Mr. Montilla was present at the time of the alleged execution of the Distributor Agreement, he directed a subordinate employee, Mr. Handley, to sign the multi-million dollar agreement. (Tr. at 335.) In the Court's view, Crew Tile's version of this event is not credible, and defies both commonly accepted business practices as well as common sense.

m. Mr. Montilla testified that he did not remember Mr. Handley signing the Distributor Agreement, and that he was certain he had not directed Jack Handley to sign it and had not watched this occur, contrary to Crew Tile's allegations. (Tr. at 1200.)

n. Mr. Montilla further testified that he had no knowledge of Crew Tile acting as a Porcelanosa Distributor. (Tr. at 1143.) To the contrary, he testified that Crew Tile had been a dealer like other dealers. (Tr. at 1144.) He testified that "[i]n the U.S. we [Porcelanosa] just don't work with distributors," and that it would have been inconsistent with Porcelanosa policy to enter into such an agreement, because "[w]e simply don't work with distributors, and we wouldn't have given exclusive rights to a distributor." (Tr. at 1197, 1201.) The comparatively little evidence arguably contradicting this testimony was not probative overall, in that it

related to distributors outside the United States or constituted use of the term “distributor” in informal or non-binding contexts.

o. During the relevant timeframe after December 2009, Mr. Handley, as Porcelanosa’s sales representative for Colorado,[7] repeatedly directed Crew Tile’s employees to remove the language from e-mail signatures representing that Crew Tile was the “exclusive” provider of Porcelanosa products in Colorado. (ECF No. 382-10 at 4–5 (M. Sudovich testifying that Mr. Handley directed her to remove language describing Crew Tile from her e-mails “[m]aybe a dozen times,” but that Ryan Davis directed her to ignore this direction and “keep it on there”); ECF No. 382-9 at 4–5.)

p. No current or former Porcelanosa employee who testified had seen the Distributor Agreement or was aware of its existence prior to the communications leading up to this lawsuit. (*See, e.g.*, ECF No. 380-10 at 154:14–24; Tr. at 871–72, Tr. at 1195; Tr. at 1523.)

q. Similarly, Adela Stransky testified (via deposition) that when she worked for Crew Tile in late 2010 and early 2011, Ryan Davis claimed he was then negotiating for the exclusive right to sell Porcelanosa products, but that no such rights were in place at the time. (ECF No. 380-11 at 6.)

r. The testimony of the witnesses who denied that Porcelanosa had entered into the Distributor Agreement, including Mr. Handley and Mr. Montilla, was supported by the substantial weight of the documentary,

[7] The disputed evidence regarding the change of Mr. Handley’s title or responsibilities at Porcelanosa-Los Angeles at different times does not alter the Court’s findings and rulings.

circumstantial, and directly supporting evidence. The contrary testimony by the Davises found far less support in the evidentiary record as a whole.

5. Additional evidence undercutting Crew Tile's and the Davises' explanation of the origins of the Distributor Agreement includes the following:

   a. Although the Distributor Agreement is dated December 8, 2009, the Davises allege that it was executed on December 14, 2009, without notation or correction. (*Compare* Ex. 46 at 1 *with* Tr. at 337, 915.) Ryan Davis's "speculation" that this discrepancy was because of a desire to use the date on Crew Tile's showroom lease (Tr. at 337), and the inconsistent explanation that the parties had planned to meet on December 8 but that "plans changed" (*id.*; Tr. at 915), did not provide a credible explanation for why such a high stakes agreement would be backdated, with no correction, annotation or acknowledgment that this was being done. (ECF No. 343 at 8, ¶ 10.)

   b. Despite the allegation that the Distributor Agreement was executed in December 2009, no contemporaneous evidence reflected preceding negotiations or exchange of drafts was admitted. The lack of any contemporaneous documentary record cast significant doubt on Ryan Davis's explanation that despite "dozens and dozens" of phone conversations in which he negotiated for the Distributor Agreement, he "had never seen a full draft" before it was allegedly executed, when it was allegedly provided by Mr. Handley for the first time, and only in hardcopy. (*See* Tr. at 338.)

c. No copies of the Distributor Agreement were located or produced during discovery other than the single purportedly original (*i.e.*, ink-signed) copy relied upon by Crew Tile and copies transmitted in 2013 at the time of the communications precipitating this lawsuit.

d. Although Crew Tile alleged that the Distributor Agreement was originally executed in triplicate, only one copy was ever located or produced. The Davises' testimony that they had retained a second copy for potential investors (which was lost) and that Porcelanosa retained a copy (which was never located or produced) lacked corroboration in the documentary record. (*See* Tr. at 335

e. After Ryan Davis protested to Porcelanosa's regional sales representative, Jeffrey Schnepp, in spring 2013 that Crew Tile held an exclusive distribution agreement, Mr. Schnepp asked Mr. Davis to provide a copy of the Agreement to attempt to resolve the parties' disagreements. Mr. Davis did not provide a copy of the agreement until the later communications precipitating this litigation. (ECF No. 377-7 at 4.)

f. The earliest documentary evidence in the record of an agreement resembling the Distributor Agreement (other than the disputed document itself) is an editable and unexecuted copy of a similar agreement, drafted as an agreement between Crew Tile and non-party Sark Tile, Inc., that was transmitted by Darlyne Davis to CounterDefendant Shana Bastemeyer on April 14, 2013. (Ex. B22.) Crew Tile's possession of this

template agreement in editable format in 2013, and the existence of a similar executed agreement with Sark Tile dated 2012 (Ex. A78) significantly undercut the credibility of Crew Tile's allegation that the Distributor Agreement was prepared exclusively by Porcelanosa in 2009.

g. On April 19, 2013, five days after Darlyne Davis circulated the editable Sark Tile agreement, Ms. Bastemeyer transmitted a scanned copy of the 2009 Distributor Agreement to other CounterDefendants. (Ex. B26.) No documents produced in discovery other than the purportedly original copy of the Distributor Agreement produced by Crew Tile (and disputed by Porcelanosa) corroborated its existence before this date.[8]

6. In addition, the parties' conduct during the relevant period was inconsistent with the terms of the claimed Distributor Agreement, providing contemporaneous evidence that makes it likely no exclusive distributor relationship existed.

a. Despite purporting to hold exclusive rights to distribute Porcelanosa products in Colorado (outside Pitkin County), Crew Tile's principals and employees were aware that Porcelanosa's products were also sold

---

[8] In addition to the evidence cited above, Porcelanosa introduced the expert testimony of Ms. Wendy Carlson, a forensic document examiner/handwriting expert (*see generally* Tr. at 1849–1973), who opined that it was "highly probable that Ryan Davis wrote the Jack Handley name" on the Distributor Agreement (Tr. at 1885–86), and also that Josep Domingot did not sign the purported 2004 "Exclusivity Agreement" related to ventilated facades (Tr. at 1869; *see also infra* ¶ 20.c.). Although Ms. Carlson was credible as a witness in explaining her opinions and how she reached them, the Court also found that Crew Tile's cross-examination was effective in showing these opinions should be given comparatively lesser weight. Moreover, even without considering Ms. Carlson's testimony, a preponderance of other evidence supports the findings set out in this Order, which are sufficient to resolve the parties' equitable claims and defenses. This makes reliance on Ms. Carlson's testimony unnecessary so the Court does not consider or rely on it.

through other channels in Colorado. (ECF No. 375 at 11, ¶ 2; ECF No. 379 at 10, ¶ 2; Tr. 218–19.) Crew Tile's explanation that such sales were permitted as Porcelanosa's "national accounts," bore no relationship to any terms in of the Distributor Agreement.

b. Despite the Distributor Agreement's term that Crew Tile "agree[d] not to represent or sell other products which are deemed to be competitive with [Porcelanosa's] Product[s] unless agreed to by [Porcelanosa]," Crew Tile sold and/or attempted to sell the products of other manufacturers (including Alcalegres). (Tr. 278, 1138; Ex. A37.) While the parties contested whether such products were "competitive," Crew Tile never sought Porcelanosa's approval to represent or sell the products of another tile manufacturer. (Tr. at 1210–11.)

c. The terms of the Distributor Agreement required Crew Tile to establish and maintain "appropriate, attractive and accessible premises and facilities for the display and demonstration of [Porcelanosa's] Products." (Ex. 46 at 2, ¶ II.1.A.) However, in March 2012 Crew Tile was evicted from its showroom at the Denver Design Center. (ECF No. 375 at 17, ¶ 52; ECF No. 379 at 14, ¶ 52.) Crew Tile thereafter operated out of a warehouse space, not a display facility. (*See* Tr. at 146, 1242.) Crew Tile never informed Porcelanosa it had been evicted because, as Darlyne Davis testified, "[w]e didn't think it was their business." (Tr. at 1027–28; 1243–44.)

d. Crew Tile purchased products from Porcelanosa in "the same price group as any dealer," rather than receiving preferential or more wholesale pricing, as would be expected for an exclusive distributor that was re-selling product to dealers. (*See* ECF No. 377-3 at 3.) The "platinum" pricing level given to Crew Tile was the same given to a high percentage of Porcelanosa dealers and "wasn't really that exclusive a club." (*See* Tr. at 794, 1142, 1803.) In the Court's view this fact alone went a long way toward destroying the credibility of Crew Tile's contention that it was an exclusive Porcelanosa distributor. Without the more advantageous pricing structure a legitimate distributor would normally enjoy in these circumstances, Crew Tile's actual business model—that of a regular retail dealer allegedly selling product to other dealers who could purchase the same product directly from Porcelanosa at similar pricing levels—is absurd and illogical on its face.

e. Mr. Schnepp testified that Porcelanosa was a dealer, not a distributor, and that he was surprised when Ryan Davis claimed Crew Tile was a distributor. (ECF No. 377-7 at 3–4.)

f. A preponderance of the evidence reflected that Crew Tile did not maintain an inventory of Porcelanosa products for re-sale to other dealers, as a distributor would be expected to do. (*See* Tr. at 138–39; 1131–32; ECF No. 380-11 at 4; ECF No. 380-13 at 2, 10.)

g. The evidence reflected that during the time period when Crew Tile was

allegedly the exclusive distributor of Porcelanosa products in Colorado, it was regularly delinquent on payments due to Porcelanosa. (*See, e.g.*, Exs. B15, B16, B17, B18, B19.) In fact, the Davises' prior company, Infinite Flooring & Design ("Infinite"), had a history of significant delinquency with Porcelanosa before December 2009. (*See* Exs. O, T.) This makes it highly unlikely that Porcelanosa—which the uncontroverted trial evidence established is the manufacturer of very highly-regarded, premier tile products, with a business presence all over the world—would make Crew Tile (*i.e.*, the Davises) its exclusive Colorado distributor in December 2009.

h. Both before and after December 14, 2009, the Davises (on behalf of Crew Tile, Infinite Flooring, and Paradigm) executed dealer applications/agreements with Porcelanosa that bore no resemblance to the terms of the Distributor Agreement, nowhere mentioned exclusive distribution or sales rights, and explicitly abrogated any previous agreements between the parties. (Ex. 115, ECF No. 276-7 at 3, ¶ 11 (March 28, 2012 application/agreement stating it "supersedes and takes [the] place of all prior Agreements between Porcelanosa and [Crew Tile]"); *see also* Exs. 29, 115, O, B11.)

i. Despite the Distributor Agreement's terms making Crew Tile's purported distributorship non-assignable and exclusive to Crew Tile, in 2012 the Davises created a second entity, Paradigm, which they used to sell

Porcelanosa products as an alter ego to Crew Tile. No evidence shows that the Davises attempted to amend the Distributor Agreement to account for the operation of two affiliate companies. (See Ex. 46 at 1, ¶ 1; *infra* ¶¶ 7–8.)

j. Overall, little evidence corroborated the testimony of the Davises and Ms. Bastemeyer that Crew Tile had operated as a distributor rather than one dealer among many. The contemporaneous documentary evidence presented by Crew Tile to support this claim was demonstrably inconclusive and not credible. This included documents that used the term "distributor" in informal or non-binding contexts, use of the term by Crew Tile itself, or documents reasonably subject to competing interpretations. No corroborating non-party witnesses supported Crew Tile's claims other than Mr. Perry, whose knowledge was mostly based on representations by Ryan Davis. For instance, no representative of a non-party dealer testified that, as to them, Crew Tile acted as a Porcelanosa distributor in Colorado.

2. <u>Facts and Evidence Related to Veil-Piercing / Alter-Ego Liability Claim</u>

a. *Paradigm*

7. The Davises created Paradigm Tile & Stone Distributors LLC ("Paradigm") in the fall of 2012; it was incorporated with the Colorado Secretary of State on September 17, 2012. (ECF No. 375 at 14, ¶ 30; Ex. B4; ECF No.379 at 14, ¶ 47.)

8. A preponderance of the evidence shows that the Davises operated Paradigm as an alter ego entity for Crew Tile. Evidence supporting this finding includes the following:

   a. On and around October 19, 2012, Shana Bastemeyer and Ryan Davis prepared a communication to customers stating that "[m]oving forward all communications will come through Paradigm . . . including all invoices. . . . please remit all payments . . . to Paradigm." (Ex. B7.)

   b. Paradigm submitted an account application to Porcelanosa on November 14, 2012, listing Ryan Davis and Darlyne Davis as individuals authorized to charge to Paradigm's account, and Ryan and Glenn Davis as Paradigm's owners, and stated "current acct is Crew Tile." (Ex. B11.) Glenn Davis testified this representation was "consistent with the way that we did the business," and that it was "a family owned and run business." (Tr. 1457.)

   c. Darlyne Davis testified that Crew Tile and Paradigm "were actually two entities, but we ran them as one." (Tr. at 1033.)

   d. Shana Bastemeyer testified that Paradigm was "an affiliate company," that she "didn't make a distinction between the two," in representing them to customers, that Paradigm was also a distributor of Porcelanosa's products "[t]hrough Crew [Tile]," and that she and the Davises did business as both entities. (Tr. at 65, 181, 186, 191.)

   e. After the Davises incorporated Paradigm, they maintained a single set of

books for both Paradigm and Crew Tile, and at critical times the two entities shared a single bank account. (Tr. 950–51.)

f. Crew Tile directed its customers to send payments to Paradigm's accounts. (Tr. at 1034; *supra* ¶ 8.a.) Darlyne Davis testified this was to evade the Denver Design Center's garnishment of Crew Tile's bank accounts following Crew Tile's 2012 eviction from its showroom and confession of judgment for unpaid rent. (Tr. at 1034.)

g. The Davises continued using "crewtiledistribution@yahoo.com" to send communications on behalf of both Crew Tile and Paradigm, including to Porcelanosa. (*See, e.g.*, Ex. B15; Tr. at 185.)

h. The Davises' explanation that Paradigm was intended to service a distinct client base from Crew Tile (*see, e.g.*, Tr. at 65–66) was contradicted by the contemporaneous communications showing that *all* of Crew Tile's customers were directed to send payments and communications to Paradigm instead of to Crew Tile, regardless of client or order type.

b. *Other Entities*

9. When Paradigm filed Articles of Incorporation with the Secretary of State, it disclosed the Radicchio Domestic Trust (the "Radicchio Trust") as its registered agent. (Ex. B4.)

10. Non-party "alter ego defendant" the Radicchio Trust was formed on or around August 24, 2012. (ECF No. 375 at 20, ¶ 74; ECF No. 379 at 16, ¶ 74.) Glenn Davis testified that the Radicchio Trust was "my son's" (*i.e.*, Ryan Davis's), and

that he was not familiar with it, did not know what its assets were, and "do[es] es not know for certain" whether it owns (or owned) any portion of Paradigm. (Tr. at 1452.)

11. Non-party "alter ego defendant" the Stardust Domestic Trust (the "Stardust Trust") was also formed by one or more of the Davises on or around August 24, 2012, with assistance from the same attorney who helped them to create the Radicchio Domestic Trust and G&D Davis Holdings, LLC. (ECF No. 375 at 20, ¶¶ 70, 71; ECF No. 379 at 16, ¶¶ 70, 71.)

12. Defendant G&D Davis Holdings, LLC is a Nevada LLC, with an operating agreement executed on August 24, 2012. (ECF No. 375 at 23, ¶¶ 64–65.)

13. Non-party "alter ego defendant" the G&D Davis Holdings Trust is a trust created at around the same time as the other entities noted above; Glenn Davis is the managing trustee. (ECF No. 375 at 23, ¶¶ 66–67; ECF No. 379 at 15, ¶¶ 66–67.)

14. Ryan Davis is the Manager of the G&D Davis Holdings Trust and G&D Davis Holdings, LLC. (ECF No. 375 at 19, ¶ 67; ECF No. 379 at 15, ¶ 67.)

15. The Davises and their employees and investor, Mr. Perry, described their business entities collectively as a "family business." (*See, e.g.* Tr. at 115, 258, 904, 1362, 1374, 1399.) Darlyne Davis testified that "what I do in this company thing, Glenn and Ryan did; or what Ryan did, I and Glenn did. So we . . . might have different names, but we were all one when it came to the company." (Tr. at 914.)

16. Glenn Davis testified that the purpose of the several entities created by the Davis family in August 2012 (including the trust entities) was to consolidate assets. (Tr. at 1451.) These entities were created with the assistance of the same attorney who handled the stipulation confessing to judgment in the litigation with the Denver Design Center, and Glenn Davis testified that the entities were created with the assistance of this attorney "to help us resolve the situation with [the] design center." (Tr. at 1453.)

3. Credibility Considerations

17. The Court's factual findings are informed by a determination that the testimony offered by the Davises (and to a lesser extent by Ms. Bastemeyer) was on the whole less credible than the testimony of the witnesses who established and corroborated Porcelanosa's factual contentions.

18. The evidence showed a history of material misrepresentations, omissions, and or shifting explanations offered by the Davises at various times in connection with the material facts of this case in general, and with matters relevant to the alter ego liability counterclaim in particular, including the following:

   a. In response to a lawsuit filed against Crew Tile and/or the Davises by non-party Sark Tile, Inc., seeking to collect unpaid amounts due in Lancaster County, Nebraska, Darlyne Davis represented to that court as of December 27, 2012 that Crew Tile had "closed as of November 1, 2012 and no longer is doing business in the State of Colorado." (Tr. 1031:19-33:23; Ex. B12; Ex. B13.) At trial she conceded this was not true. Her

explanation that it was a simple mistake was not credible. The Court finds it more likely than not that this was a misrepresentation purposefully made to the Nebraska court in an effort to evade liability on Sark Tile's claims.

b. In his individual bankruptcy petition filed in 2011, Ryan Davis did not disclose any ownership interest in Crew Tile, including no disclosure of the value of the purported Distributor Agreement and its $2.5 million guaranteed buyout provision. (Ex. A54 at 17–19.)

c. The Davises representations over time regarding the ownership and control of their various business entities were at times evasive and/or contradictory. For example:

i. At trial, Ryan Davis testified that Darlyne Davis was the owner of Crew Tile. (Tr. at 500.) In 2009, Darlyne Davis likewise submitted documents to Porcelanosa that listed herself as the only "owne[r], partne[r], or corporate office[r]." (Ex. 29.) However, in 2010 Ryan Davis signed corporate documents representing that *he* was the "sole shareholder and director" of Crew Tile (Ex. A32), offering the excuse at trial that he had been signing "on behalf of our family." (Tr. at 504.) Other evidence (as well as Crew Tile's present briefing) tends to show that Crew Tile is in fact 85% owned by Ryan Davis and 15% by Mr. Perry. (Ex. A33.) As noted, however, Ryan Davis disclosed no ownership in Crew Tile in his 2011 bankruptcy petition. (*Supra*, ¶ 18.b.)

ii. As to Infinite Flooring, Ryan Davis testified that he was "the owner," but also that "his parents" were additional owners and they "all put money into it." (Tr. at 313, 500.) In seeking to open a credit account with Porcelanosa in 2004, Darlyne Davis represented that she was the sole owner of Infinite, but the company's K-1 forms reflect that it was jointly owned by Ryan Davis (34%) and Darlyne Davis (66%). (Ex. B69.) In his 2011 bankruptcy petition, Ryan Davis disclosed Glenn Davis as 49% owner of an unspecified partnership, evidently in reference to Infinite Flooring, since that was the entity he disclosed as connected to the debts he sought to discharge. (Ex. A54 at 11–12.)

iii. The Davises explanations that they were unsophisticated or did not understand the structure of their own business entities were not credible. This lawsuit has put the facts regarding those entities directly at issue for several years. The Davises' professed confusion regarding their own closely-held entities at the time of trial was, in the Court's judgment, more evasive than confused.

19. The trial testimony of Ryan Davis and Darlyne Davis was highly prepared. The Davises testimony frequently emphasized irrelevant facts such as Ryan Davis's military service and the fact that his grandfather "stormed the beaches of Normandy," in obvious efforts to evoke jury sympathy rather than focusing on the relevant facts and evidence. (*See, e.g.*, Tr. at 294, 1354.)

20. The Davises dealings with Porcelanosa were less than honest and candid over a period of many years.

a. On approximately March 25, 2004, while Ryan Davis was then employed by Porcelanosa, Darlyne Davis submitted an account application to Porcelanosa on behalf of Infinite Flooring. She used her maiden name instead of Davis, although this was inconsistent with her legal name, her signature, and her usual practice over the course of many years . (Ex. D, ECF No. 376-5 at 4.) Her explanation that she "must not have been thinking too well" was not at all persuasive. (Tr. at 1002.) In the same document, she listed herself as the sole owner of Infinite flooring, although Ryan Davis was the owner. A few days later, Ryan Davis forwarded the application to a co-worker at Porcelanosa referring to Infinite Flooring as "they" and giving no indication he was affiliated with the company. (Ex. D, ECF No. 376-5 at 1.) More likely than not, these representations were a deliberate effort to conceal Ryan Davis's involvement in Infinite Flooring from Porcelanosa.

b. Ryan Davis was terminated by Porcelanosa as a result of his efforts to open and operate Infinite Flooring and his failure to disclose this venture. Porcelanosa considered this an undisclosed conflict of interest, and dishonest. (Tr. 1472–73, 1476, 1186; Ex. A.)

c. A document dated July 29, 2004—approximately eight days after Ryan Davis's termination from Porcelanosa—purported to be a prior "Exclusivity

Agreement" for Infinite Flooring to have the "exclusive right to distribute" certain ventilated facade products manufactured by Porcelanosa. (Ex. J.) Although bearing the signature of the then-general manager of Porcelanosa-Los Angeles, Mr. Josep Domingot, Mr. Domingot testified that he was certain he had never signed this document. (Tr. at 1532–33.) The ventilated facade products were not approved for use in the United States at that time, and Mr. Domingot testified that "there was no Porcelanosa Group or Porcelanosa Grupo in Anaheim, California," although the document bore the name of such an entity. (Tr. at 1534.) Mr. Domingot testified he would not have negotiated, and did not have authority to enter into, such a contract because "this [*i.e.,* exclusive distribution rights] is one of the things that Porcelanosa does not finish [*sic*] this here with anybody," and that he would never have signed a contract containing the errors in the document. (Tr. 1535.) Ryan Davis's explanation that this was an agreement he and Mr. Domingot negotiated at the same time he was being terminated was not credible.

d. When Crew Tile was evicted from the Denver Design Center in 2012, it never informed Porcelanosa of this material fact; Porcelanosa learned of it only when Mr. Montilla attempted to visit the showroom location but found it empty. (Tr. at 1212.)

## III. ANALYSIS

### A. Crew Tile's Claim for Unjust Enrichment/Quantum Meruit

Although Crew Tile's breach of contract claim failed before the jury, Crew Tile argues it should still prevail on its claim in the alternative for unjust enrichment or *quantum meruit*. (*See* ECF No. 370 at 17–21; ECF No. 379 at 2.) The Court finds that such an award is barred for two reasons.

#### 1. Crew Tile's Equitable Claims are Barred by Unclean Hands

Claims for unjust enrichment or *quantum meruit* are equitable in nature. *See Matter of Gilbert*, 346 P.3d 1018, 1023 (Colo. 2015)*; Lewis v. Lewis*, 189 P.3d 1134, 1140 (Colo. 2008);. "Generally, '[o]ne who comes into equity must come with clean hands.'" *Salzman v. Bachrach*, 996 P.2d 1263, 1269 (Colo. 2000) (quoting Dan B. Dobbs, Law of Remedies § 2.4(2) (2d ed.1993)). Therefore, under the doctrine of "unclean hands," "[m]any different forms of improper conduct may bar a plaintiff's equitable claim." *Id.* Courts apply this doctrine "when a plaintiff's improper conduct relates in some significant way to the claim he now asserts," and "the conduct need not be illegal." *Id.*

Crew Tile's claim for equitable relief is barred under these principles. The Court has found above that Crew Tile, through its principals, falsified the alleged Distributor Agreement or participated in doing so. Crew Tile then sued Defendants on the basis of that document seeking to recover at least $2.5 million. These acts constitute a clear instance of "unclean hands" and bar Crew Tile from recovery in equity. At a minimum, even if the issue of falsification were an open question, a preponderance of the

evidence shows Crew Tile and its principals had reason to know the Distributor Agreement was not a valid and enforceable contract when they filed suit.

Crew Tile argues that because the alleged falsification occurred in 2013, they should still be entitled to recover for their claim of unjust enrichment because it arose before that misconduct. This argument fails for two reasons. First, the Court disagrees with Crew Tile's factual contention that it "was acting in good faith at all times between 2009 and 2013," and that the alleged wrongful conduct "occurred only *after* the quasi-contractual relationship between the parties ended in April 2013." (ECF No. 379 at 4, 5 (emphasis in original).) The evidence and facts quite clearly show otherwise. Crew Tile failed to inform Porcelanosa of its eviction from the Denver Design Center in 2012, although claiming to operate in good faith as Porcelanosa's distributor, and although Porcelanosa had provided display materials for the showroom which it never recovered. (*See generally* Tr. at 834, 1574, 1775; ECF No. 375 at 18, ¶¶ 27–28.) Crew Tile sold potentially competing products with no effort to inform Porcelanosa or obtain its consent. (*Supra* ¶ 6.b.) Crew Tile refused to comply with Porcelanosa's repeated and persistent requests to stop representing itself as the "exclusive" Colorado distributor of Porcelanosa products. (*Supra* ¶ 4.a.) In fact, Crew Tile (operating under an earlier name) held itself out as "exclusively offering Porcelanosa," in Colorado even *before* December 2009, with no apparent legal or factual basis. (Ex. Z.) Crew Tile was also regularly delinquent in paying amounts due to Porcelanosa. (*Supra* ¶ 6.g.) This record strongly belies Crew Tile's claims that it acted with candor and good faith in its dealings with Porcelanosa before April 2013 and independently bars recovery on Crew Tile's

equitable claims.

Second, even if it the falsification of the Distributor Agreement had been Crew Tile's only misconduct, that is more than sufficient to bar any recovery in equity. The general rule that the relevant improper conduct must "relat[e] in some significant way to the claim," *Salzman*, 996 P.2d at 1269, does not call for the strict chronological analysis for which Crew Tile argues. Under Crew Tile's theory, a party that was entitled to equitable relief at any time in the past could never be later barred from recovery by "unclean hands," no matter how egregious or closely related to the relevant facts the later conduct had been. Crew Tile cites no authority adopting such a blanket rule regarding timing, a rule which in the Court's view would ill serve public policy. To the contrary, the doctrine of unclean hands gives "wide range to the equity court's use of discretion in refusing to aid the unclean litigant. It is not bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion." *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814–15 (1945). Having presided over the entire trial, and heard all the evidence, the Court has little trouble finding, in its discretion, that Crew Tile's misconduct was inextricably intertwined with its claims against Porcelanosa, and as a consequence, Crew Tile's claims are barred by the doctrine of unclean hands.

2. An Award for Crew Tile Would Contradict the Jury's Findings

In addition, an award in Crew Tile's favor would be inconsistent with the jury's verdict. The jury both rejected Crew Tile's breach of contract claim, and also found that Crew Tile, Ryan Davis, and Darlyne Davis had together committed the tort of abuse of process. There is simply no way to square those jury findings with granting Crew Tile

an award in equity.

"Under well settled principles, when a plaintiff brings both legal and equitable claims in the same action, the Seventh Amendment right to jury trial on the legal claims must be preserved by trying those claims first (or at least simultaneously with the equitable claims), and the jury's findings on any common questions of fact must be applied when the court decides the equitable claims." *Colo. Visionary Acad. v. Medtronic, Inc.*, 397 F.3d 867, 875 (10th Cir. 2005). The Court must "giv[e] due effect to any findings necessarily implicit in a general verdict." *Id.*

Although the jury did not return a special verdict or make enumerated findings as the Court has done above, the Court still must give effect to the jury's general verdict and necessarily implied findings. *Id.*[9] The Court sees no way Crew Tile could prevail on its claim for unjust enrichment/*quantum meruit* given the jury's findings and rejection of Crew Tile's positions on both claims. The jury unanimously agreed either that there never was a valid contract between the parties or, at a minimum, that Crew Tile materially breached any contract it had with Porcelanosa. Further, the jury found Crew Tile's own breach of contract claim was brought "not for the proper legal purpose for which such process is used, in that Crew Tile's claim was devoid of reasonable factual support," and that Crew Tile had acted intentionally and to Porcelanosa's detriment.

---

[9] No party requested a special verdict enumerating elements of any claim, or that the jury should return enumerated findings of fact. (*See* ECF No. 261 at 43–46; ECF No. 265.)

(ECF No. 343 at 34, 45.)[10] Any of these jury findings, either singly or in any one of a number of combinations, necessarily precludes recovery in equity by Crew Tile.

**B. Veil-Piercing / Alter Ego Liability**

Porcelanosa argues that "the Alter Ego Defendants (*i.e.,* G&D Davis Holdings, LLC, the Radicchio Domestic Trust, and the Stardust Domestic Trust) are the alter egos of Crew Tile, Ryan A. Davis and Darlyne A. Davis." (ECF No. 375 at 7.) Porcelanosa also argues for "reverse veil piercing," alleging that "[b]y divesting their assets to the Alter Ego Defendants, Ryan A. Davis and Darlyne A. Davis intentionally sheltered their individual assets. As a result, Ryan A. Davis and Darlyne A. Davis are likely incapable of satisfying debts owed by each individually and by Crew Tile." (ECF No. 375 at 9.) Porcelanosa therefore asks the Court to impose liability on each of the identified "Alter Ego Defendants." (*Id.* at 8–9.)

"Traditional piercing penetrates the corporate veil and imposes liability on individual shareholders for the obligations of the corporation." *In re Phillips*, 139 P.3d 639, 644 (Colo. 2006). "Individual liability is appropriate when the corporation is merely the alter ego of the shareholder, and the corporate structure is used to perpetuate a wrong." *Id.* (citations omitted). Although only recognized in "extraordinary circumstances," when it is appropriate, "courts may ignore the independent existence of

---

[10] Although Crew Tile would also have had to prove Porcelanosa materially breached the terms of the Distributor Agreement to prevail on its breach of contract claim, it was not materially disputed at trial that Porcelanosa's actions would have been in violation of the Distributor Agreement, *if* it had been a valid and enforceable contract between the parties. Moreover, if there *was* a contract between the parties, then Crew Tile's equitable claims necessarily fail as result. *Pulte Home Corp., Inc. v. Countryside Cmty. Ass'n, Inc.*, 382 P.3d 821, 833 (Colo. 2016) ("A party generally cannot recover for unjust enrichment . . . where there is an express contract addressing the subject of the alleged obligation to pay.").

the business entity and pierce the corporate veil to achieve an equitable result." *Id.*

Relatedly, "[r]everse piercing occurs when a claimant seeks to hold a corporation liable for the obligations of an individual shareholder." *Id.* "Two types of reverse piercing exist: inside and outside claims." *Id.* As relevant here, "[o]utside reverse piercing claims occur when a corporate outsider 'pressing an action against a corporate insider seeks to disregard the corporate entity [and] to subject corporate assets to the claim' or when an outsider 'with a claim against a corporate insider seeks to assert that claim against the corporation in an action between the claimant and the corporation.'" *Id.* at 645 (quoting Gregory S. Crespi, *The Reverse Pierce Doctrine: Applying Appropriate Standards*, 16 J. Corp. L. 33, 55 (1990)). In other words, "[o]utside reverse piercing actions involve a corporate outsider seeking to obligate a corporation for the debts of a dominant shareholder or other corporate insider." *Id.*

"Both types of piercing strive to achieve an equitable result." *Id*. Under either theory, Colorado courts consider three factors: (1) whether the corporate entity is the alter ego of the third party, such that the corporation is a "mere instrumentality" for the third party and a "unity of interest" exists such that both entities may be considered one; (2) whether justice requires disregarding the corporate form "because the corporate fiction was used to perpetrate a fraud or defeat a rightful claim"; and (3) "whether an equitable result will be achieved by disregarding the corporate form and holding the [third party] personally liable for the acts of the corporation." *Id.* at 644, 646. "A claimant seeking to pierce the corporate veil must make a clear and convincing showing that each consideration has been met." *Id.* at 644; *Swinerton Builders v. Nassi*, 272 P.3d 1172, 1177 (Colo. App. 2012).

As to the first of these three considerations (whether the corporate entity is an "alter ego" of the other party), "[a]n alter ego relationship exists when the corporation is a 'mere instrumentality for the transaction of the shareholders' own affairs, and there is such unity of interest in ownership that the separate personalities of the corporation and the owners no longer exist.'" *Phillips*, 139 P.3d at 644 (quoting *Krystkowiak v. W.O. Brisben Co.*, Inc., 90 P.3d 859, 867 n.7 (Colo. 2004)).

> In establishing whether such unity of interest exists as to disregard the corporate fiction and treat the corporation and shareholder as alter egos, courts consider a variety of factors, including whether (1) the corporation is operated as a distinct business entity, (2) funds and assets are commingled, (3) adequate corporate records are maintained, (4) the nature and form of the entity's ownership and control facilitate misuse by an insider, (5) the business is thinly capitalized, (6) the corporation is used as a mere shell, (7) shareholders disregard legal formalities, and (8) corporate funds or assets are used for noncorporate purposes.

*Id.* at 644. "These factors reflect the underlying principle that the court should only pierce when the corporate form has been abused." *Id.*

Since Ryan Davis and Darlyne Davis are already liable individually under the jury's verdict, Porcelanosa's veil-piercing arguments are unnecessary and therefore denied to the extent they seek a duplicative basis for individual liability against Ryan or Darlyne Davis. *Floyd v. I.R.S.*, 151 F.3d 1295, 1300 (10th Cir. 1998) ("[D]isregard of the corporate form is an equitable remedy. As a consequence, it is appropriately granted only in the absence of adequate remedies at law."). Therefore, the relevant determinations here are whether any of the additional entities or their owners *other than* Ryan and Darlyne Davis should be held liable in equity, including whether Glenn Davis

might be liable as an owner of one or more of the entities identified, despite the lack of evidence showing he was individually culpable.[11]

1. Crew Tile

Porcelanosa's overall veil-piercing theory pursues the assets of the "alter ego" entities, given its fear that Crew Tile, Ryan Davis, and Darlyne Davis will prove not to own assets sufficient to satisfy Porcelanosa's judgment against them. (ECF No. 375 at 7, 9.) Porcelanosa does not *appear* to be advancing a claim of traditional veil-piercing to make the owners of Crew Tile liable. (*See id.*) Given the lack of a "clear and convincing" showing, the Court rejects such a claim to any extent it is asserted.

While the record may reflect improper corporate records or abuse of formalities by Crew Tile, a preponderance of the evidence shows its shareholders are (or were) Ryan Davis and Mr. Perry. Veil-piercing to impose liability against Ryan Davis is unnecessary and improper, since he is already personally liable. *Floyd*, 151 F.3d at 1300. As to Mr. Perry, Porcelanosa does not appear to seek liability against him, and its veil-piercing arguments do not mention him. (*See* ECF No. 375 at 6–10.) Mr. Perry has never been a named defendant or served process, is only a minority shareholder, and Porcelanosa does not claim he participated in Crew Tile's tortious acts. Porcelanosa has not met the burden of showing that veil-piercing liability should attach to Mr. Perry, or to any other unidentified shareholders of Crew Tile Distribution, Inc.

---

[11] The Court entered Judgment as a Matter of Law against Porcelanosa's pending claims against Glenn Davis, ruling that insufficient evidence had been introduced to hold him liable on Porcelanosa's claims of abuse of process or civil conspiracy. (ECF No. 341; Tr. at 2167.) The Court's ruling on equitable claims also reflects its determination that Porcelanosa introduced insufficient evidence to hold Glenn Davis liable.

2. Paradigm

The Court finds that reverse veil piercing *is* appropriate to make Paradigm liable for the obligations of Ryan Davis, Darlyne Davis, and Crew Tile. All of the relevant considerations favor imposing alter ego liability based on or reverse veil-piercing.

First, the record makes clear that Paradigm was created and operated as an alter ego to Crew Tile, and for the Davises to the extent they were liable for Crew Tile's debts and sought to evade them by using Paradigm as an alter ego. The Davises disregarded virtually all corporate formalities, operating Paradigm and Crew Tile as an interchangeable single entity, commingled their funds and assets, structured the ownership and control to facilitate misuse, and used Paradigm's funds and assets for noncorporate purposes by using the names, e-mails, bank accounts, and essentially all assets of the two entities interchangeably, keeping a single set of books and a single bank account, and acknowledging the two entities operated as one.

Second, the acknowledged reason for diverting payments from Crew Tile to Paradigm (*i.e.*, commingling of funds) was to evade the garnishment of Crew Tile's bank account and thereby defeat payment of a rightful claim. While the Davises characterize their actions as being "for [their] convenience" (*see* Tr. at 951), it is manifestly obvious to the Court that Paradigm was created and operated "to perpetrate a fraud or defeat a rightful claim." *See Phillips*, 139 P.3d at 644.

Third, an equitable result will be achieved by holding Paradigm liable for the obligations of Ryan Davis, Darlyne Davis, and Crew Tile in this action. The Davises themselves acknowledged operating Paradigm and Crew Tile as one and the same, and this conduct was bound up in the course of their misrepresentations as to their

relationship with Porcelanosa and their efforts to evade Crew Tile's obligations. In the circumstances of this case, where each of Ryan Davis, Darlyne Davis, and Crew Tile are liable for a tort against Porcelanosa, and where they purposefully used Paradigm and Crew Tile interchangeably in their dealings with Porcelanosa, Paradigm should be held equally liable for the jury's judgment in Porcelanosa's favor.[12]

3. Other "Alter Ego" Entities

As to the other "alter ego" entities, including named CounterDefendant G&D Davis Holdings LLC, and non-parties, the G&D Davis Holdings Trust, the Radicchio Trust, and the Stardust Trust, Porcelanosa has not met its burden of making a "clear and convincing" showing to support its request for reverse veil piercing or for any other theory of "alter ego" liability.

Initially, while G&D Davis Holdings LLC and Paradigm were named and added as parties to this action, none of the other entities (including the Radicchio Trust, the Stardust Trust, or the G&D Davis Holdings) against which Porcelanosa is evidently trying to impose liability were ever named or added as parties to this actions. (*See generally* ECF No. 132.) These other entities, although described in a few parts of Porcelanosa's pleading as "alter ego defendants," were not enumerated as parties and were never included in the caption on any of Porcelanosa' filings. (*Id.*; *see also* ECF No. 250.) More importantly, so far as the Court's review of the docket reveals, these additional entities were never served with process in this action and have never

[12] To any extent Porcelanosa seeks traditional veil piercing to make the owners of Paradigm liable as owners, that request is rejected for the same reasons the Court rejects any traditional veil piercing claim as to Crew Tile. *See* Part III.B.1, *supra*.

appeared to have their interests represented. In short, although the CounterDefendants do not raise this issue the Court has serious doubt that it has obtained jurisdiction over these entities or could enter judgment against them. *See generally* Fed. R. Civ. P. 4(c) & 5(a)(1)(B).

Regardless, Porcelanosa has not met its burden to show entitlement to veil piercing or alter ego liability as to any entity other than Paradigm. Veil piercing is only appropriate in "extraordinary" circumstances, and requires a "clear and convincing" showing by the party requesting it. *In re Phillips*, 139 P.3d 639, 644 (Colo. 2006). The evidence introduced at trial by Porcelanosa fell well short of discharging this burden.

The record reflects that the other entities were all created around the same time in 2012, with the assistance of the same attorney who represented the Davises in their dispute with the Denver Design Center. While the timing and relationship of these actions, as well as the testimony of Glenn Davis regarding their origins, might support a finding that these entities were created in part to shelter certain assets (including Glenn and Darlyne Davis's residence) from the Denver Design Center's judgment, that is the most the evidence could show. No evidence supports a finding that such asset protection was fraudulent or improper, rather than a permissible use of these legal means to manage and protect assets, or for estate planning. Moreover, to the extent these entities were created in response to the Denver Design Center judgment, that obligation is only tangentially related to the present liability to Porcelanosa.

Further, unlike Paradigm, essentially no evidence was introduced to establish what assets these entities hold, or reflecting impropriety in their recordkeeping, finances, or in the observance of other formalities. Other than establishing that they

were created at the same time and used Glenn and Darlyne Davises' residential address, the record is mostly silent as to these entities. Porcelanosa therefore cannot meet its burden of a clear showing that these entities were no more than "alter egos" or "mere instrumentalities" of the Davises or any other entity.

4. Glenn Davis

As with veil piercing of Crew Tile, Porcelanosa's briefing does seem to advance a separate argument that Glenn Davis should be individually liable, other than the veil-piercing theories addressed above. Only for purposes of clarity, and consistent with the Court's grant of judgment as a matter of law at trial, *supra* note 10, the Court reiterates that Glenn Davis is not individually liable in this action.

**C. Attorneys' Fees**

Porcelanosa also requests an award of attorneys' fees pursuant to the Court's "inherent equitable power to sanction" Crew Tile and the Davises' conduct. (ECF No. 375 at 10–11.) Although the Court is troubled by the evident misuse of judicial processes in this case, it rejects Porcelanosa's request for two reasons.

First, Porcelanosa has not made a sufficient showing to support an award of fees. Porcelanosa's opening argument on this point spans less than a page of briefing. (ECF No. 375 at 14–15.) It nowhere identifies what amount of attorneys' fees Porcelanosa might actually be requesting, nor includes argument or evidence showing its hourly or total amount of fees were reasonable. (ECF No. 375 at 14–15.) Among other shortcomings, Porcelanosa's request falls short of the requisite showing of "but-for" causation, under which a party seeking a fee award as a sanction may recover "only the portion of his fees that he would not have paid but for the misconduct."

*Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178, 1187 (2017). By failing to make any factual or evidentiary submission, Porcelanosa has not met this requirement. The Court will not award fees on such a blank record.[13]

Second, an award of fees here would be contrary to the jury's verdict. At trial, Porcelanosa was entitled to seek recovery of its attorneys fees as part of its request for consequential damages for abuse of process, and Porcelanosa did seek such a recovery. (*See* ECF No. 343 at 47.) However, Porcelanosa introduced only a bare minimum of evidence regarding its claimed damages. The only evidence admitted was the testimony of Porcelanosa's corporate witness, Mr. Manuel Prior, that Porcelanosa's internal costs in investigating and defending Crew Tile's claim were "around . . . $460,000," and that its costs including attorneys' fees had been "something close to $1.6 million." (Tr. at 1825.) After hearing this testimony, the jury awarded Porcelanosa only $460,000. (ECF No. 355.) This amounts to a clear rejection of Porcelanosa's claim for the larger amount, including its attorneys' fees, reflecting a jury finding that Porcelanosa failed to discharge its burden of proof on its request for attorneys' fees. The Court will not invoke its inherent authority to grant the same request for attorneys' fees that the jury already rejected. *Cf. Colo. Visionary Acad.*, 397 F.3d at 875.

## IV. CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

---

[13] For example, Porcelanosa makes no attempt to distinguish the amount of fees it incurred in defending against Crew Tile's sham claims, and therefore as a consequence of Crew Tile's actions, as opposed to the amount of fees attributable to prosecuting Porcelanosa's own counterclaims, including those which the Court found lacked legal and/or evidentiary support at the summary judgment phase.

1. Judgment is entered in favor of all Defendants and against Plaintiff on all of Plaintiff's equitable claims, including its claim(s) for unjust enrichment/*quantum meruit*;

2. Judgment is entered in favor of CounterClaimants and against CounterDefendant Paradigm Tile & Stone Distributors, LLC on CounterClaimants' claims for declaratory judgment and piercing the corporate veil, as follows:

   a. The Court DECLARES that CounterDefendant Paradigm Tile & Stone Distributors, LLC is and was at relevant times an alter ego of CounterDefendants Crew Tile Distribution, Inc., Ryan A. Davis, and Darlyne A. Davis;

   b. Paradigm Tile & Stone Distributors, LLC is therefore jointly and severally liable for the liabilities in this action of CounterDefendants Crew Tile Distribution, Incorporated; Ryan A. Davis' and Darlyne A. Davis;

3. Judgment is entered against CounterClaimants and in favor of all CounterDefendants *other than* Paradigm Tile & Stone Distributors, LLC on CounterClaimants' equitable claims for declaratory judgment and piercing the corporate veil;

4. Defendants'/CounterClaimants' request for an award of attorneys fees as a sanction pursuant to the Court's inherent authority is DENIED;

5. Consistent with the foregoing and with the jury's verdict (ECF No. 355), the Clerk shall enter Final Judgment in this matter, making CounterDefendants Crew Tile Distribution, Incorporated; Paradigm Tile & Stone Distributors, LLC; Ryan A.

Davis; and Darlyne A. Davis jointly and severally liable to CounterClaimants in the amount of $460,000.00.

Dated this 2nd day of November, 2017.

BY THE COURT:

William J. Martínez
United States District Judge